No. 22-20463

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————————

BMC SOFTWARE, INC.,

*Plaintiff-Appellee/Cross-Appellant*,

v.

INTERNATIONAL BUSINESS MACHINES CORPORATION,

*Defendant-Appellant/Cross-Appellee*.

———————————

On Appeal from the United States District Court
for the Southern District of Texas
No. 4:17-cv-2254

———————————

## BRIEF FOR DEFENDANT-APPELLANT/CROSS-APPELLEE
## INTERNATIONAL BUSINESS MACHINES CORPORATION

———————————

R. PAUL YETTER
CONSTANCE H. PFEIFFER
REAGAN W. SIMPSON
YETTER COLEMAN LLP
811 Main Street
Suite 4100
Houston, TX 77002

PAUL D. CLEMENT
ERIN E. MURPHY
ANDREW C. LAWRENCE
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for International Business Machines Corporation*

January 9, 2023

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate their possible recusal or disqualification:

1. No publicly held company owns 10% or more of stock of Appellant/Cross-Appellee International Business Machines Corporation (IBM). In November 2021, IBM spun off its managed infrastructure services business as a new independent company, Kyndryl Holdings, Inc (Kyndryl). Kyndryl has stated in securities filings that it may retain a financial interest in the outcome of this litigation. A group of insurers also has a financial interest in the outcome of this litigation.

2. IBM is represented in the Fifth Circuit by:

R. PAUL YETTER
CONSTANCE H. PFEIFFER
REAGAN W. SIMPSON
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002

PAUL D. CLEMENT
ERIN E. MURPHY
ANDREW C. LAWRENCE
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, Virginia 22314

Counsel who represented IBM in the district court proceedings are:

R. PAUL YETTER
REAGAN W. SIMPSON
TIMOTHY S. MCCONN
GRANT B. MARTINEZ
YETTER COLEMAN LLP
811 Main Street
Suite 4100
Houston, Texas 77002

RICHARD I. WERDER, JR.
RACHEL E. EPSTEIN
DONALD J. REINHARD, II
QUINN EMANUEL
URQUHART & SULLIVAN, LLP
51 Madison Avenue
22nd Floor
New York, New York 10010

EMILY SMITH
QUINN EMANUEL
URQUHART & SULLIVAN, LLP
711 Louisiana Street
Suite 500
Houston, Texas 77002

3. Plaintiff-Appellee/Cross-Appellant BMC Software, Inc. (BMC) is

represented in the Fifth Circuit by:

SEAN GORMAN
WARREN W. HARRIS
JEFFREY L. OLDHAM
BRACEWELL LLP
711 Louisiana Street
Suite 2300
Houston, Texas 77002

Counsel who represented BMC in the district court proceedings are:

SEAN GORMAN
CHRISTOPHER L. DODSON
TIMOTHY R. GEIGER
ANDREW W. ZEVE
KYLE A. MASON
BRACEWELL LLP
711 Louisiana Street
Suite 2300
Houston, Texas 77002

s/Paul D. Clement
Paul D. Clement

*Counsel of Record for Defendant-Appellant/Cross-Appellee*

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellant/Cross-Appellee International Business Machines Corporation (IBM) respectfully requests oral argument. This appeal arises out of a $1.6 billion damages award that implicates significant issues of New York contract law and Texas tort law. IBM respectfully submits that oral argument would assist the Court in resolving the important issues presented.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS.......................................................... i

STATEMENT REGARDING ORAL ARGUMENT ................................................. iv

TABLE OF AUTHORITIES............................................................................ vii

INTRODUCTION ........................................................................................ 1

JURISDICTIONAL STATEMENT ................................................................. 5

STATEMENT OF THE ISSUES ................................................................... 6

STATEMENT OF THE CASE....................................................................... 6

    A.    Factual Background........................................................... 6

    B.    Procedural History.......................................................... 12

SUMMARY OF ARGUMENT....................................................................... 21

STANDARD OF REVIEW ........................................................................... 25

ARGUMENT .............................................................................................. 26

I.     IBM Did Not Breach §5.4 By Replacing BMC Software At AT&T's Request—And Did Not Inflict Anything Approaching $717 Million In Damages By Any Breach. ...................................................... 26

    A.    Section 5.4 Authorized IBM to Comply With Customer-Directed Requests to Replace BMC Software With IBM Software.............................................................................. 27

    B.    The District Court's $717 Million Damages Award Is Radically Divorced From Any Viable Theory of Damages. .............. 32

II.    The District Court's Fraudulent-Inducement Holding Is Flatly Inconsistent With Texas Tort Law. ................................................. 42

    A.    IBM Made No Knowing Misrepresentation. ..................................... 43

    B.    BMC Could Not Have Justifiably Relied on Any Purported Misrepresentation. .......................................................... 48

     C.     IBM's Purported Fraud Did Not Cause Any Injury, Let Alone Justify an Excessive $717 Million Punitive-Damages Award. .......... 50

III.    The $1.6 Billion Award Is Barred By The Contract's Unambiguous Damages Limitations. .................................................................... 52

CONCLUSION ...................................................................................... 57

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases**

*172 Van Duzer Realty Corp.*
*v. Globe Alumni Student Assistance Ass'n, Inc.*,
25 N.E.3d 952 (N.Y. 2014) ........................................................... 41, 42

*Arete Partners, L.P. v. Gunnerman*,
594 F.3d 390 (5th Cir. 2010) .................................................................47

*Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*,
590 S.W.3d 471 (Tex. 2019) .................................................................48

*BDO Seidman v. Hirshberg*,
712 N.E.2d 1220 (N.Y. 1999) ..............................................................31

*Bennett v. Grant*,
525 S.W.3d 642 (Tex. 2017) .................................................................52

*Bennett v. Reynolds*,
315 S.W.3d 867 (Tex. 2010) .................................................................52

*Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*,
572 S.W.3d 213 (Tex. 2019) ............................................ 44, 50, 55, 56

*Bradford v. Vento*,
48 S.W.3d 749 (Tex. 2001) ...................................................................47

*Brushton-Moira Cent. Sch. Dist. v. Fred. H. Thomas Assocs., P.C.*,
91 N.Y.2d 256 (1998)............................................................................33

*Calico Cottage, Inc. v. TNB, Inc.*,
2014 WL 4828774 (E.D.N.Y. Sept. 29, 2014)....................................32

*Consol. Rail Corp. v. MASP Equip. Corp.*,
67 N.Y.2d 35 (1986)..............................................................................42

*Deloach Marine Servs., L.L.C. v. Marquette Transp. Co., L.L.C.*,
974 F.3d 601 (5th Cir. 2020).................................................................25

*Design Strategy Corp. v. Knack Sys., LLC*,
2007 WL 4562926 (S.D.N.Y. Dec. 18, 2007)......................................32

*Donohue v. Cuomo*,
  38 N.Y.3d 1 (2022).......................................................................27

*Eni US Operating Co., Inc.*
  *v. Transocean Offshore Deepwater Drilling, Inc.*,
  919 F.3d 931 (5th Cir. 2019)...............................................36

*Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*,
  960 S.W.2d 41 (Tex. 1998) ...................................................44

*Freund v. Wash. Square Press, Inc.*,
  34 N.Y.2d 379 (1974)............................................................33

*Gen. Cap. Grp. Beteligungsberatung GMBH v. AT&T*,
  407 S.W.3d 507 (Tex. App.—Dallas 2013) ...................50

*Grant Thornton LLP v. Prospect High Income Fund*,
  314 S.W.3d 913 (Tex. 2010) ...................................... 48, 49

*Horizon Health Corp. v. Acadia Healthcare Co.*,
  520 S.W.3d 848 (Tex. 2017) .................................................52

*JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*,
  546 S.W.3d 648 (Tex. 2018) ...................................... 48, 49

*Kalisch-Jarcho Inc. v. City of New York*,
  58 N.Y.2d 377 (1983).................................................... 54, 55

*Kariuki v. Tarango*,
  709 F.3d 495 (5th Cir. 2013)...............................................25

*La. Generating, LLC v. Ill. Union Ins. Co.*,
  831 F.3d 618 (5th Cir. 2016)...............................................30

*Lodging Sols., LLC v. Miller*,
  2020 WL 6875255 (S.D.N.Y. Nov. 23, 2020)...................32

*Loughlin v. Meghji*,
  186 A.D.3d 1633 (N.Y. App. Div. 2020) ..........................33

*Mercedes-Benz USA, LLC v. Carduco, Inc.*,
  583 S.W.3d 553 (Tex. 2019) ............................... 48, 49, 52

*Meyer v. Cathey*,
   167 S.W.3d 327 (Tex. 2005) ..............................................................47

*Miga v. Jensen*,
   96 S.W.3d 207 (Tex. 2002) ................................................................47

*Motorola Credit Corp. v. Uzan*,
   388 F.3d 39 (2d Cir. 2004)................................................................52

*Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*,
   273 F.Supp.2d 436 (S.D.N.Y. 2003) ................................................55

*Nomura Home Equity Loan, Inc., Series 2006-FM2
   v. Nomura Credit & Cap., Inc.*,
   92 N.E.3d 743 (N.Y. 2017) ...............................................................28

*Oracle Corp. v. SAP AG*,
   765 F.3d 1081 (9th Cir. 2014).............................................................41

*Rocanova v. Equitable Life Assurance Soc'y of U.S.*,
   83 N.Y.2d 603 (1994)........................................................................54

*S. Union Co. v. City of Edinburg*,
   129 S.W.3d 74 (Tex. 2003) ...............................................................44

*Schlumberger Tech. Corp. v. Swanson*,
   959 S.W.2d 171 (Tex. 1997) ..............................................................55

*Sears, Roebuck & Co. v. Meadows*,
   877 S.W.2d 281 (Tex. 1994) ..............................................................43

*Sekhar v. United States*,
   570 U.S. 729 (2013)..........................................................................23

*Tony Gullo Motors I, L.P. v. Chapa*,
   212 S.W.3d 299 (Tex. 2006) .......................................................44, 55

*Trianco, LLC v. IBM*,
   466 F.Supp.2d 600 (E.D. Pa. 2006) ................................................40

*Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*,
   41 N.Y.2d 420 (1977)..................................................................41, 42

**Other Authorities**

22 N.Y. Jur. 2d *Contracts* §265 (2d ed. 2022) ..........................................................54

36 N.Y. Jur. 2d *Damages* §32 (2d ed. 2022) ............................................................33

*Covenant*, Black's Law Dictionary (11th ed. 2019) ..................................................31

*Discontinue*, Merriam-Webster, https://bit.ly/3Xg4W5x..........................................27

*Displace*, Merriam-Webster, https://bit.ly/3V6GG4b...............................................27

KKR & Co. Inc., Annual Report 166 (Form 10-K) (Dec. 31, 2021),
 https://bit.ly/3X0gEAq...............................................................................................7

KKR, *KKR Portfolio*, https://bit.ly/3Od68CZ ............................................................6

Scalia & Garner, *Reading Law* (2012)......................................................................27

# INTRODUCTION

This case involves a judgment for $1.6 billion in damages—among the largest awards in a commercial dispute in U.S. history—that is riddled with errors. International Business Machines Corporation (IBM) and BMC Software, Inc. (BMC) develop competing software for mainframe computers. For years, IBM also had a unit that provided "IT outsourcing" services, through which it helped clients keep their mainframes operational using software (including BMC software) that the clients licensed or developed. IBM and BMC thus always had a complex relationship. While BMC acknowledged that IBM could service BMC software, as it did for all other software providers, the parties agreed that IBM would not try to lure a shared customer over to IBM software by using confidential information about BMC software acquired in IBM's capacity as IT outsourcer. But IBM consistently rejected any suggestion that BMC could preclude it from executing *customer*-initiated requests to replace unwanted BMC software with IBM software.

To address that dynamic, the parties' contracts dating back to 2008 provided that, while IBM could not "displace" an IT-outsourcing customer's BMC software with IBM software, IBM could "discontinue" an IT-outsourcing customer's BMC software "for other valid business reasons." Although the parties agreed that this provision limited IBM in certain respects and authorized it in others, they disagreed about the scope of the limits and authorizations. While BMC took the position that

the provision prohibited IBM from *ever* replacing BMC software with its own, IBM consistently told BMC that the provision allowed IBM to execute a customer-initiated decision to discontinue BMC software in favor of IBM's. And IBM did exactly that—with BMC's knowledge—multiple times before the parties renegotiated their contract in 2015.

The scope of this "non-displacement" provision featured prominently in those negotiations. Unhappy with IBM's interpretation, BMC tried to get IBM to remove the "other valid business reasons" language, and to agree to purchase licenses from BMC if it ever replaced BMC software with IBM software again. IBM, in turn, tried to get BMC to eliminate the provision altogether. Ultimately, neither party got everything it wanted. They instead compromised by carrying over the disputed provision in its prior form, while confining its application to only 54 BMC customers—including AT&T.

Consistent with its long-standing view that customer-initiated changeovers were permissible, IBM obliged when AT&T, for cost and efficiency reasons, asked IBM to remove its BMC software and instead use a combination of IBM and third-party software that AT&T had previously licensed and was already using in parts of its business. BMC, in turn, predictably objected, and ultimately filed this lawsuit alleging that IBM not only breached the 2015 contract, but somehow fraudulently

induced BMC to enter that contract simply by carrying over the hotly disputed non-displacement provision into the 2015 agreement.

Through a series of deeply flawed rulings, the district court adopted *both* of BMC's theories, concluding that IBM breached the parties' contract—supposedly causing a whopping $717 million in damages for the loss of a customer account worth only a small fraction of that amount—while *also* fraudulently inducing BMC to enter that windfall-generating contract—again supposedly causing the exact same $717 million in damages. While the court acknowledged that BMC could not recover the same compensatory damages twice, it nonetheless awarded BMC the second $717 million as *punitive* damages, even though the parties' agreement prohibits punitive damages. The ultimate result is an eye-popping $1.6 billion judgment (after prejudgment interest) for the loss of an AT&T account that, by BMC's own calculations, generated just $5.6 million in profits annually and at most $100 million in perpetuity, and that the district court found BMC would have lost inevitably because the decision to replace BMC software was initiated by AT&T, not IBM.

That $1.6 billion judgment defies law, fact, and logic. The contract between IBM and BMC expressly authorized IBM to discontinue BMC software "for other valid business reasons," and complying with a customer request that IBM neither initiated nor encouraged is plainly such a reason. Even if complying with a

customer-initiated request were somehow a breach, damages would be minimal because, as the district court recognized, the contract allowed AT&T to execute its desired switchover without IBM's ministerial assistance in removing the BMC software.  The district court generated its inflated damages award only by reading into the contract an obligation that IBM pay more than $700 million in claimed license fees as damages for having helped AT&T execute the switchover.  That license-fees-as-damages theory has no grounding in the contract—indeed, IBM successfully *resisted* BMC's effort to insert such a provision.  The contract instead had the kind of sensible limits on windfall-damage recoveries one would expect from a contract between sophisticated parties.

The district court's fraudulent-inducement ruling is even more puzzling.  First, if one accepts the court's conclusion that the contract entitled BMC to $717 million for the loss of an account that BMC says generated just $5.6 million in annual profits, the notion that BMC was fraudulently induced into entering that deal-of-the-century is absurd on its face.  But even if the outsized breach-of-contract award is overturned, BMC's fraudulent-inducement theory fails on its own terms.  IBM made no misrepresentation by signing an agreement that included the non-displacement provision while telling BMC repeatedly that IBM did not share BMC's interpretation of that hotly and openly disputed provision.  And BMC could not possibly have relied on the contract as an indication that IBM had suddenly repudiated its long-

held and oft-expressed interpretation of that provision when IBM was telling it exactly the opposite. Indeed, given the parties' open-and-notorious disagreement about the scope of the provision, BMC's fraudulent-inducement claim fails on every element. And there is no valid basis for the court's $717 million punitive-damages award, which simply duplicates its flawed license-fees-as-damages theory.

On top of all that, the outsized damages award violates the contract's express limits on recoverable damages. The sophisticated parties here agreed to strict limits on compensatory damages and foreclosed punitive damages in a studied effort to avoid this commercial contract becoming a font of unpredictable damages. The district court eviscerated those limits in derogation of New York and Texas law, while actually using one of the limits to generate its outsized award. That double-standard exemplifies the highly skewed rulings that converted a routine commercial dispute into a billion-and-a-half-dollar windfall. This Court should reverse that decision and restore order to commercial dealings, New York contract law, and Texas tort law.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §1332(a)(1). On September 9, 2021, the court issued an opinion resolving summary-judgment motions. ROA.3995-4006. The court issued findings of fact and conclusions of law and entered final judgment on May 30, 2022, ROA.8384-8492, and entered an

amended final judgment on August 9, 2022, ROA.10371-73.  IBM noticed an appeal

on September 7, 2022; BMC noticed a cross-appeal on September 20, 2022.

ROA.10413-15, 10425-26.  This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1.      Whether IBM breached §5.4 of the 2015 Outsourcing Attachment by

complying with AT&T's request to replace BMC software with IBM software.

2.      Whether BMC is entitled to $717 million in compensatory damages for

the alleged breach of §5.4.

3.      Whether IBM fraudulently induced BMC to execute the 2015

Outsourcing Attachment.

4.      Whether BMC is entitled to $717 million in compensatory or punitive

damages for the alleged fraudulent inducement.

5.      Whether §9 of the 2008 Master Licensing Agreement caps BMC's

compensable damages at $5 million.

6.      Whether §10 of the 2008 Master Licensing Agreement prohibits BMC

from recovering punitive damages.

## STATEMENT OF THE CASE

### A.  Factual Background

BMC is a portfolio company of the global investment firm Kohlberg Kravis

Roberts & Co. (KKR), which manages approximately half-a-trillion dollars in assets.

KKR, *KKR Portfolio*, https://bit.ly/3Od68CZ; KKR & Co. Inc., Annual Report 166

(Form 10-K) (Dec. 31, 2021), https://bit.ly/3X0gEAq. Among other things, BMC develops and licenses certain software tools for mainframe computers, which are high-performance computers used primarily by large organizations. ROA.8390.

Several competitors, including IBM, develop and sell mainframe-software tools that compete with BMC's. ROA.8391. Unlike BMC, IBM also previously provided IT-outsourcing services—*i.e.*, companies hired IBM to maintain and operate their network, computing, and software environments, even if they did not rely exclusively on IBM mainframe software.[1] ROA.8391-92. "Hundreds" of companies using BMC software contracted with IBM for such services. ROA.8393. Because IBM and BMC compete in the mainframe-software market, the agreements governing IBM's use of BMC software in its IT-outsourcing capacity included a restrictive covenant providing that, "while [IBM] cannot displace any BMC Customer Licenses with [IBM] products, [IBM] may discontinue use of BMC Customer Licenses for other valid business reasons."[2] ROA.8393-95, 8400.

While the parties had employed similar language since 2008, the precise meaning of the clause and its displace/discontinue dichotomy "has always been a contentious issue." ROA.8403. BMC maintained that the provision categorically

---

[1] In November 2021, IBM spun off its managed infrastructure services business as a new independent company, Kyndryl.

[2] The relevant agreements are in IBM's record excerpts.

barred IBM from replacing BMC software with IBM software under any circumstances. IBM, by contrast, acknowledged that the provision prohibited it from inducing a BMC customer to switch to IBM software (and from switching the software unilaterally),[3] but from the beginning, IBM consistently maintained that the "discontinue … for other valid business reasons" language allowed it to execute *customer*-initiated requests to replace BMC software with IBM software. Consistent with that reading, after the parties signed the 2008 agreement, IBM complied with the Bank of Ireland's request to replace BMC software with IBM software. ROA.8403-04. Although BMC protested that this violated the agreement, IBM disagreed because the Bank "solely and independently" decided to discontinue BMC products. ROA.8404.

Displeased with IBM's interpretation, BMC sought to remove the "other valid business reasons" language when the parties renegotiated their agreement in 2013. ROA.24063. But IBM resisted those requests to safeguard its ability to compete with other IT outsourcers that were unencumbered in executing customer-directed replacement requests. ROA.7464-65. In the end, the parties agreed to carry over the non-displacement provision from the 2008 agreement without material change.

---

[3] In an outsourcing engagement, the customer or outsourcer may have "architectural control"—*i.e.*, decisionmaking authority over what software to run. ROA.12064. Accordingly, IBM sometimes had unilateral authority to replace software. Here, AT&T retained architectural control over its environment. ROA.12062-63.

ROA.8405, 8416.  And IBM continued to perform in accordance with its stated interpretation that customer-initiated replacements were permissible.  ROA.24405-07.  For example, IBM executed National Australia Bank's request to replace BMC software with IBM software.  ROA.8407.  When BMC predictably claimed that doing so violated the non-displacement provision, IBM unsurprisingly disagreed because "acting at the customer's direction" to discontinue BMC software is "the most obvious example of a valid business reason."  ROA.24874.

By the time the parties negotiated their next agreement in 2015—which occurred at BMC's insistence years before the 2018 expiration of the 2013 agreement—BMC was acutely aware that IBM interpreted the non-displacement provision to permit compliance with customer-initiated requests.  ROA.26790 (BMC stating IBM's "interpretation of the current language '[o]ther valid business reason' … include[s] client request"); ROA.26849, 25965 (similar).  Indeed, IBM's position was communicated to the highest levels of BMC management.  ROA.26846 (BMC advising CEO and Chairman "IBM believes they can displace us" based on "a 'valid business reason' such as … Customer request"); ROA.26248, 26273 (similar).

As in 2013, BMC sought to remove the "other valid business reasons" language, and even attempted to add a specific remedy—in the form of a duty to pay for BMC software licenses—if IBM participated in a customer-initiated

replacement.  ROA.25826 (proposing the "Displacement of BMC Products with IBM products will require IBM to purchase the license and support from first access through 1 year forward").  IBM once again resisted.  ROA.7474, 26460.  Instead, it proposed removing the non-displacement language to eliminate debate about its scope once and for all.  ROA.8417-18.

Ultimately, the parties "compromise[d]" and preserved the provision substantially as it existed in 2008 and 2013, but limited its application to 54 of the hundreds of BMC customers IBM serviced.  ROA.8417-18; ROA.8422.  But as to those 54 customers, IBM and BMC agreed to continue to disagree—or, as BMC put it, "perpetuate the challenge"—about whether IBM could comply with customer-initiated replacement requests.  ROA.27190; ROA.7481, 27187-89.  In addition, IBM agreed to financial incentives, including a commitment to spend more than $150 million on BMC products.  ROA.14392-93.

The parties executed the agreement, known as the 2015 Outsourcing Attachment (2015 OA), in September 2015.  ROA.8389.  Structurally, like preceding agreements, the 2015 OA "addresse[d] the terms under which BMC grant[ed] to [IBM] the right to use [BMC software] in [IBM's] IT Services business."  ROA.8398-99.  In §1.1, it allowed IBM to "elect one of … five options regarding its use" of BMC's products, each of which referenced other sections of the agreement that governed if IBM made a particular selection:  "(a) Access and Use — (sections

5.1, 5.2, 5.3, and 5.4), (b) License Suspension — (section 5.5), (c) Customer owned Products — (sections 6, 7, and 8), (d) Mirror Order — (section 11), or (e) Shared Hosting — (section 12)." ROA.8399. While the agreement did not specify the purchase price of licenses for "Customer [*i.e.*, IBM] owned Products," §8.1 "entitled" IBM "to a minimum discount of 72% off the Listed Price." ROA.8401.

But the first and most common option, "Access and Use," permitted IBM to access and use the BMC software license already purchased by IBM's IT-services customers, making it unnecessary for IBM to purchase its own duplicative license. IBM's use of its customer's license was subject to §5.1, §5.2, §5.3, and §5.4 (and §12, which expressly prohibited IBM from installing on a "Shared Hosting Computer" BMC software that IBM used pursuant to the "Access and Use" option). In particular, §5.1 provided that "BMC will allow [IBM] to use, access, install and have operational responsibility of the BMC Customer Licenses … under the terms of the BMC Customer's license agreement with BMC for no fee … provided that the BMC Customer Licenses are used solely for the purposes of supporting the BMC Customer who owns such licenses." ROA.8401. And §5.4 contained the non-displacement provision, under which IBM "agree[d] that," for the 54 customers identified elsewhere, "while [IBM] cannot displace any BMC Customer Licenses with [IBM] products, [IBM] may discontinue use of BMC Customer Licenses for other valid business reasons." ROA.8400.

Like the outsourcing agreements before it, the 2015 OA was an attachment to the parties' 2008 Master Licensing Agreement (MLA), and the two together formed "one integrated agreement." ROA.8396-97, 8441 n.28. As is typical in agreements among sophisticated commercial enterprises, the MLA included "Disclaimer of Damages" and "Limits on Liability" provisions. The former—MLA §9—provided that "neither party" was "liable for any … punitive or consequential damages" (including "lost profits") "relating to or arising out of this agreement … irrespective of … whether such damages result from a claim arising under tort or contract law." ROA.8398. The latter—MLA §10—limited "[e]ach party's liability arising out of or related to [the MLA] agreement … to the greater of $5,000,000 or the amount paid or payable by the customer for the license to the applicable product giving rising to the claim." ROA.8398. Neither the 2015 OA nor the MLA contained what BMC tried to impose during the 2015 negotiations—a requirement that IBM purchase a BMC software license if it effectuated a customer-initiated changeover from BMC software to IBM software.

## B. Procedural History

1. AT&T has had an IT-outsourcing relationship with IBM since 1999. By 2015, due to various mergers, AT&T had three separate mainframe systems for three separate legacy businesses and used inconsistent combinations of IBM software, BMC software, and third-party software to provide similar functionality for the

various systems.  ROA.8389.  "[C]ost considerations" and "larger standardization goals" led AT&T to decide to replace its BMC software with IBM software and other third-party software, an undertaking it called "Project Swallowtail."  ROA.8418; ROA.8412, 8467.  AT&T asked IBM to assist with this transition.

Both IBM and AT&T independently assessed whether IBM could execute AT&T's request consistent with the non-displacement provision, as AT&T had signed a tripartite agreement with IBM and BMC with the same language. ROA.14470.  Both concluded IBM could do so since AT&T (not IBM) had conceived of and directed the project.  ROA.7493.  Accordingly, a few months before IBM signed the 2015 OA, it agreed with AT&T to assist with the changeover, ROA.8390, 8418.  Among other things, the project involved removing 14 BMC software products and replacing them with IBM software for which AT&T already owned licenses and was already using on one or more of its three mainframe systems. ROA.8390.  Because AT&T already owned "perpetual licenses" for the discontinued BMC software, BMC had already received full payment for the licenses, and the immediate impact on BMC was limited to the loss of less than $6 million in annual profits from providing support to AT&T.  ROA.8394, 8454, 8466, 11845-46.  IBM similarly made no new software sales because AT&T already owned all necessary perpetual IBM licenses.

2. AT&T required IBM to keep Project Swallowtail confidential. ROA.8409. But BMC eventually learned of the project and sued IBM in 2017 on the (mistaken) premise that IBM—not AT&T—had initiated the replacement. ROA.86, 28141. BMC's operative complaint—the second amended complaint—asserted 12 causes of action, including claims for allegedly breaching §1.1, §5.1, and §5.4 of the 2015 OA and fraudulently inducing BMC to execute that agreement. ROA.8385.

Although BMC initially tried (and failed) to enjoin IBM from executing the switchover, ROA.8384-85, 40197-40241, 41452-79, it never argued that the 2015 OA prohibited AT&T from discontinuing BMC software in favor of IBM software—presumably because that would raise anti-competitive concerns. BMC instead argued only that §5.4 prohibited *IBM* from executing the changeover (without purchasing a suite of licenses duplicative of the perpetual licenses AT&T desired to cease using), while conceding that AT&T could have hired a third party to accomplish that task (at no additional cost). According to BMC, because §5.4 allegedly prohibited IBM from employing an "Access and Use" license to execute even a customer-initiated changeover, any IBM breach of §5.4 also necessarily involved a breach of §1.1, which purportedly obligated IBM to select a licensing option unconstrained by §5.4's non-displacement provision. BMC therefore claimed that it could recover as damages *either* lost profits (based on the $5.6 million in lost profits on AT&T's annual-servicing payments) *or* the cost to IBM of licenses

that BMC claimed §1.1 obligated IBM to purchase.  According to BMC, moreover, it would have been entitled to more than $700 million for full, perpetual-use licenses for the BMC software that AT&T had already licensed and asked IBM to remove (and neither AT&T nor IBM would continue to use).

The parties sought summary judgment on various claims and counterclaims, while agreeing that New York law governs the contract claims and Texas law governs the tort claims.  ROA.8385-86, 8450.  The district court referred the matter to a magistrate judge, who recommended denying summary judgment to both parties.  ROA.82522-85.  Among other things, the magistrate judge viewed IBM's interpretation of §5.4 as permitting customer-initiated changeovers as "viable," but found the provision "ambiguous" and recommended further fact-finding to assess its scope.  ROA.82531-32.

The district court rejected some of the magistrate judge's recommendations in a brief opinion.  ROA.3995-4006.  Starting with §5.4, the court concluded—in two short paragraphs—that the non-displacement provision unambiguously and categorically precludes IBM from replacing a client's previously purchased BMC software with IBM software on client systems, even at the client's independent request.  ROA.3998-99.  According to the court, allowing IBM to replace BMC software with IBM software under the "discontinue" clause would create "surplusage."  ROA.3998-99.  The court thus awarded BMC summary judgment on

the §5.4 claim because "IBM displaced BMC Customer Licenses with IBM products." ROA.3999.

But the court awarded summary judgment to IBM on the §1.1 claim. As it explained, §1.1 "merely puts IBM to an election regarding how it would use BMC products in relation to its provision of IT Services at AT&T," and "IBM elected to proceed pursuant to §1.1(a): 'Access and Use — (Sections 5.1, 5.2, 5.3 and 5.4).'" ROA.4000. Whether "IBM then breached §5.4," the court continued, "does not demonstrate that IBM breached §1.1 by electing 'Access and Use.'" ROA.4000. The court denied summary judgment to both parties when it came to whether IBM breached §5.1 and its requirement that IBM use the BMC licenses solely to support AT&T. ROA.3999-4000.

Turning to damages, the court stated that BMC could "argu[e] the damage limitation provisions are unenforceable if it succeeds on its claim for fraudulent inducement." ROA.3999-4000. Furthermore, while the court's §1.1 ruling eliminated the sole basis for BMC's claim that IBM was contractually obligated to purchase its own software licenses to assist AT&T with Project Swallowtail, the court nevertheless concluded that BMC could seek lost license and support fees as "direct damages not barred by the limitation on consequential damages contained in MLA §9." ROA.3999-4000. Finally, although the court stated that the $5 million limit in MLA §10 could inform the damages ceiling, it stated that whether there is

"some other amount 'paid or payable'" "remains to be determined … at trial." ROA.4002-03.

3. After holding a bench trial, the district court concluded that IBM did not breach §5.1. ROA.8456. That provision, the court explained, required IBM to act "for the sole purpose of supporting AT&T" when accessing and using AT&T's BMC licenses, and it found that "IBM used the licenses to achieve what AT&T wanted done—and nothing more." ROA.8456.

As for the §5.4 breach (pre-determined at summary judgment), the court rejected BMC's prayer for $104.5 million in damages (premised on the assumption that AT&T would have remained a BMC software customer in perpetuity but for that purported breach) because it found that the decision to stop using BMC software came from AT&T. ROA.8466. As the court explained, BMC "failed to show that AT&T would not have removed BMC's software" with or without IBM's help, as BMC "acknowledged AT&T could have accomplished [its] strategic objectives by having a different company"—*i.e.*, anyone other than IBM—"perform the displacement." ROA.8467.

Nevertheless, the court awarded BMC a whopping $717,739,615 in damages—more than a hundred times BMC's annual profit for the displaced software—based on purportedly "unpaid" license fees for software already licensed to AT&T. ROA.8461. Although the court had already rejected BMC's claim that

IBM breached §1.1 by failing to elect a licensing option unconstrained by §5.4, it nevertheless posited that IBM "would have had to purchase the licenses and related support" for the perpetual *use* of BMC software just to execute the ministerial task of removing that software from AT&T's systems. ROA.8463-64. The court did not purport to derive that purchase requirement from IBM's affirmative contractual *obligations*. Instead, it purported to locate the obligation in MLA §10's "Limits on Liability" provision. ROA.8462. According to the court, that *limitation* to no more than the amount "payable" under an agreed-upon license somehow translated into an *obligation* to purchase an exorbitant perpetual license to execute a one-time changeover that would provide IBM with no net benefits compared to a changeover executed by a third party. And because the court viewed that obligation as an amount "payable" under hypothetical licenses, it viewed the obligation as *ipso facto* consistent with §10's damages caps.

Turning yet another contractual shield for IBM into a contractual sword for BMC, the court pegged the cost of these hypothetical licenses at more than $717 million, reasoning not only that IBM would have had to purchase full, perpetual-use licenses just to terminate BMC's software, but that a contractual entitlement to a "minimum discount of 72% off the Listed Price" for any license, ROA.8401, actually "reflect[s] definite, bargained-for prices," ROA.8464. The court reached that conclusion notwithstanding undisputed evidence that IBM routinely received

substantially greater discounts when it actually purchased licenses from BMC, and that no rational party in IBM's position would pay such exorbitant permanent-use fees solely to perform the one-time *removal* of the software when a third party unconstrained by §5.4 could accomplish that task.  ROA.12298.

While the court's combined rulings yielded a formulaic damages figure that exceeds BMC's own estimate of lost profits by 686%, the court summarily declared that its interpretation does not produce "a liquidated damages provision" or "reflect a contractual penalty."  ROA.8462 n.35.  And the court rejected IBM's argument that its reading converts §5.4 into an unenforceable restrictive covenant, deeming it sufficient that BMC has a "legitimate business interest" in precluding IBM from receiving an "unfair advantage when competing with BMC in the software business."  ROA.8469-70.

Although the court had just converted the 2015 OA into the deal-of-the-century for BMC, parlaying the loss of a $5.6-million-per-year customer into a $717 million windfall, the court proceeded to reach the puzzling conclusion that IBM "fraudulently induced" BMC to enter this sweetheart deal.  ROA.8470.  The court acknowledged that IBM had repeatedly explained to BMC that "customer-directed displacements were permissible under the OA's 'other valid business reasons' provision."  ROA.8479.  But according to the court, IBM nevertheless "made written 'material misrepresentations'" by entering an agreement in which "it promised not

to displace BMC products with its own products at [mutual] customers—including AT&T." ROA.8472. In other words, IBM made "material misrepresentations" by signing an agreement that it repeatedly told BMC it viewed as allowing IBM to assist with customer-initiated changeovers. Equally remarkable, the court concluded that BMC "justifiably relied on IBM's promise" set forth in the 2015 OA even though IBM repeatedly disabused BMC of any conceivable misperception that IBM shared BMC's reading of §5.4 and BMC itself acknowledged internally that the 2015 agreement would "perpetuate the challenge" posed by IBM's interpretation. ROA.27190. Finally, underscoring the oddity of layering a fraudulent-inducement claim on top of a *successful* breach-of-contract claim, the court concluded that the damages for BMC's fraudulent-inducement claim are identical to the damages for BMC's breach-of-contract claim: $717,739,615 in license fees purportedly owed under the contract that IBM purportedly tricked BMC into signing. ROA.8474-81.

The court acknowledged that BMC could recover $717 million in *compensatory* damages under only one claim or the other. ROA.8486-87. But it then deemed BMC "entitled" to recover the exact same amount in *punitive* damages. ROA.8485-86. While MLA §9 explicitly prohibits punitive damages, the court posited that its fraudulent-inducement ruling necessitated "suspension" of both §9 and §10's damages limits. ROA.8482-84. The court never explained how it could rely on §10 as the purported font of BMC's $717 million compensatory damages

award while simultaneously declaring that provision defunct when considering its avowed purpose of limiting liability. All told, the court awarded BMC more than $1.4 billion in damages, $168 million in prejudgment interest, and $21 million in attorney's fees and costs, yielding a total award exceeding $1.6 billion. ROA.8489, 10350.

## SUMMARY OF ARGUMENT

The district court awarded BMC $717 million in damages for a supposed contractual breach that it found did not cause BMC any demonstrated real-world injury. The court then turned around and found that IBM fraudulently induced BMC to enter a contract the court had just construed as the deal-of-the-century for BMC— entitling it to $717 million for the loss of an account that produced only $5.6 million per year in profit. And it awarded another $717 million in punitive damages for that purported inducement notwithstanding the contract's unambiguous punitive-damages bar. The end result—a $1.6 billion windfall—defies the parties' agreement, New York and Texas law, and common sense at every turn.

I. The plain terms of the parties' contract and New York contract law foreclose both BMC's claimed breach and the extravagant damages award. The text, context, and purpose of §5.4 make clear that, consistent with both AT&T's and IBM's contemporaneous views and the thrust of §5.1, IBM could execute customer-initiated requests like AT&T's without breaching the contract. The district court

barely analyzed §5.4 before rejecting the magistrate judge's contrary conclusion and declaring that §5.4 unambiguously foreclosed IBM's interpretation because it viewed the words "displace" and "discontinue" as not synonymous. But to the extent those terms differ, they do so only in a manner that allows IBM to execute *customer-driven* decisions to discontinue BMC software, while forbidding IBM from displacing BMC software on its own initiative. The court's contrary reading converts §5.4 into an unenforceable restrictive covenant, as prohibiting IBM from complying with customer-initiated requests has no nexus to BMC's legitimate interest in ensuring that IBM does not use inside information to gain an unfair advantage. That kind of restraint furthers only an illegitimate interest in restricting competition and locking customers like AT&T into using BMC products when they decide to opt for a different product.

The district court's $717 million damages award for the purported "breach" is even more egregiously wrong. BMC's sole lost-profits model rested on the dubious assumption that AT&T would have continued to use BMC software—in perpetuity, no less—absent IBM's breach. And by BMC's own telling, that measure was only about $100 million. But the district court found that BMC failed to prove that IBM's breach caused BMC to lose *any* AT&T-associated profits—precisely because *AT&T* independently decided to discontinue BMC software in favor of IBM software and could have (and would have) hired a third party unencumbered by §5.4 to execute a

switch from BMC software if IBM were contractually side-lined. The court nevertheless concluded that IBM would have had to pay $717 million in perpetual license fees for the privilege of executing a one-time switchover that BMC concedes a third party could have executed at a fraction of that cost. And the court reached that conclusion even though the contract does not specify a license rate (as opposed to a minimum discount) and IBM rebuffed BMC's effort to insert just this sort of license-fee remedy for improper "displacements" into the 2015 OA. Finally, if the contract truly obligated IBM to pay $717 million for a breach that could have been avoided by hiring a third party and caused BMC no real-world harm, it would be an obviously unenforceable penalty under New York law.

II. The district court's fraudulent-inducement determinations are incompatible with Texas tort law and common sense. The court concluded that IBM made a knowingly false and intentional misrepresentation by signing the 2015 OA while openly disclosing that it did not share BMC's reading of the disputed non-displacement provision. That "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738 (2013). Signing a contract that includes a provision with an openly and hotly disputed scope does not involve a material misrepresentation just because a court ultimately sides with the counterparty on the scope of the openly disputed provision. And BMC certainly could not have plausibly—let alone *justifiably*—relied on IBM affixing its signature to a contract as indicating IBM's

abandonment of its long-held and oft-invoked view when IBM repeatedly told BMC the opposite throughout protracted 2015 renegotiations.

On top of all that, a fraudulent-inducement claim requires proof that *the fraud itself* caused an injury that would not otherwise have occurred. BMC plainly failed to make any such showing. If the contract really entitles BMC to the extravagant damages awarded, then BMC should be thanking IBM for agreeing to it, not crying fraud. Conversely, if the breach-of-contract claim is reversed, then BMC still could not show any meaningful damages—let alone anything close to $700 million—for being induced to enter the agreement. After all, the relevant terms of the 2015 OA were identical to the 2013 OA, which would have continued to govern until 2018 absent modification—the 2015 OA changed absolutely nothing concerning IBM's services to AT&T. In addition, because the district court found that AT&T's decision to change software was its own and that it could have hired a third party to execute the changeover, agreeing to the 2015 OA is not what caused BMC to lose the AT&T account. Merely entering the contract thus did not injure BMC at all. And those fundamental causation problems aside, the district court's punitive damages award is constitutionally excessive.

III. Finally, any damages award that would otherwise be legally appropriate should have been strictly limited by the parties' agreed-upon damages caps. In a sensible effort to prevent a dispute between sophisticated commercial parties with

ongoing commercial relations from becoming a font of unpredictable and outsized liability, the parties agreed to limit their exposure in two relevant respects: MLA §9 prohibits punitive damages altogether (which requires vacating the $717 million punitive-damages award), and §10 caps any otherwise-available damages at $5 million or the amount "paid or payable" under an actual existing licensing agreement (which does not exist here). The district court thought it could ignore these freely negotiated limits by pointing to its fraud finding (while simultaneously using one of those provisions to generate BMC's license-fee damages). But no New York court has ever invalidated a limitation-of-liability provision on that basis—which is unsurprising since, in New York, a fraud claim rooted in a broken promise to perform a contract merges with the underlying breach claim. Texas courts likewise enforce limitation-of-liability clauses like §9 and §10 in the face of fraudulent-inducement claims just like BMC's. At the very least, then, the staggering $1.6 billion award cannot stand.

## STANDARD OF REVIEW

Following a bench trial, this Court reviews legal issues *de novo* and findings of fact for clear error. *Deloach Marine Servs., L.L.C. v. Marquette Transp. Co., L.L.C.*, 974 F.3d 601, 606 (5th Cir. 2020). The Court reviews grants of summary judgment *de novo*. *Kariuki v. Tarango*, 709 F.3d 495, 501 (5th Cir. 2013).

# ARGUMENT

## I. IBM Did Not Breach §5.4 By Replacing BMC Software At AT&T's Request—And Did Not Inflict Anything Approaching $717 Million In Damages By Any Breach.

The district court found as a matter of fact that AT&T asked IBM to replace BMC software with IBM software on its own accord, not because IBM instigated or encouraged that changeover. That finding should have resolved this case. Section 5.4 of the 2015 OA permitted IBM to execute a customer's decision to discontinue BMC software, and the court's finding meant that BMC lost the AT&T account because of AT&T's decision, not because of any breach *by IBM*. Moreover, once the court's breach theory is eliminated, its fraudulent-inducement theory collapses. But even if §5.4 prohibited IBM from conducting the ministerial task of effectuating a customer-initiated removal of BMC software that (as BMC concedes) another third-party IT outsourcer was free to execute, nothing in the 2015 OA or MLA provides the slightest support for the district court's conclusion that the penalty for IBM performing tasks others were free to execute was an astounding $717 million—over a hundred times BMC's annual profits from the AT&T account. Provisions that impose draconian penalties bearing no reasonable relationship to actual harm are unenforceable liquidated-damages provisions under New York law.

**A. Section 5.4 Authorized IBM to Comply With Customer-Directed Requests to Replace BMC Software With IBM Software.**

1. Under New York law, it is "well established" that "words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties manifested thereby." *Donohue v. Cuomo*, 38 N.Y.3d 1, 18 (2022). Here, text, context, and purpose confirm that §5.4 permitted IBM to comply with customer-directed requests to remove BMC software and install IBM software.

Section 5.4 provides: "Customer [*i.e.*, IBM] agrees that while Customer cannot displace any BMC Customer Licenses with Customer products, Customer may discontinue use of BMC Customer Licenses for other valid business reasons." ROA.14384. The term "displace" means "to remove from the usual or proper place" or make "obsolete," *Displace*, Merriam-Webster, https://bit.ly/3V6GG4b, while "discontinue" means to "cease to operate, administer, [or] use" or "terminate," *Discontinue*, Merriam-Webster, https://bit.ly/3Xg4W5x. Displace and discontinue thus are essentially synonymous—they both mean to get rid of something. That explains why both terms are used to address closely related actions in a single contractual provision entitled "Non-Displacement." ROA.14384; Scalia & Garner, *Reading Law* 221-24 (2012) ("The title and headings are permissible indicators of meaning.").

Other textual clues reinforce that displace and discontinue have closely related meanings in §5.4. Immediately after specifying that "[IBM] cannot displace any BMC [software]," §5.4 provides that IBM may discontinue BMC software for certain "*other*" reasons. The term "other" ties displace and discontinue together, showing that they describe the same activity done for different reasons. If displace and discontinue meant fundamentally different things, the word "other"—in fact, the entire phrase "for other valid business reasons"—would make no sense and serve no purpose. The provision would simply have said: "while [IBM] cannot displace any BMC [software] with [IBM] products, [IBM] may discontinue use of BMC [software] ~~for other valid business reasons~~." Interpreting displace and discontinue as expressing fundamentally different ideas thus would violate the bedrock rule that "a contract must be construed … so as not to render any provision 'meaningless or without force or effect.'" *Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Cap., Inc.*, 92 N.E.3d 743, 748 (N.Y. 2017).

Because displace and discontinue are used in §5.4 to describe comparable actions taken for different reasons, the critical question is *why* IBM removed BMC software. As IBM long maintained, the non-displacement clause prevented it from using information about BMC's products gained as an IT outsourcer to initiate or encourage a switch from BMC software to IBM software, but it did not prevent it from discontinuing BMC software "for other valid business reasons." And "acting

at the [mutual] customer's direction" is "the most obvious example of a 'valid business reason.'" ROA.24874. Surrounding provisions confirm that understanding. In §5.1, which §5.4 expressly references, the parties agreed that IBM is authorized to use AT&T's BMC software "solely for the purposes of supporting the BMC Customer who owns such licenses." ROA.14383. Using confidential information regarding BMC software to exploit competitive weaknesses and encourage its replacement would involve IBM impermissibly acting for its own purposes in violation of §5.1 *and* §5.4. Executing a customer-driven request to replace BMC software with other software a customer already owns, by contrast, "support[s]" the customer and violates neither provision.

That understanding accords with §5.4's undisputed purpose: "to prevent giving IBM an *unfair advantage* when competing with BMC in the software business." ROA.8469 (emphasis added). While it would be "unfair" for IBM to leverage its "first-hand insight" into "how BMC's product functioned in the AT&T environment" to lobby AT&T to switch from BMC software to IBM software, ROA.8469; ROA.8395, the court found that did not happen here. "AT&T *independently decided* to displace BMC software" with IBM software it already owned, and IBM did "nothing more" than implement "what AT&T wanted done." ROA.8447, 8456 (emphasis added). Preventing IBM from executing that AT&T-initiated request is not necessary to prevent unfair competition or unfair advantage

in the software market, and it would unnecessarily hamper competition in the IT-outsourcing market, as the IT-outsourcing providers with which IBM competed could execute such a request as readily as any other customer-initiated request.

2. The district court declared—in a single paragraph overruling the magistrate judge's conclusion that IBM's interpretation of §5.4 is "viable," ROA.82531-32—that §5.4 *unambiguously* precluded IBM from complying with an AT&T-initiated request to switch to IBM software because discontinuing something, as distinct from displacing it, forecloses "supplant[ing]" it with something else. ROA.3998. Thus, under the court's construction, discontinue covers only situations where BMC software is replaced with nothing. That is such an unrealistic scenario that not even BMC agrees that "discontinue" is so limited. ROA.2189, 23081-82. Instead, BMC repeatedly acknowledged that the principal reason any client would discontinue BMC software is to replace it with different software, and that IBM *could* replace BMC software with non-BMC software consistent with §5.4—just so long as it is not IBM software. ROA.2171 ("Section 5.4 does not prohibit IBM from displacing BMC products with non-IBM products."); ROA.2812-13. That concession, rooted in "typical business" realities, confirms that displace and discontinue are *not* mutually exclusive concepts, with discontinue strictly limited to non-replacement scenarios. *La. Generating, LLC v. Ill. Union Ins. Co.*, 831 F.3d 618, 622, 626 n.21 (5th Cir. 2016). Indeed, under BMC's theory, the only language in the 2015 OA that

could authorize IBM to replace BMC software with non-IBM, third-party software is the "discontinue" clause.

The district court expressed concern that interpreting §5.4 to permit IBM to comply with customer-initiated requests would introduce "surplusage" into §5.4 by rendering the phrase "with Customer product" superfluous. ROA.8388. But there is nothing superfluous about interpreting §5.4 to prohibit *IBM-initiated* replacements of BMC software with IBM software while allowing IBM to execute *customer-initiated* decisions to discontinue BMC software in favor of IBM products. The district court's reading, by contrast, spawns a much greater superfluity problem: By making displacement and discontinuance fundamentally different actions, it renders the phrase "for other valid business reasons" pointless.

Worse still, the court's reading converts §5.4 from a modest restriction on unfair competition into an unlawful restrictive covenant. It is undisputed that §5.4 is a restrictive covenant—specifically, a covenant not to compete. *Covenant*, Black's Law Dictionary (11th ed. 2019); ROA.41975-76. Under New York law, a restrictive covenant that is "greater than is required for the protection of [a] legitimate interest of the [business]" is "invalid." *BDO Seidman v. Hirshberg*, 712 N.E.2d 1220, 1223 (N.Y. 1999) (emphases omitted). The only legitimate interest BMC identified here is preventing IBM from receiving an "unfair advantage" by leveraging information gathered as an IT outsourcer to convince customers to

migrate to IBM products. ROA.8469. That interest is not implicated when IBM merely executes a client's *independent decision* to replace BMC software with IBM software. Because there is no "factual nexus" between BMC's asserted interest and the conduct of which it complains, it could not lawfully enforce §5.4 even if that provision meant what the district court says. *Calico Cottage, Inc. v. TNB, Inc.*, 2014 WL 4828774, at *8 (E.D.N.Y. Sept. 29, 2014); *Lodging Sols., LLC v. Miller*, 2020 WL 6875255, at *7 (S.D.N.Y. Nov. 23, 2020); *Design Strategy Corp. v. Knack Sys., LLC*, 2007 WL 4562926, at *3 (S.D.N.Y. Dec. 18, 2007). At the very least, then, if (as the magistrate judge concluded) §5.4 is ambiguous, then the anti-competitive concerns that would otherwise arise would compel reading it not to prohibit IBM from carrying out tasks that customers like AT&T conceived of themselves for their own business reasons.

### B. The District Court's $717 Million Damages Award Is Radically Divorced From Any Viable Theory of Damages.

1. Even accepting the erroneous premise that IBM "breached" §5.4 by complying with a customer-initiated request, BMC failed to prove that it suffered any compensable damages—let alone *$717 million* in damages. AT&T had already paid BMC for the software licenses, so BMC's only loss from the switchover was $5.6 million in annual profits from ongoing support services (*e.g.*, a help desk and routine bug fixes), which by BMC's own estimate would amount to only $100 million if it maintained the AT&T account *forever.* But as the district found in

rejecting that damages claim, BMC would have lost the AT&T account with or without a breach, because AT&T independently decided to move away from BMC software and could have (and would have) hired a third party to execute the switch. Under those circumstances, BMC suffered no injury *because of the breach*. The district court's manufacture of a $717 million damages award cannot be reconciled with New York contract law or any plausible reading of the contract.

Under New York law, it is "elemental" that "the recovery in an action for breach of contract is generally limited to the loss which the plaintiff has actually suffered by reason of the breach." 36 N.Y. Jur. 2d *Damages* §32 (2d ed. 2022). That is because "the theory underlying damages is to make good or replace the loss caused by the breach of contract." *Brushton-Moira Cent. Sch. Dist. v. Fred. H. Thomas Assocs., P.C.*, 91 N.Y.2d 256, 261 (1998). Thus, "the injured party should not recover more from the breach than he would have gained had the contract been fully performed." *Freund v. Wash. Square Press, Inc.*, 34 N.Y.2d 379, 382 (1974).

Those principles make the damages analysis here straightforward. New York law is clear that the proper measure of damages for breach of a covenant not to compete is what the plaintiff lost "by reason of the defendant's improper competition." *Loughlin v. Meghji*, 186 A.D.3d 1633, 1638 (N.Y. App. Div. 2020). As noted, it is undisputed that §5.4 does not lock AT&T into BMC products. As the district court found, it at most prevented *IBM* from being the entity that executed

AT&T's decision to replace BMC software. Any viable damages model thus needed to identify some loss BMC suffered because IBM, rather than someone else, executed AT&T's request.

BMC could have tried to present such a model—*e.g.*, it could have tried to prove that the changeover would have taken AT&T longer to execute had its long-time IT servicer been unable to assist—so that BMC would have continued to receive its $5.6 million in annual profits during that interval. But, as the district court observed, BMC chose not to present any model "that measured how IBM's participation in Project Swallowtail may have accelerated the loss of BMC's mainframe revenues from AT&T." ROA.8466. Instead, BMC based its entire lost-profits model on the theory that, had IBM been unable to assist, AT&T would not have changed software at all, ever.

As the district court correctly concluded, that theory is fatally flawed because AT&T itself decided to stop using BMC software and could have (and would have) executed that decision using a third party, rather than IBM. "AT&T initiated Project Swallowtail in April 2013 to migrate away from BMC's products because its use of BMC software inhibited its larger standardization goals." ROA.8467. And as BMC itself "acknowledged," "[o]ther outsourcers could have performed the displacement for AT&T." ROA.8467. Thus, BMC did not lose the AT&T account *because of the breach*, as New York law requires. Moreover, because AT&T already held a

"perpetual license" for BMC software, the most BMC could have lost is the profits it would have earned from AT&T paying service and support fees on the software it already owned. BMC itself pegged that amount at $5.6 million a year and (discounted to present value) $104.5 million in perpetuity. ROA.8466. The district court correctly found that BMC failed to prove even that much, ROA.8467, but then went on to award more than seven times that amount in a calculation with no support in the contract or New York law.

2. The district court concluded that BMC is contractually entitled to more than *$717 million* in "unpaid license fees." The contract does not—indeed, lawfully could not—entitle BMC to such a windfall. The only provision of the contract that IBM was found to have breached is §5.4, which is a purely prohibitory provision that unambiguously does not purport to require any software license purchase or provide for a license-fee remedy or penalty for breach.

The district court reasoned that IBM *could* have executed the AT&T changeover itself without breaching the contract by purchasing its own permanent licenses to use BMC software, and that under the terms of the contract, IBM could have purchased those licenses at a 72% discount. Put differently, under the terms of the 2015 OA, IBM *could* have paid BMC $717 million for full, perpetual licenses to execute a one-time switchover from BMC software to IBM software, even though doing so would make no material contribution to IBM's bottom line (since AT&T

35

had already bought and paid for licenses to use IBM software). But to be a viable measure of damages, it is not enough that IBM theoretically *could* have made this commercially irrational decision. Rather, BMC needed to show that, but for the breach, IBM actually *would* have pursued this value-destroying course, and there is not a shred of evidence that, in a but-for world without a breach, IBM would have paid $717 million to earn a relatively trivial amount of services fees, especially when a third party could have executed the transition without that cost. *See Eni US Operating Co., Inc. v. Transocean Offshore Deepwater Drilling, Inc.*, 919 F.3d 931, 941-42 (5th Cir. 2019). In short, as a measure of what BMC actually lost because of the breach, the notion that BMC lost $717 million in license fees it otherwise would have earned is a complete non-starter. Indeed, no court in the country has ever sanctioned a damages theory like that in a case involving a restrictive covenant.

The district court nonetheless seemed to think this exorbitant damages award was compelled by the contract's terms. That is triply flawed. Nothing in the contract provided that a §5.4 violation triggered an obligation to purchase licenses, and even if one (mis)reads the contract as containing such an obligation, the contract included no predetermined purchase prices (much less a $717 million price) that could serve as a proxy for damages. Finally, if the contract truly did provide for a $717 million remedy in the event of a breach of §5.4, it would constitute an impermissible liquidated-damages penalty under New York law.

In the first place, the contract itself does not specify that the remedy for a one-time breach of §5.4 is the mandatory payment of exorbitant fees for permanent licenses. BMC never sought to identify anything in §5.4 itself that required the payment of license fees as damages, nor could it plausibly have done so given the purely prohibitory language of §5.4 and the fact that BMC tried and failed to insert such a license-fees-liquidated-damages remedy for a §5.4 breach into the 2015 OA. But BMC did recognize the need to ground a license-fee remedy in the contract, and so consistently asserted that this remedy was required based on a claimed breach of the licensing provisions in §1.1 of the 2015 OA. But the district court rejected that argument. ROA.4000. That should have spelled the end of BMC's license-fees theory.

That the 2015 OA does not obligate IBM to buy a license for a customer-driven switchover is especially clear when §5.4 is contrasted with other provisions, like §12 of the 2015 OA and §14 of the MLA. Section 12 addresses "shared hosting"—*i.e.*, when IBM installs BMC software on an IBM computer that is "not dedicated exclusively for one Client." ROA.14388. Like §5.4, §12.2 expressly *prohibited* certain IBM conduct—*i.e.*, installing BMC software that IBM used under the "Access and Use" option on a "Shared Hosting Computer." ROA.14388. But unlike §5.4, §12.2 *affirmatively obligated* IBM to purchase BMC software for shared-hosting purposes "prior to such installation," and §12.4 stated that, if IBM

did not do so, "then [IBM] must execute an Order" for a software license at a penalty price.  ROA.14388-39.  In a similar vein, §14 imposes a license-purchase *remedy* for certain contractual violations.  There, the parties agreed that, if IBM transgressed the bargained-for limitations on the "amount" of a given product IBM could use by "exceed[ing] the Licensed Capacity," it would have to "pay the applicable fees for additional capacity."  ROA.14298.  The parties clearly understood how to impose both *ex ante* and *ex post* license-purchase obligations in their contract; they just did not do so in §5.4.

That omission is no accident.  As negotiations over the 2015 OA were getting underway, BMC observed that the then-operative outsourcing attachment provided no specific financial remedy for a displacement that violated (BMC's view of) the agreement.  ROA.25434.  To correct that perceived deficiency, BMC proposed adding a requirement that IBM buy licenses and support to conduct displacements— a requirement that would have been unnecessary if BMC's current interpretation of §5.4 were correct.  ROA.25805.  BMC even drafted proposed language. ROA.25835.  But IBM never accepted such a provision, and the executed contract omitted it.

Despite all that, the district court identified a contractual basis for a license-fee remedy for a §5.4 breach in the most unlikely of places—the "Limits on Liability" provision in MLA §10.  That provision does not affirmatively authorize

any remedies at all, but instead limits any damages that would otherwise be available "arising out of or related to this agreement, the product, or the use of the product … to the greater of $5,000,000 or the amount paid or payable by Customer for the license to the applicable product giving rise to the claim." ROA.8462. Remarkably, the court construed the "paid or payable" language in a damages cap to affirmatively obligate IBM to pay the full amount that BMC claimed would be "payable" under theoretical licenses that IBM was not contractually obligated to purchase, but that IBM *could* have purchased to execute the changeover but did not. That is a gross distortion of the contractual language. First, and most obviously, §10 is a damages *limitation*, not a font of liability. Second, consistent with its role as a concrete cap on damages, the "paid or payable" language refers to the amounts already paid or still payable under actual licenses with readily identifiable terms. Interpreting it instead to extend to hypothetical licenses with never-negotiated (and thus never payable) amounts is a wholly implausible construction of a damages-cap provision that requires readily identifiable amounts (like $5,000,000)—not counterfactual constructions—to serve its intended purpose.

To complete its wildly inflated damages calculation, the district court converted yet another contractual shield for IBM into a contractual sword for BMC. Section 8.1 of the 2015 OA, which is part of the customer-license section that anticipates the purchases of actual licenses in a real-world negotiation, provides that

IBM is "entitled to a global *minimum* discount of 72% … for all purchases of new licenses." ROA.8401 (emphasis added). That provision, as written, plainly provides IBM with a guaranteed minimum discount in the event IBM actually decided to purchase a license from BMC. It provides only a "minimum discount," not a final price, ROA.7544, and the record reflects that IBM consistently obtained much steeper discounts when it actually purchased a license, ROA.12298. Undeterred, the district court converted this "minimum discount" into a proxy for "definite, bargained for prices." ROA.8464. That cannot be squared with the contractual text, the facts concerning the parties' performance, or New York law. By its terms, §8.1 establishes a price *ceiling—i.e.*, the maximum BMC could charge—and "such a ceiling is far from providing the definiteness required by New York law." *Trianco, LLC v. IBM*, 466 F.Supp.2d 600, 606-07 (E.D. Pa. 2006). And that is how the parties consistently construed the provision throughout the life of the contract when IBM chose to purchase licenses.

Seemingly recognizing as much, the court conceded that IBM "might have successfully negotiated a steeper discount" in an imaginary world where IBM sought to purchase licenses to execute the changeover—a wise concession given the conceded ability of AT&T to use a third party, making the notion that IBM would have agreed to pay $717 million for the privilege of doing so facially absurd. But the court decided that it need not take *that* "imagin[ary] … scenario" into account,

even though the district court's own theory is premised on the amounts "payable" under imaginary licenses. ROA.8464-65. That is not the law: When unlicensed intellectual property is at issue, "we do not ask what the owner would like to have charged if unconstrained by reality, but what a willing owner actually would have charged after negotiation with the buyer." *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1088 (9th Cir. 2014); *contra* ROA.11869 (BMC expert testifying that hypothetical-negotiation framework "wouldn't be applicable here").

Finally, even if the parties' contract could be construed to put a $717 million price tag on a §5.4 breach, it still would not entitle BMC to recover that massive windfall. Instead, the net result of the court's convoluted rulings is to convert provisions designed to *limit* IBM's exposure into an unenforceable liquidated-damages provision. As New York's highest court has repeatedly admonished, "[a] provision which requires damages 'grossly disproportionate to the amount of actual damages provides for a penalty and is unenforceable.'" *172 Van Duzer Realty Corp. v. Globe Alumni Student Assistance Ass'n, Inc.*, 25 N.E.3d 952, 957 (N.Y. 2014) (alteration omitted). A contrary rule "would lead to the most terrible oppression in pecuniary dealings." *Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 424-25 (1977). Those concerns are particularly acute when, as here, exorbitant liquidated-damages provisions would stifle competition. By BMC's own telling, the only losses it suffered from AT&T's decision to shift to a competitor's product are

$5.6 million in profits from annual payments, and the district court correctly rejected those damages as stemming from AT&T's decision, not IBM's alleged breach. Yet, by the district court's (mis)construction of MLA §10, the contract entitles BMC to damages astronomically greater than these (unproven) real-world damages—*i.e.*, to "reap a windfall well above actual harm sustained." *Id.* If that award is not "grossly disproportionate to the amount of actual damages," *172 Van Duzer Realty*, 25 N.E.3d at 957, then it is hard to see what would be.

The court did not even try to reconcile its staggering damages award with that settled body of law; it instead offered only the *ipse dixit* that the contract "does not contain a liquidated damages provision and the 'paid or payable' language does not reflect a contractual penalty." ROA.8462 n.35. The lack of any explanation for that declaration is conspicuous but unsurprising, as it is difficult to imagine a clearer example of an unenforceable penalty than a provision that awards $717 million to a party that failed to prove it suffered any damages at all. *Consol. Rail Corp. v. MASP Equip. Corp.*, 67 N.Y.2d 35, 40 (1986).

## II.     The District Court's Fraudulent-Inducement Holding Is Flatly Inconsistent With Texas Tort Law.

The only thing more implausible than the district court's conclusion that the parties' contract entitles BMC to a $717 million windfall for the loss of a $5.6 million-a-year account that it could (and would) have lost without a breach is the court's conclusion that IBM fraudulently induced BMC to enter that windfall-

42

generating contract. According to the court, by signing the 2015 OA, IBM "misrepresented" that it would never execute a customer-initiated switchover—even as IBM adamantly and repeatedly told BMC that §5.4 permitted it to do exactly that. In reality, IBM's open-and-notorious indication that it viewed the contract as permitting customer-initiated switchovers (such as Bank of Ireland and National Australia Bank) foreclosed any finding of a misrepresentation or justifiable reliance or the other requirements for a fraudulent-inducement claim under Texas law. *Sears, Roebuck & Co. v. Meadows*, 877 S.W.2d 281, 282 (Tex. 1994) (per curiam) (plaintiff must show "a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury" (emphasis omitted)).

## A. IBM Made No Knowing Misrepresentation.

According to the district court, "IBM made written 'material misrepresentations'" when it signed the 2015 OA because, in the court's view, §5.4 embodied a "promise[]" "not to displace BMC products with its own products." ROA.8472. That mistakes an agreed-upon provision in a bilateral contract as to which the parties had fully disclosed differing interpretations for the kind of unilateral misrepresentation that can give rise to a fraudulent-inducement claim. It is one thing for a plaintiff to claim that *extra*-contractual promises induced it to enter

43

a contract, or even that an express contractual promise was accompanied by certain implicit representations. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46-47 (Tex. 1998). But "the mere failure to perform a contract is *not* evidence of fraud." *Id.* at 48; *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 305 (Tex. 2006); *S. Union Co. v. City of Edinburg*, 129 S.W.3d 74, 92 (Tex. 2003). And when a party makes clear that it does not share the other party's view of a disputed provision, there is neither an actionable misrepresentation nor justifiable reliance. Finally, a fraudulent-inducement claim makes particularly little sense when, as here, a party seeks not to vitiate the contract, but to enforce it and collect $717 million in contractual damages. To pile a fraudulent-inducement claim on top of a breach claim violates the bedrock rule that plaintiffs "cannot both have the contract and defeat it too." *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 232 (Tex. 2019).

The problems with this contract-as-misrepresentation theory hardly end there. For one thing, it depends entirely on the mistaken view that §5.4 precluded IBM from conducting a switchover "at AT&T's behest." ROA.8474. Thus, if this Court reverses on the breach-of-contract count, then the fraudulent-inducement claim also falls. But, even assuming the court was correct to reject IBM's reading of §5.4 six years after the parties inked the 2015 OA, that does not convert either IBM's signing of the 2015 OA or its contemporaneous representations to BMC into

misrepresentations. To the contrary, IBM could have hardly been clearer in negotiating with BMC over the 2015 OA that it did not share BMC's view of §5.4 as precluding IBM from complying with customer-initiated switchover requests.

For years before 2015, IBM complied with customer-directed requests like AT&T's and communicated to BMC that doing so was consistent with non-displacement provisions that the 2015 OA carried forward in all material respects. ROA.8403, 8479. For instance, after the parties signed the 2008 OA, "BMC caught wind that IBM, in its capacity as [the Bank of Ireland's] IT outsourcer, might be displacing BMC's products with IBM's own." ROA.8403. After BMC suggested that doing so would violate the non-displacement provision, IBM responded that "the decision to displace BMC product[s] was made by [the Bank of Ireland] independently and not by IBM," so "it is not clear … what it is that you allege IBM has done wrong." ROA.24055, 24058.

After the parties signed the 2013 agreement, IBM reiterated to BMC that IBM did "not believe the language restricts [BMC's] licensees from directing IBM to implement competing solutions, whether of IBM or any other BMC competitor." ROA.8423. BMC then "learned that IBM was involved in another displacement project involving a mutual … customer, National Australia Bank." ROA.8407. When BMC claimed that this violated the non-displacement provision, IBM responded by emphasizing that "acting at the customer's direction" is "the most

obvious example of a 'valid business reason,'" and asked BMC to stop "harass[ing] our employees and customers with BMC's misinterpretation." ROA.24874.

Then, in negotiating the 2015 OA, IBM made crystal clear to BMC that it still did not share BMC's view of §5.4 and made its own *contrary* interpretation of that provision clear to BMC. ROA.26849 (August 2015: "IBM's legal opinion is they can displace us by … exercising the clause within our current non-displace language which states: '*IBM may discontinue use of the* BMC *Customer Licenses for other valid business reasons*,' such as[] Customer Request[.]"); ROA.26790 (August 2015: "IBM has expanded the interpretation of the current language 'Other valid business reason' to include client request[.]"); ROA.25965 (April 2015: "IBM position is that displacement is a customer decision to displace BMC with IBM that is an 'other valid business decision[.]'"). Indeed, even BMC's C-suite got the message loud and clear. ROA.26846 (August 2015: "IBM believes they can displace us by operating … under the premise of a 'valid business reason' such as: "Customer request[.]"); ROA.26273 (June 2015: ("IBM Position" is that "acting at the customer's direction would constitute the most obvious example of a 'valid business reason.'"). Given those undisputed facts, IBM made no representation, let alone misrepresentation, that it shared BMC's view of §5.4 or would never comply with a customer-initiated request to replace BMC software with IBM software.

The district court tried to brush all that aside on the theory that IBM had "no intention of complying with the 2015 OA's non-displacement provision because it had already agreed to supplant BMC's products—at AT&T's behest—when it entered into the Project Swallowtail agreement." ROA.8474. That is a non sequitur. IBM's actions confirm only that IBM had no intention of complying *with BMC's interpretation of the disputed provision*, and every intention of complying with *its own interpretation of* §5.4—namely, as permitting a customer-directed switchover—*as it explained to BMC in no uncertain terms*. Accordingly, there was no misrepresentation at all, let alone grounds for a $717 million fraudulent-inducement claim. *Arete Partners, L.P. v. Gunnerman*, 594 F.3d 390, 397-98 (5th Cir. 2010); *Miga v. Jensen*, 96 S.W.3d 207, 210-11 (Tex. 2002).

The district court also observed that IBM "failed to disclose" that it had already agreed to execute Project Swallowtail when it signed the 2015 OA. Even setting aside that BMC dropped its non-disclosure theory at the summary-judgment stage, it is black-letter law in Texas that "a failure to disclose information does not constitute fraud unless there is a duty to disclose the information." *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001). IBM had no duty to disclose AT&T's plans or its own role in executing them to BMC in the context of an "arm's-length transaction," ROA.8477, which "do[es] not establish a basis for a fiduciary relationship," *Meyer v. Cathey*, 167 S.W.3d 327, 331 (Tex. 2005). To the contrary, IBM owed a duty to

*AT&T* to keep AT&T's plans confidential under the terms of their non-disclosure agreement. ROA.8409; *Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 562-63 (Tex. 2019).

### B. BMC Could Not Have Justifiably Relied on Any Purported Misrepresentation.

Even assuming that IBM made some knowing misrepresentation by agreeing to §5.4 while telling BMC that it did not share BMC's view of §5.4's scope, there is no world in which BMC could have "justifiably relied" in the face of IBM's repeated insistence that it could assist with client-initiated requests to replace BMC software. *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 653 (Tex. 2018). As the Texas Supreme Court has repeatedly emphasized, "a person may not justifiably rely on a representation if there are red flags indicating such reliance is unwarranted." *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010); *accord Carduco*, 583 S.W.3d at 559; *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 501 (Tex. 2019); *Orca Assets*, 546 S.W.3d at 653-60. It is hard to imagine a more vivid red flag than a party repeatedly telling its counterparty that it viewed the contract as fully permitting the very conduct that ensued.

As just explained, for the better part of a decade before the negotiations over the 2015 OA, IBM repeatedly made clear to BMC that it interpreted the non-displacement provision to permit compliance with customer-initiated switchovers.

ROA.8403, 8407, 8423, 8479, 24055, 24058, 24874. That is precisely why, throughout 2015, BMC consistently acknowledged that IBM "interpret[ed]" the "[o]ther valid business reason[s]" language to "include client request[s]." ROA.26790; ROA.25965, 26849, 26846, 26273. It thus cannot seriously be disputed that, "before the time of the alleged fraud," *Grant Thornton*, 314 S.W.3d at 923, BMC encountered multiple red flags that "preclude[] its claim of justifiable reliance as a matter of law," *Orca Assets*, 546 S.W.3d at 660.

The district court did not dispute any of that. It just dismissed it as irrelevant under the Texas Supreme Court's decisions in *Orca Assets* and *Carduco*. ROA.8477-80. The court read those cases to allow a party to ignore red flags entirely if they contradict the terms of the parties' contract. ROA.8478 ("Texas law recognizes that the written, binding contractual language matters—and plaintiffs who refrain from relying on a written contract's unambiguous language do so at their own detriment."). But those decisions, both of which *rejected* fraud claims, hold only that *a plaintiff* cannot justifiably rely on extracontractual representations that contradict *undisputed* contractual terms. *Orca Assets*, 546 S.W.3d at 659-60; *Carduco*, 583 S.W.3d at 559. They do not remotely support the notion that *a defendant* cannot defeat a fraudulent-inducement claim by making crystal clear that it views the contract as less restrictive than the plaintiff claims. By fully disclosing that IBM disagreed with BMC over the proper construction of §5.4, IBM foreclosed

any effort by BMC to show that it justifiably relied on a shared (and more restrictive) understanding of §5.4 in signing the 2015 OA. When parties have a fully disclosed dispute about the scope of contractual language, both sides may be banking on their ability to later bring a breach-of-contract action and succeed, but neither is relying on the other's representations, which are telling them loud and clear that there is an open-and-notorious disagreement about the provision's meaning.

### C. IBM's Purported Fraud Did Not Cause Any Injury, Let Alone Justify an Excessive $717 Million Punitive-Damages Award.

In addition to satisfying the other four elements of fraudulent inducement, BMC had to prove, "beyond mere conjecture, guess, or speculation," "that [IBM's] wrongful conduct"—*i.e.*, purportedly inducing BMC to enter the 2015 OA—"was a substantial factor 'in bringing about an injury which would not otherwise have occurred.'" *Gen. Cap. Grp. Beteligungsberatung GMBH v. AT&T*, 407 S.W.3d 507, 510 (Tex. App.—Dallas 2013). BMC failed to meet that burden too.

In a typical fraudulent-inducement claim, the plaintiff complains that he was tricked into an unfavorable contract that he now seeks to "vitiate[]." *Bombardier*, 572 S.W.3d at 232. While Texas courts are rightly skeptical of such efforts to evade a written agreement, at least that kind of claim makes sense, and the plaintiff's injury is clear: He is harmed by his own onerous obligations under the contract that he seeks to avoid. Here, by contrast, BMC complains that it was "induced" into a contract that it wants to *enforce*, and that in the district court's view entitles BMC to

$717 million in damages for the loss of an account BMC itself valued at only $100 million over its lifetime. If IBM induced BMC to enter such a contract, BMC should be saying thank you. Entering that contract not only caused BMC zero injury, but netted BMC some $600 million. Being fraudulently induced to buy a winning lottery ticket does not cause any injury.

If BMC's extravagant contractual-damages theory does not survive this appeal—and it should not—then BMC's lack of any fraud-based injury is still crystal clear. If BMC had not been "induced" to sign the 2015 OA, that would not mean that AT&T would be locked in as a BMC customer for life, or even that IBM would have had no access to BMC software to service AT&T. Absent agreeing to the 2015 OA, the parties would have continued to be bound by the 2013 OA, which included identical non-displacement language. Moreover, even under BMC's view of the non-displacement provisions, they allowed AT&T to switch from BMC software to IBM software as long as a third party executed the switch. Thus, agreeing to the 2015 OA did not cause BMC to surrender some means of maintaining AT&T as a customer.

Finally, no matter the fate of BMC's contract or fraudulent-inducement claims, the $717 million punitive-damages award claim cannot stand as a matter of state or federal law. That award dwarfs even BMC's inflated estimate of its lost profits by nearly seven-fold. When compensatory damages provide a substantial

windfall over the plaintiffs' asserted harm, there is no basis for awarding punitive damages at all. *Bennett v. Grant*, 525 S.W.3d 642, 651-53 (Tex. 2017). And punitive damages that exceed any possible measure of claimed harm by a factor of seven are constitutionally excessive, especially when the underlying conduct is not reprehensible. *Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 875-76 (Tex. 2017); *Bennett v. Reynolds*, 315 S.W.3d 867, 877-80 (Tex. 2010); *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 63 (2d Cir. 2004). A garden-variety contract dispute is the antithesis of the kind of reprehensible conduct that could justify a punitive award approaching $1 billion. *Cf. Mercedes-Benz USA*, 583 S.W.3d at 559.

## III. The $1.6 Billion Award Is Barred By The Contract's Unambiguous Damages Limitations.

Even if BMC were otherwise entitled to substantial damages, the MLA damages cap and prohibition on punitive damages would require reversal of the district court's $1.6 billion award. The district court's effort to evade those provisions was flawed at every turn.

1. As is typical in agreements between sophisticated commercial parties with ongoing business relationships, IBM and BMC agreed to strictly limit money damages and prohibit punitive damages. In MLA §10, they agreed (in a provision titled "Limits on Liability") that "each party's liability arising out of or related to this agreement … shall be limited to the greater of $5,000,000 or the amount paid or

payable by the customer for the license to the applicable product giving rise to the claim." ROA.8398. And in §9, they agreed that "neither party … [is] liable for any special, indirect, punitive, or consequential damages relating to or arising out of this agreement … irrespective of … whether such damages result from a claim arising under tort or contract law." ROA.8398.

The district court concluded that the MLA and the 2015 OA "are one integrated agreement," ROA.8441 n.28, and therefore acknowledged that both provisions presumptively covered BMC's claims. Despite the absence of any contractually required license-purchase provision in §5.4 or elsewhere, the court found that $717 million was the amount "payable" under hypothetical licenses that IBM could have obtained to execute the switchover and thus did not exceed §10's cap on compensatory damages. That reasoning is deeply flawed for all the reasons already explained. Contractual damages therefore should have been capped at $5 million under §10 and punitive damages foreclosed entirely by §9. Instead, the district declared that its fraudulent-inducement finding rendered §9 and §10 "not enforceable" to limit BMC's recovery. ROA.8448-49, 8482-85. No matter which state's law applies—whether New York law for BMC's breach-of-contract claim or Texas law for its fraudulent-inducement claim—the court had no basis to liberate BMC from these agreed-upon restrictions.

2. Under New York law, "it is well settled that contractual terms limiting liability"—like MLA §9 and §10—"are enforceable," especially in cases involving sophisticated parties. 22 N.Y. Jur. 2d *Contracts* §265 (2d ed. 2022). And BMC cannot avail itself of New York's "extraordinary" and "strict" fraud carveout, which applies only when a breach not only is "actionable as an independent tort," but is "sufficiently egregious" that it rises to the level of "criminal" misbehavior, and part of a pattern of conduct "directed at the public generally." *Rocanova v. Equitable Life Assurance Soc'y of U.S.*, 83 N.Y.2d 603, 613, 616 (1994). This case plainly does not fit that bill. Tellingly, BMC cited no case in which a New York court invalidated a punitive-damages disclaimer negotiated by sophisticated parties.

The district court never suggested otherwise; it candidly admitted it was not applying New York's heightened fraud standard. ROA.8448-49 (rejecting argument "that BMC must prove something higher than ordinary fraud"). Instead, it cited a much earlier New York high court decision for the idea that its fraudulent-inducement finding under Texas law sufficed to invalidate the damages limitations under New York contract law. ROA.8448-49 (citing *Kalisch-Jarcho Inc. v. City of New York*, 58 N.Y.2d 377 (1983)). That reading of *Kalisch-Jarcho* is irreconcilable with numerous high court decisions applying the "strict" standard to deny punitive damages in fraudulent-inducement cases. Unsurprisingly, it is a misreading of that decision. Far from invalidating a damages limitation, *Kalisch-Jarcho* did the near

opposite:  It *vacated* a jury's damages award and remanded for a new trial, holding that the defendant was entitled to a "stricter" instruction that would make it even harder to disregard the parties' exculpatory clause.  58 N.Y.2d at 382.  The district court's next citation compounds the error:  In *Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*, 273 F.Supp.2d 436, 449 (S.D.N.Y. 2003), the district court *enforced* the parties' limitation-of-liability clause.  There is simply no support in New York law for the court's disregard of common and critical damages limitations like §9 and §10.

3. Texas law does not furnish BMC an escape route.  Texas courts enforce damages caps for fraudulent-inducement claims just like this one—whether based on affirmative misrepresentations or non-disclosure.  *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 182 (Tex. 1997).  Texas law admits of no exceptions.  As the Texas Supreme Court recently observed:  "We have *never* held … that fraud vitiates a limitation-of-liability clause." *Bombardier*, 572 S.W.3d at 232 (emphasis added).  This black-letter remedial principle of Texas tort law bars BMC's effort to use its fraudulent-inducement-by-way-of-non-disclosure claim to be the first.

Wisdom justifies Texas courts' unwillingness to tread where the district court rushed in.  The court first blurred distinct bodies of law by treating disagreement over a long-debated contractual term as a basis for fraudulent inducement.  *Tony Gullo*, 212 S.W.3d at 305.  It further erred by treating "contractual fraud" not as a

basis for avoiding a contract, but as a have-your-cake-and-eat-it-too basis for BMC to enforce through both contract *and* tort law the aspects of the contract it likes— even to the point of deriving its measure of damages for both of its claims from the very same "Limits on Liability" provision that the court declared unenforceable. *Contra Bombardier*, 572 S.W.3d at 232. Permitting BMC's tort claim to reach back and undo the parties' express agreement to limit damages and foreclose punitives altogether compounds the error. Before permitting a federal court to merge contract and tort law and create exceptions to the freedom of contract that Texas courts have never recognized, at an absolute minimum the Court would need to certify a question to the Texas Supreme Court. But as things stand, Texas law is clear: The $1.6 billion award cannot stand.

*    *    *

Regardless of whether BMC's contract or fraudulent-inducement claim is at issue, §9 bars punitive damages, and §10 caps everything else. The most BMC could possibly recover if it had proven any recoverable damages would be $5 million—a far cry from $1.6 billion.

## CONCLUSION

The Court should reverse.

Respectfully submitted,

/s/ Paul D. Clement

R. PAUL YETTER
CONSTANCE H. PFEIFFER
REAGAN W. SIMPSON
YETTER COLEMAN LLP
811 Main Street
Suite 4100
Houston, TX 77002

PAUL D. CLEMENT
ERIN E. MURPHY
ANDREW C. LAWRENCE
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for International Business Machines Corporation*

January 9, 2023

**CERTIFICATE OF SERVICE**

I certify that, on January 9, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Paul D. Clement
Paul D. Clement

## CERTIFICATE OF COMPLIANCE

I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,978 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). *See* Fed. R. App. P. 32(g).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 with 14-point Times New Roman font.

January 9, 2023

/s/ Paul D. Clement
Paul D. Clement
