No. 22-20463

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————————

BMC SOFTWARE, INC.,

*Plaintiff-Appellee/Cross-Appellant*,

v.

INTERNATIONAL BUSINESS MACHINES CORPORATION,

*Defendant-Appellant/Cross-Appellee.*

———————————

On Appeal from the United States District Court
for the Southern District of Texas
No. 4:17-cv-2254

———————————

## UNSEALED RECORD EXCERPTS FOR
## DEFENDANT-APPELLANT/CROSS-APPELLEE
## INTERNATIONAL BUSINESS MACHINES CORPORATION

———————————

R. PAUL YETTER
CONSTANCE H. PFEIFFER
REAGAN W. SIMPSON
YETTER COLEMAN LLP
811 Main Street
Suite 4100
Houston, TX 77002

PAUL D. CLEMENT
ERIN E. MURPHY
ANDREW C. LAWRENCE
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for International Business Machines Corporation*

January 9, 2023

# TABLE OF CONTENTS

| Tab | Description of Document | ROA |
|---|---|---|
| 1 | Docket Report | 1-85 |
| 2 | Notice of Appeal (International Business Machines Corporation) (09/07/2022); Dkt.787 | 10413-15 |
| 3 | Notice of Cross-Appeal (BMC Software, Inc.) (09/20/2022); Dkt.928 | 10425-26 |
| 4 | Amended Final Judgment (08/09/2022); Dkt.783 | 10371-73 |
| 5 | Opinion & Order Granting in Part and Denying in Part IBM's Motion to Amend Judgment (08/09/2022); Dkt.782 | 10351-70 |
| 6 | Opinion & Order Granting in Part and Denying in Part BMC's Motion for Attorney's Fees and Costs (08/08/2022); Dkt.781 | 10334-50 |
| 7 | Original Final Judgment (05/30/2022); Dkt.757 | 8490-92 |
| 8 | Findings of Fact and Conclusions of Law (05/30/2022); Dkt.756 | 8384-8489 |
| 9 | Order Clarifying Issues for Trial (02/07/2022); Dkt.603 | 4120-29 |
| 10 | Summary-Judgment Opinion (09/09/2021); Dkt.586 | 3995-4006 |
| 11 | [Sealed] Magistrate Judge's Summary-Judgment Memorandum & Recommendation (2021/06/07); Dkt.561 | 82522-85 |
| 12 | 2008 Master Licensing Agreement | 14795-800 |
| 13 | 2008 Outsourcing Attachment | 14803-08 |
| 14 | 2013 Outsourcing Attachment | 14840-48 |
| 15 | 2015 Outsourcing Attachment | 14881-92 |

**CERTIFICATE OF SERVICE**

I hereby certify that, on January 9, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Paul D. Clement
Paul D. Clement

**TAB 1**

# U.S. District Court
# SOUTHERN DISTRICT OF TEXAS (Houston)
# CIVIL DOCKET FOR CASE #: 4:17-cv-02254
# Internal Use Only

| | |
|---|---|
| BMC Software, Inc. vs International Business Machines Corporation | Date Filed: 07/21/2017 |
| Assigned to: Judge Gray H Miller | Date Terminated: 05/30/2022 |
| Cause: 28:1332 Diversity-Breach of Contract | Jury Demand: None |
| | Nature of Suit: 190 Contract: Other |
| | Jurisdiction: Diversity |

**Plaintiff**

**BMC Software, Inc.**                    represented by  **Sean R D Gorman**
Bracewell LLP
711 Louisiana, Suite 2300
Houston, TX 77002
713-221-1221
Email: sean.gorman@bracewell.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew William Zeve**
Bracewell LLP
711 Louisiana St
Ste 2300
Houston, TX 77002
713-221-1116
Email: andrew.zeve@bracewell.com
*ATTORNEY TO BE NOTICED*

**Christopher Lee Dodson**
Bracewell LLP
711 Louisiana St
Ste 2300
Houston, TX 77002-2770
713-221-1373
Fax: 713-221-1212
Email: chris.dodson@bracewell.com
*ATTORNEY TO BE NOTICED*

**Cole Allan Thoms**
Bracewell LLP
711 Louisiana Street
Suite 2300
Houston, TX 77002
713-221-1482
Email: cole.thoms@bracewell.com
*ATTORNEY TO BE NOTICED*

**Diane M Lancaster**
Bracewell LLP
711 Louisiana St
Ste 2300
Houston, St 77002
713-221-1566
Email: diane.lancaster@bracewell.com

**Drewe Edith Molin**
Bracewell LLP
711 Louisiana St
Ste 2300
Houston, TX 77002
713-223-2300
Email: drewe.molin@bracewell.com
*ATTORNEY TO BE NOTICED*

**Elizabeth Frances Eoff**
Munsch Hardt Kopf & Harr, P.C.
700 Milam
Suite 2700
Houston, TX 77002
713-222-1493
Email: eeoff@munsch.com

**Jeffrey L. Oldham**
Bracewell LLP
711 Louisiana St., Ste. 2300
Houston, TX 77002
713-221-1225
Fax: 800-404-3970
Email: jeff.oldham@bracewelllaw.com
*ATTORNEY TO BE NOTICED*

**Kyle Alden Mason**
Bracewell LLP
711 Louisiana St
Suite 2300
Houston, TX 77002
713-223-2300
Email: kyle.mason@bracewell.com
*ATTORNEY TO BE NOTICED*

**Matthew Joseph Reasoner**
Bracewell LLP
711 Louisiana St.
Suite 2300
Houston, TX 77002
832-875-8514
Fax: 713-221-1212
Email: matthew.reasoner@bracewell.com
*ATTORNEY TO BE NOTICED*

**Timothy R Geiger**
Bracewell Giuliani LLP
711 Louisiana St
Ste 2300
Houston, TX 77002
713-223-2300
Email: tim.geiger@bracewell.com
*ATTORNEY TO BE NOTICED*

**Walter Allums Simons**
Bracewell LLP
711 Louisiana St
Ste 2300
Houston, TX 77002
713-223-2300
Email: walter.simons@bracewell.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**International Business Machines Corporation**

represented by **Donald John Reinhard , II**
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Ave.
Ste Floor 22
New York, NY 10010
212-849-7314
Email: DonaldReinhard@quinnemanuel.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Grant Bellows Martinez**
Yetter Coleman LLP
811 Main Street
Suite 4100
Houston, TX 77002
713-632-8000
Email: gmartinez@yettercoleman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John H. Chun**
Quinn Emanuel et al
51 Madison Avenue
22nd Fl
New York, NY 10010
212.849.7000
Email: johnchun@quinnemanuel.com
*TERMINATED: 03/17/2022*
*LEAD ATTORNEY*

**Kimberly Eden Carson**

Quinn Emanuel et al
51 Madison Ave
22nd Fl
New York, NY 10010
212.849.7000
Email: kimberlycarson@quinnemanuel.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Marlo A. Pecora**
Quinn Emanuel et al
51 Madison Ave
22nd Fl
New York, NY 10010
212.849.7000
Email: marlopecora@quinnemanuel.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Mark Berdon**
Quinn Emanuel et al
51 Madison Ave
22nd Fl
New York, NY 10010
212-849-7000
Email: andrewberdon@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

**Emily McLemore Smith**
Rusty Hardin & Associates, LLP
Suite 2250
1401 McKinney
Ste 500
Houston, TX 77002
713-652-9000
Email: esmith@rustyhardin.com
*TERMINATED: 03/17/2022*

**Guyon H Knight**
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
212-849-7000
Email: gknight@mwe.com
*TERMINATED: 03/17/2022*

**Jaclyn Marie Palmerson**
Quinn Emanuel Urquhart & Sullivan LLp
51 Madison Avenue FL 22
New York, NY 10010-1603
212-849-7104
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Leigha Empson**
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue
22nd Floor
New York, NY 10010
212-8497034
*ATTORNEY TO BE NOTICED*

**Mario O Gazzola**
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
212-849-7000
Email: mariogazzola@quinnemanuel.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**R Paul Yetter**
Yetter Coleman LLP
811 Main Street
Suite 4100
Houston, TX 77002
713-632-8000
Fax: 713-632-8002
Email: pyetter@yettercoleman.com
*ATTORNEY TO BE NOTICED*

**Rachel Elizabeth Epstein**
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Avenue
New York, NY 10010
212-749-7485
Email: rachelepstein@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

**Richard Irving Werder , Jr**
Quinn Emanuel et al
51 Madison Ave.
22nd Fl
New York, NY 10010
212-849-7000
Email: rickwerder@quinnemanuel.com
*ATTORNEY TO BE NOTICED*

**Wesley Hartman**
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue
22nd Floor
New York, NY 10010
415-875-6478
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/21/2017 | 1 | COMPLAINT against BMC Software, Inc. (Filing fee $ 400 receipt number 0541-18684291) filed by BMC Software, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit 3, # 7 Civil Cover Sheet)(Gorman, Sean) (Entered: 07/21/2017) |
| 07/21/2017 | 2 | Request for Issuance of Summons as to BMC Software, Inc., filed.(Gorman, Sean) (Entered: 07/21/2017) |
| 07/21/2017 | 3 | MOTION to Expedite Discovery by BMC Software, Inc., filed. Motion Docket Date 8/11/2017. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Proposed Order)(Gorman, Sean) (Entered: 07/21/2017) |
| 07/21/2017 | 4 | Sealed Event, filed. (With attachments) (Entered: 07/21/2017) |
| 07/21/2017 | 5 | CORPORATE DISCLOSURE STATEMENT by BMC Software, Inc. identifying Boxer Parent Company, Inc. as Corporate Parent, filed.(Gorman, Sean) (Entered: 07/21/2017) |
| 07/24/2017 | | Summons Issued as to International Business Machines Corporation. Issued summons delivered to plaintiff by First-class mail, filed.(hler, 4) (Entered: 07/24/2017) |
| 07/24/2017 | 6 | ORDER for Initial Pretrial and Scheduling Conference and Order to Disclose Interested Persons. Scheduling Order Deadline date 10/31/2017(Signed by Judge Gray H Miller) Parties notified.(ckrus, 4) (Entered: 07/24/2017) |
| 07/24/2017 | 7 | RETURN of Service of SUMMONS Executed as to BMC Software, Inc. served on 7/24/2017, answer due 8/14/2017, filed.(Gorman, Sean) (Entered: 07/24/2017) |
| 07/25/2017 | 8 | NOTICE of Appearance by Elizabeth F. Eoff on behalf of BMC Software, Inc., filed. (Eoff, Elizabeth) (Entered: 07/25/2017) |
| 07/25/2017 | 9 | NOTICE of Appearance by Christopher L. Dodson on behalf of BMC Software, Inc., filed. (Dodson, Christopher) (Entered: 07/25/2017) |
| 08/05/2017 | 10 | Joint MOTION for Protective Order by BMC Software, Inc., filed. Motion Docket Date 8/28/2017. (Attachments: # 1 Proposed Order Agreed Protective Order)(Gorman, Sean) (Entered: 08/05/2017) |
| 08/08/2017 | 11 | AGREED PROTECTIVE ORDER Granting 10 Joint MOTION for Protective Order. (Signed by Judge Gray H Miller) Parties notified.(rkonieczny, 4) (Entered: 08/08/2017) |
| 08/08/2017 | 12 | MOTION for Rachel Epstein to Appear Pro Hac Vice by International Business Machines Corporation, filed. Motion Docket Date 8/29/2017. (Attachments: # 1 Unredacted attachment 1, # 2 Unredacted attachment 2)(Yetter, R) (Entered: 08/08/2017) |
| 08/09/2017 | 13 | NOTICE of Appearance by Diane M. Crabtree on behalf of BMC Software, Inc., filed. (Crabtree, Diane) (Entered: 08/09/2017) |
| 08/10/2017 | 14 | Agreed MOTION for Entry of Order re: Permitting Agreed Expedited Discovery by BMC Software, Inc., filed. Motion Docket Date 8/31/2017. (Attachments: # 1 Proposed Order Agreed Order Permitting Expedited Discovery)(Gorman, Sean) (Entered: 08/10/2017) |
| 08/11/2017 | 15 | ORDER Granting 3 Agreed Motion to Expedite discovery; terminating as moot 14 Motion for Entry of Order.(Signed by Judge Gray H Miller) Parties notified.(rkonieczny, 4) (Entered: 08/11/2017) |

| 08/11/2017 | 16 | ORDER granting 12 MOTION for Rachel Epstein to Appear Pro Hac Vice. (Signed by Judge Gray H Miller) Parties notified.(olindor, 4) (Entered: 08/11/2017) |
|---|---|---|
| 08/11/2017 | 17 | CERTIFICATE OF INTERESTED PARTIES by International Business Machines Corporation, filed.(Yetter, R) (Entered: 08/11/2017) |
| 08/11/2017 | 18 | CORPORATE DISCLOSURE STATEMENT by International Business Machines Corporation, filed.(Yetter, R) (Entered: 08/11/2017) |
| 08/11/2017 | 19 | CERTIFICATE OF INTERESTED PARTIES by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 08/11/2017) |
| 08/14/2017 | 20 | STIPULATION re: Agreed Stipulation To Extend Deadline to Answer or Otherwise Respond to Plaintiff's Complaint by International Business Machines Corporation, filed.(Yetter, R) (Entered: 08/14/2017) |
| 08/15/2017 | 21 | MOTION for Andrew Mark Berdon to Appear Pro Hac Vice by International Business Machines Corporation, filed. Motion Docket Date 9/5/2017. (Yetter, R) (Entered: 08/15/2017) |
| 08/15/2017 | 22 | MOTION for Donald John Reinhard II to Appear Pro Hac Vice by International Business Machines Corporation, filed. Motion Docket Date 9/5/2017. (Yetter, R) (Entered: 08/15/2017) |
| 08/15/2017 | 23 | MOTION for Richard Irving Werder, Jr. to Appear Pro Hac Vice by International Business Machines Corporation, filed. Motion Docket Date 9/5/2017. (Yetter, R) (Entered: 08/15/2017) |
| 08/16/2017 | | (Court only) ***Attorney Andrew Mark Berdon for International Business Machines Corporation added. (jguajardo, 4) (Entered: 08/17/2017) |
| 08/16/2017 | 24 | ORDER Granting 21 Motion for Andrew M. Berdon to Appear Pro Hac Vice.(Signed by Judge Gray H Miller) Parties notified.(jguajardo, 4) (Entered: 08/17/2017) |
| 08/16/2017 | | (Court only) ***Attorney Richard Irving Werder, Jr for International Business Machines Corporation added. (jguajardo, 4) (Entered: 08/17/2017) |
| 08/16/2017 | 25 | ORDER Granting 23 Motion for Richard Irving Werder, Jr. to Appear Pro Hac Vice.(Signed by Judge Gray H Miller) Parties notified.(jguajardo, 4) (Entered: 08/17/2017) |
| 08/18/2017 | 26 | ORDER REFERRING CASE to Magistrate Judge Nancy K Johnson for full pretrial management.(Signed by Judge Gray H Miller) Parties notified.(rkonieczny, 4) (Entered: 08/18/2017) |
| 08/23/2017 | 27 | NOTICE of Setting. Parties notified. Scheduling Conference set for 8/29/2017 at 10:00 AM in Courtroom 700 before Magistrate Judge Nancy K Johnson, filed. (sjones, 4) (Entered: 08/23/2017) |
| 08/23/2017 | | (Court only) ***Attorney Donald John Reinhard, II for International Business Machines Corporation added. (sjones, 4) (Entered: 08/23/2017) |
| 08/23/2017 | 28 | ORDER granting 22 Motion for Donald John Reinhard, II to Appear Pro Hac Vice.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 08/23/2017) |
| 08/24/2017 | 29 | NOTICE of Resetting. Parties notified. Scheduling Conference reset for 8/30/2017 at 10:00 AM in Courtroom 700 before Magistrate Judge Nancy K Johnson, filed. (sjones, 4) |

| | | (Entered: 08/24/2017) |
|---|---|---|
| 08/29/2017 | | (Court only) Scheduling Conference set for August 30, 2017 is CANCELLED DUE TO INCLEMENT WEATHER, WILL RESET***Deadlines terminated. (sjones, 4) (Entered: 08/29/2017) |
| 09/01/2017 | 30 | Sealed Event, filed. (With attachments) (Entered: 09/01/2017) |
| 09/07/2017 | 31 | ORDER granting 30 Sealed Motion.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 09/08/2017) |
| 09/07/2017 | 218 | Sealed Event, filed. (With attachments) (Entered: 07/05/2018) |
| 09/12/2017 | 32 | NOTICE of Resetting. Parties notified. Scheduling Conference reset for 9/18/2017 at 03:00 PM in Courtroom 9D before Magistrate Judge Nancy K Johnson, filed. (sjones, 4) (Entered: 09/12/2017) |
| 09/18/2017 | 35 | MINUTE ENTRY ORDER: Scheduling Conference/Discovery Hearing held Appearances: Rob Eillis, Elizabeth Frances Eoff, Christopher Lee Dodson, Sean R D Gorman, R Paul Yetter, Rachel Elizabeth Epstein, Andrew Mark Berdon. Ct Reporter: ERO. Digital Number: 3:03-3:47AM. Deft Expert Report due by 3/2/2018. Deft Expert Witness List due by 3/2/2018. Discovery due by 5/18/2018. Dispositive Motion Filing due by 6/8/2018. Mediation due by 7/6/2018. Non-Dispositive Motion Filing due by 6/8/2018. Pltf Expert Report due by 1/5/2018. Pltf Expert Witness List due by 1/5/2018. Responses due by 9/26/2017. Preliminary Injunction Hearing set for 11/13/2017 at 09:00 AM in Courtroom 700 before Magistrate Judge Nancy K Johnson(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 09/20/2017) |
| 09/19/2017 | 33 | AO 435 TRANSCRIPT REQUEST by BMC Software, Inc./Sean Gorman for Transcript of Scheduling Conference/Discovery Dispute held on September 18, 2017 before Hon. Nancy K. Johnson. Expedited (7 days) turnaround requested. Court Reporter/Transcriber: Judicial Transcribers of Texas, filed. (Gorman, Sean) Electronically forwarded to Judicial on 9/20/2017. Estimated completion date 9/27/2017. Modified on 9/20/2017 (ShoshanaArnow, 4). (Entered: 09/19/2017) |
| 09/20/2017 | 34 | AO 435 TRANSCRIPT REQUEST by Steven Vacek for Transcript of Status Conference 9/18/17 before Judge Johnson. Expedited (7 days) turnaround requested (copy). Court Reporter/Transcriber: Judicial Transcribers of Texas, filed. (smurdock, 4) Electronically forwarded to Judicial on 9/20/2017. Estimated Completion date 9/27/2017. (ShoshanaArnow) (Entered: 09/20/2017) |
| 09/22/2017 | 36 | Unopposed MOTION for Leave to File SEALED First Amended Complaint and Application for Preliminary and Permanent Injunctive ReliefMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 10/13/2017. (Attachments: # 1 Proposed Order for Leave to File Under Seal)(Gorman, Sean) (Entered: 09/22/2017) |
| 09/22/2017 | 37 | **STRICKEN JURY DEMAND ONLY PER ORDER 256 Plaintiff's SEALED First Amended Complaint and Application for Preliminary and Permanent Injunctive Relief, filed. (With attachments) Modified on 10/2/2017 (rkonieczny, 4). Modified on 8/30/2018 (sjones, 4). (Entered: 09/22/2017) |
| 09/22/2017 | 38 | **STRICKEN JURY DEMAND ONLY PER ORDER 256 First AMENDED COMPLAINT with Jury Demand against International Business Machines Corporation filed by BMC Software, Inc.. (Attachments: # 1 Exhibit 1 - Ridge Declaration, # 2 Exhibit 2 - Jones Declaration redacted, # 3 Exhibit 2A - slip sheet sealed doc, # 4 Exhibit 3 - Chagnon Declaration, # 5 Exhibit 4 - slip sheet sealed document, # 6 Exhibit 5 - slip sheet |

| | | |
|---|---|---|
| | | sealed document, # 7 Exhibit 6 - slip sheet sealed document)(Gorman, Sean) Modified on 8/30/2018 (sjones, 4). (Entered: 09/22/2017) |
| 09/22/2017 | 39 | Unopposed MOTION for Leave to File Under Seal Its Response to IBM's Motion to DismissMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 10/13/2017. (Attachments: # 1 Proposed Order to File Under Seal Its Response)(Gorman, Sean) (Entered: 09/22/2017) |
| 09/22/2017 | 40 | Sealed Event, filed. (With attachments) (Entered: 09/22/2017) |
| 09/22/2017 | 41 | Unopposed MOTION for Leave to File sealed BMC Motion to StrikeMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 10/13/2017. (Attachments: # 1 Proposed Order on BMC Mt for Leave to File Under Seal)(Gorman, Sean) (Entered: 09/22/2017) |
| 09/22/2017 | 42 | Sealed Event, filed. (With attachments) (Entered: 09/22/2017) |
| 09/25/2017 | 43 | ORDER granting 36 Motion for Leave to File.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 09/25/2017) |
| 09/25/2017 | 44 | ORDER granting 39 Motion for Leave to File.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 09/25/2017) |
| 09/25/2017 | 45 | ORDER granting 41 Motion for Leave to File.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 09/25/2017) |
| 09/26/2017 | 46 | TRANSCRIPT re: Scheduling Conference held on September 18, 2017 before Magistrate Judge Nancy K Johnson. Court Reporter/Transcriber Judicial Transcribers of Texas, LLC. Ordering Party Sean Gorman Release of Transcript Restriction set for 12/26/2017., filed. (mahenry, ) (Entered: 09/26/2017) |
| 09/27/2017 | 47 | Notice of Filing of Official Transcript as to 46 Transcript,. Party notified, filed. (hcarr, 4) (Entered: 09/27/2017) |
| 09/28/2017 | 48 | Unopposed MOTION for Leave to File SEALED Application for Temporary Restraining OrderMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 10/19/2017. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 09/28/2017) |
| 09/28/2017 | 49 | Plaintiff's SEALED Application for Temporary Restraining Order, filed. (With attachments) Modified on 10/2/2017 (rkonieczny, 4). (Entered: 09/28/2017) |
| 09/28/2017 | 50 | REDACTION to 49 Sealed Event, 48 Unopposed MOTION for Leave to File SEALED Application for Temporary Restraining Order by BMC Software, Inc., filed. (Attachments: # 1 Exhibit 1 - slip sheet for under seal doc, # 2 Exhibit 2 - slip sheet for under seal doc, # 3 Exhibit 3 - slip sheet for under seal doc, # 4 Exhibit 4 - slip sheet for under seal doc, # 5 Exhibit 5 - slip sheet for under seal doc, # 6 Exhibit 6 - slip sheet for under seal doc, # 7 Exhibit 7 - Jones Declaration 1 Redac, # 8 Exhibit 8 - Chagnon Declaration, # 9 Proposed Order Granting TRO)(Gorman, Sean) (Entered: 09/28/2017) |
| 09/28/2017 | 51 | APPENDIX re: 50 Redacted Document,, by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 09/28/2017) |
| 09/28/2017 | 52 | ORDER granting 48 Motion for Leave to File.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 09/28/2017) |
| 09/28/2017 | 53 | NOTICE *Notification of Withdrawal* re: 30 Sealed Event by International Business |

| | | |
|---|---|---|
| | | Machines Corporation, filed. (Yetter, R) (Entered: 09/28/2017) |
| 09/28/2017 | | (Court only) ***Motion(s) terminated (withdrawn by counsel - duplicate of Dkt 30): 218 Sealed Event. (rkonieczny, 4) (Entered: 09/07/2018) |
| 09/30/2017 | 54 | ORDER - Defendant is ORDERED to file its response to plaintiff's application for temporary restraining order no later than noon on Tuesday, October 3, 2017. (Signed by Judge Gray H Miller) Parties notified.(rkonieczny, 4) (Entered: 09/30/2017) |
| 10/02/2017 | | (Court only) ***Motion(s) terminated: 30 Sealed Event, TERMINATED AS MOOT 42 Sealed Event. (sjones, 4) (Entered: 10/02/2017) |
| 10/03/2017 | 55 | Unopposed MOTION to Seal Defendant IBM's Opposition to Plaintiff's Application for a Temporary Restraining OrderMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 10/24/2017. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 10/03/2017) |
| 10/03/2017 | 56 | Sealed Event, filed. (With attachments) (Entered: 10/03/2017) |
| 10/03/2017 | 57 | Unopposed MOTION for Leave to File Excess PagesMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 10/24/2017. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 10/03/2017) |
| 10/03/2017 | 58 | ORDER Granting 57 Motion for Leave to File Excess Pages.(Signed by Judge Gray H Miller) Parties notified.(rkonieczny, 4) (Entered: 10/04/2017) |
| 10/04/2017 | 59 | ORDER Denying 49 Sealed application for temporary restraining order.(Signed by Judge Gray H Miller) Parties notified.(rkonieczny, 4) (Entered: 10/04/2017) |
| 10/06/2017 | 60 | Unopposed MOTION to Seal Defendant IBM's Answer to First Amended ComplaintMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 10/27/2017. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 10/06/2017) |
| 10/06/2017 | 61 | Sealed Event, filed. (Entered: 10/06/2017) |
| 10/09/2017 | 62 | MOTION for Kimberly E. Carson to Appear Pro Hac ViceMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 10/30/2017. (Yetter, R) (Entered: 10/09/2017) |
| 10/09/2017 | 63 | MOTION for Marlo A. Pecora to Appear Pro Hac ViceMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 10/30/2017. (Yetter, R) (Entered: 10/09/2017) |
| 10/10/2017 | 64 | MOTION for John H. Chun to Appear Pro Hac ViceMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 10/31/2017. (Yetter, R) (Entered: 10/10/2017) |
| 10/10/2017 | | (Court only) ***Attorney Marlo A. Pecora for International Business Machines Corporation added. (sjones, 4) (Entered: 10/10/2017) |
| 10/10/2017 | | (Court only) ***Attorney Kimberly Eden Carson for International Business Machines Corporation added. (sjones, 4) (Entered: 10/10/2017) |
| 10/10/2017 | | (Court only) ***Attorney John H. Chun for International Business Machines Corporation added. (sjones, 4) (Entered: 10/10/2017) |
| 10/10/2017 | 65 | |

| | | |
|---|---|---|
| | | ORDER granting <u>60</u> Motion to Seal.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 10/10/2017) |
| 10/10/2017 | <u>66</u> | ORDER granting <u>63</u> Motion for Marlo A. Pecora to Appear Pro Hac Vice.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 10/10/2017) |
| 10/10/2017 | <u>67</u> | ORDER granting <u>64</u> Motion for John H. Chun to Appear Pro Hac Vice.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 10/10/2017) |
| 10/10/2017 | <u>68</u> | ORDER granting <u>62</u> Motion for Kimberly Eden Carson to Appear Pro Hac Vice.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 10/10/2017) |
| 10/10/2017 | <u>69</u> | ORDER granting <u>55</u> Motion to Seal.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 10/10/2017) |
| 10/11/2017 | <u>70</u> | NOTICE of Setting. Parties notified. Status Conference set for 10/16/2017 at 10:00 AM in Courtroom 700 before Magistrate Judge Nancy K Johnson, filed. (sjones, 4) (Entered: 10/11/2017) |
| 10/16/2017 | <u>71</u> | AO 435 TRANSCRIPT REQUEST by BMC Software, Inc./Sean Gorman for Transcript of Status Conference on October 16, 2017 before Magistrate Judge Nancy K. Johnson. Expedited (7 days) turnaround requested. Court Reporter/Transcriber: Judicial Transcribers of Texas, filed. (Gorman, Sean)Electronically forwarded to Judicial Transcribers on 10/17/2017. Estimated completion date 10/24/2017. Modified on 10/17/2017 (ShoshanaArnow, 4). (Entered: 10/16/2017) |
| 10/16/2017 | <u>72</u> | RETURN of Service Executed as to Richard Clyne on October 13, 2017 re: Subpoena to Testify at Deposition and Deposition Notice, filed.(Gorman, Sean) (Entered: 10/16/2017) |
| 10/16/2017 | <u>75</u> | MINUTE ENTRY ORDER: Discovery Hearing held. Appearances: Tim Geiger, Elizabeth Frances Eoff, Sean R D Gorman, R Paul Yetter, Rachel Elizabeth Epstein, Andrew Mark Berdon. Ct Reporter: ERO. Digital Number: 10:04AM-12:00PM. Preliminary Injunction Hearing reset for 11/27/2017 at 09:00 AM in Courtroom 700 before Magistrate Judge Nancy K Johnson(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 10/17/2017) |
| 10/17/2017 | <u>73</u> | AO 435 TRANSCRIPT REQUEST by Steven Vacek for Transcript of Judge Nancy Johnson, 10/16/2017. Expedited (7 days) turnaround requested. Court Reporter/Transcriber: Judicial Transcribers of Texas, filed. (mmapps, 4)Electronically forwarded to Judicial Transcribers on 10/17/2017. Estimated completion date 10/24/2017. Modified on 10/17/2017 Modified on 10/17/2017 (ShoshanaArnow, 4). (Entered: 10/17/2017) |
| 10/17/2017 | <u>74</u> | NOTICE of Setting. Parties notified. Status Conference set for 10/18/2017 at 10:00 AM in by telephone before Magistrate Judge Nancy K Johnson, filed. (sjones, 4) (Entered: 10/17/2017) |
| 10/18/2017 | <u>76</u> | MINUTE ENTRY ORDER: Status Conference held. Appearances: (By phone) Rob Ellis, Tim Geiger, Elizabeth Frances Eoff, Christopher Lee Dodson, Sean R D Gorman, Andrew Mark Berdon. Ct Reporter: ERO. Digital Number: 10:05-10:19AM.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 10/19/2017) |
| 10/23/2017 | <u>77</u> | TRANSCRIPT re: Status Conference held on October 16, 2017 before Magistrate Judge Nancy K Johnson. Court Reporter/Transcriber Judicial Transcribers of Texas, LLC. Ordering Party Sean Gorman Release of Transcript Restriction set for 1/22/2018., filed. (mahenry, ) (Entered: 10/23/2017) |

| 10/23/2017 | 78 | NOTICE of Setting. Parties notified. Status Conference set for 10/27/2017 at 02:00 PM in Courtroom 700 before Magistrate Judge Nancy K Johnson, filed. (sjones, 4) (Entered: 10/23/2017) |
|---|---|---|
| 10/25/2017 | 79 | Notice of Filing of Official Transcript as to 77 Transcript,. Party notified, filed. (hcarr, 4) (Entered: 10/25/2017) |
| 10/26/2017 | 80 | NOTICE of Cancellation (parties worked out issues) re: 78 Notice of Setting, filed. (sjones, 4) (Entered: 10/26/2017) |
| 10/26/2017 |  | (Court only) Hearing set for 10.27.17 is HAS BEEN TERMINATED***Deadlines terminated. (sjones, 4) (Entered: 10/26/2017) |
| 10/26/2017 | 81 | Joint MOTION Joint Motion to Extend Hearing DateMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 11/16/2017. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 10/26/2017) |
| 10/27/2017 | 82 | ORDER granting 81 Motion.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 10/27/2017) |
| 10/27/2017 |  | ***Set/Reset Deadlines/Hearings: Preliminary Injunction Hearing reset for 11/28/2017 at 09:00 AM in Courtroom 700 before Magistrate Judge Nancy K Johnson (sjones, 4) (Entered: 10/27/2017) |
| 10/27/2017 |  | ***Set/Reset Deadlines: Reply Brief due by 11/27/2017 (sjones, 4) (Entered: 10/27/2017) |
| 10/31/2017 | 83 | RETURN of Service Executed as to Rick Clyne on 10/27/17 re: Subpoena to Testify at Deposition and Deposition Notice, filed.(Gorman, Sean) (Entered: 10/31/2017) |
| 10/31/2017 | 84 | AO 435 TRANSCRIPT REQUEST by BMC Software, Inc./Sean Gorman for Transcript of Telephonic Status Conference on October 18, 2017 before Magistrate Judge Nancy K. Johnson. Expedited (7 days) turnaround requested. Court Reporter/Transcriber: Judicial Transcribers of Texas, filed. (Gorman, Sean) (Entered: 10/31/2017) |
| 10/31/2017 | 85 | NOTICE of Appearance by Grant Martinez on behalf of International Business Machines Corporation, filed. (Yetter, R) (Entered: 10/31/2017) |
| 10/31/2017 | 86 | AO 435 TRANSCRIPT REQUEST by Tracey Ebdon for Transcript of Telephonic Status Conf. 10/18/2017 Judge Nancy K. Johnson. Expedited (7 days) turnaround requested. Court Reporter/Transcriber: N/A, filed. (jguajardo, 4) *Electronically forwarded to JTT 11/2/2017. Estimated Transcript Completion Date: 11/9/2017. (Entered: 11/01/2017)* |
| 11/01/2017 | 87 | JOINT DISCOVERY/CASE MANAGEMENT PLAN by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 11/01/2017) |
| 11/02/2017 |  | (Court only) ***Attorney Grant Bellows Martinez for International Business Machines Corporation added. (sjones, 4) (Entered: 11/02/2017) |
| 11/03/2017 | 88 | NOTICE of Appearance by Jeffrey L. Oldham on behalf of BMC Software, Inc., filed. (Oldham, Jeffrey) (Entered: 11/03/2017) |
| 11/03/2017 | 89 | NOTICE of Appearance by Timothy R.Geiger on behalf of BMC Software, Inc., filed. (Geiger, Timothy) (Entered: 11/03/2017) |
| 11/03/2017 | 90 | Unopposed MOTION for Leave to File Excess PagesMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 11/24/2017. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 11/03/2017) |

| 11/03/2017 | 91 | Unopposed MOTION to Seal BMC's Supplement to, and Brief in Support of, Application for Preliminary Injunction and Exhibits A - QMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 11/24/2017. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 11/03/2017) |
|---|---|---|
| 11/03/2017 | 92 | Sealed Event, filed. (With attachments) (Entered: 11/04/2017) |
| 11/04/2017 | 93 | First APPENDIX re: 92 Sealed Event by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 11/04/2017) |
| 11/04/2017 | 94 | Second APPENDIX re: 92 Sealed Event by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 11/04/2017) |
| 11/04/2017 | 95 | Third APPENDIX re: 92 Sealed Event by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 11/04/2017) |
| 11/04/2017 | 96 | Fourth APPENDIX re: 92 Sealed Event by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 11/04/2017) |
| 11/04/2017 | 97 | APPENDIX re: 92 Sealed Event by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 11/04/2017) |
| 11/06/2017 | 98 | ORDER granting 91 Motion to Seal.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 11/06/2017) |
| 11/06/2017 | 99 | ORDER granting 90 Motion for Leave to File Excess Pages.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 11/06/2017) |
| 11/07/2017 | 100 | NOTICE of Setting. Parties notified. Discovery Hearing set for 11/7/2017 at 03:00 PM in by telephone before Magistrate Judge Nancy K Johnson, filed. (sjonesadi, 4) (Entered: 11/07/2017) |
| 11/07/2017 | 103 | Parties' pre-conference memo to the court, filed.(sjones, 4) (Entered: 11/15/2017) |
| 11/07/2017 | 104 | MINUTE ENTRY ORDER: Discovery Hearing held. Appearances: Rob Ellis, Elizabeth Frances Eoff, Christopher Lee Dodson, Andrew Mark Berdon. Ct Reporter: ERO. Digital Number: 3:34-3:50PM.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 11/16/2017) |
| 11/12/2017 | 101 | TRANSCRIPT re: Telephonic Status Conference held on October 18, 2017 before Magistrate Judge Nancy K Johnson. Court Reporter/Transcriber Judicial Transcribers of Texas, LLC. Ordering Party Sean Gorman Release of Transcript Restriction set for 2/12/2018., filed. (mahenry, ) (Entered: 11/12/2017) |
| 11/13/2017 | 102 | Notice of Filing of Official Transcript as to 101 Transcript,. Party notified, filed. (hcarr, 4) (Entered: 11/13/2017) |
| 11/20/2017 | 105 | Unopposed MOTION to Seal IBM's Opposition to BMC's Request for a Preliminary InjunctionMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 12/11/2017. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 11/20/2017) |
| 11/20/2017 | 106 | Sealed Event, filed. (With attachments) (Entered: 11/20/2017) |
| 11/20/2017 | 107 | Unopposed MOTION for Leave to File Excess PagesMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 12/11/2017. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 11/20/2017) |

| 11/21/2017 | 108 | ORDER granting 107 Motion for Leave to File Excess Pages.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 11/21/2017) |
|---|---|---|
| 11/21/2017 | 109 | ORDER granting 105 Motion to Seal.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 11/21/2017) |
| 11/21/2017 | 110 | Sealed Event, filed. (With attachments) (Entered: 11/21/2017) |
| 11/21/2017 | 111 | Unopposed MOTION to Seal IBM's Supplemental Brief in Opposition to BMC's Request for a Preliminary InjunctionMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 12/12/2017. (Smith, Emily) (Entered: 11/21/2017) |
| 11/21/2017 | 112 | Sealed Event, filed. (With attachments) (Entered: 11/21/2017) |
| 11/26/2017 | 113 | MOTION for Leave to File Excess PagesMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 12/18/2017. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 11/26/2017) |
| 11/26/2017 | 114 | Unopposed MOTION to Seal BMC Software, Inc.'s Reply in Support of Application for Preliminary Injunction.Motions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 12/18/2017. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 11/26/2017) |
| 11/26/2017 | 115 | Sealed Event, filed. (With attachments) (Entered: 11/26/2017) |
| 11/26/2017 | 116 | APPENDIX re: 115 Sealed Event by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 11/26/2017) |
| 11/27/2017 | 117 | ORDER granting 113 Motion for Leave to File Excess Pages.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 11/27/2017) |
| 11/27/2017 | 118 | ORDER granting 114 Motion to Seal.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 11/27/2017) |
| 11/27/2017 | 119 | ORDER granting 111 Motion to Seal.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 11/27/2017) |
| 11/28/2017 | 120 | Minute Entry for proceedings held before Magistrate Judge Nancy K Johnson. Preliminary INJUNCTION HEARING DAY 1 held on 11/28/2017. Exhibits ADMITTED on the record. Sworn Testimony taken. Witnesses: Brian Jones, Geoffrey Decker, Nicholas Pachnos. Appearances: Elizabeth Frances Eoff, Timothy R Geiger, Christopher Lee Dodson, Sean R D Gorman, Marlo A. Pecora, Grant Bellows Martinez, Emily McLemore Smith, R Paul Yetter, Rachel Elizabeth Epstein, Andrew Mark Berdon, Richard Irving Werder, Jr, Donald John Reinhard, II, Wesley Hartman, Todd Anten. (ERO:Yes), filed.(sjones, 4) (Entered: 11/29/2017) |
| 11/29/2017 | | ***Set/Reset Deadlines/Hearings: Preliminary Injunction Hearing continued for 11/29/2017 at 09:00 AM in Courtroom 700 before Magistrate Judge Nancy K Johnson (sjones, 4) (Entered: 11/29/2017) |
| 11/29/2017 | 121 | AO 435 TRANSCRIPT REQUEST by Steven Vacek for Transcript of Judge Nancy Johnson, 11/28/2017. Hourly turnaround requested. Court Reporter/Transcriber: Judicial Transcribers of Texas, filed. (mmapps, 4) *Electronically forwarded to JTT 11/29/2017. Estimated Transcript Completion Date: N/A Transcript was requested hourly. (Entered: 11/29/2017)* |

| 11/29/2017 | | ***Set/Reset Deadlines/Hearings: Preliminary Injunction Hearing continued for 11/30/2017 at 09:00 AM in Courtroom 700 before Magistrate Judge Nancy K Johnson (sjones, 4) (Entered: 11/29/2017) |
|---|---|---|
| 11/29/2017 | | ***Set/Reset Deadlines/Hearings: Preliminary Injunction Hearing continued for 12/1/2017 at 09:00 AM in Courtroom 700 before Magistrate Judge Nancy K Johnson (sjones, 4) (Entered: 11/29/2017) |
| 11/29/2017 | 122 | AO 435 TRANSCRIPT REQUEST by BMC/Sean Gorman for Transcript of Preliminary Injunction Hearing, 11/28/2017, Judge Nancy Johnson. Hourly turnaround requested. Court Reporter/Transcriber: Judicial Transcribers of Texas, filed. (Gorman, Sean) *Electronically forwarded to JTT 11/29/2017. Estimated Transcript Completion Date: N/A Transcript was requested hourly. (Entered: 11/29/2017)* |
| 11/29/2017 | 123 | AO 435 TRANSCRIPT REQUEST by IBM/Steven Vacek for Transcript of Full day's proceedings 11/29/17 - 12/1/17. Daily (24 hours) turnaround requested. Court Reporter/Transcriber: Judicial Transcribers of Texas. (yhausmann, 6)Electronically forwarded audio from 11/29/2017 to Judicial Transcribers on 11/29/2017. Estimated completion date 11/30/2017. Modified on 11/29/2017 (ShoshanaArnow, 4). (Entered: 11/29/2017) |
| 11/29/2017 | 124 | AO 435 TRANSCRIPT REQUEST by BMC/Sean Gorman for Transcript of Preliminary Injunction Hearing, 11/29/2017 - 12/01/2017, Judge Nancy Johnson. Daily (24 hours) turnaround requested. Court Reporter/Transcriber: Judicial Transcribers of Texas, filed. (Gorman, Sean) Electronically forwarded audio from 11/29/2017 to Judicial Transcribers on 11/29/2017. Estimated completion date 11/30/2017. Modified on 11/29/2017 (ShoshanaArnow, 4). (Entered: 11/29/2017) |
| 11/29/2017 | 125 | Minute Entry for proceedings held before Magistrate Judge Nancy K Johnson. Preliminary INJUNCTION HEARING DAY 2 held on 11/29/2017. Exhibits ADMITTED on the record. Sworn Testimony taken; Video deposition. Witnesses: Nicholas Pachnos, Edward Conway. Appearances: Elizabeth Frances Eoff, Timothy R Geiger, Christopher Lee Dodson, Sean R D Gorman, Marlo A. Pecora, Grant Bellows Martinez, Emily McLemore Smith, R Paul Yetter, Rachel Elizabeth Epstein, Andrew Mark Berdon, Richard Irving Werder, Jr, Donald John Reinhard, II, Wesley Hartman, Todd Anten.(ERO:Yes), filed.(sjones, 4) (Entered: 11/30/2017) |
| 11/30/2017 | 126 | TRANSCRIPT re: Preliminary Injunction Hearing (Cont'd) - (MORNING SESSION ONLY) held on November 29, 2017 before Magistrate Judge Nancy K Johnson. Court Reporter/Transcriber Judicial Transcribers of Texas, LLC. Ordering Party Steven Vacek Release of Transcript Restriction set for 2/28/2018., filed. (mahenry, ) (Entered: 11/30/2017) |
| 11/30/2017 | 127 | TRANSCRIPT re: Preliminary Injunction Hearing (Afternoon Session) held on November 28, 2017 before Magistrate Judge Nancy K Johnson. Court Reporter/Transcriber Judicial Transcribers of Texas, LLC. Ordering Party Steven Vacek Release of Transcript Restriction set for 2/28/2018., filed. (mahenry, ) (Entered: 11/30/2017) |
| 11/30/2017 | 128 | TRANSCRIPT re: Preliminary Injunctio Hearing (Cont'd) (AFTERNOON SESSION) held on November 29, 2017 before Magistrate Judge Nancy K Johnson. Court Reporter/Transcriber Judicial Transcribers of Texas, LLC. Ordering Party Steven Vacek Release of Transcript Restriction set for 2/28/2018., filed. (mahenry, ) (Entered: 11/30/2017) |
| 11/30/2017 | 129 | Minute Entry for proceedings held before Magistrate Judge Nancy K Johnson. Preliminary INJUNCTION HEARING DAY 3 held on 11/30/2017. Exhibits ADMITTED |

| | | |
|---|---|---|
| | | on the record. Sworn testimony taken. Video depositions of Howard Rogers and Alfonza Mays. Witnesses: Chet Fenner (SEALED testimony), Christopher Gerardi. Appearances: Elizabeth Frances Eoff, Timothy R Geiger, Christopher Lee Dodson, Sean R D Gorman, Marlo A. Pecora, Kimberly Eden Carson, Grant Bellows Martinez, Emily McLemore Smith, R Paul Yetter, Rachel Elizabeth Epstein, Andrew Mark Berdon, Richard Irving Werder, Jr, Donald John Reinhard, II, Wesley Hartman, Todd Anten.(ERO:Yes), filed.(sjones, 4) (Entered: 12/01/2017) |
| 12/01/2017 | 130 | TRANSCRIPT re: Preliminary Injunction Hearing (Morning Session) held on November 28, 2017 before Magistrate Judge Nancy K Johnson. Court Reporter/Transcriber Judicial Transcribers of Texas, LLC. Ordering Party Steven Vacek Release of Transcript Restriction set for 3/1/2018., filed. (mahenry, ) (Entered: 12/01/2017) |
| 12/01/2017 | 131 | Notice of Filing of Official Transcript as to 128 Transcript, 127 Transcript, 126 Transcript,. Party notified, filed. (mmapps, 4) (Entered: 12/01/2017) |
| 12/01/2017 | 132 | Transcript (Sealed) of proceedings held on held on November 30, 2017. Court Reporter/Transcriber Judicial Transcribers of Texas, LLC, filed. (mahenry, ) (Entered: 12/01/2017) |
| 12/01/2017 | 135 | Minute Entry for proceedings held before Magistrate Judge Nancy K Johnson. Preliminary INJUNCTION HEARING DAY 4 held on 12/1/2017. Exhibits ADMITTED on the record. Sworn Testimony taken. Video depositions of Janet Sessarego, and Marc Chagnon. Witnesses: Guy Skinner, Bruce V. Hartley. Appearances: Elizabeth Frances Eoff, Timothy R Geiger, Christopher Lee Dodson, Sean R D Gorman, Marlo A. Pecora, Grant Bellows Martinez, Emily McLemore Smith, R Paul Yetter, Rachel Elizabeth Epstein, Andrew Mark Berdon, Richard Irving Werder, Jr, Donald John Reinhard, II. Wesley Hartman, Todd Anten.(ERO:Yes), filed.(sjones, 4) (Entered: 12/04/2017) |
| 12/02/2017 | 133 | TRANSCRIPT re: Preliminary Injunction Hearing (Cont'd) AFTERNOON SESSION held on December 1, 2017 before Magistrate Judge Nancy K Johnson. Court Reporter/Transcriber Judicial Transcribers of Texas, LLC. Ordering Party Steven Vacek Release of Transcript Restriction set for 3/2/2018., filed. (mahenry, ) (Entered: 12/02/2017) |
| 12/02/2017 | 134 | TRANSCRIPT re: Preliminary Injnction Hearing (Cont'd) MORNING SESSION held on December 1, 2017 before Magistrate Judge Nancy K Johnson. Court Reporter/Transcriber Judicial Transcribers of Texas, LLC. Ordering Party Steven Vacek Release of Transcript Restriction set for 3/2/2018., filed. (mahenry, ) (Entered: 12/02/2017) |
| 12/04/2017 | 136 | Notice of Filing of Official Transcript as to 133 Transcript, 134 Transcript, 130 Transcript,. Party notified, filed. (hcarr, 4) (Entered: 12/04/2017) |
| 12/05/2017 | | ***Set/Reset Deadlines: Mediation due by 1/19/2018. Proposed Finding of Facts & Conclusion of Law due by 2/6/2018 (sjones, 4) (Entered: 12/05/2017) |
| 01/17/2018 | 137 | RETURN of Service Executed as to Richard Clyne on January 16, 2018 re: Subpoena to Testify at a Deposition and Deposition Notice, filed.(Gorman, Sean) (Entered: 01/17/2018) |
| 01/17/2018 | 138 | RETURN of Service Executed as to Richard Clyne on January 16, 2018 re: Subpoena to Produce Documents, filed.(Gorman, Sean) (Entered: 01/17/2018) |
| 01/29/2018 | 139 | Joint MOTION for Extension of Time Extend Deadline for Proposed Findings of Fact and Conclusions of LawMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 2/20/2018. (Attachments: # 1 Proposed |

| | | |
|---|---|---|
| | | Order)(Yetter, R) (Entered: 01/29/2018) |
| 01/30/2018 | 140 | ORDER granting 139 Motion for Extension of Time Proposed findings of fact & conclusions due by 3/1/2018.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 01/30/2018) |
| 01/30/2018 | | CONTINUATION OF ENTRY 140 FOR STATISTICAL PURPOSES- Proposed findings of fact & conclusions due by 3/1/2018.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 01/30/2018) |
| 02/12/2018 | 141 | NOTICE of Setting. Parties notified. Discovery Hearing set for 2/14/2018 at 09:00 AM in Courtroom 700 before Magistrate Judge Nancy K Johnson, filed. (sjones, 4) (Entered: 02/12/2018) |
| 02/14/2018 | 142 | AO 435 TRANSCRIPT REQUEST by BMC Software/Sean Gorman for Transcript of Discovery Hearing on 02/14/18 before Magistrate Johnson. Expedited (7 days) turnaround requested. Court Reporter/Transcriber: Judicial Transcribers of Texas, filed. (Gorman, Sean) Electronically forwarded to Judicial Transcribers of Texas on 2/14/2018. Estimated transcript completion date: 2/21/2018. (LaurenWebster, 4) (Entered: 02/14/2018) |
| 02/14/2018 | 143 | AO 435 TRANSCRIPT REQUEST by Steven Vacek for Transcript of Dicovery Hearing 2/14/18 before Judge Johnson. Expedited (7 days) turnaround requested. Court Reporter/Transcriber: Judicial Transcribers of Texas, filed. (smurdock, 4) **Copy order** electronically forwarded to Judicial Transcribers of Texas on 2/14/2018. Estimated transcript completion date: 2/21/2018. (LaurenWebster, 4) (Entered: 02/14/2018) |
| 02/14/2018 | 144 | MINUTE ENTRY ORDER: Discovery Hearing held. Appearances: Stephen Purdie (by phone), Elizabeth Frances Eoff, Christopher Lee Dodson, Sean R D Gorman, Grant Bellows Martinez, Emily McLemore Smith, Rachel Elizabeth Epstein, Donald John Reinhard, II. Ct Reporter: ERO. Digital Number: 9:01-9:29AM. Amended Pleadings due by 6/29/2018. Deft Expert Report due by 10/26/2018. Deft Expert Witness List due by 10/26/2018. Discovery due by 12/31/2018. Dispositive Motion Filing due by 1/18/2019. Mediation due by 1/11/2019. Non-Dispositive Motion Filing due by 1/18/2019. Document production due by 6/22/2018 Pltf Expert Report due by 9/21/2018. Pltf Expert Witness List due by 9/21/2018. Status Conference set for 4/2/2018 at 02:00 PM in Courtroom 700 before Magistrate Judge Nancy K Johnson(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 02/15/2018) |
| 02/16/2018 | 145 | TRANSCRIPT re: Hearing on Discovery and Scheduling Conference held on February 14, 2018 before Magistrate Judge Nancy K Johnson. Court Reporter/Transcriber Judicial Transcribers of Texas, LLC. Ordering Party Sean Gorman Release of Transcript Restriction set for 5/17/2018., filed. (mahenry, ) (Entered: 02/16/2018) |
| 02/20/2018 | 146 | Notice of Filing of Official Transcript as to 145 Transcript,. Party notified, filed. (hcarr, 4) (Entered: 02/20/2018) |
| 02/20/2018 | 147 | Joint MOTION to Seal Transcripts from Preliminary Injunction Hearing (Dkt. #126, 127, 128, 130, 132, 133, 134)Motions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 3/13/2018. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 02/20/2018) |
| 02/22/2018 | 148 | NOTICE of Setting re: 147 Joint MOTION to Seal Transcripts from Preliminary Injunction Hearing (Dkt. #126, 127, 128, 130, 132, 133, 134). Parties notified. Motion Hearing set for 3/1/2018 at 10:00 AM in by telephone before Magistrate Judge Nancy K Johnson, filed. (sjones, 4) (Entered: 02/22/2018) |

| 02/23/2018 | 149 | NOTICE of Resetting as to 147 Joint MOTION to Seal Transcripts from Preliminary Injunction Hearing (Dkt. #126, 127, 128, 130, 132, 133, 134). Parties notified. Motion Hearing set for 2/26/2018 at 10:00 AM in by telephone before Magistrate Judge Nancy K Johnson, filed. (sjones, 4) (Entered: 02/23/2018) |
|---|---|---|
| 02/26/2018 | 150 | MINUTE ENTRY ORDER: Motion Hearing held on 02.26.18. Appearances: Rebecca Huddle, Elizabeth Frances Eoff, Christopher Lee Dodson, Sean R D Gorman, Grant Bellows Martinez, Rachel Elizabeth Epstein, Donald John Reinhard, II. Ct Reporter: ERO. Digital Number: 10:00-10:32AM.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 02/26/2018) |
| 02/26/2018 | 151 | ORDER re: 147 Motion to Seal.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 02/26/2018) |
| 02/26/2018 | 152 | MINUTE ENTRY ORDER: AMENDED Discovery Hearing held on 02.26.18. Appearances: Rebecca Huddle, Elizabeth Frances Eoff, Christopher Lee Dodson, Sean R D Gorman, Grant Bellows Martinez, Rachel Elizabeth Epstein, Donald John Reinhard, II. Ct Reporter: ERO. (Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 02/26/2018) |
| 02/26/2018 | 154 | AO 435 TRANSCRIPT REQUEST by Steven Vacek for Transcript of 2/26/2018. Expedited (7 days) turnaround requested. Court Reporter/Transcriber: Judicial Transcribers of Texas, filed. (ShoshanaArnow, 4)Electronically forwarded to Judicial Transcribers on 2/27/2018. Estimated completion date 3/6/2018. Modified on 2/27/2018 Modified on 2/27/2018 (ShoshanaArnow, 4). (Entered: 02/27/2018) |
| 02/27/2018 | 153 | AO 435 TRANSCRIPT REQUEST by BMC Software/Sean Gorman for Transcript of Telephonic Hearing on 02/26/18 before Magistrate Johnson. Expedited (7 days) turnaround requested. Court Reporter/Transcriber: Judicial Transcribers of Texas, filed. (Gorman, Sean) Electronically forwarded to Judicial Transcribers on 2/27/2018. Estimated completion date 3/6/2018. Modified on 2/27/2018 (ShoshanaArnow, 4). (Entered: 02/27/2018) |
| 03/01/2018 | | The court informally extended the parties deadline to March 6, 2018 to submit highlighted versions of the submissions, per email request***, filed. (sjones, 4) (Entered: 03/01/2018) |
| 03/01/2018 | 155 | Sealed Event, filed. (With attachments) (Entered: 03/01/2018) |
| 03/01/2018 | 156 | Proposed Findings of Fact/Conclusions of Law by BMC Software, Inc.(Gorman, Sean) (Entered: 03/01/2018) |
| 03/01/2018 | 157 | Sealed Event, filed. (Entered: 03/01/2018) |
| 03/05/2018 | 158 | Transcript (Sealed) of proceedings held on held on February 26, 2018. Court Reporter/Transcriber Judicial Transcribers of Texas, LLC, filed. (mahenry, ) (Entered: 03/05/2018) |
| 03/06/2018 | 159 | Sealed Event, filed. (Entered: 03/06/2018) |
| 03/06/2018 | 160 | Sealed Event, filed. (Entered: 03/06/2018) |
| 03/09/2018 | 161 | RETURN of Service Executed as to Richard Clyne on 02/23/2018 re: Subpoena to Testify at a Deposition in a Civil Action, filed.(Gorman, Sean) (Entered: 03/09/2018) |
| 03/22/2018 | 162 | Unopposed MOTION to Seal Proposed Limited Response to IBM's Proposed Findings of Fact and Conclusions of LawMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 4/12/2018. (Attachments: # 1 Proposed Order)(Gorman, |

| | | Sean) (Entered: 03/22/2018) |
|---|---|---|
| 03/22/2018 | 163 | Opposed MOTION for Leave to File Motion to Admit and Objections to Certain Documents and Limited Response to IBM's Proposed Findings of Fact and Conclusions of LawMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 4/12/2018. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2 - under seal, # 3 Proposed Order)(Gorman, Sean) (Entered: 03/22/2018) |
| 03/22/2018 | 164 | Sealed Event, filed. (Entered: 03/22/2018) |
| 03/22/2018 | 165 | Corrected MOTION to Seal Proposed Limited Response to IBM's Proposed Findings of Fact and Conclusions of LawMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 4/12/2018. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 03/22/2018) |
| 03/23/2018 | 166 | RESPONSE in Opposition to 163 Opposed MOTION for Leave to File Motion to Admit and Objections to Certain Documents and Limited Response to IBM's Proposed Findings of Fact and Conclusions of Law, filed by International Business Machines Corporation. (Yetter, R) (Entered: 03/23/2018) |
| 03/26/2018 | 167 | Unopposed MOTION to Withdraw 165 Corrected MOTION to Seal Proposed Limited Response to IBM's Proposed Findings of Fact and Conclusions of Law Motions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 4/16/2018. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 03/26/2018) |
| 03/26/2018 | 168 | ORDER granting 167 Motion to Withdraw; withdrawing 165 Corrected MOTION to Seal Proposed Limited Response to IBM's Proposed Findings of Fact and Conclusions of Law.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 03/26/2018) |
| 03/26/2018 | 169 | ORDER granting 163 Motion for Leave to File.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 03/26/2018) |
| 03/26/2018 | 170 | MOTION to Admit & Objections to Certain DocumentsMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 4/16/2018. (Attachments: # 1 Proposed Order)(sjones, 4) (Entered: 03/26/2018) |
| 03/26/2018 | | SEALED DOC 164 IS RELATED TO ENTRY 170 ***, filed. (sjones, 4) (Entered: 03/26/2018) |
| 03/28/2018 | 171 | Joint MOTION for Extension of Time For Filing Privilege Objections and Reschedule HearingMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 4/18/2018. (Attachments: # 1 Proposed Order)(Smith, Emily) (Entered: 03/28/2018) |
| 03/28/2018 | 172 | NOTICE of Change of Address by Yetter Coleman LLP, counsel for International Business Machines Corporation, filed. (Yetter, R) (Entered: 03/28/2018) |
| 03/29/2018 | | (Court only) TERMINATED SEE ENTRY 165 ***Motion(s) terminated: 162 Unopposed MOTION to Seal Proposed Limited Response to IBM's Proposed Findings of Fact and Conclusions of Law. (sjones, 4) (Entered: 03/29/2018) |
| 03/29/2018 | 173 | ORDER granting 171 Motion for Extension of Time.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 03/29/2018) |
| 03/29/2018 | 174 | NOTICE of Setting. Parties notified. Status Conference reset for 4/13/2018 at 10:00 AM in Courtroom 700 before Magistrate Judge Nancy K Johnson, filed. (sjones, 4) (Entered: |

| | | |
|---|---|---|
| | | 03/29/2018) |
| 04/04/2018 | 175 | NOTICE of Setting. Parties notified. In Camera Hearing set for 4/19/2018 at 10:00 AM in Courtroom 700 before Magistrate Judge Nancy K Johnson, filed. (sjones, 4) (Entered: 04/04/2018) |
| 04/11/2018 | 176 | Unopposed MOTION to Seal BMC's Objections to IBM's Privilege Claims and ExhibitsMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 5/2/2018. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 04/11/2018) |
| 04/11/2018 | 177 | Sealed Event, filed. (With attachments) (Entered: 04/11/2018) |
| 04/11/2018 | 178 | Unopposed MOTION to Seal IBM's Objections to BMC's Amended Privilege LogMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 5/2/2018. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 04/11/2018) |
| 04/11/2018 | 179 | Sealed Event, filed. (With attachments) (Entered: 04/11/2018) |
| 04/13/2018 | 180 | DECLARATION of Brian Jones in Support of BMC's Amended Second Privilege Log, filed. (Attachments: # 1 Exhibit A)(Gorman, Sean) (Entered: 04/13/2018) |
| 04/13/2018 | 181 | DECLARATION of Steve Ridge in Support of BMC's Amended Second Privilege Log, filed.(Gorman, Sean) (Entered: 04/13/2018) |
| 04/13/2018 | 182 | AO 435 TRANSCRIPT REQUEST by Sean Gorman for Transcript of Status Conference on 04/13/18 before Magistrate Johnson. Expedited (7 days) turnaround requested. Court Reporter/Transcriber: Judicial Transcribers of Texas, filed. (Gorman, Sean) Electronically forwarded to Judicial Transcribers of Texas on 4/16/2018. Estimated transcript completion date: 4/23/2018. (LaurenWebster, 4) (Entered: 04/13/2018) |
| 04/13/2018 | 183 | MINUTE ENTRY ORDER: Status Conference held granting 176 Unopposed MOTION to Seal BMC's Objections to IBM's Privilege Claims and Exhibits, granting 178 Unopposed MOTION to Seal IBM's Objections to BMC's Amended Privilege Log. Appearances: Elizabeth Frances Eoff, Christopher Lee Dodson, Sean R D Gorman, Marlo A. Pecora, Grant Bellows Martinez, Emily McLemore Smith, Rachel Elizabeth Epstein, Donald John Reinhard, II. Ct Reporter: ERO. Digital Number: 9:58-10:44AM.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 04/16/2018) |
| 04/16/2018 | 184 | AO 435 TRANSCRIPT REQUEST by Steven Vacek for Transcript of Status Conference, 4/13/2018, Judge N. Johnson. Daily (24 hours) turnaround requested. Court Reporter/Transcriber: Judicial Transcribers of Texas, filed. (jguajardo, 4) Electronically forwarded to Judicial Transcribers of Texas on 4/16/2018. Estimated transcript completion date: 4/17/2018. (LaurenWebster, 4) (Entered: 04/16/2018) |
| 04/18/2018 | 185 | TRANSCRIPT re: Status Conference held on April 13, 2018 before Magistrate Judge Nancy K Johnson. Court Reporter/Transcriber Judicial Transcribers of Texas, LLC. Ordering Party Steven Vacek Release of Transcript Restriction set for 7/17/2018., filed. (mahenry, ) (Entered: 04/18/2018) |
| 04/19/2018 | 186 | Notice of Filing of Official Transcript as to 185 Transcript,. Party notified, filed. (jdav, 4) (Entered: 04/19/2018) |
| 04/19/2018 | 187 | DECLARATION of Thomas P. Hagen, Esq. in Support of IBM's March 22, 2018 Privilege Log and March 23, 2018 Redaction Log, filed.(Smith, Emily) (Entered: 04/19/2018) |

| 04/19/2018 | 188 | Sealed Event, filed. (Entered: 04/19/2018) |
|---|---|---|
| 04/19/2018 | 189 | Sealed Event, filed. (Entered: 04/19/2018) |
| 04/19/2018 | 190 | Sealed Order, filed. (Entered: 04/20/2018) |
| 04/20/2018 | | (Court only) In Camera Hearing held on 04.19.18***Deadlines terminated. (sjones, 4) (Entered: 04/20/2018) |
| 05/02/2018 | 191 | Unopposed MOTION to Seal (1) IBM's Response to BMCs Motion to Admit and Objections to Certain Exhibits and (2) IBM's Reply to BMCs Response to IBMs Proposed Findings of Fact and Conclusions of LawMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 5/23/2018. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 05/02/2018) |
| 05/02/2018 | 192 | Sealed Event, filed. (With attachments) (Entered: 05/02/2018) |
| 05/02/2018 | 193 | Sealed Event, filed. (With attachments) (Entered: 05/02/2018) |
| 05/04/2018 | 194 | ORDER granting 191 Motion to Seal.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 05/04/2018) |
| 05/09/2018 | 195 | Sealed Event, filed. (Entered: 05/09/2018) |
| 05/23/2018 | 196 | Sealed Event, filed. (Entered: 05/23/2018) |
| 05/23/2018 | 197 | Sealed Event, filed. (Entered: 05/23/2018) |
| 05/29/2018 | 198 | Sealed Event, filed. (Entered: 05/29/2018) |
| 06/06/2018 | 199 | NOTICE of Setting. Parties notified. Discovery Hearing set for 6/14/2018 at 02:00 PM in Courtroom 700 before Magistrate Judge Nancy K Johnson, filed. (sjones, 4) (Entered: 06/06/2018) |
| 06/12/2018 | 200 | Unopposed MOTION to Seal IBM's Motion for Protective OrderMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 7/3/2018. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 06/12/2018) |
| 06/12/2018 | 201 | Sealed Event, filed. (With attachments) (Entered: 06/12/2018) |
| 06/12/2018 | 202 | MOTION for Protective OrderMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 7/3/2018. (Attachments: # 1 Proposed Order, # 2 Appendix, # 3 Unredacted attachment, # 4 Unredacted attachment)(Yetter, R) (Entered: 06/12/2018) |
| 06/13/2018 | 203 | Unopposed MOTION to Seal BMC's Opposed Motion for Leave to File Motion to Strike IBMs Exhibits and BMCs Sur-reply in Support of its Proposed Findings of Facts and Conclusions of LawMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 7/5/2018. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 06/13/2018) |
| 06/13/2018 | 204 | Sealed Event, filed. (With attachments) (Entered: 06/13/2018) |
| 06/13/2018 | 220 | Sealed Event, filed. (With attachments) (Entered: 07/10/2018) |
| 06/14/2018 | 205 | ORDER granting 200 Motion to Seal.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 06/14/2018) |
| 06/14/2018 | 206 | |

| | | |
|---|---|---|
| | | ORDER granting 203 Motion to Seal.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 06/14/2018) |
| 06/14/2018 | 209 | MINUTE ENTRY ORDER: Discovery Hearing held on 06.14.18. Appearances: Elizabeth Frances Eoff, Timothy R Geiger, Christopher Lee Dodson, Sean R D Gorman, Marlo A. Pecora, John H. Chun, Grant Bellows Martinez, Emily McLemore Smith, Rachel Elizabeth Epstein, Donald John Reinhard, II. Ct Reporter: ERO. Discovery Hearing set for 7/19/2018 at 01:00 PM in Courtroom 700 before Magistrate Judge Nancy K Johnson(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 06/20/2018) |
| 06/15/2018 | 207 | AO 435 TRANSCRIPT REQUEST by Steven Vacek for Transcript of Discovery Hearing 6/14/18 before Magistrate Judge Johnson. Expedited (7 days) turnaround requested. Court Reporter/Transcriber: Judicial Transcribers of Texas, filed. (ckrus, 4) Electronically forwarded to Judicial Transcribers of Texas on 6/15/2018. Estimated transcript completion date: 6/22/2018. (LaurenWebster, 4) (Entered: 06/15/2018) |
| 06/15/2018 | 208 | AO 435 TRANSCRIPT REQUEST by BMC Software/Sean Gorman for Transcript of Discovery Hearing on 06/14/18 before Magistrate Johnson. Expedited (7 days) turnaround requested. Court Reporter/Transcriber: Judicial Transcribers of Texas, filed. (Gorman, Sean) Copy order electronically forwarded to Judicial Transcribers of Texas on 6/15/2018. Estimated transcript completion date: 6/22/2018. (LaurenWebster, 4) (Entered: 06/15/2018) |
| 06/21/2018 | | ***Set/Reset Deadlines/Hearings: Discovery Hearing reset for 7/19/2018 at 01:00 PM in Courtroom 700 before Magistrate Judge Nancy K Johnson (sjones, 4) (Entered: 06/21/2018) |
| 06/21/2018 | 210 | Unopposed MOTION to Seal IBM's Motion to Strike BMC's Jury Demand and Exhibits 1 - 4Motions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 7/12/2018. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 06/21/2018) |
| 06/21/2018 | 211 | Sealed Event, filed. (With attachments) (Entered: 06/21/2018) |
| 06/22/2018 | 212 | ORDER granting 210 Motion to Seal.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 06/22/2018) |
| 06/22/2018 | 213 | MOTION to Strike *IBM's Motion to Strike BMC's Jury Demand (Public Redacted Version)* Motions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 7/13/2018. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Proposed Order)(Yetter, R) (Entered: 06/22/2018) |
| 06/22/2018 | 214 | TRANSCRIPT re: Discovery Hearing held on June 14, 2018 before Magistrate Judge Nancy K Johnson. Court Reporter/Transcriber Judicial Transcribers of Texas, LLC. Ordering Party Steven C. Vacek Release of Transcript Restriction set for 9/20/2018., filed. (mahenry, ) (Entered: 06/22/2018) |
| 06/25/2018 | 215 | Notice of Filing of Official Transcript as to 214 Transcript,. Party notified, filed. (dhansen, 4) (Entered: 06/25/2018) |
| 07/02/2018 | 216 | STIPULATION re: Agreed Deadlines for Responses and Replies by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 07/02/2018) |
| 07/03/2018 | 217 | AGREED STIPULATION ( Responses due by 7/12/2018., Replies due by 7/25/2018), |

| | | |
|---|---|---|
| | | (Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 07/03/2018) |
| 07/10/2018 | 219 | MEMORANDUM AND RECOMMENDATION re 38 Amended Complaint/Counterclaim/Crossclaim etc., 92 Sealed Event, 37 Sealed Event, 170 MOTION to Admit & Objections to Certain Documents Objections to M&R due by 7/24/2018(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 07/10/2018) |
| 07/10/2018 | | (Court only) TERMINATED AS MOOT, CASE MANAGER FILED DOC AS 220 ***Motion(s) terminated: 204 Sealed Event. (sjones, 4) (Entered: 07/10/2018) |
| 07/12/2018 | 221 | Unopposed MOTION to Seal BMC's Response to IBM's Motion for Protective OrderMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 8/2/2018. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 07/12/2018) |
| 07/12/2018 | 222 | UNSEALED PER ORDER 258 BMC's Response to IBM's Motion for Protective Order (With attachments) Modified on 9/5/2018 (sjones, 4). (Entered: 07/12/2018) |
| 07/12/2018 | 223 | APPENDIX re: 222 Sealed Event by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 07/12/2018) |
| 07/12/2018 | 224 | Unopposed MOTION to Seal BMC's Response to IBM's Motion to Strike BMC's Jury DemandMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 8/2/2018. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 07/12/2018) |
| 07/12/2018 | 225 | UNSEALED PER ORDER 258 BMC's Response to IBM's Motion to Strike BMC's Jury Demand filed. (With attachments) Modified on 9/5/2018 (sjones, 4). (Entered: 07/12/2018) |
| 07/12/2018 | 226 | APPENDIX re: 225 Sealed Event by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 07/12/2018) |
| 07/18/2018 | 227 | NOTICE of Resetting. Parties notified. Discovery Hearing reset for 8/20/2018 at 01:00 PM in Courtroom 700 before Magistrate Judge Nancy K Johnson, filed. (sjones, 4) (Entered: 07/18/2018) |
| 07/24/2018 | 228 | Unopposed MOTION for Leave to File Excess PagesMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 8/14/2018. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 07/24/2018) |
| 07/24/2018 | 229 | Unopposed MOTION to Seal BMC's Objections to Memorandum and RecommendationMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 8/14/2018. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 07/24/2018) |
| 07/24/2018 | 230 | Sealed Event, filed. (With attachments) (Entered: 07/24/2018) |
| 07/24/2018 | 231 | APPENDIX re: 230 Sealed Event by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 07/24/2018) |
| 07/25/2018 | 232 | Unopposed MOTION to Seal IBM's Reply in Support of Its Motion to Strike BMC's Jury DemandMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 8/15/2018. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 07/25/2018) |

| 07/25/2018 | 233 | UNSEALED PER ORDER 258 IBM's Reply in Support of its Motion to Strike BMC's Jury Demand, filed. (With attachments) Modified on 9/5/2018 (sjones, 4). (Entered: 07/25/2018) |
|---|---|---|
| 07/25/2018 | 234 | Unopposed MOTION to Seal IBM's Reply in Support of Its Motion for Protective OrderMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 8/15/2018. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 07/25/2018) |
| 07/25/2018 | 235 | Sealed Event, filed. (Entered: 07/25/2018) |
| 07/26/2018 | 236 | ORDER granting 228 Motion for Leave to File Excess Pages.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 07/26/2018) |
| 07/26/2018 | 237 | ORDER denying 221 Motion to Seal; denying 224 Motion to Seal; denying 229 Motion to Seal; denying 232 Motion to Seal; denying 234 Motion to Seal.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 07/26/2018) |
| 08/07/2018 | 238 | Joint MOTION to Seal Limited Portions of Certain Filings (Dkt. Nos. 222, 225, 230, 233Motions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 8/28/2018. (Attachments: # 1 Exhibit A - filed under seal, # 2 Exhibit B - filed under seal, # 3 Exhibit C - filed under seal, # 4 Exhibit D - filed under seal, # 5 Proposed Order)(Gorman, Sean) (Entered: 08/07/2018) |
| 08/07/2018 | 239 | Sealed Event, filed. (With attachments) (Entered: 08/07/2018) |
| 08/07/2018 | 240 | Unopposed MOTION for Leave to File Excess PagesMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 8/28/2018. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 08/07/2018) |
| 08/07/2018 | 241 | Unopposed MOTION to Seal IBM's Response to BMC's Objections to Memorandum and RecommendationMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 8/28/2018. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 08/07/2018) |
| 08/07/2018 | 242 | Sealed Event, filed. (With attachments) (Entered: 08/07/2018) |
| 08/09/2018 | 243 | Unopposed MOTION to Expedite Unopposed Motion for Leave to File Reply in Support of Objections to Memorandum and RecommendationMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 8/30/2018. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 08/09/2018) |
| 08/10/2018 | 244 | ORDER granting 243 Motion to Expedite.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 08/10/2018) |
| 08/10/2018 | | CONTINUATION OF ENTRY 244 FOR STATISTICAL PURPOSES-Replies due 08.16.18. Replies due by 8/16/2018(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 08/10/2018) |
| 08/16/2018 | 245 | Unopposed MOTION to Seal Reply in Support of its Objections to the Memorandum and RecommendationMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 9/6/2018. (Attachments: # 1 Exhibit A Filed Under Seal, # 2 Proposed Order)(Gorman, Sean) (Entered: 08/16/2018) |
| 08/16/2018 | 246 | Sealed Document Modified on 9/6/2018 (sjones, 4). (Entered: 08/16/2018) |
| 08/16/2018 | 247 | APPENDIX re: 246 Sealed Event by BMC Software, Inc., filed.(Gorman, Sean) (Entered: |

| | | 08/16/2018) |
|---|---|---|
| 08/16/2018 | 248 | Sealed Event, filed. (Entered: 08/16/2018) |
| 08/17/2018 | 249 | NOTICE of Cancellation of Discovery Hearing set for 08.20.18, filed. (sjones, 4) (Entered: 08/17/2018) |
| 08/17/2018 | | (Court only) ***Deadlines terminated. (sjones, 4) (Entered: 08/17/2018) |
| 08/20/2018 | 250 | NOTICE of Resetting. Parties notified. Discovery Hearing reset for 8/28/2018 at 02:30 PM in Courtroom 700 before Magistrate Judge Nancy K Johnson, filed. (sjones, 4) (Entered: 08/20/2018) |
| 08/23/2018 | 251 | THIS ENTRY IS WITHDRAWN PER ORDER 252 MEMORANDUM AND RECOMMENDATIONS recommending that 218 Defendant IBM's Motion to Dismiss for Failure to Join an Indispensable Party should be DENIED. Objections to M&R due by 9/6/2018(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(olindor, 4) Modified on 8/27/2018 (sjones, 4). (Entered: 08/23/2018) |
| 08/27/2018 | 252 | ORDER WITHDRAWING MEMORANDUM AND RECOMMENDATION 251 (Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 08/27/2018) |
| 08/28/2018 | 255 | MINUTE ENTRY ORDER: Discovery Hearing held on 08.28.18.Appearances: Thomas Bridges, Elizabeth Frances Eoff, Timothy R Geiger, Christopher Lee Dodson, Sean R D Gorman, Marlo A. Pecora, Grant Bellows Martinez, Emily McLemore Smith, Andrew Mark Berdon, Donald John Reinhard, II. Ct Reporter: ERO. Digital Number: 2:28-5:30PM.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 08/29/2018) |
| 08/29/2018 | 253 | AO 435 TRANSCRIPT REQUEST by BMC Software/Sean Gorman for Transcript of Discovery Hearing on 08/28/18 before Magistrate Johnson. Expedited (7 days) turnaround requested. Court Reporter/Transcriber: Judicial Transcribers of Texas, filed. (Gorman, Sean) Electronically forwarded to JTT on Aug 29. Estimated completion date is September 5.Modified on 8/29/2018 (JenniferOlson, 4). (Entered: 08/29/2018) |
| 08/29/2018 | 254 | AO 435 TRANSCRIPT REQUEST by International Business Machines Corporation/R. Paul Yetter for Transcript of Discovery Hearing on 08/28/18 before Magistrate Johnson. Expedited (7 days) turnaround requested. Court Reporter/Transcriber: Judicial JTT on Aug 29. Estimated completion date is September 5. Modified on 8/29/2018 (JenniferOlson, 4). (Entered: 08/29/2018) |
| 08/30/2018 | 256 | ORDER granting 211 Sealed Motion; granting 213 Motion to Strike.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 08/30/2018) |
| 09/05/2018 | 257 | ORDER granting 240 Motion for Leave to File Excess Pages.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 09/05/2018) |
| 09/05/2018 | 258 | ORDER granting in part and denying in part 238 Motion to Seal; granting in part and denying in part 241 Motion to Seal; granting in part and denying in part 245 Motion to Seal.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 09/05/2018) |
| 09/06/2018 | 259 | TRANSCRIPT re: #250 - Motion to Compel held on August 28, 2018 before Magistrate Judge Nancy K Johnson. Court Reporter/Transcriber Judicial Transcribers of Texas, LLC. Ordering Party Sean Gorman Release of Transcript Restriction set for 12/5/2018., filed. (mahenry, ) (Entered: 09/06/2018) |

| 09/06/2018 | | ***Set/Reset Deadlines/Hearings: Telephone Conference set for 9/6/2018 at 10:00 AM by telephone before Magistrate Judge Nancy K Johnson (sjones, 4) (Entered: 09/06/2018) |
|---|---|---|
| 09/06/2018 | 260 | MINUTE ENTRY ORDER: Telephone Conference held on 09.06.18. Appearances: Elizabeth Frances Eoff, Rachel Elizabeth Epstein. Ct Reporter: ERO. Digital Number: 9:56-10:12AM.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 09/06/2018) |
| 09/07/2018 | 261 | Notice of Filing of Official Transcript as to 259 Transcript,. Party notified, filed. (hcarr, 4) (Entered: 09/07/2018) |
| 09/07/2018 | 262 | Redaction of 259 Transcript,, filed. (mahenry, ) (Entered: 09/07/2018) |
| 09/13/2018 | 263 | Joint MOTION for Extension of Time to Respond to Order Striking BMC's Jury DemandMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 10/4/2018. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 09/13/2018) |
| 09/13/2018 | 264 | ORDER granting 263 Motion for Extension of Time.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 09/13/2018) |
| 09/17/2018 | 265 | RESPONSE to 258 Order on Motion to Seal,,,,, *Redacted Doc. 230*, filed by BMC Software, Inc.. (Attachments: # 1 Exhibit A)(Gorman, Sean) (Entered: 09/17/2018) |
| 09/17/2018 | 266 | RESPONSE to 258 Order on Motion to Seal,,,,, *Redacted Doc. 246*, filed by BMC Software, Inc.. (Gorman, Sean) (Entered: 09/17/2018) |
| 09/17/2018 | 267 | RESPONSE to 258 Order on Motion to Seal,,,,, , filed by International Business Machines Corporation. (Smith, Emily) (Entered: 09/17/2018) |
| 09/19/2018 | 268 | NOTICE of Setting. Parties notified.Hearing set for 9/26/2018 at 01:00 PM at Courtroom 700 before Magistrate Judge Nancy K Johnson, filed. (sjones, 4) (Entered: 09/19/2018) |
| 09/20/2018 | 269 | OBJECTIONS to 256 Order on Sealed Motion, Order on Motion to Strike *Jury Demand*, filed by BMC Software, Inc.. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 09/20/2018) |
| 09/21/2018 | 270 | ORDER ADOPTING in part 219 Memorandum and Recommendations re 92 Sealed Event, 37 Sealed Event, 170 MOTION to Admit & Objections to Certain Documents (Signed by Judge Gray H Miller) Parties notified.(rkonieczny, 4) (Entered: 09/21/2018) |
| 09/26/2018 | | Minute Entry for proceedings held before Magistrate Judge Nancy K Johnson. HEARING held on 9/26/2018. NO RECORD TAKEN OF THE HEARING PER COURT'S REQUEST. Appearances:Sara Melendez, Elizabeth Frances Eoff, Emily McLemore Smith, Rachel Elizabeth Epstein.(Digital # 1:04-3:50PM)(ERO:Yes), filed.(sjones, 4) (Entered: 09/27/2018) |
| 10/11/2018 | 271 | RESPONSE to 269 Objections *IBM's Response to BMC's Objections to Order Striking Jury Demand*, filed by International Business Machines Corporation. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 10/11/2018) |
| 10/12/2018 | 272 | Unopposed MOTION for Leave to File Reply in Support of Objections to Order Striking Jury DemandMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 11/2/2018. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 10/12/2018) |
| 10/15/2018 | 273 | ORDER granting 272 Motion for Leave to File.(Signed by Magistrate Judge Nancy K |

| | | |
|---|---|---|
| | | Johnson) Parties notified.(sjones, 4) (Entered: 10/15/2018) |
| 10/15/2018 | | ***Set/Reset Deadlines/Hearings: Replies due by 10/25/2018 (sjones, 4) (Entered: 10/15/2018) |
| 10/25/2018 | 274 | REPLY to 269 Objections *Reply in Support of Objections to Order Striking Jury Demand*, filed by BMC Software, Inc.. (Gorman, Sean) (Entered: 10/25/2018) |
| 11/05/2018 | 275 | Agreed JOINT DISCOVERY/CASE MANAGEMENT PLAN by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 11/05/2018) |
| 11/06/2018 | 276 | AGREED AMENDED SCHEDULING ORDER. Fact Discovery due by 5/17/2019. Mediation due by 10/18/2019. Dispositive Motion Filing due by 9/24/2019. Non-Dispositive Motion Filing due by 9/24/2019.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 11/06/2018) |
| 11/06/2018 | 277 | Corrected JOINT DISCOVERY/CASE MANAGEMENT PLAN by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 11/06/2018) |
| 11/06/2018 | 278 | USB Flash Drive forwarded to chambers, filed.(kpicota, 4) Modified on 11/7/2018 (sjones, 4). (Entered: 11/06/2018) |
| 11/07/2018 | 279 | AGREED CORRECTED AMENDED SCHEDULING ORDER. Amended Pleadings due by 1/18/2019. Joinder of Parties due by 1/18/2019(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 11/07/2018) |
| 12/14/2018 | | (Court only) TERMINATED AS MOOT, PER ATTY***Motion(s) terminated: 220 Sealed Event. (sjones, 4) (Entered: 12/14/2018) |
| 12/14/2018 | 280 | NOTICE */Notification of Withdrawal* re: 202 MOTION for Protective Order, 201 Sealed Event, 235 Sealed Event by International Business Machines Corporation, filed. (Yetter, R) (Entered: 12/14/2018) |
| 12/14/2018 | | (Court only) TERMINATED AS MOOT, PER 280 ***Motion(s) terminated: 201 Sealed Event, 202 MOTION for Protective Order. (sjones, 4) (Entered: 12/14/2018) |
| 01/07/2019 | 281 | RETURN of Service Executed as to CA Technologies on 12/26/18 re: Subpoena to Testify at a Deposition in a Civil Action, filed.(Gorman, Sean) (Entered: 01/07/2019) |
| 01/07/2019 | 282 | RETURN of Service Executed as to Rocket Software, Inc. on 12/27/18 re: Subpoena to Testify at a Deposition in a Civil Action, filed.(Gorman, Sean) (Entered: 01/07/2019) |
| 01/07/2019 | 283 | RETURN of Service Executed as to CA Technologies on 12/26/18 re: Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, filed.(Gorman, Sean) (Entered: 01/07/2019) |
| 01/07/2019 | 284 | RETURN of Service Executed as to Rocket Software, Inc. on 12/27/18 re: Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, filed.(Gorman, Sean) (Entered: 01/07/2019) |
| 01/18/2019 | 285 | Agreed JOINT DISCOVERY/CASE MANAGEMENT PLAN by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 01/18/2019) |
| 01/22/2019 | 286 | AGREED AMENDED SCHEDULING ORDER. Document Production due by 1/31/2019. Amended Pleadings due by 2/22/2019. Responses due by 3/15/2019. Fact Depositions due by 6/14/2019. Fact Discovery Cut Off due by 6/14/2019. Expert Reports due by 7/17/2019. Experts Supplements due by 8/23/2019. Expert Depositions due by 9/20/2019. Motions Filing due by 10/23/2019. Mediation due by 11/22/2019. (Signed by |

| | | |
|---|---|---|
| | | Magistrate Judge Nancy K Johnson) Parties notified.(ShoshanaArnow, 4) (Entered: 01/22/2019) |
| 01/25/2019 | 287 | MEMORANDUM OPINION AND ORDER ADOPTING 256 ORDER Granting 213 Motion to Strike jury demand.(Signed by Judge Gray H Miller) Parties notified.(rkonieczny, 4) (Entered: 01/25/2019) |
| 02/15/2019 | 288 | RETURN of Service Executed as to CA Inc. c/o Registered Agent CT Corporation System on February 12, 2019 re: Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, filed.(Gorman, Sean) (Entered: 02/15/2019) |
| 02/15/2019 | 289 | RETURN of Service Executed as to CA Inc. c/o Registered Agent CT Corporation System on February 12, 2019 re: Subpoena to Testify at a Deposition in a Civil Action, filed.(Gorman, Sean) (Entered: 02/15/2019) |
| 02/22/2019 | 290 | NOTICE *of Written Consent to File Second Amended Complaint* by BMC Software, Inc., filed. (Attachments: # 1 Exhibit Written Consent from IBM)(Gorman, Sean) (Entered: 02/22/2019) |
| 02/22/2019 | 291 | NOTICE *of Written Consent to file an Amended Answer, Affirmative Defenses and CounterClaims* by International Business Machines Corporation, filed. (Attachments: # 1 Exhibit A)(Yetter, R) (Entered: 02/22/2019) |
| 02/22/2019 | 292 | Unopposed MOTION to Seal BMC's Second Amended ComplaintMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 3/15/2019. (Attachments: # 1 Proposed Order Order Granting Leave to File Under Seal)(Gorman, Sean) (Entered: 02/22/2019) |
| 02/22/2019 | 293 | Unopposed MOTION to Seal Amended Answer, Affirmative Defenses and Counter-ClaimMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 3/15/2019. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 02/22/2019) |
| 02/22/2019 | 294 | SEALED DOCUMENT *AMENDED ANSWER TO FIRST AMENDED COMPLAINT, AFFIRMATIVE DEFENSES, AND COUNTERCLAIM* by International Business Machines Corporation, filed. (Yetter, R) (Entered: 02/22/2019) |
| 02/22/2019 | 295 | SEALED DOCUMENT *BMC's Second Amended Complaint* by BMC Software, Inc., filed. (Gorman, Sean) (Entered: 02/22/2019) |
| 02/25/2019 | 296 | ORDER granting 292 Motion to Seal.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 02/25/2019) |
| 02/25/2019 | 297 | ORDER granting 293 Motion to Seal.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 02/25/2019) |
| 03/15/2019 | 298 | Unopposed MOTION to Seal /Defendant IBM's UnOpposed Motion to Seal Its Answer, Affirmative Defenses, and CounterclaimsMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 4/5/2019. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 03/15/2019) |
| 03/15/2019 | 299 | SEALED DOCUMENT */Answer to Second Amended Complaint, Affirmative Defenses, and Counterclaims* by International Business Machines Corporation, filed. (Yetter, R) (Entered: 03/15/2019) |
| 03/15/2019 | 300 | |

| | | Unopposed MOTION to Seal BMC's Answer to IBM's CounterclaimsMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 4/5/2019. (Attachments: # 1 Proposed Order Proposed Order Granting BMC's Motion to Seal Answer)(Gorman, Sean) (Entered: 03/15/2019) |
|---|---|---|
| 03/15/2019 | 301 | Unopposed SEALED RESPONSE *to IBM's Counterclaims* by BMC Software, Inc., filed. (Gorman, Sean) (Entered: 03/15/2019) |
| 03/18/2019 | 302 | ORDER granting 298 Motion to Seal.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 03/18/2019) |
| 03/18/2019 | 303 | ORDER granting 300 Motion to Seal.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 03/18/2019) |
| 06/14/2019 | 304 | Joint MOTION for Leave to File Agreed Amended Scheduling OrderMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. (Attachments: # 1 Agreed Proposed Second Amended Scheduling Order)(Epstein, Rachel) (Entered: 06/14/2019) |
| 06/17/2019 | 305 | ORDER granting 304 Motion for Leave to File.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 06/17/2019) |
| 06/17/2019 | | CONTINUATION OF ENTRY 305 FOR STATISTICAL PURPOSES- Fact Discovery due by 9/27/2019. Dispositive Motion Filing due by 2/13/2020. Mediation due by 2/28/2020. Non-Dispositive Motion Filing due by 2/13/2020.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 06/17/2019) |
| 08/22/2019 | 306 | RETURN of Service Executed as to Paul Appleby on August 20, 2019 re: Subpoena to Testify at a Deposition with Deposition Notice, filed.(Reinhard, Donald) (Entered: 08/22/2019) |
| 09/05/2019 | 307 | NOTICE of Setting. Parties notified. Discovery Hearing set for 9/11/2019 at 02:00 PM in Courtroom 700 before Magistrate Judge Nancy K Johnson, filed. (sjones, 4) (Entered: 09/05/2019) |
| 09/05/2019 | 308 | NOTICE of Resetting. Parties notified. Discovery Hearing reset for 9/13/2019 at 02:00 PM in Courtroom 700 before Magistrate Judge Nancy K Johnson, filed. (sjones, 4) (Entered: 09/05/2019) |
| 09/13/2019 | 309 | Sealed ORDER., filed. (sjones, 4) (Entered: 09/16/2019) |
| 09/16/2019 | | (Court only) Document(s) Sent by regular mail to parties who attended hearing re: 309 Sealed Order, filed. (sjones, 4) (Entered: 09/16/2019) |
| 09/16/2019 | 310 | AO 435 TRANSCRIPT REQUEST by Steven Vacek for Transcript of 9/13/2019 Discovery Hearing before Judge Johnson. Expedited (7 days) turnaround requested. Court Reporter/Transcriber: Judicial Transcribers of Texas, filed. (SamanthaWarda, 4) Sealed Transcript unable to be provided to requesting party per court order. Modified on 9/17/2019 (ClaudiaGutierrez, 4). (Entered: 09/16/2019) |
| 09/17/2019 | 311 | AO 435 TRANSCRIPT REQUEST by Elizabeth Eoff for Transcript of Discovery Hearing on 9/13/2019 before Judge Nancy Johnson. 3-Day turnaround requested. Court Reporter/Transcriber: Judicial Transcribers of Texas, filed. (Eoff, Elizabeth) Electronically forwarded to Judicial Transcribers of Texas on September 17, 2019. Estimated completion date: September 20, 2019. Modified on 9/17/2019 (ClaudiaGutierrez, 4). (Entered: 09/17/2019) |

| 09/17/2019 | 312 | AO 435 TRANSCRIPT REQUEST by IBM/Donald J. Reinhard for Transcript of Discovery hearing on 9/13/19 before Judge N. Johnson. 3-Day turnaround requested. Court Reporter/Transcriber: Judicial Transcribers of Texas, filed. (Reinhard, Donald) Electronically forwarded to Judicial Transcribers of Texas on September 17, 2019. Estimated completion date: September 20, 2019. Modified on 9/17/2019 (ClaudiaGutierrez, 4). (Entered: 09/17/2019) |
|---|---|---|
| 09/21/2019 | 313 | Transcript (Sealed) of proceedings held on held on September 13, 2019. Court Reporter/Transcriber Judicial Transcribers of Texas, LLC, filed. (mahenry, ) (Entered: 09/21/2019) |
| 10/02/2019 | 314 | MOTION for Guyon H. Knight to Appear Pro Hac ViceMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 10/23/2019. (Martinez, Grant) (Entered: 10/02/2019) |
| 10/03/2019 | | (Court only) ***Attorney Guyon H Knight for International Business Machines Corporation added. (sjones, 4) (Entered: 10/03/2019) |
| 10/03/2019 | 315 | ORDER granting 314 Motion for Guyon H. Knight to Appear Pro Hac Vice.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 10/03/2019) |
| 10/11/2019 | 316 | Unopposed MOTION for Leave to File BMC's Motion to Compel Financial Documents Under Seal, MOTION to Seal BMC's Motion to Compel Financial Documents( Motion Docket Date 11/1/2019.)Motions referred to Nancy K Johnson. by BMC Software, Inc., filed. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 10/11/2019) |
| 10/11/2019 | 317 | SEALED MOTION *to Compel Financial Documents* by BMC Software, Inc., filed. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Proposed Order) (Gorman, Sean) (Entered: 10/11/2019) |
| 10/15/2019 | 318 | ORDER granting 316 Motion for Leave to File; granting 316 Motion to Seal.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 10/15/2019) |
| 10/25/2019 | 319 | NOTICE of Setting re: 317 SEALED MOTION *to Compel Financial Documents*. Parties notified. Motion Hearing set for 11/21/2019 at 02:00 PM in Courtroom 700 before Magistrate Judge Nancy K Johnson, filed. (sjones, 4) (Entered: 10/25/2019) |
| 10/30/2019 | 320 | Unopposed MOTION for Extension of Time to Respond to Plaintiff's Sealed Motion to Compel Financial Documents.Motions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 11/20/2019. (Attachments: # 1 Proposed Order)(Epstein, Rachel) (Entered: 10/30/2019) |
| 10/31/2019 | 321 | ORDER granting 320 Motion for Extension of Time Responses due by 11/8/2019..(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 10/31/2019) |
| 10/31/2019 | | CONTINUATION OF ENTRY 321 FOR STATISTICAL PURPOSES-Responses due 11.08.19. (Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 10/31/2019) |
| 11/01/2019 | 322 | Joint MOTION for Leave to File TO AMEND THE AGREED SECOND AMENDED SCHEDULING ORDERMotions referred to Nancy K Johnson. by BMC Software Finance, Inc., filed. Motion Docket Date 11/22/2019. (Attachments: # 1 Proposed Order)(Epstein, Rachel) (Entered: 11/01/2019) |
| 11/04/2019 | 323 | ORDER granting 322 Motion for Leave to Amend the Agreed Second Amended Scheduling Order.(Signed by Magistrate Judge Nancy K Johnson) Parties |

| Date | No. | Description |
|---|---|---|
| | | notified.(sanderson, 4) (Entered: 11/04/2019) |
| 11/04/2019 | | CONTINUATION OF ENTRY 323 ORDER FOR STATISTICAL PURPOSES ONLY - Expert Reports due 12/6/19. Supplemental Reports due 1/17/20. Expert Depositions due 2/14/20. Dispositive Motions due by 3/6/2020. Mediation due by 4/10/2020. (Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sanderson, 4) (Entered: 11/04/2019) |
| 11/08/2019 | 324 | Unopposed MOTION for Leave to File Excess PagesMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 11/29/2019. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 11/08/2019) |
| 11/08/2019 | 325 | Unopposed MOTION to Seal IBM's Opposition to BMC's Motion to Compel Financial Documents (DI-317)Motions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 11/29/2019. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 11/08/2019) |
| 11/08/2019 | 326 | SEALED RESPONSE *International Business Machine Corporation's Opposition to BMC Software Inc.'s Motion to Compel Financial Documents* re: 317 SEALED MOTION *to Compel Financial Documents*, 325 Unopposed MOTION to Seal IBM's Opposition to BMC's Motion to Compel Financial Documents (DI-317) by International Business Machines Corporation, filed. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42) (Yetter, R) (Entered: 11/08/2019) |
| 11/12/2019 | 327 | Unopposed MOTION for Extension of Time to File Reply in Support of Motion to Compel Financial DocumentsMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 12/3/2019. (Attachments: # 1 Proposed Order Proposed Order)(Gorman, Sean) (Entered: 11/12/2019) |
| 11/12/2019 | 328 | ORDER granting 324 Motion for Leave to File Excess Pages.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 11/12/2019) |
| 11/12/2019 | 329 | ORDER granting 325 Motion to Seal.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 11/12/2019) |
| 11/12/2019 | 330 | ORDER granting 327 Motion for Extension of Time Replies due by 11/18/2019.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 11/12/2019) |
| 11/12/2019 | | CONTINUATION OF ENTRY 330 FOR STATISTICAL PURPOSES-Replies due 11.18.19. (Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 11/12/2019) |
| 11/18/2019 | 331 | Unopposed MOTION for Leave to File Excess PagesMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 12/9/2019. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 11/18/2019) |
| 11/18/2019 | 332 | Unopposed MOTION to Seal BMC's Reply in Support of its Motion to Compel Financial DocumentsMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 12/9/2019. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 11/18/2019) |

| | | |
|---|---|---|
| 11/18/2019 | 333 | SEALED REPLY *in Support of Motion to Compel Financial Documents* re: 317 SEALED MOTION *to Compel Financial Documents* by BMC Software, Inc., filed. (Gorman, Sean) (Entered: 11/18/2019) |
| 11/18/2019 | 334 | Letter to Court re: Exhibit to IBM's Opposition (DI-326) to BMC Software Inc.'s Motion to Compel Financial Documents (DI-317) by International Business Machines Corporation, filed. (Attachments: # 1 Proposed Order)(Epstein, Rachel) (Entered: 11/18/2019) |
| 11/18/2019 | 335 | Corrected SEALED EXHIBITS *to IBM Opposition* re: 334 Document, by International Business Machines Corporation, filed. (Epstein, Rachel) (Entered: 11/18/2019) |
| 11/20/2019 | 336 | ORDER granting 331 Motion for Leave to File Excess Pages.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 11/20/2019) |
| 11/20/2019 | 337 | ORDER GRANTING REQUEST FOR LEAVE TO FILE UNDER SEAL 334 (Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 11/20/2019) |
| 11/20/2019 | 338 | ORDER granting 332 Motion to Seal.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 11/20/2019) |
| 11/21/2019 | | Minute Entry for proceedings held before Magistrate Judge Nancy K Johnson. SEALED Motion Hearing held on 11/21/2019. Appearances: Rachel Elizabeth Epstein, Timothy R Geiger, Christopher Lee Dodson, Sean R D Gorman, R Paul Yetter, Donald John Reinhard, II.(Digital # 2:01-4:53PM)(ERO:Yes), filed.(sjones, 4) (Entered: 11/26/2019) |
| 11/21/2019 | 342 | Sealed ORDER., filed. (sjones, 4) (Entered: 12/05/2019) |
| 11/22/2019 | 339 | AO 435 TRANSCRIPT REQUEST by BMC Software/Sean Gorman for Transcript of Motion Hearing on 11/21/19 before Hon. Nancy K. Johnson. 3-Day turnaround requested. Court Reporter/Transcriber: Judicial Transcribers of Texas, filed. (Gorman, Sean) Electronically Forwarded to Access on 11/26/2019. Modified on 11/26/2019 (SamanthaWarda, 4). Modified on 11/26/2019 (SamanthaWarda, 4). (Entered: 11/22/2019) |
| 11/22/2019 | 340 | AO 435 TRANSCRIPT REQUEST by Steven C. Vacek for Transcript of hearing held 11/22/2019 at 2:00PM befor the Honorable Nancy Johnson. 3-Day turnaround requested. Court Reporter/Transcriber: Judicial Transcribers of Texas, filed. (jdav, 4) Electronically forwarded to Access on 11/26/2019. Modified on 11/26/2019 (SamanthaWarda, 4). (Entered: 11/22/2019) |
| 11/29/2019 | 341 | Transcript (Sealed) of proceedings held on held on November 21, 2019. Court Reporter/Transcriber Access Transcripts, filed. (ShoshanaArnow, 4) (Entered: 12/02/2019) |
| 12/05/2019 | | ***Set/Reset Deadlines: Deft Expert Report due by 1/21/2020. Deft Expert Witness List due by 1/21/2020. Dispositive Motion Filing due by 3/13/2020. Mediation due by 4/17/2020. Non-Dispositive Motion Filing due by 3/13/2020. Pltf Expert Report due by 12/13/2019. Pltf Expert Witness List due by 12/13/2019. (sjones, 4) (Entered: 12/05/2019) |
| 01/03/2020 | 343 | Unopposed MOTION to Seal BMC's Motion to Compel Evidence Withheld as PrivilegedMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 1/24/2020. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 01/03/2020) |
| 01/03/2020 | 344 | Opposed SEALED MOTION *to Compel Evidence Withheld as Privileged* by BMC Software, Inc., filed. (Attachments: # 1 Proposed Order, # 2 Exhibit A, # 3 Exhibit B, # 4 |

| | | |
|---|---|---|
| | | Exhibit C, # <u>5</u> Exhibit D, # <u>6</u> Exhibit E, # <u>7</u> Exhibit F, # <u>8</u> Exhibit G, # <u>9</u> Exhibit H, # <u>10</u> Exhibit I, # <u>11</u> Exhibit J, # <u>12</u> Exhibit K, # <u>13</u> Exhibit L, # <u>14</u> Exhibit M, # <u>15</u> Exhibit N, # <u>16</u> Exhibit O, # <u>17</u> Exhibit P, # <u>18</u> Exhibit Q, # <u>19</u> Exhibit R, # <u>20</u> Exhibit S, # <u>21</u> Exhibit T, # <u>22</u> Exhibit U, # <u>23</u> Exhibit V, # <u>24</u> Exhibit W, # <u>25</u> Exhibit X, # <u>26</u> Exhibit Y, # <u>27</u> Exhibit Z, # <u>28</u> Exhibit AA, # <u>29</u> Exhibit BB, # <u>30</u> Exhibit CC, # <u>31</u> Exhibit DD, # <u>32</u> Exhibit EE, # <u>33</u> Exhibit FF, # <u>34</u> Exhibit GG, # <u>35</u> Exhibit HH, # <u>36</u> Exhibit II, # <u>37</u> Exhibit JJ, # <u>38</u> Exhibit KK, # <u>39</u> Exhibit LL, # <u>40</u> Exhibit MM, # <u>41</u> Exhibit NN) (Gorman, Sean) (Entered: 01/03/2020) |
| 01/07/2020 | <u>345</u> | ORDER granting <u>343</u> Motion to Seal.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 01/07/2020) |
| 01/16/2020 | <u>346</u> | Joint MOTION for Leave to File TO AMEND THE AGREED THIRD AMENDED SCHEDULING ORDERMotions referred to Nancy K Johnson. by BMC Software Finance, Inc., International Business Machines Corporation, filed. Motion Docket Date 2/6/2020. (Attachments: # <u>1</u> Proposed Scheduling Order)(Epstein, Rachel) (Entered: 01/16/2020) |
| 01/17/2020 | <u>347</u> | ORDER granting <u>346</u> Motion for Leave to File.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 01/17/2020) |
| 01/17/2020 | | CONTINUATION OF ENTRY <u>347</u> FOR STATITICAL PURPOSES- Dispositive Motion Filing due by 3/27/2020. Mediation due by 4/17/2020. Expert Depositions due by 3/6/2020 Non-Dispositive Motion Filing due by 3/27/2020. Expert Reports due by 2/4/2020 Responses due by 4/27/2020. Replies due by 5/18/2020(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 01/17/2020) |
| 01/24/2020 | <u>348</u> | Unopposed MOTION to Seal Defendant IBM's Opposition to BMC's Motion to CompelMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 2/14/2020. (Attachments: # <u>1</u> Proposed Order)(Epstein, Rachel) (Entered: 01/24/2020) |
| 01/24/2020 | <u>349</u> | SEALED REPLY *Opposition to BMC's Motion to Compel Evidence Withheld as Privileged* by International Business Machines Corporation, filed. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2, # <u>3</u> Exhibit 3, # <u>4</u> Exhibit 4, # <u>5</u> Exhibit 5, # <u>6</u> Exhibit 6, # <u>7</u> Exhibit 7, # <u>8</u> Exhibit 8, # <u>9</u> Exhibit 9, # <u>10</u> Exhibit 10, # <u>11</u> Exhibit 11, # <u>12</u> Exhibit 12, # <u>13</u> Exhibit 13, # <u>14</u> Exhibit 14, # <u>15</u> Exhibit 15, # <u>16</u> Exhibit 16, # <u>17</u> Exhibit 17, # <u>18</u> Exhibit 18, # <u>19</u> Exhibit 19, # <u>20</u> Exhibit 20, # <u>21</u> Exhibit 21, # <u>22</u> Exhibit 22, # <u>23</u> Exhibit 23, # <u>24</u> Exhibit 24, # <u>25</u> Exhibit 25, # <u>26</u> Exhibit 26, # <u>27</u> Exhibit 27, # <u>28</u> Exhibit 28, # <u>29</u> Exhibit 29, # <u>30</u> Exhibit 30, # <u>31</u> Proposed Order) (Epstein, Rachel) (Entered: 01/24/2020) |
| 01/27/2020 | <u>350</u> | Unopposed MOTION for Extension of Time for BMC to File a Reply in Support of its Motion to Compel Evidence Withheld as PrivilegedMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 2/18/2020. (Attachments: # <u>1</u> Proposed Order)(Gorman, Sean) (Entered: 01/27/2020) |
| 01/28/2020 | <u>351</u> | ORDER granting <u>348</u> Motion to Seal.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 01/28/2020) |
| 01/28/2020 | <u>352</u> | ORDER granting <u>350</u> Motion for Extension of Time Replies due by 2/3/2020.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 01/28/2020) |
| 01/28/2020 | | CONTINUATION OF ENTRY <u>352</u> FOR STATISTICAL PURPOSES-Replies due 02.03.20. (Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 01/28/2020) |

| | | |
|---|---|---|
| 02/03/2020 | 353 | Joint MOTION Leave to Amend the Agreed Fourth Amended Scheduling OrderMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 2/24/2020. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 02/03/2020) |
| 02/03/2020 | 354 | Unopposed MOTION for Leave to File Excess PagesMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 2/24/2020. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 02/03/2020) |
| 02/03/2020 | 355 | Unopposed MOTION to Seal Reply in Support of Motion to Compel Evidence Withheld as PrivilegedMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 2/24/2020. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 02/03/2020) |
| 02/03/2020 | 356 | SEALED REPLY *in Suppport* re: 344 Opposed SEALED MOTION *to Compel Evidence Withheld as Privileged* by BMC Software, Inc., filed. (Gorman, Sean) (Entered: 02/03/2020) |
| 02/04/2020 | 357 | ORDER granting 353 Motion.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 02/04/2020) |
| 02/04/2020 | | CONTINUATION OF ENTRY 357 FOR STATISTICAL PURPOSES- Dispositive Motion Filing due by 4/3/2020. Mediation due by 4/17/2020. Non-Dispositive Motion Filing due by 4/3/2020. Responses due by 5/4/2020. Replies due by 5/29/2020(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) Modified on 2/4/2020 (sjones, 4). (Entered: 02/04/2020) |
| 02/04/2020 | 358 | ORDER granting 355 Motion to Seal.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 02/04/2020) |
| 02/04/2020 | 359 | ORDER granting 354 Motion for Leave to File Excess Pages.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 02/04/2020) |
| 02/04/2020 | | (Court only) Plaintiff AND Deft expert reports (dates were not listed in order 357 ) ***Deadlines terminated. (sjones, 4) Modified on 2/4/2020 (sjones, 4). (Entered: 02/04/2020) |
| 02/21/2020 | 360 | NOTICE of Setting re: 344 Opposed SEALED MOTION *to Compel Evidence Withheld as Privileged*. Parties notified. Motion Hearing set for 3/25/2020 at 02:00 PM in Courtroom 700 before Magistrate Judge Nancy K Johnson, filed. (sjones, 4) (Entered: 02/21/2020) |
| 03/16/2020 | 361 | NOTICE of Cancellation re: 360 Notice of Setting, filed. (The court will reset at later date and time).(sjones, 4) (Entered: 03/16/2020) |
| 03/16/2020 | | Motion Hearing set for 03.25.20 is terminated. (sjones, 4) (Entered: 03/16/2020) |
| 03/25/2020 | 362 | ORDER: In light of the current coronavirus emergency and the parties inability to agree on an amended course of discovery, it is ORDERED that all discovery in this action is STAYED for sixty days. A scheduling conference will be set after the expiration of sixty days. (Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 03/25/2020) |
| 05/22/2020 | 363 | NOTICE of Setting. Parties notified. Scheduling Conference set for 5/22/2020 at 03:30 PM by ZOOM before Magistrate Judge Nancy K Johnson, filed. (sjones, 4) (Entered: 05/22/2020) |

| | | |
|---|---|---|
| 05/22/2020 | 364 | AO 435 TRANSCRIPT REQUEST by Plaintiff BMC/Sean Gorman for Transcript of Scheduling Conference, May 22, 2020, Honorable Nancy Johnson. 3-Day turnaround requested. Court Reporter/Transcriber: Judicial Transcribers of Texas, filed. (Gorman, Sean) Unable to process request. Per Case Manager there is no audio for the hearing on 05/22/2020. Ordering Party and Judicial Transcribers of Texas notified. Modified on 5/26/2020 (ClaudiaGutierrez, 4). (Entered: 05/22/2020) |
| 05/22/2020 | | Minute Entry for proceedings held before Magistrate Judge Nancy K Johnson. SCHEDULING CONFERENCE (by phone) held on 5/22/2020. Reply Briefs due by 9/11/2020 Responses due by 8/17/2020. Order to follow. Appearances: Sean R D Gorman, Richard Irving Werder, Jr.(Court Reporter: No), filed.(sjones, 4) (Entered: 05/26/2020) |
| 05/26/2020 | 365 | RULE 16 SCHEDULING ORDER. Expert Discovery due by 6/30/2020. Mediation due by 11/30/2020. Dispositive Motion Filing due by 7/10/2020. Non-Dispositive Motion Filing due by 8/31/2020. Objections due by 2/19/2021 Joint Pretrial Order due by 2/12/2021. Docket Call set for 2/26/2021 at 10:00 AM in Courtroom 9D before Judge Gray H Miller(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 05/26/2020) |
| 05/26/2020 | 366 | NOTICE of Setting re: 344 Opposed SEALED MOTION *to Compel Evidence Withheld as Privileged*. Parties notified. Motion Hearing set for 6/15/2020 at 10:00 AM before Magistrate Judge Nancy K Johnson, filed. (sjones, 4) (Entered: 05/26/2020) |
| 06/12/2020 | 367 | ORDER: The parties are hereby notified that the only issues that the court will consider at the hearing on Monday will be to resolve any remaining disputes related to extant discovery requests. No new discovery requests will be considered. The new judge will resolve the attorney-client privilege/crime-fraud exception and the Dzaluk emails at a later date. (Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 06/12/2020) |
| 06/15/2020 | 368 | AO 435 TRANSCRIPT REQUEST by BMC Software/Sean Gorman for Transcript of Telephonic hearing, June 15, 2020 before Hon. Nancy K. Johnson. 3-Day turnaround requested. Court Reporter/Transcriber: Judicial Transcribers of Texas, filed. (Gorman, Sean) (Entered: 06/15/2020) |
| 06/15/2020 | 369 | AO 435 TRANSCRIPT REQUEST by Steven Vacek for Transcript of 6/15/2020, hearing, Judge N. Johnson. 3-Day turnaround requested. Court Reporter/Transcriber: Judicial Transcribers of Texas, filed. (mmapps, 4) (Entered: 06/15/2020) |
| 06/15/2020 | 370 | AMENDED MINUTE ENTRY ORDER: Discovery Hearing held on 06.15.20. Appearances: Rachel Elizabeth Epstein, Elizabeth Frances Eoff, Christopher Lee Dodson, Sean R D Gorman, Richard Irving Werder, Jr, Donald John Reinhard, II. Ct Reporter: Kathy Miller. Digital Number: 10:10-11:37AM.(Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Main Document 370 replaced on 6/29/2020) (sjones, 4). (Entered: 06/15/2020) |
| 06/23/2020 | 371 | Receipt for Withdrawal of Exhibits by attorney for BMC Software, Inc.(sjones, 4) (Entered: 06/23/2020) |
| 06/23/2020 | 372 | Receipt for Withdrawal of Exhibits by attorney for International Business Machines Corporation(sjones, 4) (Entered: 06/23/2020) |
| 06/23/2020 | 373 | TRANSCRIPT re: Telephonic Hearing held on June 15, 2020 before Judge Gray H Miller. Court Reporter/Transcriber Kathleen Miller. Ordering Party Sean R.D. Gorman Release of Transcript Restriction set for 9/21/2020., filed. (kmiller, ) (Entered: |

| | | |
|---|---|---|
| | | 06/23/2020) |
| 06/24/2020 | 374 | Notice of Filing of Official Transcript as to 373 Transcript. Party notified, filed. (jdav, 4) (Entered: 06/24/2020) |
| 06/25/2020 | 375 | NOTICE of Setting. Parties notified. In Camera Hearing set for 6/29/2020 at 02:00 PM by telephone before Magistrate Judge Nancy K Johnson, filed. (sjones, 4) (Entered: 06/25/2020) |
| 06/29/2020 | | Minute Entry for proceedings held before Magistrate Judge Nancy K Johnson. SEALED IN CAMERA HEARING held on 6/29/2020. Appearances: Rachel Elizabeth Epstein, Richard Irving Werder, Jr, Donald John Reinhard, II.(Court Reporter: Kathy Miller)(Digital # 2:02-2:36PM), filed.(sjones, 4) (Entered: 06/30/2020) |
| 06/29/2020 | 376 | Sealed ORDER., filed. (sjones, 4) (Entered: 06/30/2020) |
| 06/29/2020 | 377 | SEALED DOCUMENT, filed. (sjones, 4) (Entered: 06/30/2020) |
| 06/30/2020 | 378 | ORDER ON IN CAMERA INSPECTION (Signed by Magistrate Judge Nancy K Johnson) Parties notified.(sjones, 4) (Entered: 06/30/2020) |
| 07/09/2020 | 379 | Joint MOTION for Leave to File Excess PagesMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 7/30/2020. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 07/09/2020) |
| 07/10/2020 | 380 | Unopposed MOTION to Seal BMC's Motion for Partial Summary Judgment on Breach of Outsourcing Attachments Sections 1.1 and 5.4Motions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 7/31/2020. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 07/10/2020) |
| 07/10/2020 | 381 | SEALED MOTION *for Partial Summary Judgment on IBM's Breach of Outsourcing Attachment Sections 1.1 and 5.4* by BMC Software, Inc., filed. (Attachments: # 1 Exhibit Declaration of Elizabeth Eoff, # 2 Exhibit Ex 30 to Eoff Decl, # 3 Exhibit Ex 31 to Eoff Decl, # 4 Exhibit Ex 32 to Eoff Decl, # 5 Exhibit Ex 33 to Eoff Decl, # 6 Exhibit Ex 34 to Eoff Decl, # 7 Exhibit Ex 35 to Eoff Decl, # 8 Exhibit Ex 36 to Eoff Decl, # 9 Exhibit Ex 37 to Eoff Decl, # 10 Exhibit Ex 38 to Eoff Decl, # 11 Exhibit Ex 39 to Eoff Decl, # 12 Exhibit Ex 40 to Eoff Decl, # 13 Exhibit Ex 41 to Eoff Decl, # 14 Exhibit Ex 42 to Eoff Decl, # 15 Exhibit Ex 43 to Eoff Decl, # 16 Exhibit Ex 44 to Eoff Decl, # 17 Exhibit Ex 45 to Eoff Decl, # 18 Exhibit Ex 46 to Eoff Decl, # 19 Exhibit Ex 47 to Eoff Decl, # 20 Exhibit Ex 48 to Eoff Decl, # 21 Exhibit Ex 49 to Eoff Decl, # 22 Exhibit Ex 50 to Eoff Decl, # 23 Exhibit Ex 51 to Eoff Decl, # 24 Exhibit Ex 52 to Eoff Decl, # 25 Exhibit Ex 53 to Eoff Decl, # 26 Exhibit Ex 54 to Eoff Decl, # 27 Exhibit Ex 55 to Eoff Decl, # 28 Exhibit Ex 56 to Eoff Decl, # 29 Exhibit Ex 57 to Eoff Decl, # 30 Exhibit Ex 58 to Eoff Decl, # 31 Exhibit Ex 59 to Eoff Decl, # 32 Exhibit Ex 60 to Eoff Decl, # 33 Exhibit Ex 61 to Eoff Decl, # 34 Exhibit Ex 62 to Eoff Decl, # 35 Exhibit Ex 63 to Eoff Decl, # 36 Exhibit Ex 64 to Eoff Decl, # 37 Exhibit Ex 65 to Eoff Decl, # 38 Exhibit Ex 66 to Eoff Decl, # 39 Exhibit Ex 67 to Eoff Decl, # 40 Exhibit Ex 68 to Eoff Decl) (Gorman, Sean) (Entered: 07/10/2020) |
| 07/10/2020 | 382 | SEALED EXHIBITS *Continuation* re: 381 SEALED MOTION *for Partial Summary Judgment on IBM's Breach of Outsourcing Attachment Sections 1.1 and 5.4* by BMC Software, Inc., filed. (Attachments: # 1 Exhibit Ex 69 to Eoff Decl, # 2 Exhibit Ex 70 to Eoff Decl, # 3 Exhibit Ex 71 to Eoff Decl, # 4 Exhibit Ex 72 to Eoff Decl, # 5 Exhibit Ex 73 to Eoff Decl, # 6 Exhibit Ex 74 to Eoff Decl, # 7 Exhibit Ex 75 to Eoff Decl, # 8 Exhibit Ex 76 to Eoff Decl, # 9 Exhibit Ex 77 to Eoff Decl, # 10 Exhibit Ex 78 to Eoff Decl, # 11 Exhibit Ex 79 to Eoff Decl, # 12 Exhibit Ex 80 to Eoff Decl, # 13 Exhibit Ex |

| | | |
|---|---|---|
| | | 81 to Eoff Decl, # 14 Exhibit Ex 82 to Eoff Decl, # 15 Exhibit Ex 83 to Eoff Decl, # 16 Exhibit Ex 84 to Eoff Decl, # 17 Exhibit Ex 85 to Eoff Decl, # 18 Exhibit Ex 86 to Eoff Decl, # 19 Exhibit Ex 87 to Eoff Decl, # 20 Exhibit Ex 88 to Eoff Decl, # 21 Exhibit Ex 89 to Eoff Decl, # 22 Exhibit Ex 90 to Eoff Decl, # 23 Exhibit Ex 91 to Eoff Decl, # 24 Exhibit Ex 92 to Eoff Decl, # 25 Exhibit Ex 93 to Eoff Decl, # 26 Exhibit Ex 94 to Eoff Decl, # 27 Exhibit Ex 95 to Eoff Decl, # 28 Exhibit Ex 96 to Eoff Decl, # 29 Exhibit Ex 97 to Eoff Decl, # 30 Exhibit Ex 98 to Eoff Decl, # 31 Exhibit Ex 99 to Eoff Decl, # 32 Exhibit Ex 100 to Eoff Decl, # 33 Exhibit Ex 101 to Eoff Decl, # 34 Exhibit Ex 102 to Eoff Decl, # 35 Exhibit Ex 103 to Eoff Decl, # 36 Exhibit Ex 104 to Eoff Decl, # 37 Exhibit Ex 105 to Eoff Decl, # 38 Exhibit Ex 106 to Eoff Decl, # 39 Exhibit Ex 107 to Eoff Decl, # 40 Exhibit Ex 108 to Eoff Decl, # 41 Exhibit Ex 109 to Eoff Decl, # 42 Exhibit Ex 110 to Eoff Decl, # 43 Exhibit Ex 111 to Eoff Decl, # 44 Exhibit Ex 112 to Eoff Decl, # 45 Exhibit Ex 113 to Eoff Decl, # 46 Exhibit Ex 114 to Eoff Decl, # 47 Exhibit Ex 115 to Eoff Decl, # 48 Exhibit Ex 116 to Eoff Decl, # 49 Exhibit Ex 117 to Eoff Decl, # 50 Exhibit Ex 118 to Eoff Decl) (Gorman, Sean) (Entered: 07/10/2020) |
| 07/10/2020 | 383 | SEALED EXHIBITS *Continuation* re: 381 SEALED MOTION *for Partial Summary Judgment on IBM's Breach of Outsourcing Attachment Sections 1.1 and 5.4* by BMC Software, Inc., filed. (Attachments: # 1 Exhibit Declaration of Judy Schafer, # 2 Exhibit Ex 1 to Schafer Decl, # 3 Exhibit Ex 2 to Schafer Decl, # 4 Exhibit Ex 3 Part 1 to Schafer Decl, # 5 Exhibit Ex 3 Part 2 to Schafer Decl, # 6 Exhibit Ex 4 to Schafer Decl, # 7 Exhibit Ex 5 to Schafer Decl, # 8 Exhibit Ex 6 to Schafer Decl, # 9 Exhibit Ex 7 to Schafer Decl, # 10 Exhibit Ex 8 to Schafer Decl, # 11 Exhibit Ex 9 to Schafer Decl, # 12 Exhibit Ex 10 to Schafer Decl, # 13 Exhibit Ex 11 to Schafer Decl, # 14 Exhibit Ex 12 to Schafer Decl, # 15 Exhibit Ex 21 Part 1 to Schafer Decl, # 16 Exhibit Ex 21 Part 2 to Schafer Decl, # 17 Exhibit Declaration of Alan Ratliff, # 18 Exhibit Ex A to Ratliff Decl, # 19 Exhibit Ex B to Ratliff Decl, # 20 Exhibit Ex C to Ratliff Decl, # 21 Exhibit Declaration of Kendyl Roman, # 22 Exhibit Ex A to Roman Decl, # 23 Exhibit Ex B to Roman Decl, # 24 Exhibit Declaration of Steve Ridge, # 25 Exhibit Ex 19 to Ridge Decl) (Gorman, Sean) (Entered: 07/10/2020) |
| 07/10/2020 | 384 | Unopposed MOTION to Seal BMC's Motion for Partial Summary Judgment on Construction of Damage Limitations ProvisionsMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 7/31/2020. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 07/10/2020) |
| 07/10/2020 | 385 | SEALED MOTION *BMC's Motion for Partial Summary Judgment on Construction of Damage Limitations Provisions* by BMC Software, Inc., filed. (Attachments: # 1 Exhibit Declaration of Elizabeth Eoff, # 2 Exhibit Ex 150 to Eoff Decl, # 3 Exhibit Ex 151 to Eoff Decl, # 4 Exhibit Ex 152 to Eoff Decl, # 5 Exhibit Ex 153 to Eoff Decl, # 6 Exhibit Ex 154 to Eoff Decl, # 7 Exhibit Ex 155 to Eoff Decl, # 8 Exhibit Ex 156 to Eoff Decl, # 9 Exhibit Ex 157 to Eoff Decl, # 10 Exhibit Ex 158 to Eoff Decl, # 11 Exhibit Ex 159 to Eoff Decl, # 12 Exhibit Ex 160 to Eoff Decl, # 13 Exhibit Ex 161 to Eoff Decl, # 14 Exhibit Ex 162 to Eoff Decl, # 15 Exhibit Ex 163 to Eoff Decl, # 16 Exhibit Ex 164 to Eoff Decl, # 17 Exhibit Ex 165 to Eoff Decl, # 18 Exhibit Ex 166 to Eoff Decl, # 19 Exhibit Declaration of Sharon Clack, # 20 Exhibit Ex 1 to Clack Decl, # 21 Exhibit Declaration of Dianne McGee, # 22 Exhibit Ex 13 to McGee Decl, # 23 Exhibit Ex 14 to McGee Decl, # 24 Exhibit Ex 15 to McGee Decl, # 25 Exhibit Ex 16 to McGee Decl, # 26 Exhibit Ex 17 to McGee Decl, # 27 Exhibit Ex 18 to McGee Decl, # 28 Exhibit Declaration of Kendyl Roman, # 29 Exhibit Ex A to Roman Decl, # 30 Exhibit Ex B to Roman Decl, # 31 Exhibit Declaration of Alan Ratliff, # 32 Exhibit Ex A to Ratliff Decl, # 33 Exhibit Ex B to Ratliff Decl, # 34 Exhibit Ex C to Ratliff Decl, # 35 Exhibit Declaration of Steve Ridge, # 36 Exhibit Ex 19 to Ridge Decl) (Gorman, Sean) (Entered: 07/10/2020) |

22-20463.37

| 07/10/2020 | 386 | Unopposed MOTION to Seal BMC's Motion for Partial Summary Judgment on IBM's Affirmative DefensesMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 7/31/2020. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 07/10/2020) |
|---|---|---|
| 07/10/2020 | 387 | SEALED MOTION *BMC's Motion for Partial Summary Judgment on IBM's Affirmative Defenses* by BMC Software, Inc., filed. (Attachments: # 1 Exhibit Declaration of Elizabeth Eoff, # 2 Exhibit Ex 176 to Eoff Decl, # 3 Exhibit Ex 177 to Eoff Decl, # 4 Exhibit Ex 178 to Eoff Decl, # 5 Exhibit Ex 179 to Eoff Decl, # 6 Exhibit Ex 180 to Eoff Decl, # 7 Exhibit Ex 181 to Eoff Decl, # 8 Exhibit Ex 182 to Eoff Decl, # 9 Exhibit Ex 183 to Eoff Decl, # 10 Exhibit Ex 184 to Eoff Decl, # 11 Exhibit Ex 185 to Eoff Decl, # 12 Exhibit Ex 186 to Eoff Decl, # 13 Exhibit Ex 187 to Eoff Decl, # 14 Exhibit Ex 188 to Eoff Decl, # 15 Exhibit Ex 189 to Eoff Decl, # 16 Exhibit Ex 190 to Eoff Decl, # 17 Exhibit Ex 191 to Eoff Decl, # 18 Exhibit Ex 192 to Eoff Decl, # 19 Exhibit Ex 193 to Eoff Decl, # 20 Exhibit Ex 194 to Eoff Decl, # 21 Exhibit Ex 195 to Eoff Decl) (Gorman, Sean) (Entered: 07/10/2020) |
| 07/10/2020 | 388 | Unopposed MOTION to Seal Defendant IBM's Motion for Partial Summary Judgment on its CounterclaimMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 7/31/2020. (Attachments: # 1 Proposed Order)(Epstein, Rachel) (Entered: 07/10/2020) |
| 07/10/2020 | 389 | SEALED EXHIBITS *Continuation* re: 387 SEALED MOTION *BMC's Motion for Partial Summary Judgment on IBM's Affirmative Defenses* by BMC Software, Inc., filed. (Attachments: # 1 Exhibit Declaration of Judy Schafer, # 2 Exhibit Ex 1 to Schafer Decl, # 3 Exhibit Ex 2 to Schafer Decl, # 4 Exhibit Ex 3 Part 1 to Schafer Decl, # 5 Exhibit Ex 3 Part 2 to Schafer Decl, # 6 Exhibit Ex 4 to Schafer Decl, # 7 Exhibit Ex 5 to Schafer Decl, # 8 Exhibit Ex 6 to Schafer Decl, # 9 Exhibit Ex 7 to Schafer Decl, # 10 Exhibit Ex 8 to Schafer Decl, # 11 Exhibit Ex 9 to Schafer Decl, # 12 Exhibit Ex 10 to Schafer Decl, # 13 Exhibit Ex 11 to Schafer Decl, # 14 Exhibit Ex 12 to Schafer Decl, # 15 Exhibit Ex 21 Part 1 to Schafer Decl, # 16 Exhibit Ex 21 Part 2 to Schafer Decl, # 17 Exhibit Decaration of Steve Ridge, # 18 Exhibit Ex 19 to Ridge Decl, # 19 Exhibit Ex 20 to Ridge Decl, # 20 Exhibit Declaration Kendyl Roman, # 21 Exhibit Ex A to Roman Decl, # 22 Envelope Ex B to Roman Decl) (Gorman, Sean) (Entered: 07/10/2020) |
| 07/10/2020 | 390 | Unopposed MOTION to Seal BMC's Motion for Partial Summary Judgment on IBM's Counterclaim for Breach of the Most Favored Customer ProvisionMotions referred to Nancy K Johnson. by BMC Software, Inc., filed. Motion Docket Date 7/31/2020. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 07/10/2020) |
| 07/10/2020 | 391 | SEALED MOTION *BMC's Motion for Partial Summary Judgment on IBM's Counterclaim for Breach of the Most Favored Customer Provision* by BMC Software, Inc., filed. (Attachments: # 1 Exhibit Declaration of Judy Schafer, # 2 Exhibit Ex 1 to Schafer Decl, # 3 Exhibit Ex 2 to Schafer Decl, # 4 Exhibit Ex 3 Part 1 to Schafer Decl, # 5 Exhibit Ex 3 Part 2 to Schafer Decl, # 6 Exhibit Ex 4 to Schafer Decl, # 7 Exhibit Ex 5 to Schafer Decl, # 8 Exhibit Ex 6 to Schafer Decl, # 9 Exhibit Ex 7 to Schafer Decl, # 10 Exhibit Ex 8 to Schafer Decl, # 11 Exhibit Ex 9 to Schafer Decl, # 12 Exhibit Ex 10 to Schafer Decl, # 13 Exhibit Ex 11 to Schafer Decl, # 14 Exhibit Ex 12 to Schafer Decl, # 15 Exhibit Ex 21 Part 1 to Schafer Decl, # 16 Exhibit Ex 21 Part 2 to Schafer Decl, # 17 Exhibit Declaration of Elizabeth Eoff, # 18 Exhibit Ex 205 to Eoff Decl, # 19 Exhibit Ex 206 to Eoff Decl, # 20 Exhibit Ex 207 to Eoff Decl, # 21 Exhibit Ex 208 to Eoff Decl, # 22 Exhibit Ex 209 to Eoff Decl, # 23 Exhibit Ex 210 to Eoff Decl, # 24 Exhibit Ex 211 to Eoff Decl, # 25 Exhibit Ex 212 to Eoff Decl, # 26 Exhibit Ex 213 to Eoff Decl, # 27 Exhibit Ex 214 to Eoff Decl, # 28 Exhibit Ex 215 to Eoff Decl, # 29 Exhibit Ex 216 to |

| | | |
|---|---|---|
| | | Eoff Decl, # 30 Exhibit Ex 217 to Eoff Decl, # 31 Exhibit Ex 218 to Eoff Decl, # 32 Exhibit Ex 219 to Eoff Decl, # 33 Exhibit Declaration of Peter Iannone, # 34 Exhibit Ex A to Iannone Decl, # 35 Exhibit Ex B to Iannone Decl, # 36 Exhibit Ex C to Iannone Decl) (Gorman, Sean) (Entered: 07/10/2020) |
| 07/10/2020 | 392 | SEALED EXHIBITS *Continuation* re: 381 SEALED MOTION *for Partial Summary Judgment on IBM's Breach of Outsourcing Attachment Sections 1.1 and 5.4* by BMC Software, Inc., filed. (Attachments: # 1 Exhibit Ex 20 to Ridge Decl) (Gorman, Sean) (Entered: 07/10/2020) |
| 07/10/2020 | 393 | SEALED EXHIBITS *Continuation* re: 385 SEALED MOTION *BMC's Motion for Partial Summary Judgment on Construction of Damage Limitations Provisions* by BMC Software, Inc., filed. (Attachments: # 1 Exhibit Ex 20 to Ridge Decl) (Gorman, Sean) (Entered: 07/10/2020) |
| 07/10/2020 | 394 | SEALED MOTION *for Partial Summary Judgment on IBM's Breach of Contract Counterclaim* by International Business Machines Corporation, filed. (Attachments: # 1 Declaration of Rachel E. Epstein, # 2 Appendix Part 1 of 2, # 3 Appendix Part 2 of 2) (Epstein, Rachel) (Entered: 07/10/2020) |
| 07/10/2020 | 395 | Unopposed MOTION to Seal Defendant IBM's Motion for Summary Judgment on BMCs ClaimsMotions referred to Nancy K Johnson. by International Business Machines Corporation, filed. Motion Docket Date 7/31/2020. (Attachments: # 1 Proposed Order)(Epstein, Rachel) (Entered: 07/10/2020) |
| 07/10/2020 | 396 | SEALED MOTION *for Summary Judgment on BMC's Claims* by International Business Machines Corporation, filed. (Attachments: # 1 Declaration of Rachel E. Epstein, # 2 Appendix Part 1 of 6, # 3 Appendix Part 2 of 6, # 4 Appendix Part 3 of 6, # 5 Appendix Part 4 of 6, # 6 Appendix Part 5 of 6, # 7 Appendix Part 6 of 6) (Epstein, Rachel) (Entered: 07/10/2020) |
| 07/17/2020 | 397 | ORDER GRANTING 395 Unopposed MOTION to Seal Defendant IBM's Motion for Summary Judgment on BMCs Claims, 390 Unopposed MOTION to Seal BMC's Motion for Partial Summary Judgment on IBM's Counterclaim for Breach of the Most Favored Customer Provision (Signed by Judge Gray H Miller) Parties notified.(rkonieczny, 4) (Entered: 07/17/2020) |
| 07/17/2020 | 398 | ORDER Granting 380 Motion to Seal; Granting 384 Motion to Seal; Granting 386 Motion to Seal; Granting 388 Motion to Seal.(Signed by Judge Gray H Miller) Parties notified.(rkonieczny, 4) (Entered: 07/20/2020) |
| 07/20/2020 | 399 | ORDER REFERRING CASE to Magistrate Magistrate Judge Christina A Bryan for full pretrial management. (Signed by Judge Gray H Miller) Parties notified.(sanderson, 4) (Entered: 07/20/2020) |
| 07/20/2020 | | (Court only) ***(PRIVATE ENTRY) - Cs Mngr notified via email re: 399 Order Referring Case to Magistrate Judge Bryan, filed. (sanderson, 4) (Entered: 07/20/2020) |
| 07/24/2020 | 400 | REDACTION to 381 SEALED MOTION *for Partial Summary Judgment on IBM's Breach of Outsourcing Attachment Sections 1.1 and 5.4* by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 07/24/2020) |
| 07/24/2020 | 401 | REDACTION to 385 SEALED MOTION *BMC's Motion for Partial Summary Judgment on Construction of Damage Limitations Provisions* by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 07/24/2020) |

| | | |
|---|---|---|
| 07/24/2020 | 402 | REDACTION to 387 SEALED MOTION *BMC's Motion for Partial Summary Judgment on IBM's Affirmative Defenses* by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 07/24/2020) |
| 07/24/2020 | 403 | REDACTION to 391 SEALED MOTION *BMC's Motion for Partial Summary Judgment on IBM's Counterclaim for Breach of the Most Favored Customer Provision* by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 07/24/2020) |
| 07/24/2020 | 404 | MOTION for Partial Summary Judgment *on IBM's Breach of Contract Counterclaim (Redacted)* Motions referred to Christina A Bryan. by International Business Machines Corporation, filed. Motion Docket Date 8/14/2020. (Epstein, Rachel) (Entered: 07/24/2020) |
| 07/24/2020 | 405 | MOTION for Summary Judgment *on BMC's Claims (Redacted)* Motions referred to Christina A Bryan. by International Business Machines Corporation, filed. Motion Docket Date 8/14/2020. (Epstein, Rachel) (Entered: 07/24/2020) |
| 07/24/2020 | | (Court only) ***Motion(s) terminated (duplicate filings): 404 MOTION for Partial Summary Judgment *on IBM's Breach of Contract Counterclaim (Redacted)*, 405 MOTION for Summary Judgment *on BMC's Claims (Redacted)*. (rkonieczny, 4) (Entered: 03/01/2021) |
| 07/27/2020 | 406 | ORDER denying without prejudice 344 Sealed Motion - Plaintiff's motion to compel.(Signed by Magistrate Judge Christina A Bryan) Parties notified.(cjan) (Main Document 406 replaced on 7/27/2020) (cjan, 4). (Entered: 07/27/2020) |
| 08/10/2020 | 407 | Renewed SEALED MOTION *to Compel Evidence Withheld as Privileged* by BMC Software, Inc., filed. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X, # 25 Exhibit Y, # 26 Exhibit Z, # 27 Exhibit AA, # 28 Exhibit BB, # 29 Exhibit CC, # 30 Exhibit DD, # 31 Exhibit EE, # 32 Exhibit FF, # 33 Exhibit GG, # 34 Exhibit HH, # 35 Exhibit II, # 36 Exhibit JJ, # 37 Exhibit KK, # 38 Exhibit LL, # 39 Exhibit MM, # 40 Exhibit NN, # 41 Proposed Order) (Gorman, Sean) (Entered: 08/10/2020) |
| 08/11/2020 | 408 | NOTICE of Setting. Parties notified. Telephone Conference set (letter to the court and status of outstanding issues) 8/14/2020 at 10:00 AM by telephone before Magistrate Judge Christina A Bryan, filed. (cjan, 4) (Entered: 08/11/2020) |
| 08/12/2020 | 409 | NOTICE of Resetting. Parties notified. Telephone Conference (letter to the court and status of outstanding issues) set for 9/4/2020 at 03:00 PM by telephone before Magistrate Judge Christina A Bryan, filed. (The telephone conference set for 8/14/2020 is cancelled due to request from IBM). (cjan, 4) (Entered: 08/12/2020) |
| 08/14/2020 | 410 | Amended PROPOSED ORDER re: 365 Scheduling Order,, filed.(Epstein, Rachel) (Entered: 08/14/2020) |
| 08/14/2020 | 411 | Joint MOTION for Leave to File Amended Rule 16 Scheduling Order re:(410) Amended PROPOSED ORDERMotions referred to Christina A Bryan. by International Business Machines Corporation, filed. Motion Docket Date 9/4/2020. (Epstein, Rachel) (Entered: 08/14/2020) |
| 08/20/2020 | 412 | Joint MOTION for Leave to File Excess PagesMotions referred to Christina A Bryan. by BMC Software Finance, Inc., International Business Machines Corporation, filed. Motion |

| | | |
|---|---|---|
| | | Docket Date 9/10/2020. (Attachments: # 1 Proposed Order)(Epstein, Rachel) (Entered: 08/20/2020) |
| 08/20/2020 | 413 | ORDER granting 412 Motion for Leave to File Excess Pages.(Signed by Magistrate Judge Christina A Bryan) Parties notified.(cjan, 4) (Entered: 08/20/2020) |
| 08/21/2020 | 414 | ORDER granting in part and denying in part 411 Motion to Amend Rule 16 Scheduling Order. (Signed by Magistrate Judge Christina A Bryan) Parties notified.(cjan, 4) (Entered: 08/21/2020) |
| 08/21/2020 | | ***Set/Reset Deadlines: Joint Pretrial Order due by 2/12/2021. Mediation due by 11/30/2020. Responses to Dispositive motions due by 8/21/2020. Replies due by 9/17/2020. Daubert Motion due by 10/1/2020. (cjan, 4) Modified on 8/25/2020 (cjan, 4). (Entered: 08/21/2020) |
| 08/21/2020 | | ***Set/Reset Scheduling Order and Trial Settings: Trial Term: Jury. Docket Call set for 2/26/2021 at 10:00 AM in Courtroom 9D before Judge Gray H Miller (cjan, 4) (Entered: 08/21/2020) |
| 08/21/2020 | 415 | Unopposed MOTION to Seal BMC's Response to IBM's Motion for Summary JudgmentMotions referred to Christina A Bryan. by BMC Software, Inc., filed. Motion Docket Date 9/11/2020. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 08/21/2020) |
| 08/21/2020 | 416 | SEALED RESPONSE *of BMC* re: 396 SEALED MOTION *for Summary Judgment on BMC's Claims* by BMC Software, Inc., filed. (Attachments: # 1 Exhibit 1 - Decl of E Eoff, # 2 Exhibit 2 - Decl of S Hines, # 3 Exhibit 3 - Decl of C Schulman, # 4 Exhibit 4 - Decl of K McGuinn, # 5 Exhibit 5 - Decl of J Schafer, # 6 Exhibit 6 - Decl of M Quistorff, # 7 Exhibit 7 - Decl of J Obermaier, # 8 Exhibit 8 - Decl of D Kushner, # 9 Appendix Part 1 of 5, # 10 Appendix Part 2 of 5, # 11 Appendix Part 3 of 5, # 12 Appendix Part 4 of 5, # 13 Appendix Part 5 of 5) (Gorman, Sean) (Entered: 08/21/2020) |
| 08/21/2020 | 417 | Unopposed MOTION to Seal BMC's Response to IBM's Motion for Summary Judgment on IBM's Breach of Contract CounterclaimMotions referred to Christina A Bryan. by BMC Software, Inc., filed. Motion Docket Date 9/11/2020. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 08/21/2020) |
| 08/21/2020 | 418 | SEALED RESPONSE *of BMC* re: 394 SEALED MOTION *for Partial Summary Judgment on IBM's Breach of Contract Counterclaim* by BMC Software, Inc., filed. (Attachments: # 1 Exhibit 1 - Decl of E Eoff, # 2 Exhibit 2 - Decl of P Janssen, # 3 Appendix Part 1 of 4, # 4 Appendix Part 2 of 4, # 5 Appendix Part 3 of 4, # 6 Appendix Part 4 of 4) (Gorman, Sean) (Entered: 08/21/2020) |
| 08/21/2020 | 419 | Unopposed MOTION to Seal IBM Opposition to BMC's Motion for Partial Summary Judgment on IBM's Affirmative DefensesMotions referred to Christina A Bryan. by International Business Machines Corporation, filed. Motion Docket Date 9/11/2020. (Attachments: # 1 Proposed Order)(Epstein, Rachel) (Entered: 08/21/2020) |
| 08/21/2020 | 420 | SEALED RESPONSE */IBM Opposition to BMC's Motion for Partial Summary Judgment on IBM's Affirmative Defenses* re: 387 SEALED MOTION *BMC's Motion for Partial Summary Judgment on IBM's Affirmative Defenses*, 419 Unopposed MOTION to Seal IBM Opposition to BMC's Motion for Partial Summary Judgment on IBM's Affirmative Defenses by International Business Machines Corporation, filed. (Epstein, Rachel) (Entered: 08/21/2020) |
| 08/21/2020 | 421 | |

| | | |
|---|---|---|
| | | Unopposed MOTION to Seal IBM's Opposition to BMC's Motion for Partial Summary Judgment on Construction of Damage Limitations ProvisionsMotions referred to Christina A Bryan. by International Business Machines Corporation, filed. Motion Docket Date 9/11/2020. (Attachments: # 1 Proposed Order)(Epstein, Rachel) (Entered: 08/21/2020) |
| 08/21/2020 | 422 | SEALED RESPONSE *IBM's Opposition to BMC's Motion for Partial Summary Judgment on Construction of Damage Limitations Provisions* re: 421 Unopposed MOTION to Seal IBM's Opposition to BMC's Motion for Partial Summary Judgment on Construction of Damage Limitations Provisions, 401 Redacted Document by International Business Machines Corporation, filed. (Epstein, Rachel) (Entered: 08/21/2020) |
| 08/21/2020 | 423 | Unopposed MOTION to Seal IBM's Opposition to BMC's Motion for Partial Summary Judgment on IBM's Counterclaim for Breach of the Most Favored Customer ProvisionMotions referred to Christina A Bryan. by International Business Machines Corporation, filed. Motion Docket Date 9/11/2020. (Attachments: # 1 Proposed Order)(Epstein, Rachel) (Entered: 08/21/2020) |
| 08/21/2020 | 424 | SEALED RESPONSE *IBM's Opposition to BMC's Motion for Partial Summary Judgment on IBM's Counterclaim for Breach of the Most Favored Customer Provision* re: 391 SEALED MOTION *BMC's Motion for Partial Summary Judgment on IBM's Counterclaim for Breach of the Most Favored Customer Provision*, 423 Unopposed MOTION to Seal IBM's Opposition to BMC's Motion for Partial Summary Judgment on IBM's Counterclaim for Breach of the Most Favored Customer Provision by International Business Machines Corporation, filed. (Epstein, Rachel) (Entered: 08/21/2020) |
| 08/21/2020 | 425 | Unopposed MOTION to Seal IBM's Opposition to BMC's Motion for Partial Summary Judgment on Breach of Outsourcing Attachment Sections 1.1 and 5.4Motions referred to Christina A Bryan. by International Business Machines Corporation, filed. Motion Docket Date 9/11/2020. (Attachments: # 1 Proposed Order)(Epstein, Rachel) (Entered: 08/21/2020) |
| 08/21/2020 | 426 | SEALED RESPONSE *IBM's Opposition to BMC's Motion for Partial Summary Judgment on Breach of Outsourcing Attachment Sections 1.1 and 5.4* re: 381 SEALED MOTION *for Partial Summary Judgment on IBM's Breach of Outsourcing Attachment Sections 1.1 and 5.4*, 425 Unopposed MOTION to Seal IBM's Opposition to BMC's Motion for Partial Summary Judgment on Breach of Outsourcing Attachment Sections 1.1 and 5.4 by International Business Machines Corporation, filed. (Attachments: # 1 Affidavit Declaration of R. Epstein, # 2 Appendix Part 1 of 5, # 3 Appendix Part 2 of 5, # 4 Appendix Part 3 of 5, # 5 Appendix Part 4 of 5, # 6 Appendix Part 5 of 5) (Epstein, Rachel) (Entered: 08/22/2020) |
| 08/24/2020 | 427 | ORDER granting 415 Motion to Seal; granting 417 Motion to Seal; granting 419 Motion to Seal; granting 421 Motion to Seal; granting 423 Motion to Seal; granting 425 Motion to Seal.(Signed by Magistrate Judge Christina A Bryan) Parties notified.(cjan, 4) (Entered: 08/24/2020) |
| 08/24/2020 | 428 | Corrected SEALED RESPONSE *IBM's Corrected Opposition to BMC's Motion for Partial Summary Judgment on Breach of Outsourcing Attachment Sections 1.1 and 5.4* re: 381 SEALED MOTION *for Partial Summary Judgment on IBM's Breach of Outsourcing Attachment Sections 1.1 and 5.4*, 426 Sealed Response,, by International Business Machines Corporation, filed. (Epstein, Rachel) (Entered: 08/24/2020) |
| 08/26/2020 | 429 | SEALED DOCUMENT *BMC's correspondence to the Court* by BMC Software, Inc., filed. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E) (Gorman, Sean) (Entered: 08/26/2020) |

| 08/31/2020 | 430 | SEALED DOCUMENT *Response to BMCs Pre-Motion Conference Letter at Docket Entry 429.* by International Business Machines Corporation, filed. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10) (Epstein, Rachel) (Entered: 08/31/2020) |
|---|---|---|
| 08/31/2020 | 431 | Correspondence to the Court re: BMCs Renewed Motion to Compel Evidence Withheld as Privileged (Dkt. 407) by International Business Machines Corporation, filed.(Epstein, Rachel) (Entered: 08/31/2020) |
| 08/31/2020 | 432 | Unopposed MOTION to Seal IBM'S Opposition to BMC'S Renewed Motion to Compel Under SealMotions referred to Christina A Bryan. by International Business Machines Corporation, filed. Motion Docket Date 9/21/2020. (Attachments: # 1 Proposed Order)(Epstein, Rachel) (Entered: 08/31/2020) |
| 08/31/2020 | 433 | SEALED RESPONSE *IBMs Opposition to BMCs* re: 407 Renewed SEALED MOTION *to Compel Evidence Withheld as Privileged* by International Business Machines Corporation, filed. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30) (Epstein, Rachel) (Entered: 08/31/2020) |
| 09/01/2020 | 434 | ORDER granting 432 Motion to Seal.(Signed by Magistrate Judge Christina A Bryan) Parties notified.(cjan, 4) (Entered: 09/01/2020) |
| 09/01/2020 | 435 | Renewed SEALED REPLY *in Support* re: 407 Renewed SEALED MOTION *to Compel Evidence Withheld as Privileged* by BMC Software, Inc., filed. (Gorman, Sean) (Entered: 09/01/2020) |
| 09/03/2020 | 436 | NOTICE of Resetting. Parties notified. Telephone Conference (letter to the court and status of outstanding issues) set for 9/4/2020 at 11:00 AM by telephone before Magistrate Judge Christina A Bryan, filed. (TIME CHANGE ONLY) (cjan, 4) Modified on 9/3/2020 (cjan, 4). (Entered: 09/03/2020) |
| 09/04/2020 | 437 | SEALED DOCUMENT *BMC's correspondence to the Court in support of Dkt 429* by BMC Software, Inc., filed. (Gorman, Sean) (Entered: 09/04/2020) |
| 09/04/2020 | | Minute Entry for proceedings held before Magistrate Judge Christina A Bryan. TELEPHONE CONFERENCE held on 9/4/2020. Hearing held on parties' letters (Discovery disputes and remaining issues) to the Court. IBM to produce documents for in camera review. Further hearings to be set. Appearances: Rachel Elizabeth Epstein, Elizabeth Frances Eoff, Christopher Lee Dodson, Sean R D Gorman, Marlo A. Pecora, Donald John Reinhard, II.(ERO:R. Castro), filed.(cjan, 4) (Entered: 09/04/2020) |
| 09/04/2020 | 438 | ORDER relating to discovery disputes raised by 429 SEALED DOCUMENT BMC's correspondence to the Court by BMC Software and telephone hearing held on 9/4/2020.(Signed by Magistrate Judge Christina A Bryan) Parties notified.(cjan, 4) (Entered: 09/04/2020) |
| 09/04/2020 | 439 | AO 435 TRANSCRIPT REQUEST by BMC Software/Sean Gorman for Transcript of Telephonic hearing, September 4, 2020 before Hon. Christina A. Bryan. 3-Day turnaround requested. Court Reporter/Transcriber: Judicial Transcribers of Texas, filed. (Gorman, Sean) Electronically forwarded to Judicial Transcribers of Texas on September 8, 2020. |

| | | Estimated completion date: September 11, 2020. Modified on 9/8/2020 (ClaudiaGutierrez, 4). (Entered: 09/04/2020) |
|---|---|---|
| 09/04/2020 | 440 | AO 435 TRANSCRIPT REQUEST by Steven C. Vacek for Transcript of 9/4/2020, hearing, Judge Christina Bryan. 3-Day turnaround requested. Court Reporter/Transcriber: Judicial Transcribers of Texas, filed. (mmapps, 4) Copy Request electronically forwarded to Judicial Transcribers of Texas on September 8, 2020. Estimated completion date: September 11, 2020. Modified on 9/8/2020 (ClaudiaGutierrez, 4). (Entered: 09/04/2020) |
| 09/04/2020 | 441 | REDACTION to 416 Sealed Response,, by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 09/04/2020) |
| 09/04/2020 | 442 | REDACTION to 418 Sealed Response, by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 09/04/2020) |
| 09/04/2020 | 443 | REDACTION to 420 Sealed Response, by International Business Machines Corporation, filed.(Epstein, Rachel) (Entered: 09/04/2020) |
| 09/04/2020 | 444 | REDACTION to 424 Sealed Response,, by International Business Machines Corporation, filed.(Epstein, Rachel) (Entered: 09/04/2020) |
| 09/04/2020 | 445 | REDACTION to 422 Sealed Response, by International Business Machines Corporation, filed.(Epstein, Rachel) (Entered: 09/04/2020) |
| 09/04/2020 | 446 | REDACTION to 428 Sealed Response, by International Business Machines Corporation, filed.(Epstein, Rachel) (Entered: 09/04/2020) |
| 09/11/2020 | 447 | AMENDED SCHEDULING ORDER. The deadline for filing Daubert motions is extended until October 15, 2020. (Signed by Magistrate Judge Christina A Bryan) Parties notified.(cjan, 4) (Entered: 09/11/2020) |
| 09/11/2020 | 448 | TRANSCRIPT re: Telephonic Conference Re: Discovery Dispute held on September 4, 2020 before Magistrate Judge Christina A Bryan. Court Reporter/Transcriber Judicial Transcribers of Texas, LLC. Ordering Party Sean Gorman Release of Transcript Restriction set for 12/10/2020., filed. (mahenry, ) **SEALED pursuant to 548 Order of Court** (Entered: 09/11/2020) |
| 09/14/2020 | 449 | Notice of Filing of Official Transcript as to 448 Transcript,. Party notified, filed. (dhansen, 4) (Entered: 09/14/2020) |
| 09/15/2020 | 450 | BMC letter to Judge Bryan by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 09/15/2020) |
| 09/16/2020 | 451 | Joint MOTION for Leave to File Excess PagesMotions referred to Christina A Bryan. by International Business Machines Corporation, filed. Motion Docket Date 10/7/2020. (Attachments: # 1 Proposed Order)(Epstein, Rachel) (Entered: 09/16/2020) |
| 09/17/2020 | 452 | ORDER granting 451 Motion for Leave to File Excess Pages.(Signed by Magistrate Judge Christina A Bryan) Parties notified.(cjan, 4) (Entered: 09/17/2020) |
| 09/17/2020 | 453 | Unopposed MOTION to Seal Reply in Support of Motion for Partial Summary Judgment on Breach of Outsourcing Attachment Sections 1.1 and 5.4Motions referred to Christina A Bryan. by BMC Software, Inc., filed. Motion Docket Date 10/8/2020. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 09/17/2020) |
| 09/17/2020 | 454 | SEALED REPLY *in Support of* re: 381 SEALED MOTION *for Partial Summary Judgment on IBM's Breach of Outsourcing Attachment Sections 1.1 and 5.4* by BMC |

| | | |
|---|---|---|
| | | Software, Inc., filed. (Gorman, Sean) (Entered: 09/17/2020) |
| 09/17/2020 | 455 | Unopposed MOTION to Seal Reply in Support of Motion for Partial Summary Judgment on IBM's Counterclaim for Breach of the Most Favored Customer ProvisionMotions referred to Christina A Bryan. by BMC Software, Inc., filed. Motion Docket Date 10/8/2020. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 09/17/2020) |
| 09/17/2020 | 456 | SEALED REPLY *in Support of* re: 391 SEALED MOTION *BMC's Motion for Partial Summary Judgment on IBM's Counterclaim for Breach of the Most Favored Customer Provision* by BMC Software, Inc., filed. (Gorman, Sean) (Entered: 09/17/2020) |
| 09/17/2020 | 457 | Unopposed MOTION to Seal Reply in Support of Motion for Partial Summary Judgment on Construction of Damages Limitations ProvisionsMotions referred to Christina A Bryan. by BMC Software, Inc., filed. Motion Docket Date 10/8/2020. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 09/17/2020) |
| 09/17/2020 | 458 | SEALED REPLY *in Support of* re: 385 SEALED MOTION *BMC's Motion for Partial Summary Judgment on Construction of Damage Limitations Provisions* by BMC Software, Inc., filed. (Gorman, Sean) (Entered: 09/17/2020) |
| 09/17/2020 | 459 | Unopposed MOTION to Seal Reply in Support of Motion for Partial Summary Judgment on IBM's Affirmative DefensesMotions referred to Christina A Bryan. by BMC Software, Inc., filed. Motion Docket Date 10/8/2020. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 09/17/2020) |
| 09/17/2020 | 460 | SEALED REPLY *in Support of* re: 387 SEALED MOTION *BMC's Motion for Partial Summary Judgment on IBM's Affirmative Defenses* by BMC Software, Inc., filed. (Gorman, Sean) (Entered: 09/17/2020) |
| 09/17/2020 | 461 | Unopposed MOTION to Seal IBM's Reply In Further Support of Its Motion for Partial Summary Judgment on IBM's Breach of Contract CounterclaimMotions referred to Christina A Bryan. by International Business Machines Corporation, filed. Motion Docket Date 10/8/2020. (Attachments: # 1 Proposed Order)(Epstein, Rachel) (Entered: 09/17/2020) |
| 09/17/2020 | 462 | SEALED REPLY */IBM's Reply In Further Support of Its Motion for Partial Summary Judgment on IBM's Breach of Contract Counterclaim* re: 394 SEALED MOTION *for Partial Summary Judgment on IBM's Breach of Contract Counterclaim* by International Business Machines Corporation, filed. (Epstein, Rachel) (Entered: 09/17/2020) |
| 09/17/2020 | 463 | SEALED EXHIBITS */IBM's Notice of Filing Exhibits to its Reply on its Motion for Partial Summary Judgment on IBM's Counterclaim* re: 462 Sealed Response, 394 SEALED MOTION *for Partial Summary Judgment on IBM's Breach of Contract Counterclaim* by International Business Machines Corporation, filed. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2) (Epstein, Rachel) (Entered: 09/17/2020) |
| 09/17/2020 | 464 | Unopposed MOTION to Seal IBM's Reply on its Motion for Summary Judgment on BMC's ClaimsMotions referred to Christina A Bryan. by International Business Machines Corporation, filed. Motion Docket Date 10/8/2020. (Attachments: # 1 Proposed Order)(Epstein, Rachel) (Entered: 09/17/2020) |
| 09/17/2020 | 465 | SEALED REPLY */IBM's Reply in Further Support of its Motion for Summary Judgment on BMC's Claims* re: 396 SEALED MOTION *for Summary Judgment on BMC's Claims* by International Business Machines Corporation, filed. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Epstein, Rachel) (Entered: 09/17/2020) |

| 09/18/2020 | 466 | ORDER granting 453 Motion to Seal; granting 455 Motion to Seal; granting 457 Motion to Seal; granting 459 Motion to Seal; granting 461 Motion to Seal; granting 464 Motion to Seal.(Signed by Magistrate Judge Christina A Bryan) Parties notified.(cjan, 4) (Entered: 09/18/2020) |
|---|---|---|
| 10/01/2020 | 467 | REDACTION to 454 Sealed Response by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 10/01/2020) |
| 10/01/2020 | 468 | REDACTION to 456 Sealed Response by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 10/01/2020) |
| 10/01/2020 | 469 | REDACTION to 458 Sealed Response by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 10/01/2020) |
| 10/01/2020 | 470 | REDACTION to 460 Sealed Response by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 10/01/2020) |
| 10/01/2020 | 471 | REDACTION to 462 Sealed Response, by International Business Machines Corporation, filed.(Epstein, Rachel) (Entered: 10/01/2020) |
| 10/01/2020 | 472 | REDACTION to 465 Sealed Response, by International Business Machines Corporation, filed.(Epstein, Rachel) (Entered: 10/01/2020) |
| 10/14/2020 | 473 | NOTICE of Appearance by Kyle A. Mason on behalf of BMC Software, Inc., filed. (Mason, Kyle) (Entered: 10/14/2020) |
| 10/15/2020 | 474 | Joint MOTION for Leave to File Excess PagesMotions referred to Christina A Bryan. by BMC Software, Inc., filed. Motion Docket Date 11/5/2020. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 10/15/2020) |
| 10/15/2020 | 475 | Unopposed MOTION to Seal BMC's Motion to Exclude the Expert Opinions of Bruce V. HartleyMotions referred to Christina A Bryan. by BMC Software, Inc., filed. Motion Docket Date 11/5/2020. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 10/15/2020) |
| 10/15/2020 | 476 | SEALED MOTION *to Exclude the Expert Opinions of Bruce V. Hartley* by BMC Software, Inc., filed. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Proposed Order) (Gorman, Sean) (Entered: 10/15/2020) |
| 10/15/2020 | 477 | Unopposed MOTION to Seal BMC's Motion to Exclude the Expert Opinions of Barry GrahamMotions referred to Christina A Bryan. by BMC Software, Inc., filed. Motion Docket Date 11/5/2020. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 10/15/2020) |
| 10/15/2020 | 478 | SEALED MOTION *to Exclude the Expert Opinions of Barry Graham* by BMC Software, Inc., filed. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Proposed Order) (Gorman, Sean) (Entered: 10/15/2020) |
| 10/15/2020 | 479 | Unopposed MOTION to Seal BMC's Motion to Exclude the Expert Opinions of Paul C. PintoMotions referred to Christina A Bryan. by BMC Software, Inc., filed. Motion Docket Date 11/5/2020. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 10/15/2020) |
| 10/15/2020 | 480 | Unopposed MOTION to Seal IBM's Motion to Exclude the Testimony of Alan RatliffMotions referred to Christina A Bryan. by International Business Machines Corporation, filed. Motion Docket Date 11/5/2020. (Attachments: # 1 Proposed Order)(Epstein, Rachel) (Entered: 10/15/2020) |

| 10/15/2020 | 481 | SEALED MOTION *to Exclude the Expert Opinions of Paul C. Pinto* by BMC Software, Inc., filed. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W, # 24 Exhibit X, # 25 Exhibit Y, # 26 Proposed Order) (Gorman, Sean) (Entered: 10/15/2020) |
|---|---|---|
| 10/15/2020 | 482 | SEALED MOTION */IBM's Motion to Exlude the Testimony of Alan Ratliff* by International Business Machines Corporation, filed. (Attachments: # 1 Affidavit Declaration of Rachel E. Epstein, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Proposed Order) (Epstein, Rachel) (Entered: 10/15/2020) |
| 10/15/2020 | 483 | Unopposed MOTION to Seal BMC's Motion to Exclude the Expert Opinions of Christopher GerardiMotions referred to Christina A Bryan. by BMC Software, Inc., filed. Motion Docket Date 11/5/2020. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 10/15/2020) |
| 10/15/2020 | 484 | SEALED MOTION *to Exclude the Expert Opinions of Christopher Gerardi* by BMC Software, Inc., filed. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Proposed Order) (Gorman, Sean) (Entered: 10/15/2020) |
| 10/15/2020 | 485 | Unopposed MOTION to Seal IBM's Motion to Exclude the Testimony of Kendyl RomanMotions referred to Christina A Bryan. by International Business Machines Corporation, filed. Motion Docket Date 11/5/2020. (Attachments: # 1 Proposed Order)(Epstein, Rachel) (Entered: 10/15/2020) |
| 10/15/2020 | 486 | Unopposed MOTION to Seal BMC's Motion to Exclude the Expert Opinions of Richard J. GilbertMotions referred to Christina A Bryan. by BMC Software, Inc., filed. Motion Docket Date 11/5/2020. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 10/15/2020) |
| 10/15/2020 | 487 | SEALED MOTION *to Exclude the Expert Opinions of Richard J. Gilbert* by BMC Software, Inc., filed. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Proposed Order) (Gorman, Sean) (Entered: 10/15/2020) |
| 10/15/2020 | 488 | SEALED MOTION */IBM's Motion to Exclude the Testimony fo Kendyl Roman* by International Business Machines Corporation, filed. (Attachments: # 1 Affidavit Declaration of Rachel E. Epstein, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26, # 28 Exhibit 27, # 29 Exhibit 28, # 30 Exhibit 29, # 31 Exhibit 30, # 32 Exhibit 31, # 33 Exhibit 32, # 34 Exhibit 33, # 35 Exhibit 34, # 36 Appendix A, # 37 Proposed Order) (Epstein, Rachel) (Entered: 10/15/2020) |
| 10/16/2020 | 489 | ORDER granting 474 Motion for Leave to File Excess Pages. Each parties cumulative total briefing on Daubert motions shall not exceed 140 pages, excluding any exhibits, declarations, appendices, or tables of authorities or contents. ORDER granting 475 |

| | | |
|---|---|---|
| | | Motion to Seal; granting 477 Motion to Seal; granting 479 Motion to Seal; granting 480 Motion to Seal; granting 483 Motion to Seal; granting 485 Motion to Seal; granting 486 Motion to Seal. The documents referenced in the motions will be filed under seal. (Signed by Magistrate Judge Christina A Bryan) Parties notified.(sanderson, 4) (Entered: 10/16/2020) |
| 10/23/2020 | 490 | Joint MOTION for Extension of Time Motions referred to Christina A Bryan. by BMC Software Finance, Inc., filed. Motion Docket Date 11/13/2020. (Attachments: # 1 Proposed Order)(Epstein, Rachel) (Entered: 10/23/2020) |
| 10/24/2020 | 491 | ***The 2/26/2021 docket call and all remaining deadlines are CANCELLED pending a ruling on the outstanding motions. Parties notified.(rkonieczny, 4) (Entered: 10/24/2020) |
| 10/26/2020 | 492 | ORDER granting 490 Motion for Extension of Time.(Signed by Magistrate Judge Christina A Bryan) Parties notified.(cjan, 4) (Entered: 10/26/2020) |
| 10/28/2020 | 493 | REDACTION to 476 SEALED MOTION *to Exclude the Expert Opinions of Bruce V. Hartley* by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 10/28/2020) |
| 10/28/2020 | 494 | REDACTION to 478 SEALED MOTION *to Exclude the Expert Opinions of Barry Graham* by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 10/28/2020) |
| 10/28/2020 | 495 | REDACTION to 481 SEALED MOTION *to Exclude the Expert Opinions of Paul C. Pinto* by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 10/28/2020) |
| 10/28/2020 | 496 | REDACTION to 484 SEALED MOTION *to Exclude the Expert Opinions of Christopher Gerardi* by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 10/28/2020) |
| 10/28/2020 | 497 | REDACTION to 487 SEALED MOTION *to Exclude the Expert Opinions of Richard J. Gilbert* by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 10/28/2020) |
| 10/28/2020 | 498 | REDACTION to 482 SEALED MOTION */IBM's Motion to Exlude the Testimony of Alan Ratliff* by International Business Machines Corporation, filed.(Epstein, Rachel) (Entered: 10/28/2020) |
| 10/28/2020 | 499 | REDACTION to 488 SEALED MOTION */IBM's Motion to Exclude the Testimony fo Kendyl Roman* by International Business Machines Corporation, filed.(Epstein, Rachel) (Entered: 10/28/2020) |
| 11/02/2020 | | (Court only) ***Motion(s) terminated: 379 Joint MOTION for Leave to File Excess Pages. (cjan, 4) (Entered: 11/02/2020) |
| 11/12/2020 | 500 | Joint MOTION for Leave to File Excess PagesMotions referred to Christina A Bryan. by BMC Software, Inc., filed. Motion Docket Date 12/3/2020. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 11/12/2020) |
| 11/12/2020 | 501 | Unopposed MOTION to Seal IBM's Unopposed Motion for Leave to File Its Opposition to BMC's Motion to Exclude the Expert Opinions of Barry GrahamMotions referred to Christina A Bryan. by International Business Machines Corporation, filed. Motion Docket Date 12/3/2020. (Attachments: # 1 Proposed Order)(Epstein, Rachel) (Entered: 11/12/2020) |
| 11/12/2020 | 502 | Unopposed MOTION to Seal IBM's Unopposed Motion for Leave to File Its Opposition to BMC's Motion to Exclude the Expert Opinions of Bruce V. Hartley Under SealMotions referred to Christina A Bryan. by International Business Machines Corporation, filed. Motion Docket Date 12/3/2020. (Attachments: # 1 Proposed Order)(Epstein, Rachel) (Entered: 11/12/2020) |

| | | |
|---|---|---|
| 11/12/2020 | 503 | Unopposed MOTION to Seal IBM's Unopposed Motion for Leave to File Its Opposition to BMC's Motion to Exclude the Expert Opinions of Christopher Gerardi Under SealMotions referred to Christina A Bryan. by International Business Machines Corporation, filed. Motion Docket Date 12/3/2020. (Attachments: # 1 Proposed Order)(Epstein, Rachel) (Entered: 11/12/2020) |
| 11/12/2020 | 504 | Unopposed MOTION to Seal IBM's Unopposed Motion for Leave to File Its Opposition to BMC's Motion to Exclude the Expert Opinions of Paul C. Pinto Under SealMotions referred to Christina A Bryan. by International Business Machines Corporation, filed. Motion Docket Date 12/3/2020. (Attachments: # 1 Proposed Order)(Epstein, Rachel) (Entered: 11/12/2020) |
| 11/12/2020 | 505 | MOTION to Seal IBM's Unopposed Motion for Leave to File Its Opposition to BMC's Motion to Exclude the Expert Opinions of Richard J. Gilbert Under SealMotions referred to Christina A Bryan. by International Business Machines Corporation, filed. Motion Docket Date 12/3/2020. (Attachments: # 1 Proposed Order)(Epstein, Rachel) (Entered: 11/12/2020) |
| 11/12/2020 | 506 | SEALED RESPONSE *IBM's Opposition to BMC's Motion to Exclude the Expert Opinions of Christopher Gerardi* re: 484 SEALED MOTION *to Exclude the Expert Opinions of Christopher Gerardi* by International Business Machines Corporation, filed. (Attachments: # 1 Affidavit Declaration of Donald Reinhard, # 2 Exhibit 1, # 3 Exhibit 2) (Epstein, Rachel) (Entered: 11/12/2020) |
| 11/12/2020 | 507 | SEALED RESPONSE *IBM's Opposition to BMC's Motion to Exclude the Expert Opinions of Richard Gilbert* re: 487 SEALED MOTION *to Exclude the Expert Opinions of Richard J. Gilbert* by International Business Machines Corporation, filed. (Attachments: # 1 Affidavit Declaration of Rachel E. Epstein, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5) (Epstein, Rachel) (Entered: 11/12/2020) |
| 11/12/2020 | 508 | Unopposed MOTION to Seal BMC's Response in Opposition to IBM's Motion to Exclude Testimony of Alan RatliffMotions referred to Christina A Bryan. by BMC Software, Inc., filed. Motion Docket Date 12/3/2020. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 11/12/2020) |
| 11/12/2020 | 509 | SEALED RESPONSE *in Opposition* re: 482 SEALED MOTION *IBM's Motion to Exlude the Testimony of Alan Ratliff* by BMC Software, Inc., filed. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V) (Gorman, Sean) (Entered: 11/12/2020) |
| 11/12/2020 | 510 | Unopposed MOTION to Seal BMC's Response in Opposition to IBM's Motion to Exclude Testimony of Kendyl RomanMotions referred to Christina A Bryan. by BMC Software, Inc., filed. Motion Docket Date 12/3/2020. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 11/12/2020) |
| 11/12/2020 | 511 | SEALED RESPONSE *in Opposition* re: 488 SEALED MOTION *IBM's Motion to Exclude the Testimony fo Kendyl Roman* by BMC Software, Inc., filed. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T) (Gorman, Sean) (Entered: 11/12/2020) |
| 11/12/2020 | 512 | |

| | | |
|---|---|---|
| | | SEALED RESPONSE */IBM's Opposition to BMC's Motion to Exclude the Expert Opinions of Bruce V. Hartley* re: 476 SEALED MOTION *to Exclude the Expert Opinions of Bruce V. Hartley* by International Business Machines Corporation, filed. (Attachments: # 1 Affidavit Declaration of Marlo A. Pecora, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3) (Epstein, Rachel) (Entered: 11/12/2020) |
| 11/12/2020 | 513 | SEALED RESPONSE */IBM's Opposition to BMC's Motion to Exclude the Expert Opinions of Paul C. Pinto* re: 481 SEALED MOTION *to Exclude the Expert Opinions of Paul C. Pinto* by International Business Machines Corporation, filed. (Attachments: # 1 Affidavit Declaration of Rachel E. Epstein, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10) (Epstein, Rachel) (Entered: 11/12/2020) |
| 11/12/2020 | 514 | SEALED RESPONSE */IBM's Opposition to BMC's Motion to Exclude the Expert Opinions of Barry Graham* re: 478 SEALED MOTION *to Exclude the Expert Opinions of Barry Graham* by International Business Machines Corporation, filed. (Epstein, Rachel) (Entered: 11/12/2020) |
| 11/12/2020 | 515 | ORDER granting 500 Motion for Leave to File Excess Page Limit. Each partys cumulative total briefing in opposition to pending Daubert motions shall not exceed 140 pages, excluding exhibits, declarations, appendices, or table of authorities or contents. Each parties reply briefs in support of its Daubert motions shall not exceed 10 pages per brief. (Signed by Magistrate Judge Christina A Bryan) Parties notified.(sanderson, 4) (Entered: 11/13/2020) |
| 11/13/2020 | 516 | ORDER granting 501 Motion to Seal Response; granting 502 Motion to Seal Response; granting 503 Motion to Seal Response; granting 504 Motion to Seal Response; granting 505 Motion to Seal Response; granting 508 Motion to Seal Response; granting 510 Motion to Seal Response. The documents referenced in the motions will be filed under seal. (Signed by Magistrate Judge Christina A Bryan) Parties notified.(sanderson, 4) (Entered: 11/13/2020) |
| 11/16/2020 | 517 | ORDER for Mediation - the parties must participate in a mediation before Ret. Magistrate Judge Nancy K. Johnson within 60 days of entry of this Order. The mediation may be held in person or by videoconference. A person authorized to to agree to settlement terms must attend for each party. (Signed by Judge Gray H Miller) Parties notified.(rkonieczny, 4) (Entered: 11/16/2020) |
| 11/23/2020 | 518 | REDACTION to 511 Sealed Response,, by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 11/23/2020) |
| 11/23/2020 | 519 | REDACTION to 509 Sealed Response,, by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 11/23/2020) |
| 11/23/2020 | 520 | REDACTION to 506 Sealed Response, by International Business Machines Corporation, filed.(Epstein, Rachel) (Entered: 11/23/2020) |
| 11/23/2020 | 521 | REDACTION to 507 Sealed Response, by International Business Machines Corporation, filed.(Epstein, Rachel) (Entered: 11/23/2020) |
| 11/23/2020 | 522 | REDACTION to 512 Sealed Response, by International Business Machines Corporation, filed.(Epstein, Rachel) (Entered: 11/23/2020) |
| 11/23/2020 | 523 | REDACTION to 513 Sealed Response,, by International Business Machines Corporation, filed.(Epstein, Rachel) (Entered: 11/23/2020) |

| 11/23/2020 | 524 | REDACTION to 514 Sealed Response, by International Business Machines Corporation, filed.(Epstein, Rachel) (Entered: 11/23/2020) |
|---|---|---|
| 11/25/2020 | 525 | Unopposed MOTION to Seal IBM's Reply in Support of Motion to Exclude Testimony of Kendyl RomanMotions referred to Christina A Bryan. by International Business Machines Corporation, filed. Motion Docket Date 12/16/2020. (Attachments: # 1 Proposed Order to File Under Seal)(Epstein, Rachel) (Entered: 11/25/2020) |
| 11/25/2020 | 526 | Unopposed MOTION to Seal IBM's Reply in Support of Motion to Exclude Testimony of Alan RatliffMotions referred to Christina A Bryan. by International Business Machines Corporation, filed. Motion Docket Date 12/16/2020. (Attachments: # 1 Proposed Order to File Under Seal)(Epstein, Rachel) (Entered: 11/25/2020) |
| 11/25/2020 | 527 | Unopposed MOTION to Seal BMC's Reply in Support of its Motion to Exclude the Expert Opinions of Bruce V. HartleyMotions referred to Christina A Bryan. by BMC Software, Inc., filed. Motion Docket Date 12/16/2020. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 11/25/2020) |
| 11/25/2020 | 528 | SEALED REPLY *in Support* re: 476 SEALED MOTION *to Exclude the Expert Opinions of Bruce V. Hartley* by BMC Software, Inc., filed. (Gorman, Sean) (Entered: 11/25/2020) |
| 11/25/2020 | 529 | Unopposed MOTION to Seal BMC's Reply in Support of its Motion to Exclude the Expert Opinions of Paul C. PintoMotions referred to Christina A Bryan. by BMC Software, Inc., filed. Motion Docket Date 12/16/2020. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 11/25/2020) |
| 11/25/2020 | 530 | SEALED REPLY *in Support* re: 481 SEALED MOTION *to Exclude the Expert Opinions of Paul C. Pinto* by BMC Software, Inc., filed. (Gorman, Sean) (Entered: 11/25/2020) |
| 11/25/2020 | 531 | Unopposed MOTION to Seal BMC's Reply in Support of its Motion to Exclude the Expert Opinions of Barry GrahamMotions referred to Christina A Bryan. by BMC Software, Inc., filed. Motion Docket Date 12/16/2020. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 11/25/2020) |
| 11/25/2020 | 532 | SEALED REPLY *in Support* re: 478 SEALED MOTION *to Exclude the Expert Opinions of Barry Graham* by BMC Software, Inc., filed. (Gorman, Sean) (Entered: 11/25/2020) |
| 11/25/2020 | 533 | Unopposed MOTION to Seal BMC's Reply in Support of its Motion to Exclude the Expert Opinions of Richard J. GilbertMotions referred to Christina A Bryan. by BMC Software, Inc., filed. Motion Docket Date 12/16/2020. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 11/25/2020) |
| 11/25/2020 | 534 | SEALED REPLY *in Support* re: 487 SEALED MOTION *to Exclude the Expert Opinions of Richard J. Gilbert* by BMC Software, Inc., filed. (Gorman, Sean) (Entered: 11/25/2020) |
| 11/25/2020 | 535 | Unopposed MOTION to Seal BMC's Reply in Support of its Motion to Exclude the Expert Opinions of Christopher GerardiMotions referred to Christina A Bryan. by BMC Software, Inc., filed. Motion Docket Date 12/16/2020. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 11/25/2020) |
| 11/25/2020 | 536 | SEALED REPLY *in Support* re: 484 SEALED MOTION *to Exclude the Expert Opinions of Christopher Gerardi* by BMC Software, Inc., filed. (Gorman, Sean) (Entered: 11/25/2020) |
| 11/25/2020 | 537 | SEALED REPLY *in Support* re: 488 SEALED MOTION */IBM's Motion to Exclude the Testimony fo Kendyl Roman* by International Business Machines Corporation, filed. (Epstein, Rachel) (Entered: 11/25/2020) |

| 11/25/2020 | 538 | SEALED REPLY *in Support* re: 482 SEALED MOTION */IBM's Motion to Exlude the Testimony of Alan Ratliff* by International Business Machines Corporation, filed. (Attachments: # 1 Affidavit Declaration of Rachel E. Epstein, # 2 Exhibit Exhibit 13, # 3 Exhibit Exhibit 14, # 4 Exhibit Exhibit 15, # 5 Exhibit Exhibit 16) (Epstein, Rachel) (Entered: 11/25/2020) |
|---|---|---|
| 11/30/2020 | 539 | ORDER granting 525 Motion to Seal; granting 526 Motion to Seal; granting 527 Motion to Seal; granting 529 Motion to Seal; granting 531 Motion to Seal; granting 533 Motion to Seal; granting 535 Motion to Seal.(Signed by Magistrate Judge Christina A Bryan) Parties notified.(cjan, 4) (Entered: 11/30/2020) |
| 12/09/2020 | 540 | Unopposed MOTION to Seal Transcript of the September 4, 2020 Telephonic Conference, Dkt. No. 448Motions referred to Christina A Bryan. by International Business Machines Corporation, filed. Motion Docket Date 12/30/2020. (Attachments: # 1 Proposed Order)(Epstein, Rachel) (Entered: 12/09/2020) |
| 12/09/2020 | 541 | REDACTION to 537 Sealed Response by International Business Machines Corporation, filed.(Epstein, Rachel) (Entered: 12/09/2020) |
| 12/09/2020 | 542 | REDACTION to 538 Sealed Response, by International Business Machines Corporation, filed.(Epstein, Rachel) (Entered: 12/09/2020) |
| 12/09/2020 | 543 | REDACTION to 528 Sealed Response by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 12/09/2020) |
| 12/09/2020 | 544 | REDACTION to 530 Sealed Response by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 12/09/2020) |
| 12/09/2020 | 545 | REDACTION to 532 Sealed Response by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 12/09/2020) |
| 12/09/2020 | 546 | REDACTION to 534 Sealed Response by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 12/09/2020) |
| 12/09/2020 | 547 | REDACTION to 536 Sealed Response by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 12/09/2020) |
| 12/10/2020 | 548 | ORDER granting 540 Unopposed MOTION to Seal Transcript of the September 4, 2020 Telephonic Conference, Dkt. No. 448. The transcript shall be sealed. (Signed by Magistrate Judge Christina A Bryan) Parties notified.(sanderson, 4) (Entered: 12/11/2020) |
| 12/11/2020 | 549 | REDACTION to 448 Transcript, by International Business Machines Corporation, filed.(Epstein, Rachel) (Entered: 12/11/2020) |
| 12/21/2020 | 550 | Mail Returned Undeliverable as to attorney Guyon H Knightre: 548 Order on Motion to Seal, filed. An updated address could not be found. (JosephWells, 4) (Entered: 12/21/2020) |
| 02/08/2021 | 551 | ORDER in re: 429 (Sealed Document) BMC's Correspondence to the Court (Signed by Magistrate Judge Christina A Bryan) Parties notified.(cjan, 4) (Entered: 02/08/2021) |
| 02/11/2021 | 552 | ORDER in re: 429 SEALED DOCUMENT BMC's correspondence to the Court. (Signed by Magistrate Judge Christina A Bryan) Parties notified.(cjan, 4) (Entered: 02/11/2021) |
| 02/15/2021 | 553 | Alternative Dispute Resolution Memorandum; case Did not settle, filed.(sjones, 4) (Entered: 02/15/2021) |
| 02/15/2021 | 554 | |

| | | |
|---|---|---|
| | | Alternative Dispute Resolution Questionnaire provided to all parties of record, filed. (ccassadyadi, 4) (Entered: 02/15/2021) |
| 02/23/2021 | 555 | ORDER denying 407 Sealed Motion. Plaintiff BMCs Renewed Motion to Compel Evidence Withheld as Privileged.(Signed by Magistrate Judge Christina A Bryan) Parties notified.(cjan, 4) (Entered: 02/23/2021) |
| 04/26/2021 | 556 | Unopposed MOTION to Seal Motion for Leave to File Supplemental Appendix in Support of BMC's Response to IBM's Motion for Summary Judgment and Request for Status ConferenceMotions referred to Christina A Bryan. by BMC Software, Inc., filed. Motion Docket Date 5/17/2021. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 04/26/2021) |
| 04/26/2021 | 557 | Opposed SEALED MOTION *for Leave to File Supplemental Appendix in Support of BMC's Response to IBM's Motion for Summary Judgment and Request for Status Conference* by BMC Software, Inc., filed. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Proposed Order) (Gorman, Sean) (Entered: 04/26/2021) |
| 05/03/2021 | 558 | REDACTION to 557 Opposed SEALED MOTION *for Leave to File Supplemental Appendix in Support of BMC's Response to IBM's Motion for Summary Judgment and Request for Status Conference* by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 05/03/2021) |
| 05/12/2021 | 559 | ORDER granting 556 Motion to Seal.(Signed by Magistrate Judge Christina A Bryan) Parties notified.(cjan, 4) (Entered: 05/12/2021) |
| 05/13/2021 | 560 | ORDER granting in part and denying in part 557 Sealed Motion for Leave to File Supplemental Appendix. The Court denies the Request for Status Conference.(Signed by Magistrate Judge Christina A Bryan) Parties notified.(cjan, 4) (Entered: 05/13/2021) |
| 06/07/2021 | 561 | MEMORANDUM AND RECOMMENDATIONS. It is recommended that the following motions be granted in part and denied in part: re 391 SEALED MOTION *BMC's Motion for Partial Summary Judgment on IBM's Counterclaim for Breach of the Most Favored Customer Provision*, 387 SEALED MOTION *BMC's Motion for Partial Summary Judgment on IBM's Affirmative Defenses*, 381 SEALED MOTION *for Partial Summary Judgment on IBM's Breach of Outsourcing Attachment Sections 1.1 and 5.4*, 396 SEALED MOTION *for Summary Judgment on BMC's Claims*, 385 SEALED MOTION *BMC's Motion for Partial Summary Judgment on Construction of Damage Limitations Provisions*, 394 SEALED MOTION *for Partial Summary Judgment on IBM's Breach of Contract Counterclaim* Objections to M&R due by 6/21/2021(Signed by Magistrate Judge Christina A Bryan) Parties notified.(cjan, 4) (Entered: 06/07/2021) |
| 06/15/2021 | 562 | Joint MOTION for Extension of Time DeadlinesMotions referred to Christina A Bryan. by International Business Machines Corporation, filed. Motion Docket Date 7/6/2021. (Attachments: # 1 Proposed Order)(Epstein, Rachel) (Entered: 06/15/2021) |
| 06/16/2021 | 563 | ORDER granting 562 Motion for Extension of Time. Objections, if any, to the M and R shall be filed on or before July 5, 2021 and responsive briefs, if any, shall be filed on or before August 2, 2021..(Signed by Magistrate Judge Christina A Bryan) Parties notified.(cjan, 4) (Entered: 06/16/2021) |
| 06/21/2021 | 564 | Mail Returned Undeliverable as to attorney Guyon H Knight as to International Business Machines Corporation re: 561 Memorandum and Recommendations,,,, filed. (dnoriega, 1) (Entered: 06/21/2021) |
| 07/05/2021 | 565 | |

| | | Joint MOTION for Leave to File Excess PagesMotions referred to Christina A Bryan. by BMC Software, Inc., filed. Motion Docket Date 7/26/2021. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 07/05/2021) |
|---|---|---|
| 07/05/2021 | 566 | MOTION to Seal BMC_Objections_to_Memorandum and RecommendationMotions referred to Christina A Bryan. by BMC Software, Inc., filed. Motion Docket Date 7/26/2021. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 07/05/2021) |
| 07/05/2021 | 567 | SEALED DOCUMENT *Objections to Memorandum and Recommendation* by BMC Software, Inc., filed. (Attachments: # 1 Exhibit A, # 2 Proposed Order) (Gorman, Sean) (Entered: 07/05/2021) |
| 07/05/2021 | 568 | Unopposed MOTION to Seal IBM's Objections to the June 7, 2021 Memorandum & RecommendationMotions referred to Christina A Bryan. by International Business Machines Corporation, filed. Motion Docket Date 7/26/2021. (Attachments: # 1 Proposed Order)(Epstein, Rachel) (Entered: 07/05/2021) |
| 07/05/2021 | 569 | SEALED DOCUMENT *Objections to June 7, 2021 Memorandum and Recommendation* by International Business Machines Corporation, filed. (Epstein, Rachel) (Entered: 07/05/2021) |
| 07/06/2021 | 570 | ORDER granting 565 Motion for Leave to File Excess Pages.(Signed by CR Houston) Parties notified.(cjan, 4) (Entered: 07/06/2021) |
| 07/06/2021 | 571 | ORDER granting 568 Motion to Seal.(Signed by Magistrate Judge Christina A Bryan) Parties notified.(cjan, 4) (Entered: 07/06/2021) |
| 07/06/2021 | 572 | ORDER granting 566 Motion to Seal.(Signed by Magistrate Judge Christina A Bryan) Parties notified.(cjan, 4) (Entered: 07/06/2021) |
| 07/07/2021 | 573 | MEMORANDUM OPINION AND ORDER denying 476 SEALED MOTION to Exclude the Expert Opinions of Bruce V. Hartley 481 SEALED MOTION to Exclude the Expert Opinions of Paul C. Pinto 487 SEALED MOTION to Exclude the Expert Opinion of Richard J. Gilbert 482 SEALED MOTION IBM's Motion to Exlude the Testimony of Alan Ratliff, 484 SEALED MOTION to Exclude the Expert Opinions of Christopher Gerardi, 488 SEALED MOTION IBM's Motion to Exclude the Testimony fo Kendyl Roman, 478 SEALED MOTION to Exclude the Expert Opinions of Barry Graham. The parties must submit to the court each specific expert opinion they intend to offer at trial along with the specific finding of fact or conclusion of law each experts opinion is offered to support or reject fourteen days in advance of the pre-trial conference. The opposing side will have seven days to make a specific objection to each specific opinion to be offered at trial. (Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 07/07/2021) |
| 07/19/2021 | 574 | REDACTION to 569 Sealed Document by International Business Machines Corporation, filed.(Epstein, Rachel) (Entered: 07/19/2021) |
| 07/19/2021 | 575 | REDACTION to 567 Sealed Document by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 07/19/2021) |
| 08/02/2021 | 576 | Unopposed MOTION to Seal Response to IBM's Objections to the Memorandum & RecommedationMotions referred to Christina A Bryan. by BMC Software, Inc., filed. Motion Docket Date 8/23/2021. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 08/02/2021) |
| 08/02/2021 | 577 | SEALED RESPONSE *to IBM's Objections to the June 7 2021 Memorandum and* |

| | | |
|---|---|---|
| | | *Recommendation* by BMC Software, Inc., filed. (Gorman, Sean) (Entered: 08/02/2021) |
| 08/02/2021 | 578 | Joint MOTION for Leave to File Excess PagesMotions referred to Christina A Bryan. by International Business Machines Corporation, filed. Motion Docket Date 8/23/2021. (Attachments: # 1 Proposed Order Granting Leave to Exceed Page Limit)(Epstein, Rachel) (Entered: 08/02/2021) |
| 08/02/2021 | 579 | Unopposed MOTION to Seal IBM's Response to BMC's Objection to the Memorandum & RecommendationMotions referred to Christina A Bryan. by International Business Machines Corporation, filed. Motion Docket Date 8/23/2021. (Attachments: # 1 Proposed Order)(Epstein, Rachel) (Entered: 08/02/2021) |
| 08/02/2021 | 580 | SEALED RESPONSE *to BMC's Objections to the June 7 2021 Memorandum and Recommendation* by International Business Machines Corporation, filed. (Epstein, Rachel) (Entered: 08/02/2021) |
| 08/03/2021 | 581 | ORDER granting to seal 580 IBM's Response to BMC's Objection to the June 7, 2021 Memorandum and Recommendation.(Signed by Magistrate Judge Christina A Bryan) Parties notified.(cjan, 4) (Entered: 08/03/2021) |
| 08/03/2021 | 582 | ORDER granting 578 Motion for Leave to File Excess Pages.(Signed by Magistrate Judge Christina A Bryan) Parties notified.(cjan, 4) (Entered: 08/03/2021) |
| 08/03/2021 | 583 | ORDER granting 576 Motion to Seal BMC's Response to IBM's Objections to the June 7, 2021 Memorandum and Recommendation..(Signed by Magistrate Judge Christina A Bryan) Parties notified.(cjan, 4) (Entered: 08/03/2021) |
| 08/03/2021 | | (Court only) ***Motion(s) terminated: 579 Unopposed MOTION to Seal IBM's Response to BMC's Objection to the Memorandum & Recommendation. (cjan, 4) (Entered: 08/03/2021) |
| 08/16/2021 | 584 | REDACTION to 577 Sealed Response by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 08/16/2021) |
| 08/16/2021 | 585 | BRIEF REDACTION to 580 Sealed Response by IBM *to BMC's Objections to the June 7 2021 Memorandum and Recommendation* by International Business Machines Corporation, filed.(Epstein, Rachel) (Entered: 08/16/2021) |
| 09/09/2021 | 586 | MEMORANDUM OPINION AND ORDER adopting in part 561 Memorandum and Recommendation regarding 385 SEALED MOTION BMC's Motion for Partial Summary Judgment on Construction of Damage Limitations Provisions, 387 SEALED MOTION BMC's Motion for Partial Summary Judgment on IBM's Affirmative Defenses, 391 SEALED MOTION BMC's Motion for Partial Summary Judgment on IBM's Counterclaim for Breach of the Most Favored Customer Provision, 381 SEALED MOTION for Partial Summary Judgment on IBM's Breach of Outsourcing Attachment Sections 1.1 and 5.4, 396 SEALED MOTION for Summary Judgment on BMC's Claims, 394 SEALED MOTION for Partial Summary Judgment on IBM's Breach of Contract Counterclaim (Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 09/09/2021) |
| 09/09/2021 | | (Court only) ***Motion(s) terminated: 385 SEALED MOTION BMC's Motion for Partial Summary Judgment on Construction of Damage Limitations Provisions, 387 SEALED MOTION BMC's Motion for Partial Summary Judgment on IBM's Affirmative Defenses. See Memorandum Opinion and Order 586 . (rguerrero, 4) (Entered: 09/23/2021) |
| 09/09/2021 | | (Court only) ***Case No Longer Referred to Magistrate Judge Christina A Bryan. |

| | | (rguerrero, 4) (Entered: 01/19/2022) |
|---|---|---|
| 09/16/2021 | 587 | ORDER. To prepare this case for trial, the parties are ORDERED to submit a joint status report by October 29, 2021, addressing the remaining issues to be tried; and how long the parties anticipate needing for trial. (Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 09/16/2021) |
| 10/29/2021 | 588 | STATUS REPORT by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 10/29/2021) |
| 11/12/2021 | 589 | NOTICE of Setting. Parties notified. Telephone Conference set for 12/3/2021 at 10:00 AM by telephone before Judge Gray H Miller, filed. Dial In:713-250-5707, Conf ID: 45707, PW: 13579 (rguerrero, 4) (Entered: 11/12/2021) |
| 12/01/2021 | | 12/3/21 10:00 Telephone Conference is terminated. Phone conference will be reset at a later date. (rguerrero, 4) (Entered: 12/01/2021) |
| 12/02/2021 | 590 | NOTICE of Resetting. Parties notified. Telephone Conference set for 12/17/2021 at 10:30 AM by telephone before Judge Gray H Miller, filed. (rguerrero, 4) (Entered: 12/02/2021) |
| 12/17/2021 | | Minute Entry for proceedings held before Judge Gray H Miller. STATUS CONFERENCE held on 12/17/2021. Scheduling Order to follow. Appearances: Christopher Lee Dodson, Sean R D Gorman, R Paul Yetter, Richard Irving Werder, Jr.(Court Reporter: H. Alcaraz), filed.(ShoshanaArnow, 4) (Entered: 12/17/2021) |
| 12/17/2021 | 591 | AO 435 TRANSCRIPT REQUEST by BMC Software, Inc./Sean Gorman for Transcript of Status Conference held on December 17, 2021 before Hon. Gray H. Miller. Expedited (7 days) turnaround requested. Court Reporter/Transcriber: Heather Alcaraz, filed. (Gorman, Sean) (Entered: 12/17/2021) |
| 12/17/2021 | 592 | SCHEDULING ORDER Memoranda of Law due by 1/14/2022. Responses due by 1/24/2022. Pltf Expert Witness List due by 2/28/2022. Deft Expert Witness List due by 2/28/2022. Joint Pretrial Order due by 3/4/2022. Pretrial Conference set for 3/14/2022 at 09:00 AM in Courtroom 9D before Judge Gray H Miller. Trial will commence immediately thereafter. (Signed by Judge Gray H Miller) Parties notified.(ShoshanaArnow, 4) (Entered: 12/17/2021) |
| 12/20/2021 | 593 | AO 435 TRANSCRIPT REQUEST by Steven Vacek for Transcript of Status Conference, 12/17/2021, Judge Gray H Miller. Expedited (7 days) turnaround requested. Court Reporter/Transcriber: Heather Alcaraz, filed. (BrendaLacy, 4) (Entered: 12/20/2021) |
| 12/27/2021 | 594 | TRANSCRIPT re: Status Conference held on 12/17/21 before Judge Gray H Miller. Court Reporter Heather Alcaraz. Ordering Party Sean Gorman. Release of Transcript Restriction set for 3/28/2022, filed. (halcaraz, ) (Entered: 12/27/2021) |
| 12/28/2021 | 595 | Notice of Filing of Official Transcript as to 594 Transcript. Party notified, filed. (hcarr, 4) (Entered: 12/28/2021) |
| 01/11/2022 | | (Court only) ***(PRIVATE ENTRY) Deadlines terminated. (rguerrero, 4) (Entered: 01/11/2022) |
| 01/14/2022 | 596 | Unopposed MOTION to Seal IBM's Pretrial Brief on Remaining Issues for TrialMotions referred to Christina A Bryan. by International Business Machines Corporation, filed. Motion Docket Date 2/4/2022. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 01/14/2022) |
| 01/14/2022 | 597 | SEALED DOCUMENT /Defendant IBM's Pretrial Brief on Remaining Issues for Trial by International Business Machines Corporation, filed. (Yetter, R) (Entered: 01/14/2022) |

| 01/14/2022 | 598 | MEMORANDUM on Remaining Issues to be Tried by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 01/14/2022) |
| --- | --- | --- |
| 01/19/2022 | 599 | ORDER granting 596 Motion to File Pretrial Brief Seal.(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 01/19/2022) |
| 01/24/2022 | 600 | RESPONSE to 598 Memorandum /Defendant IBM's Response to BMC Brief on Remaining Issues for Trial, filed by International Business Machines Corporation. (Yetter, R) (Entered: 01/24/2022) |
| 01/24/2022 | 601 | RESPONSE to 597 Sealed Document BMC Software, Inc.'s Response to Defendant IBM's Pretrial Brief on Remaining Issues to be Tried, filed by BMC Software, Inc.. (Gorman, Sean) (Entered: 01/24/2022) |
| 01/28/2022 | 602 | REDACTION to 597 Sealed Document by International Business Machines Corporation, filed.(Yetter, R) (Entered: 01/28/2022) |
| 02/07/2022 | 603 | ORDER clarifying prior decision order and outlining the remaining issues (Docket entry no. 586)(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 02/07/2022) |
| 02/16/2022 | 604 | Trial Scheduling Order. The court will host a pre-trial conference in this case at 9:00 a.m. on March 14, 2022, with trial commencing directly thereafter. Trial will run from Monday, March 14, 2022, through Thursday, March 24, 2022, 9:00 a.m. to 6:00 p.m.; no proceedings will be held on Friday, March 18, 2022. The court will offer short breaks during the morning and afternoon, and a forty-five-minute lunch break. The deadlines outlined in the courts pre-trial scheduling order (Dkt. 592) remain in effect(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 02/16/2022) |
| 02/25/2022 | 605 | Joint MOTION Leave to Amend the Scheduling Order by International Business Machines Corporation, filed. Motion Docket Date 3/18/2022. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 02/25/2022) |
| 02/25/2022 | 606 | Agreed Amended Scheduling Order granting 605 Joint MOTION Leave to Amend the Scheduling Order.(Pltf Expert Report due by 3/4/2022, Deft Expert Report due by 3/4/2022, Objections due by 3/8/2022)(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 02/25/2022) |
| 03/02/2022 | 607 | NOTICE of Appearance by Andrew W. Zeve on behalf of BMC Software, Inc., filed. (Zeve, Andrew) (Entered: 03/02/2022) |
| 03/02/2022 | | (Court only) ***Attorney Andrew William Zeve for BMC Software, Inc. added. (rguerrero, 4) (Entered: 03/16/2022) |
| 03/03/2022 | 608 | Joint MOTION for Leave to File Excess Pages by BMC Software, Inc., filed. Motion Docket Date 3/24/2022. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 03/03/2022) |
| 03/04/2022 | 609 | ORDER granting 608 Motion for Leave to File Excess Pages. Each partys Trial Memorandum of Law shall not exceed 50 pages, excluding any exhibits, declarations, appendices, or other ancillary papers. (Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 03/04/2022) |
| 03/04/2022 | 610 | Joint MOTION to Seal the Joint Pretrial Order by International Business Machines Corporation, filed. Motion Docket Date 3/25/2022. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 03/04/2022) |

| | | |
|---|---|---|
| 03/04/2022 | <u>611</u> | ORDER granting <u>610</u> Joint Motion to Seal the Joint Pretrial Order.(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 03/04/2022) |
| 03/04/2022 | <u>612</u> | SEALED DOCUMENT *Joint Pretrial Order* by BMC Software, Inc., filed. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B, # <u>3</u> Exhibit C, # <u>4</u> Exhibit D, # <u>5</u> Exhibit E, # <u>6</u> Exhibit F, # <u>7</u> Exhibit G, # <u>8</u> Exhibit H, # <u>9</u> Exhibit I, # <u>10</u> Exhibit J, # <u>11</u> Exhibit K, # <u>12</u> Exhibit L) (Gorman, Sean) (Entered: 03/04/2022) |
| 03/07/2022 | <u>613</u> | OBJECTIONS *to IBM's Trial Exhibit List*, filed by BMC Software, Inc.. (Gorman, Sean) (Entered: 03/07/2022) |
| 03/07/2022 | <u>614</u> | OBJECTIONS *and Counter-Designations to IBM's Affirmative Designations*, filed by BMC Software, Inc.. (Gorman, Sean) (Entered: 03/07/2022) |
| 03/07/2022 | <u>615</u> | OBJECTIONS */IBM's Objections to BMC's Exhibit List and Deposition Designations*, filed by International Business Machines Corporation. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit E, # <u>3</u> Exhibit F)(Yetter, R) (Entered: 03/07/2022) |
| 03/08/2022 | <u>616</u> | MOTION to Seal BMC's Unopposed Motion for Leave to File BMC's Objections and Renewed Motion to Exclude the Expert Opinions of Bruce V. Hartley Under Seal by BMC Software, Inc., filed. Motion Docket Date 3/29/2022. (Attachments: # <u>1</u> Proposed Order)(Gorman, Sean) (Entered: 03/08/2022) |
| 03/08/2022 | <u>617</u> | SEALED MOTION *BMC's Objections and Renewed Motion to Exclude the Expert Opinions of Bruce V. Hartley* by BMC Software, Inc., filed. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B, # <u>3</u> Exhibit C, # <u>4</u> Proposed Order) (Gorman, Sean) (Entered: 03/08/2022) |
| 03/08/2022 | <u>618</u> | MOTION to Seal BMC's Unopposed Motion for Leave to File BMC's Objections and Renewed Motion to Exclude the Expert Opinions of Barry Graham Under Seal by BMC Software, Inc., filed. Motion Docket Date 3/29/2022. (Attachments: # <u>1</u> Proposed Order)(Gorman, Sean) (Entered: 03/08/2022) |
| 03/08/2022 | <u>619</u> | SEALED MOTION *BMC's Objections and Renewed Motion to Exclude the Expert Opinions of Barry Graham* by BMC Software, Inc., filed. (Attachments: # <u>1</u> Proposed Order) (Gorman, Sean) (Entered: 03/08/2022) |
| 03/08/2022 | <u>620</u> | Unopposed MOTION to Seal Defendant IBM's Objections to BMC's Designated Testimony of Alan Ratliff and Kendyl Roman by International Business Machines Corporation, filed. Motion Docket Date 3/29/2022. (Attachments: # <u>1</u> Proposed Order)(Yetter, R) (Entered: 03/08/2022) |
| 03/08/2022 | <u>621</u> | SEALED DOCUMENT */Defendant IBM's Objections to BMC's Designated Testimony of Alan Ratliff* by International Business Machines Corporation, filed. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2, # <u>3</u> Exhibit 3, # <u>4</u> Exhibit 6, # <u>5</u> Exhibit 9, # <u>6</u> Exhibit 10, # <u>7</u> Exhibit 11, # <u>8</u> Exhibit 13, # <u>9</u> Exhibit 14) (Yetter, R) (Entered: 03/08/2022) |
| 03/08/2022 | <u>622</u> | SEALED DOCUMENT */Defendant IBM's Objections to BMC's Designated Testimony of Kendyl Roman* by International Business Machines Corporation, filed. (Attachments: # <u>1</u> Exhibit 10, # <u>2</u> Exhibit 14, # <u>3</u> Exhibit 15, # <u>4</u> Exhibit 16, # <u>5</u> Exhibit 19, # <u>6</u> Exhibit 20, # <u>7</u> Exhibit 21, # <u>8</u> Exhibit 25, # <u>9</u> Exhibit 26, # <u>10</u> Exhibit 29, # <u>11</u> Exhibit 33) (Yetter, R) (Entered: 03/08/2022) |
| 03/09/2022 | <u>623</u> | ORDER granting <u>616</u> Motion for Leave to File BMC's Objections and Renewed Motion to Exclude the Expert Opinions of Bruce V. Hartley Under Seal. (Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 03/09/2022) |
| 03/09/2022 | <u>624</u> | |

| | | ORDER granting <u>618</u> Unopposed Motion for Leave to File BMC's Objections ad Renewed Motion to Exclude the Expert Opinions of Barry Graham Under Seal. (Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 03/09/2022) |
|---|---|---|
| 03/09/2022 | <u>625</u> | ORDER granting <u>620</u> IBM's Unopposed Motion for Leave to File Under Seal Its Objections to BMC's Designated Testimony of Alan Ratliff and Kendyl Roman. (Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 03/09/2022) |
| 03/12/2022 | <u>626</u> | REDACTION to <u>612</u> Sealed Document, by BMC Software, Inc., filed. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B, # <u>3</u> Exhibit C, # <u>4</u> Exhibit D, # <u>5</u> Exhibit E, # <u>6</u> Exhibit F, # <u>7</u> Exhibit G, # <u>8</u> Exhibit H, # <u>9</u> Exhibit I, # <u>10</u> Exhibit J, # <u>11</u> Exhibit K, # <u>12</u> Exhibit L)(Gorman, Sean) (Entered: 03/12/2022) |
| 03/12/2022 | <u>627</u> | Amended Exhibit List by BMC Software, Inc.(Gorman, Sean) (Entered: 03/12/2022) |
| 03/12/2022 | <u>628</u> | BMC Software Inc.'s Amended Page/Line Designations for Deposition and Preliminary Injunction Hearing Testimony by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 03/12/2022) |
| 03/12/2022 | <u>629</u> | NOTICE of Appearance by Walter A. Simons on behalf of BMC Software, Inc., filed. (Simons, Walter) (Entered: 03/12/2022) |
| 03/12/2022 | <u>630</u> | NOTICE of Appearance by Cole A. Thoms on behalf of BMC Software, Inc., filed. (Thoms, Cole) (Entered: 03/12/2022) |
| 03/12/2022 | <u>631</u> | NOTICE of Appearance by Matthew J. Reasoner on behalf of BMC Software, Inc., filed. (Reasoner, Matthew) (Entered: 03/12/2022) |
| 03/13/2022 | <u>632</u> | OBJECTIONS *IBM Amended Objections to BMC Affirmative Designations*, filed by International Business Machines Corporation. (Yetter, R) (Entered: 03/13/2022) |
| 03/13/2022 | <u>633</u> | OBJECTIONS */IBM's Amended Objections to BMC Counter-designations*, filed by International Business Machines Corporation. (Yetter, R) (Entered: 03/13/2022) |
| 03/13/2022 | <u>634</u> | OBJECTIONS */IBM's Objections to BMC Trial Exhibits*, filed by International Business Machines Corporation. (Yetter, R) (Entered: 03/13/2022) |
| 03/13/2022 | <u>635</u> | Amended Exhibit List by International Business Machines Corporation(Yetter, R) (Entered: 03/13/2022) |
| 03/13/2022 | <u>636</u> | OBJECTIONS *BMC's Amended Objections and Counter-Designations to IBM's Affirmative Designations*, filed by BMC Software, Inc.. (Gorman, Sean) (Entered: 03/13/2022) |
| 03/13/2022 | <u>637</u> | OBJECTIONS *BMC's Objections to IBM's Trial Exhibit List*, filed by BMC Software, Inc.. (Gorman, Sean) (Entered: 03/13/2022) |
| 03/13/2022 | <u>638</u> | OBJECTIONS */IBM's Second Amended Objections to BMC's Amended Exhibit List*, filed by International Business Machines Corporation. (Yetter, R) (Entered: 03/13/2022) |
| 03/13/2022 | <u>639</u> | Amended Exhibit List by BMC Software, Inc.(Gorman, Sean) (Entered: 03/13/2022) |
| 03/13/2022 | <u>640</u> | BMC Software Inc.'s Amended Page/Line Designations for Deposition and Preliminary Injunction Hearing Testimony by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 03/13/2022) |
| 03/14/2022 | <u>641</u> | BMCS AMENDED OBJECTIONS AND COUNTER-DESIGNATIONS TO IBMS AFFIRMATIVE DESIGNATIONS by BMC Software, Inc., filed.(Gorman, Sean) |

| | | |
|---|---|---|
| | | (Entered: 03/14/2022) |
| 03/14/2022 | 642 | BMCS SECOND AMENDED OBJECTIONS AND COUNTER-DESIGNATIONS TO IBMS AFFIRMATIVE DESIGNATIONS by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 03/14/2022) |
| 03/14/2022 | 643 | OBJECTIONS *IBM's Second Amended Objections to BMC Afirmative Designations*, filed by International Business Machines Corporation. (Yetter, R) (Entered: 03/14/2022) |
| 03/14/2022 | 644 | OBJECTIONS *IBM's Second Amended Objections to BMC Counter-Designations*, filed by International Business Machines Corporation. (Yetter, R) (Entered: 03/14/2022) |
| 03/14/2022 | 645 | MOTION for Jaclyn Palmerson to Appear Pro Hac Vice by International Business Machines Corporation, filed. Motion Docket Date 4/4/2022. (Yetter, R) (Entered: 03/14/2022) |
| 03/14/2022 | 646 | MOTION for Leigha Empson to Appear Pro Hac Vice by International Business Machines Corporation, filed. Motion Docket Date 4/4/2022. (Yetter, R) (Entered: 03/14/2022) |
| 03/14/2022 | 647 | MOTION for Mario O. Gazzola to Appear Pro Hac Vice by International Business Machines Corporation, filed. Motion Docket Date 4/4/2022. (Yetter, R) (Entered: 03/14/2022) |
| 03/14/2022 | 648 | MOTION for Wesley Hartman to Appear Pro Hac Vice by International Business Machines Corporation, filed. Motion Docket Date 4/4/2022. (Yetter, R) (Entered: 03/14/2022) |
| 03/14/2022 | 649 | NOTICE of Appearance by Drewe E. Molin on behalf of BMC Software, Inc., filed. (Molin, Drewe) (Entered: 03/14/2022) |
| 03/14/2022 | 650 | Minute Entry for proceedings held before Judge Gray H Miller. Final Pretrial Conference held. DAY ONE of BENCH TRIAL held on 3/14/2022. Opening statements by plaintiff and defendant presented. All exhibits pre-admitted by agreement of the parties. Plaintiffs exhibits PX001-PX481 are admitted. Defendants exhibits DX001-DX742 are admitted. Testimony of plaintiffs witness Raul Ah Chu heard. Court is adjourned for the day and bench trial to continue 3/15/22 at 9:00 a.m. Appearances: For BMC: Sean Gorman, Chris Dodson, Kyle Mason, Drewe Edith Molin, Timothy R Geiger. For IBM: R Paul Yetter, Tim McConn, Rachel Elizabeth Epstein, Richard Irving Werder, Jr, Marlo A. Pecora, Donald John Reinhard, II. (Court Reporter: H. Alcaraz)(rguerrero, 4) (Entered: 03/15/2022) |
| 03/14/2022 | | (Court only) ***(PRIVATE ENTRY) Deadlines terminated. (rguerrero, 4) (Entered: 03/15/2022) |
| 03/14/2022 | | (Court only) ***Attorney Jaclyn Palmerson for International Business Machines Corporation added. (rguerrero, 4) (Entered: 03/15/2022) |
| 03/14/2022 | 651 | ORDER granting 645 Motion for Jaclyn Palmerson to Appear Pro Hac Vice.(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 03/15/2022) |
| 03/14/2022 | | (Court only) ***Attorney Leigha Empson, Mario O Gazzola, Wesley Hartman for International Business Machines Corporation added. (rguerrero, 4) (Entered: 03/15/2022) |
| 03/14/2022 | 652 | ORDER granting 646 Motion for Leigha Empson to Appear Pro Hac Vice.(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 03/15/2022) |

| | | |
|---|---|---|
| 03/14/2022 | <u>653</u> | ORDER granting <u>647</u> Motion for Mario O. Gazzola to Appear Pro Hac Vice.(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 03/15/2022) |
| 03/14/2022 | <u>654</u> | ORDER granting <u>648</u> Motion for Wesley Hartman to Appear Pro Hac Vice.(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 03/15/2022) |
| 03/15/2022 | 655 | Minute Entry for proceedings held before Judge Gray H Miller. DAY TWO of BENCH TRIAL held on 3/15/2022. Testimony of plaintiffs witness Raul Ah Chu, Brian Jones heard. Court is adjourned for the day and bench trial to continue 3/16/22 at 9:00 a.m. Appearances: For BMC: Sean Gorman, Chris Dodson, Kyle Mason, Drewe Edith Molin, Timothy R Geiger. For IBM: R. Paul Yetter, Tim McConn, Rachel Elizabeth Epstein, Richard Irving Werder, Jr, Donald John Reinhard, II, Mario Gazzola, Wes Hartman. (Court Reporter: H. Alcaraz)filed.(rguerrero, 4) (Entered: 03/15/2022) |
| 03/16/2022 | <u>656</u> | BMC Software Inc.'s Amended Page/Line Designations for Deposition and Preliminary Injunction Hearing Testimony by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 03/16/2022) |
| 03/16/2022 | 657 | Minute Entry for proceedings held before Judge Gray H Miller. DAY THREE of BENCH TRIAL held on 3/16/2022. Defendants exhibit DX0744 offered and admitted. Testimony of plaintiffs witnesses Kevin McGuinn, Kendyl Roman, and Alan Ratliff heard. Court is adjourned for the day and bench trial to continue 3/17/22 at 9:00 a.m. Appearances: For BMC: Sean Gorman, Chris Dodson, Kyle Mason, Drewe Edith Molin, Timothy R Geiger, Andrew Zeve. For IBM: R. Paul Yetter, Reagan Simpson, Tim McConn, Rachel Elizabeth Epstein, Jaclyn Palmerson, Richard Irving Werder, Jr, Donald John Reinhard, II, Mario Gazzola, Wesley Hartman. (Court Reporter: H. Alcaraz) filed. (rguerrero, 4) (Entered: 03/16/2022) |
| 03/16/2022 | <u>658</u> | MOTION for John H. Chun, Emily Mclemore Smith and Guyon Knight to Withdraw as Attorney by International Business Machines Corporation, filed. Motion Docket Date 4/6/2022. (Attachments: # <u>1</u> Affidavit Declaration of D. Reinhard, # <u>2</u> Proposed Order)(Yetter, R) (Entered: 03/16/2022) |
| 03/17/2022 | <u>659</u> | ORDER granting <u>658</u> IBM's Motion to Withdraw as Attorney. Attorney Emily McLemore Smith; John H. Chun and Guyon H Knight terminated.(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 03/17/2022) |
| 03/17/2022 | 660 | Minute Entry for proceedings held before Judge Gray H Miller. DAY FOUR of BENCH TRIAL held on 3/17/2022. Plaintiffs witness testimony heard from Alan Ratliff. Plaintiff rests. Defendants Fed. R. Civ. Proc. 52(c) motion for judgment on partial findings heard and taken under advisement. Defendants witness testimony heard from Guy Skinner. Court is adjourned for the day and bench trial to resume on Monday, 3/21/22 at 9:00 a.m. Appearances: For BMC: Sean Gorman, Chris Dodson, Kyle Mason, Drewe Edith Molin, Timothy R Geiger, Andrew Zeve. For IBM: R. Paul Yetter, Reagan Simpson, Tim McConn, Rachel Elizabeth Epstein, Jaclyn Palmerson, Richard Irving Werder, Jr, Donald John Reinhard, II, Mario Gazzola, Wesley Hartman. (Court Reporter: H. Alcaraz) filed. (rguerrero, 4) (Entered: 03/18/2022) |
| 03/21/2022 | 661 | MMinute Entry for proceedings held before Judge Gray H Miller. DAY FIVE of BENCH TRIAL held on 3/21/2022. Defendants witness testimony heard and concluded from John Sweetman. Court is adjourned for the day and bench trial to resume on Tuesday, 3/22/22 at 9:00 a.m. Appearances: For BMC: Sean Gorman, Chris Dodson, Kyle Mason, Drewe Edith Molin, Timothy R Geiger, Andrew Zeve. For IBM: R. Paul Yetter, Reagan Simpson, Tim McConn, Rachel Elizabeth Epstein, Jaclyn Palmerson, Richard Irving Werder, Jr, Donald John Reinhard, II, Mario Gazzola, Wesley Hartman. (Court Reporter: |

| | | |
|---|---|---|
| | | H. Alcaraz) filed. (rguerrero, 4) (Entered: 03/21/2022) |
| 03/21/2022 | 662 | MOTION for Leave to File Excess Pages by BMC Software, Inc., filed. Motion Docket Date 4/11/2022. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 03/21/2022) |
| 03/21/2022 | 663 | Corrected MOTION for Leave to File Excess Pages by BMC Software, Inc., filed. Motion Docket Date 4/11/2022. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 03/21/2022) |
| 03/21/2022 | 664 | MOTION to Seal Unopposed Motion for Leave to File BMC Software, Inc.'s Motion for Judgment on Partial Findings Under Seal by BMC Software, Inc., filed. Motion Docket Date 4/11/2022. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 03/21/2022) |
| 03/22/2022 | 665 | SEALED MOTION *For Judgment on Partial Findings* by BMC Software, Inc., filed. (Attachments: # 1 Exhibit Exhibit A, # 2 Proposed Order Proposed Order) (Gorman, Sean) (Entered: 03/22/2022) |
| 03/22/2022 | 666 | Minute Entry for proceedings held before Judge Gray H Miller. DAY SIX of BENCH TRIAL held on 3/22/2022. Defendants witness testimony heard and concluded from Christopher Gerardi. Defendant rests. Plaintiffs Fed. R. Civ. Proc. 52(c) motion for judgment on partial findings heard and taken under advisement. Plaintiff calls rebuttal witness: Kendyl Roman. Rebuttal witness excused. Court is adjourned for the day and bench trial to resume on Thursday, 3/24/22 at 9:00 a.m. Appearances: For BMC: Sean Gorman, Chris Dodson, Kyle Mason, Drewe Edith Molin, Timothy R Geiger, Andrew Zeve, Jeffrey Oldham. For IBM: R. Paul Yetter, Reagan Simpson, Tim McConn, Rachel Elizabeth Epstein, Jaclyn Palmerson, Richard Irving Werder, Jr, Donald John Reinhard, II, Mario Gazzola, Wesley Hartman. (Court Reporter: H. Alcaraz) filed. (rguerrero, 4) (Entered: 03/22/2022) |
| 03/22/2022 | 667 | MOTION to Seal Unopposed Motion for Leave to File BMC Software, Inc.'s Trial Brief on Standard for Fraudulent-Inducement Claim Under Seal by BMC Software, Inc., filed. Motion Docket Date 4/12/2022. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 03/22/2022) |
| 03/23/2022 | 668 | SEALED DOCUMENT *BMC Software's Trial Brief on Standard for Fraudulent-Inducement Claim* by BMC Software, Inc., filed. (Gorman, Sean) (Entered: 03/23/2022) |
| 03/23/2022 | 669 | Unopposed MOTION to Seal IBM's Supplemental Objections to Testimony of Alan Ratliff by International Business Machines Corporation, filed. Motion Docket Date 4/13/2022. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 03/23/2022) |
| 03/23/2022 | 670 | SEALED DOCUMENT *IBM's Supplemental Objections to Testimony of Alan Ratliff* by International Business Machines Corporation, filed. (Yetter, R) (Entered: 03/23/2022) |
| 03/24/2022 | 671 | Minute Entry for proceedings held before Judge Gray H Miller. DAY SEVEN of BENCH TRIAL held on 3/24/2022. Defendant renewed Fed. R. Civ. Proc. 52(c) motion for judgment on partial findings heard and taken under advisement. The court takes both plaintiff and defendants motion under advisement. Closing argument by plaintiff. Closing argument by defendant. Rebuttal argument by plaintiff. Bench trial concluded. Admitted exhibit lists to follow. Parties are to electronically file all admitted exhibits. For BMC: Sean Gorman, Chris Dodson, Kyle Mason, Drewe Edith Molin, Timothy R Geiger, Andrew Zeve, Jeffrey Oldham. For IBM: R. Paul Yetter, Reagan Simpson, Tim McConn, Rachel Elizabeth Epstein, Jaclyn Palmerson, Richard Irving Werder, Jr, Donald John Reinhard, II, Mario Gazzola, Wesley Hartman. (Court Reporter: H. Alcaraz) filed. (rguerrero, 4) (Entered: 03/24/2022) |

| 03/24/2022 | 672 | Certification of Custody/Receipt for Withdrawal of Admitted Exhibits by attorney for BMC Software, Inc., International Business Machines Corporation(rguerrero, 4) (Entered: 03/24/2022) |
|---|---|---|
| 03/24/2022 | 673 | Exhibit List of admitted exhibits PX001 - PX481 by BMC Software, Inc.(rguerrero, 4) (Entered: 03/24/2022) |
| 03/24/2022 | 674 | Exhibit List of Admitted Exhibits DX001 - DX746 by International Business Machines Corporation.(rguerrero, 4) (Entered: 03/24/2022) |
| 03/25/2022 | 675 | ORDER granting 663 BMC's Corrected motion for Leave to exceed page limit in its motion for judgment on partial findings, responses, replies, and arguments; terminating 662 Motion for Leave to File Excess Pages;(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 03/25/2022) |
| 03/25/2022 | 676 | ORDER granting 664 BMC's Motion to file its Motion for Judgment on Partial Findings under seal.(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 03/25/2022) |
| 03/25/2022 | 677 | ORDER granting 667 BMC's Unopposed Motion for Leave to File BMCs Trial Brief on Standard for Fraudulent-Inducement Claim Under Seal.(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 03/25/2022) |
| 03/25/2022 | 678 | ORDER granting 669 IBMs Unopposed Motion for Leave to File Under Seal Its Supplemental Objections to Testimony of Alan Ratliff.(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 03/25/2022) |
| 03/29/2022 | 679 | Unopposed MOTION to Seal Unopposed Motion for Leave to File BMC's Response in Opposition to IBM's Objection to BMC's Designated Testimony of Kendyl Roman Under Seal by BMC Software, Inc., filed. Motion Docket Date 4/19/2022. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 03/29/2022) |
| 03/29/2022 | 680 | SEALED RESPONSE *BMC's Response in Opposition to IBM's Objection to BMC's Designated Testimony of Kendyl Roman* by BMC Software, Inc., filed. (Gorman, Sean) (Entered: 03/29/2022) |
| 03/29/2022 | 681 | Unopposed MOTION to Seal Unopposed Motion for Leave to File BMC's Response in Opposition to IBM's Objections to BMC's Designated Testimony of and IBM's Supplemental Objections to Testimony of Alan Ratliff Under Seal by BMC Software, Inc., filed. Motion Docket Date 4/19/2022. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 03/29/2022) |
| 03/29/2022 | 682 | SEALED RESPONSE *BMC's Response in Opposition to IBM's Objections to BMC's Designated Testimony of and IBM's Supplemental Objections to Testimony of Alan Ratliff* by BMC Software, Inc., filed. (Gorman, Sean) (Entered: 03/29/2022) |
| 03/30/2022 | 683 | ORDER granting 679 Motion to Seal BMCs Response in Opposition to IBMs Objection to BMCs Designated Testimony of Kendyl Romn.(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 03/30/2022) |
| 03/30/2022 | 684 | ORDER granting 681 Motion to Seal BMCs Response in Opposition to IBMs Objections to BMCs Designated Testimony of and IBMs Supplemental Objections to Testimony of Alan Ratliff.(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 03/30/2022) |
| 03/31/2022 | 685 | Unopposed MOTION to Seal Unopposed Motion for Leave to File BMC Software, Inc.'s Post-Trial Proposed Findings of Fact and Conclusions of Law by BMC Software, Inc., |

| | | |
|---|---|---|
| | | filed. Motion Docket Date 4/21/2022. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 03/31/2022) |
| 03/31/2022 | 686 | Unopposed MOTION to Seal Defendant IBM's Post-Trial Brief Addressing Damages Issues Raised at Trial by International Business Machines Corporation, filed. Motion Docket Date 4/21/2022. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 03/31/2022) |
| 03/31/2022 | 687 | SEALED DOCUMENT /*Defendant IBM's Post-Trial Brief Addressing Damages Issues Raised at Trial* by International Business Machines Corporation, filed. (Yetter, R) (Entered: 03/31/2022) |
| 03/31/2022 | 688 | Unopposed MOTION to Seal Defendant IBM's Post-Trial Proposed Findings of Fact and Conclusions of Law by International Business Machines Corporation, filed. Motion Docket Date 4/21/2022. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 03/31/2022) |
| 03/31/2022 | 689 | SEALED DOCUMENT /*Defendant IBM's Post-Trial Proposed Findings of Fact and Conclusions of Law* by International Business Machines Corporation, filed. (Yetter, R) (Entered: 03/31/2022) |
| 03/31/2022 | 690 | SEALED DOCUMENT *BMC Software, Inc.'s Post-Trial Proposed Findings of Fact and Conclusions of Law* by BMC Software, Inc., filed. (Gorman, Sean) (Entered: 03/31/2022) |
| 04/01/2022 | 691 | REDACTION to 621 Sealed Document, by International Business Machines Corporation, filed.(Yetter, R) (Entered: 04/01/2022) |
| 04/01/2022 | 692 | REDACTION to 622 Sealed Document, by International Business Machines Corporation, filed.(Yetter, R) (Entered: 04/01/2022) |
| 04/01/2022 | 693 | Unopposed MOTION to Seal Defendant IBM's Posttrial Brief and Response to BMC's Motion for Judgment on Partial Findings by International Business Machines Corporation, filed. Motion Docket Date 4/22/2022. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 04/01/2022) |
| 04/01/2022 | 694 | SEALED DOCUMENT /*Defendant IBM's Posttrial Brief and Response to BMC's Motion for Judgment on Partial Findings* by International Business Machines Corporation, filed. (Yetter, R) (Entered: 04/01/2022) |
| 04/04/2022 | 695 | Unopposed MOTION to Seal Defendant IBM's Response to BMC's Trial Brief on Fraudulent Inducement by International Business Machines Corporation, filed. Motion Docket Date 4/25/2022. (Attachments: # 1 Proposed Order)(Reinhard, Donald) (Entered: 04/04/2022) |
| 04/04/2022 | 696 | SEALED RESPONSE *of Defendant IBM to BMC's Trial Brief on Fraudulent Inducement* re: 668 Sealed Document by International Business Machines Corporation, filed. (Reinhard, Donald) (Entered: 04/04/2022) |
| 04/04/2022 | 697 | ORDER granting 685 BMC's Motion to Seal BMCs Post-Trial Proposed Findings of Fact and Conclusions of Law.(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 04/04/2022) |
| 04/04/2022 | 698 | ORDER granting 686 IBM's Motion to Seal its post-trial brief addressing damages raised at trial.(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 04/04/2022) |
| 04/04/2022 | 699 | |

| | | |
|---|---|---|
| | | ORDER granting <u>688</u> IBM's Motion to Seal its Proposed Findings of Fact and Conclusions of Law.(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 04/04/2022) |
| 04/04/2022 | <u>700</u> | ORDER granting <u>693</u> IBM's Motion to Seal its Post-trial Brief and Response to BMC's Motion for Judgment on Partial Findings.(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 04/04/2022) |
| 04/04/2022 | <u>701</u> | ORDER granting <u>695</u> IBM's Motion to Seal its Response to BMC's Trial Brief on Fraudulent Inducement.(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 04/04/2022) |
| 04/06/2022 | <u>702</u> | TRANSCRIPT re: Bench Trial Vol. 1 held on 3/14/22 before Judge Gray H Miller. Court Reporter/Transcriber Heather Alcaraz. Ordering Party Paul Yetter/Sean Gorman Release of Transcript Restriction set for 7/5/2022., filed. (Alcaraz, Heather) (Entered: 04/06/2022) |
| 04/06/2022 | <u>703</u> | TRANSCRIPT re: Bench Trial Vol. 2 held on 3/15/22 before Judge Gray H Miller. Court Reporter/Transcriber Heather Alcaraz. Ordering Party Paul Yetter/Sean Gorman Release of Transcript Restriction set for 7/5/2022., filed. (Alcaraz, Heather) (Entered: 04/06/2022) |
| 04/06/2022 | <u>704</u> | TRANSCRIPT re: Bench Trial Vol. 3 held on 3/16/22 before Judge Gray H Miller. Court Reporter/Transcriber Heather Alcaraz. Ordering Party Paul Yetter/Sean Gorman Release of Transcript Restriction set for 7/5/2022., filed. (Alcaraz, Heather) (Entered: 04/06/2022) |
| 04/06/2022 | <u>705</u> | TRANSCRIPT re: Bench Trial Vol. 4 held on 3/17/22 before Judge Gray H Miller. Court Reporter/Transcriber Heather Alcaraz. Ordering Party Paul Yetter/Sean Gorman Release of Transcript Restriction set for 7/5/2022., filed. (Alcaraz, Heather) (Entered: 04/06/2022) |
| 04/06/2022 | <u>706</u> | TRANSCRIPT re: Bench Trial Vol. 5 held on 3/21/22 before Judge Gray H Miller. Court Reporter/Transcriber Heather Alcaraz. Ordering Party Paul Yetter/Sean Gorman Release of Transcript Restriction set for 7/5/2022., filed. (Alcaraz, Heather) (Entered: 04/06/2022) |
| 04/06/2022 | <u>707</u> | TRANSCRIPT re: Bench Trial Vol. 6 held on 3/22/22 before Judge Gray H Miller. Court Reporter/Transcriber Heather Alcaraz. Ordering Party Paul Yetter/Sean Gorman Release of Transcript Restriction set for 7/5/2022., filed. (Alcaraz, Heather) (Entered: 04/06/2022) |
| 04/06/2022 | <u>708</u> | TRANSCRIPT re: Bench Trial Vol. 7 held on 3/24/22 before Judge Gray H Miller. Court Reporter/Transcriber Heather Alcaraz. Ordering Party Paul Yetter/Sean Gorman Release of Transcript Restriction set for 7/5/2022., filed. (Alcaraz, Heather) (Entered: 04/06/2022) |
| 04/07/2022 | <u>709</u> | Notice of Filing of Official Transcript as to <u>704</u> Transcript, <u>705</u> Transcript, <u>703</u> Transcript, <u>706</u> Transcript, <u>702</u> Transcript, <u>708</u> Transcript, <u>707</u> Transcript. Party notified, filed. (olindor, 4) (Entered: 04/07/2022) |
| 04/08/2022 | <u>710</u> | Unopposed MOTION for Leave to File Excess Pages by BMC Software, Inc., filed. Motion Docket Date 4/29/2022. (Attachments: # <u>1</u> Proposed Order)(Gorman, Sean) (Entered: 04/08/2022) |
| 04/08/2022 | <u>711</u> | Unopposed MOTION to Seal Unopposed Motion for Leave to File BMC Software, Inc.'s Reply in Support of its Motion for Judgment on Partial Findings Under Seal by BMC Software, Inc., filed. Motion Docket Date 4/29/2022. (Attachments: # <u>1</u> Proposed Order)(Gorman, Sean) (Entered: 04/08/2022) |
| 04/08/2022 | <u>712</u> | SEALED REPLY *BMC Software, Inc.'s Reply in Support of its Motion for Judgment on Partial Findings* re: <u>665</u> SEALED MOTION *For Judgment on Partial Findings* by BMC Software, Inc., filed. (Gorman, Sean) (Entered: 04/08/2022) |

| 04/08/2022 | 713 | REDACTION to 670 Sealed Document by International Business Machines Corporation, filed.(Yetter, R) (Entered: 04/08/2022) |
|---|---|---|
| 04/11/2022 | 714 | Unopposed MOTION for Leave to File Excess Pages by BMC Software, Inc., filed. Motion Docket Date 5/2/2022. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 04/11/2022) |
| 04/11/2022 | 715 | Unopposed MOTION to Seal Unopposed Motion for Leave to File BMC Software, Inc.'s Reply in Support of its Trial Brief on Fraudulent Inducement by BMC Software, Inc., filed. Motion Docket Date 5/2/2022. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 04/11/2022) |
| 04/11/2022 | 716 | SEALED REPLY *BMC Software, Inc.'s Reply in Support of its Trial Brief on Fraudulent Inducement* by BMC Software, Inc., filed. (Gorman, Sean) (Entered: 04/11/2022) |
| 04/12/2022 | 717 | ORDER granting 710 BMC Software, Inc.s motion for leave to exceed the default page limit in its Reply in Support of its Motion for Judgment on Partial Findings.(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 04/12/2022) |
| 04/12/2022 | 718 | ORDER granting 711 BMCs Unopposed Motion for Leave to File BMC Software, Inc.s Reply in Support of its Motion for Judgment on Partial Findings Under Seal.(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 04/12/2022) |
| 04/12/2022 | 719 | ORDER granting 714 BMC Software, Inc.s motion for leave to exceed the default page limit in its Reply in Support of its Trial Brief on Fraudulent Inducement.(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 04/12/2022) |
| 04/12/2022 | 720 | ORDER granting 715 BMCs Unopposed Motion for Leave to File BMC Software, Inc.s Reply in Support of its Trial Brief on Fraudulent Inducement Under Seal.(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 04/12/2022) |
| 04/12/2022 | 721 | BMC Software Inc.'s Fifth Amended Page/Line Designations for Deposition and Preliminary Injunction Hearing Testimony by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 04/12/2022) |
| 04/13/2022 | 722 | Unopposed MOTION to Seal Unopposed Motion for Leave to File BMC Software, Inc.'s Corrected Post-Trial Proposed Findings of Fact and Conclusions of Law by BMC Software, Inc., filed. Motion Docket Date 5/4/2022. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 04/13/2022) |
| 04/13/2022 | 723 | SEALED DOCUMENT *BMC Software, Inc.'s Corrected Post-Trial Proposed Findings of Fact and Conclusions of Law* by BMC Software, Inc., filed. (Gorman, Sean) (Entered: 04/13/2022) |
| 04/13/2022 | 724 | RESPONSE to 687 Sealed Document *BMC Software's Response to Defendant IBM's Post-Trial Brief Addressing Damages Issues Raised at Trial*, filed by BMC Software, Inc.. (Gorman, Sean) (Entered: 04/13/2022) |
| 04/14/2022 | 725 | ORDER granting 722 BMCs Unopposed Motion for Leave to File BMCs Corrected Post-Trial Proposed Findings of Fact and Conclusions of Law Under Seal.(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 04/14/2022) |
| 04/14/2022 | 726 | REDACTION to 687 Sealed Document by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 04/14/2022) |
| 04/14/2022 | 727 | REDACTION to 689 Sealed Document by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 04/14/2022) |

| 04/14/2022 | 728 | REDACTION to 696 Sealed Response by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 04/14/2022) |
|---|---|---|
| 04/15/2022 | 729 | REDACTION to 617 SEALED MOTION *BMC's Objections and Renewed Motion to Exclude the Expert Opinions of Bruce V. Hartley* by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 04/15/2022) |
| 04/15/2022 | 730 | REDACTION to 619 SEALED MOTION *BMC's Objections and Renewed Motion to Exclude the Expert Opinions of Barry Graham* by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 04/15/2022) |
| 04/15/2022 | 731 | REDACTION to 665 SEALED MOTION *For Judgment on Partial Findings* by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 04/15/2022) |
| 04/15/2022 | 732 | REDACTION to 668 Sealed Document by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 04/15/2022) |
| 04/15/2022 | 733 | REDACTION to 694 Sealed Document by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 04/15/2022) |
| 04/19/2022 | 734 | Unopposed MOTION to Seal IBM's Corrected Post-Trial Proposed Findings of Fact and Conclusions of Law by International Business Machines Corporation, filed. Motion Docket Date 5/10/2022. (Attachments: # 1 Proposed Order)(Reinhard, Donald) (Entered: 04/19/2022) |
| 04/19/2022 | 735 | SEALED DOCUMENT *Defendant IBM's Corrected Post-Trial Proposed Findings of Fact and Conclusions of Law* by International Business Machines Corporation, filed. (Reinhard, Donald) (Entered: 04/19/2022) |
| 04/20/2022 | 736 | ORDER granting 734 Defendant IBM's Motion to Seal Its Corrected Post-Trial Proposed Findings of Fact and Conclusions of Law.(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 04/20/2022) |
| 04/20/2022 | 737 | Unopposed MOTION to Seal IBM's Reply Brief Addressing Damages Issues Raised At Trial by International Business Machines Corporation, filed. Motion Docket Date 5/11/2022. (Attachments: # 1 Proposed Order)(Reinhard, Donald) (Entered: 04/20/2022) |
| 04/20/2022 | 738 | SEALED REPLY *in Support of its Post-Trial Brief Addressing Damages Issues Raised at Trial* re: 687 Sealed Document by International Business Machines Corporation, filed. (Reinhard, Donald) (Entered: 04/20/2022) |
| 04/22/2022 | 739 | ORDER granting 737 Defendant IBMs Unopposed Motion, Submitted at the Request of BMC, for Leave to File Under Seal Its Reply Brief Addressing Damages Issues Raised At Trial.(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 04/22/2022) |
| 04/22/2022 | 740 | REDACTION to 680 Sealed Response by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 04/22/2022) |
| 04/22/2022 | 741 | REDACTION to 682 Sealed Response by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 04/22/2022) |
| 04/22/2022 | 742 | REDACTION to 690 Sealed Document by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 04/22/2022) |
| 04/22/2022 | 743 | REDACTION to 712 Sealed Response by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 04/22/2022) |

| 04/22/2022 | 744 | REDACTION to 716 Sealed Response by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 04/22/2022) |
|---|---|---|
| 04/22/2022 | 745 | REDACTION to 723 Sealed Document by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 04/22/2022) |
| 04/22/2022 | 746 | REDACTION to 735 Sealed Document by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 04/22/2022) |
| 04/22/2022 | 747 | REDACTION to 738 Sealed Response by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 04/22/2022) |
| 04/25/2022 | 748 | BMC Software, Inc.'s Response to the Court's Request for Proposed Final Judgment by BMC Software, Inc., filed. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Gorman, Sean) (Entered: 04/25/2022) |
| 04/25/2022 | 749 | PROPOSED ORDER *IBM's Proposed Final Judgment*, filed.(Reinhard, Donald) (Entered: 04/25/2022) |
| 05/23/2022 | 750 | Unopposed MOTION to Seal Motions for Judgment on Partial Findings by International Business Machines Corporation, filed. Motion Docket Date 6/13/2022. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 05/23/2022) |
| 05/23/2022 | 751 | SEALED MOTION *Defendant IBM's Initial Motion for Judgment on Partial Findings* by International Business Machines Corporation, filed. (Attachments: # 1 Exhibit A) (Yetter, R) (Entered: 05/23/2022) |
| 05/23/2022 | 752 | SEALED MOTION *Defendant IBM's Renewed Motion for Judgment on Partial Findings* by International Business Machines Corporation, filed. (Attachments: # 1 Exhibit A) (Yetter, R) (Entered: 05/23/2022) |
| 05/24/2022 | 753 | NOTICE of Setting. Parties notified. Telephone Conference set for 5/26/2022 at 12:30 PM before Judge Gray H Miller, filed. (rguerrero, 4) (Entered: 05/24/2022) |
| 05/26/2022 | 754 | Minute Entry for proceedings held before Judge Gray H Miller. TELEPHONE CONFERENCE held on 5/26/2022. Post trial motion deadlines and whether to shorten the time was discussed. The attorney fee issue and whether it is more efficient to rule on it after appeal decision is returned was also discussed. An order to follow. Appearances: Sean R D Gorman, R Paul Yetter.(Court Reporter: L. Smith).(rguerrero, 4) (Entered: 05/26/2022) |
| 05/27/2022 | 755 | ORDER granting 750 Motion to Seal Defendant IBMs Initial Motion for Judgment on Partial Findings and Defendant IBMs Renewed Motion for Judgment on Partial Findings.(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 05/27/2022) |
| 05/30/2022 | 756 | FINDINGS OF FACT AND CONCLUSIONS OF LAW. 1. BMCs Objections and Renewed Motion to Exclude the Expert Opinions of Bruce Hartley (Dkt. 617) is DENIED; 2. BMCs Objections and Renewed Motion to Exclude the Expert Opinions of Barry Graham (Dkt. 619) is DENIED; 3. BMCs Motion for Judgment on Partial Findings (Dkt. 665) is GRANTED in PART and DENIED in PART. 4. IBMs objections to BMCs designated testimony of Alan Ratliff (Dkt. 621) are DENIED; 5. IBMs supplemental objections to testimony of Alan Ratliff (Dkt. 670) are DENIED; 6. IBMs objections to BMCs designated testimony of Kendyl Romn (Dkt. 622) is DENIED AS MOOT; 7. IBMs Motion for Judgment on Partial Findings (Mar. 17, 2022 Trial Tr. at 20:847:23; see Mar. 24, 2022 Trial Tr. at 4:1735:14) (Dkts. 751, 752) is GRANTED in PART and DENIED in |

| | | |
|---|---|---|
| | | PART; 8.BMCs breach of MLA section 8 claim is DISMISSED WITH PREJUDICE;9.BMCs DTSA, TUTSA, and common law unfair competition through misappropriation claims are DISMISSED WITH PREJUDICE; 10.BMCs breach of 2015 OA section 5.1 is DISMISSED WITH PREJUDICE;11.BMC lost profits claim is DISMISSED WITH PREJUDICE;12.BMC shall recover direct and punitive damages from IBM on its fraudulent inducement claim, plus prejudgment interest in the amount of 5% and post-judgment interest: a.BMC is entitled to recover from IBM $717,739,615 in actual contractual damages.b.BMC is entitled to recover from IBM $168,226,367.29 in prejudgment interest on the actual damages described above.c.BMC is entitled to recover from IBM $717,739,615 in punitive damages based on fraud found by clear and convincing evidence.d.BMC is entitled to recover from IBM post-judgment interest from the date of the entry of judgment at the federally mandated rate. 28 U.S.C. § 1961. (Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 05/30/2022) |
| 05/30/2022 | 757 | FINAL JUDGMENT in favor of BMC Software Inc. Case terminated on 5/30/22.(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 05/30/2022) |
| 06/03/2022 | 758 | REDACTION to 751 Sealed Motion by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 06/03/2022) |
| 06/03/2022 | 759 | REDACTION to 752 Sealed Motion by BMC Software, Inc., filed.(Gorman, Sean) (Entered: 06/03/2022) |
| 06/13/2022 | 760 | MOTION for Attorney Fees by BMC Software, Inc., filed. Motion Docket Date 7/5/2022. (Attachments: # 1 Exhibit A, # 2 Exhibit A-1, # 3 Exhibit A-2, # 4 Exhibit A-3, # 5 Exhibit A-4, # 6 Exhibit A-5, # 7 Exhibit A-6, # 8 Exhibit A-7, # 9 Exhibit A-8, # 10 Exhibit A-9, # 11 Exhibit A-10, # 12 Exhibit A-11, # 13 Exhibit B, # 14 Exhibit B-1, # 15 Exhibit B-2, # 16 Exhibit C, # 17 Exhibit C-1, # 18 Exhibit D)(Gorman, Sean) (Entered: 06/14/2022) |
| 06/15/2022 | 761 | SUPPLEMENT to 760 MOTION for Attorney Fees by BMC Software, Inc., filed. (Attachments: # 1 Exhibit A-2)(Gorman, Sean) (Entered: 06/15/2022) |
| 06/15/2022 | 762 | Amended PROPOSED ORDER *Granting BMC Software Inc.'s Application for Attorneys' Fees and Costs* re: 760 MOTION for Attorney Fees, filed.(Gorman, Sean) (Entered: 06/15/2022) |
| 06/21/2022 | 763 | AO 435 TRANSCRIPT REQUEST by BMC Software, Inc./Sean Gorman for Transcript of Telephone Conference held on 5/26/22 before Hon. Gray H. Miller. Expedited (7 days) turnaround requested. Court Reporter/Transcriber: Lanie Smith, filed. (Gorman, Sean) (Entered: 06/21/2022) |
| 06/21/2022 | 764 | TRANSCRIPT re: Telephone conference held on 5/26/2022 before Judge Gray H Miller. Court Reporter/Transcriber Lanie Smith. Release of Transcript Restriction set for 9/19/2022., filed. (LanieSmith, 4) (Entered: 06/21/2022) |
| 06/21/2022 | 765 | AO 435 TRANSCRIPT REQUEST by R. Paul Yetter for Transcript of hearing on 5-26-2022 before Judge Gray H. Miller. Hourly turnaround requested. Court Reporter/Transcriber: Lanie Smith, filed. (Yetter, R) (Entered: 06/21/2022) |
| 06/21/2022 | 766 | Notice of Filing of Official Transcript as to 764 Transcript. Party notified, filed. (ShannonHolden, 4) (Entered: 06/22/2022) |
| 06/22/2022 | 767 | NOTICE *of No Response in Opposition to BMC's Application for Attorneys' Fees and Costs* by BMC Software, Inc., filed. (Gorman, Sean) (Entered: 06/22/2022) |

| 06/22/2022 | 768 | MOTION to Stay *and Defer Adjudication of Attorney Fees* by International Business Machines Corporation, filed. Motion Docket Date 7/13/2022. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 06/22/2022) |
|---|---|---|
| 06/23/2022 | 769 | RESPONSE to 767 Notice (Other) *regarding Attorneys' Fees and Costs (Dkt. 767)*, filed by International Business Machines Corporation. (Attachments: # 1 Exhibit A)(Yetter, R) (Entered: 06/23/2022) |
| 06/24/2022 | 770 | RESPONSE to 768 MOTION to Stay *and Defer Adjudication of Attorney Fees* filed by BMC Software, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Proposed Order)(Gorman, Sean) (Entered: 06/24/2022) |
| 06/24/2022 | 771 | ORDER denying 768 IBM's Motion to Stay and defer adjudication of attorney fees. IBM must respond to BMCs motion for attorneys fees by July 1, 2022. BMC must file any reply by July 6, 2022..(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 06/24/2022) |
| 06/27/2022 | 772 | MOTION to Amend 756 Order,,,,,,, 757 Final Judgment by International Business Machines Corporation, filed. Motion Docket Date 7/18/2022. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 06/27/2022) |
| 07/01/2022 | 773 | RESPONSE to 760 MOTION for Attorney Fees filed by International Business Machines Corporation. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 07/01/2022) |
| 07/06/2022 | 774 | REPLY in Support of 760 MOTION for Attorney Fees, filed by BMC Software, Inc.. (Gorman, Sean) (Entered: 07/06/2022) |
| 07/18/2022 | 775 | Unopposed MOTION for Leave to File Excess Pages by BMC Software, Inc., filed. Motion Docket Date 8/8/2022. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 07/18/2022) |
| 07/18/2022 | 776 | RESPONSE to 772 MOTION to Amend 756 Order,,,,,,, 757 Final Judgment filed by BMC Software, Inc.. (Attachments: # 1 Proposed Order)(Gorman, Sean) (Entered: 07/18/2022) |
| 07/18/2022 | 777 | ORDER granting 775 Motion for Leave to File Excess Pages. It is ORDERED that BMC Software, Inc.s Response to IBMs Motion for Amended Findings and Conclusions and/or to Alter or Amend the Judgment shall not exceed 35 pages, excluding any exhibits, declarations, appendices, or other ancillary papers. (Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 07/18/2022) |
| 07/20/2022 | 778 | Unopposed MOTION for Leave to File Excess Pages by International Business Machines Corporation, filed. Motion Docket Date 8/10/2022. (Attachments: # 1 Proposed Order)(Yetter, R) (Entered: 07/20/2022) |
| 07/21/2022 | 779 | ORDER granting 778 Motion for Leave to File Excess Pages. IBMs Reply in support of its Motion for Amended Findings and Conclusions and/or To Alter or Amend the Judgment shall not exceed 10 pages. (Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 07/21/2022) |
| 07/25/2022 | 780 | REPLY in Support of 772 MOTION to Amend 756 Order,,,,,,, 757 Final Judgment, filed by International Business Machines Corporation. (Yetter, R) (Entered: 07/25/2022) |
| 08/08/2022 | 781 | MEMORANDUM OPINION AND ORDER granting in part and denying in part 760 MOTION for Attorney Fees. BMC is AWARDED: $16,287,868.40 in attorneys fees; $4,094,718.13 in litigation costs, consistent with this opinion; and $1,232,558.00 in post-judgment and conditional appellate expenses.(Signed by Judge Gray H Miller) |

| | | Parties notified.(rguerrero, 4) (Entered: 08/08/2022) |
|---|---|---|
| 08/09/2022 | 782 | MEMORANDUM OPINION AND ORDER granting in part and denying in part 772 MOTION to Amend 757 Final Judgment. It is GRANTED with respect to the post-judgment interest rate, which shall be corrected to 2.02 percent per annum in an amended judgment, but it is otherwise DENIED. (Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 08/09/2022) |
| 08/09/2022 | 783 | AMENDED FINAL JUDGMENT. (Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 08/09/2022) |
| 08/12/2022 | 784 | Unopposed MOTION for Approval of Subpersedeas Bond by International Business Machines Corporation, filed. Motion Docket Date 9/2/2022. (Attachments: # 1 Attachment 1 - Supersedeas Bond, # 2 Proposed Order)(Yetter, R) (Entered: 08/12/2022) |
| 08/24/2022 | 785 | Unopposed MOTION for Approval of Subpersedeas Bond by International Business Machines Corporation, filed. Motion Docket Date 9/14/2022. (Attachments: # 1 Attachment 1 - Supersedeas Bond, # 2 Proposed Order)(Yetter, R) (Entered: 08/24/2022) |
| 08/25/2022 | 786 | ORDER granting 785 Amended Unopposed Motion for Approval of Supersedeas Bond. mooting 784 Motion for Approval of Supersedeas Bond. IBMs supersedeas bond in the amount of $1,674,899,558.23 is approved. It will be forwarded to the Court for holding pending the outcome of any appeals to the U.S. Court of Appeals for the Fifth Circuit and the U.S. Supreme Court.(Signed by Judge Gray H Miller) Parties notified.(rguerrero, 4) (Entered: 08/25/2022) |
| 09/07/2022 | 787 | NOTICE OF APPEAL to US Court of Appeals for the Fifth Circuit re: 782 Memorandum and Order, 783 Final Judgment, 756 Order,,,,,,, 561 Memorandum and Recommendations,,, 603 Order, 586 Memorandum and Order,,, 757 Final Judgment, 781 Memorandum and Order, by International Business Machines Corporation (Filing fee $ 505, receipt number ATXSDC-28735213), filed.(Martinez, Grant) (Entered: 09/07/2022) |
| 09/08/2022 | 788 | Clerks Notice of Filing of an Appeal. The following Notice of Appeal and related motions are pending in the District Court: 787 Notice of Appeal,. Fee status: Paid. Reporter(s): ERO, K. Miller, filed. (Attachments: # 1 Notice of Appeal) (SaraCelis, 1) (Entered: 09/08/2022) |
| 09/08/2022 | | Appeal Review Notes re: 787 Notice of Appeal,. Fee status: Paid. The appeal filing fee has been paid.Hearings were held in the case. DKT13 transcript order form(s) due within 14 days of the filing of the notice of appeal.Twenty five (25) transcripts were produced. Number of DKT-13 Forms expected: 5. Pending the filing of exhibits admitted during Injunction Hearing held from 11/28/2017 - 12/1/2017 and Bench Trial held from 3/14/2022 - 3/24/2022, filed.(SaraCelis, 1) (Entered: 09/08/2022) |
| 09/08/2022 | 789 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-002, # 2 Exhibit DX-003)(Yetter, R) (Entered: 09/08/2022) |
| 09/08/2022 | 790 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-005, # 2 Exhibit DX-006, # 3 Exhibit DX-007, # 4 Exhibit DX-008, # 5 Exhibit DX-009, # 6 Exhibit DX-010, # 7 Exhibit DX-011, # 8 Exhibit DX-012, # 9 Exhibit DX-013, # 10 Exhibit DX-014, # 11 Exhibit DX-015)(Yetter, R) (Entered: 09/08/2022) |
| 09/08/2022 | 791 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-017, # 2 Exhibit DX-018, # 3 Exhibit DX-019, # 4 Exhibit DX-020)(Yetter, R) (Entered: 09/08/2022) |

| 09/08/2022 | 792 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX002, # 2 Exhibit PX003, # 3 Exhibit PX004, # 4 Exhibit PX005, # 5 Exhibit PX006, # 6 Exhibit PX007, # 7 Exhibit PX008, # 8 Exhibit PX009, # 9 Exhibit PX010)(Gorman, Sean) (Entered: 09/08/2022) |
|---|---|---|
| 09/08/2022 | 793 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX012, # 2 Exhibit PX013, # 3 Exhibit PX014, # 4 Exhibit PX015, # 5 Exhibit PX016, # 6 Exhibit PX017, # 7 Exhibit PX018, # 8 Exhibit PX019, # 9 Exhibit PX020)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 794 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX022, # 2 Exhibit PX023, # 3 Exhibit PX024, # 4 Exhibit PX025, # 5 Exhibit PX026, # 6 Exhibit PX027, # 7 Exhibit PX028, # 8 Exhibit PX029, # 9 Exhibit PX029A, # 10 Exhibit PX030)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 795 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX032, # 2 Exhibit PX033, # 3 Exhibit PX034, # 4 Exhibit PX035, # 5 Exhibit PX036, # 6 Exhibit PX037, # 7 Exhibit PX038, # 8 Exhibit PX039, # 9 Exhibit PX040)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 796 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX042, # 2 Exhibit PX043, # 3 Exhibit PX043A, # 4 Exhibit PX044, # 5 Exhibit PX045, # 6 Exhibit PX046, # 7 Exhibit PX047, # 8 Exhibit PX048, # 9 Exhibit PX049, # 10 Exhibit PX050, # 11 Exhibit PX050A, # 12 Exhibit PX051, # 13 Exhibit PX052, # 14 Exhibit PX053, # 15 Exhibit PX054, # 16 Exhibit PX055, # 17 Exhibit PX056, # 18 Exhibit PX057, # 19 Exhibit PX058, # 20 Exhibit PX059, # 21 Exhibit PX060)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 797 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX061A, # 2 Exhibit PX062, # 3 Exhibit PX063, # 4 Exhibit PX064, # 5 Exhibit PX065, # 6 Exhibit PX066, # 7 Exhibit PX066A-F, # 8 Exhibit PX067, # 9 Exhibit PX068, # 10 Exhibit PX069, # 11 Exhibit PX070, # 12 Exhibit PX071, # 13 Exhibit PX072, # 14 Exhibit PX073, # 15 Exhibit PX074, # 16 Exhibit PX075, # 17 Exhibit PX076, # 18 Exhibit PX077, # 19 Exhibit PX078, # 20 Exhibit PX079, # 21 Exhibit PX080, # 22 Exhibit PX081, # 23 Exhibit PX082, # 24 Exhibit PX083, # 25 Exhibit PX084, # 26 Exhibit PX085, # 27 Exhibit PX086, # 28 Exhibit PX087, # 29 Exhibit PX088, # 30 Exhibit PX089, # 31 Exhibit PX090)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 798 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX092, # 2 Exhibit PX093, # 3 Exhibit PX094, # 4 Exhibit PX095, # 5 Exhibit PX096, # 6 Exhibit PX097, # 7 Exhibit PX098, # 8 Exhibit PX099, # 9 Exhibit PX099A, # 10 Exhibit PX100, # 11 Exhibit PX101, # 12 Exhibit PX102, # 13 Exhibit PX103, # 14 Exhibit PX104, # 15 Exhibit PX105, # 16 Exhibit PX106, # 17 Exhibit PX107, # 18 Exhibit PX108, # 19 Exhibit PX109, # 20 Exhibit PX110)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 799 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-022, # 2 Exhibit DX-023, # 3 Exhibit DX-024, # 4 Exhibit DX-025, # 5 Exhibit DX-026, # 6 Exhibit DX-027, # 7 Exhibit DX-028, # 8 Exhibit DX-029, # 9 Exhibit DX-030, # 10 Exhibit DX-031, # 11 Exhibit DX-032)(Yetter, R) (Entered: 09/08/2022) |
| 09/08/2022 | 800 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-034, # 2 Exhibit DX-035, # 3 Exhibit DX-036, # 4 Exhibit DX-037, # 5 Exhibit DX-038, # 6 Exhibit DX-039, # 7 Exhibit DX-040, # 8 Exhibit DX-041, # 9 Exhibit DX-042, # 10 Exhibit DX-043, # 11 Exhibit DX-044, # 12 Exhibit DX-045, # 13 |

| | | |
|---|---|---|
| | | Exhibit DX-046, # <u>14</u> Exhibit DX-047, # <u>15</u> Exhibit DX-048, # <u>16</u> Exhibit DX-049, # <u>17</u> Exhibit DX-050, # <u>18</u> Exhibit DX-051, # <u>19</u> Exhibit DX-052, # <u>20</u> Exhibit DX-053, # <u>21</u> Exhibit DX-054, # <u>22</u> Exhibit DX-055)(Yetter, R) (Entered: 09/08/2022) |
| 09/08/2022 | <u>801</u> | Trial EXHIBITS by BMC Software, Inc. (Attachments: # <u>1</u> Exhibit PX112, # <u>2</u> Exhibit PX113, # <u>3</u> Exhibit PX114, # <u>4</u> Exhibit PX115, # <u>5</u> Exhibit PX115A-B, # <u>6</u> Exhibit PX116, # <u>7</u> Exhibit PX118, # <u>8</u> Exhibit PX119, # <u>9</u> Exhibit PX119A-B, # <u>10</u> Exhibit PX120, # <u>11</u> Exhibit PX121, # <u>12</u> Exhibit PX122, # <u>13</u> Exhibit PX123, # <u>14</u> Exhibit PX124, # <u>15</u> Exhibit PX125, # <u>16</u> Exhibit PX126, # <u>17</u> Exhibit PX127, # <u>18</u> Exhibit PX128, # <u>19</u> Exhibit PX129, # <u>20</u> Exhibit PX130, # <u>21</u> Exhibit PX131, # <u>22</u> Exhibit PX132, # <u>23</u> Exhibit PX133, # <u>24</u> Exhibit PX134, # <u>25</u> Exhibit PX135, # <u>26</u> Exhibit PX136, # <u>27</u> Exhibit PX137, # <u>28</u> Exhibit PX138, # <u>29</u> Exhibit PX139, # <u>30</u> Exhibit PX140, # <u>31</u> Exhibit PX117)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | <u>802</u> | Trial EXHIBITS by International Business Machines Corporation (Attachments: # <u>1</u> Exhibit DX-057, # <u>2</u> Exhibit DX-058, # <u>3</u> Exhibit DX-059, # <u>4</u> Exhibit DX-060, # <u>5</u> Exhibit DX-061, # <u>6</u> Exhibit DX-062, # <u>7</u> Exhibit DX-063, # <u>8</u> Exhibit DX-064, # <u>9</u> Exhibit DX-065, # <u>10</u> Exhibit DX-066, # <u>11</u> Exhibit DX-067, # <u>12</u> Exhibit DX-068, # <u>13</u> Exhibit DX-069, # <u>14</u> Exhibit DX-070, # <u>15</u> Exhibit DX-071, # <u>16</u> Exhibit DX-072, # <u>17</u> Exhibit DX-073, # <u>18</u> Exhibit DX-074, # <u>19</u> Exhibit DX-075)(Yetter, R) (Entered: 09/08/2022) |
| 09/08/2022 | <u>803</u> | Trial EXHIBITS by International Business Machines Corporation (Attachments: # <u>1</u> Exhibit DX-077, # <u>2</u> Exhibit DX-078, # <u>3</u> Exhibit DX-079, # <u>4</u> Exhibit DX-080, # <u>5</u> Exhibit DX-081, # <u>6</u> Exhibit DX-082, # <u>7</u> Exhibit DX-083)(Yetter, R) (Entered: 09/08/2022) |
| 09/08/2022 | <u>804</u> | Trial EXHIBITS by International Business Machines Corporation (Attachments: # <u>1</u> Exhibit DX-085, # <u>2</u> Exhibit DX-086, # <u>3</u> Exhibit DX-087, # <u>4</u> Exhibit DX-088, # <u>5</u> Exhibit DX-089, # <u>6</u> Exhibit DX-090, # <u>7</u> Exhibit DX-091, # <u>8</u> Exhibit DX-092, # <u>9</u> Exhibit DX-093, # <u>10</u> Exhibit DX-094, # <u>11</u> Exhibit DX-095, # <u>12</u> Exhibit DX-096)(Yetter, R) (Entered: 09/08/2022) |
| 09/08/2022 | <u>805</u> | Trial EXHIBITS by International Business Machines Corporation (Attachments: # <u>1</u> Exhibit DX-098, # <u>2</u> Exhibit DX-099, # <u>3</u> Exhibit DX-100, # <u>4</u> Exhibit DX-101, # <u>5</u> Exhibit DX-102, # <u>6</u> Exhibit DX-103, # <u>7</u> Exhibit DX-104, # <u>8</u> Exhibit DX-105, # <u>9</u> Exhibit DX-106)(Yetter, R) (Entered: 09/08/2022) |
| 09/08/2022 | <u>806</u> | Trial EXHIBITS by BMC Software, Inc. (Attachments: # <u>1</u> Exhibit PX142, # <u>2</u> Exhibit PX143, # <u>3</u> Exhibit PX144, # <u>4</u> Exhibit PX145, # <u>5</u> Exhibit PX146, # <u>6</u> Exhibit PX146A, # <u>7</u> Exhibit PX147, # <u>8</u> Exhibit PX148, # <u>9</u> Exhibit PX149, # <u>10</u> Exhibit PX150, # <u>11</u> Exhibit PX151, # <u>12</u> Exhibit PX151A-B, # <u>13</u> Exhibit PX152, # <u>14</u> Exhibit PX153, # <u>15</u> Exhibit PX154, # <u>16</u> Exhibit PX155, # <u>17</u> Exhibit PX156, # <u>18</u> Exhibit PX157, # <u>19</u> Exhibit PX158, # <u>20</u> Exhibit PX159, # <u>21</u> Exhibit PX160, # <u>22</u> Exhibit PX161, # <u>23</u> Exhibit PX162, # <u>24</u> Exhibit PX163, # <u>25</u> Exhibit PX164, # <u>26</u> Exhibit PX165, # <u>27</u> Exhibit PX166, # <u>28</u> Exhibit PX167, # <u>29</u> Exhibit PX168, # <u>30</u> Exhibit PX169, # <u>31</u> Exhibit PX170, # <u>32</u> Exhibit PX171, # <u>33</u> Exhibit PX181A-L, # <u>34</u> Exhibit PX172, # <u>35</u> Exhibit PX173, # <u>36</u> Exhibit PX174, # <u>37</u> Exhibit PX175)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | <u>807</u> | Trial EXHIBITS by International Business Machines Corporation (Attachments: # <u>1</u> Exhibit DX-108, # <u>2</u> Exhibit DX-109, # <u>3</u> Exhibit DX-110, # <u>4</u> Exhibit DX-111, # <u>5</u> Exhibit DX-112, # <u>6</u> Exhibit DX-113)(Yetter, R) (Entered: 09/08/2022) |
| 09/08/2022 | <u>808</u> | |

| | | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-115, # 2 Exhibit DX-116, # 3 Exhibit DX-117, # 4 Exhibit DX-118, # 5 Exhibit DX-119, # 6 Exhibit DX-120, # 7 Exhibit DX-121, # 8 Exhibit DX-122, # 9 Exhibit DX-123, # 10 Exhibit DX-124, # 12 Exhibit DX-126, # 13 Exhibit DX-127)(Yetter, R) The following exhibit was NOT ADMITTED and is REMOVED from the record: # 11 Exhibit DX-125). Modified on 9/17/2022 (rguerrero, 4). (Entered: 09/08/2022) |
|---|---|---|
| 09/08/2022 | 809 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX177, # 2 Exhibit PX178, # 3 Exhibit PX179, # 4 Exhibit PX180, # 5 Exhibit PX181, # 6 Exhibit PX183, # 7 Exhibit PX184, # 8 Exhibit PX185, # 9 Exhibit PX186, # 10 Exhibit PX187, # 11 Exhibit PX188, # 12 Exhibit PX189, # 13 Exhibit PX190, # 14 Exhibit PX191, # 15 Exhibit PX192, # 16 Exhibit PX193, # 17 Exhibit PX194, # 18 Exhibit PX195, # 19 Exhibit PX196, # 20 Exhibit PX197, # 21 Exhibit PX198, # 22 Exhibit PX199, # 23 Exhibit PX200, # 24 Exhibit PX200A)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 810 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX202, # 2 Exhibit PX203, # 3 Exhibit PX204, # 4 Exhibit PX205, # 5 Exhibit PX206, # 6 Exhibit PX207, # 7 Exhibit PX208, # 8 Exhibit PX209, # 9 Exhibit PX210)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 811 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX212, # 2 Exhibit PX213, # 3 Exhibit PX215)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 812 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX217)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 813 | Trial EXHIBITS by BMC Software, Inc. (Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 814 | Trial EXHIBITS by BMC Software, Inc. (Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 815 | Trial EXHIBITS by BMC Software, Inc. (Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 816 | Trial EXHIBITS by BMC Software, Inc. (Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 817 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX221, # 2 Exhibit PX222, # 3 Exhibit PX223, # 4 Exhibit PX225, # 5 Exhibit PX226, # 6 Exhibit PX227, # 7 Exhibit PX228, # 8 Exhibit PX229, # 9 Exhibit PX230)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 818 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX232, # 2 Exhibit PX233, # 3 Exhibit PX234, # 4 Exhibit PX235, # 5 Exhibit PX236, # 6 Exhibit PX237, # 7 Exhibit PX237A, # 8 Exhibit PX238, # 9 Exhibit PX239, # 10 Exhibit PX240)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 819 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX242, # 2 Exhibit PX243, # 3 Exhibit PX244, # 4 Exhibit PX245, # 5 Exhibit PX246, # 6 Exhibit PX247, # 7 Exhibit PX248, # 8 Exhibit PX249, # 9 Exhibit PX249A1-A3, # 10 Exhibit PX250, # 11 Exhibit PX250A)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 820 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX252, # 2 Exhibit PX252A, # 3 Exhibit PX253, # 4 Exhibit PX253A, # 5 Exhibit PX254, # 6 Exhibit PX255, # 7 Exhibit PX256, # 8 Exhibit PX257, # 9 Exhibit PX258, # 10 Exhibit PX259, # 11 Exhibit PX260)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 821 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX262, # 2 Exhibit PX263A, # 3 Exhibit PX264, # 4 Exhibit PX265, # 5 Exhibit PX266, # 6 Exhibit PX267, |

| | | |
|---|---|---|
| | | # 7 Exhibit PX268, # 8 Exhibit PX269, # 9 Exhibit PX270, # 10 Exhibit PX271, # 11 Exhibit PX272, # 12 Exhibit PX273, # 13 Exhibit PX274, # 14 Exhibit PX275, # 15 Exhibit PX263)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 822 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX277, # 2 Exhibit PX277A, # 3 Exhibit PX278, # 4 Exhibit PX278A-E, # 5 Exhibit PX279, # 6 Exhibit PX280, # 7 Exhibit PX281, # 8 Exhibit PX282, # 9 Exhibit PX283, # 10 Exhibit PX284, # 11 Exhibit PX285, # 12 Exhibit PX286, # 13 Exhibit PX287, # 14 Exhibit PX288, # 15 Exhibit PX289, # 16 Exhibit PX290)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 823 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX292, # 2 Exhibit PX293, # 3 Exhibit PX294, # 4 Exhibit PX295, # 5 Exhibit PX296, # 6 Exhibit PX297, # 7 Exhibit PX297A, # 8 Exhibit PX298, # 9 Exhibit PX299, # 10 Exhibit PX299A-B, # 11 Exhibit PX300)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 824 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX302, # 2 Exhibit PX303, # 3 Exhibit PX304, # 4 Exhibit PX305, # 5 Exhibit PX306, # 6 Exhibit PX306A, # 7 Exhibit PX307, # 8 Exhibit PX308, # 9 Exhibit PX309, # 10 Exhibit PX310, # 11 Exhibit PX311, # 12 Exhibit PX312, # 13 Exhibit PX313, # 14 Exhibit PX314, # 15 Exhibit PX315)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 825 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX317, # 2 Exhibit PX318, # 3 Exhibit PX319, # 4 Exhibit PX320, # 5 Exhibit PX321, # 6 Exhibit PX322, # 7 Exhibit PX323, # 8 Exhibit PX324, # 9 Exhibit PX325, # 10 Exhibit PX326, # 11 Exhibit PX327, # 12 Exhibit PX328, # 13 Exhibit PX329, # 14 Exhibit PX330)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 826 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX332, # 2 Exhibit PX332A, # 3 Exhibit PX333, # 4 Exhibit PX334, # 5 Exhibit PX335, # 6 Exhibit PX336, # 7 Exhibit PX337, # 8 Exhibit PX337A, # 9 Exhibit PX338, # 10 Exhibit PX339, # 11 Exhibit PX340, # 12 Exhibit PX341, # 13 Exhibit PX342, # 14 Exhibit PX343, # 15 Exhibit PX344, # 16 Exhibit PX345)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 827 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX347, # 2 Exhibit PX347A, # 3 Exhibit PX348, # 4 Exhibit PX349, # 5 Exhibit PX350, # 6 Exhibit PX350A, # 7 Exhibit PX351, # 8 Exhibit PX352)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 828 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX355, # 2 Exhibit PX355A, # 3 Exhibit PX356, # 4 Exhibit PX357, # 5 Exhibit PX357A-B, # 6 Exhibit PX358, # 7 Exhibit PX358A1-A3, # 8 Exhibit PX359, # 9 Exhibit PX360)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 829 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX362, # 2 Exhibit PX362A-J, # 3 Exhibit PX363, # 4 Exhibit PX364, # 5 Exhibit PX365, # 6 Exhibit PX365A-B)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 830 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX367, # 2 Exhibit PX368, # 3 Exhibit PX369, # 4 Exhibit PX369A-B, # 5 Exhibit PX370, # 6 Exhibit PX371, # 7 Exhibit PX372, # 8 Exhibit PX373, # 9 Exhibit PX374, # 10 Exhibit PX375)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 831 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX377, # 2 Exhibit PX378, # 3 Exhibit PX379, # 4 Exhibit PX380, # 5 Exhibit PX380A, # 6 Exhibit PX381, # 7 Exhibit PX381A, # 8 Exhibit PX382, # 9 Exhibit PX383, # 10 Exhibit PX384, # 11 Exhibit PX385, # 12 Exhibit PX386, # 13 Exhibit PX386A1-A2, # 14 Exhibit PX387, # 15 Exhibit PX388, # 16 Exhibit PX389, # 17 Exhibit PX390)(Gorman, Sean) (Entered: |

| | | |
|---|---|---|
| | | 09/08/2022) |
| 09/08/2022 | 832 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX392, # 2 Exhibit PX392A1-A2, # 3 Exhibit PX393, # 4 Exhibit PX394, # 5 Exhibit PX395, # 6 Exhibit PX396, # 7 Exhibit PX397, # 8 Exhibit PX398, # 9 Exhibit PX399, # 10 Exhibit PX400)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 833 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX402, # 2 Exhibit PX403, # 3 Exhibit PX404, # 4 Exhibit PX405)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 834 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX407, # 2 Exhibit PX408, # 3 Exhibit PX409)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 835 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX412, # 2 Exhibit PX413, # 3 Exhibit PX414)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 836 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX416, # 2 Exhibit PX417, # 3 Exhibit PX418, # 4 Exhibit PX419, # 5 Exhibit PX420)(Gorman, Sean) (Entered: 09/08/2022) |
| 09/08/2022 | 837 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX422, # 2 Exhibit PX423, # 3 Exhibit PX424, # 4 Exhibit PX425, # 5 Exhibit PX426, # 6 Exhibit PX427, # 7 Exhibit PX428, # 8 Exhibit PX429, # 9 Exhibit PX430)(Gorman, Sean) (Entered: 09/09/2022) |
| 09/09/2022 | 838 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX432, # 2 Exhibit PX433, # 3 Exhibit PX434, # 4 Exhibit PX435, # 5 Exhibit PX436, # 6 Exhibit PX437, # 7 Exhibit PX438, # 8 Exhibit PX439, # 9 Exhibit PX440)(Gorman, Sean) (Entered: 09/09/2022) |
| 09/09/2022 | 839 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX446, # 2 Exhibit PX447, # 3 Exhibit PX448, # 4 Exhibit PX449)(Gorman, Sean) (Entered: 09/09/2022) |
| 09/09/2022 | 840 | Trial EXHIBITS by BMC Software, Inc. (Gorman, Sean) (Entered: 09/09/2022) |
| 09/09/2022 | 841 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX452, # 2 Exhibit PX453, # 3 Exhibit PX454, # 4 Exhibit PX455)(Gorman, Sean) (Entered: 09/09/2022) |
| 09/09/2022 | 842 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX457, # 2 Exhibit PX458, # 3 Exhibit PX459, # 4 Exhibit PX460)(Gorman, Sean) (Entered: 09/09/2022) |
| 09/09/2022 | 843 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX462, # 2 Exhibit PX463, # 3 Exhibit PX463A, # 4 Exhibit PX464, # 5 Exhibit PX465, # 6 Exhibit PX466, # 7 Exhibit PX467, # 8 Exhibit PX468, # 9 Exhibit PX469, # 10 Exhibit PX470)(Gorman, Sean) (Entered: 09/09/2022) |
| 09/09/2022 | 844 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX472, # 2 Exhibit PX473, # 3 Exhibit PX474)(Gorman, Sean) (Entered: 09/09/2022) |
| 09/09/2022 | 845 | Trial EXHIBITS by BMC Software, Inc. (Gorman, Sean) (Entered: 09/09/2022) |
| 09/09/2022 | 846 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX477, # 2 Exhibit PX478, # 3 Exhibit PX478A, # 4 Exhibit PX479, # 5 Exhibit PX479A, # 6 Exhibit PX480, # 7 Exhibit PX481)(Gorman, Sean) (Entered: 09/09/2022) |
| 09/09/2022 | 847 | Trial EXHIBITS by BMC Software, Inc. (Gorman, Sean) (Entered: 09/09/2022) |
| 09/09/2022 | 848 | Trial EXHIBITS by BMC Software, Inc. (Gorman, Sean) (Entered: 09/09/2022) |

22-20463.76

| | | |
|---|---|---|
| 09/09/2022 | 849 | Trial EXHIBITS by BMC Software, Inc. (Gorman, Sean) (Entered: 09/09/2022) |
| 09/09/2022 | 850 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-129, # 2 Exhibit DX-130)(Yetter, R) (Entered: 09/09/2022) |
| 09/09/2022 | 851 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-132, # 2 Exhibit DX-133, # 3 Exhibit DX-134, # 4 Exhibit DX-135)(Yetter, R) (Entered: 09/09/2022) |
| 09/09/2022 | 852 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-137, # 2 Exhibit DX-138, # 3 Exhibit DX-139, # 4 Exhibit DX-140, # 5 Exhibit DX-141, # 6 Exhibit DX-142, # 7 Exhibit DX-143, # 8 Exhibit DX-144, # 9 Exhibit DX-145, # 10 Exhibit DX-146, # 11 Exhibit DX-147, # 12 Exhibit DX-148, # 13 Exhibit DX-149, # 14 Exhibit DX-150, # 15 Exhibit DX-151, # 16 Exhibit DX-152, # 17 Exhibit DX-153)(Yetter, R) (Entered: 09/09/2022) |
| 09/09/2022 | 853 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 7 Exhibit DX-162, # 8 Exhibit DX-163, # 9 Exhibit DX-164, # 10 Exhibit DX-165, # 11 Exhibit DX-166, # 12 Exhibit DX-167, # 13 Exhibit DX-168, # 14 Exhibit DX-169, # 15 Exhibit DX-170, # 16 Exhibit DX-171, # 17 Exhibit DX-172, # 18 Exhibit DX-173)(Yetter, R) The following exhibits were NOT ADMITTED AND HAVE BEEN REMOVED FROM THE RECORD: # 1 Exhibit DX-156, # 2 Exhibit DX-157, # 3 Exhibit DX-158, # 4 Exhibit DX-159, # 5 Exhibit DX-160, # 6 Exhibit DX-161,Modified on 9/17/2022 (rguerrero, 4). (Entered: 09/09/2022) |
| 09/09/2022 | 854 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-175, # 2 Exhibit DX-176, # 3 Exhibit DX-177, # 4 Exhibit DX-178, # 5 Exhibit DX-179, # 6 Exhibit DX-180, # 7 Exhibit DX-181, # 8 Exhibit DX-182, # 9 Exhibit DX-183)(Yetter, R) (Entered: 09/09/2022) |
| 09/09/2022 | 855 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-185, # 2 Exhibit DX-186, # 3 Exhibit DX-187, # 4 Exhibit DX-188, # 5 Exhibit DX-189, # 6 Exhibit DX-190, # 7 Exhibit DX-191, # 8 Exhibit DX-192, # 9 Exhibit DX-193, # 10 Exhibit DX-194)(Yetter, R) (Entered: 09/09/2022) |
| 09/09/2022 | 856 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-196, # 2 Exhibit DX-197, # 3 Exhibit DX-198, # 4 Exhibit DX-199, # 5 Exhibit DX-200)(Yetter, R) (Entered: 09/09/2022) |
| 09/09/2022 | 857 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-202, # 2 Exhibit DX-203, # 3 Exhibit DX-204, # 4 Exhibit DX-205, # 5 Exhibit DX-206, # 6 Exhibit DX-207, # 7 Exhibit DX-208, # 8 Exhibit DX-209, # 9 Exhibit DX-210, # 10 Exhibit DX-211, # 11 Exhibit DX-212, # 12 Exhibit DX-213, # 13 Exhibit DX-214, # 14 Exhibit DX-215, # 15 Exhibit DX-216, # 16 Exhibit DX-217, # 17 Exhibit DX-218, # 18 Exhibit DX-219, # 19 Exhibit DX-220, # 20 Exhibit DX-221, # 21 Exhibit DX-222, # 22 Exhibit DX-223)(Yetter, R) (Entered: 09/09/2022) |
| 09/09/2022 | 858 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-225, # 2 Exhibit DX-226, # 3 Exhibit DX-227, # 4 Exhibit DX-228, # 5 Exhibit DX-229, # 6 Exhibit DX-230, # 7 Exhibit DX-231, # 8 Exhibit DX-232)(Yetter, R) (Entered: 09/09/2022) |
| 09/09/2022 | 859 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-234, # 2 Exhibit DX-235, # 3 Exhibit DX-236, # 4 Exhibit DX-237)(Yetter, R) (Entered: 09/09/2022) |

| | | |
|---|---|---|
| 09/09/2022 | 860 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-239, # 2 Exhibit DX-240, # 3 Exhibit DX-241, # 4 Exhibit DX-242, # 5 Exhibit DX-243, # 6 Exhibit DX-244, # 7 Exhibit DX-245, # 8 Exhibit DX-246, # 9 Exhibit DX-247, # 10 Exhibit DX-248, # 11 Exhibit DX-249, # 12 Exhibit DX-250)(Yetter, R) (Entered: 09/09/2022) |
| 09/09/2022 | 861 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-252, # 2 Exhibit DX-253, # 3 Exhibit DX-254, # 4 Exhibit DX-255, # 5 Exhibit DX-256, # 6 Exhibit DX-257, # 7 Exhibit DX-258, # 8 Exhibit DX-259, # 9 Exhibit DX-260, # 10 Exhibit DX-261, # 11 Exhibit DX-262, # 12 Exhibit DX-263, # 13 Exhibit DX-264, # 14 Exhibit DX-265, # 15 Exhibit DX-266. The following exhibit was NOT ADMITTED and is REMOVED from the record: # 16 Exhibit DX-268)(Yetter, R) Modified on 9/17/2022 (rguerrero, 4). (Entered: 09/09/2022) |
| 09/09/2022 | 862 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-270, # 2 Exhibit DX-271, # 3 Exhibit DX-272, # 4 Exhibit DX-273, # 5 Exhibit DX-274, # 6 Exhibit DX-275, # 7 Exhibit DX-276, # 8 Exhibit DX-277)(Yetter, R) (Entered: 09/09/2022) |
| 09/09/2022 | 863 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-279, # 2 Exhibit DX-280, # 3 Exhibit DX-281, # 4 Exhibit DX-282, # 5 Exhibit DX-283,# 7 Exhibit DX-285, # 8 Exhibit DX-286, # 9 Exhibit DX-287, # 10 Exhibit DX-288, # 11 Exhibit DX-289)(Yetter, R). The following exhibit was NOT ADMITTED and has been REMOVED from the record: # 6 Exhibit DX-284, Modified on 9/17/2022 (rguerrero, 4). (Entered: 09/09/2022) |
| 09/09/2022 | 864 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-291, # 2 Exhibit DX-292, # 3 Exhibit DX-293, # 4 Exhibit DX-294, # 5 Exhibit DX-295, # 6 Exhibit DX-296, # 7 Exhibit DX-297, # 8 Exhibit DX-298, # 9 Exhibit DX-299, # 10 Exhibit DX-300, # 11 Exhibit DX-301)(Yetter, R) (Entered: 09/09/2022) |
| 09/09/2022 | 865 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-303, # 2 Exhibit DX-304, # 3 Exhibit DX-305, # 4 Exhibit DX-306, # 5 Exhibit DX-307, # 6 Exhibit DX-308, # 7 Exhibit DX-309, # 8 Exhibit DX-310, # 9 Exhibit DX-311, # 10 Exhibit DX-312)(Yetter, R) (Entered: 09/09/2022) |
| 09/09/2022 | 866 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-314, # 3 Exhibit DX-317, # 4 Exhibit DX-318, # 5 Exhibit DX-319, # 6 Exhibit DX-320, # 7 Exhibit DX-321, # 8 Exhibit DX-322, # 9 Exhibit DX-323, # 10 Exhibit DX-324, # 11 Exhibit DX-325, # 12 Exhibit DX-326, # 13 Exhibit DX-327, # 14 Exhibit DX-328, # 15 Exhibit DX-329, # 16 Exhibit DX-330, # 17 Exhibit DX-331, # 18 Exhibit DX-332, # 19 Exhibit DX-333, # 20 Exhibit DX-334, # 21 Exhibit DX-335, # 22 Exhibit DX-336, # 23 Exhibit DX-337, # 24 Exhibit DX-338, # 25 Exhibit DX-339, # 26 Exhibit DX-340)(Yetter, R). The following exhibit was NOT ADMITTED and is REMOVED from the record. # 2 Exhibit DX-316. Modified on 9/17/2022 (rguerrero, 4). (Entered: 09/09/2022) |
| 09/09/2022 | 867 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-342, # 2 Exhibit DX-343, # 3 Exhibit DX-344, # 4 Exhibit DX-345, # 5 Exhibit DX-346, # 6 Exhibit DX-347, # 8 Exhibit DX-349, # 9 Exhibit DX-350, # 10 Exhibit DX-351, # 11 Exhibit DX-352, # 12 Exhibit DX-353, # 13 Exhibit DX-354, # 14 Exhibit DX-355, # 15 Exhibit DX-356, # 16 Exhibit DX-357, # 17 Exhibit DX-358, # 18 Exhibit DX-359, # 19 Exhibit DX-360, # 20 Exhibit DX-361, # 21 Exhibit DX-362, # 22 Exhibit DX-363, # 23 Exhibit DX-364, # 24 Exhibit DX-365, # 25 Exhibit DX-366, # 26 |

| | | |
|---|---|---|
| | | Exhibit DX-367, # 27 Exhibit DX-368, # 28 Exhibit DX-369)(Yetter, R). The following exhibit was NOT ADMITTED and is REMOVED from the record: # 7 Exhibit DX-348. Modified on 9/17/2022 (rguerrero, 4). (Entered: 09/09/2022) |
| 09/09/2022 | 868 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-371, # 2 Exhibit DX-372, # 3 Exhibit DX-373, # 4 Exhibit DX-374, # 5 Exhibit DX-375, # 6 Exhibit DX-376, # 7 Exhibit DX-377, # 8 Exhibit DX-378, # 9 Exhibit DX-379, # 10 Exhibit DX-380, # 11 Exhibit DX-381, # 12 Exhibit DX-382, # 13 Exhibit DX-383, # 14 Exhibit DX-384, # 15 Exhibit DX-385, # 16 Exhibit DX-386, # 17 Exhibit DX-387, # 18 Exhibit DX-388, # 19 Exhibit DX-389, # 20 Exhibit DX-390, # 21 Exhibit DX-391, # 22 Exhibit DX-392, # 23 Exhibit DX-393, # 24 Exhibit DX-394)(Yetter, R) (Entered: 09/09/2022) |
| 09/09/2022 | 869 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-396, # 2 Exhibit DX-397, # 3 Exhibit DX-398, # 4 Exhibit DX-399, # 5 Exhibit DX-400, # 6 Exhibit DX-401, # 7 Exhibit DX-402, # 8 Exhibit DX-403, # 9 Exhibit DX-404, # 10 Exhibit DX-405, # 11 Exhibit DX-406, # 12 Exhibit DX-407, # 13 Exhibit DX-408, # 14 Exhibit DX-409, # 15 Exhibit DX-410, # 16 Exhibit DX-411, # 17 Exhibit DX-412)(Yetter, R) (Entered: 09/09/2022) |
| 09/09/2022 | 870 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-414, # 2 Exhibit DX-415, # 3 Exhibit DX-416, # 4 Exhibit DX-417, # 5 Exhibit DX-418, # 6 Exhibit DX-419, # 7 Exhibit DX-420, # 8 Exhibit DX-421, # 9 Exhibit DX-422, # 10 Exhibit DX-423, # 11 Exhibit DX-424, # 12 Exhibit DX-425, # 13 Exhibit DX-426, # 14 Exhibit DX-427, # 15 Exhibit DX-428, # 16 Exhibit DX-429, # 17 Exhibit DX-430, # 18 Exhibit DX-431, # 19 Exhibit DX-432, # 20 Exhibit DX-433, # 21 Exhibit DX-434, # 22 Exhibit DX-435, # 23 Exhibit DX-436, # 24 Exhibit DX-437, # 25 Exhibit DX-438, # 26 Exhibit DX-439, # 27 Exhibit DX-440, # 28 Exhibit DX-441, # 29 Exhibit DX-442, # 30 Exhibit DX-443)(Yetter, R) (Entered: 09/09/2022) |
| 09/09/2022 | 871 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-445, # 2 Exhibit DX-446, # 3 Exhibit DX-447, # 4 Exhibit DX-448, # 5 Exhibit DX-449, # 6 Exhibit DX-450, # 7 Exhibit DX-451, # 8 Exhibit DX-452, # 9 Exhibit DX-453, # 10 Exhibit DX-454, # 11 Exhibit DX-455, # 12 Exhibit DX-456, # 13 Exhibit DX-457, # 14 Exhibit DX-458, # 15 Exhibit DX-459, # 16 Exhibit DX-460, # 17 Exhibit DX-461, # 18 Exhibit DX-462)(Yetter, R) (Entered: 09/09/2022) |
| 09/09/2022 | 872 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-464, # 2 Exhibit DX-465, # 3 Exhibit DX-466, # 4 Exhibit DX-467, # 5 Exhibit DX-468, # 6 Exhibit DX-469, # 7 Exhibit DX-470, # 8 Exhibit DX-471, # 9 Exhibit DX-472, # 10 Exhibit DX-473, # 11 Exhibit DX-474, # 12 Exhibit DX-475, # 13 Exhibit DX-476, # 14 Exhibit DX-477)(Yetter, R) (Entered: 09/09/2022) |
| 09/09/2022 | 873 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-479, # 2 Exhibit DX-480, # 4 Exhibit DX-483, # 5 Exhibit DX-484, # 6 Exhibit DX-485, # 7 Exhibit DX-486, # 8 Exhibit DX-489, # 9 Exhibit DX-490,# 11 Exhibit DX-493)(Yetter, R) The following exhibits were NOT ADMITTED and have been REMOVED from the record: # 3 Exhibit DX-482, # 10 Exhibit DX-491. Modified on 9/17/2022 (rguerrero, 4). (Entered: 09/09/2022) |
| 09/09/2022 | 874 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-495, # 2 Exhibit DX-496, # 3 Exhibit DX-497, # 4 Exhibit DX-498, # 5 Exhibit DX-499, # 6 Exhibit DX-500, # 7 Exhibit DX-501, # 8 Exhibit DX-502, # 9 Exhibit DX-503)(Yetter, R) (Entered: 09/09/2022) |

| | | |
|---|---|---|
| 09/09/2022 | 875 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-505, # 2 Exhibit DX-506, # 3 Exhibit DX-507, # 4 Exhibit DX-508)(Yetter, R) (Entered: 09/09/2022) |
| 09/09/2022 | 876 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-510, # 2 Exhibit DX-511, # 3 Exhibit DX-512, # 4 Exhibit DX-513, # 5 Exhibit DX-515, # 6 Exhibit DX-516)(Yetter, R) (Entered: 09/09/2022) |
| 09/09/2022 | 877 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-518, # 2 Exhibit DX-519, # 3 Exhibit DX-520, # 4 Exhibit DX-521, # 5 Exhibit DX-522, # 6 Exhibit DX-523, # 7 Exhibit DX-524)(Yetter, R) (Entered: 09/09/2022) |
| 09/10/2022 | 878 | Trial EXHIBITS by BMC Software, Inc. (Gorman, Sean) (Entered: 09/10/2022) |
| 09/10/2022 | 879 | Trial EXHIBITS by BMC Software, Inc. (Gorman, Sean) (Entered: 09/10/2022) |
| 09/10/2022 | 880 | Trial EXHIBITS by BMC Software, Inc. (Gorman, Sean) (Entered: 09/10/2022) |
| 09/10/2022 | 881 | Trial EXHIBITS by BMC Software, Inc. (Gorman, Sean) (Entered: 09/10/2022) |
| 09/10/2022 | 882 | Trial EXHIBITS by BMC Software, Inc. (Gorman, Sean) (Entered: 09/10/2022) |
| 09/10/2022 | 883 | Trial EXHIBITS by BMC Software, Inc. (Gorman, Sean) (Entered: 09/10/2022) |
| 09/10/2022 | 884 | Trial EXHIBITS by BMC Software, Inc. (Gorman, Sean) (Entered: 09/10/2022) |
| 09/10/2022 | 885 | Trial EXHIBITS by BMC Software, Inc. (Gorman, Sean) (Entered: 09/10/2022) |
| 09/10/2022 | 886 | Trial EXHIBITS by BMC Software, Inc. (Gorman, Sean) (Entered: 09/10/2022) |
| 09/10/2022 | 887 | Trial EXHIBITS by BMC Software, Inc. (Gorman, Sean) (Entered: 09/10/2022) |
| 09/10/2022 | 888 | Trial EXHIBITS by BMC Software, Inc. (Gorman, Sean) (Entered: 09/10/2022) |
| 09/10/2022 | 889 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX015.01 Part 2)(Gorman, Sean) (Entered: 09/10/2022) |
| 09/10/2022 | 890 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX015.03, # 2 Exhibit PX015.04, # 3 Exhibit PX015.05, # 4 Exhibit PX015.06, # 5 Exhibit PX015.07, # 6 Exhibit PX015.08, # 7 Exhibit PX015.09, # 8 Exhibit PX015.10, # 9 Exhibit PX015.11, # 10 Exhibit PX015.12, # 11 Exhibit PX015.13, # 12 Exhibit PX015.14, # 13 Exhibit PX015.15)(Gorman, Sean) (Entered: 09/10/2022) |
| 09/10/2022 | 891 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX015.17, # 2 Exhibit PX015.18, # 3 Exhibit PX015.19, # 4 Exhibit PX015.20, # 5 Exhibit PX015.21, # 6 Exhibit PX015.22, # 7 Exhibit PX015.23, # 8 Exhibit PX015.24, # 9 Exhibit PX015.25, # 10 Exhibit PX015.26, # 11 Exhibit PX015.27, # 12 Exhibit PX015.28, # 13 Exhibit PX015.29, # 14 Exhibit PX015.30)(Gorman, Sean) (Entered: 09/10/2022) |
| 09/10/2022 | 892 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX015.32, # 2 Exhibit PX015.33, # 3 Exhibit PX015.34, # 4 Exhibit PX015.35, # 5 Exhibit PX015.36, # 6 Exhibit PX015.37, # 7 Exhibit PX015.38, # 8 Exhibit PX015.39, # 9 Exhibit PX015.40)(Gorman, Sean) (Entered: 09/10/2022) |
| 09/10/2022 | 893 | Trial EXHIBITS by BMC Software, Inc. (Attachments: # 1 Exhibit PX015.42, # 2 Exhibit PX015.43, # 3 Exhibit PX015..44, # 4 Exhibit PX015.45, # 5 Exhibit PX015.46, # 6 Exhibit PX015.47, # 7 Exhibit PX015.48, # 8 Exhibit PX015.49, # 9 Exhibit PX015.50, # |

| | | |
|---|---|---|
| | | <u>10</u> Exhibit PX015.51, # <u>11</u> Exhibit PX015.52, # <u>12</u> Exhibit PX015.53, # <u>13</u> Exhibit PX015.54, # <u>14</u> Exhibit PX015.55, # <u>15</u> Exhibit PX015.56, # <u>16</u> Exhibit PX015.57, # <u>17</u> Exhibit PX015.58, # <u>18</u> Exhibit PX015.59, # <u>19</u> Exhibit PX015.60)(Gorman, Sean) (Entered: 09/10/2022) |
| 09/10/2022 | <u>894</u> | Trial EXHIBITS by BMC Software, Inc. (Attachments: # <u>1</u> Exhibit PX015.62, # <u>2</u> Exhibit PX015.63, # <u>3</u> Exhibit PX015.64, # <u>4</u> Exhibit PX015.65, # <u>5</u> Exhibit PX015.66, # <u>6</u> Exhibit PX015.67, # <u>7</u> Exhibit PX015.68, # <u>8</u> Exhibit PX015.69, # <u>9</u> Exhibit PX015.70)(Gorman, Sean) (Entered: 09/10/2022) |
| 09/10/2022 | <u>895</u> | Trial EXHIBITS by BMC Software, Inc. (Attachments: # <u>1</u> Exhibit PX015.72, # <u>2</u> Exhibit PX015.73, # <u>3</u> Exhibit PX015.74, # <u>4</u> Exhibit PX015.75, # <u>5</u> Exhibit PX015.76, # <u>6</u> Exhibit PX015.77, # <u>7</u> Exhibit PX015.78, # <u>8</u> Exhibit PX015.79, # <u>9</u> Exhibit PX015.80)(Gorman, Sean) (Entered: 09/10/2022) |
| 09/10/2022 | <u>896</u> | Trial EXHIBITS by BMC Software, Inc. (Attachments: # <u>1</u> Exhibit PX015.82, # <u>2</u> Exhibit PX015.83, # <u>3</u> Exhibit PX015.84, # <u>4</u> Exhibit PX015.85, # <u>5</u> Exhibit PX015.86, # <u>6</u> Exhibit PX015.87, # <u>7</u> Exhibit PX015.88, # <u>8</u> Exhibit PX015.89, # <u>9</u> Exhibit PX015.90)(Gorman, Sean) (Entered: 09/10/2022) |
| 09/10/2022 | <u>897</u> | Trial EXHIBITS by BMC Software, Inc. (Attachments: # <u>1</u> Exhibit PX015.92, # <u>2</u> Exhibit PX015.93, # <u>3</u> Exhibit PX015.94, # <u>4</u> Exhibit PX015.95, # <u>5</u> Exhibit PX015.96, # <u>6</u> Exhibit PX015.97, # <u>7</u> Exhibit PX015.98, # <u>8</u> Exhibit PX015.99)(Gorman, Sean) (Entered: 09/10/2022) |
| 09/10/2022 | <u>898</u> | Trial EXHIBITS by BMC Software, Inc. (Attachments: # <u>1</u> Exhibit PX019.02, # <u>2</u> Exhibit PX019.03, # <u>3</u> Exhibit PX019.04, # <u>4</u> Exhibit PX019.05, # <u>5</u> Exhibit PX019.06, # <u>6</u> Exhibit PX019.07, # <u>7</u> Exhibit PX019.08, # <u>8</u> Exhibit PX019.09, # <u>9</u> Exhibit PX019.10)(Gorman, Sean) (Entered: 09/10/2022) |
| 09/10/2022 | <u>899</u> | Trial EXHIBITS by BMC Software, Inc. (Attachments: # <u>1</u> Exhibit PX019.12, # <u>2</u> Exhibit PX019.13, # <u>3</u> Exhibit PX019.14, # <u>4</u> Exhibit PX019.15, # <u>5</u> Exhibit PX019.16, # <u>6</u> Exhibit PX019.17, # <u>7</u> Exhibit PX019.18, # <u>8</u> Exhibit PX019.19, # <u>9</u> Exhibit PX019.20, # <u>10</u> Exhibit PX019.21, # <u>11</u> Exhibit PX019.22, # <u>12</u> Exhibit PX019.23, # <u>13</u> Exhibit PX019.24, # <u>14</u> Exhibit PX019.25, # <u>15</u> Exhibit PX019.26, # <u>16</u> Exhibit PX019.27, # <u>17</u> Exhibit PX019.28, # <u>18</u> Exhibit PX019.29, # <u>19</u> Exhibit PX019.30)(Gorman, Sean) (Entered: 09/10/2022) |
| 09/10/2022 | <u>900</u> | Trial EXHIBITS by BMC Software, Inc. (Attachments: # <u>1</u> Exhibit PX019.32, # <u>2</u> Exhibit PX019.33, # <u>3</u> Exhibit PX019.35, # <u>4</u> Exhibit PX019.36, # <u>5</u> Exhibit PX019.37, # <u>6</u> Exhibit PX019.38, # <u>7</u> Exhibit PX019.39, # <u>8</u> Exhibit PX019.40, # <u>9</u> Exhibit PX019.34)(Gorman, Sean) (Entered: 09/10/2022) |
| 09/10/2022 | <u>901</u> | Trial EXHIBITS by BMC Software, Inc. (Attachments: # <u>1</u> Exhibit PX019.42, # <u>2</u> Exhibit PX019.43, # <u>3</u> Exhibit PX019.44, # <u>4</u> Exhibit PX019.45)(Gorman, Sean) (Entered: 09/10/2022) |
| 09/12/2022 | <u>902</u> | Trial EXHIBITS by International Business Machines Corporation (Attachments: # <u>1</u> Exhibit DX-526, # <u>2</u> Exhibit DX-527, # <u>3</u> Exhibit DX-528, # <u>4</u> Exhibit DX-529)(Yetter, R) (Entered: 09/12/2022) |
| 09/12/2022 | <u>903</u> | Trial EXHIBITS by International Business Machines Corporation (Yetter, R) (Entered: 09/12/2022) |
| 09/12/2022 | <u>904</u> | Trial EXHIBITS by International Business Machines Corporation (Attachments: # <u>1</u> Exhibit DX-532, # <u>2</u> Exhibit DX-533, # <u>3</u> Exhibit DX-534, # <u>4</u> Exhibit DX-535, # <u>5</u> |

22-20463.81

| | | Exhibit DX-537, # 6 Exhibit DX-538)(Yetter, R) (Entered: 09/12/2022) |
|---|---|---|
| 09/12/2022 | 905 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-540, # 2 Exhibit DX-541, # 3 Exhibit DX-542, # 4 Exhibit DX-543, # 5 Exhibit DX-544, # 6 Exhibit DX-545, # 7 Exhibit DX-546, # 8 Exhibit DX-547, # 9 Exhibit DX-548, # 10 Exhibit DX-549, # 11 Exhibit DX-550, # 12 Exhibit DX-551, # 13 Exhibit DX-552)(Yetter, R) (Entered: 09/12/2022) |
| 09/12/2022 | 906 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-554, # 2 Exhibit DX-555, # 3 Exhibit DX-556, # 5 Exhibit DX-558, # 6 Exhibit DX-559, # 7 Exhibit DX-560, # 8 Exhibit DX-561, # 9 Exhibit DX-562)(Yetter, R). The following exhibit was NOT ADMITTED and has been REMOVED from the record: # 4 Exhibit DX-557. Modified on 9/17/2022 (rguerrero, 4). (Entered: 09/12/2022) |
| 09/12/2022 | 907 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-566, # 2 Exhibit DX-568, # 3 Exhibit DX-569, # 4 Exhibit DX-570, # 5 Exhibit DX-571, # 6 Exhibit DX-572, # 7 Exhibit DX-573, # 8 Exhibit DX-574, # 9 Exhibit DX-575, # 10 Exhibit DX-576, # 11 Exhibit DX-577, # 12 Exhibit DX-578, # 13 Exhibit DX-579, # 14 Exhibit DX-580, # 15 Exhibit DX-581, # 16 Exhibit DX-582, # 17 Exhibit DX-583, # 18 Exhibit DX-584)(Yetter, R) (Entered: 09/12/2022) |
| 09/12/2022 | 908 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-586, # 2 Exhibit DX-587, # 3 Exhibit DX-588, # 4 Exhibit DX-589, # 5 Exhibit DX-590, # 6 Exhibit DX-591, # 7 Exhibit DX-592, # 8 Exhibit DX-593, # 9 Exhibit DX-594, # 10 Exhibit DX-595, # 11 Exhibit DX-596, # 12 Exhibit DX-597, # 13 Exhibit DX-598, # 14 Exhibit DX-600, # 15 Exhibit DX-601, # 16 Exhibit DX-602, # 17 Exhibit DX-603, # 18 Exhibit DX-604, # 19 Exhibit DX-605, # 20 Exhibit DX-606, # 22 Exhibit DX-608, # 23 Exhibit DX-609, # 24 Exhibit DX-610, # 25 Exhibit DX-612, # 26 Exhibit DX-613)(Yetter, R). The following exhibit was NOT ADMITTED and is REMOVED from the record: # 21 Exhibit DX-607. Modified on 9/17/2022 (rguerrero, 4). (Entered: 09/12/2022) |
| 09/12/2022 | 909 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-615, # 2 Exhibit DX-616, # 3 Exhibit DX-617, # 4 Exhibit DX-618, # 6 Exhibit DX-621, # 7 Exhibit DX-622, # 8 Exhibit DX-626, # 9 Exhibit DX-628, # 10 Exhibit DX-629, # 11 Exhibit DX-630, # 12 Exhibit DX-632, # 13 Exhibit DX-633, # 14 Exhibit DX-634, # 15 Exhibit DX-635, # 16 Exhibit DX-636, # 17 Exhibit DX-637, # 18 Exhibit DX-638, # 19 Exhibit DX-640, # 20 Exhibit DX-641, # 21 Exhibit DX-642)(Yetter, R). The following exhibit was NOT ADMITTED and is REMOVED from the record: # 5 Exhibit DX-620. Modified on 9/17/2022 (rguerrero, 4). (Entered: 09/12/2022) |
| 09/12/2022 | 910 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-645, # 2 Exhibit DX-646, # 3 Exhibit DX-647, # 4 Exhibit DX-648, # 5 Exhibit DX-649, # 6 Exhibit DX-650, # 7 Exhibit DX-651, # 8 Exhibit DX-652, # 9 Exhibit DX-653, # 10 Exhibit DX-654, # 11 Exhibit DX-655, # 12 Exhibit DX-656, # 13 Exhibit DX-657, # 14 Exhibit DX-658, # 15 Exhibit DX-659, # 16 Exhibit DX-660, # 17 Exhibit DX-661)(Yetter, R) (Entered: 09/12/2022) |
| 09/12/2022 | 911 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-663, # 2 Exhibit DX-664, # 3 Exhibit DX-665, # 4 Exhibit DX-666, # 5 Exhibit DX-667, # 6 Exhibit DX-668, # 7 Exhibit DX-669, # 8 Exhibit DX-670, # 9 Exhibit DX-671, # 10 Exhibit DX-672, # 11 Exhibit DX-673, # 12 Exhibit DX-674, # 13 Exhibit DX-675, # 14 Exhibit DX-676, # 15 Exhibit DX-677, # 16 Exhibit DX-678, # 17 Exhibit DX-679, # 18 Exhibit DX-680, # 19 Exhibit DX-681, # 20 Exhibit DX-682, # 21 |

| | | |
|---|---|---|
| | | Exhibit DX-683, # 22 Exhibit DX-684)(Yetter, R) (Entered: 09/12/2022) |
| 09/12/2022 | 912 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-686, # 2 Exhibit DX-687, # 3 Exhibit DX-688, # 4 Exhibit DX-689, # 5 Exhibit DX-690, # 6 Exhibit DX-691, # 7 Exhibit DX-692, # 8 Exhibit DX-693, # 9 Exhibit DX-694, # 10 Exhibit DX-695, # 11 Exhibit DX-696, # 12 Exhibit DX-697, # 13 Exhibit DX-698, # 14 Exhibit DX-699, # 15 Exhibit DX-700, # 16 Exhibit DX-701, # 17 Exhibit DX-702)(Yetter, R) (Entered: 09/12/2022) |
| 09/12/2022 | 913 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-704, # 2 Exhibit DX-705, # 3 Exhibit DX-706, # 4 Exhibit DX-707, # 5 Exhibit DX-708, # 6 Exhibit DX-709, # 7 Exhibit DX-710, # 8 Exhibit DX-711, # 9 Exhibit DX-712)(Yetter, R) (Entered: 09/12/2022) |
| 09/12/2022 | 914 | Trial EXHIBITS by International Business Machines Corporation (Yetter, R) (Entered: 09/12/2022) |
| 09/12/2022 | 915 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-715, # 2 Exhibit DX-716, # 3 Exhibit DX-717, # 4 Exhibit DX-718, # 5 Exhibit DX-719, # 6 Exhibit DX-720, # 7 Exhibit DX-721, # 8 Exhibit DX-722)(Yetter, R) (Entered: 09/12/2022) |
| 09/12/2022 | 916 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-724, # 2 Exhibit DX-725, # 3 Exhibit DX-726, # 4 Exhibit DX-727, # 5 Exhibit DX-728)(Yetter, R) (Entered: 09/12/2022) |
| 09/12/2022 | 917 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-730, # 2 Exhibit DX-731, # 3 Exhibit DX-732, # 4 Exhibit DX-733, # 5 Exhibit DX-734, # 6 Exhibit DX-735)(Yetter, R) (Entered: 09/12/2022) |
| 09/12/2022 | 918 | Trial EXHIBITS by International Business Machines Corporation (Yetter, R) (Entered: 09/12/2022) |
| 09/12/2022 | 919 | Trial EXHIBITS by International Business Machines Corporation (Yetter, R) (Entered: 09/12/2022) |
| 09/12/2022 | 920 | Trial EXHIBITS by International Business Machines Corporation (Attachments: # 1 Exhibit DX-738, # 2 Exhibit DX-739, # 3 Exhibit DX-740, # 4 Exhibit DX-741, # 5 Exhibit DX-742, # 6 Exhibit DX-743, # 7 Exhibit DX-744, # 8 Exhibit DX-745, # 9 Exhibit DX-746)(Yetter, R) (Entered: 09/12/2022) |
| 09/13/2022 | 921 | SEALED EXHIBITS *IBM Sealed Trial Exhibits (DX-155)* by International Business Machines Corporation, filed. (Attachments: # 1 Exhibit DX-267, # 2 Exhibit DX-315, # 3 Exhibit DX-481, # 4 Exhibit DX-487, # 5 Exhibit DX-488, # 6 Exhibit DX-492) (Yetter, R) (Entered: 09/13/2022) |
| 09/13/2022 | 922 | SEALED EXHIBITS *IBM Sealed Trial Exhibit (DX-514)* by International Business Machines Corporation, filed. (Yetter, R) (Entered: 09/13/2022) |
| 09/13/2022 | 923 | SEALED EXHIBITS *IBM Sealed Trial Exhibit (DX-563)* by International Business Machines Corporation, filed. (Yetter, R) (Entered: 09/13/2022) |
| 09/13/2022 | 924 | SEALED EXHIBITS *IBM Sealed Trial Exhibits (DX-565)* by International Business Machines Corporation, filed. (Attachments: # 1 Exhibit DX-567, # 2 Exhibit DX-599) (Yetter, R) (Entered: 09/13/2022) |
| 09/13/2022 | 925 | |

| | | |
|---|---|---|
| | | SEALED EXHIBITS *IBM Sealed Trial Exhibits (DX-611)* by International Business Machines Corporation, filed. (Attachments: # 1 Exhibit DX-619, # 2 Exhibit DX-623, # 3 Exhibit DX-624, # 4 Exhibit DX-625, # 5 Exhibit DX-627, # 6 Exhibit DX-631, # 7 Exhibit DX-639) (Yetter, R) (Entered: 09/13/2022) |
| 09/13/2022 | 926 | Letter enclosing IBM Sealed Native Trial Exhbit DX-624 for inclusion in the case record by International Business Machines Corporation, filed.(Yetter, R) (placed in vault) Modified on 9/15/2022 (rguerrero, 4). (Entered: 09/13/2022) |
| 09/13/2022 | 927 | Letter enclosing IBM Native DX Trial exhibits for inclusion in the record by International Business Machines Corporation, filed.(Yetter, R)(placed in vault) Modified on 9/15/2022 (rguerrero, 4). (Entered: 09/13/2022) |
| 09/14/2022 | | Notice of Assignment of USCA No. 22-20463 re: 787 Notice of Appeal,, filed.(DorinaReyna, 1) (Entered: 09/14/2022) |
| 09/20/2022 | 928 | NOTICE OF CROSS APPEAL to US Court of Appeals for the Fifth Circuit by BMC Software, Inc. (Filing fee $ 505, receipt number ATXSDC-28804304), filed.(Gorman, Sean) (Entered: 09/20/2022) |
| 09/21/2022 | 929 | Clerks Notice of Filing of an Appeal. The following Notice of Appeal and related motions are pending in the District Court: 928 Notice of Appeal - Cross Appeal. Fee status: Paid. Reporter(s): ERO, K. Miller, filed. (Attachments: # 1 Notice of Appeal) (SaraCelis, 1) (Entered: 09/21/2022) |
| 09/21/2022 | | Appeal Review Notes re: 928 Notice of Appeal - Cross Appeal. Fee status: Paid. The appeal filing fee has been paid. Hearings were held in the case. DKT13 transcript order form(s) due within 14 days of the filing of the notice of appeal. Twenty Five (25) transcripts were produced. Number of DKT-13 Forms expected: 5, filed.(SaraCelis, 1) (Entered: 09/21/2022) |
| 09/21/2022 | 930 | DKT13 TRANSCRIPT ORDER REQUEST by International Business Machines. Transcript is already on file in Clerks office regarding Telephone Hearing on May 26, 2022 before Hon. Gray H. Miller. (No transcript is needed). Court Reporter/Transcriber: Lanie Smith. This order form relates to the following: 754 Telephone Conference,, filed.(Yetter, R) (Entered: 09/21/2022) |
| 09/21/2022 | 931 | DKT13 TRANSCRIPT ORDER REQUEST by R. Paul Yetter. Transcript is already on file in Clerks office regarding Bench Trial Day 1 through Day 7 held March 14, 2022 through March 24, 2022, before Hon. Gray H. Miller, and Status Conference held December 17, 2021, before Hon. Gray H. Miller. (No transcript is needed). Court Reporter/Transcriber: Heather Alcaraz. This order form relates to the following: 650 Bench Trial,, 660 Bench Trial,,, 661 Bench Trial,, Status Conference, 666 Bench Trial,,, 655 Bench Trial,, 657 Bench Trial,, 671 Bench Trial,,,, filed.(Yetter, R) (Entered: 09/21/2022) |
| 09/21/2022 | 932 | DKT13 TRANSCRIPT ORDER REQUEST by R. Paul Yetter. Transcript is already on file in Clerks office regarding Preliminary Injunction Hearing, Day 1 through Day 4, held November 28, 2017 through December 1, 2017, before Magistrate Nancy Johnson. (No transcript is needed). Court Reporter/Transcriber: Judicial Transcribers of Texas. This order form relates to the following: 120 Injunction Hearing,, 128 Transcript, 133 Transcript, 129 Injunction Hearing,, 127 Transcript, 126 Transcript, 134 Transcript, 125 Injunction Hearing,, 130 Transcript, 135 Injunction Hearing,, 132 Transcript (Sealed), filed.(Yetter, R) (Entered: 09/21/2022) |
| 09/21/2022 | 933 | |

| | | |
|---|---|---|
| | | DKT13 TRANSCRIPT ORDER REQUEST by R. Paul Yetter. Transcript is already on file in Clerks office regarding Motion Hearing held on November 21, 2019 before Magistrate Nancy Johnson. (No transcript is needed). Court Reporter/Transcriber: Access Transcripts. This order form relates to the following: <u>341</u> Transcript (Sealed), Minute Entry,, filed.(Yetter, R) (Entered: 09/21/2022) |
| 09/22/2022 | | (Court only) Set/Cleared Flags. Appeal_Nat flag cleared. (SaraCelis, 1) (Entered: 09/22/2022) |
| 09/22/2022 | | (Court only) ***(PRIVATE ENTRY) EROA requested from the Fifth Circuit. Due on 10/6/2022 [22-20463] (SDH), filed. (SaraCelis, 1) (Entered: 09/22/2022) |
| 09/22/2022 | <u>934</u> | Mail Returned Undeliverable as to attorney Jaclyn Marie Palmerson as to International Business Machines Corporation re: <u>786</u> Order on Motion for Approval, filed. The address was updated and the Order/Notice was re-noticed. (DMcKinnieRichardson, 4) (Entered: 09/22/2022) |
| 09/22/2022 | | Notice of Assignment of USCA No. 22-20463 re: <u>928</u> Notice of Appeal - Cross Appeal, filed.(SaraCelis, 1) (Entered: 09/22/2022) |

**TAB 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BMC SOFTWARE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No.  4:17-cv-2254 |
| | ) | |
| INTERNATIONAL BUSINESS | ) | |
| MACHINES CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**NOTICE OF APPEAL**
**BY DEFENDANT, INTERNATIONAL BUSINESS MACHINES CORPORATION**

Defendant, International Business Machines Corporation, hereby appeals to the United States Court of Appeals for the Fifth Circuit from the Amended Final Judgment (Dkt. 783) entered on August 9, 2022.

If necessary to state for purposes of appellate jurisdiction, Defendant, International Business Machines Corporation, further appeals to the United States Court of Appeals for the Fifth Circuit from all orders, adjudications, findings, and conclusions that are intertwined with or related to the Amended Final Judgment (Dkt. 783).

If the above two paragraphs of this notice of appeal do not encompass the following, Defendant, International Business Machines Corporation, also appeals to the United States Court of Appeals for the Fifth Circuit from:

(1) the Memorandum and Opinion (Dkt. 782) entered on August 9, 2022, denying in part International Business Machines Corporation's Motion for Amended Findings and Conclusions and/or to Alter or Amend the Judgment (Dkt. 772) filed on June 27, 2022;

(2) the Memorandum and Opinion (Dkt. 781) entered on August 8, 2022, granting in part BMC Software Inc.'s application for recovery of its attorneys' fees and costs (Dkt. 760) filed on June 13, 2022;

(3) the Findings of Fact and Conclusions of Law (Dkt. 756) entered on May 30, 2022;

(4) the Final Judgment (Dkt. 757) entered on May 30, 2022;

(5) the Order clarifying the issues remaining for trial and the Court's prior decision (Dkt. 603) entered on February 7, 2022; and

(6) the Memorandum and Opinion (Dkt. 586) entered on September 9, 2021, which ruled on motions for summary judgment filed by the parties and adopted in part the Magistrate's June 7, 2021 Memorandum and Recommendation (Dkt. 561) to which International Business Machines objected.

Dated: September 7, 2022

Respectfully submitted,

| | |
|---|---|
| **QUINN EMANUEL URQUHART & SULLIVAN, LLP** | **YETTER COLEMAN LLP** |
| | /s/ R. Paul Yetter |
| Richard I. Werder, Jr. (pro hac vice) | R. Paul Yetter |
| Rachel E. Epstein (pro hac vice) | State Bar No. 22154200 |
| Donald J. Reinhard, II (pro hac vice) | Reagan W. Simpson |
| 51 Madison Avenue, 22nd Floor | State Bar No. 18404700 |
| New York, New York 10010 | Timothy S. McConn |
| (212) 849-7000 | State Bar No. 24032713 |
| rickwerder@quinnemanuel.com | Grant B. Martinez |
| rachelepstein@quinnemanuel.com | State Bar No. 24104118 |
| donaldreinhard@quinnemanuel.com | 811 Main Street, Suite 4100 |
| | Houston, Texas 77002 |
| | (713) 632-8000 |
| | pyetter@yettercoleman.com |
| | rsimpson@yettercoleman.com |
| | tmcconn@yettercoleman.com |

ATTORNEYS FOR DEFENDANT,
INTERNATIONAL BUSINESS MACHINES CORPORATION

22-20463.10414

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this document has been served on all counsel of record via e-filing on September 7, 2022.

/s/ Grant B. Martinez
Grant B. Martinez

22-20463.10415

**TAB 3**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| BMC SOFTWARE, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CASE NO. 4:17-cv-2254 |
| | § | |
| INTERNATIONAL BUSINESS | § | |
| MACHINES CORPORATION, | § | |
| | § | |
| Defendant. | § | |

### PLAINTIFF BMC SOFTWARE, INC.'S NOTICE OF CROSS APPEAL

Notice is hereby given that BMC Software, Inc., Plaintiff in the above-named case, hereby appeals to the United States Court of Appeals for the Fifth Circuit from the Amended Final Judgment entered in this action on August 9, 2022 (Dkt. 783).

If necessary to state for the purposes of appellate jurisdiction, Plaintiff, BMC Software, Inc., further appeals to the United States Court of Appeals for the Fifth Circuit from all orders, opinions, adjudications, rulings, findings, and conclusions that preceded the Amended Final Judgment (Dkt. 783).

Date: September 20, 2022

Of Counsel:

BRACEWELL LLP
Christopher L. Dodson
Texas State Bar No. 24050519
S.D. Bar No. 613937
Timothy R. Geiger
Texas State Bar No. 24078552
S.D. Bar No. 1742526
Andrew W. Zeve
Texas State Bar No. 24042209
S.D. Bar No. 57054
Kyle A. Mason
Texas State Bar No. 24116728
S.D. Bar No. 3501712
711 Louisiana Street, Suite 2300
Houston, Texas 77002-2770
(713) 223-2300 Telephone
(800) 404-3970 Facsimile
chris.dodson@bracewell.com
tim.geiger@bracewell.com
andrew.zeve@bracewell.com
kyle.mason@bracewell.com

Respectfully submitted,

  _/s/ Sean Gorman_____
Sean Gorman
Texas State Bar No. 08218100
S.D. Bar No. 10168
711 Louisiana Street, Suite 2300
Houston, Texas 77002-2770
(713) 221-1221 Telephone
(800) 404-3970 Facsimile
sean.gorman@bracewell.com

**Attorney-In-Charge for
BMC Software, Inc.**

## CERTIFICATE OF SERVICE

I certify that a copy of BMC's Notice of Cross Appeal has been forwarded to all counsel

of record via CM/ECF on September 20, 2022.

_/s/  Kyle A. Mason_____
Kyle A. Mason

DM-#8295246.1

22-20463.10426

**TAB 4**

United States District Court
Southern District of Texas
**ENTERED**
August 09, 2022
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| BMC Software, Inc., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action No. H-17-2254 |
| | § | |
| International Business Machines | § | |
| Corporation, | § | |
| | § | |
| *Defendant*. | § | |

**AMENDED[1] FINAL JUDGMENT**

Plaintiff BMC Software, Inc. (BMC) brought claims for breaches of contract, fraudulent inducement, trade-secret misappropriation, and common-law unfair competition by misappropriation against Defendant International Business Machines Corporation (IBM). The court held a bench trial on these claims from March 14 to March 24, 2022. Subsequently, the court issued Findings of Fact and Conclusions of Law in favor of BMC, which are incorporated into this final judgment in full and for all purposes. Dkt. 756. Based on the court's Findings of Fact and Conclusions of law:

1. BMC's breach of MLA section 8 claim is DISMISSED WITH PREJUDICE;

2. BMC's DTSA, TUTSA, and common law unfair competition through misappropriation claims are DISMISSED WITH PREJUDICE;

3. BMC's breach of 2015 OA section 5.1 claim is DISMISSED WITH PREJUDICE;

4. BMC' lost profits claim is DISMISSED WITH PREJUDICE;

In addition, the court has determined that the theory asserted by BMC, and found

---

[1] This amended judgment is substantially the same as the original judgment that was filed on May 30, 2022, except that the post-judgment interest rate has been corrected to reflect the correct rate on the date of the original judgment.

22-20463.10371

meritorious by the court, which affords BMC the greatest recovery is its claim against IBM for fraudulent inducement. Accordingly, BMC shall recover direct and punitive damages from IBM on its fraudulent inducement claim, plus prejudgment interest in the amount of 5% and post-judgment interest:

    a.   BMC is entitled to recover from IBM $717,739,615 in actual contractual damages.

    b.   BMC is entitled to recover from IBM $168,226,367.29 in prejudgment interest on the actual damages described above.

    c.   BMC is entitled to recover from IBM $717,739,615 in punitive damages based on fraud found by clear and convincing evidence.

    d.   BMC is entitled to recover from IBM post-judgment interest from the date of the entry of judgment at the federally mandated rate. 28 U.S.C. § 1961.

The combined amount of actual damages, exemplary damages, and pre-judgment interest on actual damages awarded to BMC in this judgment against IBM is therefore $1,603,705,597.29. This combined amount in this judgment shall bear post-judgment interest from the date of entry of judgment until satisfaction or payment at the rate of 2.02% per annum, compounded on an annual basis. If a reviewing court determines that BMC is not entitled to such a judgment as entered and decreed above based on this claim, BMC has reserved its right to seek and recover judgment under an alternative theory of recovery as set forth above and in the Findings of Fact and Conclusions of Law incorporated herein.

Pursuant to Federal Rule of Civil Procedure 58(a), and for the reasons set forth above and further detailed in the Findings of Fact and Conclusions of Law, FINAL JUDGMENT is hereby ENTERED for Plaintiff BMC Software, Inc. as set forth above.

IT IS SO ORDERED.

22-20463.10372

SIGNED in Houston, Texas this 9th day of August, 2022.

_____
Gray H. Miller
Senior United States District Judge

**TAB 5**

United States District Court
Southern District of Texas
**ENTERED**
August 09, 2022
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| BMC SOFTWARE, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-17-2254 |
| | § | |
| INTERNATIONAL BUSINESS MACHINES | § | |
| CORPORATION, | § | |
| | § | |
| *Defendant*. | § | |

## MEMORANDUM OPINION & ORDER

Pending before the court is IBM's motion to amend judgment.  Dkt. 772.  After reviewing the motion, BMC's response (Dkt. 776), IBM's reply (Dkt. 780), and the applicable law, the court is of the opinion that the motion should be GRANTED IN PART and DENIED IN PART.

### I.  BACKGROUND

The court assumes familiarity with the underlying facts of the case, and recounts only facts necessary to give a general overview for purposes of the instant motion.  On May 30, 2022, the court entered its Findings of Fact and Conclusions of Law and a Final Judgment in this case. Dkts. 756, 757.  Concluding that BMC prevailed on its breach of section 5.4 claim and fraudulent inducement claim, the court awarded BMC $717,739,615.00 in direct damages and $717,739,615.00 in punitive damages.  Dkt. 756 ¶¶ 206, 214.

### II.  LEGAL STANDARD

IBM brings its motion to amend judgment under Federal Rules of Civil Procedure 52(b), 59(a), and 59(e).  Dkt. 772 at 9.  For the court to grant IBM the relief it seeks under Rule 52(b), 59(a), or 59(e), IBM must show that the court committed a "manifest error of law or fact."  *See,*

*e.g.*, *Pounds v. Katy Indep. Sch. Dist.*, 730 F. Supp. 2d 636, 641 (S.D. Tex. 2010) (Rosenthal, J.) ("[T]o alter or amend the judgment under Rule 59(e), [the moving party] 'must clearly establish either a manifest error of law or fact.'") (quoting *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 863–64 (5th Cir. 2003)); *Cooper v. Ocwen Loan Servicing, LLC,* No. 3:14-CV-2795-N, 2016 WL 4440485, at *2 (N.D. Tex. July 29, 2016) ("Rule 52(b)'s purpose is, generally, to correct manifest errors of law or fact.") (quotation marks omitted), *report and recommendation adopted*, No. 3:14-CV-2795-N, 2016 WL 4429248 (N.D. Tex. Aug. 22, 2016); *Hicks v. R.H. Lending, Inc.*, No. 3:18-CV-0586-D, 2020 WL 2065637, at *1 (N.D. Tex. Apr. 29, 2020) ("A motion for a new trial in a nonjury case . . . should be based upon a manifest error of law or mistake of fact, and a judgment should not be set aside except for substantial reasons.") (quoting *Isystems v. Spark Networks Ltd.*, No. 3:08-CV-1175-N, 2015 WL 13469855, at *1 (N.D. Tex. Jan. 13, 2015)).

But—critically, for this case—"a party may not use a motion under Rule 52(b), 59(a), or 59(e) to repeat previous arguments or raise arguments that could, and should, have been raised at trial." *Equistar Chems., L.P. v. Indeck Power Equip. Co.*, No. CV H-19-3757, 2021 WL 2270212, at *1 (S.D. Tex. June 3, 2021) (Rosenthal, C.J.); *see also T. B. ex rel. Bell v. Nw. Indep. Sch. Dist.*, 980 F.3d 1047, 1051 (5th Cir. 2020) (stating a Rule 59(e) motion "cannot be used to raise arguments which could, and should, have been made before the judgment issued") (internal quotations omitted); *Templet v. HydroChem Inc.*, 367 F.3d 473, 478–79 (5th Cir. 2004) (stating a Rule 59(e) motion "is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment"); *Cooper*, 2016 WL 4440485, at *2 (stating a Rule 52(b) motion "should not be employed . . . to re-litigate old issues, to advance new theories, or to secure a rehearing on the merits").

22-20463.10352

## III.   ANALYSIS

Contrary to the Fifth Circuit's clear instruction, IBM uses its motion to rehash the very arguments that the court previously rejected.  *See Templet*, 367 F.3d at 478–79.  IBM asserts that the court committed manifest errors of law because (1) section 5.4 of the 2015 Outsourcing Attachment between IBM and BMC (the " 2015 OA") is an unenforceable restrictive covenant; (2) the court's damage award for breach was incorrectly determined because there was no causation, the license prices the court relied on were incorrect, and the award is a windfall; (3) BMC's fraud claim is barred by New York law; (4) BMC's fraud claim is contrary to established Texas law; (5) the punitive damages award violates the 2008 Master Licensing Agreement's ("MLA") punitive damages waiver provision contained in § 9; (6) the punitive damages are barred by Texas law in the absence of aggravating circumstances apart from the underlying wrongful act; (7) the punitive damages award violates due process under Texas state and federal constitutional law; and (8) the court used the wrong interest rate for the post-judgment interest award.  The court addresses each of IBM's complaints in turn.

## A.   Section 5.4 Is Not an Unenforceable Restrictive Covenant

IBM argues that section 5.4, as applied, is an unenforceable restrictive covenant.  Dkt. 772.  BMC asserts that IBM's challenge "has been made many times before and IBM does not identify any basis for Rule 52 or 59 relief."  Dkt. 776.  The court agrees with BMC.  The court previously held that section 5.4 is not an unenforceable restrictive covenant, *see* Dkt. 756 ¶¶ 181–84, and IBM has not convinced the court that this ruling is a manifest error of law.

Restrictive covenants, or anticompetitive agreements, enjoy a long and rich common law history.[1]  *See BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388, 712 N.E.2d 1220 (1999) (noting

---

[1] The parties agree that New York law governs the contract claims in this case and Texas law applies to BMC's common law and statutory trade secrets claims.  Dkt. 612 (joint pretrial order);

that reported cases upholding some forms of restrictive covenants date back 300 years).  Three factors govern the court's assessment of contractual restraints on trade agreed to between businesses: (1) the presence of a legitimate business interest; (2) the reasonableness of the restriction's scope; and (3) the hardship on the restricted party.  *Calico Cottage, Inc. v. TNB, Inc.*, No. 11-CV-0336 (DLI) (MDG), 2014 WL 4828774, at *5 (E.D.N.Y. Sept. 29, 2014).  In applying these factors, some courts have invalidated restrictive covenants where a reasonable nexus is lacking between the conduct they proscribe and the conduct challenged in court.  *See, e.g.*, *Freedom Mortg. Corp. v. Tschernia*, No. 20-CV-1206 (AJN), 2021 WL 1163807, at *4 (S.D.N.Y. Mar. 26, 2021) (invalidating an "exceptionally broad" post-employment restrictive covenant of indefinite length covering any commercial or residential mortgage business in the entire United States that did not implicate plaintiff's "legitimate interest in the enjoyment of the goodwill it purchased" from company where employee was a shareholder).

The court found that section 5.4 advanced a legitimate business interest by preventing IBM from leveraging its role as an IT outsourcer and using BMC's software for free to unfairly compete against BMC in the software business.[2]  Dkt. 756 ¶ 183.  IBM does not challenge the court's finding; instead, it claims the court found that the "covenant's purported legitimate purpose was . . . to preclude unfair competition and misappropriation of BMC's confidential information." Dkt. 772 at 11.  On that premise, IBM reasons that 5.4's legitimate "purpose is not implicated" by IBM's breach "given the Court's holdings on unfair competition and misappropriation" regarding BMC's trade secrets claims.  Dkt. 772.

---

Dkt. 756 (findings of fact and conclusions of law).

[2] In passing, IBM argues that "[section] 5.4's application implicates an invalid, publicly-injurious purpose—to attempt to lock AT&T into BMC's mainframe products." Dkt. 772 at 12.  That argument is unavailing, as section 5.4 did not prevent AT&T, which was not a party in this case, from using another mainframe software developer's products.  Nor did it prevent IBM from displacing BMC's products with another software developer's products.

But IBM's argument rests on a dubious characterization of the court's finding and a faulty premise to boot.  The court did not conclude that the covenant's legitimate purpose was to preclude conduct that would amount to an "unfair competition" claim or "misappropriation of . . . confidential information" claim, as IBM suggests.  Dkt. 772 (noting that BMC failed to prove unfair competition or trade secrets misappropriation).  Rather, the court concluded that the covenant was "designed to prevent giving IBM an *unfair advantage* when competing with BMC in the *software* business."  Dkt. 756 ¶ 183 (emphasis added).  This mischaracterization notwithstanding, IBM's premise that the court's dismissal of BMC's common law unfair competition and trade secrets claims annuls any finding of "unfair advantage" is wrong, as not all unfair advantages in business will constitute unfair competition or misappropriation of trade secrets.  Equally wrong is IBM's assertion that a reasonable nexus is lacking between the court's factual findings and the covenant's purpose.  As the court previously explained, IBM, as an IT outsourcer, enjoyed free access to the inner workings of BMC's software, enabling it to "acquire unique knowledge about how a competitor's software operates on a mutual customer's mainframe system" that could benefit its "*software*" development business. Dkt. 756 ¶ 183 (emphasis added). Leveraging the familiarity with AT&T's mainframe needs and the intimate knowledge of BMC's mainframe software it gained as an IT outsourcer for "no fee," IBM transitioned AT&T to IBM's software during Project Swallowtail.  *See id.*  This conduct squarely implicates section 5.4's legitimate purpose of preventing IBM from applying the "unfair advantage" it secured as an IT outsourcer "when competing with BMC in the *software* business."  *See id.*  Accordingly, the court concludes, once more, that section 5.4 is not an unenforceable restrictive covenant.

## B.   IBM's Breach Resulted in over $717 Million in Direct Damages

IBM brings a bevy of objections based on the court's breach-of-contract damages findings.

5

Dkt. 772.  BMC asserts that all of the arguments are "repeat arguments" that are "procedurally improper and should not be considered" as the damages flow directly from the 2015 OA.  Dkt. 776. While the court agrees that IBM is mostly rehashing previous arguments, it will briefly consider each objection.

### 1. Causation

*First*, IBM claims that "the Court manifestly erred in holding that IBM's purported breach of § 5.4 caused BMC's damages."  *Id.* at 12.  Specifically, IBM argues that "[c]ausation requires proof by a preponderance of the evidence that it is 'reasonably certain' that IBM would have paid BMC $718 million in licensing fees."  *Id.*  BMC asserts that the damages award is based on the rights IBM exercised and did not pay for under the 2015 OA's terms and pre-negotiated discount prices that, again, IBM agreed to pay.  Dkt. 776 at 9.

IBM misapprehends and muddles the law of direct damages and causation, misapplying the consequential damages causation standard to direct damages.  Under New York law, "a breaching party is liable for all direct and proximate damages which result from the breach." *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110 (2d Cir. 2007) (citing *Wakeman v. Wheeler & Wilson Mfg. Co.*, 56 Sickels 205, 209, 101 N.Y. 205, 4 N.E. 264, 266 (1886)).  The damages, however, "must be not merely speculative, possible, and imaginary, but they must be reasonably certain and such only as actually follow or may follow from the breach of the contract."  *Wakeman*, 56 Sickels at 209.

"[Direct] damages are those which are the natural and probable consequence of the breach."  *Am. List Corp. v. U.S. News & World Rep., Inc.*, 75 N.Y.2d 38, 42–43, 549 N.E.2d 1161 (1989).  A "natural and probable consequence of the breach" refers to consequences that are "in the ordinary course of things" or directly within the contract itself.  *See Kenford Co. v. Cnty. of*

22-20463.10356

*Erie*, 73 N.Y.2d 312, 319, 537 N.E.2d 176 (1989).  With respect to direct damages, the "certainty" element "refers to the fact of damage, not the amount." *Tractebel*, 487 F.3d at 11.  As New York courts have long observed, "when it is certain that damages have been caused by a breach of contract, and the only uncertainty is as to their amount, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever for the breach.  A person violating his contract should not be permitted entirely to escape liability because the amount of the damage which he has caused is uncertain." *Wakeman*, 56 Sickels at 209.  "[T]he burden of uncertainty as to the amount of damage is upon the wrongdoer" and "[t]he plaintiff need only show a stable foundation for a reasonable estimate of the damage incurred because of the breach." *Contemp. Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977) (internal quotations omitted).  Unlike direct damages, consequential damages "are recoverable only upon a showing that they were foreseeable and within the contemplation of the parties at the time the contract was made." *Am. List Corp.*, 75 N.Y.2d at 42–43; *see also Hadley v. Baxendale*, 9 Exch. 341, 156 Eng.Rep. 145.

Two contracts—the 2015 OA and the 2008 MLA—are relevant here.  Section 5.4 of the 2015 OA prohibited IBM from displacing BMC's products with its own.  Dkt. 756 ¶ 28.  Section 10 of the MLA limited "'[e]ach party's liability arising out of or related to [the MLA] agreement, the product, or the use of the product . . . . to the greater of $5,000,000 or the amount paid or *payable by the customer for the license* to the applicable product giving rise to the claim.'" *Id.* ¶ 22 (emphasis added).  Agreeing with IBM, the court previously concluded that the 2015 OA and 2008 MLA form an integrated contract.  *Id.* at 2.  IBM breached section 5.4.  BMC's damages are direct and reasonably certain as they follow from the contracts themselves.  *See id.* ¶¶ 112, 167–69; *see also Tractebel*, 487 F.3d at 110 (certainty "refers to the *fact* of damage, not the amount").

7

22-20463.10357

2.      **The License Prices**

This marks a good segue into IBM's second objection.  IBM contends that the court's finding that the license fee amounts specified in the 2015 OA and its addenda formed a "contractual price" is a manifest error because the license prices used rest on a clear misreading of the OA and the court ignored the parties' course of dealing.  Dkt. 772.  The court understands IBM to argue that if there is no "contractual price," then there is no certainty that it would have paid the $717 million in license fees, and therefore there is no causation.  *See id.*  BMC asserts that IBM is merely rehashing previous arguments relating to the license-fee damages flowing from BMC's claim for breach of the OA § 5.4.  Dkt. 776.  BMC argues, moreover, that none of IBM's arguments identify error.  *Id.*  IBM replies that BMC's argument "underscores how far BMC and the Court have departed from precedent," asserting that the court erred when it "fail[ed] to examine a world in which IBM declined to participate in Project Swallowtail, assuming instead that IBM would have paid BMC $717 million."  Dkt. 780.

IBM's arguments fail.  Section 8.1 of the 2015 OA entitled IBM "to a global minimum discount of 72% off the Listed Price in Exhibit H for all purchases of new licenses."  Dkt. 756 ¶ 173.  IBM reasons that this "price" is only the price IBM must pay if it "elects to purchase" licenses, not a "damage for a breach."[3]  Dkt. 772.  But going back to section 10 of the MLA, it is plain that liability is limited to the greater of $5,000,000 or the amount payable for the license.  Dkt. 756 ¶ 22.  How does the court know the amounts payable by IBM for the applicable licenses?  Exhibit H to the 2015 OA outlined the costs of each license for the parties.  Section 8.1 gave IBM "a global minimum discount of 72% off" those listed prices.  Dkt. 756 ¶ 173.  IBM claims that the court converted the 72% discount into a set price, when it is more appropriately viewed as an

---

[3]  IBM's own briefing acknowledges that there is, in fact, a price in the contract for the license fees.

22-20463.10358

invitation to bargain.  *See* Dkt. 772 at 15.  But the court does not view the words "minimum discount" as inherently inviting maximalist bargaining.  Instead, minimum discount refers to "the smallest acceptable" discount the parties could agree on.  *See* MINIMUM, Black's Law Dictionary (11th ed. 2019).  BMC offered a "stable foundation" for a persuasively "reasonable estimate" of the direct damage incurred by IBM's breach, *see Contemporary Mission*, 557 F.2d at 926, and the court once more declines IBM's invitation to "escape liability."  *Wakeman*, 56 Sickels at 209.

### 3.  Windfall

IBM likewise argues that the court's direct "damage award departs from the stalwart principle that a plaintiff cannot recover more from a breach than it would have gained from performance"—ostensibly nothing, given the 2015 OA's "no fee" provision—because "damages cannot be windfalls."  *See* Dkt. 772 at 16.  BMC asserts that the court awarded benefit-of-the-bargain damages based on the parties' agreements and the damages.  Dkt. 776.

"IIt has long been recognized that the theory underlying damages is to make good or replace the loss caused by the breach of contract."  *Brushton-Moira Cent. Sch. Dist. v. Fred H. Thomas Assocs., P.C.*, 91 N.Y.2d 256, 261, 692 N.E.2d 551 (1998); *accord U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 936 F.2d 692, 696 (2d Cir. 1991) ("Since the purpose of damages for breach of contract is to compensate the injured party for the loss caused by the breach, those damages are generally measured by the plaintiff's actual loss.") (citing 5 Corbin On Contracts § 1002, at 31 (1964)).  In gauging an expectation interest, courts look to the "loss in the value to the injured party of the other party's performance that is caused by the failure of, or deficiency in, that performance."  Restatement (Second) of Contracts § 347 (1981).

Here, in violation of its contract with BMC, IBM exercised rights—namely, the right to displace—for which it did not pay despite having the option to purchase.  Therefore, IBM's failure

9

to perform in accordance with section 5.4's non-displacement provision deprived BMC of the value of those displacement rights.  *See id.*  Though the cost of the licenses that would have enabled it to legally displace might seem steep to the average American, IBM—a sophisticated, multibillion dollar company—entered a contract that identified each license's exact cost in Exhibit H to section 8.1.  BMC is not recovering a windfall so much as it is recuperating the benefit of its bargain.

**C.    BMC's Fraud Claim and New York Law**

In the joint pretrial order, IBM agreed with BMC that "Texas law applies to BMC's common law claims" and New York law applies to the contract claims.  Dkt. 612 at 22.  However, IBM argues that the court's fraud findings merged BMC's fraudulent inducement claim into its breach of contract claim, compelling the application of New York law.  Dkt. 772.  IBM further argues that under New York law, BMC's fraud claim fails because it is entirely duplicative of its breach of contract claim in that it rests upon an "insincere[e] . . . promis[e] to perform a contractual provision."  *Id.* (citing *Cronos Grp. Ltd. v. XComIP, LLC*, 156 A.D.3d 54, 64 (N.Y. App. Div. 2017)).

BMC asserts that (1) this argument is procedurally barred because IBM has never argued New York law applies to the fraud claim and has agreed—even in the pretrial order—that Texas law applies; (2) IBM is judicially estopped from arguing that New York law applies; (3) section 16 of the MLA—the New York law provision—on its face applies only to the construction of the MLA and 2015 OA; and (4) notwithstanding IBM's arguments that BMC's current fraud theory is different, BMC has consistently argued fraud pursuant to *Formosa*.  Dkt. 776.

In reply, IBM asserts that (1) the type of fraudulent inducement found by the court does not exist under New York law, and IBM raised its New York law issue in its pretrial briefs;

22-20463.10360

(2) while IBM agreed New York law governs contract claims and Texas law governs tort claims in the pretrial order, it disagrees with the characterization that the fraudulent inducement claim here sounds in tort because it is actually a contract claim governed by New York law; (3) regardless, because this is an issue of law, it may be asserted post-judgment; and (4) estoppel does not apply because IBM's agreement that Texas law governs fraud is distinct from the specific claim this court labelled fraudulent inducement, which IBM insists is actually a contract claim. Dkt. 780.

The court begins with BMC's argument that IBM is estopped from arguing that New York law applies to the fraudulent inducement claim because IBM agreed that Texas law applies in the pre-trial order.  The pre-trial order limits the "claims, issues, and evidence" to "narrow[] and expedite the proceeding." *Flannery v. Carroll*, 676 F.2d 126, 129 (5th Cir. 1982).  The "court may only modify a pretrial order issued after a final pretrial conference 'to prevent manifest injustice.'" *Jordan v. Maxfield & Oberton Holdings, L.L.C.*, 977 F.3d 412, 421 (5th Cir. 2020) (citing Fed. R. Civ. P. 16(e)).  A party may be properly estopped from presenting legal arguments that contradict stipulations made in the joint pretrial order.  *See Matter of Pirani*, 824 F.3d 483, 493 n.1 (5th Cir. 2016) (party was estopped from arguing a proposed definition that was stipulated to in the joint pre-trial order) (citing *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 604 (5th Cir. 2000).

IBM now argues that the fraudulent inducement claim is a contract claim, or merged with the contract claim, and thus is controlled by New York law.  However, in the joint pretrial order, the parties agreed that "New York law governs the contract claims in this case," and "Texas law applies to BMC's common law claims."  Dkt. 612 at 22.  Further, the parties agreed to the elements of fraudulent inducement under Texas law, and they agreed that a "'promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of

performing at the time it was made.'" *Id.* at 23 (citing *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018), for the elements of fraudulent inducement and quoting *Formosa Plastics Corp. USA v. Presidio Eng'rs and Contractors, Inc.*, 960 S.W.2d 41, 43, 46, 48–49 (Tex. 1998), which recognizes the tort as distinct from a breach of contract).

IBM attempts to distinguish these stipulations by saying the "no intent to perform" claim is contractual rather than common law fraud. Dkt. 772. However, the underlying cause of action for a no-intent-to-perform claim is fraudulent inducement, not breach of contract. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304–305 (Tex. 2006) (citing *Formosa Plastics Corp. USA*, 960 S.W.2d at 46). Such a claim is a tort action that "arise[s] from general obligations imposed by law, not the underlying contract." *In re Kaplan Higher Educ. Corp.*, 235 S.W.3d 206, 209 (Tex. 2007). Thus, the no-intent-to-perform claim is not a contract claim, it is a common law fraudulent inducement claim governed by Texas law according to the pre-trial order. IBM is estopped from arguing New York law applies.

IBM asserts that notwithstanding the joint pretrial order, it raised the New York law issue in its pretrial briefs. Dkt. 780. Indeed, IBM stated in its pretrial brief on remaining issues for trial, filed on January 14, 2022, that "New York law does not even recognize [BMC's] promissory fraud claim: entering a contract with no intent to perform and then breaching the contract. A complaint 'does not plausibly alleged fraud [when] it describes only an unexpressed intent not to perform under the Agreement.'" Dkt. 597 at 20–21 (quoting *Presnall v. Analogic Corp.*, No. 17-cv-6662 (PKC), 2018 WL 4473337, at *6 (S.D.N.Y. 2018)). This statement was made in the context of IBM's argument that mere fraud is insufficient to void the contract damages limitations, and the quoted section also discusses how Texas courts "enforce contract damages limitations even when fraudulently induced." *See id.* It did not argue that the court should apply New York law to the

fraud claim here, and, regardless, does not negate that fact that IBM later agreed in the pre-trial order (dated March 4, 2022) that Texas law—and specifically *Formosa Plastics*—applies to the fraudulent inducement claim.

Moreover, the fraudulent inducement theory under which the court held IBM liable is actionable in tort under New York law.  The Court of Appeals of New York has long recognized that a party may be liable in tort where it has "fraudulently induced the plaintiff to enter into a contract."  *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 316, 662 N.E.2d 763 (1995).  New York, however, distinguishes between contractual promises made without the intention to perform and those made for the *purpose* of inducing another to act or refrain from acting.  With respect to the former, "general allegations that [a] defendant entered into a contract while lacking the intent to perform it are insufficient to support a claim for fraud."  *Matter of Part 60 Put-Back Litig.*, 36 N.Y.3d 342, 361, 165 N.E.3d 180 (2020) (internal quotations omitted); *accord Ithaca Cap. Invs. I S.A. v. Trump Panama Hotel Mgmt. LLC*, 450 F. Supp. 3d 358, 370 (S.D.N.Y. 2020) (acknowledging that under New York law, "[a] party's *mere* promise to perform its contractual obligations, even if knowingly false at the time of making, is not enough to support a claim of fraud") (emphasis added).  So, a cognizable fraudulent inducement claim must be predicted on "independently tortious" conduct that is "separate and distinct from the conduct giving rise to the breach of defendants' contractual obligations to plaintiff."  *Matter of Part 60 Put-Back Litig.*, 36 N.Y.3d at 361.

With respect to the latter category of contractual promises, however, one "who fraudulently makes a misrepresentation of *intent[]* for the *purpose* of inducing another to act or refrain from action in reliance thereon in a business transaction is liable for the harm caused by the other's justifiable reliance upon the misrepresentation."  *Channel Master Corp. v. Aluminum Ltd. Sales,*

22-20463.10363

*Inc.*, 4 N.Y.2d 403, 407–08, 151 N.E.2d 833 (1958) (emphasis added) (cleaned up) (noting that "one who fraudulently misrepresents himself as intending to perform an agreement is subject to liability in tort whether the agreement is enforceable or not").[4]

Though overlapping, BMC's fraudulent inducement claim is not duplicative of its breach of contract claim, so Texas law still applies. *See* Dkt. 756 ¶ 134. As the court recounted in its Findings of Fact and Conclusions of Law, the factual record evidenced that IBM promised not to displace for the "purpose of inducing" BMC into signing the 2015 OA, *see Channel Master Corp.*, 4 N.Y.2d at 407, which gave IBM "no fee" access to BMC's software and critical shared hosting rights. Dkt. 756 ¶¶ 189–95. This theory of fraud is far more particularized and independent from the "general allegations" often dismissed at the outset of litigation in New York courts. *See Matter of Part 60 Put-Back Litig.*, 36 N.Y.3d at 361. Thus, even if New York law applied, BMC would have a cognizable claim.

## D.    BMC's Fraud Claim is Consistent with Texas Law

Regarding BMC's fraudulent inducement claim as analyzed under Texas law, IBM largely reiterates the same arguments the court already rejected. *See Equistar Chems., L.P. v. Indeck Power Equip. Co.*, No. CV H-19-3757, 2021 WL 2270212, at *1 (S.D. Tex. June 3, 2021) ("A party may not use a motion under Rule 52(b), 59(a), or 59(e) to repeat previous arguments or raise arguments that could, and should, have been raised at trial.").

*First*, IBM argues that BMC could not justifiably rely on IBM's representations in a written contract when contradicted by IBM's oral representations during contractual negotiations. Dkt. 772 at 19. The court already explained why IBM's theory conflicts with Texas law. Dkt. 756

---

[4] On this score, Texas law parallels New York law. *See Formosa Plastics Corp. USA*, 960 S.W.2d at 48 (stating that a fraudulent inducement claim requires a defendant to make "representations with no intention of performing as represented in order to induce [the plaintiff] to enter into this contract").

22-20463.10364

¶¶ 196–203; *see JPMorgan Chase Bank, N.A. v. Orca Assets G.P., LLC*, 546 S.W.3d 648, 653 (Tex. 2018) (explaining that "reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law. . . . . If written contracts are to serve a purpose under the law, relative to oral agreements, it is to provide greater certainty regarding what the terms of the transaction are and that those terms will be binding, thereby lessening the potential for error, misfortune, and dispute"). IBM cannot cite a single case for the proposition that a party must rely on oral representations made *before* a contract's execution—and during contractual negotiations, at that—that are contradicted by the contract's plain language. Such a rule would encourage fraudulent parties to gaslight their counterparts during contractual negotiations—what IBM did here—to evade subsequent accountably in a fraudulent inducement action. That principle finds no support in Texas law.

*Second*, and relatedly, IBM claims that the court "did not analyze whether IBM intended to deceive BMC through § 5.4." Dkt. 772 at 21. That assertion is belied by several pages of analysis in the court's Findings of Fact and Conclusions of Law. *See* Dkt. 756 ¶¶ 190–95. IBM agreed, in writing, not to displace BMC's products while lacking the intention of abiding by that promise to gain something of advantage; that conduct is, by definition, deceptive. *See id.*

*Third*, and lastly, IBM argues that BMC's reliance did not result in an injury because "BMC was not injured by entering into the OA or by agreeing to § 5.4."[5] Dkt. 772 at 21. Common sense and the factual record instruct otherwise. As the court previously explained, because "BMC entered the 2015 OA with IBM, IBM was able to access and use BMC's software at AT&T for 'no fee' while blatantly violating the non-displacement provision." Dkt. 756 ¶ 205. IBM injured

---

[5] The court notes that IBM's defense parallels the classic "dog bite defense," where a defending party declares that he does not have a dog, but if he did have a dog, the dog did not bite the plaintiff, and even if the dog bit the plaintiff, the bite did not result in injury.

22-20463.10365

BMC by exercising displacement rights for which it did not pay. *See, e.g.*, *id.* ¶ 174. Those rights, like all intellectual property, may be intangible, but courts still recognize their unlawful exercise as a cognizable injury.

**E.    New York Law Suspended the MLA's Damages Limitation**

IBM next argues that the court's suspension of the MLA's damages limitation was manifest error because an intentional breach of contract is insufficient to suspend a contract's damages limitations under the public policy doctrine articulated *Kalisch-Jarcho Inc. v. City of New York*, 448 N.E.2d 413, 58 N.Y.2d 377 (N.Y. 1983). Dkt. 772 at 22–23 (citing cases). IBM also argues that the court erroneously applied New York law to the MLA's limiting provision and Texas law to the fraudulent inducement claim and reiterates its argument that BMC could not allege a fraud claim under New York law. *Id.* at 24. Finally, IBM argues that the Court of Appeals of New York's recent decision in *Matter of Part 60 Put-Back Litigation* precludes *Kalisch-Jarcho*'s application to breach of contract claims. *See generally* 36 N.Y.3d 342. The court addresses each objection in turn.

IBM's first objection is premised on an incorrect fact. Contrary to IBM's representations, the court did not find that *Kalisch-Jarcho* applied because IBM intentionally breached a contract. Rather, consistent with New York case law, the court concluded that the *Kalisch-Jarcho* doctrine applied because IBM committed fraud. Dkt. 756 ¶¶ 207–10.

With respect to IBM's next objection—that the court improperly applied New York law to the contract's damages limitation and Texas law to the fraudulent inducement claim—IBM *agreed* in the Joint Pretrial Order that New York law—not Texas law—applied to the contract while Texas law applied to BMC's common law claims. *See* Dkt. 612 at 22. It further agreed that the *Kalisch-Jarcho* doctrine applied in instances of intentional wrongdoing. *Id.* at 23–24.

22-20463.10366

Lastly, IBM overextends the Court of Appeals of New York's holding in *Matter of Part 60 Put-Back Litigation*.  First, as New York courts have recognized, that case "considered only the public policy exception for gross negligence; it did not discuss the public policy exception for willful misconduct."  *IS Chrystie Mgmt. LLC v. ADP, LLC*, 205 A.D.3d 418, 420, 168 N.Y.S.3d 449 (1st Dept. 2022).   In this case, the court applied *Kalisch-Jarcho*'s willful misconduct exception, not its gross negligence exception.  *See* Dkt. 756 ¶¶ 207–10.  Second, *Matter of Part 60 Put-Back Litigation* involved a claim where "a breach of contract occurred as a result of gross negligence." 36 N.Y.3d at 352.  That is, the case was at bottom, "a breach of contract case."  *See id.* at 353.  Thus, the court explained, where "the only causes of action raised in the complaint sound in breach of contract," the "rationales underlying the gross negligence public policy exception fail to overcome the public policy in favor of freedom of contract," and the court will not suspend the limiting clause.  *Id.* at 355.  Here, however, BMC's claims sound in fraudulent inducement and breach of contract.  This court declines IBM's implicit invitation to extend *Matter of Part 60 Put-Back Litigation* beyond its express terms and posture, especially given that a party fraudulently induced into a contract cannot provide the assent necessary to make the contract binding.

## F.    The Punitive Damages Award is Consistent with Texas Law

IBM argues that the court's punitive damages award is inconsistent with Texas law, which it claims required the court to find "aggravating circumstances."  Dkt. 772 at 26.  That is, IBM argues that Texas law forecloses an award of punitive damages where it was motivated by profit or other economic considerations, and not an ill or evil will toward the plaintiff.  *Id.*  BMC asserts that because IBM never raised this issue before, it is procedurally improper.  Dkt. 776.  BMC also argues that IBM is estopped from making this argument because the court has accepted and relied

22-20463.10367

on IBM's previous position that fraud will support an award of punitive damages.  *Id.*  BMC
contends, moreover, that IBM is "also plainly wrong" because section 41.0003 indicates that "clear
and convincing evidence of fraud is a sufficient predicate for punitive damages."  *Id.*  BMC argues
that fraud itself is the "aggravating circumstance."  *Id.*

Texas statutory law, itself, distinguishes between the fraud and malice that IBM seeks to
obscure.  Section 41.003(a) of the Texas Civil Practice and Remedies Code provides that a
claimant prove "by clear and convincing evidence that the harm with respect to which the claimant
seeks recovery of exemplary damages results from (1) fraud, (2) malice, or (3) gross negligence."
Unsurprisingly, the Fifth Circuit has upheld punitive damages awards based on fraud and absent
the "aggravating circumstances" IBM claims are necessary.  *See, e.g.*, *Dunbar Med. Sys. Inc. v.
Gammex Inc.*, 216 F.3d 441, 455 (5th Cir. 2000); *accord Cont'l Coffee Prod. Co. v. Cazarez*, 937
S.W.2d 444, 453 (Tex. 1996) ("The existence of [ill-will, spite, evil motive, or purposing the
injuring of another] may not be necessary in a case where the defendant's acts are accompanied by
*fraud* or other aggravating circumstances.") (emphasis added) (quoting *Clements v. Withers*, 437
S.W.2d 818, 822 (Tex. 1969)).  Accordingly, the court concludes that the punitive damages award
is consistent with Texas law.

## G.    The Punitive Damages Award is Consistent with Federal and State Constitutional
Law

IBM also argues that the punitive damages award is unconstitutional under state and federal
law.  The court disagrees.  "Punitive damages may properly be imposed to further a . . . legitimate
interest[] in punishing unlawful conduct and deterring its repetition," but it is important to "avoid
an arbitrary determination of an award's amount."  *BMW of N. Am. v. Gore*, 517 U.S. 559, 568,
116 S. Ct. 1589 (1996); *Philip Morris USA v. Williams*, 549 U.S. 346, 352, 127 S. Ct. 1057 (2007).
Under federal constitutional law, courts reviewing punitive damages consider three guideposts: (1)

22-20463.10368

the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418, 123 S. Ct. 1513 (2003).  In Texas, whether an award of punitive damages is excessive is measured by the: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; and (5) the extent to which such conduct offends a public sense of justice.  *Lesikar v. Rappeport*, 33 S.W.3d 282, 315 (Tex. App.—Texarkana 2000, *pet. denied*) (citing *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981)).

The punitive damages framework in this case is not excessive under either framework.  The court concluded that IBM's intentional, deceptive, and fraudulent misconduct was near the apex of reprehensibility for an entity of its size and sophistication.  *See* Dkt. 756 ¶ 213.  IBM knew that BMC would not enter the 2015 OA absent the non-displacement protection, a provision that resulted in months of protracted negotiations, and it took advantage of BMC's justifiable reliance on IBM's contractual promise.  *See generally* Dkt. 756.  Moreover, there is zero disparity between the harm suffered by BMC—namely, the $717 million in lost license fees—and the punitive damages award.  And, though there are few cases with comparable awards, the $717 million award, which represents a 1:1 ratio, is consistent with the ratio that has been found to comport with due process in other cases involving sizeable awards.  *See, e.g.*, *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 513, 128 S. Ct. 2605 (2008) (finding that while excessive punitive damages awards may offend due process, "a 1:1 ratio, which is above the median award, is a fair upper limit in . . . maritime cases" when the compensatory award was $507.5 million); *see also State Farm*, 538 U.S.

19

at 425 ("[I]n practice, few awards exceeding a single-digit ratio between punitive and compensatory damages . . . will satisfy due process."); *Epic Sys. Corp.*, 980 F.3d 1117, 1145 (7th Cir. 2020) (holding that a 1:1 ratio resulting in a $140 million punitive damages award comported with due process). Finally, IBM's fraudulent, bad faith conduct privileged profit over the good faith that free contractual enterprise requires, eroding the public senses of justice and confidence. As the Supreme Court, itself, has instructed, "[a]ction taken or omitted in order to augment profit represents an enhanced degree of punishable culpability, as of course does willful or malicious action, taken with a purpose to injure." *See Exxon Shipping Co.*, 554 U.S. at 494. The punitive damages award was therefore not excessive under either federal or state constitutional law.

**H.   Excessive Interest**

Lastly, IBM correctly complains that the court entered the incorrect post-judgment interest rate. Dkt. 772. BMC asserts that any change made to the post-judgment interest award should be limited to correcting the rate. Dkt. 776. The court agrees with both parties. The correct post-judgment interest rate is 2.02 percent per annum. Accordingly, IBM's motion to amend judgment is GRANTED as to the court's post-judgment interest award.

## IV.   CONCLUSION

For the reasons described above, IBM's motion to amend judgment (Dkt. 772) is GRANTED IN PART and DENIED IN PART. It is GRANTED with respect to the post-judgment interest rate, which shall be corrected to 2.02 percent per annum in an amended judgment, but it is otherwise DENIED.

Signed at Houston, Texas, on August 9, 2022.

Gray H. Miller
Senior United States District Judge

20

**TAB 6**

United States District Court
Southern District of Texas
**ENTERED**
August 08, 2022
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| BMC SOFTWARE, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-17-2254 |
| | § | |
| INTERNATIONAL BUSINESS MACHINES | § | |
| CORPORATION, | § | |
| | § | |
| *Defendant*. | § | |

## MEMORANDUM OPINION & ORDER

Pending before the court is BMC's motion for recovery of its attorneys' fees and costs.

Dkt. 760. After reviewing IBM's response (Dkt. 773), BMC's reply (Dkt. 774), and the applicable

law, the court is of the opinion that the motion should be GRANTED IN PART and DENIED IN

PART.

## I. BACKGROUND

The court assumes familiarity with the underlying facts of the case, and recounts only facts

necessary to give a general overview for purposes of the instant motion. *See generally* Dkt. 756

at 1–66.

### A. BMC's Claims

In 2008, the parties entered into a Master License Agreement (the "MLA"), which provides

that "[t]he prevailing party in any litigation is entitled to recover reasonable and customary

attorney's fees and costs from the other party." PX1. BMC initiated suit against IBM and raised

eleven causes of action in its Second Amended Complaint (the "SAC"), including breach of

sections 1.1, 5.1, and 5.4 of a 2015 Outsourcing Attachment (the "2015 OA") governing the

parties' business relationship; anticipatory breach of contract; breach of section 8 of the MLA for misuse of confidential information; fraudulent inducement; breach of the duty of good faith and fair dealing; tortious interference; common law misappropriation of trade secrets and unfair competition; and misappropriation of trade secrets under both the Texas Uniform Trade Secrets Act ("TUTSA") and the Defend Trade Secrets Act ("DTSA").[1]  Dkt. 295 ¶¶ 71–180.

BMC's three breach of contract claims related to the 2015 OA all involved the same universe of facts wherein IBM—after agreeing not to displace BMC's products with its own pursuant to section 5.4—breached its agreement with BMC when it did just that.  *See* Dkt. 295 at ¶¶ 71–79.  BMC's breach of section 1.1 claim rested on the theory that IBM, which elected the contractual option to use BMC's products for free subject to a non-displacement restriction, was legally obligated to elect the contractual option that would have allowed it to the displace BMC's products for a fee.  *Id.* at ¶ 34, 90–97.  BMC also claimed that IBM breached section 5.1 of the 2015 OA by virtue of using BMC's own products to effectuate the displacement.  *See id.* ¶¶ 84–89.

The facts surrounding BMC's breach of section 5.1 claim also intersect with those related to BMC's breach of MLA section 8 claim and misappropriation of trade secrets claims.  In the SAC, BMC alleged that

> IBM is not allowed to use BMC's products and confidential, proprietary, and trade secret information to transition a customer from BMC products to other products. IBM, however, has used, and is continuing to use, its access to and use of AT&T's BMC products and related confidential, proprietary, and trade secret information, including BMC Technical Information, for the purpose of displacing BMC products and selling IBM products and services.

Dkt. 295 ¶ 84.  This conduct put IBM, BMC averred, in breach of both section 5.1 of the 2015 OA

---

[1]     Seven of BMC's claims—breach of 2015 OA sections 5.1 and 5.4, breach of MLA section 8, fraudulent inducement, and its three trade secrets claims—survived summary judgment.  *See generally* Dkt. 756 at 5.

22-20463.10335

and section 8 of the MLA and helped form the basis of BMC's trade secrets claims.  *See id.* ¶ 109

("IBM is breaching Section 8 of the Master License Agreement by disclosing BMC's Confidential

Information, as defined in the Master License Agreement, to third parties without BMC's

consent."); ¶ 150 (detailing the overlapping relationship between BMC's common law

misappropriation claim and breach of contract claims); ¶ 160 (detailing the overlapping

relationship between BMC's TUTSA claim and breach of contract claims); ¶ 170–80 (detailing

the overlapping relationship between BMC's DTSA claim and breach of contract claims).

### B. Bracewell's Representation of BMC

When BMC initiated suit in 2017, it entered into an agreement with Bracewell LLP

("Bracewell") to fix attorneys' fees at their 2017 rates throughout the entirety of the matter.

Dkts. 760 at 14, 760-1 at 10.  Generally, law firms increase their rates incrementally on an annual

basis.  Dkt. 760-1 at 9–10.  But, pursuant to BMC and Bracewell's fixed-rate agreement, new

attorneys added to this case worked under the 2017-rate structure.  *Id.* at 10.  Because Bracewell

increased its standard rates annually, the 2017 agreement resulted in an increasing discount—

valued at approximately $6,011,560.70—to BMC over time.  *Id.*  In addition, Bracewell reduced

its fee rate by 30% while pursuing a preliminary injunction for BMC, resulting in a $724,148.41

discount.

In the lead-up to trial, the parties extensively litigated multiple discovery issues and

collectively took fifty-two depositions, issued seventeen expert reports, admitted over one

thousand exhibits into evidence, and authored voluminous objections to Judge Bryan's

Memorandum & Recommendation.  *See* Dkts. 760-8, 760-9, 760-10.  Together, the parties filed

six motions for summary judgment as well as responses and replies for each; the summary

judgment record alone totaled 790 pages of briefing and over 18,000 pages of exhibits.  *See*

22-20463.10336

Dkts. 517, 760-9.  All told, the parties collectively filed 126 pleadings and motions in this matter and produced 401,813 pages of documents.  Dkts. 760-8 at 2, 760-9 at 2.

Following a two-week bench trial, the court entered its Findings of Fact and Conclusions of Law, determining that BMC proved only its breach of section 5.4 claim and fraudulent inducement claim.  *Id.* at ¶¶ 164–76, 181–206.  The court's final judgment awarded BMC $717,739,615.00 in direct damages on its breach of contract claim and $717,739,615.00 in punitive damages on its fraudulent inducement claim.  Dkt. 757.

Pursuant to Federal Rule of Civil Procedure 54, BMC filed its motion for attorneys' fees on June 13, 2022.  Dkt. 760.  BMC seeks attorneys' fees and costs in the amount of $30,220,319.13, including $18,129,053.89 in total fees billed; $6,011,560.70 in recovery for the discounted rates pursuant to the 2017 fixed-rate agreement; $724,148.41 in discounted rates for the unsuccessful preliminary injunction; $4,122,998.13 in total costs; and $1,232,558.00 in conditional post-judgment and appellate representation costs.  *Id.* at 26.  IBM responded on July 1, 2022, and BMC replied on July 6, 2022.  Dkts. 773, 774.

## II. LEGAL STANDARD

"Under the bedrock principle known as the American Rule, each litigant pays his own attorneys' fees, win or lose, unless a statute or contract provides otherwise."  *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 382, 133 S. Ct. 1166 (2013) (cleaned up).  The court must "not deviate from the American Rule 'absent explicit statutory authority.'"  *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 126, 135 S. Ct. 2158 (2015) (quoting *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health and Hum. Res.*, 532 U.S. 598, 602, 121 S. Ct. 1835 (2001)).

New York law recognizes that parties "may contract for the indemnification of attorneys' fees and expenses."  *Blue Citi, LLC v. 5Barz Int'l Inc.*, 338 F. Supp. 3d 326, 341 (S.D.N.Y. 2018),

4

22-20463.10337

*aff'd*, 802 F. App'x 28 (2d Cir. 2020) (citation omitted).   Should parties contract for indemnification of attorneys' fees and expenses, determining the reasonableness of those fees is committed to the discretion of the district court.  *Id.*

### III.    DISCUSSION

#### A.    The MLA Entitles the Prevailing Party to Reasonable Fees and Costs

The court previously found that the MLA is governed by New York law and that section 18 is "clear and enforceable."  Dkt. 756 at 104.  When a New York contract "provides for shifting of the actual attorneys' fees expended by a prevailing party, 'the court will order the losing party to pay whatever amounts have been expended . . . so long as those amounts are not unreasonable.'" *Wells Fargo Bank N.W., N.A. v. Taca Int'l Airlines, S.A.*, 315 F. Supp. 2d 347, 353 (S.D.N.Y. 2003) (quoting *F.H. Krear & Co. v. Nineteen Named Trs.*, 810 F.2d 1250, 1263 (2d Cir. 1987)). Thus, the MLA contractually requires the losing party in this litigation to pay reasonable attorneys' fees and costs to the prevailing party, a proposition that IBM does not contest.

#### B.    BMC is the Prevailing Party

IBM also declines to contest that BMC is the prevailing party in this litigation.  *See generally* Dkt. 773.  A party can be said to have prevailed if it succeeded "with respect to the central relief sought."  *Blinds to Go (U.S.), Inc. v. Times Plaza Dev., L.P.*, 143 N.Y.S.3d 91, 93 (N.Y. App. Div. 2021).  "Such a determination requires an initial consideration of the true scope of the dispute litigated, followed by a comparison of what was achieved within that scope."  *Id.* (internal quotations omitted).  Put differently, a party must receive "substantial relief" relating to the central claims advanced.  *Grand v. Schwarz*, No. 15-CV-8779(KMW), 2019 WL 624603, at *3 (S.D.N.Y. Feb. 14, 2019) (citing *Sykes v. RFD Third Ave. I Assocs., LLC*, 833 N.Y.S.2d 76, 77–78 (N.Y. App. Div. 2007)).  And, because New York law looks principally to a party's

22-20463.10338

"central" claims, *see Blinds to Go*, 143 N.Y.S.3d at 93, "it is of no moment that [the] plaintiff did not prevail on its [alternative] claims." *See Okoye v. deVere Grp., Ltd.*, 92 N.Y.S.3d 625, 626 (N.Y. App. Div. 2019).

BMC is the prevailing party. The crux of BMC's case turned upon the allegation that IBM fraudulently induced BMC to sign the 2015 OA, which IBM allegedly then breached when it displaced BMC's products with its own. *See* Dkt. 295. By clear and convincing evidence, the court found that IBM fraudulently induced BMC to enter into a contract by agreeing, in section 5.4, not to poach an important BMC account, when IBM did not intend to uphold that agreement. Dkt. 756. Relatedly, the court found for BMC because it showed by the preponderance that IBM breached the contractual promise not to displace. *Id.* Even though BMC raised, and lost, other claims—including trade secrets violations, unfair competition, a breach of section 5.1 of the contract, and a breach of section 8 of the contract—in this suit, those claims were of a lower tier compared to the core claims it won.

## C. The Reasonableness of BMC's Fee Request

The court next turns to whether BMC's fee request is reasonable and customary. *See F.H. Krear & Co.*, 810 F.2d at 1263. The "lodestar" amount for attorneys' fees—what the Fifth Circuit has characterized as presumptively reasonable fees, *League of United Latin Am. Citizens No. 4552 (LULAC) v. Roscoe Indep. Sch. Dist.*, 119 F.3d 1228, 1232 (5th Cir. 1997)—"is the product of reasonable hours times a reasonable rate." *City of Burlington v. Dague*, 505 U.S. 557, 559, 112 S. Ct. 2638 (1992); *accord Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany*, 522 F.3d 182, 183 (2d Cir. 2008) (noting that the lodestar method is presumptively reasonable).[2]

---

[2]      IBM does not disagree with BMC's contention—and the court's conclusion—that New York law applies to the MLA's application in this dispute. However, in determining a reasonable fee, courts in both the Fifth Circuit and the Second Circuit apply the lodestar method and look to prevailing rates within the judicial district—here, the Southern District of Texas. Thus, though reasonable and customary attorneys' fees in the Southern District of Texas

In calculating an award of fees, courts must determine the "number of hours reasonably expended on the litigation" and then multiply them by a reasonable hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S. Ct. 1933 (1983); *Arbor Hill*, 522 F.3d at 184 (noting that a "reasonable hourly rate" is "what a reasonable, paying client would be willing to pay"); *accord La. Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th Cir.), *cert. denied*, 516 U.S. 862, 116 S. Ct. 173 (1995).

"[I]n some cases of exceptional success an enhanced award may be justified." *Blum v. Stenson*, 465 U.S. 886, 897, 104 S. Ct. 1541 (1984); *see also Hensley*, 461 U.S. at 435 ("Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified."). So, "[o]nce the court determines a lodestar figure, the court may, in its discretion, increase or decrease that amount based upon the prevailing party's level of success." *EEOC v. United Health Programs of Am., Inc.*, 350 F. Supp. 3d 199, 234 (E.D.N.Y. 2018); *accord LULAC*, 119 F.3d at 1232 ("[T]he district court may adjust it upward or downward in exceptional cases.").

### 1. Reasonable Hours

IBM challenges the reasonableness of BMC's hours on two fronts, arguing that the court should (1) reduce BMC's lodestar amount by 25% to account for the hours its attorneys spent litigating BMC's failed trade secrets claims and (2) downwardly adjust BMC's expended hours due to its submission of "block billing" invoices. The court agrees that BMC should have segregated time spent on its trade secrets claims but will impose a more reasonable 10% reduction. Otherwise, the court rejects IBM's objections to BMC's invoices and finds that the number of

---

might differ from those in the Southern District of New York, courts in both districts use the same method in determining reasonable and customary fees.

hours Bracewell expended on this litigation is reasonable.

### a. Segregation

IBM first argues that the court should reduce Bracewell's fee by 25%—or $4.5 million—for time that BMC spent pursuing its unsuccessful trade secrets claims.  Dkt. 773 at 4–8.  Specifically, IBM claims that two Bracewell partners, Tim Geiger and Andrew Zeve, "worked exclusively on the trade secret claim," collectively charging $3,256,458.20—or 18%—of BMC's total bill.  Dkt. 773 at 7.  IBM also claims that Sean Gorman, lead counsel for BMC, and Liza Eoff, an associate, devoted considerable time to the trade secrets claims, and asks the court to deduct the fees for BMC's trade secret experts.  *Id.*  BMC counters that its trade secrets claims involved facts overlapping with its successful breach of contract claim and that, even if segregation were required, a reduction of ten percent is more reasonable.  Dkt. 774 at 3–7.

Generally, "[i]n determining the number of hours reasonably expended for purposes of calculating the lodestar, the district court should exclude excessive, redundant or otherwise unnecessary hours, as well as hours dedicated to severable unsuccessful claims."  *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999).  But, as the Supreme Court made clear in *Hensley*, when unsuccessful claims "involve a common core of facts" with a meritorious claim "or [are] based on related legal theories," they are compensable.   461 U.S. at 435; *accord LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 762 (2d Cir. 1998) ("No fees should be awarded for time spent pursuing a failed claim if it was unrelated to the plaintiff's successful claims in the sense that it was based on different facts and legal theories.") (internal quotations omitted).

While Bracewell achieved excellent results for its client after nearly five years of litigation, BMC's trade secrets claims are severable from its meritorious breach of section 5.4 claim and fraudulent inducement claim.  To be sure, BMC always alleged that "IBM . . . used its confidential

22-20463.10341

proprietary information and trade secrets . . . to implement AT&T's transition from BMC products to IBM products," *see* Dkt. 1 ¶ 60, a theme it reiterated throughout the operative SAC. *See* Dkt. 295 ¶¶ 84, 109, 150, 160. But BMC's successful breach of contract claim rested on the fact that IBM *removed* BMC's products from AT&T's mainframe and replaced them with its own— not that it *used* BMC's products to effectuate this transition. Moreover, IBM's use of BMC's products after the parties executed the 2015 OA had nothing to do with IBM's clear and convincing fraud inducing BMC into that contract. Therefore, segregation is appropriate. However, the court disagrees with IBM that a 25% reduction is necessary and agrees with BMC's expert, Murray Fogler, that a 10% reduction is more appropriate to account for Zeve, Geiger, Gorman, and Eoff's work on the trade secrets claims. *See* Dkt. 760-3 at 969–1139.

Relatedly, IBM asks the court to exclude BMC's $337,629 in trade secrets expert costs. Dkt. 773. BMC's initial trade secrets expert, Geoffrey Decker, billed $28,280, and its subsequent expert, Kendyl Roman, billed $309,349. As BMC correctly notes, Roman opined both at trial and in his reports on far more than trade secrets, and his testimony discussed IBM's displacement activities at length. IBM's displacement of BMC's products and replacement of those products with IBM's own products put IBM in breach of section 5.4 of the 2015 OA, one of the core claims of this case. The court agrees with IBM that BMC's expenses related to Decker should be segregated, as his work focused more exclusively on BMC's failed trade secrets claims, but disagrees that BMC's expenses related to Roman merit segregation. Accordingly, the court will (1) reduce the fee award by 10% to account for the time Bracewell attorneys pursued the BMC's trade secret claims and (2) exclude $28,280 in expenses related to Decker from BMC's recovery of litigation costs. *See supra* at 14–16.

### b. Block Billing

22-20463.10342

IBM next complains that BMC's fee submissions reflect "block billing," Dkt. 773 at 8, the practice of billing for "the tasks performed during [a time] period, giving some detail about the kinds of work performed on a particular day, but [not itemizing] the amount of time spent on each." *Humphrey v. United Way of Tex. Gulf Coast,* 802 F. Supp. 2d 847, 864 (S.D. Tex. 2011).   In particular, IBM objects to the following entries:

- 14.7 hours a Bracewell associate worked on finalizing BMC's "proposed findings of fact and conclusions of law" and "meet[ing] and [confer]ing with IBM." Dkt. 760-4 at 141;

- 8.7 partner hours spent to "[r]eview, analyze, and revise multiple versions of draft proposed findings of fact and conclusions of law; multiple working team meeting regarding [REDACTED]; review and analyze legal authorities and other materials regarding [REDACTED]; and revise draft regarding same; work with working team regarding [REDACTED]." *Id.*; and

- Several hours used to "prepare for trial," "revise joint pre-trial order," and "meet with [expert] to [REDACT]." *Id.* at 1043–45.

"Block billing is disfavored because it prevents the court from accurately determining the time spent on any particular task, thus impairing the court's evaluation of whether the hours were reasonably expended." *Hoffman v. L & M Arts*, No. 3:10-cv-0953-D, 2015 WL 3999171, at *4 n.15 (N.D. Tex. July 1, 2015).   But reductions for block billing are not automatic.   *Fralick v. Plumbers & Pipefitters Na. Pension Fund*, No. 3:09-cv-0752-D, 2011 WL 487754, at *5 (N.D. Tex. Feb. 11, 2011).   However, if the records are inadequate to determine reasonable hours, the court may reduce the hours or the lodestar figure by 10–30%.   *Peterson v. Tenant Tracker, Inc.*, No. 6:20-CV-00588, 2021 WL 4956244, at *6 (E.D. Tex. Sept. 30, 2021); *accord N.Y. State Ass'n*

22-20463.10343

*for Retarded Child., Inc. v. Carey*, 711 F.2d 1136, 1142, 1146 (2d Cir. 1983) (concluding that inadequate timekeeping may justify "trimming [the] fat" from a fee application).

The court finds that BMC's billing entries are not unreasonably vague and further concludes, especially given the time the court devoted to the Findings of Fact and Conclusions of Law, that 14.7 associate hours and 8.7 partner hours is more than a reasonable expenditure for BMC's *proposed* Findings of Fact and Conclusions of Law.  In that same vein, the court finds that Bracewell's entries for trial preparation and revisions to the joint pre-trial order are sufficiently descriptive to be credited toward their ultimate hour count.  More generally, the court concludes that the number of hours BMC's attorneys billed on this case is reasonable and customary given the case's duration and complexity.  *See* Dkt. 760-2 at 2–3.  The parties zealously litigated this matter at every stage, resulting in extensive discovery, protracted discovery disputes, and substantial motion practice that culminated in two weeks of trial.  Except for the time spent on the trade secrets claims—for which the court will deduct 10% from the lodestar figure—BMC's attorneys billed a reasonable number of hours.

### 2. Reasonable Rate

The court next turns to whether BMC's requested fee rates are reasonable.  "In determining an hourly rate, the district court bases its decision on the 'prevailing market rates in the relevant community.'"  *LULAC*, 119 F.3d at 1234 (quoting *Blum*, 465 U.S. at 895).  The "burden is on the applicant to produce satisfactory evidence . . . that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."  *Blum*, 465 U.S. at 895 n.11; *accord Farbotko v. Clinton Cnty.*, 433 F.3d 204, 208 (2d Cir. 2005).  The Fifth Circuit "has interpreted rates 'prevailing in the community' to mean what it says," namely that district courts are required to consider the local

rates for similar work "in the community." *McClain v. Lufkin Indus., Inc.*, 649 F.3d 374, 381 (5th Cir. 2011). District courts can, of course, "draw on [their] own expertise" in determining the reasonableness of fees. *Kondos v. Allstate Tex. Lloyds*, No. 1:03-CV-1440, 2005 WL 1004720, at *18 (E.D. Tex. Apr. 25, 2005).

The court agrees that BMC's attorneys billed a reasonable hourly rate. Thirty-four timekeepers—including eleven partners, two counsel, eighteen associates, and three legal assistants—charged for their time on this matter based on their 2017 rates, which ranged from $165 per hour to $885 per hour. *See* Dkts. 760-1 at 9, 760-2 at 2. Gorman charged BMC $850 per hour. *Id.* Eoff charged BMC $394 per hour. *Id.* All told, Bracewell billed $18,129,053.89 under the 2017 rate structure. *Id.* Notably, IBM does not object to Bracewell's hourly rates. *See generally* Dkt. 773. The court concludes that Bracewell's rates are "reasonable in comparison to the prevailing market rates in Houston, Texas for comparable law firms and attorneys" of its caliber. *See Eni US Operating Co Inc. v. Transocean Offshore Deepwater Drilling Inc.*, No. 4:13-CV-03354, 2018 WL 2271162, at *1 (S.D. Tex. May 16, 2018) (finding rates ranging from $360 to $800 per hour reasonable); *see also Calsep A/S v. Intelligent Petroleum Software Sols., LLC*, No. 4:19-CV-1118, 2022 WL 508334, at *5 (S.D. Tex. Feb. 18, 2022) (finding a rate of $700 for partners and $500 for mid-level associates reasonable in a trade secrets dispute resolved on default judgment).

### 3. Upward Adjustment

To fairly compensate its attorneys, BMC requests an upward adjustment of the lodestar figure based on the fixed rates and preliminary injunction discount it and Bracewell agreed to at the start of this litigation. *See* Dkt. 760 at 14, Ex. A at 11. IBM objects. Dkt. 773. Generally, "[t]he reasonable hourly rate is the rate a paying client would be willing to pay." *Arbor Hill*, 522

22-20463.10345

F.3d at 190.  Where, as here, "a sophisticated client pays attorneys' fees that it does not know it will necessarily recover, the rate paid is presumptively reasonable." *Wells Fargo Bank v. Konover*, Civ. No. 3:05-CV-1924 (AWT), 2014 WL 3908596, at *6 (D. Conn. Aug. 8, 2014) (citing *Blanchard v. Bergeron*, 489 U.S. 87, 93, 109 S. Ct. 939 (1989)); *see Crescent Publ'g Grp. v. Playboy Enters.*, 246 F.3d 142, 144 (2d Cir. 2001) ("[A]ny evidence of the actual billing arrangement between [the party seeking fees] and its counsel should be considered a significant, though not necessarily controlling, factor in the determination of what fee is 'reasonable'"); *Diamond D Enters. USA, Inc. v. Steinsvaag,* 979 F.2d 14, 19 (2d Cir. 1992) ("[W]hen a contract provides that in the event of litigation the losing party will pay the attorneys' fees of the prevailing party, the court will order the losing party to pay *whatever amounts have been expended* by the prevailing party, so long as those amounts are not unreasonable." (emphasis added) (internal quotations omitted)).  For this reason, the fee applicant—here, BMC—shoulders the burden to show that an upward enhancement is necessary to provide fair and reasonable compensation.  *See Blum*, 461 U.S. at 898.

While the court acknowledges that BMC's attorneys obtained an extraordinary result for their client, the court pays great deference to the contractual agreement that BMC and Bracewell executed.  Bracewell agreed to represent BMC at its 2017 rates and to discount its work pursuing a preliminary injunction, and the court rejects BMC's invitation to award fees beyond what it and its counsel privately contracted for.  *See Steinsvaag,* 979 F.2d at 19.

### 4.  The Lodestar Figure and Segregation Deduction

Considering the number of hours worked multiplied by the reasonable rates charged, BMC's lodestar figure is $18,129,053.89.  *See* Dkt. 760-1 at 19.  Per the discussion above, the court will apply a 10% deduction—or $1,812,905.38—to account for attorneys' fees associated

22-20463.10346

with the failed trade secrets claims that BMC should have segregated.  Because the court declines BMC's invitation to apply an upward adjustment to the fee award, the total lodestar amount is $16,316,148.40.

### D.   Litigation Costs

BMC seeks reimbursement for $4,122,998.13 in litigation costs.  Of that, BMC seeks to recover $2,031,295.34 incurred from the following types of costs: photocopying, printing, service of process, legal research, filing fees, delivery and postage services, transcribing services, document production costs, and witness fees.  *See* Dkts. 760-2, 760-3.  Inclusive of this total, BMC seeks to recover $1,403,795.20 in taxable costs pursuant to 28 U.S.C. § 1920.  BMC also seeks to recover costs incurred by its experts in the amount of $2,449,029.78.

IBM claims that $1,123,152.87 of BMC's e-discovery expenses—such as a $250 charge related to "Encrypted Imaging Media" and a $2,611.56 charge for "Active Relativity Monthly Data Hosting Review Pop Size (GB) – Peak"—is not recoverable under 28 U.S.C. § 1920(4).  Dkts. 773 at 10, Dkt. 760-15 (first invoice detailing charges).  BMC argues that e-discovery costs are generally recoverable under § 1920(4) and that, in any event, the MLA permits recovery for the "reasonable and customary *costs*" of litigation.  Dkt. 774 at 5 (emphasis added).  And, as previously noted, IBM also seeks to exclude only $337,629 in trade secrets expert costs.[3]

### a.   Taxable Costs

The court agrees with IBM that the two charges identified above, together totaling $2,861.56, are unrecoverable under § 1920(4).  Section 1920(4) provides that the court may tax as costs "[f]ees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case."  28 U.S.C. § 1920(4).  As other courts have

---

[3]   As the court previously explained, it will exclude only Decker's $28,280 fee.  *See infra* at 9.

22-20463.10347

recognized, decryption might be "necessary to make a final production copy that is viewable by the requester," but it precedes the act of copying in the same way that safely storing paper copies in a safe prior to printing hard copies is an antecedent to copying itself.  *CBT Flint Partners, LLC v. Return Path, Inc.*, 737 F.3d 1320, 1331 (Fed. Cir. 2013).  Just as "the party's expense in removing [the paper copies] from such security, and getting them to the duplication machine, would not naturally constitute 'making copies,'" encrypting and decrypting electronic documents does not constitute making copies.  Likewise, to extend the analogy to "data hosting," *see* Dkt. 760-15, the expense of paying for a space to store paper files a party intends to copy is separate from duplication expenses.  *Accord Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 674 F.3d 158, 169 (3d Cir. 2012) ("Section 1920(4) does not state that all steps that lead up to the production of copies of materials are taxable.").

Though IBM asks the court to exclude $1,123,152.87 in e-discovery expenses, it only specifically objects to two of BMC's e-discovery charges.  Absent an itemized list and explanation from IBM as to why the remaining $1,120,291.31 in e-discovery expenses is unrecoverable under 28 U.S.C. § 1920, the court credits BMC's explanation that these expenses were related to statutorily legitimate document production efforts.  *See U.S. ex rel. Long v. GSDMIdea City*, *L.L.C.*, 807 F.3d 125, 132 (5th Cir. 2015) (noting with respect to an e-discovery dispute that, "[w]ithout an itemization by [the objecting party] of which costs were not permissible and an explanation of why § 1920 does not cover those costs, we find no abuse of discretion in this award.").  Therefore, under § 1920, BMC may recover taxable costs in the amount of $1,400,933.64.

### b.  Recovery Through the MLA

The court agrees with BMC that the MLA entitles it, as the prevailing party, to recover

22-20463.10348

"reasonable and customary . . . costs" beyond attorneys' fees from IBM. *See* Dkt. 774 at 5; PX1. These costs reasonably include the full $4,122,998.13 BMC seeks to recover, including those costs BMC incurred from photocopying, printing, service of process, legal research, filing fees, delivery and postage services, transcribing services, document production costs, and expert witness fees, except for Decker's $28,280 fee for his trade secrets opinion. *See Themis Cap. v. Democratic Republic of Congo*, No. 09 Civ. 1652 (PAE), 2014 WL 4379100, at *9 (S.D.N.Y, Sept. 4, 2014) ("[C]ourts in this District routinely reimburse prevailing parties for the costs of expert witnesses and consultants, regardless of whether the expert testified at trial."). Accordingly, BMC can recover $4,094,718.13 in litigation costs under the MLA, including the taxable costs discussed above.

### 5.   Post-Judgment Attorney Expenses and Appellate Expenses

Finally, BMC seeks $1,232,558.00 in conditional appellate expenses. Dkt. 760. In the Second Circuit, as in Texas, the trial court may award conditional post-judgment and appellate attorney fee expenses. *See, e.g.*, *Wifiland, LLP v. R.V.C., Inc.*, 564 F. App'x 612, 614 (2d Cir. 2014) (interpreting a contract including an attorneys' fee award to include appellate attorneys' fees); *Q2 Software, Inc. v. Radius Bank*, No. A-18-CV-00878-RP, 2020 WL 1482591, at *1 (W.D. Tex. Mar. 27, 2020) ("In Texas, it is well-settled that the trial court's award of attorneys' fees may include appellate attorneys' fees.") (internal quotations omitted), *report and recommendation adopted*, No. 1:18-CV-878-RP, 2020 WL 10056073 (W.D. Tex. Apr. 14, 2020). IBM does not object to BMC's post-judgment and conditional appellate expenses, which the court finds reasonable. Accordingly, the court will award BMC $1,232,558.00 in post-judgment and conditional appellate fees.

22-20463.10349

**IV.   Conclusion**

For the reasons outlined above, BMC's motion for recovery of its attorneys' fees and costs

(Dkt. 760) is GRANTED IN PART and DENIED IN PART.  BMC is AWARDED:

1. $16,287,868.40 in attorneys' fees;

2. $4,094,718.13 in litigation costs, consistent with this opinion; and

3. $1,232,558.00 in post-judgment and conditional appellate expenses.

Signed at Houston, Texas, on August 8, 2022.

Gray H. Miller
Senior United States District Judge

22-20463.10350

# TAB 7

United States District Court
Southern District of Texas
**ENTERED**
May 30, 2022
Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| BMC SOFTWARE, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CASE NO. 4:17-cv-2254 |
| | § | |
| INTERNATIONAL BUSINESS MACHINES | § | |
| CORPORATION, | § | |
| Defendant. | § | |

### FINAL JUDGMENT

Plaintiff BMC Software, Inc. (BMC) brought claims for breaches of contract, fraudulent inducement, trade-secret misappropriation, and common-law unfair competition by misappropriation against Defendant International Business Machines Corporation (IBM).  The court held a bench trial on these claims from March 14 to March 24, 2022.  Subsequently, the court issued Findings of Fact and Conclusions of Law in favor of BMC, which are incorporated into this final judgment in full and for all purposes.  Dkt. 756.  Based on the court's Findings of Fact and Conclusions of law:

1.   BMC's breach of MLA section 8 claim is DISMISSED WITH PREJUDICE;

2.   BMC's DTSA, TUTSA, and common law unfair competition through misappropriation claims are DISMISSED WITH PREJUDICE;

3.   BMC's breach of 2015 OA section 5.1 claim is DISMISSED WITH PREJUDICE;

4.   BMC' lost profits claim is DISMISSED WITH PREJUDICE;

In addition, the court has determined that the theory asserted by BMC, and found meritorious by the court, which affords BMC the greatest recovery is its claim against IBM for fraudulent inducement.  Accordingly, BMC shall recover direct and punitive damages from IBM

on its fraudulent inducement claim, plus prejudgment interest in the amount of 5% and post-judgment interest:

   a.     BMC is entitled to recover from IBM $717,739,615 in actual contractual damages.

   b.     BMC is entitled to recover from IBM $168,226,367.29 in prejudgment interest on the actual damages described above.

   c.     BMC is entitled to recover from IBM $717,739,615 in punitive damages based on fraud found by clear and convincing evidence.

   d.     BMC is entitled to recover from IBM post-judgment interest from the date of the entry of judgment at the federally mandated rate.  28 U.S.C. § 1961.

The combined amount of actual damages, exemplary damages, and pre-judgment interest on actual damages awarded to BMC in this judgment against IBM is therefore $1,603,705,597.29. This combined amount in this judgment shall bear post-judgment interest from the date of entry of judgment until satisfaction or payment at the rate of 2.06% per annum, compounded on an annual basis.  If a reviewing court determines that BMC is not entitled to such a judgment as entered and decreed above based on this claim, BMC has reserved its right to seek and recover judgment under an alternative theory of recovery as set forth above and in the Findings of Fact and Conclusions of Law incorporated herein.

Pursuant to Federal Rule of Civil Procedure 58(a), and for the reasons set forth above and further detailed in the Findings of Fact and Conclusions of Law, **FINAL JUDGMENT** is hereby **ENTERED** for Plaintiff BMC Software, Inc. as set forth above.

**IT IS SO ORDERED.**

22-20463.8491

**SIGNED** in Houston, Texas this 30th day of May, 2022.

Honorable Gray H. Miller
Senior United States District Judge

**TAB 8**

United States District Court
Southern District of Texas

**ENTERED**

May 30, 2022

Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| BMC SOFTWARE, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-17-2254 |
| | § | |
| INTERNATIONAL BUSINESS MACHINES | § | |
| CORPORATION, | § | |
| | § | |
| *Defendant*. | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.   PROCEDURAL HISTORY OF THE CASE

BMC filed this case against IBM on July 21, 2017.  Dkt. 1.  In its initial and first amended complaints, BMC applied for a preliminary injunction to prevent AT&T and IBM from completing Project Swallowtail, an AT&T-initiated project involving the migration of BMC software to IBM software that BMC claimed caused ongoing damages and infringed on its trade secrets.[1]  *Id.* at 19–32; *see also* Dkts. 37, 38, 92, 170.  United States Magistrate Judge Nancy K. Johnson held a preliminary injunction hearing from November 28 through December 1, 2017.  Dkt. 219 at 1.  Ultimately, Judge Johnson concluded that BMC failed to establish a substantial threat of irreparable injury if Project Swallowtail were allowed to proceed.  *Id.* at 26–27.  To the extent that BMC argued that Project Swallowtail caused ongoing damages, the court found that the evidence was "too speculative to form the factual basis for the issuance of an injunction."  *Id.* at 27.  Turning to BMC's trade secrets claim, the court concluded that BMC's software patches did not contain

---

[1]   AT&T was one of BMC and IBM's mutual customers.  Though this case concerns an AT&T-initiated project, AT&T is not a party to this case.

protected source code, even as they were subject to confidentiality restrictions found in the 2008 Master Licensing Agreement (the "MLA"), one of the contracts governing the parties' relationship. *See id.* at 29–30. This court adopted Judge Johnson's factual findings in full and her conclusion that BMC failed to show a substantial threat of injury justifying the extraordinary equitable relief it sought. Dkt. 270 at 9–11.

BMC also sought a jury trial through its initial and first amended complaints. *See* Dkts. 1 at 33, 37 at 55. IBM moved to strike BMC's jury demand on the theory that the MLA's waiver of jury trial provision applied to BMC's claims under the 2015 Outsourcing Attachment (the "2015 OA" or the "OA"), another contract governing the parties' relationship. *See* Dkt. 213. Looking to the contracts' plain meaning, Judge Johnson agreed that the MLA and the 2015 OA formed an integrated whole. *See* Dkt. 256 at 14–21. On January 25, 2019, this court adopted Judge Johnson's conclusion in full because the "straightforward language of the 2015 OA indicates the parties' clear intention for the 2015 OA and the MLA to form an integrated contract." Dkt. 287 at 6. BMC filed a Second Amended Complaint (the "SAC") on February 22, 2019, wherein it raised twelve causes of action, including: breach of sections 5.4, 5.1, and 1.1 of the 2015 OA; anticipatory breach of contract; breach of section 8 of the MLA; fraudulent inducement; breach of the duty of good faith and fair dealing; tortious interference; common law misappropriation of trade secrets; misappropriation of trade secrets under Texas Uniform Trade Secrets Act ("TUTSA") and Federal Defend Trade Secrets Act ("DTSA"); and unfair competition. *See* Dkt. 295 at 23–48. In its Answer, IBM raised ten affirmative defenses including, in relevant part, that section 5.4 of the 2015 OA is unenforceable under New York law and that the equitable doctrine of unclean hands barred BMC's claims because BMC failed to perform under the 2015 OA. *See* Dkt. 299 at 22–27.

In July 2020, BMC moved for partial summary judgment on IBM's breach of sections 1.1

and 5.4 of the 2015 OA (Dkt. 381), construction on damages limitations provisions in the MLA (Dkt. 385), certain IBM affirmative defenses (Dkt. 387), and IBM's counterclaim for breach of the 2015 OA's most-favored customer provision (dkt. 391).  With respect to its motion for partial summary judgment on the MLA's damage limitations, BMC argued that MLA section 10 authorized the recovery of licensing fees that are "payable" to BMC.  Dkt. 385 at 16–18.  In its motion on IBM's affirmative defenses, BMC did not move for summary judgment on IBM's defense that section 5.4 is an unenforceable restrictive covenant under New York law.  *See generally* Dkt. 387.

Likewise, IBM moved for partial summary judgment on its counterclaims (dkt. 394) and summary judgment on all of BMC's claims (dkt. 396).  Echoing its affirmative defense, IBM argued in the former that BMC's interpretation of the 2015 OA's non-displacement provision rendered it an unenforceable restrictive covenant under New York contract law.  *See* Dkt. 394 at 21.  In the latter motion, IBM claimed that all of BMC's claims failed as a matter of law.  *See generally* Dkt. 396.

On referral from this court, United States Magistrate Judge Christina Bryan issued a Memorandum and Recommendation (the "M&R") adjudicating the parties' competing motions. *See generally* Dkt. 561.  In relevant part, the Magistrate Court: (1) recommended denying summary judgment to both parties on BMC's claims for breach of sections 1.1, 5.1, and 5.4 of the 2015 OA after finding that the 2015 OA was ambiguous;[2] (2) recommended denying summary judgment to IBM on BMC's claim for breach of MLA section 8, fraudulent inducement, and BMC's claims for breach of TUTSA, DTSA, and common law unfair competition; (3) recommended granting

---

[2]     BMC only moved for summary judgment on its claims for breach of sections 1.1 and 5.4, even though in the SAC BMC also raised a breach claim related to section 5.1.  *See* Dkts. 381, 299.  Because IBM moved for summary judgment on *all* of BMC's claims, Judge Bryan analyzed whether IBM was entitled to summary judgment for BMC's breach of section 5.1 claim.

22-20463.8386

summary judgment on BMC's lost profits damages model because it was barred by MLA section 10; (4) recommended granting summary judgment on certain of IBM's affirmative defenses except ratification; and (5) recommended denying summary judgment to both parties on IBM's counterclaim for breach of the 2015 OA's most favored customer provision. *Id.*

After reviewing the parties' objections, this court adopted the M&R only in part. *See* Dkt. 586. The court granted BMC summary judgment on its claim for breach of section 5.4 of the 2015 OA after finding that the 2015 OA was unambiguous and there was no dispute of material fact that IBM displaced BMC's products with its own. *See id.* at 2–5. The court also determined that section 5.1 of the OA was unambiguous. *Id.* at 5–6. Because the court determined that sections 5.1 and 5.4 were unambiguous, it did not defer ruling on BMC's claim for breach of section 1.1. *Id.* at 6. Finding that section 1.1 "merely puts IBM to an election regarding how it would use BMC products in relation to its provision of IT Services at AT&T," the court concluded that BMC could not "proceed on an independent claim for breach of section 1.1."[3] *Id.* The court next adopted the M&R's recommendation that MLA section 9's consequential damages limitation barred BMC's lost profits model. *Id.* at 8. However, the court noted that this decision would not preclude BMC "from arguing that the damage limitation provisions are unenforceable if it succeeds on its claim for fraudulent inducement of the 2015 OA." *Id.* Turning next to the MLA's "paid or payable" language, the court did not determine whether BMC's licensing fees were recoverable. *See id.* at 9. Finally, with respect to IBM's counterclaim for breach of the 2015 OA's most favored customer provision, the court concluded that IBM "failed to raise a genuine issue of material fact as to the existence of a comparable competitor or its damages." *Id.* at 9.

---

[3]     Importantly, the court noted that this finding would not "preclude BMC from arguing that section 1.1 provides the framework for benefit-of-the-bargain damages for IBM's breach of section 5.4." Dkt. 589 at 6.

22-20463.8387

Following further briefing from the parties, the court clarified in a subsequent order that: (1) its finding that the 2015 OA was unambiguous constituted objective evidence that there was a meeting of the minds; (2) the determination of IBM's breach of section 5.4 did not resolve the other elements of BMC's contract claims, including its own performance; (3) whether section 5.4 is an unenforceable restrictive covenant was not squarely resolved at summary judgment because BMC did not technically move for summary judgment on IBM's unenforceability affirmative defense; (4) whether IBM displaced BMC products for the "sole purpose" of supporting AT&T— an issue critical to BMC's breach of section 5.1 claim—remained to be tried; and (5) the breach, causation, and damages elements of BMC's breach of MLA section 8 claim remained to be tried. Dkt. 603 2–10.

BMC has six remaining claims against IBM.  Of those six, three are breach of contract claims: (1) IBM's breach of section 5.4 of the 2015 OA; (2) IBM's breach of section 5.1 of the 2015 OA; (3) IBM's breach of section 8 of the MLA.  BMC also claims that IBM fraudulently induced it into signing the 2015 OA.  Finally, BMC claims that IBM misappropriated its trade secrets under TUTSA and DTSA, and, for any information that does not qualify as a trade secret, BMC asserts a claim for common law unfair competition by misappropriation.  *See* Dkts. 295, 561, 586, 603.

IBM denies it breached the MLA or the 2015 OA, fraudulently induced BMC into the 2015 OA, and misappropriated BMC's trade secrets.  In addition, IBM asserts that even if BMC can prove some or all its claims, it cannot show any damages.  *See* Dkt. 299.

As a result of the parties' waiver of a jury trial, this case was tried to the court from March 14 through March 24, 2022.  Both parties moved for judgment on partial findings.  *See* Dkts. 665, 751, 752.  Both parties filed proposed findings of fact and conclusions of law, as well as multiple

22-20463.8388

post-trial briefs on the remaining issues. *See* Dkts. 668 (BMC Software's Trial Brief on Standard for Fraudulent-Inducement Claim), 687 (Defendant IBM's Post-Trial Brief Addressing Damages Issues Raised at Trial), 689 (IBM's Post-Trial Proposed Findings of Fact and Conclusions of Law), 694 (Defendant IBM's Posttrial Brief and Response to BMC's Motion for Judgment on Partial Findings), 723 (BMC Software, Inc.'s Corrected Post-Trial Proposed Findings of Fact and Conclusions of Law).

The parties agreed to the following facts:

a) BMC is a Delaware corporation and a citizen of Texas, with its principal place of business located in Texas.

b) IBM is a New York corporation and a citizen of New York, with its principal place of business located in New York. IBM also does business in Texas.

c) AT&T and BMC entered into a Master Purchase Agreement in 2007.

d) IBM was the IT Outsourcer for AT&T's mainframe environment for many years.

e) The current AT&T is the result of various mergers, including the acquisition by SBC of two other "Baby Bell" companies.

f) BMC and IBM entered into the MLA in March 2008.

g) The MLA is a valid contract in existence between BMC and IBM.

h) BMC and IBM entered into a 2008 Outsourcing Attachment to the MLA.

i) BMC and IBM entered into a 2013 Outsourcing Attachment.

j) IBM and AT&T entered into an agreement to perform Project Swallowtail on June 26, 2015.

k) BMC and IBM entered into the 2015 OA on September 30, 2015.

l) The 2015 OA is a valid contract in existence between BMC and IBM.

m) Project Swallowtail is complete. It resulted in the replacement of fourteen BMC mainframe software products with IBM's mainframe software products, the replacement of five BMC mainframe software products with third-party products, and the retirement of one additional BMC mainframe software product.

n) BMC is not pursuing any claims for equitable relief.

The matter is fully briefed and tried.   After thoroughly reviewing this case's extensive record, including the applicable law, the testimony at trial, designated depositions, and admitted exhibits, the court makes the following Findings of Fact and Conclusions of Law.[4]

## II.   FINDINGS OF FACT

### A.   The Parties and Their Relationships

1.      BMC is a private, Houston-based software company that, among other things, develops and licenses proprietary mainframe software products that help customers manage and automate business operations.  Dkt. 561 at 1; Trial Tr. 137:17–23, 149:25–150:6, Mar. 14, 2022 (Ah Chu); Trial Tr. 102:9–103:5, Mar. 15, 2022 (Jones).  A "mainframe" is a high-performance computer—a piece of hardware made of integrated circuits—that can process massive amounts of information at once.   Trial Tr. 140:23–25, Mar. 14, 2022 (Ah Chu); Trial Tr. 57:01–59:25, Mar. 16, 2022 (Román).  When first produced, mainframes were the size of refrigerators.  Trial Tr. 58:12–13, Mar. 16, 2022 (Román).  Today, mainframes are smaller pieces of hardware, though still significantly larger than the laptops familiar to most consumers. *See id.*

2.      Because mainframes exceed the needs of most computer users, they are used primarily by large organizations for critical applications that require high volumes of data processing.  Trial Tr. 144:17–24, Mar. 14, 2022 (Ah Chu); Trial Tr. 103:12–16, Mar. 15, 2022

---

[4]      If any finding of fact is more properly considered a conclusion of law, it shall be so deemed. Likewise, if any conclusion of law is more properly deemed a finding of fact, it shall be so deemed.

22-20463.8390

(Jones); Trial Tr. 57:25–58:16, Mar. 17, 2022 (Skinner). A mainframe's capacity is measured by the millions of instructions per second ("MIPS") that it can process. Trial Tr. 140:15–20, Mar. 14, 2022 (Ah Chu). Depending on what a software product does, its efficiency can be more-or-less gauged by the number of MIPS it uses, with more efficient software products using fewer MIPS. Trial Tr. 138:06–08, Mar. 15, 2022 (Ah Chu).

3.      BMC's mainframe software products, and the accompanying services that BMC provides, are used by its customers to run, manage, and secure operations on their mainframe computers. Trial Tr. 137:17–23, Mar. 14, 2022 (Ah Chu). BMC's software products are like the "system utilities" familiar to some PC users: they help customers manage computer memory usage, backup data, automate tasks, and the like. Trial Tr. 60:13–63:20, Mar. 16, 2022 (Román). BMC's mainframe business unit is responsible for selling BMC's mainframe software products to "end user" customers—the business entities that are using the software on their mainframe computers. *See* Appleby Dep. 8:08–9:10.[5]

4.      BMC's entire business model is predicated on the creation and licensing of its software. Trial Tr. 140:01–04, Mar. 14, 2022 (Ah Chu). During trial, Raul Ah Chu, BMC's Vice President of Global Outsourcers and Systems Integrated Group, testified that "software [intellectual property] is the entire company. So, every dollar…[of]…revenue that BMC generates is directly related to licensing that IP." *Id.*

5.      IBM is a public, New York-based information technology company. Dkt. 561 at 1. With more than 345,000 employees and $73 billion in annual revenue as of 2020, IBM is one of the world's largest companies and is a "heavyweight" puncher in the IT industry. Trial Tr. 62:23–25, Mar. 15, 2022 (Román). In relevant part, IBM manufactures mainframe computers,

---

[5]      The parties designated twenty-four depositions in lieu of presenting those witnesses at trial.

creates mainframe software, and provides IT outsourcing services, including to BMC customers. Dkt. 561 at 1; Trial Tr. 140:14–16, Mar. 14, 2022 (Ah Chu).  "IT outsourcing" refers to a business's use of an external service provider to operate and manage its information technology (IT)-enabled business processes, application services, and infrastructure solutions.  Trial Tr. 138:17–20, Mar. 14, 2022 (Ah Chu); Trial Tr. 26:23–27:07, Mar. 16, 2022 (McGuinn); Trial Tr. 65:13–65:19 Mar. 16, 2022 (Román); Trial Tr. 50:20–51:07, Mar. 17, 2022 (Skinner).  In short, IT outsourcers are tasked with keeping the client's computer systems up and running.  Trial Tr. 62:10–63:11, Mar. 16, 2022 (Román).

6.      As a mainframe software developer, IBM directly competes with BMC "almost one for one."  Trial Tr. 145:16–17, Mar. 14, 2022 (Ah Chu).  In its role as an IT outsourcer, IBM is paid to operate and maintain its customers' mainframe IT services, including customers who employ BMC software on their mainframes.  Dkt. 561 at 1; *see* Bergdoll Dep. at 58:08–13 ("IBM [is] . . . in essence, a monopoly player in the mainframe business because they provide the hardware, they provide the system software, they provide the database software, and they have a host of offerings that other [Independent Software Vendors] might have . . . .");  Trial Tr. 138:17–20, Mar. 14, 2022 (Ah Chu); Trial Tr. 117:07–19, Mar. 15, 2022 (Jones); Trial Tr. 26:17–27:07, Mar. 16, 2022 (McGuinn); Trial Tr. 65:05–19, Mar. 16, 2022 (Román); Trial Tr. 50:20–51:07, Mar. 17, 2022 (Skinner).

7.      IBM provides IT outsourcing services to its customers through its Global Technology Services ("GTS") business, also known as its Strategic Outsourcing Division.  Shell Dep. 48:01–05; Cattanach Dep. 14:13–20; Stafford Dep. 5:11–25; Trial Tr. 145:22–146:03, Mar. 14, 2022 (Ah Chu); Trial Tr. 105:01–25, 106:18–24, Mar. 15, 2022 (Jones); Trial Tr. 50:16–51:05, 50:08–12, Mar. 17, 2022 (Skinner).  GTS' functions are now housed in a separate spin-off business

22-20463.8392

named Kendryl.  Trial Tr. 51:10–12, Mar. 16, 2022 (Román).  IBM's outsourcing division generates approximately $20 billion in revenue per year, and IBM functions as the largest outsourcer of mainframe services in the world.  Trial Tr. 100:23–24, Mar. 15, 2022 (Jones).

8.      Although other companies offer IT outsourcing services that use BMC products, IBM is the only outsourcer that both uses BMC products to service its clients and offers a full suite of competing mainframe software products large enough to replace a client's entire portfolio of BMC products.[6]  Bergdoll Dep. 187:08–24; *see* Trial Tr. 145:17–21, Mar. 14, 2022 (Ah Chu).  BMC does not offer competing IT outsourcing services, though it "supports and manages the relationship between [itself] and . . . global outsourcers," like IBM, through its Global Outsourcers and Systems Integrators ("GOSI") team.  Trial Tr. 138:08–15, Mar. 14, 2022 (Ah Chu).  By virtue of these two complementary roles, IBM—as an outsourcer—can acquire unique knowledge about how a competitor's software operates on a mutual customer's mainframe system.  Trial Tr. 63:21–25, Mar. 16, 2022 (Román).

9.      Hundreds of BMC's software customers also use IBM's IT outsourcing services to manage their mainframe computers' operations.  Dkt. 561 at 2; PX250 at BMC-000070461 (list sent by IBM to BMC identifying certain mutual customers); PX479 at IBM00000390 (same); *see* Stafford Dep. 5:16–6:22; Trial Tr. 186:24–187:04, Mar. 14, 2022 (Ah Chu).  As a general matter, when this occurs, the mutual customer contracts with BMC to own licenses to the BMC mainframe software products, but separately contracts with IBM in its outsourcing capacity to operate BMC products in the customer's mainframe environment and interact with BMC's technical support

---

[6]      Computer Associates ("CA"), another software development company, directly competes with BMC's mainframe software portfolio but does not manufacture mainframes or provide IT outsourcing services.  Trial Tr. 100:12–101:15, Mar. 15, 2022 (Jones).

22-20463.8393

when issues arise.  Shell Dep. 34:12–20; Trial Tr. 103:06–09, 105:04–25, Mar. 15, 2022 (Jones);

Trial Tr. 26:13–27:07, Mar. 16, 2022 (McGuinn); Trial Tr. 65:05–19, Mar. 16, 2022 (Román).

10.     Because they are direct competitors in the software development space, but partners

when a mutual customer hires IBM as an outsourcer to operate mainframes running BMC software,

BMC and IBM have "a complex, multifaceted relationship."  Trial Tr. 145:24–25, Mar. 14, 2022

(Ah Chu); *see also* Bergdoll Dep. at 53:12–21; *id.* at 54:05–11 (noting that IBM is different from

other outsourcers because "IBM acts in multiple behalves in part for their customers"); Stafford

Dep. 221:14–20 (noting that BMC is one of IBM's top software suppliers).  Augmenting this

complexity further, IBM was also, at the time, a "significant customer" of BMC's insofar as it

purchased software licenses or certain licensing rights from BMC.  Trial Tr. 101:24–102:02, Mar.

15, 2022 (Jones).

**B.     AT&T**

11.     One of BMC and IBM's mutual customers is AT&T.  AT&T was one of BMC's

biggest mainframe software clients, and "was one of the most strategic and tenured customers that

[BMC] had."  Trial Tr. 187:22–23, Mar. 14, 2022 (Ah Chu).  BMC considered AT&T to be a

"showcase" account.  DX128 (describing "showcase" accounts as "key strategic clients" to BMC);

*see also* Appleby Dep. 51:25–52:12; PX205 at BMC-000010535 ("AT&T is [BMC's] largest

commercial account."); Poole Dep. 186:23–187:02 (noting that AT&T was a valued client to

BMC).

12.     Prior to the events giving rise to this case, BMC provided mainframe software to

AT&T.  Conway Dep. 21:18–20.  For this software, AT&T held a perpetual license granting it and

its IT outsourcers the right to use BMC's software.  Trial Tr. 195:01–11, Mar. 15, 2022 (Jones)

(testifying that AT&T purchased a perpetual license to use BMC's software).  AT&T also held a

22-20463.8394

separate "software maintenance and support" contract from BMC that entitled AT&T (and IBM and other AT&T services providers) to contact BMC customer service for assistance when problems arose relating to AT&T's use of BMC's products.  *See* DX018 (2014 Mainframe Order).

13.     Since 1999, AT&T has used IBM as its mainframe IT outsourcer.  Shell Dep. 23:18–21; Ulaszek Dep. 9:23–25; *see* Conway Dep. 11:08–24, 13:14–23.  IBM's revenue from AT&T is substantial; as of 2017, IBM received more than $100 million per month from AT&T. Ulaszek Dep. 17:12–18:02 (testifying that IBM received "in th[e] neighborhood" of over $100 million in revenue a month from AT&T); *see also* Brickhaus Dep. 83:03-84:05 (IBM monthly bills to AT&T for mainframe services alone are "approximately $10 million a month"); Knight Dep. 66:10–21 (noting the importance of AT&T to IBM).  Over the last seven years, AT&T accounted for at least $1 billion of IBM's outsourcing division's revenue.  *See* PX222 at IBM00007098–99 (internal slideshow discussing "contract value" figures); PX216 at IBM00007356–57 (same).  So, understandably, AT&T is also an important client for IBM.  *See* Knight Dep. 66:10–21 (noting the importance of AT&T to IBM).

14.     To perform as an IT outsourcer when a client used BMC mainframe software, IBM required "a contractual vehicle . . . to conduct . . . business" with "BMC and any clients [in] an outsourcing environment."  Craig Dep. 26:01–07.  BMC provided IBM that ability under the 2015 OA's "no fee" Access and Use option on the condition that it not then displace BMC's products with its own products.  *See* PX4; Schulman Dep. 145:10–147:05 (explaining that the parties' agreements prevented IBM from "leveraging its position and access to displace BMC").

15.     As AT&T's IT outsourcer, IBM manages and operates AT&T's mainframe operations—"all the application jobs," database support requirements, "hardware refreshes," and other "basic IT stuff"—and the software products on the AT&T mainframe computers, including

the BMC products AT&T previously used.  Shell Dep. 34:12–20.  IBM's responsibilities also include resolving technical issues as they arise by opening technical support cases directly with any Independent Software Vendor ("ISV"), including BMC, that licenses software installed in AT&T's mainframe environment.  *See* Conway Dep. 11:25–12:06.  For example, when IBM had a question about the way a BMC product functioned in the AT&T environment, IBM would contact BMC's support services, and BMC would diagnose the problem and provide instructions to IBM on how to resolve the issue.  *See* Sessarego Dep. 5:25–7:11; Trial Tr. 22:18–26:01, Mar. 16, 2022 (McGuinn); Trial Tr. 96:09–97:04, Mar. 16, 2022 (Román).

16.     The close access that IBM personnel had to AT&T's mainframe environment and experience with how BMC products operate in that environment gave IBM exclusive insights into how the software products AT&T used, including BMC products, worked under the operational demands of AT&T's computing environment.  *See* Shell Dep. 35:23–37:01; *see also* Bergdoll Dep. 187:08–24 (noting the "unique nature" of IBM as an IT outsourcer that also sells competing products, as "[n]o other outsourcer has competing products").

C.     **The Parties' Contractual Relationship**

17.     This case, however, principally involves contract disputes between BMC and IBM. Relevant to those disputes are several contracts: the MLA; the 2015 OA; BMC's standard End User License Agreement (the "EULA"); and the BMC-AT&T End User License Agreement (the "AT&T EULA").

1.     **The MLA**

18.     The contractual structure governing the business relationship between BMC and IBM includes the MLA.  PX1.  BMC and IBM executed the MLA on March 31, 2008, to streamline the way they do business by agreeing to a contractual framework that governs both IBM's licensing

13

of BMC's software products and the parties' business relationship worldwide.  PX1; *see also* Craig Dep. 25:14–26:7;[7] Trial Tr. 141:25–142:05, Mar. 14, 2022 (Ah Chu) (Q: "So what generally governs BMC's relationships with companies that provide outsourcing services using BMC products?  What agreements are issue?" A: "It's—the agreements [are] typically the MLA…and then the OA.").

19.     In recognition of IBM's preeminent role as an IT outsourcer, and "[s]ubject to the terms of an executed Outsourcing Attachment," the MLA "grant[s]" IBM a "license" for the "provision of services to a third party," among other rights.  PX1 at 1.  But the use of this license is subject to some restrictions.

   a.     **MLA Section 8: Proprietary Rights and Confidentiality**

20.     Section 8: Proprietary Rights and Confidentiality, limits IBM's ability to use confidential information about BMC's products that it might receive during the parties' business relationship:

> "Confidential Information" means all proprietary or confidential information that is disclosed to the recipient ("Recipient") by the discloser ("Discloser"), and includes, among other things (i) any and all information relating to products or services provided by a Discloser, its financial information, software code, flow charts, techniques, specifications, development and marketing plans, strategies, and forecasts; [and](ii) as to BMC, and its licensors, the Product and any third party software provided with the Product…*Confidential Information does not include information that Recipient can show: (a) was rightfully in Recipient's possession without any obligation of confidentiality before receipt from the Discloser; [or] (b) is or becomes a matter of public knowledge through no fault of Recipient*…All materials containing Confidential Information must have a restrictive marking of the Discloser at the time of disclosure…Recipient may not disclose Confidential Information of Discloser to any third party, however, the Recipient may disclose Confidential Information to: i) its employees and employees of its parent and majority owned affiliates who have a need to know; and ii) any other party with the Discloser's prior written consent.

---

[7]     Robert Craig, a Procurement Project Manager for IBM, has been responsible for managing IBM's relationship with BMC at the global level since approximately 2006.  *See* Craig Dep. 4:09–4:23.

22-20463.8397

PX1 at 3 (emphasis added).  The MLA defines "Product" as "the object code of the software and all accompanying Documentation delivered to [IBM], including all items delivered by BMC to [IBM] under [the support services program]."  PX1 §1.  "Documentation" is defined to include "the technical publications relating to the software, such as release notes, reference, user, installation, system administrator and technical guidelines, included with the Product."  *Id.*

### b.   MLA Section 9: Disclaimer of Damages

21.    Just as the MLA limits the scope of acceptable behavior between the parties, so too does it limit their remedies in the event of breach in two important respects.  First, section 9: Disclaimer of Damages provides that:

> Except for violation of proprietary rights and confidentiality (section 8) and infringement claims (section 12), neither party, its affiliates or BMC's licensors are liable for any special, indirect, incidental, punitive or consequential damages relating to or arising out of this agreement, support, the product, or any third party code or software provided with the product (including, without limitation, lost profits, lost computer usage times, and damage to or loss of use of data), even if advised of the possibility of such damages, and irrespective of negligence of a party or whether such damages result from a claim arising under tort or contract law.  The foregoing limitation of liability will apply unless otherwise required by the local law of the country where the products are ordered.

*Id.* at 3.

### c.   MLA Section 10: Limits on Liability

22.    The very next section—section 10: Limits of Liability—limits "[e]ach party's liability arising out of or related to [the MLA] agreement, the product, or the use of the product . . . . to the greater of $5,000,000 or the amount paid or payable by the customer for the license to the applicable product giving rising to the claim."  *Id.* at 10.

### 2.    The 2015 OA

23.    As contemplated by the MLA, the parties signed several outsourcing attachments to define the terms of their business relationship.  Most relevant among them is the 2015 OA.  PX4.  Titled as an "Attachment" to the "Master License Agreement," the 2015 OA "addresses the terms

22-20463.8398

under which BMC grants to [IBM] the right to use the Products in its IT Services business."[8]  *Id.*

Acknowledging the parties' mutual "intent . . . to operate under a common set of terms and

conditions on a worldwide basis," the 2015 OA, "along with the [MLA]," was meant to "serve as

the master worldwide document[] for all applicable" software and software licensing orders.  *Id.*

Were there any doubt, though, the 2015 OA makes clear that "[a]ll Products provided under the

OA are governed by the OA, the [MLA], any Participation Agreement, and any applicable Order."

*Id*.  ("The parties agree that . . . this OA will govern all IT Services engagements by Customer and

that all prior Orders, Access and Use Agreements . . . entered into under the Prior Agreements will

now be governed by this OA and the [MLA].").  In short, the 2015 OA functions as the "single

point of control for the business terms related to the subject matter" contained in its four corners.

*Id.*

24.     The kinds of "IT Services" that IBM could pick from were detailed in section 1.1

of the 2015 OA, "IT Services Options."  That section required IBM to "elect one of . . . five options

regarding its use" of BMC's products: "(a) Access and Use — (sections 5.1, 5.2, 5.3, and 5.4), (b)

License Suspension — (section 5.5), (c) Customer owned Products — (sections 6, 7, and 8), (d)

Mirror Order — (section 11), or (e) Shared Hosting — (section 12)."  *Id.* §1.1.

25.     Pursuant to section 3 of the OA, IBM "may exercise its rights to access and use the

Products (including BMC Customer Licenses) through its Authorized Users."[9]  *Id.* §3.

26.     Section 3.1 supplements section 3 and ensures that IBM "may allow its Clients [*i.e.*,

AT&T in this case] and Clients' employees, agents, contractors and third party service

---

[8]     As Craig testified in his deposition, the outsourcing attachments "typically cover[ed] operational matters" and guided IBM in managing the day-to-day relationship with BMC.  *See* Craig Dep. 39:24–40:03.

[9]     "Authorized Users" is defined in section 2 of the OA as IBM's "employees, agents, contractors and third party service providers.  PX4.

16

providers . . . to have worldwide access to and use of the Products."  *Id.*

27.     Section 5 of the 2015 OA provides that it "will apply to [IBM]'s access and use of

the BMC Customer Licenses and apply retroactively to the point of first access by [IBM]."  *Id.* at

§ 5.

28.     IBM availed itself of BMC's "Access and Use" option.  Section 5.1 provided that

"BMC will allow [IBM] to use, access, install and have operational responsibility of the BMC

Customer Licenses . . . under the terms of the BMC Customer's license agreement with BMC for

*no fee* . . . provided that the BMC Customer Licenses are used *solely* for the *purposes* of supporting

the BMC Customer who owns such licenses."[10]  PX4 §5.1 (emphasis added).  While this language

limited how IBM could use AT&T's license, it required BMC to make certain disclosures to IBM:

> Except as set forth herein, the BMC Customer Licenses will continue to be
> governed by the terms, conditions and discounts of the BMC license agreement
> between BMC and the BMC Customer; notwithstanding the terms of the
> Agreement and the OA, Customer shall be bound by such terms of such license
> agreement.  BMC will make available to Customer a representative copy of its
> typical BMC Customer license agreement ("BMC EULA") and will inform
> Customer in writing of any material differences between the BMC EULA and BMC
> Customer's agreement after Customer provides written notice of Access and Use
> in accordance with the process detailed in section 5.3.

*Id*.  Elsewhere, in section 5.4, the 2015 OA also limited IBM's ability to displace BMC's products.

Specifically, the contract's non-displacement provision

> applies only to [IBM's] Access and Use of BMC Customer Licenses by [IBM's]
> strategic outsourcing division (or its successor) for the BMC Customers listed on
> Exhibit K (the "Exhibit K Customers").  Subject to the foregoing, [IBM] agrees
> that, while [IBM] cannot displace any BMC Customer Licenses with [IBM]
> products, [IBM] may discontinue use of BMC Customer Licenses for other valid
> business reasons.  All terms in sections 5.1, 5.2, and 5.3 apply to [IBM's] use of
> BMC Customer licenses belonging to any Exhibit K Customers.

---

[10]     "BMC Customer" is defined as "a third party which licenses the Products and which
becomes a Client at commencement of or during delivery of IT Services."  PX4 at 1.  Here, the
"BMC Customer" is AT&T, for whom IBM served as an IT outsourcer.

22-20463.8400

*Id.* §5.4.

29.     These restrictions and obligations were absent under other election options outlined in section 1.1, namely "(c) Customer owned Products — (sections 6, 7, and 8)." *Id.*  For a price, IBM could purchase its own license unencumbered by the restrictions attached to its "no fee" use of AT&T's license under section 5.  Should IBM want its own license, section 8.1 stated that it "will be entitled to a global minimum discount of 72% off the Listed Price in Exhibit H for all purchases of new licenses." *Id.*[11]  Exhibit H (Systems Management — Mainframe Products), in turn, lists the standard pricing available for each of BMC's products. *Id.*

30.     While the MLA contained various liability and damages restrictions, the 2015 OA also included a full-scale release for IBM for "claims of any nature whatsoever arising from or related to [IBM's] performance or failure of performance under" prior outsourcing attachments and the MLA, including "any and all Claims related to Customer displacements of BMC Customer Licenses to date." *Id.*

### 3.     The BMC–AT&T Licensing Agreement

31.     AT&T's mainframe utility software-related agreements with BMC include a 2007 Master Purchase Agreement ("MPA").  DX10.  The MPA "grants to AT&T a nonexclusive, irrevocable (except as provided ), perpetual . . . Enterprise-Wide license to use the Standard Software." *Id.* at 44.  Section 3.3 of the MPA gave AT&T certain assignment and delegation rights.  Specifically,

> [n]either Party may assign, delegate, or otherwise transfer its rights or obligations
> under this Agreement . . . without the prior written consent of the other Party, except
> as follows with notice: (a) Without securing the consent of the other Party, either
> Party may assign its rights, or delegate its duties, or both, in whole or in part, (i) to
> any present or future Affiliate of the assigning Party; or (ii) to any third party that

---

[11]     The minimum discount to which IBM would be "entitled" for BMC products would downgrade to 35% off the list price in the event the parties failed to reach a renewal agreement following the OA's termination date.  PX4 at 10.

22-20463.8401

assumes the operation of or otherwise acquires any substantial portion of the business of the assigning Party affected by this Agreement or an Order provided that in either (a)(i) or (ii) above, the assignee assumes all obligations under this Agreement or Order and if the assignment is for Materials the assigning entity no longer uses the assigned Material; and (b) Supplier may subcontract its performance…Any assignment, delegation or transfer for which consent is required hereby and which is made without such consent given in writing will be void.

The provisions of the foregoing paragraph are not applicable in the event a third party ("Outsourcer") which by purchase, lease, outsourcing or otherwise, assumes the operation, administration and/or management of any substantial portion of the business of AT&T . . . for the purpose of providing *data processing services* to AT&T or an Affiliate ("Outsourcing").  In the event of an Outsourcing, [BMC's] consent shall be required and shall not be unreasonably withheld provided that the Outsourcer agrees in writing with [BMC] to be bound by the terms of this Agreement and the applicable Order and only uses the Material for the sole benefit of AT&T or the applicable Affiliate by providing data processing services to such entity.

DX10 at 10–11.

32.     Under the MPA, "services" meant "any and all labor or service provided in connection with this Agreement and an applicable Order, including but not limited to, consultation, engineering, installation, removal, maintenance, training, technical support, repair, programming," among others.  *Id.* at 8.

**4.     The Standard BMC EULA**

33.     BMC's standard EULA was considerably shorter than the company's agreement with AT&T.  *Compare* DX10 (sixty-six pages), *with* DX7 (twelve pages).  It did not contain the same assignment and delegation rights as the BMC-AT&T licensing agreement and, in fact, (subject to exceptions not relevant here) stated that the customer "may not assign or transfer a Product separate from the applicable Agreement and License, and may not assign or transfer an Agreement or a License."  DX7 at 4.

**D.     IBM's History of Displacement and the Displacement Concerns Between the Parties**

34.     Because BMC claimed that IBM fraudulently induced it into signing the 2015 OA,

19

the parties devoted substantial attention to their prior course of dealings and each other's subjective understandings of the contract language, specifically section 5.4's non-displacement language. "Non-displacement has always been a contentious issue between BMC and IBM since 2008," Craig Dep. 49:15–49:16, in no small part because IBM had a general desire to replace BMC's software with its own at outsourced accounts. *See* Stanton Dep. 57:01–57:08. Thus, in addition to reviewing the at-issue contracts, the court reviews the parties' interpretive evidence, including IBM's prior displacement conduct, the negotiations leading up to the 2013 OA, IBM's displacement at AT&T through Project Swallowtail, the 2015 OA negotiations, and how IBM talked about displacement, both internally and externally.

### 1.    IBM Displaces BMC at Bank of Ireland

35.    Before the instant dispute, BMC and IBM ran into issues over contractual non-displacement restrictions over a decade ago involving a different mutual customer: Bank of Ireland ("BoI"). *See* Trial Tr. 206:02–06 Mar. 16, 2022 (Jones); Trial Tr. 14:21–15:08 Mar. 21, 2022 (Sweetman). As IBM's John Sweetman tells it, BoI wanted to transition away from using BMC software on its mainframe systems and toward IBM software. *See* Trial Tr. 15:01–17 Mar. 21, 2022 (Sweetman). At the time, IBM worked as BoI's IT outsourcer; the MLA and a 2008-era Outsourcing Attachment containing the same non-displacement language present in the 2015 OA governed IBM's relationship with BMC. *Id.* 15:16–17 (Sweetman). *See generally* PX2. Regarding that language, IBM's John Stafford, in an internal e-mail, explained that the language was "very clear" in limiting "what [IBM] [is] permitted or not permitted to do in situations where we take over a client's footprint." PX460.

36.    In late 2011 or early 2012, BMC caught wind that IBM, in its capacity as BoI's IT outsourcer, might be displacing BMC's products with IBM's own. *See* DX152 at 3. BMC

executives e-mailed their counterparts at IBM raising concerns that IBM's conduct contravened the 2008 OA. *Id.* More than a year later, on March 19, 2013, BMC's Chris Alexander, who served as the IBM Strategic Account Manager, e-mailed BMC executives about IBM's position on the BoI displacement project. DX149 at 1. In his summation, "IBM asked BoI to uninstall all BMC [software] before IBM came on . . . and took over," a task that BoI only partially completed. *Id.* Nevertheless, IBM "then argued that BoI solely and independently removed BMC products." *Id.* IBM characterizes this e-mail as evidence of its "consistent[]" advisement of BMC that it believed the non-displacement provision authorized customer-directed displacements, *i.e.*, where the mutual customer requests IBM to displace BMC's products with its own products.[12] *See* Dkt. 612–8 at 13–14; Trial Tr. 19:23–20:01, Mar. 21, 2022 (Sweetman) (Q: "Based on [these e-mails], in IBM's view, who was causing the displacement at Bank of Ireland?" A: "The Bank of Ireland."). In any case, IBM conducted the BoI displacement without buying a license. Trial Tr. 36:21–37:10, 30:25–31:14, Mar. 21, 2022 (Sweetman).

### 2. The 2013 OA Negotiations

37.    As Sweetman testified, BMC raised some of its concerns about IBM's displacement activities at BoI in the lead up to, and during, the negotiations surrounding the 2013 OA. Trial Tr. 20:05–07, Mar. 21, 2022 (Sweetman). Two weeks after Alexander's e-mail, on March 31, 2013, the parties executed the 2013 OA. PX3. Like the 2008 OA, the 2013 OA provided IBM several

---

[12]    The court notes that the e-mail does not squarely support IBM's reading in two important respects. First, BMC's understanding that IBM "asked BoI to uninstall" its software—which IBM's quoted language neglected to acknowledge—suggests that IBM might have requested the displacement, undermining IBM's contention that BoI directed the displacement. Second, and more importantly, the e-mail can also be read as evidence that IBM believed that the non-displacement provision limited what it could do, but not what mutual, third-party customers may do, which is consistent with both parties' contemporaneous understanding of the non-displacement language. DX149 at 1–3. In that sense, if IBM believed that it could serve as BoI's agent in conducting the displacement—the position it has adopted in this litigation with respect to BMC's fraudulent inducement claim—it would not have asked BoI to remove BMC's products, itself.

ways to use BMC's products when serving as an IT outsourcer.  For the option to "access and use" a mutual customer's BMC products for "no fee," the 2013 OA included a nearly identical non-displacement provision that prohibited IBM from displacing BMC's products.  *Compare* PX3 at 2 ("Customer agrees that while Customer cannot displace any BMC Customer Licenses with Customer products, Customer may discontinue use of BMC Customer Licenses for other valid business reasons . . . ."), *with* PX2 at 2 ("IBM agrees that while IBM cannot displace any Products with IBM products, IBM may discontinue use of Products for other valid business reasons.").  The 2013 OA also included the same alternative path whereby IBM could purchase its own licenses— which did not contain any displacement restrictions—for a discounted price instead of operating under the BMC customer's licenses for free.  PX3 at 1–3; PX48 at IBM00078246 (IBM internal guidance on 2013 OA explaining that "[w]here displacement is desired by the Client," the "[c]ostly [a]pproach" is to "[n]egotiate with BMC to acquire equivalent BMC licenses to be held by IBM that do not include the restrictive language" contained in "client-licensed BMC products"); PX94 at IBM00081140 (IBM document explaining that if IBM wanted to displace a joint-customer's license then it needed to purchase its own license).

38.    During the negotiations, IBM unsuccessfully sought to "remov[e] . . . all migration restrictions," *i.e.*, the OA's non-displacement provision.  PX22 at 5; PX28 at 6 (noting that BMC has "aggressively sought to enforce [the non-displacement] provisions" and that "executive direction for renegotiation is to focus on removing the [non-displacement] restrictions"); PX30 at 1 (IBM employee internally stating, prior to the 2013 OA's execution, that she "didn't think [IBM was] agreeing to another non-displacement clause – in fact I thought we agreed to negotiate out of that"); PX34 at 1–3 (Sweetman e-mail noting that an "access and consent agreement . . . allows IBM to access the software without a fee, but also bars IBM from displacing the BMC products

with IBM products for the duration of our services agreement" and that this displacement restriction "is being discussed in our worldwide negotiations with BMC but there is no change at present to current arrangements.").

39.     While negotiating the 2013 OA, IBM even proposed adding contractual language specifying that IBM was "not restrict[ed] . . . from executing on IBM customer requests with regard to any decision to discontinue or displace as determined by the IBM customer."  PX475 at IBM00061376.  BMC, however, refused and "despite very senior level discussions amongst [the] companies," there was "no change on the non-displace."  PX37 at 3; PX33 (IBM internal guidance noting that "BMC is not willing to remove current non-displacement language"); *see also* DX167 (e-mail from BMC's Brian Jones stating "I have also updated the non-displacement language to make sure it is the same as the 2008 agreement as agreed" by BMC's and IBM's then-negotiators); DX164 at 2 (in response to IBM's request to "remove or amend . . . the current non-displacement language," BMC responded that its "position is unchanged as it related to non-displacement"); Craig Dep. 168:22–169:13 (IBM wanted to get rid of the non-displacement provision, but BMC would not agree to it without "additional consideration" which "would have cost [IBM] a hell of a lot more money.").

40.     Within four days of executing the 2013 OA, IBM began strategizing internally about how it "may cho[o]se to manage the non-displacement language overall as a business" despite there being "no change on the non-displace."  PX37 at IBM00062682, 684; *see also* PX38 (internal IBM e-mail wherein IBM account executives discussed "put[ting] BMC to the test on the additional non-displace restrictions); PX52 at IBM00063460 ("As migration projects get on, the 'other valid business reason' text from non displacement clause will need to be leveraged in discussion [with] BMC."); PX462 (e-mail from Bruno Hibert, the Vice President of Facilities and

22-20463.8406

Software Infrastructures in IBM's Strategic Outsourcing division, noting that "this reads as a great 'test case' for 'other valid business reasons.'").  Two months after the 2013 OA was signed, IBM began carrying out its strategy to "manage" the non-displacement language, informing BMC that it believed the non-displacement provision did not "clearly align" with "the intent and the principles of US competition law."  *See* PX465 at IBM00077478–79.  BMC immediately rebuffed this claim, and BMC's Brian Jones, an outsourcing executive, reminded IBM of the other options it had under the OA to displace products.  *Id.* at IBM00077476–78.  IBM lawyers also drafted what IBM employees referred to as the "BMC White Paper" regarding the "[p]lanning, communication, and strategy relating to guiding IBM employees in the appropriate management of specific vendor/competitor issues."  *See* PX80 at IBM00078423.

### 3.   IBM Displaces at National Australia Bank

41.    No later than August of 2013, and after the parties executed the 2013 OA, BMC learned that IBM was involved in another displacement project involving a mutual (but longtime BMC) customer, National Australia Bank ("NAB").  DX192 at 4–6; DX193 at 1 (noting that NAB informed BMC that IBM was "actively displacing the majority" of BMC's software).  On August 1, 2013, Andrew Wiltshire, BMC's Sales Director in its GOSI division, e-mailed IBM personnel asserting that IBM's upcoming displacement of "up to 19 of the BMC tools at the NAB" directly contravened the outsourcing attachment both parties had signed.  *Id.*  Though Wiltshire noted his preference "to work to a commercial solution over a contractual one," IBM evidently did not respond within a week, and BMC's Jones escalated the matter to his counterparts at IBM.  *Id.*

42.    As with BoI, IBM did not buy product licenses to perform the NAB displacement project.  Trial Tr. 36:21–37:10, 30:25–31:14, Mar. 21, 2022 (Sweetman); Trial Tr. 254:02–04, Mar. 14, 2022 (Ah Chu).  Instead, it appears that the parties were able to come to alternative

22-20463.8407

business resolution over the dispute, as evidenced by the 2015 OA's release of claims against IBM. Trial Tr. 254:25–255:01, Mar. 14, 2022 (testifying that the NAB dispute "ended up being part of the release . . . negotiated as part of the 2015" OA) (Ah Chu).

### 4. Project Swallowtail

43.     IBM's displacement opportunities did not end with NAB.   In April 2013, immediately after signing the 2013 OA—and unbeknownst to BMC—IBM began communicating with AT&T regarding a secret  AT&T project, codenamed "Project Swallowtail."  Cattanach Dep. 56:18–57:04; PX39 at IBM00000794.  The leadup to Project Swallowtail functionally advanced in two stages.  In the first, in 2014, AT&T solicited IBM's involvement in a displacement project but ultimately pulled out of negotiations.  In the second, in 2015, AT&T expressed renewed interest in integrating IBM's software onto its mainframe computers.   IBM's eventual execution of a contract with AT&T to displace BMC's products with its own and its subsequent signing of the 2015 OA with BMC expressly prohibiting it from displacing BMC's products with its own gave way to the claims raised in this case.

### a. Project Swallowtail: Stage 1

44.     The purpose of Project Swallowtail was "for IBM to migrate the BMC software products currently installed in the AT&T environment to [alternative] software products," primarily IBM's competing software products.  PX18 at IBM00000139; PX41 at IBM00061937; PX39 at IBM00000794; PX68 at IBM00079049 ("I believe the intent at AT&T is to remove 100% of the existing BMC [software] estate and replace with IBM tools.  This is being done at the direction of AT&T with the intent that we standardize on the platform AT&T has chosen which includes the IBM products in scope."); *see also* Shell Dep. 19:14–20:23 ("Q. The general scope of the project was to replace BMC software products with other products for AT&T, right? A. Yes.

22-20463.8408

Q. And some of the products that would be replacing the BMC products were IBM products, right? A. Yes."); Brickhaus Dep. 95:05–95:15 (agreeing that Project Swallowtail was a displacement of BMC software products with "IBM products and . . . some CA [Technologies] products"). Indeed, Project Swallowtail explicitly called for IBM to displace AT&T's BMC products. *See* PX57 at IBM00063804 ("scope" of Swallowtail included "migration of all BMC Mainframe Software to other products across the 3 AT&T [mainframes]"); PX56 at IBM00063957 (IBM internal Swallowtail description: "Software takeout of BMC across the [AT&T] enterprise").

45. Due to the Project's "sensitive nature," IBM signed a non-disclosure agreement with AT&T and instructed its employees to refrain from acknowledging the Project or its purpose outside of the Project Swallowtail Team. *See* PX41 at IBM00061934 (IBM giving AT&T confirmation on April 15, 2013, it "shall comply with the [confidentiality obligations] . . . with respect to [IBM's] participation in AT&T's Swallowtail Project"); PX55 at IBM00066638 ("Please remember we should not discuss the Swallowtail project with anyone outside of those involved with preliminary findings . . . .").

46. Initially, IBM performed "an assessment . . . and analy[sis] [of] [AT&T's mainframe] software products in order to determine the operational feasibility and financial cost to remove or replace such products." PX41. Subsequently, on September 4, 2013, at AT&T's request, IBM e-mailed AT&T its "proposal for the AT&T Swallowtail project." PX67. That plan promoted IBM's mainframe products and explained why AT&T should choose IBM's products over BMC's. *Id.* at IBM00063703 ("Why IBM for BMC Replacement Software Group Value.").

47. Though IBM thought that participating in Project Swallowtail could further its long-term growth and expansion goals, there is no indication that it *initiated* the partnership with AT&T. *See* PX72 at IBM00076969; PX68 at IBM00079048–09; PX476 at IBM00076329; PX82

at IBM00068683 ("Clearly last year's big play was our contract extension(s) coupled with the BMC take-out *opportunity* we are now targeting 1Q'14." (emphasis added)); PX38 at IBM00063091; PX248 at IBM00090399 ("The software part of [Project Cirrus], is around $60M+ in additional revenue."); PX72 at IBM00076969 ("[I]t is clearly the right move to remove a competitor from this environment," and its "best scenario is that our plans include displacement of 100% of the current BMC footprint."); *see also* PX67 IBM00063692 (proposing to AT&T that "all 20 BMC Products . . . be migrated utilizing a common migration approach"); PX476 at IBM00076329 (listing benefits of "putting IBM first" and using IBM software in migration projects); Shell Dep. 75:05–22 (IBM wanted the work associated with Project Swallowtail because it needed the revenue); *id.* at 120:14–122:10 (stating that he "wanted to get the business" from AT&T rather than having AT&T renew with BMC).  IBM also described Swallowtail as a "project[] to drive growth" at IBM by "displac[ing] BMC in [AT&T's] Mainframe environment." PX82 at IBM00068683–84; *see also* PX38 at IBM00063091 (internal IBM e-mail discussing efforts to try to get a mutual IBM-BMC customer "to use IBM [software] in place of the BMC products which they are currently using" because it is "an additional source of revenue for [IBM]").[13]

48.     Despite the excitement from IBM's AT&T team about this "BMC Takeout Opportunity," certain IBM executives and its BMC-facing team were "concerned" because of the "very specific verbiage around software replace" in the 2013 OA.  PX72 at IBM00076967–69 (IBM executives agreed Swallowtail "would be an Excellent BMC Replace Opty—but, are also concerned"); *id.* at IBM00076968 ("example of Excellent Oppty – that is riddled with concern

---

[13]     "Project Cirrus" was the code name for an AT&T initiative to restructure IBM's mainframe IT services contract with AT&T.  PX97 at ATT_00000967–68.  AT&T's working strategy for Cirrus was to transition IBM's mainframe IT services contract to a "consumption model that includes all 3rd party software, new labor and hardware options."  PX97 at ATT_00000971.

22-20463.8410

over Legal inhibitors/etc. . . . .").  Still, IBM continued to negotiate with AT&T to further a deal on Project Swallowtail.  *See* Shell Dep. 238:10–239:1 (IBM offered various incentives to make the price of Project Swallowtail more attractive to AT&T to encourage AT&T to close on the deal by the end of the year); PX064 at 3 ("Project Swallowtail – Additional Consideration for 3Q'13 Contract Signature").  Notwithstanding IBM's apparent enthusiasm, in March 2014, AT&T decided not to proceed with Project Swallowtail, opting instead to renew its agreement with BMC. *See* DX-245; PX85; PX84 at IBM00068614-616; PX12 at 1–19.

49.     Upon hearing that AT&T would not proceed with Project Swallowtail, IBM voiced its frustrations about losing the project and immediately started strategizing ways to "flip [AT&T's] decision back to IBM."  PX84 at IBM00068613; *see id.* ("[W]e need to fight to try and get back in this or make the decision that it is not financially viable."); *see also* PX104 at IBM00110239–40 ("About a year ago, there was a[n] Engagement Project called "Swallowtail" that was specifically intended to displace BMC software on the [AT&T] account (i.e. replace with IBM software solutions).  The client ended up signing a new deal with BMC and we lost the new business opportunity.").  IBM's desire to perform Project Swallowtail was so great that it offered to perform Project Swallowtail for free.  PX84 at IBM0068612 (noting that IBM offered its migration services to AT&T "at no charge (free)").

### a.  Project Swallowtail: Stage 2

50.     Around February 2015, AT&T changed its mind and decided to restructure its mainframe environment after all, at which point it approached IBM about a new initiative code named Project Cirrus.  PX97 at ATT_00000967-968.  AT&T's working strategy for Cirrus was to transition IBM's mainframe IT services contract to a "consumption model that includes all 3rd party software, new labor and hardware options," reaping "drastic[]" savings on "mainframe total

22-20463.8411

costs" in the process.  PX97 at ATT_00000969.  And it wanted IBM to lead the project because "IBM ha[d] skills and expertise" necessary "to successfully execute the project."  *See* Conway Dep. 11:11–11:17.  AT&T specifically wanted to replace BMC's products with other vendors' products primarily out of cost considerations.  *See id.* 18:03–19:25 ("What triggered the development of the Swallowtail plan to transition from the BMC products was negotiations . . . in 2013" wherein AT&T "could get the financial terms . . . that they wanted in the contract, so finance asked us to look at alternatives to BMC.").

51.     Shortly thereafter, on March 10, 2015, Joe Dzaluk, a Vice President in IBM's Global Technology Services (GTS) unit, contacted various strategic outsourcing account teams for the purpose of "assessing [IBM's] ongoing relationship with BMC."  PX104 at IBM00110241. Dzaluk requested that IBM's account teams help "explor[e] instances in which clients have expressed an interest in alternative technologies that do not include BMC products . . . includ[ing] replacing BMC software with other products or services performing similar functionality."  *Id.* Dzaluk further stated that "[IBM] need[ed] [IBM's account teams] to begin working with your client to form an assessment of the client's interest in considering alternatives and the size, scope, timeline, and impacts a project like this might have on your day-to-day operations."  *Id.*  Guy Skinner, IBM's Director and Sr. Delivery Project Executive for the AT&T account, responded to Dzaluk's request by informing him that "[a]bout a year ago, there was a[n] Engagement Project called 'Swallowtail' that was specifically intended to displace BMC software on the account (*i.e.*, replace with IBM software solutions)."  PX104 at IBM00110239–40.  Skinner then told Dzaluk that "[t]he client ended up signing a new deal with BMC and [IBM] lost the new business opportunity."[14]  *Id.*

---

[14]     Skinner's e-mail also noted that "the BMC software is retained by the AT&T client and they have a software license agreement directly with BMC."  PX104 at IBM00110240.

22-20463.8412

52.    On March 26, 2015, Jason Cattanach, an Associate Project Executive for IBM's GTS division, sent an e-mail with a PowerPoint presentation titled "GTS Savings for AT&T Challenge." PX113. That slide show listed "transfer architectural control and software to IBM," resulting in "savings and simplification via Project Cirrus methodology" under the heading "Mainframe." *Id.* at IBM00104420; *see also* Stafford Dep. 206:24–209:12 (confirming replacing BMC software with other products, including IBM products, at IBM strategic outsourcing accounts was part of IBM's broader effort to identify possible displacement projects). Shortly after Skinner informed Dzaluk that IBM lost Project Swallowtail when AT&T signed a new deal with BMC, IBM resumed discussing Project Swallowtail with AT&T executives as part of the larger Project Cirrus. PX114 (e-mail from AT&T noting that it "plan[ned] to displace all of the. . . . BMC products before their next renewal date"); *see* Conway Dep. 25:24–26:03 (describing Project Cirrus as a "transition plan" included in "the agreement that we signed with IBM in 2015").

53.    To be sure, like before, IBM wanted to participate in Project Swallowtail's second iteration. Project Swallowtail furthered IBM's strategic plan to "[a]ggressively [p]ursue migrations to competing [IBM] solutions" as part of IBM's strategic outsourcing division's "Top Spend Suppliers Initiative." PX89 at IBM00051438-442; *see id.* (noting that "IBM offers alternatives for most BMC products"); *see also* PX91 (Craig stating "I have a concern from these charts in that there is an entry 'IBM offers alternatives for most BMC products.' While this is true there should have been a caveat that where IBM does not own the BMC license then we cannot displace their products."). IBM had a "dedicated team . . . co-sponsored by GTS" that aggressively pursued these opportunities at outsourced clients with the goal of displacing third-party software products licensed from other software providers with IBM products. PX219 at IBM00088635-636 ("IBM teams are committed to ensure that the best ISV SW to IBM SW migration case pricing

is available to your deal.").

54.     Further, IBM's senior management for its strategic outsourcing division implemented a strategy to "pursue exclusion of all BMC [software] from [IBM's] engagement solutions." PX111 at IBM00050586.  And, by participating in Project Swallowtail, IBM thought it would financially benefit.[15]  *See* Shell Dep. 284:03–285:08; PX216 at IBM00007356–57 (internal IBM resource showing that IBM valued the outsourcing contract between it and AT&T, including Project Swallowtail, at approximately $800 million between July 2015 and December 2020, with IBM expected to earn profits nearing $300 million.); PX17 at IBM00000326 (milestone payment); Conway Dep. 40:20–41:03 (discussing AT&T's payments to IBM); PX125 at IBM00105494 (IBM internal resource illustrating AT&T revenue projections); Shell Dep. 284:03–285:08 (the plan to execute Project Swallowtail was back on as part of Project Cirrus, which was a $860 million contract); PX248 at IBM00090399 ("$60M+ in additional revenue" for software).

55.     Ultimately, on June 26, 2015, AT&T and IBM formed a partnership over the BMC displacement, and incorporated Project Swallowtail into the larger Project Cirrus framework.  *See* PX16; PX216 at IBM00007356; Cattanach Dep. 117:13–18:04 (testifying that AT&T started paying IBM more after execution of Project Swallowtail).  The executed agreement for Project Swallowtail explicitly stated that "[t]he purpose of this project is for IBM to migrate the BMC software products currently installed in the AT&T environment to the software products listed in section 4."  PX18 at IBM00000139.[16]

---

[15]     The evidence shows that, as the "project manager" for Project Swallowtail, IBM functioned as "the overall coordinator for conversion activities."  Brickhaus Dep. 107:06–18; 119:20–23.  BMC claims that this, coupled with IBM's desire to participate in Project Swallowtail, "makes clear that IBM directly influenced . . . the decision to implement Project Swallowtail."  *See* Dkt. 723 at 24.  Contrary to this interpretation, the court reads this evidence to, at most, show that IBM was directly involved in Project Swallowtail's implementation.

[16]     Section 4 of the Project Cirrus (or Swallowtail) agreement is comprised mostly of IBM products and sub-products that were expressly identified as replacements for the BMC products.

22-20463.8414

### 5.    The 2015 OA Negotiations

56.    While IBM pursued negotiations with AT&T regarding Project Swallowtail in 2015, at that same time, IBM pursued negotiations with BMC to renegotiate the 2013 OA.  IBM executed its Project Swallowtail agreement with AT&T in June 2015.  But, by that point, IBM and BMC had failed to reach an agreement on the renegotiated OA.  So, before IBM executed what would become the 2015 OA with BMC, it knew that it was going to displace BMC's products with its own at AT&T.  This, in turn, influenced IBM's negotiation goals with BMC.

### a.    IBM's Goals in the 2015 OA Negotiations: Remove or Restrict the Scope of the Non-Displacement Clause

57.    Rick Clyne, a professional negotiator, led negotiations for IBM.  According to Clyne, the re-negotiation of the 2013 OA turned, in part, on the non-displacement language.[17]  *See* PX98 at IBM00124943 (IBM internally noting that buying IBM licenses to displace was an "Option[] on the Table" but one negative was the "High Cost to Duplicate Clients environment as IBM owned"); PX121 at IBM00038707; Stafford Dep. 224:16–25; *see also* PX196 at IBM0012448 (IBM presentation: because AT&T remained on the list of accounts for which displacement was prohibited, IBM risked incurring fees to perform displacement).  As evidenced by internal e-mails with IBM executives, including Dzaluk, Clyne was aware of the non-compliance complaints BMC had raised.  In one e-mail, Dzaluk wrote that "[o]ver the last 5 years, we have had numerous global claims from BMC, Microsoft and others claiming hundreds of millions and have always settled for a small percent of the claim."  PX109 at IBM00038867.  In response, Clyne wrote:

---

PX18 at IBM00000142–45; *see also* Trial Tr. 70:12–71:02, Mar. 16, 2022 (Román).

[17]    Other issues were also negotiated, including IBM's shared hosting rights, which took on greater urgency than the displacement concerns.  Clyne Dep. 230:05–230:15; Calo Dep. 10:22–11:3, 55:9–14; PX106; PX108.  With respect to those rights, Clyne testified that IBM "[f]ar, far exceeded" its goals.  Clyne Dep. 139:04–139:08.

22-20463.8415

Trust that I would expect settlement payments for alleged, or even real, past-non-compliance issues to always be for pennies on the dollar.  (A $12M+ non-compliance claim by BMC at AMEX last year was settled for $0.)  It's the future frameworks for shared environments as well as non-displacement terms, such that we finally get out of the business of writing checks to these guys, that makes this a really steep climb.  But we'll see where we land.  (For clarity: this week is to address shared environments only.)

PX109 at IBM00038867.

58.     Clyne's e-mail reflected IBM's goal to preempt non-compliance issues resulting in settlements at the outset by removing displacement restrictions entirely.  *See id.*  IBM's own internal guidance documents—which were labeled as "IBM Confidential/Prepared for IBM Attorney"—reflected this negotiation need following IBM's execution of the Project Swallowtail contract with AT&T.  Those documents noted that the 2015 OA "need[ed] to ensure that IBM may displace a BMC product with an IBM product, if client directed."  PX170 at IBM00124599.  *See* PX196 at IBM0012448 ("Proposal will still limit IBM's ability to offer Displacement at up to fifty-four named customers. . . . Potential financial impact of paying $140m fee for planned displacement [at] AT&T not in pricing case [for Project Swallowtail].").

59.     Though the non-displacement language from the 2013 OA covered approximately 700 mutual customers, Clyne understood that BMC was "agreeable to . . . reducing the . . . list [to] 50" because it was "just fed up with this crap about, you know, IBM's interpretation [of] the language and whatnot" and did not "want to have to spend any more attorney time" on displacement issues.  *See* Clyne Dep. 55:13–55:19, 148:02–148:23 (explaining that BMC offered to provide a list of accounts for whom "IBM cannot displace BMC software . . . under any circumstances, period.").  Thus, Clyne understood that, with respect to a handful of customers, BMC insisted that "under no uncertain circumstances c[ould] IBM ever replace BMC software at

any of th[ose] accounts for any reason."[18]  *Id.* 55:21–55:23, 249:19–250:12 (explaining that BMC "wanted [the contract] to be as clear as it possibly could be that . . . IBM was prohibited from displacing BMC at any of the . . . accounts, regardless even if the customer asked for it").  To that end, BMC proposed language that would contractually neuter IBM's "interpretation" of the existing language that IBM argued enabled customer-directed displacements.  *See id.*

60.     For its part, IBM initially sought "the complete elimination of the [non-displacement] clause."  *See id.* 36:17–36:23, 54:01–54:03, 54:23–55:02; PX156 at IBM00097161 ("IBM wants the non-displacement language in the current OA fully removed from our agreement with BMC."); PX163 at IBM00032987-92 (negotiating whether "non-displacement [will be] completely removed").[19]  When BMC rejected that, IBM suggested alternative language that would permit it to displace BMC's products with IBM's products at the customer's direction.  Clyne Dep. 287:07–287:14.  Even though IBM "beat that drum constantly" during the negotiations, BMC was unwavering in its rejection of the customer-directed allowance.  *See id.* 287:14–287:21, 320:09–320:16 (explaining that IBM sought language that would enable it "to displace BMC with IBM products" if a "customer asks" but that "BMC would not agree [to that proposal] and it never made it into the final agreement").

---

[18]     BMC initially sought stronger non-displacement language than that included in section 5.4 of the 2015 OA but settled for the existing language of the 2013 OA.  *See* Clyne Dep. 203:01–203:13.

[19]     IBM pursued the complete elimination of the non-displacement clause in the days leading up to the execution of Project Swallowtail.  *See* PX162 at BMC-000008614-8616; PX163 at IBM00032995 (e-mail from Clyne stating, "Just a heads-up regarding the criticalness of obtaining agreement to have all reference to non-displacement removed and the importance of getting the confirmation to me tonight . . . however late it might be."); PX163 at IBM00032993 (e-mail from Clyne, three days prior to Swallowtail's execution: "[I]f you can deliver where we landed on Friday, . . . I am now 90% certain it will be accepted by IBM and we'll be done.  It's EXTREMELY urgent, however, that I receive e-mail confirmation asap . . . .") (emphasis in original).

22-20463.8417

61.     Citing the parties' troublesome "shared history," BMC rejected IBM's proposal. PX163 at IBM00032991–92.  Given the impasse between them with respect to changes to the contract language, BMC and IBM compromised by retaining the existing non-displacement language and narrowing down the number of accounts to which it applied.  Clyne Dep. 287:25–288:15, 291:04–291:10 (explaining that part of the compromise was "that the parties agreed to keep the original language"); *see also* PX163 at IBM00032988; Trial Tr. 208:21–209:5, Mar. 14, 2022 (Ah Chu).

62.     As BMC confirmed in its negotiations with Clyne, limiting the non-displacement language would still require IBM to "pay BMC the cost of the license fees and one year's support at a price discounted . . . per the OA" when IBM sought to "replace BMC software at IBM outsourcing accounts."  PX132.  But, if that were the case, IBM would have to purchase the licenses directly from BMC to fulfill its Project Swallowtail obligations and comply with the BMC contract.  At the direction of IBM's executives, Clyne proposed the removal of AT&T and three other accounts from the narrow list of mutual customers covered by the non-displacement language.  BMC wanted to know why:

> Q.     [W]hen you asked for the [accounts] to be removed, what as BMC's response?
> A.     Why.
> Q.     And what did you tell them?
> A.     As I had foretold IBM, that would be their very first question.
> Q.     And what did you tell them?
> A.     I diverted.  I said the business wants those [accounts] out, a nonresponsive response.
> You know, I wasn't going to lie and so I — that was the response I gave.

*Id.* 61:17–16:20.  Clyne may not have lied, but he did obfuscate.  Clyne's strategy in including the other three accounts was to conceal the importance of AT&T to IBM's overall business goals:

> [I]f I was to ask for just AT&T then I would highlight it even more than I wished
> to as negotiator for something that my client wanted removed.  So, I informed the
> executives that I was going to add three other accounts just to have AT&T in the
> mix so that the focus wouldn't be just on AT&T.  And I, as a negotiating tactic,
> added [the three other accounts.]

22-20463.8418

*See id.* 73:06–73:13.; *see also* PX200; PX205.  But as Clyne acknowledged, his correspondence with BMC omitted "the fact that IBM was intending to displace BMC's products at AT&T . . . even though [he] knew that at the time."[20]  Clyne Dep. 196:21–197:03, 101:01–101:05. Eventually—in August 2015, approximately two months after IBM executed the Project Swallowtail contract—IBM's displacement concerns could be distilled to one account: AT&T. *See id.* 95:21–95:23, 289:09–289:14 (explaining that IBM told him not to worry about the other accounts because they "just need[ed] AT&T"); PX203 (removal of AT&T from list of protected accounts a "[m]ust have"); PX205 (removal of AT&T "an absolute must"); PX174 ("Finalize displacement verbiage and agreement on 50 clients (ATT to not be on the list)."); PX183 at IBM00124379 ("In all cases, IBM must ensure that AT&T is not included on BMC's list of clients subject to non-displacement clause, when negotiating the current list of fifty-four down to fifty."). Importantly, IBM's efforts to remove AT&T from the list of fifty-four protected accounts significantly increased after June 26, 2016, when IBM and AT&T executed Project Swallowtail. PX18 at IBM00000139. *Compare* PX155 at IBM00124233 (June 16, 2015 IBM presentation stating non-displacement provision will be reduced to 50 accounts), *with* PX169 at IBM00124317 (June 26, 2015, updated draft of the same presentation emphasizing need to "ensure that AT&T is off BMC's list when bringing down the fifty-four currently on the list down to fifty").

63.    IBM's efforts to remove AT&T from the list of customers on Exhibit K subject to the non-displacement language failed because BMC was unwilling to contractually jeopardize its business relationship with AT&T.  Trial Tr. 195:16–24, Mar. 14, 2022 (Ah Chu) ("AT&T was just too strategic of a customer for BMC; and there were several attempts, I recall, from Rick Clyne to remove AT&T.  And each and every time he tried to remove them, it was flat out denied by

---

[20]    Clyne was in contact with IBM executives regarding the negotiations "[a]lmost everyday, sometimes on Saturdays and Sundays, too."  Clyne Dep. 198:24–199:03.

22-20463.8419

BMC."); PX213 ("The net is that BMC will not agree to remove AT[&]T . . . from the protected list, under any circumstances."); PX217 (IBM "would not relent on [its] insistence to discuss [BMC's] refusal to delete AT[&]T and Kaiser from the protected list"); DX-390 at IBM00028229 (BMC informing IBM that AT&T "is an unrealistic account to relinquish"); Bergdoll 52:16–54:20 (Exhibit K was "nonnegotiable" and "if there wasn't going to be a list" of protected accounts, BMC "wasn't interested" in executing the 2015 OA); Trial Tr. 195:16–19, Mar. 14, 2022 ("Q. To your knowledge, would . . . BMC have signed the 2015 OA if AT&T were not on Exhibit K, the list of customers covered by the non-displacement clause?  A. Absolutely not.") (Ah Chu).

64.    In any event, Clyne acknowledged in his deposition testimony that IBM did not plan on conforming its conduct to the contractual language:

> Q.    In your negotiations with BMC, you never told BMC that IBM was not going to abide by the non-displacement provision in the 2015 OA?
> A.    No, never told them that.  Never said that.
> Q.    But in fact, IBM's plan was not to abide by it, wasn't it?
> A.    That was the position that legal had taken.[21]

---

[21]    Clyne also explained that "IBM had gone on the record with Mr. Hagen's letter that they . . . didn't agree with the language that they had executed a couple months before in the 2013 agreement and went through with two more years of more claims [and] . . . more compliance issues" before agreeing to the same language in the 2015 OA. Clyne Dep. 146:02–146:13.  Though IBM's legal department communicated that the non-displacement clause was unenforceable and others in IBM claimed it was vague, Clyne acknowledged that IBM "very much" wanted the clause removed from the 2015 OA.  *Id.* 151:15–151:20.  Likewise, Clyne found IBM's position on the non-displacement language contradictory.  *See id.* 231:21–232:03 ("However, there were contradictions to IBM's position [regarding the non-displacement language] that IBM made in the course of the negotiations regarding that position.").  "In my experience as a business person and professional that if the agreement has been executed, then it's totally inappropriate to go back a month later, two months later and basically say, you know, the agreement we just signed all — you know, all bets are off.  We're not going to honor it."  Clyne Dep. 296:12–296:20; *see also id.* 103:10–19 (testifying the IBM "knew what [it was] signing").  Moreover, in Craig's deposition, he testified that he was unaware of the interpretation promulgated to BMC by IBM Legal was ever published in IBM's own internal guidance documents. Craig Dep. 202:04–202:16 ("I don't believe it was ever issued as a general guidance document.").

22-20463.8420

Clyne Dep. 111:10–111:19; *see id.* 113:11–113:21 (explaining that "IBM's conduct throughout the negotiations and the time spent on non-displacement claims by BMC" led Clyne to know that IBM was not going to comply with the 2015 agreement).  In that sense, Clyne did not believe that IBM negotiated the 2015 OA contract with BMC in good faith. *Id.* 117:19–118:12.

65.     Asked about the conflicting contractual obligations IBM might encounter if it signed one contract agreeing to displace BMC's products and another prohibiting it from displacing BMC's products, Clyne acknowledged that his "job [was] to negotiate and obtain what [his] client wants to achieve." *See id.* 103:10–103:11.  Compliance issues came "after the fact, after the agreement [was] signed." *Id.* 103:12–103:13.  Because he had "no control over" how IBM would perform its conflicting contractual obligations under Project Swallowtail and what became the 2015 OA, Clyne did not occupy himself with the issue: "throughout the seven months there were things that I discussed, advised against doing.  Some were listened to.  Some were not.  But at the end of the day, they know what they're signing and it's up to them to comply." *See id.* 103:10–103:19.  In Clyne's view, those tasked with complying with the contract included IBM Vice President Peter Lynt, Yvonne Calo, and John Stafford, among others. *Id.* 103:20–104:01, 204:20–204:24.

66.     Internally, IBM was considering proposing a modification to the non-displacement language that would allow displacement for a flat percentage fee. *Id.* 62:04–62:08.  That idea originated with Stafford, but Clyne cautioned that "the penalty per the contract per BMC is that if . . . IBM is found to have actually breached the contract . . . the penalty was that IBM had to pay for a license and one year's maintenance . . . I said, John, you know . . . that's awfully steep." *Id.* 62:18–62:24.

38

### b.   IBM's Execution of the 2015 OA

67.     Ultimately, the parties significantly reduced the provision's scope from hundreds of mutual customers to a defined list of fifty-four BMC customers, which are identified in Exhibit K of the 2015 OA and include AT&T.  PX4 § 5.4; *see* Clyne Dep. 43:21–45:05 ("Q. In the 2015 OA [the non-displacement provision] was limited to a list of fifty-four? A. Correct.  Q. Was that limitation in scope valuable to IBM?  A. Very much so.").  When the contract was executed, only eighteen of those customers were also IBM outsourcing customers.  *See* PX228 at IBM00124048; Trial Tr. 208:21–209:05, Mar. 14, 2022 (Ah Chu).

### 6.     How IBM Talked About Displacement

68.     How IBM talks about the non-displacement language found in the 2008, 2013, and 2015 OAs depends on whether IBM is talking to itself or to BMC.

### a.     How IBM Talked About the Non-Displacement Language to BMC

69.     On May 23, 2013, IBM Senior Counsel Thomas Hagen sent an e-mail to BMC's legal counsel shortly after the parties signed the 2013 OA.  *See* PX53 at IBM00081348.  In it, Hagen explained that IBM "interpret[ed] the intent of [the non-displacement] clause . . . to prevent IBM from unfairly competing with BMC by abusing information and access to BMC software afforded to IBM as an outsourcer providing IT Services."  *Id.*  Citing IBM's prior suggestion that the clause did not "align . . . this intent [to] the principles of U.S. competition law," Hagen declared that IBM did "not believe that this language restricts [it] from competing openly and fairly with BMC for customers who are interested in licensing IBM products."  *Id.* at IBM0081348–49.  Hagen continued:

> The right, in fact, the obligation, of horizontal competitors to engage in fair competition is a fundamental principle of competition . . . . We believe that any other reading—for instance, a reading that would prevent an IBM Software seller from approaching any customer—BMC licensee or otherwise—would be per se illegal.

PX53 at IBM00081348.  Apart from IBM's supposed concerns about U.S. competition law, Hagen

offered, as a matter of contract interpretation, that IBM did "not believe the language restricts

[BMC's] licensees from directing IBM to implement competing solutions, whether of IBM or any

other BMC competitor."[22]  *Id.* at IBM0081349.  BMC's legal counsel responded that BMC

"believe[d] the provisions in the Outsourcing Attachment speak for themselves."  *Id.* at

IBM0081348.

70.     By the close of October 2013—and as the dispute around the NAB displacement

unfolded—IBM's Sweetman echoed some of these same interpretations in an e-mail he sent

BMC's Jones.  DX233 at 1–2.  Sweetman explained that the OA did not govern where, as with

NAB, "the licensee has independently secured" IT outsourcing rights.  *Id.* at 2.  And, while denying

that IBM had displaced BMC software at NAB, Sweetman claimed that "even if IBM were

somehow deemed to be displacing software . . . acting at the customer's direction would constitute

the most obvious example of a 'valid business reason.'"  *Id.* at 2.  Jones disagreed with both points,

claiming that the OA alone governed IBM's access and use of BMC products and that the OA's

"valid business reason" language applies only "to the discontinuation of BMC products."  *Id.*

71.     BMC continued to raise displacement concerns during the 2015 OA negotiations.

Clyne, the negotiator, sent BMC executives an e-mail:

> As I am sure you know, BMC has continued to claim compliance issues by IBM in
> respect to the 2008 and now 2013 OA agreements between the two companies.  I'm
> equally confident that you are aware of IBM's very different view of its compliance
> conduct having to do with the provisions and terms of those same agreements as
> well as the behavior of our mutual customers having to do with their own respective
> license terms, too.

---

[22]     This carefully worded interpretation is correct.  The outsourcing attachments governing the
conduct of BMC and IBM did not extend to the parties' mutual customers.  Therefore, the non-
displacement language did not "restrict" the parties' mutual customers from "directing" IBM to
do anything, including displacing BMC's products with its own, though it did restrict IBM's ability
to follow their direction lawfully.

22-20463.8423

Clyne Dep. 237:14–237:24.   IBM's communications with BMC regarding the differing interpretations of the non-displacement language were part of an overall strategy to secure leverage during the negotiations.   *See, e.g.*, Clyne Dep. 239:18–239:22 ("Q: you were suggesting to Mr. Dzaluk when he talks to Mr. Ah-Chu, Mr. Dzaluk reinforce the notion that IBM and BMC are worlds apart, correct?  A. Yes.").  As Clyne further testified:

> [T]he bottom line is I'm just regurgitating what IBM's positions are internally to posture for what I knew would be very difficult negotiations such that I had to have leverage.  So, the starting point was to reiterate exactly what IBM's position was *vis-à-vis BMC*, including what IBM included in its internal presentations and *culling these out as potential exposures*.  I did not share that but that's what's driving this dialogue.  It's posture.  It doesn't make it fact.

*Id.* 243:23–244:07 (emphasis added).

**b.   How IBM Talked About the Non-Displacement Language Internally**

72.   Internally, IBM's conversations regarding the OA's non-displacement language reflected a more measured interpretation.   Mere months before telling Jones that IBM could effectuate a customer-directed displacement, Sweetman sent an e-mail to other IBM employees explaining that IBM's access and consent rights "ba[r] IBM from displacing the BMC products with IBM products for the duration of our services agreement."  PX34 (e-mail dated March 19, 2013).  Elsewhere, shortly after the 2013 OA was signed, confidential IBM internal guidance documents advised account teams that the 2013 OA retained the "2008 non-displacement provision," which "IBM w[ould] be bound by" under the "current Access and Consent terms." PX79 at IBM00116122–25.  That same guidance noted that the "licenses" that "are IBM owned" were "not subject to displacement restrictions," which in turn gave "IBM . . . the flexibility to explore IBM product migration opportunities to reduce capacity over time."[23]   *Id.* at

---

[23]   IBM's internal guidance also instructed employees not to "assume that the Client's agreement with BMC grants the rights necessary for IBM to provide services" or that the "Client's agreement with BMC's obligation to implement an Access Consent Agreement and/or comply

IBM00116124.

73.     Some IBM employees expressed frustration amongst themselves that the non-displacement provision made "IBM responsib[le] to maintain BMC's revenue" and that "[w]ithout the threat of displacement" they would not be able to ensure that clients received the best software pricing.   PX34 at 1; PX24 at 7 ("Current agreement restricts IBM's ability to offer clients technology choice in Outsourcing situations — including when clients demand flexibility. . . . IBM expressed verbally in last proposal our interest in an option to accommodate our clients' demands that was financially viable."); PX33 at 5 (noting that removing "non-displacement" would enable "greater flexibility," an "IBM Need[]" for the 2013 OA).   Yet some elements within IBM were mindful that that compliance with the "rules" of its contract with BMC was important, as "not cost[ing] appropriately" could result in "a significant hit to [its] accounts." PX28 at 2.   Compliance issues could, after all, threaten IBM's "profit margins."   PX111 at IBM00050586; *see also* PX111 at IBM00050583 ("The non-displacement clause is included in the [access and consent agreement] and BMC always tr[ies] to enforce it.").

74.     Notwithstanding these concerns, IBM's Hibert sent an e-mail to IBM outsourcing staff "in the midst of negotiations with BMC" regarding the 2013 OA, "looking to explore all opportunities for potential displacement of BMC products in [IBM's] installed environment." PX25 at 3.   Hibert framed this solicitation as a "[c]all to action," stating that the company's software group's "product portfolio has many solutions that displace BMC products" and that the company would be "launch[ing] a focused program . . . identifying migration opportunities and driving them to successful completion."   *Id.* at 4.

75.     Thus, though IBM's efforts to remove the non-displacement language from the

---

with restrictions on displacement of BMC products with IBM products."   PX79 at IBM00116120.

2013 OA were unsuccessful, IBM software and outsourcing personnel began "internal[]" discussions "about how . . . to manage the non-displacement language overall as a business" within four days of executing the contract, even while acknowledging the "general rule" that "all client-owned BMC [software] is now subject to non-displace" restrictions.  PX37 at 1; *see* Findings of Fact, *supra* ¶ 40.  In one e-mail, Craig, who was responsible for managing the global IBM-BMC relationship for IBM, cautioned that "[w]here IBM [is] using the client's license [IBM] cannot displace BMC's product with IBM product.  If IBM hold[s] the license then we can do whatever we want regarding replacing BMC's product(s)."  PX88 at IBM00079734.  According to Craig, he saw the "potential danger" of displacement, and he "issu[ed] th[at] e-mail as a cautionary and conservative note to be aware of that and the potential breaches of any agreement between [IBM and BMC]."  Craig Dep. 69:14–69:20;[24] *see also* PX87 at IBM00076667 ("IBM has an agreement with BMC that we do not displace any of its tools in favour of IBM tools."); PX208 at IBM00058136; PX461 at IBM00078823–824; PX462 at IBM00063122; Trial Tr. 182:10–186:16, Mar. 15, 2022 (Jones); Trial Tr. 69:20–24, Mar. 21, 2022 (Sweetman).  IBM's internal guidance—which Craig vetted—acknowledged the same: the 2013 OA restricted IBM from displacing BMC products "[w]here IBM requires the ability to access BMC licenses held by the Client."  PX40 at IBM00063333; *see id.* ("No right to displace the BMC products with IBM products"); Trial Tr. 69:03–13, Mar. 21, 2022 (Sweetman); *see also* PX208 at 13.  Beyond e-mails, IBM's internal

---

[24]     Craig's own understanding of the 2013 OA was that if IBM owned the BMC product licenses, the non-displacement and discontinuation restrictions did not apply.  *See* Craig Dep. 73:23–74:09.  Craig also testified that he could determine the price for the licenses by referring to "the discounts, et cetera contained within the Outsourcing Attachment and applied against the list price exhibits, which are also in the Outsourcing Agreement" that IBM agreed to.  *Id.* 74:18–74:23.  However, Craig also explained that the guidance materials would not necessarily reflect IBM's interpretation of the other "valid business reasons" provision because they towed a "conservative, cautionary line" that was intended to prevent "circumstances that might be problematic in the future."  *See id.* 93:03–93:16.

22-20463.8426

educational documents—which Craig and others within IBM also reviewed—noted that there were some IT contexts in which buying the BMC license made sense and that license purchases would free IBM from the displacement restrictions.  Craig Dep. 77:07–77:19.

76.    A little over one month prior to Sweetman's October e-mail to Jones, on September 20, 2013, Mary Quigley, an IBM executive, noted that the agreement with BMC contained "very specific verbiage around software replace."  DX214 at 2; *see* Findings of Fact, *supra* ¶ 48.  Though IBM executives found certain "BMC software takeout opportunit[ies]" attractive, they were "also concerned."  DX214.  Earlier that year, on February 14, 2013—as the parties negotiated the 2013 OA—Hibert advised IBM personnel that IBM could not "migrate," or perform a displacement, if IBM operated a license otherwise owned by a mutual BMC customer.  PX25 at 1.  However, Hibert also acknowledged that IBM could "migrate when [it] own[ed] the licenses."  *Id.*

77.    Even the guidance within IBM that eschewed bright line rules around displacement reflected the more measured discussions IBM employees had internally.  For example, a 2014-era IBM internal guidance document illustrating a decision tree for IBM employees included a displacement scenario.  PX94 at IBM00081122–23.  Though noting that exceptions could apply, that decision tree asked if the "Client already commenced activities to pursue such displacement" and "[i]f so" whether IBM could "document that this activity pre-dated the outsourcing engagement?"  *Id.* at IBM00081123.  Far from suggesting an unqualified right to effectuate a client-directed displacement, the internal guidance indicates that IBM entertained the notion that it could displace if the mutual client already "commenced" the displacement.  *See id.* at IBM00081123.

78.    But, by and large, IBM internally understood that the non-displacement provision significantly curbed its ability to effectuate a displacement.  Thus, around August 2014, IBM

managers advised employees confronted with displacement opportunities that "[w]here we are using the client's license we cannot displace BMC's product with IBM product.  If IBM hold[s] the license then we can do whatever we want regarding replacing BMC's product(s)."  PX88 at 4. IBM's internal guidance similarly acknowledged that there was "[n]o right to displace the BMC products with IBM products" under the 2013 OA's access requirements.  PX40 at 14.  That same internal guidance recognized that "[i]n some IT Services contexts, it may make economic sense for IBM to acquire licenses from BMC for the purpose of providing IT Services to a named Client," such as when the "Client License Access rights afforded [to] IBM are insufficient."  *Id.* at 10.

79.     By 2015, some of IBM's internal communications reflected an understanding of the non-displacement provision's plain meaning.  *See* Craig Dep. 129:06–130:25 (discussing an internal e-mail in which an accounts team failed to adhere to the agreement with BMC and testifying that IBM may have had "a potential problem" with "replacement" compliance issues) *id.* 144:03–144:05 (testifying as to the 2015 OA's "release from past indiscretions"); PX226 (with respect to the anticipated 2015 OA, "IBM is free to compete at any time at all accounts that are not [protected accounts] . . . [t]he net is that the restrictions have been removed . . . except for . . . the fifty-four account protected list.  Further, the BMC accounts on the list cannot be changed . . . without our specific agreement (potential leverage item in the future FOR US to be sure!)."); PX238 (internal guidance document noting that non-displacement language in the 2015 OA applies to accounts listed on Exhibit K); PX132 at BMC-000165729-730 (BMC confirming that "IBM still has the option to replace BMC software at IBM outsourcing accounts, but to do so, it would be required to pay BMC the cost of the license fee and one year's support at a price discounted by 45 or 72% per the OA").

80.     Except for the reduction in the number of accounts subject to non-displacement, the

non-displacement language in the 2015 OA tracks that of the 2013 OA. *Compare* PX3 §5.1, *with* PX4 §5.4. Because IBM failed in its efforts to remove both the non-displacement clause in its entirety and then, later, AT&T from the list of accounts subject to it, the company faced significant business "risks." *See* PX270 at IBM00000524; *see also* PX196 at IBM00124445 (internal guidance document noting "Agreement to Allow Displacement at all Accounts less a List of fifty-four Named Accounts"); Stafford Dep. 229:14–21 (testifying as to conversations within IBM regarding the "risk" of agreeing to unchanged non-displacement language).

81. Two days prior to executing the 2015 OA, IBM internally acknowledged in an internal guidance document that its planned displacement of AT&T's BMC products with IBM products was one of the deal's "cons." PX228 at IBM00124048. Tracking the distinction between the 2015 OA's use of "displacement" and "discontinue," that internal guidance document notes that the "non-displace clause [was] eliminated for IBM portfolio minus a list of fifty-four protected accounts," including "AT&T [and two other companies] where displacements are currently occurring/planned." *Id.* at IBM00124046. For those fifty-four accounts, including AT&T, "existing language with rights to 'discontinue for other valid business reasons' will be retained." *Id.* Displacement concerns, the guidance went on, were "to be addressed by Legal." *Id.* at IBM00124048. But as a general matter, IBM understood that under the 2015 OA, it could not "displace BMC products with IBM in any of the fifty-four clients on Schedule K but can displace with other ISV products (third parties)." PX240 at IBM00050260; PX282 at IBM00050628 (internal guidance noting that "[t]here are no limitations on IBM's ability to displace BMC Customer Licenses with IBM products for any client other than those listed amongst the fifty-four Accounts in Exhibit K . . . and *only* if IBM is providing strategic outsourcing services." *But see* PX282 at IBM00050623 ("[A]s a reminder to everyone, the old OA did not allow IBM to displace

any BMC products with IBM products, other than for valid business reasons.")  IBM likewise understood that the "[c]urrent displacement plans at AT&T" would likely raise a "future dispute with BMC on [the] terms" of the contract.  PX258 at IBM00049965.

82.     Also, just prior to the 2015 OA's execution, IBM's legal department prepared a PowerPoint presentation on the outstanding negotiation disputes.[25]  *See* PX150.  In a slide titled "Areas of Dispute within Agreement," IBM noted that it and BMC had differing views on "Displacement of Client owned Licenses with IBM Products (BMC Claim $769m)."  *Id.* at IBM 00124242.  IBM noted that BMC took the position that "IBM is specifically forbidden from offering displacement of BMC products with IBM products under the terms of the OA . . . and can only discontinue use of products for other valid business reasons."  *Id.*  In contrast, IBM asserted its position was that "IBM must compete in the marketplace and will meet client requirements for . . . solutions," and that the "basis and intent of [the] OA was/is that IBM will not use any BMC confidential information to compete."  *Id.*  "Valid business reasons," it claimed, "include[d] reasons to displace."  *Id.*  Still, in noting the "cons" to the proposed 2015 OA, IBM observed that the non-displacement provision would "limit IBM's ability to offer Displacement at up to 50 named customers," with "other concerns to be addressed by Legal."  *Id.* at IBM 00124244.

83.     IBM knew it could have complied with its obligations under both Project Swallowtail and the 2015 OA by purchasing its own licenses to the products it had agreed to displace.  IBM's internal guidance documents even specified the steps IBM should take when displacing a customer's products with IBM products under the OA, stating that IBM could "[n]egotiate with BMC to acquire equivalent BMC licenses to be held by IBM that do not include

---

[25]     BMC created its own slideshow in the leadup to the 2015 OA's execution wherein it noted that IBM's "core strategy [was] to push back on core terms of the 2013 OA to the legal maximum." PX152 at BMC-000118299.

the restrictive [non-displacement] language."  PX79 at IBM00116135; PX282 at IBM00050626

("When does it make sense for IBM to buy a BMC license?").  But IBM's behavior and its internal

statements establish that it never had any intention to purchase the licenses that would have

allowed it to comply with both agreements.  *See, e.g.*, PX228 (three days before execution of 2015

OA, IBM internally notes "potential risks for planned displacement [at] AT&T not in pricing

case").

## E.    BMC's Performance Under the 2015 OA

84.    Section 5.1 of the 2015 OA requires BMC to "make available to [IBM] a

representative copy of its typical BMC Customer license agreement [BMC EULA] and [to] inform

IBM] in writing of any material differences between the BMC EULA and BMC Customer's

agreement after [IBM] provides written notice of Access and Use."  PX4 section 5.1.  According

to Sweetman, IBM sought a copy of BMC's agreement with the mutual customer both to

understand what additional conditions might restrict their conduct and "understand any rights the

customer might have."  Trial Tr. 47:08–15, Mar. 21, 2022 (Sweetman).  Despite this, BMC never

advised IBM that AT&T negotiated for outsourcer use rights in certain circumstances, which are

not contained in the standard EULA.[26]  IBM argued at trial that, if it had known this, it could have

proceeded as an outsourcer under the AT&T-BMC license agreement, rather than proceeding

under the 2015 OA and abiding by the non-displacement provision and other OA restrictions.  In

short, IBM argued that the AT&T EULA is materially different than the standard EULA and

BMC's non-performance under the 2015 OA forecloses its breach of contract claims.  *See id.*

49:01–49:05 (Sweetman) (testifying that he believed the AT&T-BMC license agreement to

---

[26]    The standard EULA provides that BMC's "Customer will not.. . . . allow the products to
be used by an outsourcing or service bureau provider on Customer's behalf."  DX007 (EULA)
section 4(e).

22-20463.8431

materially differ from the standard BMC EULA).

**F.**   **BMC's Claims for Misuse of Confidential, Trade-Secret, and Other Information Against IBM**

85.    BMC claimed that IBM violated section 8 of the MLA, federal and state trade secrets law, and common law constraints by misusing confidential and trade-secret information. *See* Dkt. 295 at 30–31, 37–46.  To understand BMC's claims, the court reviews how outsourcers like IBM interact with end users, like AT&T, and software vendors, like BMC.  It then discusses the evidence relevant to each of BMC's misuse-of-information claims.

**1.**   **How IBM Generally Worked with BMC to Assist AT&T**

86.    Outsourcers function as agents and contractors for the customers they serve.  *See generally* Trial Tr. 26:23–27:07, Mar. 16, 2022 ("An outsourcer is contracted to take over, basically, the runnings of the customer's environment.") (McGuinn); Trial Tr. 65:13–19, Mar. 16, 2022 ("[T]he outsourcer's role is to manage the operation of the computer system.  They would set it up.  They would keep it running.  They would monitor it and try to determine if their resources, for example, were running out so that they could proactively avoid anything that would bring the system down.") (Román).  By supporting customer environments, outsourcers develop a "very deep knowledge" of that environment and the product tools, features, and functions that the customer uses.  Pachnos Dep. 63:21–64:21.  IBM has provided AT&T with IT outsourcing services for decades; the current master IT services agreement between AT&T and IBM has existed since 1999.  DX572 (Skinner Decl.).  IBM, therefore, has intimate familiarity with AT&T's mainframe environment and how BMC software operates within that environment.  Conway Dep. 35:13–20.

87.    As AT&T's outsourcer, IBM is responsible for making sure that the software that AT&T has chosen works correctly and functions with AT&T's business applications.  DX572 (Skinner Decl.) ¶ 4.  It is also IBM's job to maintain AT&T's existing environment—which, during

Project Swallowtail, included BMC products.  Trial Tr. 69:11–70:01, Mar. 17, 2022 (Skinner).  To maintain a customer's existing environment, outsourcers like IBM regularly step into a customer's shoes to deal with ISVs like BMC.  Trial Tr. 21:23–22:5, 26:23–27:70, Mar. 16, 2022 (McGuinn).

88.     AT&T—and IBM as AT&T's agent—had access to BMC technical support to facilitate the maintenance of AT&T's environment.  AT&T contracted with BMC for this support. *See* 2014 Mainframe Order sections 2.2, 2.6.  AT&T relied on IBM to communicate with BMC and obtain the necessary support that AT&T is entitled to under its contract with BMC.  Conway Dep. 67:23–68:11, 166:24–167:19.

89.     BMC's technical support is accessible on the restricted portion of BMC's website behind a login firewall that is only accessible with a current customer ID number and valid login credentials.[27]  Trial Tr. 16:12–18:02, 21:10–15, Mar. 16, 2022 (McGuinn); PX399 (BMC "Create BMC/Account Developer" webpage); PX400 (BMC login portal to access BMC technical support); Trial Tr. 204:20–205:12, Mar. 16, 2022 (Román).

90.      In response to IBM's requests, BMC provided IBM with the data analysis, procedures, and code fixes to resolve the issues raised in five technical support cases.  Trial Tr. 97:8–132:16, Mar. 16, 2022 (Román); *see also* Trial Tr. 12:11–15:18, Mar. 16, 2022 (McGuinn).

---

[27]     To be an authorized user for a customer who has licensed a BMC software product, a party must register with BMC and provide a valid code associated with the purchased maintenance and support to obtain the necessary login credentials to access BMC's online platform for technical resources and information.  Trial Tr. 16:12–18:02, Mar. 16, 2022 (McGuinn); *see also* PX379. BMC's "Web Site Terms of Use" further specify that the information beyond the login firewall is "restricted product information" and that "[t]his restricted information is considered confidential and proprietary information of BMC."  Trial Tr. 20:08–21:15, Mar. 16, 2022 (McGuinn); PX402 ("BMC Web Site Terms of Use"); PX383 (same).  This prohibition extends to any information provided by BMC's technical personnel via the support platform.  Trial Tr. 20:08-21:15, Mar. 16, 2022 (McGuinn).  Prior to disclosing support, BMC confirms that a current BMC customer with a valid support agreement has made the request.  Trial Tr. 17:22–18:02, 20:21–21:15, Mar. 16, 2022 (McGuinn).

22-20463.8433

These code fixes came in the form of program temporary fixes ("PTFs"), which resolve errors or abnormal endings ("ABENDs") that may or may not have appeared because of tasks associated with ongoing software version upgrades, with Project Swallowtail, or independently of either.

91.     PTFs provide a temporary change to a BMC product to fix a problem or correct a defect encountered when operating BMC software in a customer's environment and to ensure that BMC software is functioning as intended.  DX572 (Skinner Decl.) ¶ 37; DX568 (Sessarego Decl.) ¶ 8; *see* Trial Tr. 41:22–24, Mar. 16, 2022 (McGuinn).  BMC provides PTFs only when it has identified an issue with a BMC product.  *See* Sessarego Dep. 76:01–07; Pachnos Dep. 54:24–55:14.  BMC would not provide a PTF unless there was a confirmed problem with a BMC product.  Trial Tr. 42:08–10, Mar. 16, 2022 (McGuinn).

92.     BMC created some PTFs before IBM opened a support case for AT&T, prompted by similar problems encountered by other customers.  Sessarego Dep. 71:16–73:20.  There are indexes of PTFs that BMC previously created that BMC makes available on its website for customers to utilize as needed.  Pachnos Dep. 59:15–60:10; *see also* Trial Tr. 48:11–16, Mar. 16, 2022 (McGuinn).  BMC created other, newer  PTFs because of a problem with the software identified by AT&T or IBM.  Sessarego Dep. 73:21–25.  After a PTF is created, BMC makes the PTF available to all customers who contract for BMC support.  Pachnos Dep. 59:03–60:10.

93.     BMC provides its software in executable or object code format.  Pachnos Dep. 40:11–13, 42:8-10; Trial Tr. 94:10–12, Mar. 17, 2022 (Skinner).  Object code and executable code are not trade secret information.  *See* Pachnos Dep. 42:14–16, 43:18–24.  IBM never received source code for BMC products in its role as an outsourcer for AT&T.  *See* DX572 (Skinner Decl.) ¶¶ 8, 33; Pachnos Dep. 40:11–15, 41:8–10.

### 2.   Specific Incidents

94.     BMC claimed that its trade secrets were disclosed in the following five technical support cases:  Case No. 332327 (opened on May 9, 2017), PX370, and Case No. 343507 (opened on May 29, 2017), PX371, which concern errors encountered as a result of Project Swallowtail related to BMC's System Performance for IMS (MainView for IMS) product; Case No. 198877 (opened on August 17, 2016), PX311, and Case No. 210489 (opened on September 9, 2016), PX330, which concern errors encountered as a result of Project Swallowtail related to BMC's Recovery Manager products; and Case No. 120397 (opened on April 6, 2016), PX320, which concerns errors encountered as a result of Project Swallowtail related to BMC's System Performance for IMS (MainView AutoOperator) and BMC's MainView SRM Allocation products.  Trial Tr. 97:8–132:16, Mar. 16, 2022 (Román).  But BMC's expert, Kendyl Román, offered no opinion about trade secrets.  *Id.* at 136:09–14 (Román).  And Román conceded that the PTFs and ABEND fixes could sometimes be found in publicly available manuals.  *See id.* at 205:19–206:01 (Román).

### a.     BMC Technical Case No. 00120397

95.     As described by BMC's expert, this case involved the replacement of a subset of BMC's MainView products with non-IBM products. Trial Tr. 203:12–17, Mar. 16, 2022 (Román). An IBM employee sought information regarding errors connected to a BMC product.  DX656.001; Román Rpt. ¶ 204.  BMC analyzed dumped data and determined that DTS software—not BMC software—caused one of the ABENDs.  DX656.009; Román Rpt. ¶ 204.  BMC also discussed a configuration setting regarding the code that had an ABEND.  DX656.006; Román Rpt. ¶¶ 205, 278.  The standard configuration setting discussed by BMC support is not a trade secret and is also publicly available on BMC's website.  DX667; DX668; DX669; DX684.

22-20463.8435

96.     Within AT&T's dump was a "string that's in English that says 'Copyright detail software 1991, license material proprietary of DTS software.'" Trial Tr. 129:15–18, Mar. 16, 2022 (Román); DX656.009.  Mr. Román described this as "the eye catcher," *i.e.*, "a string that's human readable in the middle of all this gobbledygook, [which] catches your eye." Trial Tr. 129:10–21, Mar. 16, 2022 (Román); DX656.009.  The "eye catcher" is what identified that the first ABEND was related to DTS software.  *See* Trial Tr. 129:19–21, Mar. 16, 2022 (Román).  Thus, the "[r]oot cause," which Mr. Román identified as "DTS Software," *see id.* 130:22–24, was identified in plain English in AT&T's data dump.  DX656.009.

**b.     BMC Technical Case No. 00198877**

97.     An IBM employee experienced a problem during a disaster recovery drill for AT&T.  DX658.001; Román Rpt. ¶¶ 214-15.  BMC explained that the data set being used was created by an IBM product, not a BMC product, and thus required a different format to be processed by BMC's Recovery Manager.  DX658.004.  Accordingly, BMC disclosed "already-existing functionality and configuration settings" for a product.  Hartley Rpt. ¶ 89.  The information necessary to identify the problem experienced in this support case—that the data set was not in the proper format for use with BMC's Recovery Manager—is available on BMC's website.  *Id.* ¶ 89 & n.63; DX673; DX694.

**c.     BMC Technical Case No. 00210489**

98.     An IBM employee contacted BMC support after determining that a crash occurred because the authorization module was not found for BMC's product, Recovery Manager, which was an important disaster-recovery tool.  DX659.001; Román Rpt. ¶¶ 220, 283; Trial Tr. 125:23–25, March 16, 2022 (Román) (testifying that Recovery Manager crashed because of a user ABEND and that an "authorization module was not found for Recovery Manager").  An authorization module is like a password that enables the program to run.  Trial Tr. 126:03–09, March 16, 2022

22-20463.8436

(Román).  The information provided by BMC regarding which authorization modules to use and where they are located is available on BMC's public website.  *See* DX670; DX671; DX724.  Indeed, during cross-examination, Mr. Román testified:

> Q.    So, the information that was provided by BMC in this case was information that, if IBM had looked hard enough, they would have found on . . . BMC's publicly available world wide web website?
>
> A.    Well, I can't say what was available at that time, but just to speed things along, I'll say if it's publicly—if it was publicly available at the time, there are certain pieces of information that are publicly known, yes.

Trial Tr. 202:01–202:08, Mar.16, 2022 (Román).

**d.    BMC Technical Case No. 00332327**

99.    IBM first discovered the ABEND that led to Technical Case No. 00332327 in February 2017 while it was solving another technical issue.  DX554.012.  The ABEND arose as IBM was displacing BMC's product, MainView, with its own product, Omegamon.  Trial Tr. 185:15—187:15, Mar. 16, 2022 (Román).  Specifically, IBM found an ABEND with code U3042.  DX554.012.  After further analysis, in May 2017 IBM determined that an 0CE ABEND immediately preceded every U3042 ABEND, and that a BMC MainView for IMS module appeared in connection with that ABEND.  DX554.026, .035.

100.    Once IBM's technical support team had isolated the S0CE and U3042 ABENDs and tied them to BMC's MainView product, IBM (acting as AT&T's IT outsourcer) contacted BMC on May 9, 2017, to open Technical Case No. 00332327.  DX663.001–002.  The BMC help desk reviewed the AT&T dumps that IBM had isolated and concluded that a bit was set to "on."  DX663.022.  On May 10, 2017, BMC provided PTFs to address the S0CE and U3042 ABENDs.  DX663.010.  BMC would not have provided PTFs if there was not a confirmed problem with its product.  *See* Trial Tr. 42:08–10, Mar. 16, 2022 (McGuinn).

22-20463.8437

101.    At the time BMC was responding to this support request, BMC was aware that an IBM replacement product—Omegamon—was being used in AT&T's environment.  Trial Tr. 188:08–21, 190:05–09, Mar. 16, 2022 (Román).  At no point in responding to this support request did BMC suggest that IBM was doing anything improper with BMC's information.  *Id.* at 189:05–14, (Román).

102.    In his report, Mr. Román called out four purported trade secrets disclosed in this support case.  First, "two custom PTFs for Mainview, and the accompanying PTF descriptions" were provided by BMC support.  Román Rpt. ¶ 244.  The description accompanying the PTF provides no technical information—it "merely provides an overview of 'what' the PTF does, not 'how' the PTF works internally."  Hartley Rpt. ¶ 145.

103.    Second, "a description of the internal functions performed by Mainview's code related to the accumulation of event timing fields and the PSW PGM MASK" was provided by BMC support.  Román Rpt. ¶ 244.  BMC support provided no substantive information regarding the accumulation of event timing fields—merely the fact that event timing fields were accumulating.  Hartley Rpt. ¶ 126.

104.    Third, "the changes that the PTFs made" were explained by BMC support.  Román Rpt. ¶ 244.  As explained by IBM's expert, "BMC's PTFs did nothing more than apply basic and well-understood principles of coding"—clearing a hardware register before use.  Hartley Rpt. ¶ 128.  BMC was describing "a simple 'housekeeping' function."  *Id.*  Similar information is also provided in publicly available IBM documentation.  *Id.*  For instance, a z/OS Programmer's Guide, freely available on IBM's public website, instructs that "[a] program should save the values contained in the general registers when it receives control and, on completion, restore these same values to the general registers."  DX746.001.

55

105.    Fourth, "the analysis performed by BMC's product development group related to the root cause of errors occurring in the mainframe environment" was identified by Mr. Román as trade secret information.  Román Rpt. ¶ 244.  BMC analyzed information dumps from AT&T's mainframe environment to try to identify the root cause.  Hartley Rpt. ¶ 129.  This information, if proprietary at all, is proprietary to AT&T, not BMC.  *Id.*

106.    At trial, Mr. Román testified that "finding the problem" is what BMC contributed to IBM.  Trial Tr. 205:19–206:7, Mar. 16, 2022 (Román).  BMC's "identification of the problem" in this support case, according to Mr. Román's report, was the following:

> PSW Key mask set on for Significance Exceptions; What happened here is that we have fields in our TRN record that are zero and we are accumulating these various event timing fields and when this particular PSW Key mask is on and the field is zero, you get the S0CE during floating point ADD.  Did the setting for the PSW Key Mask recently change on the systems encountering the problem and what is the setting compared to other systems that haven't experienced the problem?

DX663.012; Román Rpt. ¶ 237.

107.    However, Mr. Román's testimony ignores that this was not new information to IBM.  On March 6, 2017, IBM referenced the "Systems Codes manual," which listed possible causes of the ABENDs, including that "[a]t least one reserved bit in the ESPIE parmlist is incorrectly set on."  DX554.019.  After eliminating other possibilities, IBM stated: "That leaves a reserved bit being set on."  DX554.020.  IBM also identified that "[t]his is a Significance exception."  DX554.022.  This is the same information conveyed by BMC months later, on May 9, 2017, when BMC stated that the "PSW Key mask set on for Significance Exceptions" and that the ABEND was occurring because the "PSW Key mask is on."  DX663.012.  Thus, BMC's purported identification of the problem was not even new or unique.

108.    Further, while Mr. Román testified that IBM asked for more information from BMC after BMC provided the PTFs because "they were still concerned about what the root cause

56

was," Trial Tr. 107:01–07, Mar. 16, 2022 (Román), IBM explained that it asked "more questions" because it "want[ed] to make sure that BMC PTF will not introduce any other issue[s] to the system," DX554.041.

109.    Mr. Román also testified about his understanding that there was a purported seven-month period before IBM contacted BMC for support concerning the problem.  *See, e.g.*, Trial Tr. 104:04–105:21, March 16, 2022 (Román).   However, Mr. Román simply ignored that the first several months of this seven-month period consisted of IBM investigating an unrelated S46D ABEND.  Hartley Rpt. ¶¶ 106–07.  This unrelated S46D ABEND was ultimately determined to be related to a product from a different software vendor, Informatica, and was resolved separately by IBM.  *Id.* ¶ 120.  IBM did not encounter the ABEND connected to BMC's MainView product until February 2017.  *Id.* ¶ 108.  Between February 2017 and when BMC was contacted in May 2017, IBM was investigating that ABEND.  *Id.* ¶¶ 108–16.  This investigation eventually led to IBM connecting the ABEND to BMC's MainView product.  *Id.* ¶ 116.

   **e.    BMC Technical Case No. 00343507**

110.    BMC support was contacted after a PTF it had developed kept failing.  DX664.001; Román Rpt. ¶ 250.  After reviewing AT&T system dumps that were provided, BMC "identified a problem that was exposed with BQ12263 PTF," DX664.028, *i.e.*, one of the PTFs that was applied in connection with Case No. 00332327, DX664.030.  As IBM's expert explained, "it appears that the original PTF provided by BMC may simply have reset configuration settings that had been customized for the AT&T environment back to standard BMC default values, thus causing . . . abends.  After the problem was identified, BMC recommended certain configuration settings." DX664.023; Román Rpt. ¶ 251.  BMC's recommendations are publicly disclosed on its

22-20463.8440

website.  *See, e.g.*, DX665; DX676; DX677.  BMC also provided two PTFs, which are not trade secret information.  DX664.010–011.

### G.    BMC's Damages Models

111.    BMC argued that license fees for the BMC products which IBM displaced with IBM products at AT&T in Project Swallowtail are "payable" under the MLA's plain text.  But even if they were not, BMC presented a license fee damage model that measures the value—based on the contract's text—of the licensing rights that IBM used without payment.  Separately, BMC presented a damage model measuring its lost profits and the alleged misuse of its confidential information.  Finally, arguing that the MLA's damage limitations do not apply because of IBM's wrongful, fraudulent conduct, BMC seeks exemplary damages.  The court reviews each in turn.

#### 1.    The License Fees Are Payable

112.    The court finds that BMC is entitled to the full amount of the lost license fees for its claim for breach of section  5.4 of the 2015 OA.  The court previously ruled that pursuant to MLA section 10, any "amount paid or payable by [IBM] for the license to the applicable product giving rise to the claim" is not subject to the $5 million-per-product limitation.  Dkt. 586 at 8–9.  Because these "license" amounts are "greater" than $5 million per product—and because their value can be ascertained within the four corners of the 2015 OA—the court finds that they reflect "payable" sums for the bundle of rights IBM exercised in this case, including the right to displace BMC products with IBM products.[28]  *See* Conclusions of Law, *infra* ¶¶ 166–76.

---

[28]    Even if MLA sections 9–10 are enforceable, they only apply to BMC's OA breach claims if the MLA and OA are one integrated agreement.  This court previously ruled that they are one integrated agreement; BMC has reserved the right to challenge this ruling.

22-20463.8441

2. **License Fee Models**

113.    BMC seeks to recover damages based on the product-specific licensing and interrelated support fees prescribed by the 2015 OA for the bundle of rights, including the right to displace an Exhibit K customer's mainframe software, that IBM used but did not pay for.[29]  *See generally* PX4.  As explained above, under OA section 1.1, IBM had to choose from multiple options when deciding how to use BMC products while providing IT outsourcing services for a mutual customer.  PX4 section 1.1.  IBM elected to access and use AT&T's BMC license for no additional fee but that entailed IBM's agreement not to displace AT&T's BMC products with IBM products and to adhere to the other limitations in OA section 5.  PX4 §§5.1, 5.4.

114.    IBM could have elected to purchase its own BMC licenses under OA section 1.1, which would have given it the right to displace BMC's products on AT&T's mainframes.[30]  Trial Tr. 176:20–177:12, 194:08–195:10, Mar. 14, 2022 (Ah Chu).  BMC's core damages models calculate BMC's damages based on the licenses and support that IBM failed to pay for under the OA.

115.    Specifically, BMC seeks recovery of $717 million in unpaid license and support fees for the fourteen BMC products that were displaced with IBM products at AT&T in violation of OA section 5.4 and $791 million for the nineteen BMC products that BMC claims IBM improperly accessed and used while performing Project Swallowtail in violation of OA section 5.1.  Trial Tr. 220:13–221:10, Mar. 16, 2022 (Ratliff).  BMC seeks the $717 million in unpaid license

---

[29]    IBM is one of the world's largest and most sophisticated information technology companies and understood that it was contracting for a bundle of rights.  Its own internal guidance reflected as much.  *See* PX282 at IBM00050629 (listing the rights and restrictions associated with "client license access," including the "right to displace with IBM products").

[30]    At summary judgment, the court rejected BMC's argument that 2015 OA section 1.1 required IBM to make a different election than the one it made and purchase its own licenses.  *See* Dkt. 586 at 6–7.

22-20463.8442

and support fees not only for its claim for breach of OA section 5.4, but also for IBM's fraudulent inducement of BMC into the 2015 OA.[31]  Trial Tr. 222:22–223:4, Mar. 16, 2022 (Ratliff).

116.    BMC also seeks $109 million in unpaid license and support fees for the three BMC products that were the basis for IBM's breach of MLA section 8, misappropriation of trade secrets under TUTSA and DTSA, and common-law unfair competition.  Trial Tr. 221:11–17, Mar. 16, 2022 (Ratliff).  These amounts represent unpaid licensing revenue recoverable for each of those claims.  Trial Tr. 257:14–22, 14:24–15:12, Mar. 17, 2022 (Ratliff) ("[I]ts the actual loss to BMC of license fees from IBM related to IBM's use of the products and support during the displacement.") (Ratliff).   For trade-secret misappropriation, BMC asserts that the same calculation represents a "reasonable royalty" for IBM to obtain the right to use BMC's trade secrets for the purpose of displacement as it did for Project Swallowtail.

117.    The basis for each of these calculations is the sum amount the parties agreed upon in sections 6 through 8 of the 2015 OA for IBM to purchase its own BMC licenses, including having the right to displace BMC products.  PX4.  The licensing fees for BMC's products are stated in section 8 of the 2015 OA, which details the price for each product (in Exhibit H to the 2015 OA), the applicable discounts, and the contractually required "support" fees associated with any payment of licensing fees.  PX4; Trial Tr. 216:05–219:22, Mar. 16, 2022 (Ratliff); *see also* Stanton Dep. 102:16–102:20 ("Q: Is it consistent with your understanding that if IBM elected to

---

[31]     BMC asserted several claims and associated remedies in this lawsuit.  Once the court resolves BMC's claims, if the court finds and concludes that BMC is entitled to recover on multiple claims, the court will require BMC to make an election of remedies (if necessary) as part of entering a final judgment in this case.  For example, if the court finds and concludes that BMC can recover the $717 million in license-fee damages on either its OA section 5.4 breach claim or its fraud claim, BMC's election of that remedy under the OA  section 5.4 breach claim would preclude BMC from also recovering the AT&T lost profits under that claim (discussed below).  But BMC's election of that remedy under the fraud claim would not foreclose recovery of certain other remedies, such as exemplary damages based on fraud.

acquire licenses from BMC, that those prices were set forth in the . . . outsourcing attachment?  A: Yes.").  The products at issue in this lawsuit are "System Management Products" set forth in section 8, and IBM received a 72% global minimum discount off of the price listed in Exhibit H for those products.  PX4; Stanton Dep. 207:02–207:07 ("Q: What did you mean by 'IBM has good pricing with BMC?'  A: As per the OA, we had a 72 percent discount.").  The interrelated support fees were "calculated at 20% of the net price, where the net price is the List price set forth on Exhibit H, less the [72%] discount."  *Id.* at Exhibit H (IBM00049713-IBM00049717); *see* PX112 ("The calculations on displacement values actually reflect a license price and one-year of support for the accounts they identify using IBM's existing discounts (*i.e.*, 72% on the license with maintenance at 20% of the license cost)."); Trial Tr. 217:07–218:04, Mar. 16, 2022 ("[T]he basic math on the support was the years times 20 percent times the net of discount license fee.") (Ratliff).

118.    IBM rejected BMC's license-fee damage model.   Putting aside its general disagreement, IBM contended that it would have been entitled to more than a 72% discount even if it were liable for the license fees.  *See, e.g.*, Trial Tr. 86:02–17, 87:15–20, 88:02–10, 89:03–19, 92:17–23, Mar. 22, 2022 (Gerardi).  *But see* Findings of Fact, *supra* ¶ 79.  Although the parties agreed to a 72% global minimum discount in the OA itself, IBM argued that the parties have sometimes negotiated larger discounts and that IBM may have been able to obtain a greater discount if it had negotiated to purchase the licenses.  *See* Trial Tr. 108:01–16, Mar. 21, 2022 (Sweetman) (testifying that the 72% discount is a "starting point for negotiations").

119.    The court finds and concludes it is proper to use 72% as the discount in calculating licensing-fee damages.  The parties agreed to 72% in the OA, and that negotiated, contractually specified figure provides a reliable, non-speculative basis for ascertaining damages.  *See* PX4 at 4 (OA section 8 provides IBM "will be entitled to a global minimum discount of 72% off the Listed

Price in Exhibit H for all purchases of new licenses"). BMC has a valid contractual basis for insisting on that discount rate.

120. Notwithstanding the contract's clear, express terms, BMC used the 72% discount when showing IBM how to calculate the license prices under the OA, and IBM never contested that and, indeed, used that in its own analysis during negotiations. *See, e.g.*, PX440 at BMC-000012586; PX132; PX463. Moreover, IBM's internal Guidance Documents consistently refer to the 72% discount rate for acquiring licenses. *See, e.g.*, PX282.10 (2015); PX208.13 (2013). IBM cannot undercut the OA-specified figure through its own speculation that the parties hypothetically might have negotiated a different discount than the 72% rate stated in the OA. Indeed, parties to any contract could always choose to re-negotiate the terms of their contract at any time, but that hypothetical possibility cannot be used to undermine the legal effect of a negotiated, contractually set term such as the 72% discount rate. IBM cannot render BMC's damages model speculative by itself speculating that the parties might have decided on different terms. Further, it was IBM that chose to forgo its ability to negotiate for a larger discount to purchase the licenses when it instead exercised displacement rights without paying for them. Importantly, again, IBM does not dispute any other variable or mathematical step in Ratliff's calculation of license-fee damages. IBM's damages expert Gerardi walked through the other variables and confirmed he had no reason to disagree with any of the other variables or inputs used by Ratliff. Trial Tr. 86:02–17, 87:15–20, 88:02–10, 89:03–19, 92:17–23, Mar. 22, 2022 (Gerardi).

121. The court finds, based on the text of the contract, that the formula, variables, and inputs used by Ratliff in PX446 are the proper basis for calculating the license fees under the OA. The court finds that the calculation by Ratliff is correct and that all the numbers in it are correct.[32]

---

[32] Gerardi admitted he had no disagreement with Ratliff's MIPS input. A discussion arose at trial over this input, and IBM agreed it "would not dispute what Gerardi testified to" on this and

122.     Using the license-fee model, the amount BMC is entitled to recover for each claim differs depending on the number of impacted products for each particular claim.  As BMC's expert Ratliff explained, it would have cost over $717 million in license and support fees for IBM to purchase its own set of licenses to the fourteen products it displaced with IBM products.  Relatedly, it would have cost approximately $791 million for the nineteen products that IBM improperly accessed and used while performing Project Swallowtail (these nineteen products include the fourteen products displaced by IBM products).  BMC also argued that the $717 million for the fourteen products at issue in BMC's breach of section 5.4 claim applies to its fraud claim.  Finally, BMC argued that it accrued $109 million in damages for the three products at issue in BMC's claims for misuse of confidential information, misappropriation of trade secrets, and unfair competition by misappropriation.  Trial Tr. 222:22–223:04, Mar.16, 2022 (Ratliff).

123.     The court finds that BMC provided sufficient evidence, under the applicable legal standards, of both the existence (or "fact") and the amount of damages in the form of its lost licensing fees and associated support services totaling approximately $717 million for IBM's breach of OA section 5.4 and $717 million for IBM's fraud.  *See* Conclusions of Law, *infra* ¶¶ 166–76.  Furthermore, BMC demonstrated these damages were foreseeable and within the contemplation of both parties as evidenced by the contract's text, and that BMC established the amounts of its licensing-fee damages with reasonable certainty.

3.     **Lost Profits**

124.     As another type of recovery, BMC seeks damages for $104.5 million in lost profits from AT&T.  Trial Tr. 249:24–250:11, Mar. 16, 2022 (Ratliff).  This number consists of the fees

---

assented when the Court stated the view that there is not "any evidence to dispute [the MIPS number] in some other way when . . . [IBM's] expert witness has testified that's the right number." Trial Tr. 137:19–142:17, Mar. 22, 2022.  Relying on IBM's representations, the court determined that no further rebuttal testimony was necessary.  *Id.*

22-20463.8446

that AT&T would have continued to pay BMC if IBM had not caused AT&T to terminate its relationship with BMC through IBM's misconduct, including by displacing BMC's AT&T products with IBM's own products.  Trial Tr. 243:07–10, 247:3–06, Mar. 16, 2022 (Ratliff). BMC's expert Ratliff calculated these damages using a baseline from BMC's historical core mainframe revenues from AT&T, based on a variety of considerations he outlined, and then forecasted BMC's lost revenues from the loss of AT&T as a mainframe customer.  Trial Tr. 226:18–228:05, Mar. 16, 2022 (Ratliff).

125.    But the evidence at trial does not support these damages.  Though BMC had a long, successful relationship with AT&T, AT&T independently decided to displace BMC software. Trial Tr. 187:22–25, Mar. 14, 2022 (Ah Chu); Trial Tr. 223:7–11, Mar. 16, 2022 (Ratliff); DX019.029; Trial Tr. 63:24–64:05, Mar. 17, 2022 (Skinner); DX460.30 (Ridge notes); Brickhaus Dep. 40:03–12.  Moreover, the evidence showed that AT&T was planning on transitioning away from mainframe software.  Findings of Fact, *supra* ¶¶ 43–45.  So, AT&T's decisions and conduct—not IBM's—are most consequentially tied to BMC's lost profits from AT&T .[33]

126.    A more credible lost profits model would have based its estimation on evidence showing how IBM's participation in Project Swallowtail accelerated the completion of AT&T's goals and the resultant loss of revenue for BMC.  BMC's model, however, does not do this.  *See* Ratliff Dep. 208:13–23.  Instead, BMC's model is predicated on a counterfactual assumption that AT&T would have chosen to use the BMC software forever but for IBM's alleged breach of section 5.4.

---

[33]    BMC's expert did not quantify the acceleration of the Project Swallowtail as a consequence of IBM's participation, even as he asserted it would have taken AT&T longer to complete Project Swallowtail without IBM's help.  Trial Tr. 154:01–20, March 16, 2022 (Román).

22-20463.8447

127.    Therefore, the court finds that BMC's lost profits model is too causally attenuated from IBM's own conduct and that BMC has not proven lost profits for IBM's breach of section 5.4 of the 2015 OA.

4.    **Damage Limitations in the MLA**

128.    IBM has asserted that MLA sections 9 and 10 limit BMC's potential recovery.  The court sets forth the applicable law below in the Conclusions of Law.  *See* Conclusions of Law, *infra* ¶¶ 207–10.  As explained further below, the court finds and concludes that MLA sections 9 and 10 are not enforceable against any of BMC's claims in this case because of IBM's intentional wrongdoing.

129.    Specifically, based on all the evidence recounted above concerning IBM's conduct, the court finds that IBM's conduct constitutes "intentional wrongdoing" as that term has been defined under New York law governing the enforceability of exculpatory damages clauses.  As explained above, IBM negotiated and entered into the 2015 OA with no intention whatsoever of performing thereunder, having previously signed a secret, conflicting agreement with AT&T to perform displacements pursuant to Project Swallowtail.  IBM never intended to (and never did) pay for the right to displace.  IBM's scheme to defeat BMC's contractual rights cheated BMC—a software company wholly dependent on the licensing of its intellectual property—out of hundreds of millions of dollars it was entitled to receive under the contract in exchange for the rights IBM exercised.  Based on all the foregoing facts, the court finds that IBM's conduct in this case was both fraudulent and malicious.  *See id.*  The court also finds that, through its misconduct in this case, IBM acted in bad faith.  *See id.*  The court further finds that, through its dealings with BMC and its performance of Project Swallowtail, IBM acted with reckless indifference to the rights of

others, namely BMC. *See id.* As a result, these contractual limitations provisions are unenforceable.

### 5.   **Punitive Damages**

130.   BMC also seeks punitive damages based on both IBM's fraud and IBM's "willful and malicious" misappropriation of trade secrets. Because the court finds and concludes elsewhere in these findings and conclusions that MLA sections 9 and 10 are unenforceable under New York law governing enforceability of contractual damages limitations, those provisions do not limit BMC's ability to recover punitive damages for these claims. *See* Conclusions of Law, *infra* ¶¶ 207–10.

131.   The court finds and concludes elsewhere in these findings and conclusions that IBM committed fraudulent inducement. The court finds by clear and convincing evidence that the harm with respect to which BMC seeks recovery of punitive damages resulted from fraud, and as to each and every element of the fraudulent-inducement claim found for liability and damages, the court hereby finds by clear and convincing evidence that BMC has established all elements of fraudulent inducement. *See* Conclusions of Law, *infra* ¶¶ 185–205.

132.   The court finds that awarding punitive damages is proper here and that $717,739,615.00 is an appropriate award in this case. In making that determination, the court has considered all evidence relating to the nature of the wrong, the character of the conduct involved, the degree of culpability of IBM, the situation and sensibilities of the parties concerned, the extent to which such conduct offends a public sense of justice and propriety, and IBM's capacity to pay. Here, the evidence of IBM's deliberate plan to defraud BMC out of hundreds of millions of dollars to enrich itself justifies an award of exemplary damages that would be meaningful for a company of IBM's size and based on IBM's behavior.

### III.   JURISDICTION

133.    The parties agree that the court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), original jurisdiction pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  *See* Dkt. 612 at 22.  The parties likewise agree that venue in this court is proper pursuant to 28 U.S.C. §§ 1391(a), (b), and (d).  *Id.*

### IV.   STANDARD OF REVIEW

134.    The parties agree that New York law governs the contract claims in this case and Texas law applies to BMC's common law and statutory trade secrets claims.  *Id.*  To prevail on its breach of contract claims, BMC must present evidence in support of the allegations set forth in the SAC and prove those allegations by a preponderance of the evidence. *See Raymond v. Marks*, 116 F.3d 466, 1 (2d Cir. 1997) (unpublished). "The burden of showing something by a preponderance of the evidence . . .simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9, 117 S. Ct. 1953 (1997) (internal quotation marks omitted).  As the fact finder, the court is entitled to make credibility findings of the witnesses and testimony and to draw reasonable inferences from the evidence presented.  *See Merck Eprova AG v. Gnosis S.p.A.*, 901 F. Supp. 2d 436, 448 (S.D.N.Y. 2012), *aff'd*, 760 F.3d 247 (2d Cir. 2014).

135.    The preponderance standard also applies to BMC's fraudulent inducement and misuse of information claims.  *See Champion v. Robinson*, 392 S.W.3d 118, 127 (Tex. App.— Texarkana 2012, pet. denied) (reviewing a fraudulent inducement claim under the preponderance standard); *Malone v. PLH Grp., Inc.*, No. 01-19-00016-CV, 2020 WL 1680058, at *5 (Tex. App.— Houston [1st Dist.] Apr. 7, 2020, pet. denied) (reviewing trade secret claims under the preponderance standard).  However, the court may award punitive damages only if BMC proves

22-20463.8450

by clear and convincing evidence that the harm at issue resulted from fraud.  *See* Tex. Civ. Prac. & Rem.Code Ann. § 41.003(a) (Supp.).

## V.   CONCLUSIONS OF LAW

136.   Based on the factual findings, the court concludes that BMC failed to prove its breach of contract claim involving section 8 of the MLA.   BMC failed to show by the preponderance that the information IBM purportedly misused fell within the contract's definition of confidential information and that, even if it did, IBM misused the information.   For similar reasons, the court also concludes that BMC failed to prove its DTSA, TUTSA, and common law unfair competition claims by the preponderance.

137.   Turning next to BMC's breach of contract claims involving the 2015 OA, the court concludes that BMC failed to demonstrate that IBM breached section 5.1.  Though IBM benefitted from Project Swallowtail, BMC did not prove that IBM used BMC's licenses for a purpose other than to help AT&T complete its software migration.  The court previously determined at summary judgment that IBM breached section 5.4.  Dkt. 586.  Now, the court concludes that IBM's breach resulted in direct damages, in the form of unpaid license fees, under the contract's express terms. BMC also proved that it substantially performed under the contract and persuasively argued that section 5.4 is not an unenforceable restrictive covenant.  Accordingly, the court finds that BMC is entitled to direct damages for the licensing rights that IBM used but for which it did not pay. However, the court concludes that BMC's consequential damages model is too speculative.  For that reason, BMC is unable to recover lost profits associated with AT&T's migration to IBM's software.

138.   The court further concludes that BMC proved by clear and convincing evidence that IBM fraudulently induced it into signing the 2015 OA.  As a result of IBM's fraudulent

68

conduct, the court finds that the MLA's damages disclaimers are unenforceable and that BMC is entitled to punitive damages.

## A.    BMC's Contract Claim Involving Section 8 of the MLA

139.    BMC claims that IBM violated section 8 of the MLA, which governs IBM's use of confidential information.   The parties agree that New York law requires the following four elements to sustain a breach of contract claim: (1) the existence of a contract; (2) the plaintiff's performance pursuant to the contract; (3) the defendant's breach; and (4) damages resulting from, or caused by, that breach.  *Riccio v. Genworth Fin.*, 124 N.Y.S.3d 370, 372, 184 A.D.3d 590 (N.Y. App. Div. 2020); *Canzona v. Atanasio*, 989 N.Y.S.2d 44, 47, 118 A.D.3d 837 (N.Y. App. Div. 2014); *see also* Dkt. 612 at 15.  The court concludes that BMC failed to prove that IBM breached section 8.

140.    Per the MLA, "Confidential Information does not include information that [IBM] can show . . .is or becomes a matter of public knowledge through no fault of [IBM]."  Findings of Fact, *supra* ¶ 20; PX1 at IBM00035620.  At trial, BMC pointed to specific instances where it said IBM violated this confidentiality restriction.  But BMC failed to show that this information was confidential under the contract's own definitions or that IBM misused it.  Findings of Fact, *supra* ¶¶ 85–110.  BMC's expert did not identify which information was public and which information was confidential.  *See id.*; Trial Tr. 202:9–16, Mar. 16, 2022 (Román).  On the contrary, IBM demonstrated that much of the information it allegedly misused was publicly available.  Findings of Fact, *supra* ¶¶ 85–110.  Accordingly, BMC did not present legally sufficient evidence that IBM contravened MLA section 8 through its use or disclosure of any confidential BMC information.

141.    Therefore, the court DISMISSES BMC's breach of contract claim as to MLA section 8 with prejudice.

22-20463.8452

**B.     BMC's DTSA, TUTSA, and Unfair Competition Claims**

**1.     DTSA and TUTSA Claims**

142.     The parties agree that the elements of a claim for trade secret misappropriation under TUTSA and DTSA are: (1) the ownership of a trade secret; (2) the misappropriation of a trade secret; and (3) an injury to the plaintiff or unjust enrichment to the defendant.  *See Morris-Shea Bridge Co. v. Cajun Indus., LLC*, No. 3:20-cv-00342, 2021 WL 4084516, at *6–7 (S.D. Tex. Feb. 22, 2021); *Silverthorne Seismic, LLC v. Sterling Seismic Servs., Ltd.*, No. H-20-2543, 2021 WL 4710813, at *4 (S.D. Tex. Oct. 7, 2021) (Miller, J.); *see also* Tex. Civ. Prac. & Rem. Code § 134A.004; 18 U.S.C. § 1836; Dkt. 612 at 23.

143.     A claim under DTSA also requires a showing that the trade secrets were used in interstate commerce.  18 U.S.C. § 1836(b)(1); *Silverthorne*, 2021 WL 4710813, at *4.  "Both the DTSA and TUTSA define 'trade secret' to include scientific and technical information, such as 'any formula [or] design,' that (1) the owner has taken reasonable measures to keep secret and (2) derives independent economic value from not being generally known or readily ascertainable through proper means."  *DBG Grp. Invs., LLC v. Puradigm, LLC*, No. 3:21-CV-678-S, 2022 WL 313435, at *3 (N.D. Tex. Feb. 2, 2022) (citing 18 U.S.C. § 1839(3); Tex. Civ. Prac. & Rem. Code § 134A.002(6)).

144.     BMC did not present legally sufficient evidence that IBM misappropriated a BMC-owned trade secret.  *See DBG Grp. Invs.*, 2022 WL 313435, at *3.  Specifically, BMC failed to demonstrate that any of the five technical support cases at issue contains trade secrets because: (a) each only contains customer support provided by low-level BMC help desk employees about off-the-shelf software products; and (b) the information at issue was publicly available.

70

145.     "'[M]isappropriation' under both statutes includes (1) 'acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means,' and (2) 'disclosure or use of a trade secret of another without express or implied consent by a person who used improper means to acquire knowledge of the trade secret,' or had reason to know that the trade secret was derived using improper means." *Id.* (citing 18 U.S.C. § 1839(5); Tex. Civ. Prac. & Rem. Code § 134A.002(3)).

146.     BMC's expert did not testify to any trade secrets.  Findings of Fact, *supra* ¶ 94. Nor did BMC present legally sufficient evidence that it owned a trade secret.  *Id.* ¶¶ 97–122.  But even assuming BMC showed that it owned a trade secret, BMC did not present legally sufficient evidence that IBM misappropriated that trade secret.  For example, IBM used BMC customer support for which AT&T paid $9.5 million annually to keep AT&T's mainframe environment running properly while AT&T continued to use BMC software to help run its business.  Sections 3 and 3.1 of the 2015 OA authorized IBM employees and third-party contractors to use BMC customer support information.  Findings of Fact, *supra* ¶¶  25–26.

147.     In addition, BMC did not present legally sufficient evidence that it sustained any recoverable damages from any misappropriation of a trade secret by IBM, in part because its damages model did not quantify the value of any alleged trade secret.  *See Select Interior Concepts, Inc. v. Pental*, No. 3:20-CV-295-L, 2021 WL 961690, at *3 (N.D. Tex. Mar. 14, 2021); Tex. Civ. Prac. & Rem. Code § 134A.004; 18 U.S.C. § 1836(b)(1).

148.     Therefore, BMC did not prove its claims under DTSA and TUTSA, and the court DISMISSES those claims with prejudice.

## 2.     BMC's Common Law Unfair Competition by Misappropriation Claim

149.     BMC claimed that IBM "solicited confidential and trade secret information from BMC to facilitate the replacement of BMC products," thereby engaging in unfair competition via

22-20463.8454

misappropriation.  *See* Dkt. 295 at 37–38, ¶ 148.  This claim likewise fails.

150.    Absent a contractual commitment, Texas law recognizes a claim for "misappropriation" of confidential information only where that information is "either secret or, at least substantially secret." *Stewart & Stevenson Servs., Inc. v. Serv-Tech, Inc.*, 879 S.W.2d 89, 99 (Tex. App.—Houston [14th Dist.] 1994, writ denied); *SP Midtown, Ltd. v. Urban Storage, L.P.*, No. 14-07-00717-CV, 2008 WL 1991747, at *5 n.5 (Tex. App.—Houston [14th Dist.] May 8, 2008, pet. denied) (mem. op.).

151.    BMC did not present legally sufficient evidence that any information in the five technical support cases was actually "secret." *See* Findings of Fact, *supra* ¶¶ 85–110.  Even if BMC could show that any information in the five technical support cases was "secret," for the same reasons set forth above, BMC did not present legally sufficient evidence to show that IBM misappropriated any confidential information of BMC contained in the technical support cases.

152.    Therefore, BMC did not prove its common law misappropriation claim, and the court DISMISSES the claim with prejudice.

***

To summarize, BMC failed to prove by the preponderance of the evidence that IBM breached section 8 of the MLA or misappropriated trade secrets under DTSA, TUTSA, or unfair competition.  The court DISMISSES those claims with prejudice.  Finally, the court concludes that BMC did not bring its trade secrets claims in bad faith.

## C.    BMC's Contract Claims Involving the 2015 OA

153.    BMC claims that IBM breached sections 5.1 and 5.4 of the 2015 OA.  *See* Dkt. 295 at 23–27, ¶¶ 71–89.  New York law requires the following four elements to prove a breach of contract claim: (1) the existence of a contract; (2) the plaintiff's performance pursuant to the

22-20463.8455

contract; (3) the defendant's breach; and (4) damages resulting from, or caused by, that breach. *Riccio*, 989 N.Y.S.2d at 47. While BMC failed to prove that IBM breached section 5.1, the court concludes that BMC satisfied each element for its breach of section 5.4 claim.

### 1.   **BMC Failed to Prove that IBM Breached Section 5.1**

154.   BMC argued that IBM breached section 5.1 of the 2015 OA by using its products to effectuate the displacement at AT&T.

Section 5.1 provides:

BMC will allow [IBM] to use, access, install, and have operational responsibility of the BMC Customer Licenses (together, "Access and Use") under the terms of the BMC Customer's license agreement with BMC for no fee, including on Computers owned or leased by BMC Customer and BMC Customer's facility, provided that the BMC Customer Licenses are used solely for the purposes of supporting the BMC Customer who owns such licenses.

PX4 § 5.1. Thus, to establish a breach of OA section 5.1, BMC had the burden to prove that IBM used BMC products at AT&T in a manner that was not "for the sole purpose of supporting AT&T." Dkt. 603 at 9 (quotations, brackets and internal citations omitted); *see also* PX4 § 5.1.

155.   BMC did not meet its burden of proving that IBM's *use* of the licenses was for any other *purpose* than to support AT&T in its Project Swallowtail efforts. To be sure, IBM benefitted from Project Swallowtail and, by proxy, derived ancillary benefits from the using the AT&T BMC licenses. *See* Findings of Fact, *supra* ¶¶ 32, 48–54. And BMC put forth ample evidence that IBM wanted to participate in Project Swallowtail. *Id.* But whether IBM benefitted from, or wanted, Project Swallowtail is not contractually relevant: the contract did not condition IBM's "no fee" use of the licenses on it not benefitting from the use of the licenses. *See* PX4 § 5.1. The record showed that IBM used the licenses to achieve what AT&T wanted done—and nothing more.

156.   Accordingly, the court DISMISSES BMC's breach of contract claim as to section 5.1 with prejudice.

22-20463.8456

2.     **BMC's Non-Performance Under Section 5.1 Was Immaterial**

157.     IBM argued that it cannot be held liable for any breach because BMC failed to perform its own obligations under the 2015 OA, namely disclosing material differences between the AT&T customer license agreement and its standard EULA agreement.  *See* Dkt. 588 at 5–6; Findings of Fact, *supra* ¶ 84.  The parties agree that "[u]nder New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach."  *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007); *see* Restatement (Second) of Contracts § 237 (1981) ("material failure").  It is a "fundamental principle of contract law" that "the material breach of a contract by one party discharges the contractual obligations of the non-breaching party."  *Bear, Stearns Funding, Inc. v. Interface Grp.–Nevada, Inc.*, 361 F. Supp. 2d 283, 291 (S.D.N.Y. 2005); *see Medinol Ltd. v. Bos. Sci. Corp.*, 346 F. Supp. 2d 575, 618 (S.D.N.Y. 2004) ("As a general principle of contract law, a material breach excuses the other party's nonperformance.") (collecting cases); *see* Dkt. 612 at 22–23.

158.     A breach is material under New York law if it "go[es] to the root of the agreement between the parties."  *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997) (internal quotation omitted).  A party's contractual obligation to perform will be excused if "the other party's breach of the contract is so substantial that it defeats the object of the parties in making the contract."  *Id.* at 289; *see* Restatement (Second) of Contracts § 241 (1981) (listing circumstances that are significant for determining the materiality of a breach, including "the extent to which the injured party will be deprived of the benefit which he reasonably expected" and "the

74

22-20463.8457

extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing").

159.    "There is no simple test for determining whether substantial performance has been rendered and several factors must be considered." *Hadden v. Consol. Edison Co. of N.Y.*, 312 N.E.2d 445, 449, 34 N.Y.2d 88, 356 N.Y.S.2d 249 (N.Y. 1974).  These factors include the ratio of the performance already rendered to that unperformed, the quantitative character of the default, the degree to which the purpose behind the contract has been frustrated, the willfulness of the default, and the extent to which the aggrieved party has already received the substantial benefit of the promised performance.  *Id.*; *see also Wechsler v. Hunt Health Sys., Ltd.*, 330 F. Supp. 2d 383, 421–22 (S.D.N.Y. 2004); *id.* at 414, 419, 422 (breach is material only if it goes "to the root of the agreement between the parties," and alleged non-material breach "does not show that [plaintiff] did not substantially perform its contractual obligations").

160.    BMC did not disclose AT&T's customer license to IBM.  Findings of Fact, *supra* ¶ 84.  However, based on the facts presented, the court finds that BMC substantially complied with the 2015 OA because there are no "material differences" between the standard BMC EULA and the BMC-AT&T license agreement that section 5.1 required it to disclose.  *See* Findings of Fact, *supra* ¶¶ 28–33.  For example, IBM could not act as AT&T's outsourcer without BMC's consent under either agreement, and BMC could (and indeed, did) reasonably condition its consent on IBM agreeing to the same non-displacement protection as in the OA.  *See id.*  The AT&T-BMC license agreement also would limit the outsourcing to only providing "data processing services" and acting for the "sole benefit" of AT&T.  *See id.*

161.    Most importantly, the OA represents the "single point of control" between IBM and BMC and does not afford IBM any "opt-out" rights that would enable it to operate directly under

22-20463.8458

AT&T's license.  Findings of Fact, *supra* ¶ 23; PX4.  It further states that the OA provides "the terms under which BMC grants to [IBM] the right to use the [BMC] products in its IT Services business."  Findings of Fact, *supra* ¶ 23; PX4.  Similarly, the OA states that it is the document that "sets forth [IBM's] rights" regarding "Access and Use" of BMC customer licenses for IT Services. Findings of Fact, *supra* ¶ 23; PX4.  The parties agreed in the OA that "[i]t is the intent of the parties to operate under a common set of terms and conditions on a worldwide basis that addresses both [IBM's] and BMC's interests."  Findings of Fact, *supra* ¶ 27; PX4.  Section 5 likewise provides that the OA controls IBM's provision of outsourcing services, regardless of any rights available under other contracts.  Findings of Fact, *supra* ¶ 27; PX4 ("Section 5 "will apply to [IBM]'s access and use of the BMC Customer Licenses and apply retroactively to the point of first access by [IBM]."").  No matter what terms exist in BMC's agreement with a third-party customer, nothing in the OA qualifies its applicability such that IBM could operate outside of its limits.

162.    Thus, IBM's argument that would have "chosen to proceed directly under AT&T's license, rather than electing Access and Use through the OA" presents epistemological difficulties. *See* Dkts. 428 at 31–32, 597 at 8.  BMC's disclosure obligation did not arise until after the parties executed the OA, and once IBM signed the OA, it could not proceed exclusively under AT&T's own rights.  To the extent IBM suggests that BMC breached the 2013 OA's EULA provision, IBM has not explained how BMC's alleged non-compliance with a past contract is relevant, given that BMC asserted breach of only the 2015 OA.  Regardless, any such argument with respect to the 2013 OA would fail for the same reasons described for the 2015 OA.  Therefore, the obligation to inform IBM of any "material differences" never arose, disposing of this "EULA" argument as a factual matter.

22-20463.8459

163.    Even if IBM could proceed directly under AT&T's license rather than abiding by the 2015 OA—and, as discussed above, it could not—the AT&T-BMC license agreement still would not have permitted IBM's Swallowtail actions, rendering any non-disclosure about that agreement legally immaterial in this case.   Under section 3.3 of the AT&T-BMC license agreement, outsourcers were not permitted to use BMC products unless BMC gave its written consent, and BMC had the right to "reasonably" withhold that consent.  PX6.  Given IBM's status as a mainframe software competitor and the importance of AT&T as a customer, it would hardly be unreasonable for BMC to withhold its consent to IBM serving as AT&T's outsourcer unless IBM agreed to protections for BMC similar to OA section 5.4.  *See also* Trial Tr. 203:13–204:2, 205:4–206:3, Mar. 14, 2022 (Ah Chu).  For this additional reason, the AT&T-BMC agreement would not have allowed IBM's planned Project Swallowtail activities, which means this alleged EULA non-disclosure is legally immaterial to this case involving BMC's claim for breach of the OA.  Accordingly, for both factual and legal reasons, the court concludes that, to the extent BMC breached, its nonperformance was not material and, therefore, it substantially performed under the contract.  *See Merrill Lynch*, 500 F.3d at 187.

### 3.    IBM's Breach of Section 5.4 Caused BMC's Damages

164.    The court already determined that IBM breached section 5.4 of the 2015 OA by displacing BMC's software products with IBM's own at AT&T.  *See* Dkt. 586.  In light of the court's finding that BMC substantially performed under the contract, the court must now determine whether IBM's breach of section 5.4 damaged BMC.  Looking to the MLA and 2015 OA's express, plain language, the court concludes that IBM's breach directly damaged BMC.

165.    Damages are generally bifurcated into two categories: direct and consequential. BMC seeks both in connection with IBM's breach of section 5.4.  Under either, BMC must show

22-20463.8460

that IBM's breach caused its damages.  As the Court of Appeals of New York explained, "[i]t is axiomatic that damages for breach of contract are not recoverable where they were not actually caused by the breach."  *Pesa v. Yoma Dev. Grp., Inc.*, 965 N.E.2d 228, 230, 18 N.Y.3d 527, 942 N.Y.S.2d 1 (N.Y. 2012).[34]   The court concludes that BMC established that its license fees represent the direct damages expressly contemplated under the contract.  As a result, BMC may recover $717,739,615.00 in unpaid license fees.  With respect to BMC's lost profits model, however, the court concludes that BMC failed to prove that IBM's breach of section 5.4 through its participation in Project Swallowtail caused it to lose profits from AT&T.  Accordingly, BMC recovers nothing on its lost profits claim.

a.   **BMC's Damages are Direct Damages Under the Contract's Express Terms**

166.   A buyer seeks direct damages "when he tries to recover the value of the very performance promised."  *Schonfeld v. Hilliard*, 218 F.3d 164, 175 (2d Cir. 2000) (internal quotations omitted); *Versatile Housewares & Gardening Sys., Inc. v. Thill Logistics, Inc.*, 819 F. Supp. 2d 230, 237 (S.D.N.Y. 2011).  "Direct damages are typically expectation damages, measured by what it would take to put the non-breaching party in the same position that it would be in had the breaching party performed as promised under the contract."  *Latham Land I, LLC v. TGI Friday's, Inc.*, 948 N.Y.S.2d 147, 151–52, 96 A.D.3d 1327 (N.Y. App. Div. 2012) (where the plaintiff sought to recover "the loss of the benefit of the bargain," the damages sought were not barred by a contractual provision excluding consequential damages); *see also Bi–Econ. Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 886 N.E.2d 127, 130, 10 N.Y.3d 187, 856 N.Y.S.2d 505 (N.Y. 2008) ("It is well settled that in breach of contract actions 'the nonbreaching party may recover

---

[34]   Because damages must "be directly traceable to the breach," IBM was permitted to produce evidence disputing the causal nexus between its breach and BMC's harm.  *See Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 526 (2d Cir. 2004).  *See also* Dkt. 603 at 4.

general damages which are the natural and probable consequence of the breach.'"); *In re CCT Commc'ns, Inc.*, 464 B.R. 97, 116 (Bankr. S.D.N.Y. 2011) (direct damages "provide the aggrieved party with the difference between the price he agreed to pay and the value he was to receive through performance"); *Kenford Co. v. County of Erie*, 537 N.E.2d 176, 178, 73 N.Y.2d 312, 540 N.Y.S.2d 1 (N.Y. 1989) (direct damages are those that "are the natural and probable consequence of the breach").

167.    IBM argued that BMC cannot prove causation because "[n]on-breach of OA section 5.4 would have meant that IBM did not execute Project Swallowtail, not that IBM would have purchased hundreds of millions of BMC software licenses." Dkt. 735 ¶ 431.  Instead, IBM claimed that BMC's "license fee" damage model is "based on a hypothetical and speculative transaction in which BMC asserts that IBM would have agreed to pay more than $700 million to buy its own BMC software licenses." *Id.* ¶ 433.

168.    The problem for IBM, however, is that it agreed to do just that.  The MLA is clear: "[e]ach party's liability arising out of or related to this agreement, the product, or the use of the product shall be limited to the greater of $5,000,000 or the amount paid or payable by customer for the license to the applicable product giving rise to the claim."[35]  PX1 at IBM00035620. "Payable" refers to the "sum of money . . . that is to be paid." *Payable*, Black's Law Dictionary (11th ed. 2019); *Payable*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/payable (last visited May 9, 2022) (the amount that "must be paid"); *see also Carr v. Maryland Cas. Co.*, 88 Misc. 2d 424, 427, 388 N.Y.S.2d 196 (N.Y. Civ. Ct. 1976) (finding "paid or payable" language unambiguous).  The court concludes that IBM's liability is limited to the greater of $5 million or the amount [that must be paid] for the license to the applicable

---

[35]    Section 10 of the MLA does not contain a liquidated damages provision and the "paid or payable" language does not reflect a contractual penalty.

22-20463.8462

product giving rise to the claim.  *See* PX1 at IBM00035620.

169.    IBM displaced fourteen BMC products with respect to BMC's section 5.4 claim. The 2015 OA provided only one avenue through which IBM could exercise the displacement rights it did in performing Project Swallowtail.  *See id.* ¶¶ 24, 29.  To secure those rights, IBM would have had to purchase the licenses and related support under section 8 and Exhibit H, which contained agreed-upon fee amounts for each specific product, including pre-negotiated minimum discounts.  *See id.* ¶ 29; PX4 §8.1.

170.    Notwithstanding this textual support for BMC's license fee model, IBM appeared to argue that the 2015 OA's "minimum discount" language renders the contract materially incomplete.  *See Trianco, LLC v. IBM*, 466 F. Supp. 2d 600, 605 (E.D. Pa. 2006) ("Every material term must be agreed upon in order to form a binding contract, and the court will not enforce a contract if price negotiations are left to a future date."), *aff'd in part*, *vacated in part*, 271 F. App'x 198 (3d Cir. 2008); *see also Major League Baseball Props., Inc. v. Opening Day Prod., Inc.*, 385 F. Supp. 2d 256, 271 (S.D.N.Y. 2005) ("Price or compensation are material terms in a contract requiring definiteness.").

171.    In *Trianco*, IBM and a subcontractor entered into an agreement wherein the subcontractor would assist IBM with preparing a government bid.  466 F. Supp. 2d at 603.  Their agreement did not include a specific price term, though it did provide a method to determine the price ceiling: the subcontractor would "supply the equipment and/or services . . . at prices that do not exceed" a set amount.  *Id.*  Only after IBM won the contract were the parties to identify a fixed price.  *See id.*  Looking to the contract's plain language, the district court found that the parties failed to negotiate a subcontract price.  *Id.* at 606.

172.    IBM also relies on *United Press v. New York Press Company*, a turn-of-the-century

Court of Appeals of New York case, for the proposition that the 2015 OA failed to set a contract price as a matter of law. *See* 56 N.E. 527, 164 N.Y. 406 (N.Y. Ct. App. 1900); Dkt. 735 ¶ 434. In that case, the defendant agreed to "pay to [the plaintiff] . . . a sum *not exceeding* three hundred dollars during each and every week" that the plaintiff delivered a daily news report "without interruption from and after the first day of January, in the year 1900." *United Press*, 164 N.Y. at 408 (emphasis added). For some time, the defendant paid United Press $300 per week for the news reports. *Id.* at 409. But when the defendant sent United Press written notice that it could not continue paying the $300 sum, United Press filed suit and demanded judgment for damages in the sum of $93,000, based on its assertion that it was owed $300 a week from January 1, 1894, through January 1, 1900. *Id.* The trial court ruled in favor of United Press; the Court of Appeals of New York reversed because the contracted-for $300 limit set a price ceiling that the parties could not exceed, not a fixed, definite rate of compensation. *Id.* at 411. Because the contract was "silent as to the price which is to be paid to the plaintiff during its term," the court concluded it did not possess "binding force." *Id.* at 413–14.

173.     But unlike *Trianco* and *United Press*, the pre-negotiated minimum discounts in this case do not represent a "starting point" for price negotiations between the parties. *See* Dkt. 735 ¶ 434. Rather, they reflect definite, bargained for prices: "[IBM] will be entitled to a global minimum discount of 72% off the listed price in Exhibit H for all purchases of new licenses." PX4 § 8.1. The price IBM must pay for the licenses is thus easy to discern. *See id.* Had IBM sought to purchase the BMC licenses, it might have successfully negotiated a steeper discount. Indeed, sophisticated business entities often bargain for more beneficial prices than those set by contract. But IBM did not attempt to purchase the licenses, and it never sought to negotiate a steeper discount. So, in measuring BMC's direct damages, this court declines IBM's invitation to go

beyond the contract's text and imagine a scenario in which IBM negotiated a steeper discount for BMC's licenses while displacing BMC's products at AT&T.

174.     In addition to being factually distinguishable from both cases, the dictum in *United Press* is unhelpful to IBM's argument that it owed BMC nothing for exercising rights for which it did not pay.  *See* 164 N.Y. at 411 ("Whether in all cases of an executory contract of purchase and sale, where the parties are altogether silent as to the price, the law will supply the want of any agreement as to price, by inferring that the parties must have intended to sell and to buy at a reasonable price, may be a question of some difficulty.  Undoubtedly, the law makes that inference where the contract is executed by the acceptance of the goods by the defendant, in order to prevent the injustice of the defendant taking the goods without paying for them."); *id.* at 412 ("[W]here work has been done, or articles have been furnished, a recovery may be based upon quantum meruit or quantum valebant."); *see also Quantum valebant*, Black's Law Dictionary (11th ed. 2019) ("At common law, a count in an assumpsit action to recover payment for goods sold and delivered to another.").

175.     The license and support fees sought by BMC are the amounts IBM owes under the OA for the set of rights it utilized.  Those fees are thus the "amount . . . payable" under MLA section 10 because they are what "must be paid" under OA section 8 and Exhibit H to obtain the rights IBM exercised.  Thus, under the contract's plain text, the license fees represent direct damages that are "the natural and probable consequence of the breach."  *See Bi–Econ.*, 886 N.E.2d at 130.

176.     Therefore, the court finds that BMC is entitled to $717,739,615.00 in direct contract damages for IBM's breach of section 5.4 of the 2015 OA.[36]

---

[36]     The parties agree that, under New York law, a plaintiff is entitled to recover prejudgment interest at the rate of 9% "as a matter of right" on a breach of contract claim.  *New England Ins.*

b.     **BMC's Consequential Damages Model Is Too Speculative**

177.     BMC also seeks to recover $104.5 million in lost profits from its relationship with AT&T.  *See* Trial Tr. 249:24–250:11, Mar. 16, 2022 (Ratliff).  BMC argues that this figure represents the amount in fees that AT&T would have continued to pay BMC had IBM not "caused" AT&T to terminate its relationship with BMC.  Dkt. 723 ¶ 153.  To arrive at the $104 million figure, BMC's damages expert used a terminal value approach—also known as a perpetuity valuation model—to value what he had determined to be about $5.6 million in annual lost profits from the loss of the AT&T business.  Trial Tr. 230:05–10, 235:03–09, Mar. 16, 2022 (Ratliff).  Mr. Ratliff testified that he used a perpetuity approach because he thought there was "uncertainty" about what might have happened to BMC's mainframe business with AT&T "in the absence of the accused acts."  *Id.* 226:18–228:05.  Basic arithmetic confirms that BMC's lost profits model assumes that AT&T would have stayed a BMC mainframe software customer for a total of nineteen years.  *See id.* 247:20–248:18 (Ratliff).  BMC did not present an alternative model that measured how IBM's participation in Project Swallowtail may have accelerated the loss of BMC's mainframe revenues from AT&T.  *See id.* 245:11–15 (Ratliff); *see also* Trial Tr. Mar. 16, 2022 154:01–20 (Román).

178.     A plaintiff need only demonstrate "a stable foundation for a reasonable estimate of the damage incurred as a result of the breach."  *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 110–11 (2d Cir. 2007) (citation and internal quotation marks omitted).  Damages, however, "must be not merely speculative, possible, and imaginary."  *Id.*  Rather, a plaintiff must

---

*Co. v. Healthcare Underwriters Mut. Ins. Co.*, 352 F.3d 599, 602–03, 606 (2d Cir. 2003); N.Y. C.P.L.R. §§ 5001(a), 5004.  Had BMC elected to recover only its contract damages, New York law would have entitled it to prejudgment interest at a rate of 9% from January 1, 2016, until the date of judgment.

22-20463.8466

prove that they are a "reasonably certain" consequence of the defendant's breach.  *Id.*; *see also*
*E.J. Brooks Co. v. Cambridge Sec. Seals*, 105 N.E.3d 301, 307, 80 N.Y.S.3d 162 (N.Y. 2018)
(explaining that lost future profits that are "remote, contingent or speculative" and are not
"reasonably traced to the event" cannot satisfy the requisite element of causation); *Kenford Co. v.
County of Erie.*, 67 N.Y.2d 257, 261, 493 N.E.2d 234, 502 N.Y.S.2d 131 (N.Y. 1986) ("[I]t must
be demonstrated with certainty that such damages have been caused by the breach and, second, the
alleged loss must be capable of proof with reasonable certainty.  In other words, the damages may
not be merely speculative, possible or imaginary, but must be reasonably certain and directly
traceable to the breach, not remote or the result of other intervening causes.").

179.    BMC did not present legally sufficient evidence of causation of damages under a
"lost profits" theory because it failed to show that AT&T would not have removed BMC's software
even if IBM had complied with OA section 5.4, and thus any breach did not "directly and
proximately cause[]" BMC's damages.  Dkt. 603 at 4 (quoting *Nat'l Mkt. Share, Inc. v. Sterling
Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004)).  BMC's lost profits damages model assumes that
BMC would have retained AT&T as a mainframe customer for nineteen years—and at the same
level of revenue and profitability—if IBM had declined to assist AT&T with Project Swallowtail.

180.    But the factual record belies this assumption.  AT&T initiated Project Swallowtail
in April 2013 to migrate away from BMC's products because its use of BMC's software inhibited
its larger standardization goals.  Findings of Fact, *supra* ¶¶ 44–55.  As BMC has acknowledged,
AT&T could have accomplished these strategic objectives by having a different company perform
the displacement.  *See* Dkt. 454 at 20; Dkt. 416 at 49 ("[O]ther outsourcers could have performed
the displacement for AT&T; in fact, six such outsourcers did perform parts of the displacement.").
Accordingly, BMC recovers nothing on its lost profits claim.

4.     **Section 5.4 is not an Unenforceable Restrictive Covenant**

181.     IBM pleaded an affirmative defense that section 5.4 of the 2015 OA is an unenforceable restrictive covenant.  *See* Dkts. 299 at 22, 694 at 24–25.  The court adopted Judge Bryan's conclusion that BMC's *interpretation* of section 5.4 did not render it an unenforceable restrictive covenant.  *See* Dkt. 561 at 12–13.  Now that IBM's larger unenforceability argument is squarely before it, the court concludes that section 5.4 is not an unenforceable restrictive covenant.

182.     Under New York law, non-competition restraints are reasonable only if "(1) no greater than is required for the protection of the legitimate interest of the [business], (2) does not impose undue hardship on the [subject], and (3) is not injurious to the public." *BDO Seidman v. Hirshberg*, 712 N.E.2d 1220, 1223, 93 N.Y.2d 382 (N.Y. 1999).   However, while courts "rigorously examine[]" these factors in the context of restrictive employment agreements, *see Am. Inst. of Chem. Eng'rs v. Reber-Friel Co.*, 682 F.2d 382, 387 (2d Cir. 1982), "restrictive covenant[s] in an ordinary commercial contract" receive lighter scrutiny.  *See Calico Cottage, Inc. v. TNB, Inc.*, No. 11–CV–0336 (DLI) (MDG), 2014 WL 4828774, at *5 (E.D.N.Y. Sept. 29, 2014).  That is because, generally, "where two business entities agree to a restrictive covenant, there is . . . no concern about the loss of [an] individual's livelihood or an imbalance of bargaining power." *Id.*; *see also Penske Media Corp. v. Shutterstock, Inc.*, 548 F. Supp. 3d 370, 378 (S.D.N.Y. 2021) ("[C]ompetition concerns, if they are relevant at all, are minimized in the context of a contract between two sophisticated business parties.").  Three factors govern the court's assessment of contractual restraints agreed to between businesses: (1) the presence of a legitimate business interest; (2) the reasonableness of the restriction's scope; and (3) the hardship on the restricted party.  *See Calico Cottage, Inc.*, 2014 WL 4828774, at *5.

22-20463.8468

183.    First, IBM's insistence that section 5.4 only protects BMC's revenue is misplaced. BMC demonstrated that section 5.4's displacement prohibition was designed to prevent giving IBM an unfair advantage when competing with BMC in the software business—a clearly legitimate business interest.  IBM directly competes against BMC as a mainframe software developer and vendor.  Findings of Fact, *supra* ¶¶ 6–9.  But as an IT outsourcer, IBM works with clients that use BMC's mainframe software—and not IBM's—to keep their computer systems up and running.  *Id.*  By wearing both hats, IBM can acquire unique knowledge about how a competitor's software operates on a mutual customer's mainframe system.  *Id.*  Indeed, the trial record showed that, as AT&T's IT outsourcer, IBM could contact BMC's support services to diagnose software problems, gleaning first-hand insight into how BMC's product functioned in the AT&T environment.  *Id.* ¶¶ 12, 15–16.  To perform as an IT outsourcer, IBM needed "a contractual vehicle . . . to conduct . . . business" with "BMC and any clients [in] an outsourcing environment." *Id.* ¶ 14; Craigsop Dep. 26:01–07.  BMC provided IBM that ability under the 2015 OA's "no fee" Access and Use option on the condition that it did not then displace BMC's products with its own products.  Findings of Fact ¶ 10.; Schulman Dep. 145:10–147:5 (explaining that the parties' agreements prevented IBM from "leveraging its position and access to displace BMC").  Both IBM and BMC are sophisticated business entities "capable of understanding the terms and implications of" section 5.4's non-displacement provision "and making an informed decision as to its risks and benefits."  *See Nat'l Elevator Cab & Door Corp. v. H & B, Inc.*, No. 07CV1562(ERK)(RML), 2008 WL 207843, at *9 (E.D.N.Y. Jan. 24, 2008), *order aff'd and remanded sub nom,* 282 F. App'x 885 (2d Cir. 2008); *see also* Findings of Fact, *supra* ¶ 5.  Second, section 5.4 is reasonable in scope.  The non-displacement provision applies only to the fifty-four customers listed in Exhibit K.  Of those fifty-four customers, IBM serves as an IT outsourcer to

eighteen.  Thus, section 5.4 effectively is limited to eighteen mutual customers.  Moreover, the 2015 OA was of a limited duration, governing the parties' relationship from September 30, 2015, to March 27, 2018.

184.    Third, section 5.4 does not impose an undue hardship on IBM, which *consented* to the provision following intensive, sophisticated negotiations held at arm's length.  The record demonstrates that IBM secured valuable benefits by assenting to the non-displacement provision, undercutting its hardship appeals.  *See* Findings of Fact, *supra* ¶¶ 56–66.

***

To summarize, BMC did not prove by the preponderance that IBM breached section 5.1 of the 2015 OA.  To the extent that BMC did not perform under section 5.1 of the 2015 OA, its nonperformance was immaterial.  IBM breached section 5.4 when it displaced fourteen BMC products with its own at AT&T.  The MLA expressly contemplates the payment of licensee fees in the event of liability.  Section 5.4 is not an unenforceable restrictive covenant that would otherwise annul IBM's liability for its breach.  Accordingly, BMC may recover $717,739,615.00 in direct damages in the form of the applicable license fees and associated support services for IBM's breach.

## D.    BMC Proved that IBM Fraudulently Induced it into Signing the 2015 OA

185.    "Texas law has long imposed a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations."  *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998).  The court concludes that IBM breached that duty with respect to the 2015 OA.

186.    Fraudulent inducement "arises only in the context of a contract."  *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018).  "As a general rule, the failure to perform the terms of

22-20463.8470

a contract is a breach of contract, not a tort." *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 597 (Tex. 1992).  However, "when one party enters into a contract with no intention of performing, that misrepresentation may give rise to an action in fraud."  *Id.*

> Under Texas law, a fraudulent inducement claim requires proof that:
>
> (1) the defendant made a material misrepresentation; (2) the defendant knew at the time that the representation was false or lacked knowledge of its truth; (3) the defendant intended that the plaintiff should rely or act on the misrepresentation; (4) the plaintiff relied on the misrepresentation; and (5) the plaintiff's reliance on the misrepresentation caused injury.

*Int'l Bus. Machs. Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 228 (Tex. 2019).  Where a plaintiff "presents legally sufficient evidence on each of the elements of a fraudulent inducement claim, any damages suffered as a result of the fraud sound in tort," including economic losses relating "to the subject matter of the contract."  *Formosa*, 960 S.W.2d at 47.

187.    Though these basic elements are uncontested, *see* Dkt. 612 at 23, the parties differ in their understandings of what IBM's intentions should be measured against: the unambiguous terms of the contract or IBM's subjective interpretation of the contract.  *Compare* Dkt. 598 at 16 ("[T]he Court should assess whether IBM intended to perform under the OA against the plain contractual meaning as written, not based on IBM's theory of an unwritten 'compromise.'"), *and* Dkt. 668 at 10 (arguing that Texas caselaw holds that "a party cannot justifiably rely on statements made during highly contentious negotiations, especially statements that conflict with the ultimate, unambiguous language of a written contract"), *with* Dkt. 597 at 23 ("IBM repeatedly told BMC that it interpreted the non-displacement language as allowing IBM to carry out a customer-ordered replacement of BMC software.  The court will need to decide whether those repeated statements preclude any fraud claim by disproving an intent to deceive."), *and* Dkt. 696 ("BMC's cases stand for the uncontroversial proposition that a plaintiff cannot rely on [extracontractual communications] where reliance is later disclaimed or contradicted by the words of the contract.").

188.    The court concludes that IBM made (1) a material misrepresentation when it promised in writing not to displace BMC's products with its own that it (2) knew at the time was false, and (3) intended that BMC to rely on the misrepresentation.  The court likewise concludes that BMC relied on IBM's written promise not to displace BMC's products with its own and that this reliance caused its injury insofar as its injury reflects direct contract damages.  BMC shall recover direct and punitive damages from IBM on its fraudulent inducement claim, plus prejudgment interest in the amount of 5% and post-judgment interest.

1.    **Material Misrepresentation**

189.    IBM made written "material misrepresentations" when it promised not to displace BMC products with its own products at Exhibit K customers—including AT&T—while operating under the 2015 OA's "no fee" Access and Use option.  *See* PX4.  Section 5.4's non-displacement provision was a significant source of contention during the 2015 OA's negotiation, and BMC made clear that it would not remove AT&T from the list of customers on Exhibit K subject to it.  *See* Findings of Fact, *supra* ¶¶ 56–66.  In short, the negotiation history makes clear that BMC would not have entered the contract with IBM but for (1) the non-displacement provision and (2) its application to the AT&T account.  *See id.*  Thus, IBM made a material misrepresentation when it agreed not to displace BMC's products with its own.

2.    **IBM Knew the Representation was False, Lacked an Intention to Perform, and Sought BMC's Reliance on Its Misrepresentation**

190.    The parties agree that "a fraud claim can be based on a promise made with no intention of performing, irrespective of whether the promise is later subsumed within a contract." *See Formosa Plastics*, 960 S.W.2d at 46; Dkt. 612 at 23; *see also Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986) ("A promise to do an act in the future is actionable fraud when made with the intention, design and purpose of deceiving, and with no intention of performing the

22-20463.8472

act.").  In determining IBM's intent, the court looks to "the time the party made the representation," though it may also consider IBM's "subsequent acts" to infer its intent.  *See Spoljaric*, 708 S.W.2d at 434.

191.    IBM asserts that it "did not intend to deceive BMC . . . and entered the 2015 OA under its mistaken belief that it was permitted to assist AT&T with Project Swallowtail."  Dkt. 696 at 13.  To be sure, "the mere failure to perform a contract is not evidence of fraud," *Formosa Plastics*, 960 S.W.2d at 48, because a "[f]ailure to perform, standing alone, is no evidence of the promisors' intent not to perform when the promise was made."  *Spoljaric*, 708 S.W.2d at 435.  But IBM's defense strains credulity.[37]  Though only "[s]light circumstantial evidence of fraud . . . is sufficient to support a finding of fraudulent intent," *id.*, the court concludes that BMC persuasively showed that IBM "made representations with the intent to deceive and with no intention" of complying with the 2015 OA's non-displacement provision "as represented" in the written contract.  *See Formosa Plastics*, 960 S.W.2d at 48.

192.    IBM knew that its representations were false and lacked an intention to perform under the written contract.  IBM's lead negotiator testified that IBM "knew what [it was] signing." Findings of Fact, *supra* ¶ 64, n. 21.  The record convincingly reflects that IBM knew it was signing a limitation on its ability to displace BMC's products with its own.  *See, e.g.*, Findings of Fact, *supra* ¶ 35; PX460 (e-mail from Stafford explaining that the non-displacement language was "very clear" in limiting "what [IBM] [is] permitted or not permitted to do in situations where we take

---

[37]    IBM argues that a court cannot measure its intent on the unambiguous contractual provision because, otherwise, "every finding that a contractual provision is unambiguous would automatically require a finding that the breaching party also intended to deceive—an absurd result."  Dkt. 696 at 12–13.  IBM's doctrinal concern need not apply here because this court's measure of IBM's intent is not in the unambiguous contract language but the substantial factual record evidencing its knowledge of the non-displacement provision's plain meaning—and its intentional disregard of the language to which it agreed.

22-20463.8473

over a client's footprint" ); Findings of Fact, *supra* ¶ 30; PX49 at IBM00078246 (IBM internal guidance on 2013 OA explaining that "[w]here displacement is desired by the Client," the "[c]ostly [a]pproach" is to "[n]egotiate with BMC to acquire equivalent BMC licenses to be held by IBM that do not include the restrictive language" contained in "client-licensed BMC products"); Findings of Fact, *supra* ¶¶ 38, 72; PX34 (Sweetman e-mail explaining that the 2013 language "bar[red] IBM from displacing the BMC products with IBM products for the duration of our services agreement with the client"); PX30 at 1 (IBM employee internally stating, prior to the 2013 OA's execution, that she "didn't think [IBM was] agreeing to another non-displacement clause – in fact I thought we agreed to negotiate out of that").

193.    IBM's insistence on removing AT&T from the list of accounts covered by the non-displacement provision underscores that it did not believe that the 2015 OA authorized a customer-directed displacement.  *See* Findings of Fact, *supra* ¶ 62; Clyne Dep. 73:06–13 (discussing IBM's desire and negotiation tactics around removing AT&T from the list of protected accounts).  Had IBM truly believed that customer-directed displacements were permissible under the contract, it likely would not have devoted considerable resources during the 2015 OA negotiations to try first remove the non-displacement language entirely and then, when that failed, remove AT&T from the list of protected accounts.  *See* Findings of Fact, *supra* ¶ 58; PX156 at IBM00097161 ("IBM wants the non-displacement language in the current OA fully removed from our agreement with BMC."); Clyne Dep. 61:17–20, 73:06–13.

194.    IBM had no intention of complying with the 2015 OA's non-displacement provision because it had already agreed to displace BMC's products—at AT&T's behest—when it entered into the Project Swallowtail agreement.  *See* Findings of Fact, *supra* ¶¶ 50–56.  Instead, IBM believed—especially in light of BMC's reluctance to engage in litigation—that it could

22-20463.8474

"always settle[] for a small percent of the claim" or for "pennies on the dollar." *Id.* ¶ 50; PX109 at  IBM00038867; *see also* Findings of Fact, *supra* ¶ 57; Clyne Dep. 55:13–19 (explaining that BMC did not "want to have to spend any more attorney time" on displacement issues); Findings of Fact, *supra* ¶¶ 40, 75; PX37 at IBM00062682 (detailing internal IBM communications immediately following the 2013 OA's execution in which IBM is shown strategizing how it  "may cho[o]se to *manage* the non-displacement language overall as a business" despite there being "no change on the non-displace") (emphasis added); Findings of Fact, *supra* ¶ 40; PX38 (internal IBM e-mail wherein IBM account executives discussed "put[ting] BMC to the test on the additional non-displace restrictions).  Indeed, Clyne, testified:

> Q.       …IBM's plan was not to abide [by the non-displacement provision in the 2015 OA], wasn't it?
>
> A.       That was the position that legal had taken.

Findings of Fact, *supra* ¶ 64; Clyne Dep. 111:10–19; *id.* 113:11–21 (explaining that "IBM's conduct throughout the negotiations and the time spent on non-displacement claims by BMC" led Clyne to know that IBM did not intend to comply with the contract).  Due to IBM's intention not to perform under the contract, Clyne did not believe that IBM negotiated the contract in good faith. Findings of Fact, *supra* ¶ 57; Clyne Dep. 117:19–118:12; *see also* Findings of Fact, *supra* ¶ 65; Clyne Dep. 103:10–20 (Clyne testifying that he did not dwell on compliance issues which would come "after the fact, after the agreement [was] signed" because he had "no control" over how IBM would perform under the contract.").  Instead, internal correspondence at IBM largely reflected (1) a  desire  to  preclude  compliance-related  settlements  altogether  (understandably  so,  since compliance disputes can cut into profit margins) and (2) an awareness that agreeing to the non-displacement language's extension to AT&T would put it immediately out of compliance with the contract.  *See generally* Findings of Fact, *supra* ¶¶ 43–67.

195.     IBM's refusal to disclose why it sought AT&T's removal from the list of protected accounts, and its inclusion of other accounts in its removal request to obfuscate AT&T's importance, evidences its intention that BMC rely on that written promise instead of on IBM's prior communications of a contract interpretation that it, internally, did not fully believe. *See, e.g.*, Findings of Fact, *supra* ¶¶ 72–83.  And that reliance was important to IBM because the 2015 OA, in addition to offering it a full release from past non-compliance claims, gave IBM the critical shared hosting rights necessary to perform its job as a global outsourcer. *See* Findings of Fact, *supra* ¶ 57, n. 17; Clyne Dep. 230:05–15, 139:04–08 (testifying that IBM "[f]ar, far exceeded its goals" in securing valuable shared hosting rights); Calo Dep. 10:22–11:3, 55:9–14; PX106; PX108.

### 3.     BMC Justifiably Relied on IBM's Promise Not to Displace BMC's Products with Its Own

196.     "[F]raud does not exist unless the defendant's representations induced the plaintiff to take a particular course of action. It is not necessary that the representations were the sole inducement, but the representations relied upon must have been a material factor in inducing the plaintiff's action." *Coffel v. Stryker Corp.*, 284 F.3d 625, 636 (5th Cir. 2002) (applying Texas law).  Thus, to prevail on its fraudulent inducement claim, BMC must show that "it actually relied on the defendant's representation and, also, that such reliance was justifiable." *See JPMorgan Chase Bank, N.A. v. Orca Assets G.P., LLC*, 546 S.W.3d 648, 653 (Tex. 2018); *see also Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 554 (Tex. 2019).

197.     Generally, justifiable reliance is a question of fact. *Orca Assets*, 546 S.W.3d at 654.  "But the element can be negated as a matter of law when circumstances exist under which reliance cannot be justified." *Id.*  In determining whether justifiable reliance is negated as a matter of law, courts "must consider the nature of the [parties'] relationship and the contract." *Id.* (quoting

93

*AKB Hendrick, LP v. Musgrave Enters., Inc.*, 380 S.W.3d 221, 232 (Tex. App.—Dallas 2012, no

pet.)). "In an arm's-length transaction[,] the defrauded party must exercise ordinary care for the

protection of his own interests. . . . [A] failure to exercise reasonable diligence is not excused by

mere confidence in the honesty and integrity of the other party." *Nat'l Prop. Holdings, L.P. v.*

*Westergren*, 453 S.W.3d 419, 425 (Tex. 2015) (quoting *Thigpen v. Locke*, 363 S.W.2d 247, 251

(Tex. 1962)).  And when a party fails to exercise such diligence, it is "charged with knowledge of

all facts that would have been discovered by a reasonably prudent person similarly situated." *See*

*AKB*, 380 S.W.3d at 232.  To this end, a plaintiff "cannot blindly rely on a representation by a

defendant where the plaintiff's knowledge, experience, and background warrant investigation into

any representations before the plaintiff acts in reliance upon those representations." *See Shafipour*

*v. Rischon Dev. Corp.*, No. 11-13-00212-CV, 2015 WL 3454219, at *8 (Tex. App.—Eastland May

29, 2015, pet. denied) (mem. op.).

    198.    IBM urges the court to hold that BMC, as a matter of law, could not rely on its

written promise not to displace when it had, for years, voiced its position that a customer-requested

displacement would not violate section 5.4.[38]  *See* Dkt. 696 at 5.  In its telling, "[s]ince BMC

entered the 2015 OA fully understanding IBM's interpretation and its intentions to act accordingly,

BMC cannot now argue it was entitled to rely on the 'words of the OA' as containing a

contradictory unwritten promise." *Id.*  Or, put differently, IBM argues that BMC could not

---

[38]    IBM suggested that the court's interpretation of the non-displacement provision is
irrelevant because the Court issued its ruling in 2021, years after the 2015 OA was executed.
Dkt. 600 at 1, 5–6.  IBM argued that, if the court's recent interpretation of the non-displacement
provision were considered, it would turn BMC's claim into a "retroactive" fraud claim. *Id.*  But
the court's ruling merely set forth the unambiguous meaning of the plain text of section 5.4.  That
text was the same in 2015 as it is now.  The court's interpretation, by simply stating what the plain
terms of the 2015 OA mean, identifies what IBM promised to do at the time IBM entered into the
contract in 2015.  And under the applicable law, the relevant question is whether IBM intended to
perform as represented in the contract. *See Formosa Plastics*, 960 S.W.2d at 48.

justifiably rely on the unambiguous written contract given its extracontractual statements.

199.    Notwithstanding IBM's protests, Texas law recognizes that the written, binding contractual language matters—and plaintiffs who *refrain* from relying on a written contract's unambiguous language do so at their own detriment.  The Texas Supreme Court's decision in *Orca Assets* illustrates the point.  There, the Court considered whether Orca—a lessee of certain mineral interests—justifiably relied on *extra*-contractual representations made by JPMorgan's agent regarding land available for lease, despite "red flags" appearing in the latter's proposed contracts. *Orca Assets*, 546 S.W.3d at 650–52.  JPMorgan argued that the company's claims were negated as a matter of law because the company could not have justifiably relied on statements that the land was "open" for lease considering the number of red flags present.  *Id.* at 654–55.  The Texas Supreme Court agreed, concluding that a letter of intent, which placed the responsibility on Orca to investigate title and contained a negation-of-warranty provision, directly contradicted the representations on which Orca purportedly relied.  *Id.* at 659.  The Texas Supreme Court concluded that the written contract directly contradicted the agent's verbal representations.  *Id.*   Taken together with other red flags—and both parties' sophistication—the court concluded that this direct contradiction precluded Orca's justifiable reliance on the alleged misrepresentation.[39]  *Id.* at 660. As the *Orca* Court explained:

> [A] party to an arm's length transaction must exercise ordinary care and reasonable
> diligence for the protection of his own interests . . . .Therefore, reliance upon an
> oral representation that is directly contradicted by the express, unambiguous terms
> of a written agreement between the parties is not justified as a matter of law. . . . .If
> written contracts are to serve a purpose under the law, relative to oral agreements,
> it is to provide greater certainty regarding what the terms of the transaction are and
> that those terms will be binding, thereby lessening the potential for error,
> misfortune, and dispute. . . . .[A] party who enters into a written contract while

---

[39]    With regards to the seven "red flags" JPMorgan identified, the Supreme Court of Texas took pains to note that it was "not prepared to say that any single one of these factors could preclude justifiable reliance on its own and as a matter of law."  *Orca Assets*, 546 S.W.3d at 655.

22-20463.8478

relying on a contrary oral agreement does so at its peril . . . .

*Id.* at 658 (quoting *DRC Parts & Accessories, LLC v. VM Motori, S.P.A.*, 112 S.W.3d 854, 858–59 (Tex. App.—Houston [14th Dist.] 2003, pet. denied)).

200.    Following *Orca Assets*, the Texas Supreme Court explained that to hold that "reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties" is justifiable as a matter of law "would be to reward a party for signing a contract under false pretenses, promising to abide by the written terms while secretly intending to enforce the conflicting terms of an unwritten bargain." *Carduco*, 583 S.W.3d at 559.

201.    That principle applies here.  Looking to the "circumstances" surrounding the 2015 OA's negotiation, *see Orca*, S.W.3d at 656, the court concludes that IBM's compliance-deflection strategies do not preclude BMC's reliance on the written contract's plain language.  As one of the largest information technology companies in the world, IBM is a sophisticated business entity.  So, too, is BMC.  The record reflects that both companies used experienced, sophisticated, and savvy contract negotiators and business managers throughout their relationship. "Such world-savvy participants entering into a complicated, multi-million-dollar transaction should be expected to recognize 'red flags' that the less experienced may overlook." *Orca Assets*, 546 S.W.3d at 656. IBM is an intelligently run operation—and it was keen on promoting its theory that customer-directed displacements were permissible under the OA's "other valid business reasons" provision when BMC called it to account for its breach of the non-displacement clause.  *See, e.g.*, DX233 at 1–2 (Sweetman e-mail explaining that that "even if IBM were somehow deemed to be displacing software . . . acting at the customer's direction would constitute the most obvious example of a 'valid business reason.'").  For IBM, the benefits of doing so were obvious: it could (1) weaken its principal competitor—BMC—in the mainframe software space; (2) acquire new business; and

96

(3) minimize the risk of consequence by requiring BMC to litigate the contract language in court or pursue alternative dispute resolutions.  To embrace IBM's reading of the caselaw—one in which a party's creation of "red flags" abrogated the terms of a contract—would perversely reward fraudulent parties for their bad deeds.[40]  Gamesmanship may characterize business relationships between competitors, but it does not annul the legal force of a contract's unambiguous plain language, which serves as the touchstone for the court's reliance analysis in this case.  *See Westergren*, 453 S.W.3d at 424–25 ("[A]s Texas courts have repeatedly held, a party to a written contract cannot justifiably rely on oral misrepresentations regarding the contract's unambiguous terms.").

202.    Moreover, as in *Orca Assets*, IBM's extracontractual representation that it could displace under section 5.4's "other valid business reasons" provision is contradicted by the contract itself, which uses the "other valid business reasons" provision to qualify IBM's ability to discontinue the use of BMC's software—not its ability to displace.  *See* PX4.  No reasonable person could "read the writing and still plausibly claim to believe [IBM's] . . . [oral] representation" that the contract permitted displacement under the "other valid business reasons" provision.  *See Orca Assets*, 546 S.W.3d at 659.  As the court has already recounted, the record undercuts IBM's assertion that it held a different interpretation of the non-displacement language in good faith.  *See* Findings of Fact, *supra* ¶¶ 50–83 .

203.    Thus, IBM cannot fault BMC for *not* relying on its extracontractual statements *if* BMC proves that it relied on the unambiguous terms of the contract.  And, as a question of fact,

---

[40]    It would be nonsensical to prohibit a plaintiff from relying on a defendant's extracontractual statements contradicting the express terms of a contract but to inflexibly permit a defendant to negate a plaintiff's reliance on a written contract's express terms by identifying its own contradictory, extracontractual statements.

22-20463.8480

the court concludes that BMC proved just that.  BMC's witnesses testified at length that BMC relied on IBM's non-displacement promise in entering into the 2015 OA, as BMC explicitly refused to agree to IBM's repeated requests to change the non-displacement provision in ways that would have left AT&T unprotected and made a displacement project like Project Swallowtail permissible.  Findings of Fact, *supra* ¶¶ 57–67.  Indeed, BMC would never have agreed to the 2015 OA if it had known that IBM did not intend to honor its promise to protect AT&T's BMC products from displacement.  *Id.* ¶ 66; Trial Tr. at 195:4–7, March 14, 2022 (Ah Chu); Trial Tr. At 174:6–16, March 15, 2022 (Jones); Bergdoll Dep. at 52:18–23.  After lengthy negotiations around the scope of the non-displacement language, BMC agreed to limit the 2013 OA's existing language to a set number of accounts and a release absolving IBM of its past non-compliant conduct.  Findings of Fact, *supra* ¶¶ 31, 61.  The record and trial testimony credibly reflects that, through this exchange, BMC genuinely believed that IBM would not displace its products at AT&T.  In that vein, BMC relied on IBM's written promise not to displace BMC's products with its own.  BMC's reliance on the contract's unambiguous written text was justifiable under the circumstances.

### 4.   **BMC's Reliance Caused its Injury**

204.   "[T]ort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract."  *Formosa Plastics*, 960 S.W.2d at 47.  BMC argued that IBM's fraudulent behavior deprived it of its benefit-of-the-bargain under the 2015 OA.   Benefit-of-the-bargain damages are recoverable under a fraudulent inducement claim.  *Bohnsack v. Varco, LP*, 668 F.3d 262, 275 (5th Cir. 2012).  Such damages "are appropriate in cases of fraudulent inducement when they are satisfactorily proven."  *Id.* at 275–76.

22-20463.8481

205.    The court has already concluded that the contracts' text supports BMC's license fee model.  Because BMC entered the 2015 OA with IBM, IBM was able to access and use BMC's software at AT&T for "no fee" while blatantly violating the non-displacement provision.  IBM's violation of the contract resulted in direct damages—namely, the lost license fees—which BMC may recover.  Thus, BMC's reliance caused its injury.

206.    Because BMC has proved each element to sustain a fraudulent inducement claim under Texas law and shown that the unpaid license fees reflect direct damages, the court finds that BMC is entitled to $717,739,615.00 in direct damages associated with its fraudulent inducement claim.  The court further finds that BMC is entitled to prejudgment interest in the amount of 5% on the $717,739,615.00 in direct contractual damages associated with its fraudulent inducement claim from September 22, 2017 through the date of judgment.  *See Meaux Surface Prot., Inc. v. Fogleman*, 607 F.3d 161, 172 (5th Cir. 2010) (Texas law allows for an equitable award of prejudgment interest, which "should be granted to the prevailing party in all but exceptional circumstances"); *see also Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 491 (Tex. App.—Fort Worth 2004, no pet.) (fraud).

**E.    New York Law Requires the Suspension of the Damage Limitations in MLA Sections 9 and 10.**

207.    Section 9 of the MLA provides that "[e]xcept for violation of proprietary rights and confidentiality . . .neither party . . . [is] liable for any special, indirect, incidental, punitive or consequential damages relating to or arising out of this agreement."  PX1 at IBM00035620. Section 10 likewise limits BMC damages "to the greater of $5,000,000 or the amount paid or payable by customer for the license to the applicable product."  *Id.*  BMC argues that, under New York law, neither of these contractual limitations apply if the court concludes that it prevails on its fraudulent inducement claim.  *See* Dkt. 598 at 25–26.  IBM disagrees and argues that BMC "must

prove something higher than ordinary fraud" for the damage waivers not to apply.  Dkt. 597 at 25.

208.    The Court of Appeals for New York answered the question in *Kalisch-Jarcho Inc. v. City of New York*, 448 N.E.2d 413, 416–17, 58 N.Y.2d 377, (N.Y. 1983).  There, it explained:

> [A]n exculpatory agreement, no matter how flat and unqualified its terms, will not exonerate a party from liability under all circumstances. Under announced public policy, it will not apply to exemption of willful or grossly negligent acts...More pointedly, an exculpatory clause is unenforceable when, in contravention of acceptable notions of morality, the misconduct for which it would grant immunity smacks of intentional wrongdoing.  This can be explicit, *as when it is fraudulent*, malicious or prompted by the sinister intention of one acting in bad faith.  Or, when, as in gross negligence, it betokens a reckless indifference to the rights of others, it may be implicit.

*Id.* at 416–17 (emphasis added).   In other words, according to New York's highest court, "fraudulent, malicious," or "bad faith" conduct is sufficient to render exculpatory clauses unenforceable.  *See id.*  This conclusion is not in tension with the Southern District of New York's decision in *Net2Globe Int'l, Inc. v. Time Warner Telecom of New York*, 273 F. Supp. 2d 436 (S.D.N.Y. 2003), a case that IBM relies on for the proposition that application of the *Kalisch-Jarcho* doctrine requires more than a successful fraud claim.[41]   That court found that plaintiffs would have to make a "compelling demonstration of egregious intentional misbehavior evincing extreme culpability" to suspend a limitations-of-liability clause.  *Id.* at 454.  It follows that federal courts applying New York law would find that "fraudulent," "malicious," "bad faith," and "gross[ly] negligen[t]" behavior all meet the Southern District's "egregious intentional misbehavior" standard.  *See Kalisch-Jarcho*, 448 N.E.2d at 416–17.

209.    Indeed, in applying *Kalisch-Jarcho*, New York's intermediary appellate courts have explained that the "type of intentional wrongdoing that could render a limitation in [a contract] unenforceable is that which is 'unrelated to any legitimate economic self-interest.'"

---

[41]    The parties agree on the basic contours of *Kalisch-Jarcho*'s applicability.  *See* Dkt. 612 at 23–24.

*Electron Trading, LLC v. Morgan Stanley & Co. LLC*, 69 N.Y.S.3d 633, 636, 157 A.D.3d 579 (N.Y. App. Div. 2018).  It is axiomatic that fraudulent inducement is unrelated to a legitimate economic self-interest.  *See CWCapital Cobalt VR Ltd. v. CWCapital Invs. LLC*, 145 N.Y.S.3d 61, 68, 195 A.D.3d 12 (N.Y. App. Div. 2021) (applying *Kalisch-Jarcho* to unjust enrichment claims); *TIAA Glob. Invs., LLC v. One Astoria Square LLC*, 7 N.Y.S.3d 1, 9,  127 A.D.3d 75 (N.Y. App. Div. 2015) ("As for the limitation of liability clause, we note that the complaint alleges sufficient allegations of fraudulent conduct on the part of Seller such that, if proved, that clause would be unenforceable."); *Great N. Assocs., Inc. v. Cont'l Cas. Co.*, 596 N.Y.S.2d 938, 940, 192 A.D.2d 976, (N.Y. App. Div. 1993) ("Inasmuch as all of the 13 causes of action interposed by plaintiff against [defendants] allege intentional wrongdoing, willful, malicious and fraudulent acts, the release clearly is ineffective to insulate [defendants] from liability.")  Accordingly, BMC's successful fraudulent inducement claim is sufficient under New York law for the suspension of exculpatory clauses like those found in MLA sections 9 and 10, and BMC may therefore recover punitive damages against IBM.[42]

210.    Finally, the court notes that under Texas law, pre-judgment interest is not recoverable on an award of punitive damages.  Tex. Civ. Prac. & Rem. Code Ann. § 41.007.

\*\*\*

The evidence clearly and convincingly supports BMC's fraudulent inducement claim.  BMC is entitled to recover the $717,739,615.00 value of the unpaid license fees related to IBM's

---

[42]    Because the court concludes that the license fees relating to IBM's breach of section 5.4 are direct damages under the contract, the application of *Kalisch-Jarcho* does not raise the ceiling of recovery for BMC's license fee model.  However, were the court incorrect that BMC's lost profits model is too speculative, *see* Conclusions of Law, *supra* ¶¶ 177–80, the suspension of MLA section 9's consequential damages disclaimer would enable BMC to recover otherwise unrecoverable lost profits.

22-20463.8484

breach of section 5.4, plus prejudgment interest.  Because of IBM's fraud, the MLA's damages disclaimers and limits are unenforceable.  The court now turns to whether IBM's conduct merits an award of punitive damages.

### F.    BMC's Punitive Damages Claim

211.    The parties agree that Texas law permits the recovery of exemplary damages where a plaintiff proves by clear and convincing evidence that the harm with respect to which it seeks recovery of punitive damages resulted from the fraud. Tex. Civ. Prac. & Rem. Code § 41.003(a); *Formosa Plastics Corp.*, 960 S.W.2d at 47; Dkt. 612 at 24.  Punitive damages may be awarded against a defendant in an amount up to the greater of (1) two times the amount of economic damages, plus the amount of noneconomic damages; or (2) $200,000.  Tex. Civ. Prac. & Rem. Code § 41.008(b).

212.    "[T]he purpose of punitive damages is to punish a party for its outrageous, malicious, or otherwise morally culpable conduct and to deter it and others from committing the same or similar acts in the future." *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 40 (Tex. 1998)  (internal quotations omitted).  In addition, "exemplary damages must be reasonably proportioned to actual damages." *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex. 1981).  Factors to consider in determining whether an award of exemplary damages is reasonable include: (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends a public sense of justice and propriety. *Id.* Through its fraudulent inducement claim, BMC can recover its $717,739,615.00 in direct contract damages.  To determine a reasonable award of punitive damages, however, the court considers the

22-20463.8485

four *Kraus* factors.

213.    The court finds by clear and convincing evidence that IBM fraudulently induced BMC into entering the 2015 OA so that it could exercise rights without paying for them, secure other contractual benefits, and ultimately acquire one of BMC's core customers.  *See* Findings of Fact, *supra* ¶¶ 43–83.  IBM did this intentionally.  *See  id.*; *see also Swinnea v. ERI Consulting Eng'rs, Inc.*, 481 S.W.3d 747, 757 (Tex. App.—Tyler 2016, no pet.) (upholding an award of punitive damages where party intentionally violated a fiduciary duty owed to longtime business partner).  The court likewise determines that BMC genuinely believed that the narrowed scope of the non-displacement clause would put IBM's troubling history of non-compliance to bed.  *See* Findings of Fact, *supra* ¶¶ 59–66.  IBM is one of the largest technology companies in the world— and it exploited BMC's justifiable reliance for its own gain, cementing its abdication of good faith and fair dealing in the service of its own self-interest.  *See* Findings of Fact, *supra* ¶¶ 5, 43–83. The degree of "reprehensibility of [IBM's] conduct is perhaps the most important indicium of [the] reasonableness of a punitive damage award."  *Malone*, 972 S.W.2d at 45–46 (internal quotations and alterations omitted).  IBM's business practices—including the routine eschewal of rules— merit a proportional punitive damages award.   *See* Findings of Fact, *supra* ¶¶ 35–58.  Finally, IBM's conduct vis-à-vis BMC offends the sense of justice and propriety that the public expects from American businesses.

214.    Therefore, the court finds that BMC is entitled to $717,739,615.00 in punitive damages.

***

The court concludes that BMC may recover under either a breach of contract theory for IBM's breach of section 5.4 of the 2015 OA or a fraudulent inducement theory.  BMC has elected

22-20463.8486

the theory providing the greatest recovery.  *See* Dkt. 748 at 5.  Accordingly, the court will enter

judgment in BMC's favor on its fraudulent inducement claim.

### G.    Attorneys' Fees

215.    Finally, section 18 of the MLA provides that the "prevailing party" in "any"

litigation "is entitled to recover reasonable and customary attorney's fees and costs from the other

party."  PX1 at section 18.  New York law governs the contract.

216.    New York follows the "American Rule" on the award of attorneys' fees, meaning

that "attorneys' fees and disbursements are incidents of litigation, and the prevailing party may not

collect them from the loser unless an award is authorized by agreement between the parties or by

statute or court rule."  *A.G. Ship Maint. Corp. v. Lezak*, 69 N.Y.2d 1, 511 N.Y.S.2d 216 (1986);

*see also Versatile Housewares & Gardening Sys., Inc. v. Thill Logistics, Inc.*, 819 F. Supp. 2d 230,

241 (S.D.N.Y. 2011).  Parties may override the presumption by contractually agreeing to permit

recovery of attorneys' fees, in which case "a federal court will enforce contractual rights to

attorneys' fees if the contract is valid under applicable state law."  *U.S. Fid. & Guar. Co. v.*

*Braspetro Oil Serv. Co.*, 369 F.3d 34, 74 (2d Cir. 2004) (*quoting McGuire v. Russell Miller, Inc.*,

1 F.3d 1306, 1313 (2d Cir. 1993)).  Thus, where "a contract . . . provides for an award of reasonable

attorneys' fees to the prevailing party in an action to enforce the contract," the language "is

enforceable" so long as it "is sufficiently clear."  *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*,

537 F.3d 168, 175 (2d Cir. 2008).  And, although awards of attorneys' fees typically fall within

the court's discretion, "where a contract authorizes an award of attorneys' fees, such an award

becomes the rule rather than the exception."  *McGuire*, 1 F.3d at 1313.

217.    The MLA's language is clear and enforceable.  Because New York law recognizes

private agreements to fees like the one at issue here, the "prevailing party" is entitled to an award.

22-20463.8487

Thus, the court's threshold determination must be which, if any, party is the "prevailing party." The parties have not briefed which of them, if either, is the prevailing party. Previously, the parties agreed to resolve the issue of attorneys' fees by motion and affidavit after entry of judgment. *See* Dkt. 612 at 20; Hearing Tr. 16:01–19, Dec. 17, 2021; *see also* Dkt. 594 at 16. Consistent with Federal Rule of Civil Procedure 54 and the parties' existing agreement, the court will order briefing to determine which party prevailed under New York law.

<h3 style="text-align:center">CONCLUSION</h3>

For the reasons discussed above:

1.      BMC's Objections and Renewed Motion to Exclude the Expert Opinions of Bruce Hartley (Dkt. 617) is DENIED;

2.      BMC's Objections and Renewed Motion to Exclude the Expert Opinions of Barry Graham (Dkt. 619) is DENIED;

3.      BMC's Motion for Judgment on Partial Findings (Dkt. 665) is GRANTED in PART and DENIED in PART, as stated above.

4.      IBM's objections to BMC's designated testimony of Alan Ratliff (Dkt. 621) are DENIED;

5.      IBM's supplemental objections to testimony of Alan Ratliff (Dkt. 670) are DENIED;

6.      IBM's objections to BMC's designated testimony of Kendyl Román (Dkt. 622) is DENIED AS MOOT;

7.      IBM's Motion for Judgment on Partial Findings (Mar. 17, 2022 Trial Tr. at 20:8–47:23; *see* Mar. 24, 2022 Trial Tr. at 4:17–35:14) (Dkts. 751, 752) is GRANTED in PART and DENIED in PART, as stated above;

8.      BMC's breach of MLA section 8 claim is DISMISSED WITH PREJUDICE;

9.      BMC's DTSA, TUTSA, and common law unfair competition through misappropriation claims are DISMISSED WITH PREJUDICE;

10.     BMC's breach of 2015 OA section 5.1 is DISMISSED WITH PREJUDICE;

11.     BMC' lost profits claim is DISMISSED WITH PREJUDICE;

12.     BMC shall recover direct and punitive damages from IBM on its fraudulent inducement claim, plus prejudgment interest in the amount of 5% and post-judgment interest:

a.      BMC is entitled to recover from IBM $717,739,615 in actual contractual damages.

b.      BMC is entitled to recover from IBM $168,226,367.29 in prejudgment interest on the actual damages described above.

c.      BMC is entitled to recover from IBM $717,739,615 in punitive damages based on fraud found by clear and convincing evidence.

d.      BMC is entitled to recover from IBM post-judgment interest from the date of the entry of judgment at the federally mandated rate.  28 U.S.C. § 1961.


**SIGNED** in Houston, Texas this 30th day of May, 2022.

Honorable Gray H. Miller
Senior United States District Judge

106

22-20463.8489

**TAB 9**

United States District Court
Southern District of Texas

**ENTERED**

**February 07, 2022**

Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| BMC SOFTWARE, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-17-2254 |
| | § | |
| INTERNATIONAL BUSINESS MACHINES | § | |
| CORPORATION, | § | |
| | § | |
| *Defendant*. | § | |

## ORDER

On June 7, 2021, United States Magistrate Judge Christina A. Bryan issued a Memorandum and Recommendation ("M&R") on multiple motions for summary judgments.  Dkt. 561.  The parties filed objections and responses to objections.  Dkts. 567, 569, 577, 580.  The court adopted the M&R in part.  Dkt. 586.  Following its order of adoption, the court ordered the parties to provide a joint status report detailing the remaining issues for trial.  Dkt. 587.  The parties' disagreement as to that issue was evident in their report, *see* Dkt. 588, and the court held a status conference on December 17, 2021, to further elucidate the scope of their disagreement.  Minute Entry of December 17, 2021.  At the court's request, the parties filed memoranda summarizing the remaining issues for trial.  *See* Dkts. 597, 598, 600, & 601.  The court issues this order clarifying its prior decision.[1]

---

[1] The parties' filings highlight their disagreement not only on the issues raised during the status conference—whether there was a meeting of the minds, whether the contract is an unenforceable restrictive covenant, and what elements for the breach of contract claims remain—but also on matters of law relating to damages and fraudulent inducement, to name but two.  *See* Dkts. 597, 598, 600, & 601.  The court's request for memoranda was not an invitation to re-open summary judgment.  Accordingly, the instant order does not resolve all the outstanding legal issues raised by the parties.

## I. DISCUSSION

This order addresses five specific issues: (1) whether the parties had a meeting of the minds on § 5.4 of the 2015 OA; (2) whether the issue of whether § 5.4 is an unenforceable restrictive covenant remains to be tried; (3) what elements in BMC's breach of contract claim regarding § 5.4 remain to be tried; (4) the meaning of § 5.1 and what elements in BMC's breach of contract claim regarding § 5.1 remain to be tried; and (5) what elements in BMC's breach of contract claim regarding MLA § 8 remain to be tried.

### 1. Agreement to the unambiguous contract language is objective evidence that the parties formed a meeting of the minds.

IBM requests a ruling on the meeting-of-the-minds question, citing the M&R's conclusion that BMC had raised a fact issue. *See* Dkt. 597 at 18, n. 4. To establish the existence of an enforceable agreement, a plaintiff must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound. *Kowalchuk v. Stroup*, 61 A.D.3d 118, 121, 873 N.Y.S.2d 43 (N.Y. App. Div. 2009). These elements establish a "meeting of the minds" — a "manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Stonehill Capital Mgt. LLC v. Bank of the W.*, 28 N.Y.3d 439, 448, 45 N.Y.S.3d 864, 68 N.E.3d 683 (2016); *see also Ostojic v. Life Med. Techs., Inc.,* No. 15091, 2022 WL 150610, at *1 (N.Y. App. Div. Jan. 18, 2022) (noting that the parties' meeting of the minds must include agreement on all essential terms). Agreement to unambiguous language implies a meeting of the minds because unambiguous language "has a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself and concerning which there is no reasonable basis for a difference of opinion." *See 6115 Niagara Falls Boulevard, LLC v. Calamar Constr. Mgmt., Inc.*, 193 A.D.3d 1436, 147 N.Y.S.3d 831 (N.Y. App. Div. 2021) (quoting *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565 (2002)) (alterations

22-20463.4121

omitted).  *See also Robert Cohn Assocs., Inc. v. Kosich*, 38 Misc. 3d 1233(A), 969 N.Y.S.2d 806

(Sup. Ct. 2008), *aff'd*, 63 A.D.3d 1388, 881 N.Y.S.2d 235 (N.Y. App. Div. 2009) (holding that an

unambiguous "signed and integrated writing provides objective evidence of the parties' meetings

of the minds regarding essential contract terms and, therefore, represents a binding and enforceable

contract."); *Indep. Cmty. Bank v. Olympia Mortg. Corp.*, 17 Misc. 3d 1109(A), 851 N.Y.S.2d 64

(Sup. Ct. 2007) (finding the "meeting of the minds" defense "devoid of merit" where party agreed

to "express written terms" of a guaranty).

In keeping with these principles, the court concludes that the parties had a meeting of the

minds.  The M&R's conclusion that whether IBM and BMC had a meeting of the minds was a fact

question was predicated on its finding that the 2015 OA, including § 5.4, was ambiguous.  *See* 561

at 10–13.  The court disagreed with that finding and concluded that the 2015 OA provisions,

including § 5.4, were unambiguous.  Dkt. 586 at 3.  Because the 2015 language is unambiguous,

it is axiomatic that the parties formed a meeting of the minds.

2. **The court's ruling that IBM is liable for breach of § 5.4 did not resolve whether the breach caused BMC's damages or if BMC performed pursuant to the contract.**

With respect to § 5.4, BMC argues that "the *sole* related issue for trial is the amount of

damages."  Dkt. 598 at 7 (emphasis added).  IBM disagrees and claims that the court must still

"decide whether BMC has proved that IBM's role in AT&T's Project Swallowtail actually and

directly *caused* the claimed BMC damages."  Dkt. 597 at 8 (emphasis added).  IBM relatedly

argues that BMC must also show that it performed pursuant to the contract.  *Id.* at 13.

New York law requires the following four elements to sustain a breach of contract claim:

(1) the existence of a contract; (2) the plaintiff's performance pursuant to the contract; (3) the

defendant's breach; and (4) damages resulting from, or caused by, that breach.  *Riccio v. Genworth

Fin.*, 184 A.D.3d 590, 591, 124 N.Y.S.3d 370 (N.Y. App. Div. 2020).  As the Court of Appeals of

New York has explained, "[i]t is axiomatic that damages for breach of contract are not recoverable where they were not actually caused by the breach—*i.e.*, where the transaction would have failed and the damage would have been suffered, even if no breach occurred." *Pesa v. Yoma Dev. Grp., Inc.*, 18 N.Y.3d 527, 532, 965 N.E.2d 228 (2012).

In its summary judgment motion, BMC argued that IBM violated § 5.4 by displacing BMC's products with its own, addressing "only the third element of BMC's claims—*i.e.*, whether IBM breached Sections 1.1 and 5.4 of the 2015 OA under the proper construction of the contract." Dkt. 381 at 36.  The court found that BMC established that third element.  Dkt. 586 at 4–5. However, the court did not decide whether BMC performed pursuant to the contract or what damages were caused by the breach because BMC did not raise those questions in its motion.  *See id.*  Therefore, those two elements remain to be decided at trial.

Regarding causation, BMC must prove that IBM "breach *directly and proximately caused* [its] damages."  *See Nat'l Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (emphasis original).  Because damages must "be directly traceable to the breach," IBM is permitted to produce evidence disputing the causal nexus between its breach and BMC's harm. *See id.* at 526.

BMC's performance is also an essential element of its breach of contract claim.  *See Legum v. Russo*, 133 A.D.3d 638, 639, 20 N.Y.S.3d 124, 126 (N.Y. App. Div. 2015).  In its Seventh Affirmative Defense in answering BMC's second amended complaint, IBM argued that the equitable doctrine of unclean hands barred BMC's claims.  As the M&R recounted:

> IBM's unclean hands defense is based on the allegation that BMC breached the 2013 and 2015 OAs by not disclosing material differences between its contract with AT&T and its standard EULA which would have allowed IBM to operate BMC software licensed to AT&T without electing to proceed under the 'access and use' provisions of the OA.

Dkt. 561 at 51.  IBM now repackages this defense as a challenge to whether BMC performed pursuant to the contract.[2]  *See* Dkt. 597 at 12–14.  Because neither party moved for summary judgment on BMC's performance, that issue remains for trial.

### 3. Whether § 5.4 is an unenforceable restrictive covenant was not squarely resolved on summary judgment and may be raised at trial.

IBM contends that the question of whether § 5.4 is an unenforceable restrictive covenant remains to be tried because BMC did not move for summary judgment on that defense.  Dkt. 597 at 14–15.  BMC disagrees, arguing that the court "implicitly resolved" the question when it adopted the M&R's conclusion that the § 5.4 serves a legitimate business interest.  Dkt. 601 at 6–7 (citing Dkt. 561 at 12–13).

Rule 56 permits a party to move for summary judgment but it instructs that the party must "identif[y] each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  "Typically, a district court may grant summary judgment only on grounds requested by the moving party."  *Molina v. Home Depot USA, Inc.*, 20 F.4th 166, 169 (5th Cir. 2021).  Relatedly, a court cannot grant summary judgment *sua sponte* without giving the parties at least ten days' notice.  *Id.* (citing *Lozano v. Ocwen Fed. Bank, FSB*, 489 F.3d 636, 641 (5th Cir. 2007).

IBM raised § 5.4's enforceability as an affirmative defense in its answer to BMC's second amended complaint.  Dkt. 299 at 22.  BMC moved for partial summary judgment on some of IBM's affirmative defenses but not its enforceability defense.  *See* Dkt. 387.  Instead, IBM argued

---

[2]    IBM correctly notes that its unclean hands defense responds to BMC's claims for *equitable* relief.  Dkt. 597 at 13.  The unclean hands defense cannot be used to defend against a contract action for damages.  *See Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 607 (2d Cir. 2005) ("Unclean hands is an equitable defense to equitable claims...Because [the plaintiff] seeks damages in an action of law, [the defendant] cannot avail itself of unclean hands as a defense."); *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 725 F. Supp. 712, 742 (S.D.N.Y. 1989).

22-20463.4124

that it was entitled to summary judgment on BMC's interpretation of § 5.4 because "[a]ccepting BMC's interpretation" of the provision would render it a "restrictive covenant" as a matter of law. Dkt. 396 at 27, 45. The M&R rejected IBM's interpretive argument, concluding that the provision advanced "legitimate business interests" under the "rule of reason" test. Dkt. 561 at 12. The court adopted the M&R's analysis as its own except otherwise noted. Dkt. 586 at 11. It did not exempt the M&R's enforceability analysis under the larger umbrella of contract interpretation from its holding. *See id.* So, BMC is correct in asserting that the court agreed with "the M&R's reasoning that refutes IBM's argument." Dkt. 601 at 7.

However, as a procedural matter, IBM is correct that its enforceability defense was not squarely resolved during the summary judgment stage of this case. Mindful of the Federal Rules of Civil Procedure, recent Fifth Circuit caselaw, and the upcoming trial dates, the court holds that whether § 5.4 is an unenforceable restrictive covenant under New York law is an issue remaining for trial.

### 4. Though § 5.1 did not authorize IBM to displace BMC's products, whether IBM's displacement activities were for the sole purpose of supporting AT&T remains to be tried.

IBM also appears to request clarification as to the meaning of § 5.1, noting that "the parties...dispute whether the Court ruled that § 5.1 is a *prohibition* on displacement of BMC software or is not itself permission for displacement." *See* Dkt. 597 at 18 (emphasis original).

"A written contract will be read as a whole, and every part will be interpreted with reference to the whole." *Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358, 794 N.E.2d 667 (2003). Where that contract is "straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence." *Ruttenberg v. Davidge Data Sys. Corp.,* 215 A.D.2d 191, 192, 626 N.Y.S.2d 174 (N.Y. App. Div. 1995). But even when a contract is complicated—and the business relations it governs complex—it is still

6

unambiguous so long as its language has a "definite and precise meaning, unattended by the danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference in opinion." *Greenfield*, 98 N.Y.2d at 569. This is true even when a contract is silent on certain issues. *Id.*

In interpreting contracts, courts are to give effect to each term and avoid the interpretation that would render contractual language mere surplusage. *See Laba v. Carey*, 29 N.Y.2d 302, 308, 277 N.E.2d 641 (1971). Just as they are to avoid surplusage, so too are courts counseled against "interpreting a contract so as to produce unreasonable results." *Fresh Del Monte Produce N.V. v. Eastbrook Caribe A.V.V.*, 40 A.D.3d 415, 418, 836 N.Y.S.2d 160 (N.Y. App. Div. 2007). "It is a well-established canon of interpretation that in seeking for the intent of the parties the fact that a construction contended for would make the contract unreasonable may be properly taken into consideration." *Fleischman v. Furgueson*, 223 N.Y. 235, 241, 119 N.E. 400 (1918).

As is standard, the court starts with the contract's text. Section 5.1 (Access and Use) provides that:

> BMC will allow Customer to use, access, install and have operational responsibility of the BMC Customer Licenses (together, "Access and Use") under the terms of the BMC Customer's license agreement with BMC for no fee, including on Computers owned or leased by BMC Customer and at BMC Customer's facility, provided that the BMC Customer Licenses are used solely for the purposes of supporting the BMC Customer who owns such licenses...Except as set forth herein, the BMC Customer Licenses will continue to be governed by the terms, conditions and discounts of the BMC license agreement between BMC and the BMC Customer; notwithstanding the terms of the Agreement and the OA, Customer shall be bound by such terms of such license agreement.

Section 5.4 (Non-Displacement) provides that:

> This Non-Displacement provision applies only to Customer's Access and Use of BMC Customer Licenses by Customer's strategic outsourcing division (or its successor) for the BMC Customers listed on Exhibit K (the "Exhibit K Customers"). Subject to the foregoing, Customer agrees that, while Customer cannot displace any BMC Customer Licenses with Customer products, Customer may discontinue use of BMC Customer Licenses for other valid business reasons.

22-20463.4126

> All terms of Sections 5.1, 5.2 and 5.3 apply to Customer's use of BMC Customer licenses belonging to any Exhibit K Customers. BMC and Customer agree to update the Information contained on Exhibit K as part of the reporting requirements in Section 5.3.

Dkt. 382, Ex. 2 at 1–3.

In its prior order, the court concluded that "§ 5.1 is unambiguous and must be interpreted to preclude access and use of Customer licenses to displace BMC products." Dkt. 586 at 6. IBM now questions whether § 5.1 prohibits the displacement of BMC software or "is not itself permission for displacement." Dkt. 597 at 18. IBM argues that reading § 5.1 as a blanket prohibition on displacement would make § 5.4 redundant, a surplusage anathema to the principles of contract interpretation. *See id.* Embracing the latter construction, IBM contends that "it did not breach § 5.1 because any access, use, and operational responsibility for AT&T's BMC licenses was solely to support AT&T." *Id.* at 19. BMC counters that § 5.1 plainly "prohibits using BMC's Customer Licenses under § 5.1 to displace BMC products." Dkt. 601 at 7.

The court's conclusion rested, in part, on the contract's "operational responsibility" provision. *See* Dkt. 586 at 5. Section 5.1 "allow[ed]" IBM to "use, access, install and have *operational responsibility* of the BMC Customer Licenses." Dkt. 382, Ex. 2 at 1–3; *supra* at 7 (emphasis added). IBM previously argued that this language empowered it to remove BMC's licenses and displace BMC's products with its own. *See* Dkt. 396 at 38. But, relying on the rules guarding against surplusage, the court explained that:

> This is not a viable interpretation of the contract and cannot render the language of § 5.1 ambiguous. *See* Dkt. 561 at 10 (citing common definitions of "operational responsibility"). Reading the contract as a whole, "operational responsibility" cannot be interpreted so broadly that it renders the entire purpose of Exhibit K and the non-displacement provision meaningless.

Dkt. 586 at 5. If the phrase "operational responsibility" were construed to permit IBM to effectively *displace* the operation of BMC's software, "little acuity is needed to see the

8

unreasonableness of the results that well could ensue" after accounting for § 5.4's explicit non-displacement provision.  *See Fresh Del Monte Produce N.V.*, 40 A.D.3d at 419.

Nevertheless, that § 5.1 cannot be read to authorize IBM to displace BMC's software does not mean, as a matter of logic or contract interpretation, that it prohibits displacement.  Failure to permit displacement does not, by itself, transform into a prohibition against displacement.  This is especially the case given that § 5.4 governs displacement.  In distinguishing the two provisions, the M&R explained that:

> Section 5.1 governs how and why IBM may access and use BMC licenses (including that it may not do so for its own benefit), whereas § 5.4 governs how and why IBM may displace BMC products with its own.  The Court is not persuaded that IBM could not simultaneously comply with BMC's interpretations of §§ 5.1 and 5.4. For one thing, § 5.4 is limited to the 54 customers on Exhibit K and there are many more BMC customers who use IBM IT outsourcing services. In addition, there appear to be fact issues regarding whether IBM could have displaced BMC products without "access and use" of AT&T's licensing rights (thereby complying with § 5.1).

Dkt. 561 at 11.  Given the different roles each provision plays, the court will not distort the overall meaning of the contract by giving "undue force...to single words or phrases" found in § 5.1.  *See Westmoreland Coal Co.*, 100 N.Y.2d at 358.  Equally important is that § 5.1 qualifies the scope of its allowances: any use of the BMC Customer Licenses is restricted for the "sole[]...purpose of supporting the BMC Customer who owns such licenses."  Dkt. 382, Ex. 2 at 1–3.  Reading the contract as a "harmonious and integrated whole," the court agrees with IBM that § 5.1 does not serve as a broader prohibition of displacement than the actual non-displacement provision, § 5.4.  *See Westmoreland Coal Co.*, 100 N.Y.2d at 358.

Therefore, the issue of breach—whether IBM's use of "BMC products to accomplish the processes to displace BMC's products," *see* Dkt. 601 at 8, was done for the "sole[]" purpose of supporting AT&T—is a question of fact that remains to be tried.  The elements of plaintiff's performance and causation of damages also remain.  *See Riccio*, 184 A.D.3d at 591.

**5. Breach, causation, and damages elements regarding BMC's MLA § 8 claim remain to be tried.**

BMC also brings a breach of contract claim against IBM regarding MLA § 8.  The M&R denied IBM's motion for summary judgment on that claim and this court adopted that finding.  *See* Dkts. 561 at 15, 586 at 11.  Therefore, BMC's breach of contract claim for § 8 of the MLA remains to be tried consistent with each element described in New York law.[3]  *See Riccio*, 124 N.Y.S.3d at 372.

### III. CONCLUSION

Consistent with the analysis above, the court holds as follows:

1.  The parties formed a meeting of the minds when they agreed to the unambiguous contract language in the 2015 OA;

2.  With respect to BMC's breach of contract claim regarding § 5.4 of the 2015 OA, the elements of its performance and the causation of damages remain to be tried;

3.  Whether § 5.4 is an unenforceable restrictive covenant remains to be tried;

4.  With respect to its breach of contract claim regarding § 5.1, the elements of BMC's claim remain to be tried;

5.  With respect to its breach of contract claim regarding MLA § 8, the elements of BMC's claim remain to be tried.

Signed at Houston, Texas on February 7, 2022.

Gray H. Miller
Senior United States District Judge

---

[3]     BMC proposes that the court resolve the legal argument as to whether a document's restrictive marking is a condition precedent to enforcing MLA § 8.  Dkt. 598 at 18–19, n. 8.  BMC did not move for summary judgment on that issue and the court declines to re-open the summary judgment stage of this case on the suggestion of a footnote.

# TAB 10

United States District Court
Southern District of Texas

**ENTERED**

September 09, 2021

Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| BMC SOFTWARE, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-17-2254 |
| | § | |
| INTERNATIONAL BUSINESS MACHINES | § | |
| CORPORATION, | § | |
| | § | |
| *Defendant*. | § | |

### MEMORANDUM OPINION AND ORDER

On June 7, 2021, United States Magistrate Judge Christina A. Bryan issued a Memorandum

and Recommendation ("M&R") on multiple motions for summary judgments.  Dkt. 561.  The

parties filed objections and responses to objections.  Dkts. 567, 569, 577, 580.  After considering

the M&R, objections, responses, related documents in the record, and applicable law, the court

finds that the parties' objections should be overruled in part and sustained in part and the M&R

should be ADOPTED IN PART.[1]

## I. LEGAL STANDARD

The court conducts a de novo review of those conclusions of a magistrate judge to which

a party has specifically objected.  *See* 28 USC § 636(b)(1)(C); *United States v. Wilson*, 864 F. 2d

1219, 1221 (5th Cir. 1989). To accept any other portions to which there is no objection, the court

need only satisfy itself that no clear error appears on the face of the record. *See Guillory v. PPG

Indus. Inc.*, 434 F. 3d 303, 308 (5th Cir. 2005), *citing Douglass v. United Servs. Auto. Ass'n*, 79 F.

---

[1]     The facts of this case have been set forth in detail in prior rulings of the court.  The facts
recited in the M&R (Dkt. 561 at 1–3) are fully adopted and incorporated herein.

3d 1415, 1420 (5th Cir. 1996); *see also* Fed. R. Civ. P. 72(b) Advisory Comm. Note (1983).  After conducting this de novo review, the court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); *see also* Fed. R. Civ. P. 72(b)(3).

## II. Discussion

The court rejects the Magistrate Judge's recommendations regarding certain breach of contract issues related to the 2015 Outsourcing Attachment ("2015 OA").  The court denies IBM's motion for summary judgment on BMC's claim for breach of § 5.4 of the 2015 OA and grants BMC's motion for summary judgment on its claim for breach of § 5.4 of the 2015 OA.  It relatedly denies IBM's motion for summary judgment on BMC's claim for breach of § 5.1 of the 2015 OA.  Because the court grants BMC's motion for summary judgment on its claim of breach of § 5.4 of the 2015 OA and denies IBM's motion on BMC's claim for breach of § 5.1, it rules on the competing motions for summary judgment on BMC's claim for breach of § 1.1.  To that end, the court grants IBM's motion and denies BMC's.  Next, though the court adopts the M&R's recommendations regarding the parties' 2008 Master Licensing Agreement, it clarifies its reasoning.  Finally, the court rejects the M&R's recommendation that IBM's motion for summary judgment as to its counterclaim for breach of the most favored customer provision in § 18 of the 2015 OA be denied and that BMC's motion for summary judgment as to IBM's counterclaim be granted only as to the remedy of reformation.  Instead, the court grants BMC's motion in full.

### A.    BMC's Claims for Breach of the 2015 OA

BMC sued IBM for breach of sections 1.1, 5.1 and 5.4 of the 2015 OA, a contract governed under New York law.  Both parties moved for summary judgment on BMC's claims for breach of sections 1.1 and 5.4.  *See* Dkts. 381, 396.  IBM also moved for summary judgment on BMC's

22-20463.3996

claim for breach of section 5.1.  The relevant provisions are as follows:

**Section 1.1: IT Services Options.**
Customer must elect one of the following five options regarding its use of the Products in relation to its provision of IT Services: *(a) Access and Use– (Sections 5.1, 5.2, 5.3 and 5.4)*, (b) License Suspension – (Section 5.5), (c) Customer owned Products – (Sections 6, 7 and 8), (d) Mirror Order –(Section 11 ), or (e) Shared Hosting – (Section 12).

**Section 5.1: Access and Use.**
BMC will allow Customer to *use, access, install and have operational responsibility* of the BMC Customer Licenses (together, "**Access and Use**") under the terms of the BMC Customer's license agreement with BMC for no fee, including on Computers owned or leased by BMC Customer and at BMC Customer's facility, *provided that the BMC Customer Licenses are used solely for the purposes of supporting the BMC Customer who owns such licenses*.… Except as set forth herein, the BMC Customer Licenses will continue to be governed by the terms, conditions and discounts of the BMC license agreement between BMC and the BMC Customer; notwithstanding the terms of the Agreement and the OA, Customer shall be bound by such terms of such license agreement.…

**Section 5.4: Non-Displacement.**
This Non-Displacement provision *applies only to Customer's Access and Use of BMC Customer Licenses by Customer's strategic outsourcing division (or its successor) for the BMC Customers listed on Exhibit K* (the "**Exhibit K Customers**"). Subject to the foregoing, *Customer agrees that, while Customer cannot displace any BMC Customer Licenses with Customer products, Customer may discontinue use of BMC Customer Licenses for other valid business reasons.* All terms of Sections 5.1, 5.2 and 5.3 apply to Customer's use of BMC Customer licenses belonging to any Exhibit K Customers. BMC and Customer agree to update the Information contained on Exhibit K as part of the reporting requirements in Section 5.3.

Dkt. 382, Ex. 2 at 1–3 (emphasis in bold and italics added).

Having reviewed the parties' objections to the M&R, the court agrees with BMC that, as a matter of law, the above provisions of the 2015 OA are unambiguous.  *See Sarinsky's Garage Inc. v. Erie Ins. Co.*, 691 F. Supp. 2d 483, 486 (S.D.N.Y. 2010) (providing that, under New York law, the question of whether contract language is ambiguous is a question of law to be decided by the court).  Therefore, the court will not look to extraneous evidence to determine the intentions of the parties or the meaning of the contract.  *See Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d, 562, 569,

22-20463.3997

750 N.Y.S.2d 565, 780 N.E.2d 166, 170 (2002) (providing that extrinsic evidence may be considered to interpret a contract only if the agreement is ambiguous).

The court's conclusion rests upon foundational tenets of contract interpretation.  First, a contract should be interpreted in accordance with the plain meaning of its terms.  *Id.*  Contract language is ambiguous if it is susceptible to more than one reasonable interpretation.  *Id.*; *see also Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 244, 997 N.Y.S.2d 339, 21 N.E.3d 1000 (2014) (stating that ambiguity arises when "specific language is susceptible of two reasonable interpretations.").  Moreover, in interpreting contracts, "a court must strive to 'give meaning to every sentence, clause, and word.'"  *Zurich Am. Ins. Co. v. ABM Indus., Inc.*, 397 F.3d 158, 165 (2d Cir. 2005) (quoting *Travelers Cas. & Sur. Co. v. Certain Underwriters at Lloyd's of London*, 96 N.Y.2d 583, 594, 734 N.Y.S.2d 531, 760 N.E.2d 319 (2001)).  That is, "surplusage is a result to be avoided."  *In re Viking Pump, Inc.*, 27 N.Y.3d 244, 261, 33 N.Y.S.3d 118, 52 N.E.3d 1144 (2016).

### 1.   Section 5.4 of the 2015 OA

Read against these principles, § 5.4 of the 2015 OA is unambiguous.  Pursuant to § 5.4, IBM could not "displace any BMC Customer [AT&T] Licenses with Customer [IBM] products."  The phrase "displace any BMC Customer Licenses with Customer product" is not susceptible to more than one reasonable interpretation.  As BMC points out in its objections, "displace means [t]o move, shift, or force from the usual place or position, and [t]o take the place of; supplant;" while "discontinue means [t]o stop doing or providing (something); end or abandon."  Dkt. 567 at 36 (citations omitted, changes in original).  IBM's argument requires the court to construe "displace" and "discontinue" as synonymous, which they are not, and to ignore the words that follow "displace" in § 5.4 — "any BMC Customer Licenses *with Customer products*."  (emphasis

22-20463.3998

added).  In effect, IBM's reading creates the very surplusage that "cannot be countenanced under New York principles of contract interpretation."  *See Olin Corp. v. OneBeacon Am. Ins. Co.*, 864 F.3d 130, 143 (2d Cir. 2017).

The summary judgment record establishes that IBM displaced BMC Customer Licenses with IBM products when it implemented Project Swallowtail at AT&T.  *See* Dkt. 381 at 30–31 (evidence cited); Dkt. 382, Exs. 99, 102.  Therefore, IBM breached § 5.4 of the 2015 OA. Accordingly, IBM's motion for summary judgment on BMC's claims (Dkt. 396) is DENIED as to the issue of breach of § 5.4 of the 2015 OA, and BMC's motion for summary judgment on BMC's claim for breach of § 5.4 of the 2015 OA (Dkt. 381) is GRANTED.

### 2.    Section 5.1 of the 2015 OA

The court similarly concludes that § 5.1 of the 2015 OA is unambiguous.  Section 5.1 allows IBM to have access, use, and operational responsibility for BMC Customer Licenses, including the AT&T license, "provided that the BMC Customer Licenses are used solely for the purposes of supporting the BMC Customer who owns such licenses."  Section 5.1 governs IBM's "access," "use," and "operational responsibility" for BMC Customer Licenses, while § 5.4 governs IBM's "displacing" and "discontinuing" BMC Customer Licenses.

The court agrees with BMC's objections to the M&R.  IBM's interpretation of the phrase "operational responsibility" would allow it "to take all actions that the customers themselves could take under their licenses," including displacing BMC product with its own.  This is not a viable interpretation of the contract and cannot render the language of § 5.1 ambiguous.  *See* Dkt. 561 at 10 (citing common definitions of "operational responsibility").  Reading the contract as a whole, "operational responsibility" cannot be interpreted so broadly that it renders the entire purpose of Exhibit K and the non-displacement provision meaningless.  *See In re Viking Pump, Inc.*, 33

N.Y.S.3d at 257; *FCI Grp., Inc. v. City of New York*, 54 A.D.3d 171, 176, 862 N.Y.S.2d 352, 356 (N.Y. App. Div. 2008) (noting that "a contract is to be construed so as to give effect to each and every part").  Therefore, the court concludes that § 5.1 is unambiguous and must be interpreted to preclude access and use of Customer licenses to displace BMC products.  Thus, IBM's motion for summary judgment on BMC's claims (Dkt. 396) is DENIED as to the breach of § 5.1 of the 2015 OA.[2]

### 3.  Section 1.1 of the 2015 OA

The M&R recommends denial of both IBM's and BMC's motions for summary judgment on BMC's claim for breach of § 1.1 because § 1.1 is "specifically linked to §§ 5.1 and 5.4."  Dkt. 561.  Having concluded that §§ 5.1 and 5.4 are ***not*** ambiguous, the court need not defer ruling on the claim for breach of § 1.1.

The court agrees with IBM that § 1.1 merely puts IBM to an election regarding how it would use BMC products in relation to its provision of IT Services at AT&T.  IBM elected to proceed pursuant to § 1.1(a): "Access and Use– (Sections 5.1, 5.2, 5.3 and 5.4)."  The fact that IBM then breached § 5.4, and possibly § 5.1, does not demonstrate that IBM breached § 1.1 by electing "Access and Use."  However, the fact that BMC cannot proceed on an independent claim for breach of § 1.1 does not preclude BMC from arguing that § 1.1 provides the framework for benefit-of-the-bargain damages for IBM's breach of § 5.4.

Therefore, IBM's motion for summary judgment on BMC's claims (Dkt. 396) is GRANTED as to the issue of breach of § 1.1, and BMC's motion for partial summary judgment on breach of the outsourcing attachment §§ 1.1 and 5.4 (Dkt. 381) is DENIED as to the issue of

---

[2]     BMC did not move for summary judgment on its claim for breach of § 5.1 of the 2015 OA. *See* Dkt. 381.

6

breach of § 1.1.

**B.      Damages Limitations**

The Parties' 2008 Master Licensing Agreement ("MLA") contains the following provisions:

> 9.      **DISCLAIMER OF DAMAGES.**  EXCEPT FOR VIOLATION OF PROPRIETARY RIGHTS AND CONFIDENTIALITY (SECTION 8) AND INFRINGMENT CLAIMS (SECTION 12), NEITHER PARTY, ITS AFFILIATES OR BMC'S LICENSORS ARE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES RELATING TO OR ARISING OUT OF THIS AGREEMENT, SUPPORT, THE PRODUCT OR ANY THIRD PARTY CODE OR SOFTWARE PROVIDED WITH THE PRODUCT (INCLUDING, WITHOUT LIMITATION, LOST PROFITS, LOST COMPUTER USAGE TIME, AND DAMAGE TO OR LOSS OF USE OF DATA), EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND IRRESPECTIVE OF NEGLIGENCE OF A PARTY OR WHETHER SUCH DAMAGES RESULT FROM A CLAIM ARISING UNDER TORT OR CONTRACT LAW.  THE FOREGOING LIMITATION OF LIABILITY WILL APPLY UNLESS OTHERWISE REQUIRED BY THE LOCAL LAW OF THE COUNTRY WHERE THE PRODUCTS ARE ORDERED.

Dkt. 396-2 at 12 (MLA § 9).

> 10.     **LIMITS ON LIABILITY.**  EXCEPT IN THE CASE OF BMC'S OBLIGATIONS WITH RESPECT TO INFRINGEMENT CLAIMS (SECTION 12), OR EITHER PARTY'S BREACH OF PROPRIETARY RIGHTS AND CONFIDENTIALITY (SECTION 8), EACH PARTY'S LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE PRODUCT, OR THE USE OF THE PRODUCT SHALL BE LIMITED TO THE GREATER OF $5,000,000 OR THE AMOUNT PAID OR PAYABLE BY THE CUSTOMER FOR THE LICENSE TO THE APPLICABLE PRODUCT GIVING RISE TO THE CLAIM.  THE FOREGOING LIMITATION OF LIABILITY WILL APPLY UNLESS OTHERWISE REQUIRED BY THE LOCAL LAW OF THE COUNTRY WHERE THE PRODUCTS ARE ORDERED.

*Id.* (MLA § 10).  The court adopts the M&R's recommendations regarding §§ 9 and 10 and clarifies its rulings.

22-20463.4001

### 1.  Section 9 of the MLA

The court ADOPTS the M&R's recommendation that BMC's lost profits from AT&T are consequential damages barred by MLA § 9.   Therefore IBM's motion for summary judgment on BMC's claims (Dkt. 396) is GRANTED as to this issue.   BMC's motion for partial summary judgment on the construction of the damages limitations provision (Dkt. 385) is DENIED. However, the summary judgment ruling that § 9 bars BMC's lost profit measure of damages will not preclude BMC from arguing the damage limitation provisions are unenforceable if it succeeds on its claim for fraudulent inducement of the 2015 OA.[3]

The court ADOPTS the M&R's recommendation that that BMC's proposed damages models for $717,000,000, or alternatively for $791,000,000, are direct damages not barred by the limitation on consequential damages contained in MLA § 9.   Therefore, IBM's Motion for Summary Judgment on this issue is DENIED and BMC's Motion for Summary Judgment on this issue is GRANTED.   However, by adopting the M&R the court is not ruling on the amount of damages BMC is entitled to recover as direct, benefit-of-the-bargain damages.   The proper measure and amount of BMC's direct damages remains an issue for trial.

### 2.  Section 10 of the MLA

Further, the court ADOPTS the M&R's recommendation that § 10 does not impose an aggregate limit of $5,000,000 on BMC's damages regardless of the number of BMC products displaced by IBM as part of Project Swallowtail.  However, this ruling does not entitle BMC to recover an amount over $5,000,000 per displaced product because whether there is some other amount "PAID OR PAYABLE BY THE CUSTOMER FOR THE LICENSE TO THE

---

[3]      As detailed in the M&R, BMC presented strong and clear evidence in support of its claim for fraudulent inducement of the 2015 OA.  Dkt. 561 at 21–26.

22-20463.4002

APPLICABLE PRODUCT GIVING RISE TO THE CLAIM" remains to be determined.  If at trial

BMC fails to persuade the court as fact-finder that some other amount is "paid or payable" as

described in MLA § 10, BMC's contract damages would be limited to $5,000,000 per displaced

product.  Assuming the evidence supports displacement of 14 products, and in the absence of some

other amount "paid or payable," BMC's damages would be limited to $70,000,000.

### C.     IBM's Counterclaim for Breach of the Most Favored Customer Provision

With respect to IBM's counterclaim that BMC breached the Most Favored Customer

Provision found in § 18 of the 2015 OA, the court concludes that IBM has failed to raise a genuine

issue of material fact as to the existence of a comparable competitor or its damages.

Section 18 of the 2015 OA provides as follows:

> **MOST FAVORED CUSTOMER**.  BMC represents that the pricing and terms
> granted to [IBM] pursuant to this Order are comparable to or better than the
> equivalent pricing and terms currently being offered by BMC to any entity
> competing with IBM *in the provision of IT Outsourcing Services of BMC for like
> transactions and volumes*.

Dkt. 381, Ex. 2 at 10 (emphasis in italics added).

To create a fact issue as to BMC's breach of the MFC, IBM must identify an IBM

competitor that (1) provides *IT outsourcing services*; (2) *of BMC*; (3) *for like transactions and*

*volumes*. *Id.* (emphasis added).  Rules of contract construction require the court to give effect to

all of the words in this provision—not just the words "any entity competing with IBM." *See In re*

*Lehman Bros. Holdings Inc*., 530 B.R. 601, 608 (Bankr. S.D.N.Y. 2015) ("Courts should, where

possible, interpret a contract in a way that does not place undue emphasis upon particular words

or phrases and gives effect to all words chosen by the parties.").  IBM's summary judgment

evidence identifies multiple entities that compete with IBM in the IT sector but fails to identify

competitors providing IT outsourcing services of BMC for like transactions and volumes.

22-20463.4003

IBM's expert, Paul Pinto, opined that 24 customers "can reasonably be compared to IBM, given their (1) Ability to directly compete with IBM; (2) Capabilities to provide IT outsourcing services to clients; and their (3) Contractual agreements with BMC, that were in effect after March 31, 2013." Dkt. 391, Ex. 30 at 26. But Pinto did not determine whether the 24 entities compete with IBM *in the provision of IT outsourcing services of BMC for like transactions and volumes*. Pinto's opinion is based on assumptions about how large IT companies operate in general. IBM bears the burden to prove that BMC gave better pricing and terms not just to *any* IBM competitor, but to a competitor who competes with IBM in the provision of IT outsourcing services of BMC *for like transactions and volumes*. Even combined with the statements from BMC witnesses noted in the M&R, Pinto's opinion fails to raise a fact issue as to the existence of such a competitor.

In addition, IBM's damages expert, Christopher Gerardi, failed to present evidence of the difference between the value of the pricing and terms of the 2015 OA and the pricing and terms contained in BMC's contract with a competitor. *See Studiengesellschaft Kohle mbh v. Novamont Corp.*, 548 F. Supp. 234, 235 (S.D.N.Y. 1981) (stating proper measure of damages for breach of a most favored customer provision). Gerardi looked at four of the IBM competitors identified by Pinto as having "better" contract terms and attempted to compare the price IBM paid for those contract terms under the 2015 OA with what the competitors paid. However, Girardi's methodology rests only on what IBM paid to BMC for certain provisions and fails to compare the contract terms as a whole.

Gerardi limited his damages calculation to a valuation of one-to-many rights, remote access rights, and shared hosting and service-provider-to-service-provider rights. Dkt. 391, Ex. 31 at 14.[4] As for one-to-many and remote access rights, Gerardi opines that BMC granted similar but less

---

[4]     Gerardi's analysis did not include non-displacement rights. Dkt. 391, Ex. 31 at 14 n.34.

22-20463.4004

restrictive rights to HP, Wipro, HCL, and Dell without charging them any fees while IBM made an initial payment and a fee for a five-year extension of those rights.  Dkt. 39, Ex. 31 at 15, 18–19.

As to shared hosting and service-provider-to-service-provider rights, Gerardi opined that some of IBM's IT outsourcing competitors received better terms than IBM and IBM suffered actual damages for Shared Hosting and SP-to-SP provisions of greater than $12.466 million, in just the initial term.  *Id.* at 21.  Gerardi's report demonstrates that he looked only at what IBM paid for specific rights and assumed, without a reasonable basis, that other competitors paid nothing for similar rights.  Because the terms are compared in isolation without comparing the contracts as a whole, Gerardi's opinion does not provide evidence of the difference between the pricing and terms BMC offered to IBM under 2015 OA and the pricing and terms BMC offered to IBM's competitors.

To succeed on its counterclaim for breach of the MFC provision, IBM must show damages caused by BMC's alleged breach.  *See Wilder v. World of Boxing LLC*, 310 F. Supp. 3d 426, 445–46 (S.D.N.Y. 2018).  IBM has not met its burden to present a reliable measure of actual damages.

For these reasons, IBM's motion for summary judgment on its counterclaim for breach of § 18 of the 2015 OA (Dkt. 394) is DENIED, and BMC's motion for summary judgment on IBM's counterclaim for breach of § 18 of the 2015 OA (Dkt. 391) is GRANTED.

## III. CONCLUSION

With exception to the rejections and clarifications outlined above, the court accepts Judge Bryan's memorandum and recommendation dated June 7, 2021, and ADOPTS it as the opinion of the court.  It is therefore ordered that:

(1) Judge Bryan's memorandum and recommendation (Dkt. 561) is ADOPTED as the

22-20463.4005

holding of the court, except as noted;

(2) IBM's motion for summary judgment on BMC's claims (Dkt. 396) is DENIED as to the issue of breach of § 5.4 of the 2015 OA;

(3) BMC's motion for partial summary judgment on breach of the outsourcing attachment §§ 1.1 and 5.4 (Dkt. 381) is GRANTED as to the issue of breach of § 5.4;

(4) IBM's motion for summary judgment on BMC's claims (Dkt. 396) is DENIED as to the breach of § 5.1 of the 2015 OA;

(5) IBM's motion for summary judgment on BMC's claims (Dkt. 396) is GRANTED as to the issue of breach of § 1.1;

(6) BMC's motion for partial summary judgment on breach of the outsourcing attachment §§ 1.1 and 5.4 (Dkt. 381) is DENIED as to the issue of breach of § 1.1;

(7) IBM's motion for summary judgment on its counterclaim for breach of § 18 of the 2015 OA (Dkt. 394) is DENIED;

(8) BMC's motion for summary judgment on IBM's counterclaim for breach of § 18 of the 2015 OA (Dkt. 391) is GRANTED in full;

(9) IBM's objections are SUSTAINED IN PART and OVERRULED IN PART; and

(10) BMC's objections are SUSTAINED IN PART and OVERRULED IN PART

Signed at Houston, Texas on September 9, 2021.

Gray H. Miller
Senior United States District Judge

12

**TAB 11**


[Sealed Document]

# TAB 12



MLA # 83106

## Master License Agreement

This World Wide Master License Agreement ("**Agreement**") is between International Business Machines Corporation, a New York corporation, located at 1 Orchard Road, Armonk, New York   ("**Customer**" or "**IBM**") and BMC Software Distribution, Inc. a Delaware corporation, located at 2101 City West Blvd., Houston, Texas, 77042, USA, or its local licensing affiliate ("**BMC**").

This Agreement is effective as of March 31, 2008 ("**Effective Date**").

Territory:  As specified on an Order.

1.  **DEFINITIONS.**
"**Affiliate**" is an entity that controls, is controlled by or shares common control with BMC or Customer, with more than 50% ownership interest.
"**Outsourcing Attachment**" is an agreed written document that sets forth certain additional terms and conditions specific to use of Product(s) in the provision of services by the Customer to clients of Customer.
"**Computer**" or "**Server**" has the meaning generally given within the computer industry, which is a single machine, whether a central processing unit, such as a mainframe machine, or a distributed systems machine, such as a Unix or Intel based server. A mainframe machine would be an individual mainframe computer having single or multiple processors or engines.
"**Documentation**" means the technical publications relating to the software, such as release notes, reference, user, installation, systems administrator and technical guidelines, included with the Product.
"**Enterprise**" is the environment consisting of all hardware owned or leased by Customer in the Territory.
"**Harmful Code**" means any computer code, programming instruction or set of instructions that is intentionally and specifically constructed to damage, interfere with or otherwise adversely affect computer programs, data, or hardware without the consent or intent of the computer user.  Harmful Code includes, but is not limited to, self propagating programming instructions commonly called viruses or worms.
"**Disabling Code**" means computer code inserted by BMC that is not addressed in the Documentation and that is designed to delete, interfere with, or disable the normal operation of the Products. The Disabling Code warranty does not apply to BMC passwords necessary for the operation of the Product, or for any use by Customer outside the scope of the license.
"**Licensed Capacity**" is the amount of each Product licensed as established in the Order.  For licenses based on the power of a computer, Customer agrees to use BMC's then current computer classification scheme. which will be provided upon request.
"**Order**" is an agreed written or electronic document identifying the Products to be licensed, subject to the terms of this Agreement and its applicable attachments and referencing this Agreement, the Product name and Licensed Capacity, type of license and fees, license term, and Territory.
"**Participation Agreement**" is the document required to be executed by each non United States Affiliate of Customer which will allow them to license Products for use under the Agreement and the Outsourcing Attachment. A separate Participation Agreement is required for each distinct country location.
"**Product**" is the object code of the software and all accompanying Documentation delivered to Customer, including all items delivered by BMC to Customer under Support.
"**Service Management Products**" consist of most Remedy, Marimba, Magic, BMC Identity Management and BMC Service Management products.
"**System Management Products**" consist of most Mainframe and Distributed Systems Management products.
"**Support**" is the support services program as further specified in this Agreement.
"**Term License**" is a non-perpetual license as provided on an Order.

2.  **LICENSE.**

2.1  **Grant.** Subject to the terms of this Agreement and any applicable Participation Agreement, BMC grants Customer a non-exclusive, non-transferable, perpetual (unless a Term License is provided on an Order) license, as specified in the relevant Order, to exercise the following rights to the Product up to the Licensed Capacity: (a) install on Customer's owned or leased hardware at a facility owned or controlled by Customer, only at the Customer location specified on an Order and subject to (i) any applicable then current international uplift fee, and (ii) Section 16 below; (b) access the Products only from the location specified on an Order, (c) operate solely for processing Customers own data in Customer's business operations, (d) subject to the terms of an executed Outsourcing Attachment use it for the provision of services to a third party, and (e) make one copy of the Product for archival purposes only (collectively a "**License**"). If the Product design permits modification, then Customer may only use such modifications or new software programs for its internal purposes and otherwise consistent with the License.  Affiliates may use and access Products, installed at the Affiliate location, and Support under the terms of this Agreement, and Customer is responsible for its Affiliates compliance with the terms of this Agreement. The Product may also be used by Customer's contractors who will be subject to obligations of confidentiality and non-disclosure no less restrictive than the terms of the confidentiality and non disclosure terms of this Agreement.

---

**CONFIDENTIAL**

**IBM00035618**

PLAINTIFF'S EXHIBIT
BMC SOFTWARE, INC

1

Case No. 4:17-CV-2254

22-20463.14795

PX001.0001



2.2 **Disaster Recovery.** In the event of a disaster, Customer may run the Products on a Disaster Recovery Computer for no additional fee, or reimburse, subject to the following: A "Disaster Recovery Computer" is defined as a single designated Computer upon which the Products are installed that is immediately available for production processing in the event of a disaster on the primary production Computers.  Customer may not use the Disaster Recovery Computer and the primary production Computers simultaneously in production; except that, Customer may, no more than twice a year and no longer than 14 continuous days, also use the Products for disaster recovery testing. Customer agrees that if the Disaster Recovery Computer is of a greater capacity than the licensed capacity of the Products, the production processing on such computer will not exceed ninety (90) days; Customer will inform BMC in writing at the commencement of such processing.

3.   **RESTRICTIONS.**  Customer agrees to not:  (a) disassemble, reverse engineer, decompile or otherwise attempt to derive any Product source code from object code, except to the extent expressly permitted by applicable law despite this limitation; (b) distribute or provide the Product to any third party or, subject to Section 2.1 above, use it in a service bureau, outsourcing environment, or for the processing of third party data, or for rental, lease, or sublicense; (c) provide a third party with the results of any functional evaluation, or performance tests, without BMC's prior written approval; (d) attempt to disable or circumvent any of the licensing mechanisms within the Product; or (e) violate any other usage restrictions contained in the Documentation.

4.   **WARRANTIES.**

4.1 **General Warranty** BMC warrants to the best of its knowledge that as of the Effective Date of this Agreement,(i) the Products are in compliance with all applicable laws, rules and regulations, and (ii) that BMC has sufficient rights to the Products (including associated marks and names) to grant IBM the rights specified in this Agreement.

4.2 **Product Performance Warranty.** Except for a trial license as described below, BMC warrants that the Product will perform in substantial accordance with its Documentation for a period of one year from the date of the Order and shall not be extended by the acquisition of additional Licensed Capacity for the specific Product.  This warranty will not apply to any problems caused by software other than the Product, hardware not supplied by BMC, or misuse of the Product.

4.3 **Disabling Code.** With respect to the Products (including any updates and releases under Support) and as of the date of delivery, BMC warrants that (i) it has used commercially reasonable efforts consistent with industry standards to scan for and remove any Harmful Code, and (ii) it has not inserted any "**Disabling Code.**"

4.4 **Harmful Code.** With respect to the Products (including any updates and releases under Support) and as of the date of delivery, BMC warrants that (i) it has used commercially reasonable efforts consistent with industry standards to scan for and remove any software viruses, and (ii) it has not inserted any "**Harmful Code.**"

5.   **LIMITED REMEDIES.**  BMC's entire liability, and Customer's exclusive remedy, for breach of the above Product Performance Warranty (Section 4.2) is limited to:  BMC's use of commercially reasonable efforts to remedy defects covered by the warranty or replacement of the defective Product within a reasonable period of time, or if BMC cannot remedy or replace such defective Product within such time period, then BMC will refund the amount paid by Customer for the License for that Product.  BMC's obligations in this section are conditioned upon Customer's providing BMC written notice of the claim during the warranty period and full cooperation and access to the Product in resolving any claim.

6.   **DISCLAIMER OF WARRANTIES.**  EXCEPT FOR THE EXPRESS WARRANTIES IN THIS AGREEMENT, THE PRODUCT IS PROVIDED WITH NO OTHER WARRANTIES WHATSOEVER, AND BMC, ITS AFFILIATES AND LICENSORS DISCLAIM ALL OTHER WARRANTIES, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT.  BMC DOES NOT WARRANT THAT THE OPERATION OF THE PRODUCT WILL BE UNINTERRUPTED OR ERROR FREE, OR THAT ALL DEFECTS CAN BE CORRECTED.

7.   **PAYMENTS AND DELIVERY.**  Customer will pay each License fee and/or Support fee correctly invoiced within 60 days of invoice date. Customer will pay, or reimburse, BMC or when required by law the appropriate governmental agency  for taxes of any kind, including sales, use, VAT, excise, customs duties, withholding, property, and other similar taxes (other than taxes based on BMC's net income) imposed in connection with the License and/or the Support fees which are exclusive of these taxes.  For Products that are delivered electronically, upon request from BMC, Customer agrees to provide BMC with Documentation supporting that the designated Product was received electronically. It is Customer's responsibility to verify that all applicable Products, including but not limited to updates, enhancements and documentation, are received via an electronic medium. If Customer accepts any Product in a non-electronic format, there may be an additional charge and it is the sole responsibility of Customer to bear any sales/use tax obligation, penalties, and interest.  The unpaid balance of an  invoice may be subject to a late payment fee calculated at 1% per month or the maximum amount permitted by law, whichever is less.  All Products are licensed FCA ("Free Carrier" as per Incoterms 2000) shipping point.  The Products are accepted on the date of the Order; however, such acceptance will not affect the Product Performance Warranty provided in this Agreement.

8.   **PROPRIETARY RIGHTS AND CONFIDENTIALITY.**  BMC, its Affiliates or licensors retain all right, title and interest in the Product and all related intellectual property and proprietary rights.  The Product and any third party software provided with the Product are

CONFIDENTIAL

IBM00035619

22-20463.14796

PX001.0002

protected by applicable copyright, trade secret, industrial and other intellectual property laws.  Customer may not remove any product identification, copyright, trademark or other notice from the Product.  BMC reserves any rights not expressly granted to Customer. "**Confidential Information**" means all proprietary or confidential information that is disclosed to the recipient ("**Recipient**") by the discloser ("**Discloser**"), and includes, among other things (i) any and all information relating to products or services provided by a Discloser, its financial information, software code, flow charts, techniques, specifications, development and marketing plans, strategies, and forecasts; (ii) as to BMC, and its licensors, the Product and any third party software provided with the Product; and (iii) the terms of this Agreement, including without limitation, Product pricing information.  Confidential Information does not include information that Recipient can show: (a) was rightfully in Recipient's possession without any obligation of confidentiality before receipt from the Discloser; (b) is or becomes a matter of public knowledge through no fault of Recipient; (c) is rightfully received by Recipient from a third party without violation of a duty of confidentiality; (d) is independently developed by or for Recipient; or (e) is required to be disclosed by applicable law or court order. All materials containing Confidential Information must have a restrictive marking of the Discloser at the time of disclosure.  Information disclosed orally must be summarized in a writing provided to the Recipient within thirty (30) days of disclosure. For five (5) years after the date of disclosure, the Recipient will use the same care and discretion to avoid disclosure of the Discloser's Confidential Information as the Recipient uses with its own similar information which it does not wish to disclose; however, and for the avoidance of doubt, Recipient's obligations with respect to Confidential Information made up of source code shall never expire and Confidential Information made up of object code shall expire 9 years after date of disclosure. The parties agree that it is not their intent to deliver source code under this Agreement. Recipient may not disclose Confidential Information of Discloser to any third party, however, the Recipient may disclose Confidential Information to: i) its employees and employees of its parent and majority owned affiliates who have a need to know; and ii) any other party with the Discloser's prior written consent.  Before disclosure to any of the above parties, the Recipient must have an appropriate agreement with such party sufficient to require that party to treat Confidential Information in accordance with this Agreement.  The Recipient may disclose Confidential Information to the extent required by law, but must give the Discloser reasonable prior notice to allow the Discloser a reasonable opportunity to obtain a protective order.   The Recipient may use in its internal business activities the ideas, concepts  and know how contained in the Discloser's Confidential Information which are retained in the unaided memories of Recipient's employees who have had access to the Confidential Information under this Agreement, but the foregoing right does not grant any license under Discloser's copyrights or patents. For purposes of this Section, "unaided" means that the employee has not intentionally memorized the information for the purpose of retaining and later using or disclosing it. Notwithstanding the terms contained in this Section 8, BMC and IBM acknowledge that this Agreement and its attachments may contain information of a nature that if made know to certain areas within each other's company could be used to a competitive advantage in the market place ("Sensitive Information"). Therefore, BMC and IBM agree to use commercially reasonable efforts to assure Sensitive Information is made available only to those who have a need to know and whose work responsibilities require knowing the terms of this Agreement and its attachments.

9.  **DISCLAIMER OF DAMAGES**.  EXCEPT FOR VIOLATION OF PROPRIETARY RIGHTS AND CONFIDENTIALITY (SECTION 8) AND INFRINGEMENT CLAIMS (SECTION 12), NEITHER PARTY, ITS AFFILIATES OR BMC'S LICENSORS ARE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES RELATING TO OR ARISING OUT OF THIS AGREEMENT, SUPPORT, THE PRODUCT OR ANY THIRD PARTY CODE OR SOFTWARE PROVIDED WITH THE PRODUCT (INCLUDING, WITHOUT LIMITATION, LOST PROFITS, LOST COMPUTER USAGE TIME, AND DAMAGE TO, OR LOSS OF USE OF DATA), EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND IRRESPECTIVE OF NEGLIGENCE OF A PARTY  OR WHETHER  SUCH DAMAGES RESULT FROM A CLAIM ARISING UNDER TORT OR CONTRACT LAW.   THE FOREGOING LIMITATION OF LIABILITY WILL APPLY UNLESS OTHERWISE REQUIRED BY THE LOCAL LAW OF THE COUNTRY WHERE THE PRODUCTS ARE ORDERED

10. **LIMITS ON LIABILITY**.  EXCEPT IN THE CASE OF BMC'S OBLIGATIONS WITH RESPECT TO INFRINGEMENT CLAIMS (SECTION 12), OR EITHER PARTY'S BREACH OF PROPRIETARY RIGHTS AND CONFIDENTIALITY (SECTION 8), EACH PARTY'S LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE PRODUCT, OR THE USE OF THE PRODUCT SHALL BE LIMITED TO THE GREATER OF $5,000,000 OR THE AMOUNT PAID OR PAYABLE BY CUSTOMER FOR THE LICENSE TO THE APPLICABLE PRODUCT GIVING RISE TO THE CLAIM. THE FOREGOING LIMITATION OF LIABILITY WILL APPLY UNLESS OTHERWISE REQUIRED BY THE LOCAL LAW OF THE COUNTRY WHERE THE PRODUCTS ARE ORDERED.

11. **TRIAL LICENSE**.  For Products provided without an Order and without charge Customer may only operate the Product on a trial basis for 30 days or longer time period if agreed to by BMC in writing, for purposes of evaluating whether Customer will acquire a license to the Product for a fee; and the Product is provided "AS IS" and without any warranty. BMC may terminate a trial license for its convenience upon notice to Customer.

12. **INFRINGEMENT CLAIMS**.  If a third party asserts a claim against Customer asserting that Customer's use of a Product in accordance with this Agreement violates that third-party's patent, trade secret or copyright ("**Infringement Claim**"), then BMC will, at its own expense: (a) defend or settle the Infringement Claim; and (b) indemnify Customer for any damages finally awarded against Customer, but only if: Customer promptly notifies BMC of any Infringement Claim, BMC retains sole control of the defense of any Infringement Claim and all negotiations for its settlement or compromise, and Customer provides all reasonable assistance requested by BMC.  Notwithstanding the foregoing, IBM's consent shall be required for any settlement or compromise which includes an admission of wrongdoing or payment of money on the part of IBM. BMC's obligations above will not apply if the Infringement Claim is based on (i) the use of Product in combination with products not supplied or approved by BMC in writing or in the Product's user manuals, or (ii) the failure of Customer to use any updates to such Product within a reasonable time after such updates are made available to Customer.  If BMC believes a Product may violate a right, then BMC will, at its expense: (a) modify the Product, or (b) procure the right to continue using the Product, and if (a) or (b) are not commercially reasonable, terminate Customer's right to use the

**CONFIDENTIAL**

IBM00035620

22-20463.14797

PX001.0003



Product and (1) for any perpetual licenses, issue a refund based upon the applicable license fees paid, prorated over 48 months from the date of the Order under which the Products are initially licensed; and (2) for any non-perpetual licenses, release Customer from its obligation to make future payments for the Product or issue a pro rata refund for any fees paid in advance. This section contains Customer's exclusive remedies and BMC's sole liability for Infringement Claims.

13. **TERMINATION.** BMC may: (i) terminate an Order and the Licenses to the Products on that Order if Customer fails to pay any applicable fees correctly invoiced due under that Order within 30 days after receipt of written notice from BMC of non-payment in accordance with Section 21.Coordinators; or (ii) terminate all Licenses specific to a material breach and this Agreement in whole or in part if Customer commits any other material breach of this Agreement, or any Outsourcing Attachment, and fails to correct the breach within 60 days after BMC notifies Customer in writing of the breach. Upon any termination of a License, Customer or Customer Affiliate, as the case may be, will immediately deinstall and stop using the relevant Product, and upon BMC's request, Customer will immediately return such Product to BMC, together with all related Documentation and copies, or certify its destruction in writing. If this Agreement is terminated under Section 13 (ii), herein, then the Attachment and any associated Access and Consent Agreement will also terminate at the same time. Either party may terminate this Agreement if Customer no longer has, in its possession, any licensed Products.

14. **AUDIT.** If requested by BMC not more than once a year, Customer agrees to deliver to BMC periodic written reports, whether generated manually or electronically, specifying Customer's use of the Product, and allow BMC, within 15 days of a request, to perform an audit at Customer's facilities during normal business hours to ensure compliance with the terms of this Agreement and provided such audit activity does not unreasonably interfere with Customer's business operations. The audit shall be performed by a public accounting firm selected and retained by BMC subject to approval by Customer which approval shall not be unreasonably withheld, and the auditors shall sign a reasonable nondisclosure agreement with respect to Customer's and clients' confidential data. Customer agrees to reasonably cooperate during any audit and to provide reasonable access to information and systems. Notwithstanding the foregoing, in no event will Customer's acceptance or rejection of a third party auditor delay the audit by more than 15 days. If an audit reveals that Customer has exceeded the Licensed Capacity for a Product, Customer agrees to pay the applicable fees for additional capacity. If the understated capacity exceeds 10% of the Licensed Capacity of the applicable Product, then Customer agrees to also pay BMC's reasonable costs of conducting the audit.

15. **EXPORT CONTROLS.** Customer will cooperate with BMC as reasonably necessary to ensure compliance with the laws and regulations of the United States and all the relevant countries, relating to exports (including "deemed" exports and "deemed" re-exports as defined by the Export Administration Regulations) and re-exports ("Export Laws"). Customer may not import, export, re-export or transfer, directly or indirectly, including via remote access, any part of the BMC Modules, or any other BMC information or technology in violation of any such laws and regulations, or without any written governmental authorization required under applicable laws. In particular, but without limitation, none of the Software or the underlying information or technology may be downloaded or otherwise exported or re-exported, directly or indirectly, (a) into (or to a national or resident of) Cuba, Iran, North Korea, Syria or Sudan; (b) to anyone on the US Treasury Department's list of Specially Designated Nationals or Other Blocked Persons, the US Commerce Department's Denied Parties List, the US Commerce Department's Entity List, or the US Commerce Department's Unverified List; or (c) to or for any proliferation-related (nuclear weapons, missile technology, or chemical/biological weapons) end use.

16. **GOVERNING LAW.** This Agreement is governed by and construed under the substantive laws, without regard to conflict of laws principles, in the State of New York.

17. **U.S. FEDERAL ACQUISITIONS.** This Article applies to all acquisitions of the commercial Product subject to this Agreement by or on behalf of the federal government, or by any prime contractor or subcontractor (at any tier) under any contract, grant, cooperative agreement or other activity with the federal government. By accepting delivery of the Product, the government hereby agrees that the Product qualifies as "commercial" within the meaning of the acquisition regulation(s) applicable to this procurement. The terms and conditions of this Agreement shall pertain to the government's use and disclosure of the Product, and shall supersede any conflicting contractual terms and conditions. If the license granted by this Agreement fails to meet the government's needs or is inconsistent in any respect with Federal law, the government agrees to return the Product, unused, to BMC. The following additional statement applies only to acquisitions governed by DFARS Subpart 227.4 (October 1988): "Restricted Rights – Use, duplication and disclosure by the Government is subject to restrictions as set forth in subparagraph (c)(1)(ii) of the Rights in Technical Data and Computer Software clause at DFARS 252.227-7013 (Oct. 1988)."

18. **MISCELLANEOUS TERMS.** Except for Customer's obligation to pay monies owed to BMC, neither Party is liable for its failure to perform any obligation under this Agreement during any period in which performance is delayed by circumstances beyond that party's reasonable control. A waiver by a party of any breach of any term of this Agreement will not be construed as a waiver of any continuing or succeeding breach. Both parties agree to comply with all applicable laws. Customer may not assign or transfer this Agreement or a License to a third party, whether by merger or otherwise. Should any term of this Agreement be invalid or unenforceable, the remaining terms will remain in effect. BMC rejects all additional or conflicting terms of a Customer form purchasing document. The parties acknowledge they have read this Agreement and agree that it is the complete and exclusive statement of the agreement and supersedes any prior or contemporaneous negotiations or agreements, between the parties relating to the subject matter of this Agreement. This Agreement may not be modified or rescinded except in writing signed by both parties. The parties expressly waive any right to a jury trial regarding disputes related to this Agreement. Unless otherwise provided by local law without the possibility of contractual waiver or limitation, any legal or other action related to a breach of this Agreement must be commenced no later than two (2) years from the date on which the cause of action arose. The prevailing party in any litigation is entitled to recover

**CONFIDENTIAL**

**IBM00035621**
**22-20463.14798**
PX001.0004

**bmc**software

reasonable and customary attorney's fees and costs from the other party. BMC's Product may consist of software components owned by BMC and components owned by BMC's licensors. BMC shall inform Customer of any notices that are related to third party software components (including open source software) that are included in a Product and that BMC is required to distribute with such Products. These notices will be provided to Customer in the Documentation of the applicable Product. Certain third party technology (collectively the "Open Source Technology") may be included on the same medium or as part of the download of the BMC Product that Customer receives, but is subject to a separate royalty-free/open source license (collectively, the "Open Source Licenses"). This Agreement does not modify or abridge any rights or obligations Customer may have related to the Open Source Technology under applicable Open Source Licenses; however, to the extent that Open Source Technology is incorporated into a BMC Product, Customer's rights and remedies under this Agreement with respect to such Open Source Technology will apply including, without limitation, warranties, indemnification, license grants and support services, but only for Customer's use of the BMC Product in compliance with the terms of this Agreement. Any use of Open Source Technology outside of Customer's licensed use of the applicable BMC Product is subject to the rights and obligations under such Open Source Technology's Open Source License.

19.  **SUPPORT.**  Customer may acquire BMC support services ("**Support**") on an Order.  Once Support is acquired for a Product, Customer is automatically enrolled in Support on an annual basis for all Licensed Capacity of that Product, unless either party terminates Support on all Licensed Capacity of a Product upon at least 60 days written notice On a best effort basis BMC agrees to notify Customer (electronically or by mail) of pending renewal of Support prior to the next Support anniversary date. The annual fee for Support is based on BMC's then-current Support price list. BMC's Support offerings as of the date of this Agreement are set forth on the attached Exhibit A; for the most then current description of Support go to www.bmc.com/support.  BMC may change its Support terms, to be effective upon Customer's support anniversary date. BMC reserves the right to discontinue Support for a Product where BMC generally discontinues such services to all licensees of that Product. BMC agrees to notify Customer (electronically or by mail ) of change in its Support terms or its plan to discontinue Support for a Product at least 60 days prior to the next Support anniversary date. If Customer terminates Support and then re-enrolls in Support, BMC may charge Customer a reinstatement fee.

20.  **AGREEMENT CONSOLIDATION.** The parties agree that, upon the Effective Date, the following agreements between Customer and BMC relating to the Products and/or the support and maintenance of such Products are of no further force and effect and are superseded and replaced by this Agreement Worldwide Software Vendor Agreement (BMC Ref. No. 4470 and IBM Ref. No. 4999VR0003) dated May 20, 1999 and any other license agreement in place between Customer or its Affiliates and BMC or its Affiliates (the "**Prior Agreements**"). However, and for the avoidance of any doubt, the Amendment to Worldwide Software Vendor Agreement dated January 1, 2007 (the "One-to-Many Amendment") is not terminated but will henceforth be subject to the terms and conditions of this Agreement. In addition, upon the Effective Date: (i)  any Products in the constructive or actual possession of Customer delivered under the terms of the Prior Agreements will be immediately subject to the terms of this Agreement; and (ii) any acts or omissions or obligations accrued prior to the Effective Date will continue to be governed by the Prior Agreements. The parties further agree that any license agreements between BMC and Customer's Client(s), as such term is defined in the Outsourcing Attachment, that are assigned to Customer with BMC's consent will remain in effect and govern the BMC Products licensed under such agreement. In addition and notwithstanding any provisions of this Agreement and any of its attachments, BMC agrees that the terms and conditions of any existing agreements which granted IBM operational responsibility using BMC customer's license (the "Access Consent Agreement") or which allowed BMC customers to suspend their licenses while subscribing to IBM's IT Services and using IBM BMC Product licenses (the "Licenses Suspension Agreement") and which were executed prior to this Agreement (the "Preexisting Access Consent Agreements") will continue in full force and effect until their natural termination. For clarification purposes, this Agreement will not change the terms and conditions of the Preexisting Access Consent Agreements, even if such terms and conditions are inconsistent with this Agreement.  The Preexisting Access Consent Agreements contemplated include, but are not limited to, the access and consent agreements and suspension agreements that were executed in the United States and Europe under the agreements, addendums and attachments to the Worldwide Software Vendor Agreement, dated 29 April 1999 and the Enterprise Licensing and Outsourcing Attachment for the United States, dated March 31, 2002.

21.  **COORDINATORS.** Any notice required or permitted to be made by either party to this Agreement or any attachments must be in writing. Notices are effective when received by the appropriate coordinator as demonstrated by reliable written confirmation (for example, certified mail receipt or facsimile receipt confirmation sheet).

The Contract Coordinators responsible to receive all notices and administer this Agreement are:

| For IBM | For BMC |
|---|---|
| Title:  BMC Procurement Relationship Mgr | Title: IBM Global Account Manager |
| Address: 1 Orchard Road, Armonk, NY 10504 | Address:  2101 CityWest Blvd, Houston, Texas 77042 |
| Phone: 914-499-1900 | Phone:  713-918-8800 |
| | |

CONFIDENTIAL

IBM00035622
22-20463.14799
PX001.0005



Each party hereto warrants and represents that a duly authorized representative of such party has executed this Agreement and this Agreement constitutes the legal, valid and binding obligation of such party

| ("BMC") BMC Software Distribution, Inc. | ("Customer") International Business Machines Corporation |
|---|---|
| By: *Judy Schafer* | By: *John R. Sweetman* |
| Name: Judy Schafer | Name: John Sweetman |
| Title: Sr. Manager of Order Services | Title: Sourcing Manager |
| Date: APR 0 2 2008 | Date: 3/31/2008 |

FINAL – Reviewed by Contracts – BR

CONFIDENTIAL

IBM00035623
22-20463.14800
PX001.0006

**TAB 13**



**OUTSOURCING**
**ATTACHMENT TO THE**
**Master License Agreement**
**between**
**BMC Software Distribution, Inc.  ("BMC")**
**and**
**International Business Machines Corporation ("Customer" or "IBM")**

This Outsourcing Attachment (the "Attachment") is to that certain Master License Agreement (No. 83106) ("Agreement") dated March 31, 2008, between BMC and Customer. The term ("Term") of this Attachment is from March 31, 2008 (the "Effective Date") and to March 30, 2013 the ("Expiration Date") unless terminated sooner under Section 12 ("Termination") below.

1.   **SCOPE.**  Customer has developed an IT Services (as such term is defined below) business and would like to use BMC's Products in the provision of such services.  This Attachment addresses the terms under which BMC grants to Customer the right to use the Products in its IT Services business in a specific Territory.  It is the intent of the parties to operate under a common set of terms and conditions on a worldwide basis that covers both Customer's and BMC's interests.  This Attachment, along with the Agreement and each applicable Participation Agreement will serve as the master worldwide documents for all applicable Orders. This Attachment sets forth terms and guidelines for (i) adding additional licensed Capacity, (ii) LPAR usage, (iii) international relocation of Products, (iv) access and consent including remote access of Products, (v) addition of new business, (vi) to establish pre-negotiated corporate discounts available to Customer and (vii) will be a single point of control for business terms related to the subject matter of this Attachment. All Products provided under this Attachment are governed by this Attachment, the Agreement, any Participation Agreement, and any applicable Order.

2.   **DEFINITIONS.**  All defined terms in the Agreement have the same meaning in this Attachment, unless otherwise provided.

"**BMC Customer**" is a third party which licenses BMC Products and which becomes a Client at commencement of or during delivery of IT Services.

"**Clients**" shall mean customers of IBM who subscribe to Customer's IT Services business, and who operate the Products as an end user, or on whose behalf the Products are operated by IBM.  A Client may not provide IT Services using the Products to other third parties.

"**IT Services**" means facilities management, service bureau, outsourcing, application management and development, installation, implementation, maintenance, web page hosting, infrastructure or application program hosting, i network services, or any other information processing or related services, provided by Customer to a Client under an agreement pursuant to a bona fide transaction for which IBM is compensated (which services may involve access to and/or use of BMC Products by Customer, its agents and subcontractors for the processing of Client data).

3.   **USAGE.**

**Products.**  For Products identified in an Order, BMC grants to Customer, for the term of this Attachment, a nonexclusive, license to operate the Products for the purpose of providing IT Services to itself or to a Client, in the Territory specified on an Order, subject to the additional terms below:

(i) **Non-Assignment.**  Neither this Attachment nor any Products may be assigned by the Customer to any third party, Customer affiliate or Customer subsidiary without prior written consent from BMC. Any approved assignment or transfer may be subject to an applicable transfer or assignment fee not to exceed 10% of the then current list price of the Products being transferred. The parties agree that they must execute a separate assignment agreement for any approved transfers and the third party transferee of Products must execute BMC's then standard Master License Agreement unless such third party already has a valid BMC license agreement in place.

**Product Restrictions and Units of Measurement.**  Certain Products have usage restrictions, and such restrictions and Product Unit of Measurements, as of the date of this Attachment, are set forth on the attached Exhibit A.

4.   **PRODUCT ORDERS.**  Customer may order Products (excluding evaluation copies of the Products) if the parties agree to an Order which (i) identifies the Products to be licensed, and (ii) identifies that the Products are for use under this Attachment.  All Orders shall be governed by the terms of the Agreement as amended by this Attachment.  The parties agree that any Order that has an expiration date later than the Attachment Expiration Date will continue to be governed by the terms of the Attachment and the Order until the Order expiration date as further set forth in Section 12 ("Termination") below.  Any extended payment terms requested by Customer on an Order will require execution of an Extended Payment Agreement governed by the Master Extended Payment Agreement number 100859 dated March 30, 2007 between BMC and Customer.

5.   **PRODUCT OUTSOURCING.**  IBM may elect by providing written notice to BMC within 30 days of signing an IT Services agreement with a BMC customer (a "**BMC Customer**"), to exercise one of the following options with respect to the licenses for the

**DX-094 - 0001**

PLAINTIFF'S EXHIBIT
BMC SOFTWARE, INC
**2**
Case No. 4:17-CV-2254

**22-20463.14803**
PX002.0001

**‹bmc** software

Products and any other BMC products licensed by BMC Customer:

A. OPTION A - Operational Responsibility using BMC Customer's license

BMC will allow IBM to have operational responsibility under the terms of the BMC Customer's license agreement with BMC for no fee, provided that: (i) the Products are used on Computers at the BMC Customer's facility or at IBM's facility located within BMC Customer's licensed Territory, and (ii) the Products are used solely for the purposes of supporting the BMC Customer with the license to the Products, IBM agrees that while IBM cannot displace any Products with IBM products, IBM may discontinue use of Products for other valid business reasons, otherwise all Products must remain enrolled in BMC Support. The license of each copy of such Product will continue to be governed by the terms, conditions and discounts of the BMC license agreement between BMC and the BMC Customer and not withstanding the terms of the Agreement and the Attachment IBM shall be bound by the terms of such license and agreement and if acting as BMC Customer agent shall be responsible to pay on the BMC Customer's behalf for any Capacity upgrade fee and the corresponding Support fee due under such license agreement based upon a change in the Licensed Capacity. If IBM elects this Option A, IBM, BMC and BMC Customer shall execute an Access Consent Agreement substantially in the form of Exhibit E to this Attachment. In the event of a violation of terms of this OPTION A, then (a) Customer's use and access rights to the Products under this OPTION A will terminate; and (b) the Access Consent Agreement executed under this OPTION A will also terminate.

**Remote Access by Customer**.   Notwithstanding any provisions to the contrary contained in the Agreement, this Attachment, or the license agreement between the BMC Customer and BMC, Customer may, upon request to BMC, access the Products installed in the BMC Customer licensed Territory from Customer's international locations. During the Term,  a fee of 50% of the then current Product price list for the Service Management Products being accessed, and 20% of the then current Product price list for the Systems Management Products being accessed will be waived provided that such licenses to the Products remain enrolled in Support.

B. OPTION B - "Deep Freeze" - Use of IBM BMC Product Licenses

If IBM elects to operate IBM BMC Licenses in support of BMC Customer, then BMC will allow BMC Customer to suspend the active status ("**Deep Freeze**") of its existing perpetual licenses for the same Products. IBM agrees that while IBM cannot displace any Products with IBM products, IBM may discontinue use of Products for other valid business reasons. BMC Customer may Deep Freeze without being subject to reinstatement fees as long as an active IBM BMC license for all surviving Products in Deep Freeze are continuously enrolled in Support for servicing BMC Customer. BMC will discontinue any future maintenance, enhancement and support plan charges for the licenses which are suspended by BMC Customer. Neither IBM nor BMC Customer shall be required to pay any fees related to the Deep Freeze, but IBM may acquire the additional Capacity of the suspended licensed Products under the terms of this Attachment.  If IBM elects this Option B, IBM, BMC and BMC Customer shall execute a License Suspension Agreement substantially in the form of Exhibit F to this Agreement. Prior to executing a License Suspension Agreement, all outstanding obligations between BMC and BMC Customer must be fulfilled by BMC Customer and BMC Customer must be up to date with its Support payments.

Subject to the terms and conditions of this Attachment, BMC will not charge a reinstatement fee provided that the following conditions are met:

   i.    If the BMC Customer re-enrolls in Support, the BMC Customer will pay fees for any increases to the Licensed Capacity, if applicable.

   ii.   If the BMC Customer re-enrolls in Support, the BMC Customer and BMC may agree to sign a new license agreement to govern BMC Customer's use of the Products. If BMC Customer and BMC do not sign a new license agreement, the licenses for the Products shall be governed by the terms, conditions and discounts contained in the license agreement then in place between BMC and BMC Customer.

   iii.  If the BMC Customer re-enrolls in Support, the minimum coverage period is 12 months. BMC Customer must re-enroll within 30 days of termination of an IT Services Agreement between BMC Customer and IBM, and BMC Customer must re-enroll all of the surviving Products in Support.

   iv.   If  IBM has acquired additional Product licenses or Capacity for the BMC Customer and BMC Customer elects to enroll the additional Products and/or Capacity in Support, those licenses and/or Capacity may be acquired by IBM and transferred on a perpetual basis to the BMC Customer and enrolled in Support. Such Products shall be governed by the license agreement between BMC and BMC Customer, as specified in (ii) above. IBM's cost for the acquisition of such additional Product licenses or Capacity shall not exceed 10% of the then current perpetual Product list price. Such Products shall be governed by the license agreement between BMC and BMC Customer, as specified in (ii) above. Customer's Capacity will be adjusted accordingly by the same level that is transferred to the BMC Customer.

6.   **SERVICE MANAGEMENT PRODUCTS**.   The provisions set forth in this Section 6 apply exclusively to BMC's Service Management Products listed in Exhibit G.  If during the Term, Products are added to or deleted from Exhibit G, BMC will provide an updated Exhibit reflecting such additions or deletions. If a Product's change in designation causes it to be subject to different discount or

Confidential                                                                                                          IBM00022010

**DX-094 - 0002**

22-20463.14804

PX002.0002

**⫷bmc** ⠐⠕⠀⠀⠀

fee, IBM shall enjoy the benefit of the greater discount and/or lesser fee for the remainder of the Term, regardless of the Product's new designation.

6.1 **Discounts**. During the term of this Attachment, Customer will be entitled to a minimum global discount of 45% for all new licenses of BMC Service Management Products.

6.2 **One-to-Many Utilization-Remedy Products Only**. Notwithstanding the terms of the Agreement, BMC agrees, subject to the terms and conditions of this Attachment, and the Amendment dated January 1, 2007 (the "One-to-Many Amendment"),Customer may use the Products to provide services to multiple customers (each a "**Client**") from a shared Remedy instance(s) ("**One-to-Many**"). Such One-to Many utilization rights will terminate upon expiration of the One-to-Many Amendment.

6.3 **Support Fees**. The applicable Support offering for all BMC Service Management Products are set forth in the Agreement. The parties agree, for the avoidance of any doubt, that Support fees for the BMC Service Management Products are calculated off of the list prices, as set forth on Exhibit G.

     6.3.1   **Support Fee Additional Terms.** During the term, Customer may renew or acquire Support for the Service Management Products at a rate of 11% of the then current list cost, if Customer meets the following criteria:

     a) All Products must be enrolled in Continuous Support and this level must be maintained as long as they remain active.

     b) Customer must have at least $11,000,000 of BMC list price value of Products under active maintenance and all Products co-termed to the same end date ("Co-Termed").

6.4 **Remote Access.** Notwithstanding any provisions to the contrary, Customer may upon request to BMC, provide access the Products installed in the licensed Territory to Customer employees, agents and subcontractors, as well as Client's employees, agents and subcontractors from locations outside the Territory. During the Term a fee of 50% of the then current Product price list for the Service Management Products being accessed will be waived provided that such licenses to the Products remain enrolled in Support.

7. **SYSTEMS MANAGEMENT PRODUCTS**. The provisions set forth in this Section 7 apply exclusively to BMC's System Management Products listed in Exhibit H. If during the Term, Products are added to or deleted from Exhibit H BMC will provide an updated Exhibit reflecting such additions or deletions. If a Product's change in designation causes it to be subject to different discount or fee, IBM shall enjoy the benefit of the greater discount and/or lesser fee for the remainder of the Term, regardless of the Product's new designation.

7.1. **Discounts**. During the term of this Attachment, Customer will be entitled to a global minimum discount of 72% for all new licenses of BMC Systems Management Mainframe Products, and a global minimum discount of 45% for all other BMC Systems Management Products.

7.2 **Support Fees**. The applicable Support offering for all BMC Systems Management Products are set forth in the Agreement. The parties agree, for the avoidance of any doubt, that Support fees for the BMC Systems Management Products are calculated at 20% of the net price, as set forth on Exhibit H.

7.3 **Workload-Based Pricing**. During the Term of this Attachment, if Customer (1) signs an IBM WLC Sub-Capacity Option contract, (2) installs an eligible IBM z-Series server or later introduced model or similar or compatible model from another vendor (each a "**z-Series Server**"), (3) runs only the IBM z/OS operating system (except no OS/390 or MVS images can be installed), (4) commits to providing monthly SCRT reports and the IBM "return receipt acknowledgements", and (5) chooses to utilize BMC's workload-based pricing , then BMC and Customer agree to negotiate in good faith on a workload-based pricing license Order to the Agreement providing for workload-based pricing for the Products for use on Customer's z-Series Servers.

7.4 **LPAR Based Pricing**. During the Term of this Attachment and the associated applicable Order, BMC will allow specific Products, including those Products licensed to a Client and governed by an Access Consent Agreement as set forth under Section 5.A, to be installed and such Capacity of the Products accounted for by LPAR based upon the guidelines set forth on Exhibit B.

7.5 **Remote Access**. Notwithstanding any provisions to the contrary, Customer may upon request to BMC, provide access the Products installed in the licensed Territory to Customer employees, agents and subcontractors, as well as Client's employees, agents and subcontractors from locations outside the Territory. During the Term a fee of 20% of the then current Product price list for the Systems Management Products being accessed will be waived provided that such licenses to the Products remain enrolled in Support.

8. **PARALLEL RUNNING AND TRANSITION**. Both parties agree that during the transition period from a BMC Customer's data center to a facility owned or controlled by IBM, and vice versa, if applicable, IBM's or a BMC Customer's license to a product shall be and is hereby modified to permit IBM to use, execute, transmit, perform and display, at no charge, the BMC Customer's licensed product(s) concurrently in production mode on a Computer at each site for a period not exceeding 90 days to ensure smooth transfer of operation. Customer must notify BMC, in writing, of the start date of the transition. In the event that the Client terminates its IT Services Agreement

---

Confidential

IBM00022011

**DX-094 - 0003**

22-20463.14805
PX002.0003

**⊲bmc** software

with IBM and (i) engages a different service provider or (ii) divests some of its business, then IBM will have a maximum of 90 days to transition the Customer workload.

9.   **NEW CLIENTS**.  From time to time during the term of this Attachment, IBM may acquire a new mainframe Client or renews its IT Services agreement with an existing Client (each a "New Client"). In such event IBM may elect to support such New Client using BMC Mainframe Products by executing a New Client Term Mirror Order ("MO"), the form of which is attached hereto as Exhibit I. The terms for each MO are as follows:

(i)   Each MO must be for a term of no less than 3 years and for the Products set forth on its Product Table are only for the exclusive use of the single New Client specified therein.

(ii)   The MO must mirror the existing BMC Product set of the Client IBM agrees that while IBM cannot displace any Products with IBM products. IBM may discontinue use of Products for other valid business reasons, otherwise all Products must remain enrolled in BMC Support during the whole duration of the IT Services agreement between IBM and Client.

(iii)   The annual term rate applicable for each MO is as follows:

| List Price Inventory Value Per Order (USD) | Annual Term Rate |
|---|---|
| Less than | |
| $    30,843,080 | 11.33% |
| $    30,843,080 | 10.77% |
| $    37,011,696 | 10.23% |
| $    44,414,035 | 9.72% |
| $    53,296,842 | 9.23% |
| $    63,956,211 | 8.77% |
| $    76,747,453 | 8.33% |
| $    92,096,944 | 7.91% |
| $  110,516,332 | 7.52% |
| $  132,619,599 | 7.14% |
| $  159,143,519 | 6.79% |
| $  190,972,222 | 6.45% |
| $  229,166,667 | 6.12% |
| $  275,000,000 | 5.82% |
| $  330,000,000 | 5.53% |
| $  396,000,000 | 5.25% |

In addition, MOs with a term greater than 3 years are also eligible for an additional discount ("Commitment Discount") as follows:

| | |
|---|---|
| 4-Year Commitment Discount | 15% |
| 5-Year Commitment Discount | 30% |
| 6-Year Commitment Discount | 34% |
| 7-Year Commitment Discount | 38% |
| 8-Year Commitment Discount | 42% |
| 9-Year Commitment Discount | 46% |
| 10-Year Commitment Discount | 50% |

**Pricing Components:**

- **Base Capacity:** The quantity of a Unit of Measure as applicable per Product
- **List Price Inventory Value:** Means the sum of the List Price Unit Cost of each Product multiplied by Base Capacity multiplied by LPAR Uplift (if applicable), multiplied by International Uplift (if applicable).
- **Annual Term Rate:** Determined by using the Table in 9.iii. above whose value is adjacent to the range containing the List Price Inventory Value
- **Annual Base Fee:** The annual value used to determine Total Order Fee, which is calculated by multiplying the List Price Inventory Value by Annual Term Rate, multiplied by one minus the Commitment Discount (if applicable).

Confidential

IBM00022012

**DX-094 - 0004**

22-20463.14806

PX002.0004

**bmc**

- **Total Order Fee:**  *Means the Annual Base Fee multiplied by the number of years in the Term of the Order. The Fee for the use of the Products is determined by multiplying the Annual Base Fee by the Term of the Order (in year).  This Fee does not include tax or finance charges.*
- **Annual P1 Unit Cost:**  *The Unit Cost used for calculating fees for additional capacity during the term.*

*For example: New Client has $300M list price value product inventory. (Assumes that the Client will not incur International Uplift or LPAR Uplift factors for purposes of this example) The Total Order Fee for this New Client will be as follows:*

*3-Year Outsourcing Agreement: ($300,000,000 * 5.82%) * 3 years = $52,357,033*
*5-Year Outsourcing Agreement: ($300,000,000 * 5.82%) * 5 years * (1-30%) = $61,063,205*
*10-Year Outsourcing Agreement: ($300,000,000 * 5.82%) * 10 years * (1-50%) = $87,261,721*

(iv)  Change in Business Condition:  BMC agrees that during the Term, and upon Expiration or Termination of an IT Services agreement, Customer will have the option to assign the MO specific to a Client to such New Client at no additional cost; in such event BMC, Customer and New Client will execute an assignment document to be negotiated by the parties.  New Client must also execute BMC's then standard Master License Agreement unless New Client already has a valid BMC license agreement in place.

(v)  Provided that the Client has entered into a License Suspension Agreement and if IBM has acquired additional Product licenses or Capacity for the New Client, those licenses and/or Capacity may be transferred on a perpetual basis to the New Client and enrolled in Support upon termination of an MO, subject to a fee not to exceed 10% of the then current Product list price for licenses.  Such Products shall be governed by the license agreement between BMC and BMC Customer, as specified in Section 5 B (ii) above.

10.  **CUSTOMER AFFILIATES**.  Customer Affiliates located outside of the United States can perform outsourcing services in their respective territories under the terms and conditions of the Agreement and this Attachment, provided that they execute, along with BMC's applicable local licensing Affiliate, a separate Participation Agreement, a form of which is attached hereto as Exhibit D.  All applicable Orders outside of the United States must reference such Participation Agreement as well as the Attachment and the Agreement.  The parties agree that under no circumstances will they or any of their Affiliates in any location sign or cause to be signed a separate Master License Agreement or Outsourcing Attachment with between the parties. All Orders placed by Customer's Affiliates under a Participation Agreement must either be placed in (i) United States Dollars based upon the Unit Costs set forth in Exhibits G and H (the Customer acknowledges that BMC's usual and customary international uplift fee will be waived for the term of this Attachment),or (ii) under the then current price list for the location in local currency. The parties agree, however, that once a pricing and currency selection is made for an Order all subsequent transactions under that Order must maintain the same price list and currency originally selected for the duration of the Order term.

11.  **PRODUCT RELOCATION**. BMC agrees that Customer may transfer a License for a Product from one Territory to another, provided that (i) Customer continues to use the Product within the scope of the License and this Attachment and continues to abide by all the terms of the Attachment and the Agreement, and, (ii) Customer pays a fee to BMC not to exceed 10% of the then current list price value of the Products to be relocated. If such Product to be transferred was licensed under an enterprise Order that requires Statement of Capacity then all transferred Product Capacity will be reported as such on the applicable Statement of Capacity, and Customer will continue to report each Territory and related Baselines on each Statement of Capacity.

12.  **EXTENSION and TERMINATION**.

12.1  **EXTENSION**.  One hundred eighty (180) days prior to Expiration Date, the parties will make reasonable commercial efforts to negotiate a proposal for the renewal of this Attachment.  If the parties fail to reach an agreement on such renewal or replacement, IBM can elect to extend this Attachment for an additional one (1) year period under the terms and conditions of this Attachment.  In the event no extension is elected or after the additional (1) year period, this Attachment shall be considered terminated.

12.2  **TERMINATION** .In the event that the parties elect not to renew or replace the Attachment, the Attachment will terminate and, Customer's right to use the Software to provide IT Services to Clients shall terminate and all Software licensed pursuant to this Attachment will be governed by the terms of the Agreement and any applicable Software Order only.  In the event that this Attachment is terminated under Section 13 of the Agreement, any fees due or owing prior to or on termination or expiration of this Attachment will be due and must be paid to BMC immediately upon such termination.  However, unless the Agreement or Attachment are terminated for cause, as set forth in Section 13 of the Agreement, the parties agree that any Order that has an expiration date later than the Attachment Expiration Date will continue to be governed by the terms of the Attachment, the Agreement and the Order until the Order expiration date.  In the event that the Attachment expires BMC agrees that any applicable Access and Consent or Suspension Agreement will continue in force and effect under the terms of the Attachment for the term of any IT Agreement in place. If parties fail to reach an agreement, the minimum global discount for BMC Service Management Products will be 35%, the minimum global discount for Systems Management Mainframe Products will be 50%, and all other BMC Systems Management Products will be 35%.

Confidential

IBM00022013

22-20463.14807
PX002.0005

**DX-094 - 0005**

bmc

13. **EXISTING ATTACHMENTS**. The parties agree that, upon the Effective Date, this Attachment will be used for all new outsource engagements by IBM and that all existing applicable territory Attachments to the Worldwide Software Vendor Agreement (BMC No. 4470) dated May 20, 1999 (the "**Existing Attachments**") will continue in effect until each Existing Attachment reaches its own expiration date; at such time any negotiated renewal will be subject to the terms and conditions of this Attachment and the Agreement.

14. **ENTIRE AGREEMENT AND MODIFICATIONS**. The parties acknowledge they have read this Attachment and agree that it, the Agreement as modified hereby, and any applicable Software Order are the complete and exclusive statements of the agreement between the parties relating to the subject matter of this Attachment (including without limitation the Software in this Amendment). This Attachment may not be modified or rescinded except in writing signed by both parties. In the event of any conflicting terms between this Attachment and the Agreement, or this Attachment and an applicable Software Order, this Attachment shall prevail. Except as provided in this Attachment, all other terms of the Agreement and any applicable Software Order shall remain in full force and effect.

| EXHIBITS INCORPORATED INTO ATTACHMENT | 'X' |
|---|---|
| Exhibit A- License Restrictions and Product Units of Measurement | X |
| Exhibit B- LPAR Guidelines | X |
| Exhibit C has been intentionally deleted | |
| Exhibit D- Participation Agreement | X |
| Exhibit E- Access Consent Agreement | X |
| Exhibit F- License Suspension Agreement | X |
| Exhibit G-Service Management Products | X |
| Exhibit H-Systems Management Products | X |
| Exhibit I-New Client Term Mirror Order Form | X |

Each party hereto warrants and represents that a duly authorized representative of such party has executed this Attachment and this Attachment constitutes the legal, valid and binding obligation of such party.

BMC Software Distribution, Inc.

By:
Name: Judy Schafer
Title: Sr. Manager of Order Services
Date: APR 02 2008

International Business Machines Corporation

By:
Name: John Sweetman
Title: Sourcing Manager
Date: 3/31/2008

FINAL – Reviewed by Contracts - ER

Confidential

**TAB 14**

**OUTSOURCING**
**ATTACHMENT TO THE**
**Master License Agreement**
**between**
**BMC Software, Inc. ("BMC")**
**and**
**International Business Machines Corporation ("Customer" or "IBM")**

This Outsourcing Attachment (the "OA") is to that certain Master License Agreement (BMC Ref. No. 83106) dated March 31, 2008 as amended by the Amendment to the Worldwide Master License Agreement dated December 23, 2008 (collectively the "Agreement") between BMC and Customer. The term ("Term") of this OA is from March 31, 2013 (the "Effective Date") to March 27, 2018 the ("Expiration Date") unless terminated sooner under Section 14 below.

1.    SCOPE. Customer has developed an IT Services (as such term is defined below) business and would like to use BMC's Products in the provision of such services.  This OA addresses the terms under which BMC grants to Customer the right to use the Products in its IT Services business in a specific Territory.  It is the intent of the parties to operate under a common set of terms and conditions on a worldwide basis that addresses both Customer's and BMC's interests.  This OA, along with the Agreement and each applicable Participation Agreement will serve as the master worldwide documents for all applicable Orders. This OA sets forth Customer rights for: (i) adding additional Licensed Capacity, (ii) LPAR usage, (iii) international relocation of Products, (iv) Access and Use for IT Services, (v) addition of new business, and (vi) establishing pre-negotiated corporate discounts available to Customer; and will be a single point of control for business terms related to the subject matter of this OA. All Products provided under this OA are governed by this OA, the Agreement, any Participation Agreement, and any applicable Order.

1.1    **IT Services Options**. Customer must elect one of the 4 options regarding usage of BMC Products in relation to the provision of IT Services: 1) Access and Use – (Section 5 below), 2) License Suspension – (Section 5.4 below), 3) Customer owned Products – (Sections 6-8 below), and 4) Mirror Order – (Section 11 below).

1.2    **Fee.** The fee for use of Products and BMC Customer Licenses during the Term and as consideration for the other promises, covenants and agreements made by BMC as set forth herein is set forth on that certain Transaction Order Form dated 31st March 2013 between BMC and Customer.

2.    DEFINITIONS. All defined terms in the Agreement have the same meaning in this OA, unless otherwise provided.

"BMC Customer" is a third party which licenses BMC Products and which becomes a Client at commencement of or during delivery of IT Services.

"Clients" shall mean customers of IBM who subscribe to Customer's IT Services business, and who operate the Products as an end user, or on whose behalf the BMC Products are operated by IBM. A Client may not provide service bureau or outsourcing services using the Products to other third parties.

"IT Services" means facilities management, service bureau, outsourcing, application management and development, installation, implementation, maintenance, web page hosting, infrastructure or application program hosting, network services, or any other information processing or related services, provided by Customer to a Client under an agreement pursuant to a bona fide transaction for which Customer is compensated (which services may involve access to and/or use of BMC Products by Customer, its agents and subcontractors for the processing of Client data).

3.    USAGE.  For Products identified in an Order between BMC and Customer, BMC grants to Customer, for the term of this OA, a nonexclusive, license to operate the Products for the purpose of providing IT Services to itself or to a Client, in the Territory specified on an Order, subject to the additional terms below:

(i) **Non-Assignment**.  Neither this OA nor any Products may be assigned by the Customer to any third party, Customer affiliate or Customer subsidiary without prior written consent from BMC. Notwithstanding the foregoing and subject to an applicable transfer or assignment fee not to exceed 10% of the then current list price of the Products being transferred, Customer may assign any Product licenses to the Client for whom Customer specifically licensed such Product under an Order. The parties agree that they must execute a separate assignment agreement for any transfers and the third party transferee of Products must execute BMC's then standard Master License Agreement unless such third party already has a valid BMC license agreement in place.

(ii)  **Product Restrictions and Units of Measurement.** Certain Products have usage restrictions, and such restrictions and Product Unit of Measurements as of the date of this OA are set forth on the attached Exhibit A.

PLAINTIFF'S EXHIBIT
BMC SOFTWARE, INC
3
Case No. 4:17-CV-2254

PX003.001
22-20463.14840

Confidential                                                                                            BMC-000054726

PX003.002

4. **PRODUCT ORDERS.** Customer may order Products (excluding evaluation copies of the Products) pursuant to an Order which (i) identifies the Products to be licensed, and (ii) identifies that the Products are for use under this OA. All Orders placed pursuant to this OA shall be governed by the terms of the Agreement as amended by this OA and the applicable Participation Agreement. Except as set forth in Section 9, Remedy Products One-to-Many Utilization, and subject to any rights granted in an Order that by their nature survive beyond the Support renewal date, the parties agree that all Orders that have an expiration date later than the OA Expiration Date will continue to be governed by the terms of the OA and the Order until the Support renewal date in such Order.

5. **ACCESS AND USE FOR IT SERVICES.** Customer will provide written notice to BMC within 60 days after signing an IT Services agreement with a BMC Customer that requires IBM to have access and use of BMC Products licensed to such BMC Customer (the "**BMC Customer Licenses**"). If the requirement for Customer to have access and use of the BMC Customer Licenses is not apparent to Customer at the time the IT Services agreement is signed, Customer will provide such notice within 60 days after such requirement is known to Customer. Upon such notice the following provisions will apply to Customer's access and use of the BMC Customer Licenses and apply retroactively to the point of first access by Customer.

5.1 **Access and Consent for using BMC Customer Licenses for IT Services after the Effective Date**. BMC will allow Customer to use, access, install and have operational responsibility of the BMC Customer Licenses under the terms of the BMC Customer's license agreement with BMC for no fee, including on Computers owned or leased by BMC Customer and at BMC Customer's facility, provided that the BMC Customer Licenses are used solely for the purposes of supporting the BMC Customer who owns such licenses. Customer agrees that while Customer cannot displace any BMC Customer Licenses with Customer products, Customer may discontinue use of BMC Customer Licenses for other valid business reasons; otherwise all BMC Customer Licenses must remain enrolled in BMC Support (BMC Continuous plan). Except as set forth herein, the BMC Customer Licenses will continue to be governed by the terms, conditions and discounts of the BMC license agreement between BMC and the BMC Customer; notwithstanding the terms of the Agreement and the OA, Customer shall be bound by such terms of such license agreement. BMC will make available to Customer a representative copy of its typical BMC Customer license agreement ("**BMC EULA**") and will inform Customer in writing of any material differences between the BMC EULA and BMC Customer's agreement after Customer provides written notice of Access and Consent being required. If Customer acts as BMC Customer's payment agent, it shall be responsible to pay, on the BMC Customer's behalf, for any increases in the Licensed Capacity and/or upgrade fee of the BMC Customer Licenses and the corresponding Support fee due under such license agreement based upon a change in the Licensed Capacity. In addition to the other restrictions set forth in this Section 5.1, Customer and BMC agree that Customer, BMC and BMC Customer must execute an Access Consent Agreement substantially in the form of Exhibit E to this OA within 60 days from Customer's notice to BMC for each BMC Customer governed by this Section 5.1. The parties acknowledge that BMC Customer may object to executing the Access Consent Agreement. In such case, BMC will, at Customer's request, work with BMC Customer to facilitate obtaining Customer's signature. In the event that BMC Customer signature cannot be obtained, Customer and BMC will treat the Access Consent Agreement as a 2-party agreement between Customer and BMC. For the avoidance of doubt, this OA and applicable executed Access and Consent Agreement sets forth Customer's operational rights and sole obligations regardless of any operational restriction claimed under the BMC Customer license agreement. In the event of a violation of terms of this Section 5.1, (a) Customer's use and access rights to BMC Customer Licenses under this Section 5.1 will terminate and (b) the Access Consent Agreement will also terminate.

5.2 **Remote Access by Customer, Customer Facility, and Customer Owned Computers**. Notwithstanding any provisions to the contrary contained in the Agreement, this OA, or the license agreement between the BMC Customer and BMC, Customer may: a) access the BMC Customer Licenses from Customer's international locations, b) install the BMC Customer Licenses at a Customer facility, and (c) install and access the BMC Customer Licenses, up to the Licensed Capacity, on a Customer-owned or leased Computer dedicated exclusively for the BMC Customer. During the Term, BMC agrees to waive any and all charges for these terms, including its customary fees of 50% of the then-current Product price list for the Service Management Products, and 20% of the then-current Product price list for the Systems Management Products and the Enterprise System Management/BSM Solution Packs Products, provided that all such BMC Customer Licenses remain enrolled in Support.

5.3 **IT Services Reconciliation**. This Section 5.3 specifies Customer's and BMC's intent to document the Clients for whom Customer requires Access and Use rights on the Effective Date. Customer will use commercially reasonable efforts to provide BMC a written list of all current BMC Customers to whom Customer is actively providing IT Services and for whom Customer is accessing and using BMC Customer Licenses or operating BMC Customer Licenses on Customer-owned or leased Computers. Such list will include the following information:

BMC Customer name

IT Services Start Date

IT Services Expiration Date

Confidential

PX003.002

22-20463.14841

BMC-000054727

The parties acknowledge that although Customer intends to and will use commercially reasonable efforts to provide BMC with a complete list and to maintain a current list, the scope and scale of Customer IT Services business, and its dynamic nature, makes the completion of this task impractical.

No later than 45 days following the Effective Date, Customer will provide BMC with an initial list.  Customer will then use commercially reasonable efforts to provide updates to this list to BMC at regular intervals during the first 12 months after the Effective Date.

In the event Customer is accessing and using BMC Customer Licenses absent a fully executed Access and Consent Agreement between BMC, Customer, and such BMC Customer, then BMC agrees to waive Customer's Access and Consent Agreement requirement for such BMC Customers. Customer agrees that the terms of Sections 5.1 and 5.2 will be deemed to govern Customer's access and use of such BMC Customer Licenses in its provision of IT Services for such Clients and as between Customer and BMC, only those rights granted apply retroactively to the point of first access by Customer.

The list will be added to and become part of this OA 12 months after the Effective Date as Exhibit C. Furthermore, Customer agrees that if its IT Services engagement agreement with a BMC Customer covered by this Section 5.3 term expires and is either renewed or renegotiated, subject to Section 5.1, the parties will sign an Access and Consent for such BMC Customer. For the avoidance of doubt, any applicable access and use rights granted under this Section 5.3  will continue in force and effect under the terms of the OA for the term of any IT Services agreement in place prior to such expiration.

The parties acknowledge that BMC will have no financial claims against Customer in the future for incompleteness during the 12 month process set forth herein.


**5.4**   **License Suspension – "Deep Freeze" – Use of Customer Products.**  If Customer elects to operate Customer Products in support of BMC Customer, then BMC will allow BMC Customer to suspend the active status ("**Deep Freeze**") of its existing perpetual licenses for the same Products.  Customer agrees that while Customer cannot displace any BMC Customer Licenses with Customer products,  Customer may discontinue use of BMC Customer Licenses for other valid business reasons. BMC Customer may Deep Freeze without being subject to reinstatement fees as long as an active Product license for all surviving BMC Customer Licenses in Deep Freeze is continuously enrolled in Support and such license is used to service such BMC Customer.  BMC will discontinue any future maintenance, enhancement and support plan charges for the BMC Customer Licenses which are suspended by BMC Customer.  Neither Customer nor BMC Customer shall be required to pay any fees related to the Deep Freeze, but Customer may acquire the additional Licensed Capacity of the suspended BMC Customer Licenses under the terms of this OA.  If Customer elects this option, Customer, BMC and BMC Customer shall execute a License Suspension Agreement substantially in the form of Exhibit F to this OA.  Prior to executing a License Suspension Agreement, all outstanding obligations between BMC and BMC Customer must be fulfilled by BMC Customer, and BMC Customer must be up to date with its Support payments.

Subject to the terms and conditions of this OA, at the time the Deep Freeze ends, BMC will not charge a reinstatement fee, provided that the following conditions are met:

i.     If the BMC Customer re-enrolls the BMC Customer Licenses in Support, the BMC Customer will pay fees for any increases to the Licensed Capacity, if applicable.

ii.    If the BMC Customer re-enrolls the BMC Customer Licenses in Support, the BMC Customer and BMC may agree to sign a new license agreement to govern BMC Customer's use of the BMC Customer Licenses. If BMC Customer and BMC do not sign a new license agreement, the BMC Customer Licenses shall be governed by the terms, conditions and discounts contained in the license agreement then in place between BMC and BMC Customer.

iii.    If the BMC Customer re-enrolls the BMC Customer Licenses in Support, (a) the minimum coverage period is 12 months, (b) BMC Customer must re-enroll within 30 days of termination of an IT Services Agreement between BMC Customer and Customer, and (c) BMC Customer must re-enroll all of the surviving BMC Customer Licenses in Support.

iv.    If  Customer has acquired additional perpetual Product licenses or Licensed Capacity for the BMC Customer and BMC Customer elects to enroll the additional Products and/or Licensed Capacity in Support, those licenses and/or Licensed Capacity may be acquired by Customer and assigned on a perpetual basis to the BMC Customer and enrolled in Support. Once assigned to BMC Customer, such Products shall be governed by the license agreement between BMC and BMC Customer, as specified in (ii) above. Customer's cost for the acquisition of such additional Product licenses or Licensed Capacity shall not exceed 10% of the then current perpetual Product list price.  Customer's Licensed Capacity will

PX003.003
22-20463.14842

Confidential                                                                                                BMC-000054728

be adjusted accordingly by the same level that is assigned to the BMC Customer. All assignments under this Section 4 will only be effective upon execution an assignment agreement between BMC, BMC Customer and Customer.

6.   **SERVICE MANAGEMENT PRODUCTS**.  The provisions set forth in this Section 6 apply exclusively to BMC's Service Management Products listed in Exhibit G. If during the Term, Products are added to or deleted from Exhibit G, BMC will provide an updated Exhibit reflecting such additions or deletions. If a Product's change in designation causes it to be subject to different discount or fee, Customer shall enjoy the benefit of the greater discount and/or lesser fee for the remainder of the Term, regardless of the Product's new designation.

6.1     Discounts.  During the term of this OA, Customer will be entitled to a minimum global discount of 45% off the Listed Price in Exhibit G for all purchases of new licenses and/or additional Licensed Capacity of BMC Service Management Products.

6.2     Support.  The applicable Support offering for all BMC Service Management Products is set forth in the Agreement under Section 19 Support and Exhibit A.

6.3     Remote Access.  Notwithstanding any provisions to the contrary, Customer may, provide remote access to Products to Customer employees, agents and subcontractors, as well as to Client's employees, agents and subcontractors, all from locations outside the Territory. During the Term, BMC will waive any and all charges, for Remote Access including its customary fee of 50% of the then-current Product list price for all Service Management Products being remotely accessed, provided that such Customer Licenses remain enrolled in Support.

7.  **ENTERPRISE SYSTEMS MANAGEMENT/BSM SOLUTION PACKS PRODUCTS**.  The provisions set forth in this Section 7 apply exclusively to BMC's Enterprise Systems Management/BSM Solution Packs Products listed in Exhibit J.  If during the Term, Products are added to or deleted from BMC's Enterprise Systems Management/BSM Solution Packs product lines, BMC will provide an updated Exhibit J reflecting such additions or deletions. If a Product's change in designation causes it to be subject to different discount or fee, Customer shall enjoy the benefit of the greater discount and/or lesser fee for the remainder of the Term, regardless of the Product's new designation.

7.1.     Discounts.  During the term of this OA, Customer will be entitled to a global minimum discount of 45% off the Listed Price in Exhibit J for all purchases of new licenses and/or additional Licensed Capacity of BMC's Enterprise Systems Management/BSM Solution Packs Products.

7.2     Support Fees.  The applicable Support offering for all BMC's Enterprise Systems Management/BSM Solution Packs Products is set forth in the Agreement under Section 19 Support and Exhibit A.

7.3     Remote Access.   Notwithstanding any provisions to the contrary, Customer may provide remote access to the Products to Customer employees, agents and subcontractors, as well as to Client's employees, agents and subcontractors, all from locations outside the Territory. During the Term, BMC will waive any and all charges, for Remote Access including its customary fee of 20% of the then-current Product list price for all BMC's Enterprise Systems Management/BSM Solution Packs Products being remotely accessed, provided that such Customer Licenses remain enrolled in Support.

8.   **SYSTEMS MANAGEMENT PRODUCTS**.  The provisions set forth in this Section 8 apply exclusively to BMC's System Management Products listed in Exhibit H.  If during the Term, Products are added to or deleted from Exhibit H BMC will provide an updated Exhibit H reflecting such additions or deletions. If a Product's change in designation causes it to be subject to different discount or fee, Customer shall enjoy the benefit of the greater discount and/or lesser fee for the remainder of the Term, regardless of the Product's new designation.

8.1.     Discounts.  During the term of this OA, Customer will be entitled to a global minimum discount of 72% off the Listed Price in Exhibit H for all purchases of new licenses and/or additional Licensed Capacity of BMC Systems Management Mainframe Products, and a global minimum discount of 45% off the list price in Exhibit H for all purchases of new licenses and/or additional Licensed Capacity of all other BMC Systems Management Products.

8.2     Support Fees.  The applicable Support offering for all BMC Systems Management Products is set forth in the Agreement under Section 19 Support and Exhibit A.

8.3     Workload-Based Pricing.  During the Term of this OA, if Customer (1) signs an IBM WLC Sub-Capacity Option contract, (2) installs an eligible IBM z-Series server or later introduced model or similar or compatible model from another vendor (each a "**z-Series Server**"), (3) runs only the IBM z/OS operating system (except no OS/390 or MVS images can be installed), (4) commits to providing monthly SCRT reports and the IBM "return receipt acknowledgements", and (5) chooses to utilize BMC's workload-based pricing , then BMC and Customer agree to negotiate in good faith on a workload-based pricing license Order to the Agreement providing for workload-based pricing for the Products for use on Customer's z-Series Servers.

8.4     LPAR Based Pricing.  During the Term of this OA and the associated applicable Order, BMC will allow specific Products, including Customer Licenses, to be installed and such Licensed Capacity of the Products to be

Confidential                                                                                    BMC-000054729

accounted for, by LPAR-based pricing, subject to the guidelines set forth on Exhibit B. Customer is entitled to take advantage of any new or changed per LPAR or workload-based licensing models that BMC makes generally available to its end customers and/or IT Services customers.

8.5     Remote Access. Notwithstanding any provisions to the contrary, Customer may, provide remote access to Products to Customer employees, agents and subcontractors, as well as to Client's employees, agents and subcontractors, all from locations outside the Territory. During the Term, BMC will waive any and all charges, for Remote Access including its customary fee of 20% of the then-current Product list price all Systems Management Products being remotely accessed, provided that such Customer Licenses remain enrolled in Support.

9.   **REMEDY ONE-TO-MANY UTILIZATION**. Notwithstanding anything to the contrary in the Agreement, BMC agrees, subject to the terms and conditions of this OA and the applicable Order, that Customer may use the BMC Remedy Products to provide IT Services to multiple Clients from a shared Remedy instance(s) ("**One-to-Many**"). BMC Remedy Products being used to provide IT Services to a single Client under a single support id ("**One to One**") can be transferred to "One to Many" usage at no additional cost during the Term, as long as such BMC Remedy Products are enrolled in Support under an active BMC Support Contract between BMC and Customer. This Section 9 does not change any of Customer's rights to continue to use the BMC Remedy Products in a "One to One" environment and does not require Customer to use all BMC Remedy Products in a One-to-Many environment. Customer agrees that under no circumstances can any BMC Remedy Products previously licensed by a Client (aka, BMC Customer Licenses), be transferred to One to Many usage. Notwithstanding anything to the contrary in this OA, the One-to-Many rights granted under this Section 9 will terminate upon termination of the OA and Customer's usage will revert to the One to One model.

10.  **PARALLEL RUNNING AND TRANSITION**. Both parties agree that, during the transition period from a BMC Customer's data center to a facility owned or controlled by Customer, and vice versa, if applicable, Customer may use, execute, transmit, perform and display, at no additional charge, either Customer Product or BMC Customer Licenses concurrently in production mode on a Computer at each site for a period not exceeding 90 days to ensure smooth transfer of operation between facilities. Customer must notify BMC, in writing, of the start date of such transition. In the event that the Client terminates its IT Services Agreement with Customer and (i) engages a different service provider or (ii) divests some of its business, then Customer will have a maximum of 90 days to transition the Customer workload.

11.  **NEW CLIENTS**. From time to time during the term of this OA, Customer may acquire a new mainframe Client or renews its IT Services agreement with an existing Client (each a "**New Client**"). In such event Customer may elect to support such New Client using BMC Mainframe Products by executing a New Client Term Mirror Order ("**MO**"), the form of which is attached hereto as Exhibit I. The terms for each MO will be as follows:

(i)     Each MO must be for a term of no less than 3 years.
(ii)    Customer may use the Products on such MO only for the single New Client specified therein.
(iii)   The MO must mirror the existing BMC Customer Licenses of the Client.
(iv)    All such Products must remain enrolled in BMC Support during the whole duration of the IT Services agreement between Customer and Client.
(v)     Customer agrees that while Customer cannot displace any BMC Customer Licenses with Customer products, Customer may discontinue use of BMC Customer Licenses for other valid business reasons, otherwise all BMC Customer Licenses must remain enrolled in BMC Support during the whole duration of the IT Services agreement between Customer and Client.
(vi)    The annual term rate applicable for each MO is listed below:

| List Price Inventory Value Per Order (USD) | | Annual Term Rate |
|---|---|---|
| Less than $ | 30,843,080 | 11.33% |
| Greater than $ | 30,843,081 | 10.77% |
| Greater than $ | 37,011,696 | 10.23% |
| Greater than $ | 44,414,035 | 9.72% |
| Greater than $ | 53,296,842 | 9.23% |
| Greater than $ | 63,956,211 | 8.77% |
| Greater than $ | 76,747,453 | 8.33% |
| Greater than $ | 92,096,944 | 7.91% |
| Greater than $ | 110,516,332 | 7.52% |

PX003.005
22-20463.14844

Confidential                                                                                                      BMC-000054730

| | |
|---|---|
| Greater than $  132,619,599 | 7.14% |
| Greater than $  159,143,519 | 6.79% |
| Greater than $  190,972,222 | 6.45% |
| Greater than $  229,166,667 | 6.12% |
| Greater than $  275,000,000 | 5.82% |
| Greater than $  330,000,000 | 5.53% |
| Greater than $  396,000,000 | 5.25% |
| Greater than $  475,000,000 | 5.00% |

In addition, MOs with a term greater than 3 years are also eligible for an additional discount ("**Commitment Discount**") as follows:

| Length of Contractual Period | Additional Discount |
|---|---|
| 4-Year Commitment Discount | 15% |
| 5-Year Commitment Discount | 30% |
| 6-Year Commitment Discount | 34% |
| 7-Year Commitment Discount | 38% |
| 8-Year Commitment Discount | 42% |
| 9-Year Commitment Discount | 46% |
| 10-Year Commitment Discount | 50% |

*Pricing Components:*

- **Base Capacity:** *The quantity of a Unit of Measure as applicable per Product*
- **List Price Inventory Value:** *Means the sum of the List Price Unit Cost of each Product multiplied by Base Capacity multiplied by LPAR Uplift (if applicable), multiplied by International Uplift (if applicable).*
- **Annual Term Rate:** *Determined by using the Table in 9.iii. above whose value  is adjacent to the range containing  the List Price Inventory Value*
- **Annual Base Fee:**  *The annual value used to determine Total Order Fee, which is calculated by multiplying the List Price Inventory Value by Annual Term Rate, multiplied by one minus the Commitment Discount (if applicable).*
- **Total Order Fee:**  *Means the Annual Base Fee multiplied by the number of years in the Term of the Order. The Fee for the use of the Products is determined by multiplying the Annual Base Fee by the Term of the Order (in year).  This Fee does not include tax or finance charges.*
- **Annual P1 Unit Cost:**  *The Unit Cost used for calculating fees for additional capacity during the term.*

*For example: New Client has $300M list price value product inventory. (Assumes that the Client will not incur International Uplift or LPAR Uplift factors for purposes of this example) The Total Order Fee for this New Client will be as follows:*

*3-Year Outsourcing Agreement: ($300,000,000 * 5.82%) * 3 years = $52,357,033*
*5-Year Outsourcing Agreement: ($300,000,000 * 5.82%) * 5 years * (1-30%) = $61,083,205*
*10-Year Outsourcing Agreement: ($300,000,000 * 5.82%) * 10 years * (1-50%) = $87,261,721*

Change in Business Condition:  BMC agrees that, during the Term and upon Expiration or Termination of an IT services agreement, Customer will have the option to assign the MO specific to a New Client to such New Client at no additional cost. In such event BMC, Customer and New Client will execute an assignment document to be negotiated by the parties. New Client must also execute BMC's then standard Master License Agreement, unless New Client already has a valid BMC license agreement in place.

Provided that the Client has entered into a License Suspension Agreement and if IBM has acquired additional Product licenses or Capacity for the New Client, those licenses and/or Capacity may be transferred on a perpetual basis to the New Client and enrolled in Support upon termination of an MO, subject to a fee not to exceed 10% of the then current Product list price for licenses.  Such Products shall be governed by the license agreement between BMC and BMC Customer, as specified in Section 5.4 above.

PX003.006
22-20463.14845

Confidential

BMC-000054731

12. **CUSTOMER AFFILIATES**. Customer Affiliates located outside of the United States can perform IT Services in their respective territories under the terms and conditions of the Agreement and this OA, provided that they execute, along with BMC's applicable local licensing Affiliate, a separate Participation Agreement, a form of which is attached hereto as Exhibit D. All applicable Orders placed outside of the United States must reference such Participation Agreement as well as the OA and the Agreement. The parties agree that under no circumstances will they or any of their Affiliates in any location sign or cause to be signed a separate Master License Agreement or Outsourcing Attachment. All Orders placed by Customer's Affiliates under a Participation Agreement must either be placed in (i) United States Dollars based upon the Unit Costs set forth in Exhibits G, J, and H (Customer acknowledges that BMC's usual and customary international uplift fee will be waived for the term of this OA), or (ii) under the then current price list for the location in local currency. The parties agree, however, that once a pricing and currency selection is made for an Order all subsequent transactions under that Order must maintain the same price list and currency originally selected for the duration of the Order term.

13. **PRODUCT RELOCATION**. BMC agrees that Customer may transfer a License for a Product from one Territory to another, provided that (i) Customer continues to use the Product within the scope of the License and this OA and continues to abide by all the terms of the OA and the Agreement, and (ii) Customer pays a fee to BMC not to exceed 10% of the then current list price value of the Products to be relocated. If such Product to be transferred was licensed under an enterprise Order that requires a Statement of Capacity then all transferred Licensed Capacity will be reported as such on the applicable Statement of Capacity, and Customer will continue to report each Territory and related Capacity on each Statement of Capacity.

14. **EXTENSION and TERMINATION**.

14.1    Extension. One hundred eighty (180) days prior to Expiration Date, the parties will make reasonable commercial efforts to negotiate a proposal for the renewal of this OA. If the parties fail to reach an agreement on such renewal or replacement, Customer can elect to extend this OA for an additional five (5) year period under the terms and conditions of this OA for maximum fees as defined below:

For a fee of $5,000,000, Customer may renew the OA for a five-year term without the right to install and access the BMC Customer Licenses on Customer-owned or leased Computers as defined in Section 5.2 and without the One-To-Many rights defined in Section 9.

For a fee of $20,000,000, Customer may add to the five-year renewal the right to install and access the BMC Customer Licenses on Customer-owned or leased Computers as defined in Section 5.2.

For a fee of $22,000,000, Customer may add to the five-year renewal the One-To-Many rights defined in Section 9.

14.2    Termination. In the event that the parties elect to not renew or replace the OA, (i) the OA will terminate, (ii) Customer's right to use the Products to provide IT Services to Clients shall terminate, and (iii) all Products licensed pursuant to this OA will be governed by the terms of the Agreement and any applicable Order only. In the event that this OA is terminated under Section 13 of the Agreement, any fees due or owing prior to or on termination or expiration of this OA will be due and must be paid to BMC immediately upon such termination. However, unless the Agreement or OA are terminated for cause, as set forth in Section 13 of the Agreement, the parties agree that any Order that has an expiration date later than the OA Expiration Date will, subject to any rights granted in an Order that by their nature survive beyond the Support renewal date, continue to be governed by the terms of the OA, the Agreement and the Order until the Support renewal date under the Order. In the event that the OA expires, BMC agrees that any applicable Access and Consent Agreement or Suspension Agreement will continue in force and effect under the terms of the OA for the term of any IT Services agreement in place prior to such expiration. If parties fail to reach an agreement to extend or replace this OA, Customer will be entitled to receive the following minimum global discounts: (a) for BMC Service Management Products, 35% off the then-current list price of such Products, (b) for Systems Management Mainframe Products, 50% off the then-current list price of such Products, (c) for all other BMC Systems Management Products, 35% off the then-current list price of such Products, and (d) for BMC Enterprise Systems Management Products, 35% off the then-current list price of such Products.

15. **EXISTING OAs AND PAs.** The parties agree that, upon the Effective Date, this OA will be used for all new IT Services engagements by Customer and that all existing applicable territory Attachments to the Worldwide Software Vendor Agreement (BMC No. 4470) dated May 20, 1999 as well as those Access and Consent Agreements and Participation Agreements executed as of the Effective Date (collectively the "**Existing Attachments**") will continue in effect until each Existing Attachment reaches its own expiration date; at such time any negotiated renewal will be subject to the terms and conditions of this OA and the Agreement.

16. **MOST FAVORED CUSTOMER**. BMC represents that the pricing and terms granted to Customer pursuant to this Order are comparable to or better than the equivalent pricing and terms currently being offered by BMC to any entity competing with IBM in the provision of IT Outsourcing Services of BMC for like transactions and volumes.

PX003.007
**22-20463.14846**

Confidential

BMC-000054732

17. **PAYMENTS AND DELIVERY.** For the purposes of this OA and any Order made hereunder, Section 7 (Payments and Delivery) of the Master License Agreement is hereby replaced with the following:

Customer will pay each License fee and/or Support fee correctly invoiced within 50 days of invoice date. BMC's invoices shall state all applicable taxes, if any, by tax jurisdiction and with a proper breakdown between taxable and non-taxable deliverables and services. BMC assumes responsibility to timely remit all tax payments to the appropriate governmental authority in each respective jurisdiction. BMC and Customer agree to cooperate to minimize, wherever possible and appropriate, any applicable taxes and provide reasonable notice and cooperation in connection with any audit. BMC shall also bear sole responsibility for all taxes, assessments, or other levies on its own income, leased or purchased property, equipment or software. If Customer provides a direct pay certificate, certification of an exemption from tax or reduced rate of tax imposed by an applicable taxing authority, then BMC agrees not to invoice or pay any such tax unless and until the applicable taxing authority assesses such tax, at which time BMC shall invoice and Customer agrees to pay any such tax that is legally owed. All Products will be delivered electronically to Customer. The unpaid balance of an invoice may be subject to a late payment fee calculated at 1% per month or the maximum amount permitted by law, whichever is less. All Products are licensed FCA ("Free Carrier" as per Incoterms 2000) shipping point. The Products are accepted on the date of the Order; however, such acceptance will not affect the Product Performance Warranty provided in this Agreement.

18. **BUSINESS CONTINUITY.** BMC has a Business Continuity Program, which encompasses Crisis Management, Business Resumption, and Disaster Recovery with a specific addendums addressing Avian Flu and Hurricane pre-event readiness. This program sets out to identify risks and the associated business impact and ensure the development of plans to resume critical business functions and/or recover critical systems. These guidelines were based on industry best practices and the Business Continuity Institute. This program is maintained by BMC certified continuity professionals. All BMC locations with more than 40 employees must develop, maintain, and exercise disaster recovery plans for the timely resumption of all critical services in the event of any disruption. All Plans assign responsibilities to designated employees to facilitate the recovery and/or restoration of essential services. Required personnel and designated alternates are identified and trained in the execution of plan activities. Procedures have been established globally for annual testing of all BMC plans. Upon Customer's request, BMC will provide a summary of the business continuity plan. Customer may, from time to time, provide feedback regarding the plan and requests that BMC take Customer's comments into consideration when updating the plan, though BMC is under no obligation to do so.

19. **RELEASE.** BMC hereby releases and discharges Customer, and its subsidiaries and affiliates, and their successors and assigns, of and from any and all proceedings, arbitrations, lawsuits, civil actions, liabilities, obligations, damages, costs, attorneys' fees, management fees, expenses, compensation and/or claims of any nature whatsoever arising from or related to Customer's performance or failure of performance under the One-To-Many Amendment dated January 1, 2007, the Enterprise License Order (Term) dated March 31, 2008, the Outsourcing Attachment dated March 31, 2008, and section 2.1 of the Master License Agreement dated March 31 ,2008 as all are amended, and including all of such agreements' attachments (together, the "Claims"). This release includes (i) any and all Claims related to Access and Consent, Remote Access, Client Licenses operating on Customer owned hardware and displacement of BMC Customer Licenses with IBM products that were completed prior to Effective Date, (ii) any and all Claims that are presently known or unknown, vested or contingent, accrued or yet to accrue, or asserted in law, equity or otherwise, if any, that occurred prior to the Effective Date, and (iii) any such Claims based in contract, quasi-contract or tort (including negligence). This Section 19 will survive and bind the parties despite any expiration or termination of the Agreement, this OA or any of its Attachments. For the avoidance of doubt Customer is not released of any contractual obligations after the Effective Date.

20. **ENTIRE AGREEMENT AND MODIFICATIONS.** The parties acknowledge they have read this OA and agree that it, the Agreement as modified hereby, and any applicable Order are the complete and exclusive statements of the agreement between the parties relating to the subject matter of this OA. There are no representations, promises, warranties, covenants, or undertakings between the parties other than those expressly set forth in this OA, the Agreement or any applicable Order. This OA may not be modified or rescinded except in writing signed by both parties. In the event of any conflicting terms between this OA and the Agreement, or this OA and an applicable Order, this OA shall prevail. Except as provided in this OA, all other terms of the Agreement and any applicable Software Order shall remain in full force and effect.

| EXHIBITS INCORPORATED INTO OA | |
| --- | --- |
| | **'X'** |
| Exhibit A: License Restrictions and Product Units of Measurement as of the Effective Date | X |
| Exhibit B: LPAR Guidelines | X |
| Exhibit C: IT Services Client Reconciliation | X |
| Exhibit D: Participation Agreement | X |

PX003.008
22-20463.14847
Confidential
BMC-000054733

PX003.009

| | |
|---|---|
| Exhibit E: Outsourcing Attachment – Access Consent Agreement | X |
| Exhibit F: Outsourcing Attachment – Suspension Agreement | X |
| Exhibit G: Service Management – Distributed Systems Products | X |
| Exhibit H: Systems Management – Mainframe Products | X |
| Exhibit I: Outsourcing Attachment – New Client Mirroring Order (Term) | X |
| Exhibit J: Enterprise Systems Management/BSM Solution Packs Products | X |

Each party hereto warrants and represents that a duly authorized representative of such party has executed this OA and this OA constitutes the legal, valid and binding obligation of such party.

**BMC Software, Inc.**

By:
Name:
Title:
Date:

Judy Schafer
Sr Manager of Order Services

MAR 3 0 2013

**International Business Machines Corporation**

By:
Name:
Title:
Date:

Digitally signed by: John R. Sweetman
DN: CN = John R. Sweetman C = US O = IBM Corporation OU = Global Software Sourcing
Date: 2013.03.30 19:50:45 -05'00'

John R. Sweetman

┌─────────────────────────────┐
│ ⋅⋅bmc                        │
│ **FINAL – Reviewed by Contracts - ER** │
└─────────────────────────────┘

PX003.009

**22-20463.14848**

Confidential                                                                BMC-000054734

# TAB 15

AMENDED AND RESTATED OUTSOURCING
ATTACHMENT TO THE
Master License Agreement
between
BMC Software, Inc. ("**BMC**")
and
International Business Machines Corporation ("**Customer**" or "**IBM**")

This Amended and Restated Outsourcing Attachment (the "**OA**") is an amendment and restatement of the Outsourcing Attachment entered into between BMC and Customer dated March 31, 2013, and is made to that certain Master License Agreement (BMC Ref. No. 83106) dated March 31, 2008 as amended by the Amendment to the Worldwide Master License Agreement dated December 23, 2008 (collectively the "**Agreement**") between BMC and Customer. The term ("**Term**") of this OA is from September 30, 2015 (the "**Effective Date**") to March 27, 2018 the ("**Expiration Date**") unless terminated sooner under Section 16 below.

1.    **SCOPE.** Customer has developed an IT Services (as such term is defined below) business and would like to use BMC's Products in the provision of such services. This OA addresses the terms under which BMC grants to Customer the right to use the Products in its IT Services business in a specific Territory. It is the intent of the parties to operate under a common set of terms and conditions on a worldwide basis that addresses both Customer's and BMC's interests. This OA, along with the Agreement and each applicable Participation Agreement will serve as the master worldwide documents for all applicable Orders. This OA sets forth Customer rights for: (i) adding additional Licensed Capacity, (ii) LPAR usage, (iii) international relocation of Products, (iv) Access and Use for IT Services, (v) addition of new business, and (vi) establishing pre-negotiated corporate discounts available to Customer; and will be a single point of control for business terms related to the subject matter of this OA. All Products provided under this OA are governed by this OA, the Agreement, any Participation Agreement, and any applicable Order.

1.1    **IT Services Options.** Customer must elect one of the following five options regarding its use of the Products in relation to its provision of IT Services: (a) Access and Use – (Sections 5.1, 5.2, 5.3 and 5.4), (b) License Suspension – (Section 5.5), (c) Customer owned Products – (Sections 6, 7 and 8), (d) Mirror Order – (Section 11), or (e) Shared Hosting – (Section 12).

1.2    **Fee.** The fee for use of Products (including the BMC Customer Licenses) during the Term and as consideration for the other promises, covenants and agreements made by BMC as set forth herein is $82,050,000.00 (the "**Fee**"). The Fee will be paid under the terms of the Master Extended Payment Agreement #100859 dated March 30, 2007 and Extended Payment Agreement #59 dated September 30, 2015.

2.    **DEFINITIONS.** All defined terms in the Agreement have the same meaning in this OA, unless otherwise provided.

"**Authorized Users**" are Customer's employees, agents, contractors and third party service providers.

"**BMC Customer**" is a third party which licenses the Products and which becomes a Client at commencement of or during delivery of IT Services.

"**Clients**" shall mean customers of IBM who subscribe to Customer's IT Services business, and who operate the Products, or on whose behalf the Products are operated by IBM. A Client may be a Service Provider using the Products to provide service to other third parties.

"**IT Services**" means facilities management, service bureau, outsourcing, application management and development, installation, implementation, maintenance, web page hosting, infrastructure or application program hosting, network services, or any other information processing or related services, provided by Customer to a Client under an agreement pursuant to a bona fide transaction for which Customer is compensated (which services may involve access to and/or use of BMC Products by Customer and its Authorized Users for the processing of Client data).

"**Service Provider**" means a third party involved in providing facilities management, service bureau, outsourcing, application management and development, installation, implementation, maintenance, web page hosting, infrastructure or application program hosting, network services, or any other information processing or related services to its customers, all pursuant to a bona fide transaction for which such Service Provider is compensated.

"**Total Customer Annualized Spend Rate**" is the sum of the annualized spend rates for all the BMC Customer contracts for the same currently supported and active Products and Licensed Capacities that have an expiration date within one year prior to or any date after the date of conversion. BMC's disclosure of any Total Customer Annualized Spend Rate to Customer is subject to prior written consent by the BMC Customer.



PLAINTIFF'S EXHIBIT
BMC SOFTWARE, INC
**4**
Case No. 4:17-CV-2254

PX004 001


22-20463.14881

Confidential

BMC-000000977

Annualized Spend rate example: BMC Customer executed contract: a 5-year deal, 4 years ago, for a total contract value of $5m. The annualized spend of that contract would be $1m ($5/5). Such BMC Customer also did a 2nd contract (upgrade 2 years ago) for a total contract value of $3m, which co-termed to the end of the original deal (making the 2nd contract term length 3 years). The annualized spend of the 2nd contract would $1m/year. The Total Customer Annualized Spend Rate for this BMC Customer would be $2m/Year ($1m/year for the first contract added to $1m/year of the 2nd contract).

3.   USAGE.  For Products identified in an Order between BMC and Customer, subject to all the terms of this OA and the Agreement, BMC grants to Customer, for the term of this OA, a nonexclusive, license to operate the Products for the purpose of providing IT Services to itself or to a Client, in the Territory provided on an Order. Customer may exercise its rights to access and use the Products (including BMC Customer Licenses) through its Authorized Users.

3.1   Use and Access of Products by Customer's Clients.  Subject to the terms of this OA and the Agreement, Customer may allow its Clients and Clients' employees, agents, contractors and third party service providers (together, "Client Contractors") to have worldwide access to and use of the Products. Clients may also be Service Providers. Customer will be responsible for all Authorized Users', Clients' and Client Contractors' compliance with all terms of this OA and the Agreement.

3.2   Non-Assignment.  Neither this OA nor any Products may be assigned by the Customer to any third party, Customer affiliate or Customer subsidiary without prior written consent from BMC. Notwithstanding the foregoing and subject to an applicable transfer or assignment fee not to exceed 10% of the then current list price of the Products being transferred, Customer may assign any Product licenses to the Client for whom Customer specifically licensed such Product under an Order. The parties agree that they must execute a separate assignment agreement for any transfers and the third party transferee of Products must execute BMC's then standard Master License Agreement unless such third party already has a valid BMC license agreement in place.

3.3   Product Restrictions and Units of Measurement.  Certain Products have usage restrictions, and such restrictions and Product Unit of Measurements as of the date of this OA are set forth on the attached Exhibit A.

4.   PRODUCT ORDERS.  Customer may order Products (excluding evaluation copies of the Products) pursuant to an Order which (i) identifies the Products to be licensed, and (ii) identifies that the Products are for use under this OA. All Orders placed pursuant to this OA shall be governed by the terms of the Agreement as amended by this OA and the applicable Participation Agreement. Except as set forth in Section 9, and subject to any rights granted in an Order that by their nature survive beyond the Support renewal date, the parties agree that all Orders that have an expiration date later than the OA Expiration Date will continue to be governed by the terms of the OA and the Order until the Support renewal date in such Order.

5.   ACCESS AND USE FOR IT SERVICES.  Customer will provide notice to BMC through the documentation process detailed in Section 5.3 after signing an IT Services agreement with a BMC Customer that requires IBM to have access and use of BMC Products licensed to such BMC Customer (the "BMC Customer Licenses"). If the requirement for Customer to have access and use of the BMC Customer Licenses is not apparent to Customer at the time the IT Services agreement is signed, Customer will provide such notice during the quarterly business review described in Section 5.3 after such requirement is known to Customer. As long as Customer is in compliance with the documentation process in Section 5.3, the following provisions will apply to Customer's access and use of the BMC Customer Licenses and apply retroactively to the point of first access by Customer.

5.1   Access and Use.  BMC will allow Customer to use, access, install and have operational responsibility of the BMC Customer Licenses (together, "Access and Use") under the terms of the BMC Customer's license agreement with BMC for no fee, including on Computers owned or leased by BMC Customer and at BMC Customer's facility, provided that the BMC Customer Licenses are used solely for the purposes of supporting the BMC Customer who owns such licenses. All BMC Customer Licenses must remain enrolled in BMC Support (BMC Continuous plan). Except as set forth herein, the BMC Customer Licenses will continue to be governed by the terms, conditions and discounts of the BMC license agreement between BMC and the BMC Customer; notwithstanding the terms of the Agreement and the OA, Customer shall be bound by such terms of such license agreement. BMC will make available to Customer a representative copy of its typical BMC Customer license agreement ("BMC EULA") and will inform Customer in writing of any material differences between the BMC EULA and BMC Customer's agreement after Customer provides written notice of Access and Use in accordance with the process detailed in Section 5.3. If Customer acts as BMC Customer's payment agent, it shall be responsible to pay, on the BMC Customer's behalf, for any increases in the Licensed Capacity and/or upgrade fee of the BMC Customer Licenses and the corresponding Support fee due under such license agreement based upon a change in the Licensed Capacity. In the event of a violation of terms of this Section 5.1, (a) Customer's Access and Use of the BMC Customer Licenses under this Section 5.1 will terminate and (b) the Access and Use for IT Services will also terminate. Notwithstanding anything in this OA to the contrary, this OA does not relieve any BMC Customer of any obligation to have a third party use and access agreement.

5.2   Remote Access by Customer, Customer Facility, and Customer Owned Computers.  Notwithstanding

PX004.002
22-20463.14882

Confidential

BMC-000000978



any provisions to the contrary contained in the Agreement, this OA, or the license agreement between the BMC Customer and BMC, Customer may: a) access the BMC Customer Licenses from Customer's international locations, b) install the BMC Customer Licenses at a Customer facility, and (c) install and access the BMC Customer Licenses, up to the Licensed Capacity, on a Customer-owned or leased Computer dedicated exclusively for the BMC Customer. During the Term, BMC agrees to waive any and all charges for these terms, including its customary fees of 50% of the then-current Product price list for the Service Management Products, and 20% of the then-current Product price list for the Systems Management Products and the Enterprise System Management/BSM Solution Packs Products, provided that all such BMC Customer Licenses remain enrolled in Support.

5.3     Documentation of Access and Use. This Section 5.3 specifies Customer's and BMC's intent to document the Clients for whom Customer requires Access and Use rights during the Term. Customer will use commercially reasonable efforts to maintain a written list of all BMC Customers for which Customer requires Access and Use. Customer will provide an updated list to BMC on a regular basis. Such list will include the following information:

- BMC Customer name
- IT Services Start Date
- IT Services Expiration Date


BMC and Customer will review the most recent list as a part of a quarterly business review to be held in the first week of March, June, September and December on a date to be agreed to by the parties. BMC and Customer agree that Customer has until February 29, 2016 to provide BMC with an initial updated list of all BMC Customers for which it requires Access and Use. Customer will provide regular updates to the list between the Effective Date and such date. In addition, BMC will provide Customer with additional information to assist Customer in providing the initial and updated list, including any BMC Customers that BMC believes need to be added to such list.

Notwithstanding anything to the contrary in this Section 5, Customer may have incidental and indirect worldwide use of BMC Customer Licenses without documenting such indirect and incidental use of BMC Customer Licenses as described in this Section 5.3. Examples of incidental and indirect use include staff augmentation services, read only access to Remedy tickets, installation services, maintenance services or facilities management services.

5.4     Non-Displacement. This Non-Displacement provision applies only to Customer's Access and Use of BMC Customer Licenses by Customer's strategic outsourcing division (or its successor) for the BMC Customers listed on Exhibit K (the "Exhibit K Customers"). Subject to the foregoing, Customer agrees that, while Customer cannot displace any BMC Customer Licenses with Customer products, Customer may discontinue use of BMC Customer Licenses for other valid business reasons. All terms of Sections 5.1, 5.2 and 5.3 apply to Customer's use of BMC Customer licenses belonging to any Exhibit K Customers. BMC and Customer agree to update the information contained on Exhibit K as part of the reporting requirements in Section 5.3.

For avoidance of doubt, BMC agrees any non-displacement provision contained in the prior Outsourcing Attachment dated March 31, 2013 or in any Access and Consent agreement to which Customer and BMC were parties (including any three-way Access and Consent Agreements), shall be null and void and have no further force and effect.

5.5     License Suspension – "Deep Freeze" – Use of Customer Products.  If Customer elects to operate Customer Products in support of Customer Products, then BMC will allow BMC Customer to suspend the active status ("Deep Freeze") of its existing perpetual licenses for the same Products.  BMC Customer may Deep Freeze without being subject to reinstatement fees as long as an active Product license for all surviving BMC Customer Licenses in Deep Freeze is continuously enrolled in Support and such license is used to service such BMC Customer.  BMC will discontinue any future maintenance, enhancement and support plan charges for the BMC Customer Licenses which are suspended by BMC Customer.  Neither Customer nor BMC Customer shall be required to pay any fees related to the Deep Freeze, but Customer may acquire the additional Licensed Capacity of the suspended BMC Customer Licenses under the terms of this OA.  If Customer elects this option, Customer, BMC and BMC Customer shall execute a License Suspension Agreement substantially in the form of Exhibit F to this OA.  Prior to executing a License Suspension Agreement, all outstanding obligations between BMC and BMC Customer must be fulfilled by BMC Customer, and BMC Customer must be up to date with its Support payments.

Subject to the terms and conditions of this OA, at the time the Deep Freeze ends, BMC will not charge a reinstatement fee, provided that the following conditions are met:

i.      If the BMC Customer re-enrolls the BMC Customer Licenses in Support, the BMC Customer will pay fees for any increases to the Licensed Capacity, if applicable.

ii.     If the BMC Customer re-enrolls the BMC Customer Licenses in Support, the BMC Customer and BMC may agree to sign a new license agreement to govern BMC Customer's use of the BMC Customer Licenses. If BMC Customer and BMC do not sign a new license agreement, the BMC Customer Licenses shall be

Confidential

PX004.003
22-20463.14883

BMC-000000979

governed by the terms, conditions and discounts contained in the license agreement then in place between BMC and BMC Customer.

iii.  If the BMC Customer re-enrolls the BMC Customer Licenses in Support, (a) the minimum coverage period is 12 months, (b) BMC Customer must re-enroll within 30 days of termination of an IT Services Agreement between BMC Customer and Customer, and (c) BMC Customer must re-enroll all of the surviving BMC Customer Licenses in Support.

iv.  If Customer has acquired additional perpetual Product licenses or Licensed Capacity for the BMC Customer and BMC Customer elects to enroll the additional Products and/or Licensed Capacity in Support, those licenses and/or Licensed Capacity may be acquired by Customer and assigned on a perpetual basis to the BMC Customer and enrolled in Support. Once assigned to BMC Customer, such Products shall be governed by the license agreement between BMC and BMC Customer, as specified in (ii) above. Customer's cost for the acquisition of such additional Product licenses or Licensed Capacity shall not exceed 10% of the then current perpetual Product list price. Customer's Licensed Capacity will be adjusted accordingly be the same level that is assigned to the BMC Customer. All assignments under this Section 5.5 will only be effective upon execution an assignment agreement between BMC, BMC Customer and Customer.

6.  **SERVICE MANAGEMENT PRODUCTS**. The provisions set forth in this Section 6 apply exclusively to BMC's Service Management Products listed in Exhibit G. If during the Term, Products are added to or deleted from Exhibit G, BMC will provide an updated Exhibit reflecting such additions or deletions. If a Product's change in designation causes it to be subject to different discount or fee, Customer shall enjoy the benefit of the greater discount and/or lesser fee for the remainder of the Term, regardless of the Product's new designation.

6.1  Discounts. During the term of this OA, Customer will be entitled to a minimum global discount of 45% off the Listed Price in Exhibit G for all purchases of new licenses and/or additional Licensed Capacity of BMC Service Management Products.

6.2  Support. The applicable Support offering for all BMC Service Management Products is set forth in the Agreement under Section 19 Support and Exhibit A.

6.3  Remote Access. Notwithstanding any provisions to the contrary, Customer may, provide remote access to Products to its Authorized Users, as well as to Clients and Client Contractors, all from locations outside the Territory. During the Term, BMC will waive any and all charges for Remote Access including its customary fee of 50% of the then-current Product list price for all Service Management Products being remotely accessed, provided that such Customer Licenses remain enrolled in Support.

7.  **ENTERPRISE SYSTEMS MANAGEMENT/BSM SOLUTION PACKS PRODUCTS**. The provisions set forth in this Section 7 apply exclusively to BMC's Enterprise Systems Management/BSM Solution Packs Products listed in Exhibit J. If during the Term, Products are added to or deleted from BMC's Enterprise Systems Management/BSM Solution Packs product lines, BMC will provide an updated Exhibit J reflecting such additions or deletions. If a Product's change in designation causes it to be subject to different discount or fee, Customer shall enjoy the benefit of the greater discount and/or lesser fee for the remainder of the Term, regardless of the Product's new designation.

7.1.  Discounts. During the term of this OA, Customer will be entitled to a global minimum discount of 45% off the Listed Price in Exhibit J for all purchases of new licenses and/or additional Licensed Capacity of BMC's Enterprise Systems Management/BSM Solution Packs Products.

7.2  Support Fees. The applicable Support offering for all BMC's Enterprise Systems Management/BSM Solution Packs Products is set forth in the Agreement under Section 19 Support and Exhibit A.

7.3  Remote Access.  Notwithstanding any provisions to the contrary, Customer may provide remote access to the Products to its Authorized Users, as well as to Clients and Client Contractors, all from locations outside the Territory. During the Term, BMC will waive any and all charges, for Remote Access including its customary fee of 20% of the then-current Product list price for all BMC's Enterprise Systems Management/BSM Solution Packs Products being remotely accessed, provided that such Customer Licenses remain enrolled in Support.

8.  **SYSTEMS MANAGEMENT PRODUCTS**. The provisions set forth in this Section 8 apply exclusively to BMC's System Management Products listed in Exhibit H. If during the Term, Products are added to or deleted from Exhibit H BMC will provide an updated Exhibit H reflecting such additions or deletions. If a Product's change in designation causes it to be subject to different discount or fee, Customer shall enjoy the benefit of the greater discount and/or lesser fee for the remainder of the Term, regardless of the Product's new designation.

8.1.  Discounts. During the term of this OA, Customer will be entitled to a global minimum discount of 72% off the Listed Price in Exhibit H for all purchases of new licenses and/or additional Licensed Capacity of BMC Systems Management Mainframe Products, and a global minimum discount of 45% off the list price in Exhibit H for all purchases of new licenses and/or additional Licensed Capacity of all other BMC Systems Management Products.

PX004.004
22-20463.14884

Confidential

BMC-000000980



8.2     <u>Support Fees.</u> The applicable Support offering for all BMC Systems Management Products is set forth in the Agreement under Section 19 Support and Exhibit A.

8.3     <u>Workload-Based Pricing.</u> During the Term of this OA, if Customer (1) signs an IBM WLC Sub-Capacity Option contract, (2) installs an eligible IBM z-Series server or later introduced model or similar or compatible model from another vendor (each a "<u>z-Series Server</u>"), (3) runs only the IBM z/OS operating system (no OS/390 or MVS images can be installed), and (4) commits to providing monthly SCRT reports and the IBM "return receipt acknowledgements", then BMC and Customer agree to negotiate in good faith on a workload-based pricing license Order providing for workload-based pricing for the Products for use on Customer's z-Series Servers.

8.4     <u>LPAR Based Pricing.</u> During the Term of this OA and the associated applicable Order, BMC will allow Customer to install the System Management Products listed on Exhibit H under a LPAR configuration and to license such Products in accordance with the guidelines set forth on Exhibit B. The parties agree that Customer has until February 29, 2016 to identify to BMC all instances, as of the Effective Date, in which Customer has licensed Products on a MIPS (Hard Cap) unit of measure but is using such Products on Soft Cap LPARS, and execute any needed Orders or amendments to Orders (as required by this OA), to convert such licenses to MIPS (Soft Cap) unit of measure. Should Customer fail to identify and execute any needed Orders or amendments to Orders by February 29, 2016 for such situations where Customer has licensed Products on a MIPS (Hard Cap) unit of measure but is using such Products on Soft Cap LPARS as of the Effective Date, then Customer will owe an uplift factor of 1.25 to total cost of such Order, backdated to Customer's initial installation of such Products under a soft capped LPAR configuration (not to exceed two years).

8.5     <u>Remote Access.</u> Notwithstanding any provisions to the contrary, Customer may, provide remote access to Products to its Authorized Users, as well as to Clients and Client Contractors, all from locations outside the Territory. During the Term, BMC will waive any and all charges for Remote Access including its customary fee of 20% of the then-current Product list price all Systems Management Products being remotely accessed, provided that such Customer Licenses remain enrolled in Support.

9.      <u>ONE-TO-MANY UTILIZATION FOR BMC DISTRIBUTED PRODUCTS.</u> Notwithstanding anything to the contrary in the Agreement, BMC agrees, subject to the terms and conditions of this OA and the applicable Order, that Customer may use the BMC distributed Products as detailed in Exhibits G and J as well as the BMC Control-M Workload Automation Suite (Task) distributed Product from Exhibit H (together, the "<u>BMC Distributed Products</u>") to provide IT Services to multiple Clients from a shared instance(s) ("<u>One-to-Many</u>"). BMC Distributed Products being used to provide IT Services to a single Client under a single support id ("<u>One to One</u>") can be transferred to "One to Many" usage at no additional cost during the Term, as long as such BMC Distributed Products are enrolled in Support under an active BMC Support Contract between BMC and Customer. This Section 9 does not change any of Customer's rights to continue to use the BMC Distributed Products from a "One to One" environment and does not require Customer to use all BMC Distributed Products in a One-to-Many environment. Customer agrees that under no circumstances can any BMC Distributed Products previously licensed by a Client (aka, BMC Customer Licenses), be transferred to One to Many usage. Notwithstanding anything to the contrary in this OA, the One-to-Many rights granted under this Section 9 will terminate upon termination of the OA and Customer's usage will revert to the One to One model.

10.     <u>PARALLEL RUNNING AND TRANSITION.</u> Both parties agree that, during the transition period from a BMC Customer's data center to a facility owned or controlled by Customer, and vice versa, if applicable, Customer may use, execute, transmit, perform and display, at no additional charge, either Customer Product or BMC Customer Licenses concurrently in production mode on a Computer at each site for a period not exceeding 90 days to ensure smooth transfer of operation between facilities. Customer must notify BMC, in writing, of the start date of such transition. In the event that the Client terminates its IT Services Agreement with Customer and (i) engages a different service provider or (ii) divests some of its business, then Customer will have a maximum of 90 days to transition the Customer workload.

11.     <u>NEW CLIENTS.</u> From time to time during the term of this OA, Customer may acquire a new mainframe Client or renews its IT Services agreement with an existing Client (each a "<u>New Client</u>"). In such event Customer may elect to support such New Client using BMC Mainframe Products by executing a New Client Term Mirror Order ("<u>MO</u>"), the form of which is attached hereto as Exhibit I. The terms for each MO will be as follows:

    (i)      Each MO must be for a term of no less than 3 years.
    (ii)     Customer may use the Products on such MO only for the single New Client specified therein.
    (iii)    The MO must mirror the existing BMC Customer Licenses of the Client.
    (iv)     All such Products must remain enrolled in BMC Support during the whole duration of the IT Services agreement between Customer and Client.
    (v)      The annual term rate applicable for each MO is listed below:

PX004.005
22-20463.14885


Confidential                                                                                                        BMC-000000981

| List Price Inventory Value Per Order (USD) | Annual Term Rate |
|---|---|
| Less than      $    30,843,080 | 11.33% |
| Greater than $    30,843,081 | 10.77% |
| Greater than $    37,011,696 | 10.23% |
| Greater than $    44,414,035 | 9.72% |
| Greater than $    53,296,842 | 9.23% |
| Greater than $    63,956,211 | 8.77% |
| Greater than $    76,747,453 | 8.33% |
| Greater than $    92,096,944 | 7.91% |
| Greater than $   110,516,332 | 7.52% |
| Greater than $   132,619,599 | 7.14% |
| Greater than $   159,143,519 | 6.79% |
| Greater than $   190,972,222 | 6.45% |
| Greater than $   229,166,667 | 6.12% |
| Greater than $   275,000,000 | 5.82% |
| Greater than $   330,000,000 | 5.53% |
| Greater than $   396,000,000 | 5.25% |
| Greater than $   475,000,000 | 5.00% |

In addition, MOs with a term greater than 3 years are also eligible for an additional discount ("**Commitment Discount**") as follows:

| Length of Contractual Period | Additional Discount |
|---|---|
| 4-Year Commitment Discount | 15% |
| 5-Year Commitment Discount | 30% |
| 6-Year Commitment Discount | 34% |
| 7-Year Commitment Discount | 38% |
| 8-Year Commitment Discount | 42% |
| 9-Year Commitment Discount | 46% |
| 10-Year Commitment Discount | 50% |

**Pricing Components:**

- *Base Capacity: The quantity of a Unit of Measure as applicable per Product*
- *List Price Inventory Value: Means the sum of the List Price Unit Cost of each Product multiplied by Base Capacity multiplied by LPAR Uplift (if applicable), multiplied by International Uplift (if applicable).*
- *Annual Term Rate: Determined by using the Table in 9.iii. above whose value is adjacent to the range containing the List Price Inventory Value*
- *Annual Base Fee:  The annual value used to determine Total Order Fee, which is calculated by multiplying the List Price Inventory Value by Annual Term Rate, multiplied by one minus the Commitment Discount (if applicable).*
- *Total Order Fee:  Means the Annual Base Fee multiplied by the number of years in the Term of the Order. The Fee for the use of the Products is determined by multiplying the Annual Base Fee by the Term of the Order (in year).  This Fee does not include tax or finance charges.*
- *Annual P1 Unit Cost:  The Unit Cost used for calculating fees for additional capacity during the term.*

*For example: New Client has $300M list price value product inventory. (Assumes that the Client will not incur International Uplift or LPAR Uplift factors for purposes of this example) The Total Order Fee for this New Client will be as follows:*

*3-Year Outsourcing Agreement: ($300,000,000 \* 5.82%) \* 3 years = $52,357,033*
*5-Year Outsourcing Agreement: ($300,000,000 \* 5.82%) \* 5 years \* (1-30%) = $61,083,205*

PX004.006
22-20463.14886

BMC-000000982



*10-Year Outsourcing Agreement: ($300,000,000 * 5.82%) * 10 years * (1-50%) = $87,261,721*

11.1     **Change in Business Condition:**  BMC agrees that, during the Term and upon Expiration or Termination of an IT services agreement, Customer will have the option to assign the MO specific to a New Client or New Client at no additional cost. In such event BMC, Customer and New Client will execute an assignment document to be negotiated by the parties. New Client must also execute BMC's then standard Master License Agreement, unless New Client already has a valid BMC license agreement in place.

Provided that the Client has entered into a License Suspension Agreement and if IBM has acquired additional Product licenses or Capacity for the New Client, those licenses and/or Capacity may be transferred on a perpetual basis to the New Client and enrolled in Support upon termination of an MO, subject to a fee not to exceed 10% of the then current Product list price for licenses.  Such Products shall be governed by the license agreement between BMC and BMC Customer, as specified in Section 5.5 above.

12.  **SHARED HOSTING.** This Section documents Customer rights to install BMC distributed and mainframe Products on a Customer Computer that is not dedicated exclusively for one Client, such as a Computer that Customer uses for shared hosting or cloud infrastructure services (each a "**Shared Hosting Computer**").

12.1     **BMC Distributed Products.** Customer may provide Shared Hosting Computers on which BMC Customers install and use BMC Customer Licenses to the BMC Distributed Products for no additional fee. All BMC Customer Licenses must remain enrolled in BMC Support (BMC Continuous plan). Customer is not required to document the provision of such Shared Hosting Computers unless Customer requires Access and Use of such BMC Customer Licenses for the purposes of providing IT Services. For avoidance of doubt, the parties agree that, with regard to the BMC Control-M Workload Automation Products (per Task licenses), the rights granted in this Section 12.1 apply only to such Products when installed in a distributed systems environment. If such Products are installed in a mainframe environment, the terms of Section 12.2 apply.

12.2     **System Management Products.** Customer must elect one of the two options below prior to such installation of System Management Products on a Shared Hosting Computer:

          (a)   Customer owned licenses pursuant to Section 8
          (b)   Term Order as detailed in Section 13 below

Notwithstanding the foregoing, the parties agree that Customer may not install any BMC Customer Licenses for System Management Products on a Computer owned or leased by Customer that is used to provide strategic outsourcing services and that is not dedicated exclusively for such BMC Customer.

12.3     **Shared Hosting Reconciliation of System Management Products.** The parties agree that Customer will have until February 29, 2016 to identify to BMC any instances of BMC Customer Licenses installed on a Shared Hosting Computer as of the Effective Date. No later than February 29, 2016, Customer and BMC will execute any new Order or amendments to Orders (as required by this OA) to cover such use on a Shared Hosting Computer. For the purposes of this reconciliation process only, the parties agree that the conversion factor for Term Orders will be 1.00 for all MIPS Ratio Percentages up to 100%, notwithstanding anything in Section 13 and Exhibit B to the contrary. If, on February 29, 2016, Customer has used commercially reasonable efforts to execute such Orders or amendments and has been unable to do so because of a lack of cooperation of a BMC Customer, then Customer will deliver to BMC a list of such BMC Customers. Upon receipt of such list, BMC will assume full responsibility to cause such BMC Customer to be in compliance with the terms of its agreement with BMC with regard to such use. Customer will reasonably cooperate with BMC in its efforts to do so, but in no event will Customer have any obligation to breach its agreement with such Client. BMC reserves the right to take all actions against such BMC Customer that are allowed by its agreement with such BMC Customer, both at law and in equity, including without limitation requiring that such BMC Customer stop using its BMC Customer Licenses. Except as set forth in this Section 12, BMC agrees that Customer will have no liability to BMC for its installation and use of BMC Customer Licenses on a Shared Hosting Computer, as long as such BMC Customer is on the list provided by Customer to BMC on February 29, 2016 and the BMC Customer Licenses were installed on a Shared Hosting Computer prior to or on the Effective Date. BMC will notify Customer if any BMC Customer has not fulfilled all outstanding financial obligations existing between BMC and BMC Customer and be in compliance with the terms of the applicable BMC Customer license agreement. To the extent any such financial obligations preclude IBM from executing a Term Order as described below, IBM shall be excused from entering into such Term Order until such financial obligations have been paid in full.

In addition, Customer may identify (i) up to six instances of BMC Customer Licenses installed on a Shared Hosting Computer at any time prior to December 31, 2016 and (ii) an additional four such instances per calendar year thereafter during the Term. In such case, the terms of this Section 12.3 will apply to such identified instances (except for the

Confidential

PX004.007
22-20463.14887

BMC-000000983



requirement that the list be provided to BMC by February 29, 2016), and Customer will have 30 days from the discovery of such installation to resolve it pursuant to the process set forth above and BMC agrees that Customer will have no liability to BMC for its installation and use of BMC Customer Licenses on a Shared Hosting Computer in such instances. For avoidance of doubt, should a BMC Customer License be installed on a dedicated Computer, any license capacity issues will be resolved solely between BMC and such BMC Customer, and IBM will not have any liability to BMC for such license capacity.

12.4    **Shared Hosting of System Management Products after the Effective Date.** Except as set forth in Section 12.3 above, if at any time after the Effective Date, if any BMC Customer Licenses are installed on a Shared Hosting Computer, then Customer must execute an Order, within 30 days of identification, pursuant to the options detailed in Section 12 for such BMC Customer Licenses. If IBM fails to execute such Order within 30 days, then such Order will include an uplift factor of 1.25 to the total cost of such Order, backdated to Customer's initial installation of such Products on a Shared Hosting Computer (not to exceed two years). BMC agrees that Customer will have no liability for any Client breaches of a Client license agreement with BMC.

13.    **REFLECTION ORDER.** If Customer desires to install any System Management Products on a Shared Hosting Computer, Customer may purchase licenses of such Products for such use as follows:

    i.    Customer and BMC will execute a Client-specific term enterprise license order (each a "**Term Order**")
    ii.    Each Term Order must be for at least 3 years.
    iii.    Customer may use the Products on such Term Order only for the single Client specified therein.
    iv.    The Term Order must reflect the existing BMC Customer Licenses owned by such Client.
    v.    The Unit of Measure for the Term Order will be per MIPS (Soft Cap) or MIPS (Hard Cap), as defined in Exhibits A and B.
    vi.    Prior to executing the Term Order, BMC Customer must have fulfilled all outstanding financial obligations existing between BMC and BMC Customer and be in compliance with the terms of the applicable BMC Customer license agreement.
    vii.    The fee for such Term Order will include a conversion factor based on the MIPS ratio between BMC Customer's current agreement with BMC and the Term Order for such Client. The appropriate conversion factors are set forth below:

The parties agree to negotiate in good faith Term Orders that require a Licensed Capacity greater than the Base Capacity.

Customer may also license System Management Products that are not on a "per MIPS" unit of measure on a Term Order, pursuant to all the terms set forth in this Section. However, BMC will not apply a conversion factor to such BMC Customer Licenses as long as Customer licenses the same Licensed Capacity of all such non MIPS based Products as licensed by the BMC Customer at the time of entering the Term Order.

*Pricing Components:*

- *BMC Customer MIPS: MIPS licensed under the current BMC Customer contract with BMC*
- *Total Customer Annualized Spend Rate: Defined in Section 2 above*
- *BMC Customer Contract Term: Number of years remaining on the BMC Customer's current agreement. Capped to a maximum of 2 years for all calculations*
- *Base Capacity:* <u>For MIPS (Soft Cap) Option</u>: *BMC Customer's four hour reported average peak for the 12 months prior to the effective date of the Term Order under the per MIPS (Soft Cap) unit of measurement.* <u>For MIPS (Hard Cap) Option</u>: *BMC Customers licensed MIPS capacity.*
- *Contract Term: Number of years in the term of the Term Order*
- *MIPS Ratio Percentage: Base Capacity divided by BMC Customer MIPS multiplied by 100*
- *Conversion Factor: Factor as per table above based on applicable MIPS Ratio Percentage*
- *Supported Cost: Total Customer Annualized Spend Rate multiplied by (the Conversion Factor – 1) multiplied by BMC Customer Contract Term, (not to exceed 2 years)*
- *Annual Cost: Total Customer Annualized Spend Rate multiplied by the Conversion factor. For Term Orders with a MIPS Ration Percentage less than 75%, the Total Customer Annualized Spend Rate will be multiplied by 1 regardless of the capacity required.*
- *Total Order Fee: (Supported Cost) + (Annual Cost multiplied by (Contract Term minus BMC Customer Contract Term))*
- *List Price MIPS Value: Sum of the Exhibit F Listed Price of each Product multiplied by 1.25*
- *List Price Inventory Value: List Price MIPS value multiplied by Base Capacity*

PX004.008
22-20463.14888

Confidential

BMC-000000984

- *Monthly flex price per MIPS: List Price MIPS Value multiplied by the Annual term rate in 11.1 (vii) (based on the List Price Inventory Value) and divided by 12*

*MIPS (Soft Cap) Option:*

| MIPS Ratio Percentage | MIPS (Soft Cap) Conversion Factor |
|---|---|
| 95%-100% of current MIPS (Full Capacity or Hard Cap) | 1.25 |
| 85%-95% of current MIPS (Full Capacity or Hard Cap) | 1.18 |
| 75%-85% of current MIPS (Full Capacity or Hard Cap) | 1.12 |
| Less than 75% of current MIPS (Full Capacity or Hard Cap) | 1.00 |

*Example: BMC Customer licenses 1000 MIPS with an annual spend of $500,000 and supported license for 1.5 years. Listed Price of $6,240, resulting in a List Price MIPS Value of $7,800. Customer licenses Base Capacity of 900 MIPS (four hour average peak from the prior 12 months SCRT reports) over 5 years. The calculation would be as follows:*

- *BMC Customer MIPS: 1000 MIPS*
- *Total Customer Annualized Spend Rate: $500,000*
- *BMC Customer Contract Term:  1.5 year*
- *Base Capacity: 900 MIPS (Soft Cap)*
- *Contract Term: 5 years*
- *MIPS Ratio Percentage: 900 / 1000 * 100 = 90%*
- *Conversion Factor: 1.18*
- *Supported Cost: $500,000 * (1.18 – 1) * 1.5 = $135,000*
- *Annual Cost: $500,000 * 1.18 = $590,000*
- *Total Order Fee: $135,000 + ($590,000 * (5 – 1.5)) = $2,200,000*
- *List Price MIPS Value: $6,240 * 125% = $7,800*
- *List Price Inventory Value: $7,800 * 900 = $7,020,000*
- *Monthly flex price per MIPS: $7,800 * 11.33% / 12 = $73.65*

*MIPS (Hard Cap) Option:*
- *The conversion ratio for Hard Cap is 1.0 of the Client's current MIPS (Full Capacity) to per MIPS (Hard Cap) LPAR under the Term Order.*
- *Annual Hard Cap MIPS Adjustment Rate: List Price MIPS Value multiplied by the Annual term rate in Section 11.1 (vii) (based on the List Price Inventory Value) * the numbers of years remaining on the contract.*

*Example: BMC Customer licenses 1000 MIPS with an annual spend of $500,000 and supported license for 1.5 years. Listed Price of $6,240, resulting in a List Price MIPS Value of $7,800. Customer converts to per MIPS (Hard Cap) of 1000 MIPS over 5 years. The calculation would be as follows:*

- *BMC Customer MIPS: 1000 MIPS*
- *Total Customer Annualized Spend Rate: $500,000*
- *BMC Customer Contract Term:  1.5 year*
- *Base Capacity: 1000 MIPS (Hard Cap)*
- *Contract Term: 5 years*
- *Total Order Fee: $500,000 * (5 – 1.5)) = $1,750,000*
- *List Price MIPS Value: $6,240 * 125% = $7,800*
- *List Price Inventory Value: $7,800 * 900 = $7,020,000*
- *Hard Cap MIPS Adjustment Rate: $7,800 * 11.33% * the numbers of years remaining on the contract*

13.1   **Change in Business Condition:**  BMC agrees that, during the term of a Term Order or upon expiration or termination of an IT Services agreement, Customer will have the option to assign a Term Order done pursuant to this Section 13 to the Client specified in such Term Order for no additional fee. Such assignment will be governed by the assignment terms in Section 3.2.

Confidential



PX004.009
**22-20463.14889**

BMC-000000985

14. **CUSTOMER AFFILIATES.** Customer Affiliates located outside of the United States can perform IT Services in their respective territories under the terms and conditions of the Agreement and this OA, provided that they execute, along with BMC's applicable local licensing Affiliate, a separate Participation Agreement, a form of which is attached hereto as Exhibit D. All applicable Orders placed outside of the United States must reference such Participation Agreement as well as the OA and the Agreement. The parties agree that under no circumstances will they or any of their Affiliates in any location sign or cause to be signed a separate Master License Agreement or Outsourcing Attachment. All Orders placed by Customer's Affiliates under a Participation Agreement must either be placed in (i) United States Dollars based upon the Unit Costs set forth in Exhibits G, J, and H (Customer acknowledges that BMC's usual and customary international uplift fee will be waived for the term of this OA), or (ii) under the then current price list for the location in local currency. The parties agree, however, that once a pricing and currency selection is made for an Order all subsequent transactions under that Order must maintain the same price list and currency originally selected for the duration of the Order term.

15. **PRODUCT RELOCATION.** BMC agrees that Customer may transfer a License for a Product from one Territory to another, provided that (i) Customer continues to use the Product within the scope of the License and this OA and continues to abide by all the terms of the OA and the Agreement, and (ii) Customer pays a fee to BMC not to exceed 10% of the then current list price value of the Products to be relocated. If such Product to be transferred was licensed under an enterprise Order that requires a Statement of Capacity then all transferred Licensed Capacity will be reported as such on the applicable Statement of Capacity, and Customer will continue to report each Territory and related Capacity on each Statement of Capacity.

16. **EXTENSION and TERMINATION.**

16.1 _Extension._ One year prior to Expiration Date, the parties will make reasonable commercial efforts to negotiate a proposal for the renewal of this OA. If the parties fail to reach an agreement on such renewal or replacement, Customer can elect to extend this OA for an additional five (5) year period under the terms and conditions of this OA for maximum fees as defined below:

For a fee of $5,000,000, Customer may renew the OA for a five-year term without the right to install and access the BMC Customer Licenses on Customer-owned or leased Computers as defined in Section 5.2 and without the One-To-Many rights defined in Section 9. For purposes of clarity, the parties agree that such renewal and all future renewals include the rights set forth in this OA related to Shared Hosting and MIPS (soft cap) LPARS.

For a fee of $20,000,000, Customer may add to the five-year renewal the right to install and access the BMC Customer Licenses on Customer-owned or leased Computers as defined in Section 5.2.

For a fee of $22,000,000, Customer may add to the five-year renewal the One-To-Many rights defined in Section 9.

16.2 _Termination._ In the event that the parties elect to not renew or replace the OA, (i) the OA will terminate, (ii) Customer's right to use the Products to provide IT Services to Clients shall terminate, and (iii) all Products licensed pursuant to this OA will be governed by the terms of the Agreement and any applicable Order only. In the event that this OA is terminated under Section 13 of the Agreement, any fees due or owing prior to or on termination or expiration of this OA will be due and must be paid to BMC immediately upon such termination. However, unless the Agreement or OA are terminated for cause, as set forth in Section 13 of the Agreement, the parties agree that any Order that has an expiration date later than the OA Expiration Date will, subject to any rights granted in an Order that by their nature survive beyond the Support renewal date, continue to be governed by the terms of the OA, the Agreement and the Order until the Support renewal date under the Order. In the event that the OA expires, BMC agrees that any applicable Access and Consent Agreement or Suspension Agreement will continue in force and effect under the terms of the OA for the term of any IT Services agreement in place prior to such expiration. If parties fail to reach an agreement to extend or replace this OA, Customer will be entitled to receive the following minimum global discounts: (a) for BMC Service Management Products, 35% off the then-current list price of such Products, (b) for Systems Management Mainframe Products, 50% off the then-current list price of such Products, (c) for all other BMC Systems Management Products, 35% off the then-current list price of such Products, and (d) for BMC Enterprise Systems Management Products, 35% off the then-current list price of such Products.

17. **EXISTING OAs AND PAs.** The parties agree that, as of the Effective Date, this OA will govern all IT Services engagements by Customer and that all prior Orders, Access and Use Agreements, MO's, License Suspension Agreements and Participation Agreements entered into under the Prior Agreements will now be governed by this OA and the Agreement.

18. **MOST FAVORED CUSTOMER.** BMC represents that the pricing and terms granted to Customer pursuant to this Order are comparable to or better than the equivalent pricing and terms currently being offered by BMC to any entity competing with IBM in the provision of IT Outsourcing Services of BMC for like transactions and volumes.

PX004.010
22-20463.14890

Confidential           BMC-000000986

19. <u>PAYMENTS AND DELIVERY</u>. For the purposes of this OA and any Order made hereunder, Section 7 (Payments and Delivery) of the Master License Agreement is hereby replaced with the following:

"Customer will pay each License fee and/or Support fee correctly invoiced within 50 days of invoice date. BMC's invoices shall state all applicable taxes, if any, by tax jurisdiction and with a proper breakdown between taxable and non-taxable deliverables and services. BMC assumes responsibility to timely remit all tax payments to the appropriate governmental authority in each respective jurisdiction. BMC and Customer agree to cooperate to minimize, wherever possible and appropriate, any applicable taxes and provide reasonable notice and cooperation in connection with any audit. BMC shall also bear sole responsibility for all taxes, assessments, or other levies on its own income, leased or purchased property, equipment or software. If Customer provides a direct pay certificate, certification of an exemption from tax or reduced rate of tax imposed by an applicable taxing authority, then BMC agrees not to invoice or pay any such tax unless and until the applicable taxing authority assesses such tax, at which time BMC shall invoice and Customer agrees to pay any such tax that is legally owed.   All Products will be delivered electronically to Customer. The unpaid balance of an invoice may be subject to a late payment fee calculated at 1% per month or the maximum amount permitted by law, whichever is less. All Products are licensed FCA ("Free Carrier" as per Incoterms 2000) shipping point. The Products are accepted on the date of the Order; however, such acceptance will not affect the Product Performance Warranty provided in this Agreement."

20. <u>BUSINESS CONTINUITY</u>. BMC has a Business Continuity Program, which encompasses Crisis Management, Business Resumption, and Disaster Recovery with a specific addendums addressing Avian Flu and Hurricane pre-event readiness. This program sets out to identify risks and the associated impact and ensure the development of plans to resume critical business functions and/or recover critical systems. These guidelines were based on industry best practices and the Business Continuity Institute. This program is maintained by BMC certified continuity professionals. All BMC locations with more than 40 employees must develop, maintain, and exercise disaster recovery plans for the timely resumption of all critical services in the event of any disruption. All Plans assign responsibilities to designated employees to facilitate the recovery and/or restoration of essential services. Required personnel and designated alternates are identified and trained in the execution of plan activities.  Procedures have been established globally for annual testing of all BMC plans. Upon Customer's request, BMC will provide a summary of the business continuity plan.  Customer may, from time to time, provide feedback regarding the plan and requests that BMC take Customer's comments into consideration when updating the plan, though BMC is under no obligation to do so.

21. <u>RELEASE</u>. BMC hereby releases and discharges Customer, and its subsidiaries and affiliates, and their successors and assigns, of and from any and all proceedings, arbitrations, lawsuits, civil actions, liabilities, obligations, damages, costs, attorneys' fees, management fees, expenses, compensation and/or claims of any nature whatsoever arising from or related to Customer's (or its affiliates') performance or failure of performance under the Outsourcing Attachment dated March 31, 2013, and Section 2.1 of the Master License Agreement dated March 31, 2008 as all are amended (the "Claims"). This release includes (i) any and all Claims related to Customer displacements of BMC Customer Licenses to date; (ii) any and all Claims related to the use of Customer owned licenses operating on soft capped LPARS; (iii) any and all Claims related to Section 5.2(c) of the 2013 Outsourcing Attachment where BMC Customer licenses are operating on multi-client hardware; (iv) all Customer Access and Use of BMC Customer licenses; (v) any and all Claims related to Customer's failure to use commercially reasonable efforts to provide and maintain an Access and Use list; (vi) any and all Claims that are presently known or unknown, vested or contingent, accrued or yet to accrue, or asserted in law, equity or otherwise, if any, that occurred prior to the Effective Date; and (vii) any such Claims based in contract, quasi contract or tort (including negligence). This Section 21 will survive and bind the parties despite any expiration or termination of the Agreement, this OA or any of its Attachments. For the avoidance of doubt (a) Customer is not released of any contractual obligations after the Effective Date of this OA, provided, however that the release granted in the prior 2013 Outsourcing Attachment remains valid and binding, and (b) Claims do not include Customer's use of the Products in excess of the Licensed Capacity set forth in any Order, except as otherwise released in (ii) and (iii) above, or Customer's failure to submit any Statement of Capacity required by any Order.

22. <u>REQUIRED ORDER</u>. No later than September 30, 2015, the parties agree to execute the term license Order attached as Exhibit L for the following seven Clients: Komatsu, Carrefour, Toto, Banca March, Baxter Healthcare, CGI Finland and IS4F (the "<u>Required Order</u>"). BMC agrees there shall be no additional fee applicable to the Required Order, the Fee as described in Section 1.2 includes full consideration for the Required Order.

23. <u>COMMITTED SPEND</u>. Customer (which for purposes of this Section include Orders by its subsidiaries and affiliates) in the aggregate agrees to enter into a minimum of $151,000,000.00 (the "<u>Committed Spend</u>") in Orders with BMC prior to the Expiration Date. The parties agree that the Fee is not included in the Committed Spend. All Orders, regardless of Order expiration date, executed by the parties at any time prior to the Expiration Date will count toward the Committed Spend, subject to Sections 22 and 23.1. Orders made in other than U.S. dollars shall be credited towards achieving the Committed Spend by converting such purchase into U.S. dollars based on the average spot currency conversion rate for the month in which such purchase was made as published by Bloomberg BBG 11 am EST rates). The parties will meet quarterly during the Term to track progress on the Committed Spend. In the event that

PX004.011
22-20463.14891

that the Committed Spend (including any Final Fee) is an integral part of this transaction, and has been agreed to as consideration for the terms and conditions set forth in this. In the event a Final Fee is required by the terms of this Section 23, Customer acknowledges and agrees that its obligation to make such Final Fee is absolute, unconditional, and irrevocable.

The parties agree that any renewal or replacement agreement of this OA shall not include any commitment or obligation of Customer to a minimum quantity of Orders, spend, revenue or other commitment to a specific volume of business, unless otherwise agreed to in writing by the parties.

23.1     ABN Amro. The parties agree that, provided that the Enterprise License Order between Customer and BMC for the Client ABN Amro is fully executed no later than 5:00pm EDT on September 30, 2015, the fee in such Order will count toward the Committed Spend. If such Order is not executed by such time, then such future fee for the renewal of the Enterprise License Order (term), dated 30 September 2010 will not count toward the Committed Spend.

23.2     CenturyLink and Desjardins. In the event that either Client, CenturyLink or Desjardins, terminates its IT Services agreement with Customer in whole or in part prior to the expiration of this OA, then BMC will provide Customer with a credit toward the Committed Spend of the following amounts for each Client: $43,000,000 for CenturyLink and $27,000,000 for Desjardins, or a prorated value based on the change in the scope of the IT Services agreement between Customer and such Client that directly relates to the Products, and subject to Customer providing evidence of such change reasonably satisfactory to BMC.

24.     ENTIRE AGREEMENT AND MODIFICATIONS. The parties acknowledge they have read this OA and agree that it, the Agreement as modified hereby, and any applicable Order are the complete and exclusive statements of the agreement between the parties relating to the subject matter of this OA. There are no representations, promises, warranties, covenants, or undertakings between the parties other than those expressly set forth in this OA, the Agreement or any applicable Order. This OA may not be modified or rescinded except in writing signed by both parties. In the event of any conflicting terms between this OA and the Agreement, or this OA and an applicable Order, this OA shall prevail. Except as provided in this OA, all other terms of the Agreement and any applicable Software Order shall remain in full force and effect.

| EXHIBITS INCORPORATED INTO OA | |
| --- | --- |
| | 'X' |
| Exhibit A:  License Restrictions and Product Units of Measurement as of the Effective Date | X |
| Exhibit B: LPAR Guidelines | X |
| Exhibit C: INTENTIONALLY LEFT BLANK | |
| Exhibit D. Participation Agreement | X |
| Exhibit E: INTENTIONALLY LEFT BLANK | |
| Exhibit F: Outsourcing Attachment – License Suspension Agreement | X |
| Exhibit G: Service Management – Distributed Systems Products | X |
| Exhibit H. Systems Management – Mainframe Products | X |
| Exhibit I: Outsourcing Attachment – New Client Mirroring Order (Term) | X |
| Exhibit J: Enterprise Systems Management/BSM Solution Packs Products | X |
| Exhibit K. List of BMC Customers | X |
| Exhibit L: Required Order | X |

Each party hereto warrants and represents that a duly authorized representative of such party has executed this OA and this OA constitutes the legal, valid and binding obligation of such party.

BMC Software, Inc.

By:
Name:            Manager of Order Services
Title:
Date:            SEP 3 0 2015

[bmc logo stamp]

International Business Machines Corporation

By:
Name:            DREW A. TERRY
Title:            GLOBAL SOURCING MANAGER
Date:            SEPTEMBER 30, 2015

PX004.012
22-20463.14892