# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 30, 2024

Lyle W. Cayce
Clerk

No. 22-20463

BMC Software, Inc.,

*Plaintiff—Appellee,*

*versus*

International Business Machines Corporation,

*Defendant—Appellant.*

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:17-CV-2254

Before Jones, Stewart, and Duncan, *Circuit Judges.*

Edith H. Jones, *Circuit Judge*:

Defendant International Business Machines Corporation ("IBM") appeals from a judgment awarding over $1.6 billion in contract and fraudulent inducement damages to Plaintiff BMC Software, Inc. We conclude that the district court's determination concerning liability was in error. Accordingly, we REVERSE.

## I. Background

BMC is a Houston-based software company that develops and licenses proprietary mainframe software products. BMC's mainframe

No. 22-20463

software products, and the accompanying services that BMC provides, are used by its customers to run, manage, and secure operations on their mainframe computers. IBM is a New York-based information technology company that also manufactures mainframe computers, creates mainframe software, and provides information technology ("IT") outsourcing services.

BMC and IBM directly compete in developing and selling mainframe software. But IBM also provides necessary outsourcing services to BMC and BMC's customers, including AT&T.[1] In 2008, IBM and BMC entered into a Master Licensing Agreement ("MLA") covering a broad range of interactions between the parties and an Outsourcing Attachment. The Outsourcing Attachment authorized IBM to use BMC's software in its IT servicing business for customers to whom BMC licensed BMC software. IBM and BMC amended the Outsourcing Attachments in 2013 and again in 2015 (the "2015 OA").

The parties' dispute over the 2015 OA is the focus of this appeal. Three of its provisions are relevant. First, Section 1.1 provides IBM with five options for using BMC's software. Among those options, the "Access and Use" option authorizes IBM to use BMC software without a license charge under certain circumstances, as provided in Section 5.1:

> BMC will allow [IBM] to use, access, install and have operational responsibility of the BMC Customer Licenses (together, "Access and Use") under the terms of the BMC Customer's license agreement with BMC for no fee, including on Computers owned or leased by BMC Customer and at BMC Customer's facility, provided that the BMC Customer Licenses are used solely for the purposes of supporting the BMC Customer who owns such licenses[.]

---

[1] Although this case concerns an AT&T-initiated project, AT&T is not a party.

No. 22-20463

Finally, Section 5.4 limits IBM's ability to "displace" BMC software in certain BMC customers' mainframes as follows:

> This Non-Displacement provision applies only to [IBM]'s Access and Use of BMC Customer Licenses by [IBM]'s strategic outsourcing division (or its successor) for the BMC Customers listed on Exhibit K . . . . Subject to the foregoing, [IBM] agrees that, while [IBM] cannot displace any BMC Customer Licenses with [IBM] products, [IBM] may discontinue use of BMC Customer Licenses for other valid business reasons. All terms of Sections 5.1, 5.2 and 5.3 apply to [IBM's] use of BMC Customer licenses belonging to any Exhibit K Customers[.]

The two predecessor Outsourcing Attachments contained nearly identically worded "non-displacement" provisions, but the 2015 OA is unique in that it limits the provision's applicability to fifty-four identified BMC customers (Exhibit K), including AT&T. The evidence indicates that both parties were well aware of the competitive implications of IBM's servicing BMC-licensed customers,[2] but during each of these contract negotiations, they were unable to agree to modify the "non-displacement" term's language.

Meanwhile, in April 2013, AT&T and IBM began to explore a project to replace BMC software with software from providers including IBM on the AT&T mainframe, a project codenamed Project Swallowtail. The district court describes the commencement of the project thus: "Though IBM thought that participating in Project Swallowtail could further its long-term growth and expansion goals, there is no indication that it *initiated* the partnership with AT&T" (emphasis in original). In March 2014, however,

---

[2] Indeed, the parties sparred over two previous instances in which IBM had provided outsourcing services pursuant to which BMC customers ended up transitioning to IBM software. One such instance led to a negotiated settlement and release of IBM.

No. 22-20463

AT&T ceased work on Project Swallowtail, opting instead to renew its
agreement with BMC.

The district court then found:

> Around February 2015, AT&T changed its mind and decided
> to restructure its mainframe environment after all, at which
> point it approached IBM about a new initiative codenamed
> Project Cirrus…AT&T's working strategy for Cirrus was to
> transition IBM's mainframe IT services contract to a
> 'consumption model that includes all 3rd party software, new
> labor and hardware options, reaping 'drastic[]' savings on
> 'mainframe total costs' in the process…And it wanted IBM to
> lead the project because 'IBM ha[d] skills and expertise'
> necessary 'to successfully execute the project.'…AT&T
> specifically wanted to replace BMC's products with other
> vendors' products primarily out of cost considerations….

After learning of IBM's involvement in Project Swallowtail, BMC
filed suit against IBM. In its Second Amended Complaint, BMC asserted
twelve causes of action, including claims that IBM's work in migrating
BMC software, *inter alia*, to IBM software in AT&T's mainframe
environment violated certain provisions of the 2015 OA. BMC also alleged
that IBM fraudulently induced BMC to enter the 2015 OA.

Eventually, both parties sought summary judgment on various claims
and counterclaims. The district court awarded summary judgment to IBM
on the claim for breach of Section 1.1, explaining that the section "merely
puts IBM to an election regarding how it would use BMC products in
relation to its provision of IT Services at AT&T," and "IBM elected to
proceed pursuant to § 1.1(a): 'Access and Use— (Sections 5.1, 5.2, 5.3 and
5.4).'"

But the district court denied IBM's motion for summary judgment
on BMC's Section 5.1 breach-of-contract claim. In so doing, the district

court concluded that "§ 5.1 is unambiguous and must be interpreted to preclude access and use of [IBM] licenses to displace BMC products." This conclusion reinforced the court's principal conclusion that the Section 5.4 non-displacement provision unambiguously prevented IBM from "displacing" BMC products with IBM software. The court granted partial summary judgment to BMC because IBM "displaced BMC Customer Licenses with IBM products when it implemented Project Swallowtail at AT&T."

A bench trial was held to resolve the remaining issues. Having found that IBM breached the 2015 OA, the district court addressed the damages IBM would owe BMC. The district court concluded that "BMC established that its license fees represent[ed] the direct damages expressly contemplated under the contract" and, therefore, ordered IBM to pay BMC "$717,739,615.00 in unpaid license fees." The district court then doubled the damages with a punitive damage assessment on the ground that IBM fraudulently induced BMC into signing the 2015 OA.[3] Summing up the actual and punitive damages with other incidental damages, the judgment awarded BMC approximately $1.6 billion.[4]

## II. Standard of Review

This court reviews the district court's order granting partial summary judgment "de novo, applying the same legal standards as the district court."

---

[3] To reach this surprising outcome as a matter of Texas law, the court had to find that the damage disclaimers and limitations in provisions of the MLA were unenforceable under New York law.

[4] The district court also awarded BMC $168,226,367.29 in prejudgment interest, $16,287,868.40 in attorneys' fees, $4,094,718.13 in litigation costs, $1,232,558.00 in "post-judgment and conditional appellate expenses, and "post-judgment interest from the date of the entry of judgment at the federally mandated rate."

*Ryder v. Union Pac. R.R. Co.*, 945 F.3d 194, 199 (5th Cir. 2019).  Entering summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). And "[f]ollowing a bench trial, findings of fact are reviewed for clear error and legal issues are reviewed de novo." *Tex. Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 504 (5th Cir. 2021) (quoting *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 262 (5th Cir. 2011)).

## III. Discussion

IBM challenges the district court's conclusion that it breached the 2015 OA by replacing BMC's software partially with IBM software at AT&T's instigation on the AT&T mainframe.  Because the interpretation of the 2015 OA is dispositive, we do not reach other issues raised by IBM concerning liability for fraudulent inducement and damages.

The district court determined that IBM breached Section 5.4 of the 2015 OA as a matter of law by executing AT&T's request to replace BMC's software with IBM software in AT&T's mainframe.  According to the court, this "non-displacement provision" unambiguously barred IBM from replacing BMC's software with IBM software in AT&T's mainframe *even if* AT&T requested IBM to complete this task.  Though we, too, find the language of Section 5.4 unambiguous, we hold that "other valid business reasons" under Section 5.4 supported IBM's service in effecting AT&T's switchover, which partially included IBM software.

New York law governs our interpretation of the 2015 OA.  "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *See W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990) (citation omitted).  The terms of a contract are clear and unambiguous if, after applying these rules of construction, "the agreement on its face is

No. 22-20463

reasonably susceptible of only one meaning." *Greenfield v. Philles Recs., Inc.*, 780 N.E.2d 166, 171 (N.Y. 2002). "Under longstanding rules of contract interpretation, '[w]here the terms of a contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and reading the contract as a whole.'" *Tomhannock, LLC v. Roustabout Res., LLC*, 128 N.E.3d 674, 675 (N.Y. 2019) (quoting *Ellington v. EMI Music, Inc.*, 21 N.E.3d 1000, 1003 (N.Y. 2014)). "Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties manifested thereby." *Donohue v. Cuomo*, 184 N.E.3d 860, 870–71 (N.Y. 2022) (quoting *Kolbe v. Tibbetts*, 3 N.E.3d 115, 11561 (N.Y. 2013)). Furthermore, "a contract must be construed in a manner which gives effect to each and every part, so as not to render any provision 'meaningless or without force or effect.'" *Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Cap., Inc.*, 92 N.E.3d 743, 748 (N.Y. 2017) (quoting *Ronnen v. Ajax Elec. Motor Corp.*, 671 N.E.2d 534, 536 (N.Y. 1996)).

Among the options contained in the 2015 OA for using BMC's software, IBM selected the "Access and Use" option, which allowed IBM to:

> use, access, install and have operational responsibility of the BMC Customer Licenses (together, 'Access and Use') under the terms of the BMC Customer's license agreement with BMC for no fee, including on Computers owned or leased by BMC Customer and at BMC Customer's facility, provided that the BMC Customer Licenses are used *solely for the purposes of supporting the BMC Customer who owns such licenses* . . . .

(Emphasis added). In other words, IBM could access and use BMC's software without itself paying a license fee but only to support BMC

No. 22-20463

customers who owned BMC software licenses.  Critically here, in Section 5.4 of the 2015 OA, IBM agreed to "non-displacement," that is, for certain listed customers (including AT&T), "while [IBM] cannot *displace* any BMC Customer Licenses *with [IBM] products*, [IBM] may *discontinue* use of BMC Customer Licenses *for other valid business reasons*."  (Emphasis added).

IBM contends that under the "other valid business reasons" language in Section 5.4, it had the right to execute AT&T's request, for AT&T's own reasons, to swap out BMC's software for IBM software in AT&T's mainframe.  BMC defends the district court's interpretation, which depends on differentiating between the terms "displace" and "discontinue," while narrowing the ambit of "other valid business reasons" to conclude that Section 5.4 categorically bars IBM from replacing BMC software with IBM software in a mainframe at a customer's request.

We disagree with BMC's and the district court's interpretation of Section 5.4 for several reasons.  First, reliance on dictionary definitions of "displace" and "discontinue" does not fully explain the section's meaning.  A holistic reading of the provision better harmonizes the entirety of the provision and accords with other parts of the parties' contract.  Second and third, BMC's interpretation either renders the descriptor "other valid business reasons" superfluous or arbitrarily and unreasonably cabins it.  Fourth, as construed by BMC, Section 5.4 runs a serious risk of being an unenforceable restrictive covenant.

First, BMC contends, the verbs "displace" and "discontinue" bear distinct meanings in Section 5.4.  Thus, "displace" is "to remove from the usual or proper place" or, in a secondary definition, to "supplant."  *Displace*, WEBSTER'S THIRD NEW INT'L DICTIONARY (1981).  "Discontinue" means to "break the continuity of: cease to use ...."  *Discontinue*, WEBSTER'S

No. 22-20463

THIRD NEW INT'L DICTIONARY (1981). BMC urges that the "non-displacement" clause absolutely bars IBM from replacing BMC software with its own software in a customer's mainframe, but the "discontinue" clause allows IBM to "discontinue" BMC software in a customer's mainframe, so long as IBM is not replacing BMC's software with IBM software.

New York law does not countenance BMC's stark dichotomy between "displace" and "discontinue." If these terms bore wholly distinct meanings, there would be no need for Section 5.4 to say that IBM may not "displace" under some circumstances but may "discontinue" for other reasons. Read that way, the provision would simply state: while IBM "cannot displace any BMC Customer Licenses *with* [*IBM*] *products*, [IBM] may discontinue use of BMC Customer Licenses." This revision of the section, however, renders "for other valid business reasons" superfluous, contrary to New York law. *Nomura Home Equity Loan, Inc.,* 92 N.E.3d at 748 ("[A] contract must be construed in a manner which gives effect to each and every part, so as not to render any provision meaningless or without force or effect.").

A holistic reading of Section 5.4 must make sense of the entire sentence. Such a reading acknowledges that the "cannot displace" clause prohibits IBM from competing unfairly with BMC by using its outsourcing services to (a) gain inside knowledge as to how BMC's customers use BMC software and (b) sell IBM software to the same customers with this special knowledge. The second clause, however, accepts the reality that IBM, in performing outsourcing services for BMC customers, may be tasked by them to "discontinue" BMC software for "other valid business reasons." This reading harmonizes all of the provision's language in accord with state law. Under Section 5.4, in other words, IBM could not displace or discontinue

No. 22-20463

BMC software in a customer's mainframe in favor of IBM software *absent* a "valid (not unfairly competitive) business reason."

Advocating the holistic reading of Section 5.4, IBM argues that "other valid business reasons" encompasses discontinuance of BMC's software in favor of its own software in AT&T's mainframes at AT&T's request. Here, it is undisputed, as found by the district court, that AT&T initiated this switchover independently and without any lobbying or influence of IBM. Consequently, IBM contends it did not violate the provision's non-displacement proviso because it did not compete for or solicit AT&T's decision.

In fact, the holistic interpretation of Section 5.4 is also supported by other provisions in the parties' agreements. Paragraph 3 of the 2008 MLA, for instance, outlines five restrictions on IBM's use of BMC's software, but not one of those bars IBM from substituting BMC's software for IBM software in a customer's mainframe at the customer's request. This court may not rewrite the parties' agreements to enforce a restriction that is not there. *See Salvano v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 647 N.E.2d 1298, 1302 (N.Y. 1995) ("The court's role is limited to interpretation and enforcement of the terms agreed to by the parties; it does not include the rewriting of their contract and the imposition of additional terms.").

Another provision of the 2015 OA further supports the conclusion that "other valid business reasons" permitted IBM to execute the software changeover instigated by AT&T. The 2015 OA delegates to IBM the authority to "use, access, install and have operational responsibility" for the BMC licenses owned by licensees like AT&T, so long as IBM used those licenses "solely for the purposes of supporting the BMC Customer who owns such licenses." In other words, IBM could access BMC's software to

No. 22-20463

assist BMC's customers with their broad range of needs and requests.[5]  That is exactly what IBM did when it executed AT&T's policy to partially replace BMC software with IBM software in the AT&T mainframes.  In following the customer's request, IBM was solely "supporting the BMC Customer" that owned the licenses.  That the district court found no violation of Section 5.1 is compatible with finding no violation of Section 5.4.

BMC's cramped reading of Section 5.4 to categorically bar IBM from replacing BMC software with IBM software, even if AT&T requested IBM to perform that task also leads to one of two absurd results.  On one hand, it would allow IBM to replace BMC's software with *any other* competing software at AT&T's request, so long as the competing software is not that of IBM.  Alternatively, Section 5.4 would require AT&T to discharge IBM as its IT-outsourcer if it decided to replace BMC's software with software of the customer's choice, but only if it elects IBM replacement software.  Either way, once AT&T decided to switch from BMC software to a competing software, whether that of IBM or any other seller, the damage to BMC would be done—the customer would be lost to BMC.  BMC's interpretation of Section 5.4 enables it to micromanage AT&T's decision to use IBM as an outsourcer for replacement software even after AT&T has chosen no longer to be a BMC customer.  In addition to producing absurd results, BMC's interpretation is commercially unreasonable and  therefore unsustainable under New York law.  *See, e.g., Macy's Inc. v. Martha Stewart Living Omnimedia, Inc.*, 6 N.Y.S.3d 7, 11 (App. Div. 2015) ("It is well settled 'that a contract should not be interpreted to produce an absurd result, one

---

[5] Notably, the district court concluded in its post-trial opinion that IBM did not breach Section 5.1 because Section 5.1 purely required IBM to act "for the sole purpose of supporting AT&T" when accessing and using AT&T's BMC licenses, and "IBM used the licenses to achieve what AT&T wanted done—and nothing more."

that is commercially unreasonable, or one that is contrary to the intent of the parties.'" (quoting *Cole v. Macklowe*, 953 N.Y.S.2d 21, 23 (App. Div. 2012))).

BMC's reading of Section 5.4 is also untenable because it risks making Section 5.4 an unenforceable illegal restriction on competition under New York law. Courts applying New York law use a "standard akin to a 'simple rule of reason, balanc[ing] the competing public policies in favor of robust competition and freedom of contract,'" in determining whether to enforce a restrictive covenant like Section 5.4. *Crye Precision LLC v. Bennettsville Printing*, 755 F. App'x. 34, 36–37 (2d Cir. 2018) (quoting *Baker's Aid, a Div. of M. Raubvogel Co. v. Hussmann Foodservice Co.*, 730 F. Supp. 1209, 1214 (E.D.N.Y. 1990)). Applying that standard to this case, this court must determine (1) "whether [BMC] has demonstrated a legitimate business interest that warrants the enforcement of" the restriction, "(2) "the reasonableness of the covenant[] with respect to geographic scope and temporal duration," and (3) "the degree of hardship that enforce[ment]" "would inflict" on IBM. *DAR & Assocs., Inc. v. Uniforce Servs., Inc.*, 37 F. Supp. 2d 192, 197, 200 (E.D.N.Y. 1999).

As applied here, we need not advance past the first criterion above. Read as BMC advocates, Section 5.4 imposes a restriction on IBM's servicing of its outsourcing customers with no legitimate purposes. We start with the proposition that IBM and BMC compete *only* in developing and selling software. Thus, Section 5.4 reasonably exists to "prevent[] IBM from leveraging its special position as an IT-outsourcer, its access to BMC products in client environments, and the unique knowledge it thereby gains to unfairly compete for BMC's software clients." But in the case of AT&T's decision to switch to IBM software, Section 5.4 had nothing to do with this sort of gamesmanship by IBM. After all, as the district court found, "AT&T *independently* decided to displace BMC software," and therefore,

No. 22-20463

"AT&T's decisions and conduct—not IBM's—are most consequentially tied to BMC's lost profits from AT&T." (Emphasis added).

Once AT&T independently decided to switch from BMC software to IBM software, BMC had already "lost" the only competition it had with IBM. Because the client made that decision without unfair influence from IBM, BMC lost out to IBM fair and square. Under these circumstances, there is no legitimate reason to enforce Section 5.4 against IBM. Consequently, BMC's interpretation of Section 5.4, which would bar IBM from completing a software switchover a customer independently requests, likely converts this provision into an illegal, and therefore unenforceable, restraint on competition pursuant to state law. *See McConnell v. Commonwealth Pictures Corp.*, 166 N.E.2d 494, 496 (N.Y. 1960).[6]

The only reasonable reading of Section 5.4 that comports with New York law is the holistic reading that takes account of all the language of the provision at issue. Under that reading, IBM could not, on its own accord, supplant BMC's software in AT&T's mainframe with IBM software. But IBM could replace BMC software with IBM software in AT&T's mainframe at AT&T's request. The phrase "other valid business reasons" unambiguously requires this result. *See Greenfield*, 780 N.E.2d at 171. IBM did not breach Section 5.4 by agreeing to provide IT services to perform this task. In concluding otherwise, the district court erred.

## Conclusion

For the foregoing reasons, the judgment of the district court is REVERSED and RENDERED.

---

[6] The district court reached the opposite conclusion in holding that the non-displacement provision served BMC's "legitimate business interest" in precluding IBM from receiving an "unfair advantage when competing with BMC in the software business."